**\*\*\*CAPITAL CASE\*\*\***

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

No. _____

JORGE GALINDO,                                           Petitioner

v.

ROB JEFFREYS, Director,

   Nebraska Department of Correctional Services            Respondent

---

### PETITION FOR A WRIT OF HABEAS CORPUS
### UNDER 28 U.S.C. § 2254

---

LAURENCE E. KOMP
Capital Habeas Unit, Chief
MEREDITH SCHLACTER
Assistant Federal Public Defender
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-675-0923
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org

TIM BURDICK
Assistant Federal Public Defender
Federal Public Defender,
District of Kansas
201 US Courthouse
500 State Ave
Kansas City, KS 66101
913-551-6712
tim_burdick@gd.org

*Counsel for Jorge Galindo*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................. i

Petition for a Writ of Habeas Corpus ............................................... 1

Jurisdiction ........................................................................................ 1

Introductory Statement .................................................................... 2

Procedural History ........................................................................... 3

Statement on Exhaustion ............................................................... 22

Claims for Relief ............................................................................. 23

    Claim 1:   Mr. Galindo was deprived of his Sixth and Fourteenth
        Amendment rights when the State of Nebraska failed to grant
        change in venue. ...................................................................... 23

    Claim 2: Mr. Galindo was deprived of his Sixth and Fourteenth
        Amendment rights when the trial court made improper statements
        regarding the voir dire process. ............................................... 36

    Claim 3: The consideration of race has no place in a capital trial and its
        presence here violated Mr. Galindo's rights as guaranteed by the
        Sixth, Eighth and Fourteenth Amendments of the United State
        Constitution. ............................................................................ 39

    Claim 4: Mr. Galindo's rights, as guaranteed by the Sixth and Fourteenth
        Amendments of the United States Constitution were violated by a
        conflict possessed by the county attorney ............................... 46

    Claim 5:   Jorge Galindo is ineligible for the death penalty because he is
        intellectually disabled as defined by clinical standards relied on by
        the Supreme Court in *Atkins v. Virginia*, anc its progeny. .............. 55

        A. The execution of the intellectually disabled is Cruel and
            unusual punishment. ......................................................... 55

        B. The Supreme Court recognizes the critical role clinical
            standards play in properly defining intellectual disability. ... 56

        C. The State of Nebraska ..................................................... 60

        D. Current clinical standards ................................................ 61

        E. Jorge Galindo is intellectually disabled ...................... 62

        F. Previous evaluation ........................................................ 92

        G. Conclusion ..................................................................... 93

    Claim 6: The State suppressed material and exculpatory evidence. ........ 94

**Claim 7: The State manipulated jail assignments to collect evidence in violation of *Massiah v. United States*.** .................................................. 109

**Claim 8: Mr. Galindo's rights to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence.** .................................................................................................... 112

**Claim 8.1: Mr. Galindo's rights to the effective assistance of counsel were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence through lay witness testimony** ............................................................................................ 114

**Claim 8.2: Mr. Galindo was deprived of his right to the effective assistance of counsel when counsel failed to adequately and properly investigate, develop, and present significant expert mitigating evidence.** .................................................................................................. 171

**Claim 8.3: Mr. Galindo was deprived of his right to the effective assistance of counsel when counsel failed to adequately prepare their witnesses to testify at the mitigation proceeding due to their failure to meaningfully investigate** .................................................................... 189

**Claim 8.4: Counsel was ineffective for failing to work with the mitigation specialist hired to investigate Mr. Galindo's life history, depriving him of the effective assistance of counsel.** ......................................... 201

**Claim 9: Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously failed to strike certain members of the jury during jury selection.** ................................................................................................... 206

**Claim 10: The categorical exclusion of mitigation and the sentencing panel's failure to give effect to mitigation violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.** ............................... 212

**Claim 11: Mr. Galindo's Due Process, Confrontation and Jury Trial rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when the sentencing judges considered a Pre-Sentencing Investigation Report.** ................................................................................................... 215

**Claim 12: Mr. Galindo's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when victim impact statements were read during sentencing.** ................................................................. 219

**Claim 13: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure**

to pursue a guilty plea which would have avoided the death penalty. ............................................................................................ 225

**Claim 14:** Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were adversely affected by a conflict of interest. .................................................................................... 228

**Claim 15:** Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to obtain consideration prior to offering assistance that incriminated Mr. Galindo and was utilized to obtain multiple death sentences. .................................................................................... 231

**Claim 16:** Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's failure to investigate, develop a defense theory, and subject the State's aggravation case as to the death of Travis Lundell to meaningful adversarial testing.......................................... 234

    A. Daniel Animas ................................................................ 236

    B. Hector Abendano a.k.a. Victor Valenzuela ...................... 239

    C. Miguel Lopez ................................................................ 240

    D. Cortney Barritt ............................................................ 241

    E. Kristie Petzold............................................................... 242

    F. Trista Wiest .................................................................. 242

    G. Guilt-by-association testimony....................................... 243

**Claim 17:** Defense counsel was ineffective for failing to investigate and raise the issues of Mr. Galindo's youth and remorse at sentencing and on direct appeal, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments................................................ 244

**Claim 18:** Defense counsel's arguments effectively conceding Mr. Galindo's guilt as to felony murder and as to two aggravators violated Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments ........................................................ 251

**Claim 19:** Counsel failed to effectively investigate and present Mr. Galindo's substance use and addiction as a mitigating factor at sentencing, depriving Mr. Galindo of the right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments ......................................................................... 253

**Claim 20:** The prosecutor knowingly presented the false testimony of Donnie Thorson, Norfolk Police Division Investigator, as rebuttal in

**Mr. Galindo's sentencing hearing, in violation of his constitutional rights to due process and to a reliable sentencing determination guaranteed by the Eighth and Fourteenth Amendments.** ............. 257

**Claim 21: Counsel was ineffective for introducing inaccurate and damaging evidence about Mr. Galindo's alleged gang membership and for failing to object to the State's introduction of such evidence, in violation of Mr. Galindo's rights to the effective assistance of counsel and a fair trial and sentencing under the Sixth, Eighth, and Fourteenth Amendments** ................................................................. 264

**Claim 22: The State's false accusation that Mr. Galindo smuggled a weapon into the courtroom, and counsel's failure to move for a mistrial, deprived Mr. Galindo of his rights to a fair sentencing proceeding and the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments** ................................................. 268

**Claim 23: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by counsel's failure to investigate jail assignments and the manipulation of snitches by the State.** ................................................................................................ 270

**Claim 24: The county attorney's involvement in defense funding decisions violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution; and it represented a conflict for trial counsel.** ............................................. 272

**Claim 25: Mr. Galindo's rights to the effective assistance of counsel at trial and on appeal, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by the failure of trial and appellate counsel to preserve and present meritorious constitutional errors.** ........................................................ 277

**Claim 26: Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial.** ...................... 285

    **A. Counsel was ineffective for making a prejudicial opening and closing arguments at each stage of Mr. Galindo's Trial** ......... 286

    **B. Counsel was ineffective for failing to cross-examine and impeach the State's witnesses** ....................................................... 288

    **C. Counsel was ineffective for failing to cross-examine and object to exaggerated and improper aggravation testimony by Dr. Jones, the State's forensic pathologist, and for failing to move for a mistrial** ....................................................................................... 292

D. Counsel was ineffective for failing to object to the prosecutor's inflammatory and improper opening and closing statements, pervasive presentation of hearsay evidence, and numerous instances of prosecutorial misconduct throughout all stages of trial and entencing, and for failing to move for a mistrial .... 294

E. Counsel was ineffective for incorrectly informing the jury that it was counsel's choice, not Mr. Galindo's, that Mr. Galindo did not testify, implying that counsel believed Mr. Galindo was guilty ................................................ 296

F. Counsel was ineffective for failing to move for a mistrial at numerous instances where a mistrial was warranted and should have been granted ............................................ 297

Claim 27: The state committed numerous instances of prosecutorial misconduct throughout Mr. Galindo's trial, depriving him of the rights to due process and a fair trial and to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. ........................................................ 299

Claim 28: Mr. Galindo's Due Process rights were violated when the State of Nebraska failed to comply with the Nebraska Death Penalty Statute and provide notice of aggravators. ......................................... 306

Claim 29: Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendment were violated when the State of Nebraska weighed non-statutory aggravators against mitigators. ........................................... 308

Claim 30: Mr. Galindo was penalized for exercising his right to a jury trial in violation of *United States v. Jackson* and *Ring*. ........................... 310

Claim 31: Mr. Galindo's was deprived of his rights under *Caldwell v. Mississippi* when the State of Nebraska minimized the jury's role. .................................................................................................................. 313

Claim 32: Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously prohibited life qualification of the jury in violation of *Morgan v. Illinois*. .................................................................................... 317

Claim 33:Mr. Galindo's death sentence violated the Eighth Amendment's prohibition on cruel and unusual punishment because he was 21 years old at the time of the offense, and defense counsel was ineffective for failing to raise this issue at sentencing or on direct appeal. ........................................................................................................ 320

Claim 34: Mr. Galindo was deprived of his rights under Article 1, Section 10, of the United States Constitution because L.B. 1 and the Repeal by Referendum of L.B. 268 are Bills of Attainder. ............................. 327

**Claim 35: Mr. Galindo's Ex Post Facto and Due Process rights were violated when the State of Nebraska sentenced him to death even though the death penalty statute was declared unconstitutional at the time of the offense.** ............................................................. 336

**Claim 36: Mr. Galindo's Sixth, Eighth, and Fourteenth Amendment rights were violated by the State of Nebraska when the district court did not receive and review sentencing orders from all Nebraska first degree murder cases for purposes of proportionality review.** ....... 342

**Claim 37: The Nebraska Death Penalty Statute is unconstitutional on its face and as applied in Mr. Galindo's case in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.** ............................................................. 345

**Prayer for Relief** ...................................................................................... 363

**CERTIFICATE OF SERVICE** .................................................................. 364

## Petition for a Writ of Habeas Corpus

Mr. Jorge Galindo petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. He asks the Court to vacate the judgment of the Madison County Circuit Court, under which he was (1) convicted of first-degree murder counts; and (2) sentenced to multiple death sentences.

This petition is filed within the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Additional claims and additional facts in support of the claims stated herein may emerge as investigation of this case continues. Mr. Galindo anticipates he will move to amend this habeas petition.

## Jurisdiction

Under 28 U.S.C. § 2254, a district court has jurisdiction to entertain an application for a writ of habeas corpus on behalf of a person in custody under the judgment of a state court. Mr. Galindo petitions for a writ of habeas corpus to vacate his convictions and sentences because they were obtained in violation of the United States Constitution. The Court thus has subject-matter jurisdiction under § 2254.

The proper respondent to a habeas-corpus petition is a person who has custody of the petitioner. *See* 28 U.S.C. § 2243; Section 2254 R. 2(a). Mr. Rob Jeffreys, Director, Nebraska Department of Correctional Services and Mr. Craig Gable, Warden, Tecumseh State Correctional Institution, have actual custody of Mr. Galindo (and is the proper respondent in this case.)

Under 28 U.S.C. § 2241(d), a state prisoner in custody under the judgment of a state court may bring a habeas-corpus petition in "the district court for the district

1

within which the State court was held which convicted and sentenced him." Because Mr. Galindo was convicted and sentenced within the State of Nebraska, venue is proper here.

### Introductory Statement

**"It would be a great understatement to say that the county attorney would be deserving of serious condemnation"**

> Nebraska Supreme Court *State v. Galindo*, 994 N.W.3d 562, 604 (Neb. 2023)

Mr. Galindo's case is representative of just how arbitrary the death penalty can be. He remains on death row having been prosecuted in state court – not federal court – for a bank robbery by a conflicted county attorney who was investigated for being involved in a drug conspiracy with testifying State's witnesses. A county attorney who seized control of an obvious federal case to maintain the lid on the federal investigation targeting him. And even more nefarious for Mr. Galindo, a county attorney who seemed to use his position to manipulate the collection of evidence in pursuit of Mr. Galindo – for the county attorney's own protection from investigation. "Serious condemnation" is well-deserved.

Even though Mr. Galindo was the third co-defendant to be tried – and came on the heels of a conviction where venue had been changed – it remained in a community riven with grief and anger from this tragedy. The trial never should have occurred there and a county attorney who agreed to a change of venue for a co-defendant refused to do so here. The resulting proceeding was rife with expressions of bias directed at Mr. Galindo. A proceeding where the county attorney successfully passed for cause a juror that expressed improper racial sentiments:

2

> The thing that bothers me the most is that we've probably had nine, ten, eleven murders in Norfolk, all of which may have been done by Hispanics. Some have already been proven guilty, and that bothers me somewhat.

Tr. 1641. "Serious condemnation" is well-deserved.

Race and ethnicity matter, and they mattered here. Any reasonable trial counsel would have been working well before this ignorant expression in jury selection to contextualize Mr. Galindo's life experiences and present him as a human being beyond his race and ethnicity. Trial counsel did not. "Serious condemnation" is well-deserved.

The county attorney participated in the funding decisions of Mr. Galindo's case – gaining insight to their theories and what they were working on. What he saw probably made him smile. According to the retained mitigation specialist, a combination of capitally inexperienced trial counsel and her weakness in trial work, resulted in a mitigation investigation best characterized as "the blind leading the blind." Habeas Exhibit Q (Ms. Fernandez Dec.) p. 4. "Serious condemnation" is well-deserved.

Because the blind was leading the blind, trial counsel failed to conduct an investigation which would have yielded a wealth of available mitigation. In addition to being a person with intellectual disability, Mr. Galindo was literally and figurately poisoned by his natural and home environment. What little the "blind" trial counsel presented was hampered by the utter failure to prepare the witnesses they intended to call – leading to a fumbling and harmful presentation. "Serious condemnation" is well-deserved.

## Procedural History

This case arises from the frantic, botched bank robbery tragically leaving five people dead, Ms. Lisa Bryant, Ms. Lola Elwood, Ms. Jo Mausbach, Mr. Samuel Sun and Ms. Evonne Tuttle, on September 26, 2002, in Norfolk, NE.  It is undisputed that Mr. Galindo fired the weapon causing the death of one bank employee, Ms. Elwood, and fired in the direction of a costumer fleeing the bank, Ms. Micki Koepke.

In a panicky flight after the botched bank robbery, Mr. Galindo and his co-defendants broke into an occupied residence, stealing a car, and then another unoccupied residence, stealing another car.  Mr. Galindo was apprehended that day in O'Neill, NE.

Along with his co-defendant's, Erick Vela and Jose Sandoval, Mr. Galindo was convicted of five counts of first-degree murder, six counts of use of a deadly weapon, one court of robbery and one count of burglary.  Mr. Galindo was sentenced to death. This petition concerns only the conviction and sentence arising from the Franklin murder.

On October 22, 2002, the State charged Mr. Galindo with first-degree murder.  On November 22, 2016, the State filed a notice of aggravators related to a newly enacted Nebraska statute.[1]  Mr. Galindo pleaded not guilty. Mr. Galindo's

---

[1] The notice relied upon: (1) Mr. Galindo had a substantial prior history of serious assaultive or terrorizing criminal activity; (2) the murder was committed in an effort to conceal the identity of the perpetrator; (3) the murder was especially heinous, atrocious, cruel, or manifested exceptional depravity; (4) at the time of the murder, another murder had been committed; and (5) at the time of the murder, Mr. Galindo knowingly created a great risk of death to at least several persons.

change of venue, unlike those of a co-defendant were denied.  The trial was to proceed in Madison County, Nebraska, under case number 02-235.

Trial counsel were Mr. Douglas J. Stratton, Mr. James Kube and Mr. Andrew D. Weeks. Jury selection commenced in the two-weeks prior to Christmas in 2003, the trial (guilt and aggravation hearing) occurred the week before Christmas. Mr. Galindo did not testify at either. The jury found Mr. Galindo guilty on all counts. As to the aggravation hearing, the jury found the existence of all five of the charged aggravators.

No jury opined on the proper penalty to impose.

The three-judge sentencing hearing, Hon. Robert B. Ebsz, Hon. Jeffre Cheuvront and Hon. Kristine R. Cecava, occurred in October of 2004.  Mr. Galindo's disjointed mitigation presentation led to a finding that no statutory mitigators had been presented, and what little non-statutory mitigation that had been presented was outweighed by the aggravation.  The trial court's judgment imposing death was entered on November 10, 2004.

Mr. Galindo timely pursued a direct appeal.  The appeal of his convictions and sentences to the Nebraska Supreme Court proceeded under Case Nos. S-04-443, S-04-1326. He was represented by Mr. Douglas J. Stratton, Mr. James Kube and Mr. Andrew D. Weeks in that appeal. He raised 20 Assignments of Error  which encompassed 25 Propositions of Law in the appeal (which are paraphrased here by topic):

4

- The trial court erred in retroactively applying a statute which increased punishment to include death in violation of ex post facto principles, improperly created a substantive change in the law, in violation of due process, and in violation of the prohibition against bills of attainder (AoE I-IV);

- The trial court erred in failing to find that the absence of notice of aggravation in the original information violated due process (AoE V);

- The trial court erred in not finding a due process and confrontation violation when the three-judge panel received the transcript from the aggravation phase (AoE VI);

- The trial court erred in not finding a due process and confrontation violation when the three-judge panel considered the presentence investigation as part of weighing the aggravating and mitigating circumstances (AoE VII);

- The trial court erred in failing to find that the new Nebraska statute was an unconstitutional inducement to waive a jury finding of aggravating circumstances (AoE VIII);

- The trial court erred in failing to grant a motion to quash the information that alleged alternative theories of first-degree murder (AoE IX);

- The trial court erred in overruling Mr. Galindo's instructions related to felony murder requirements (AoE X);

5

- The trial court erred in overruling Mr. Galindo's motions for change of venue (AoE XI);

- The trial court erred in making inappropriate comments to the venire prior to jury selection that emphasized their duty to serve as jurors (AoE XII);

- The trial court erred in failing to strike numerous jurors for cause (AoE XIII);

- The trial court erred in failing to failing to receive as evidence, for purposes of the panel's proportionality review, sentencing orders from first degree murder cases where the death penalty was not imposed (AoE XIV);

- The trial court erred in allowing consideration of the victim impact statements (AoE XV);

- The trial court erred in finding the electric chair constitutional (AoE XVI);

- The trial court erred in allowing consideration of non-statutory aggravation (AoE XVII);

- The trial court erred in receiving into evidence a photograph of Mr. Lundell's body (AoE XVIII);

- The trial court erred in failing to allow Mr. Galindo to "life qualify'" the venire (AoE XIX); and,

- The trial court erred in informing the jury during voir dire that it would have no role in sentencing (AoE XX);

On October 9, 2009, the Nebraska Supreme Court affirmed the convictions and sentence. *State v. Galindo*, 774 N.W.2d 190 (2009) (*Galindo I*).

On December 31, 2009, Mr. Galindo filed a petition for writ of certiorari in the United States Supreme Court. He was represented by Mr. Douglas J. Stratton in this proceeding. The Supreme Court denied the petition for a writ of certiorari on March 22, 2010. *Galindo v. Nebraska*, 559 U.S. 1010 (2010).

On March 9, 2011, Mr. Galindo filed a *pro se* motion for state post-conviction relief with the Madison County District Court under case number CR-02-235. In addition to requesting access to and appointment of counsel, the *pro se* petition raised the following twenty-four allegations:

1. Violation of Due Process and Ex Post Facto when L.B. 1 was applied to Mr. Galindo;

2. Violation of Due Process and right to not be subjected to cruel and unusual punishment because Mr. Galindo tried and sentenced under law that did not exist at the time of the offense;

3. L.B. 1 is Bill of Attainder;

4. Convictions and sentence violated 4th, 5th, 6th, 8th, and 14th Amendment rights because original information did not contain notice of aggravators;

5. Violation of rights to due process, confrontation, and jury trial because three-judge sentencing panel was improperly allowed to receive and consider the transcript from the aggravation phase as evidence in its sentencing determination;

7

6. Violation of rights to due process, confrontation and jury trial because three-judge sentencing panel was improperly allowed to receive and consider the pre-sentence investigation report;

7. Violation of 4th, 5th, 6th, 8th, and 14th because L.B. 1 creates an unconstitutional inducement for defendant to waive his right to a jury finding of aggravators and violates *Ring*;

8. Violation of 4th, 5th, 6th, 8th, and 14th because the court impermissibly denied Mr. Galindo's Motion for Bill of Particulars and Proffered Step Instructions;

9. Violation of rights to due process and fair trial for overruling motions for change of venue;

10. Violation of rights to due process and fair trial because the court made improper statements to the jury panel prior to voir dire;

11. Violation of rights to due process and fair trial because court erred in failing to strike jurors for cause;

12. Violation of 4th, 5th, 6th, 8th, and 14th because the district court erred in not receiving and considering evidence of sentencing orders from all Nebraska First-Degree murder cases, and a study regarding such, for purposes of sentence excessiveness and proportionality review;

13. Violation of 4th, 5th, 6th, 8th, and 14th because the court erred in allowing improper and over-broad victim impact statements by persons not considered victims under law;

14. Violation of 4th, 5th, 6th, 8th, and 14th because sentencing panel weighed the mitigating circumstance of cooperation against the non-statutory aggravating circumstance of lack of remorse;

15. Violation of 4th, 5th, 6th, 8th, and 14th because the district court abused its discretion in allowing the jury to view the photograph of Travis Lundell's body;

16. Violation of 4th, 5th, 6th, 8th, and 14th because trial court failed to "life qualify" the jury;

17. Violation of 4th, 5th, 6th, 8th, and 14th because trial court minimized jury's role in sentencing during voir dire;

18. Ineffective assistance of counsel at all stages of pre-trial, trial, motion for new trial, post-trial, and appellate;

19. State misconduct throughout all phases of pre-trial, trial, and post-trial;

20. Convictions and sentences violations of 4th, 5th, 6th, 8th, and 14th because Joe Smith was improperly allowed to observe, participate in, and decide proceedings on applications for defense fees and expenses by Mr. Galindo's attorneys;

21. Improper rulings and other errors, deprived of fair trial and reliable sentencing;

22. Violation of due process, confrontation and individualized sentencing because court impermissibly placed burden at sentencing on the defendant without allowing Mr. Galindo to make full presentation of the evidence;

9

23. Violation of rights to fair trial, due process, and right to counsel because state impermissibly secured incriminating statements from Mr. Galindo outside the presence of counsel, failed to reveal its improper agency role in securing such testimony, and the court admitted such testimony at trial; and.

24. Cumulative error.

In an order dated January 13, 2012, the trial court denied both the appointment of counsel and the petition without an evidentiary hearing.

Mr. Galindo appealed denial of his *pro se* motion under Nebraska Supreme Court case number S-12-103. Mr. Galindo was originally represented by Mr. Mark A. Keenan in that appeal. Due to a conflict, Mr. Keenan was removed and Mr. Adam J. Sipple undertook the representation. The Nebraska Supreme Court reversed and remanded the matter. *State v. Galindo*, Case No. S-12-103 (Neb. Mar. 9, 2015) (unreported).

On May 8, 2019, represented by Mr. Adam J. Sipple, Mr. Galindo filed an Amended motion for state post-conviction relief with the Madison County District Court under case number CR-02-235. The amended petition raised the following allegations:

1.  Deprivation of rights during aggravation trial:

    a. Mr. Galindo could have avoided a death sentence by pleading guilty after *Ring v. Arizona* invalidated Nebraska's death penalty law;

    b. Defense counsel should have prevented defendant from waiving Mr. Galindo's privilege against self-incrimination;

10

c. The aggravation hearing was infected by *Brady* violations, pervasive prosecutorial misconduct, false testimony, violations of the right to counsel, and ineffective assistance of counsel:

   i. The state failed to disclose Madison County attorney Joe Smith's personal connections to the Padilla drug ring;

   ii. Jail officials disregarded the housing classification system to place multiple jail informants with Mr. Galindo and/or his codefendants in order to elicit incriminating statements or fabricate false testimony;

   iii. Smith induced jailhouse informant Hector Abendano, a co-conspirator in the Padilla drug ring, to testify falsely against defendant;

   iv. The state enabled Miguel Lopez, another co-conspirator in the Padilla drug ring, to collude with Abendano to fabricate false testimony against Mr. Galindo;

   v. Since trial, Daniel Animas has admitted he did not testify truthfully about Mr. Galindo's participation in the Lundell murder, this was not established at trial, perhaps because defense counsel failed to effectively cross-examine Animas or arrange attendance of a critical defense witness;

   vi. The State failed to disclose a witness deal with Courtney Barritt, who has since admitted lying during Mr. Galindo's trial,

11

instead allowing her to testify falsely that she did not receive anything in exchange for her testimony when, in fact, she was promised she would not be prosecuted;

    vii.  Defense counsel failed to impeach Kristie Petzold with prototypical forms of bias and the State concealed additional impeachment information about her involvement in drug trafficking;

    viii.  Defense counsel failed to impeach Trista Wiest with prior inconsistent statements and the State concealed exculpatory evidence regarding the forensic examination of her car;

d.  Other errors at aggravation hearing:

    i.  Lack of notice regarding Lundell allegation;

    ii.  Defense counsel provided representation despite a conflict of interest;

    iii.  Jury instructions and verdict regarding the Lundell allegation;

2.  The State committed multiple instances of prosecutorial misconduct in relation to the aggravation trial:

a.  The State failed to disclose Madison County attorney Joe Smith's connections to the Padilla drug ring;

b.  The State failed to disclose Hector Abendano's connections to the Padilla drug ring;

12

    c.  The State failed to disclose Miguel Lopez's connections to the Padilla drug ring;

    d.  Materiality of new evidence regarding Abendano and Lopez;

    e.  The State encouraged jail informants to elicit incriminating statements from Galindo and Vela, or to fabricate false testimony incriminating Galindo in the Lundell murder;

    f.  The State failed to disclose a favorable witness deal with Courtney Barritt;

    g.  The State failed to disclose material information about Kristie Petzold's involvement in drug trafficking;

    h.  The State failed to disclose exculpatory information regarding the forensic testing of Trista Wiest's car;

    i.  The State knowingly presented the false testimony of multiple witnesses at the aggravation hearing;

    j.  Madison County attorney Joe Smith's conflicts of interest based on his connections to the Padilla drug ring rendered the aggravation hearing fundamentally unfair;

3.    Ineffective Assistance of Counsel:

    a.  Failed to advise Mr. Galindo to plead guilty to avoid the death penalty;

    b.  Failed to preserve Mr. Galindo's privilege against self-incrimination;

    c.  Failed to develop a defense theory regarding the Lundell allegation;

d.  Failed to effectively cross-examine Daniel Animas and present available evidence to rebut his testimony;

e.  Failed to effectively cross-examine Hector Abendano;

f.  Failed to effectively cross-examine Miguel Lopez;

g.  Failed to effectively cross-examine Courtney Barritt;

h.  Failed to effectively cross examine Kristie Petzold;

i.  Failed to effectively cross-examine Trista Wiest;

j.  Failed to investigate and introduce evidence relating to the jail placements of multiple informants;

k.  Failed to preserve objections to the jury instructions regarding the (1)(a) aggravator;

l.  Failed to appeal his objections to the jury instruction regarding the (1)(d) aggravator;

m. Failed to appeal the trial court's denial of the motion for new trial;

n.  Failed to appeal the lack of notice regarding the Lundell allegation;

o.  Subject to an actual conflict of interest;

p.  Cumulative attorney error;

4.  The State's failure to provide adequate notice regarding the Lundell allegation violated defendant's due process rights;

5.  The aggravation phase jury instructions violated Constitution;

6.  Deprivation of rights during sentencing determination proceedings:

14

   a.  Defense counsel failed to develop, and the sentencing panel failed to

      consider, evidence of Mr. Galindo's youth and age-related

      characteristics;

   b.  Defense counsel failed to present compelling evidence of Mr. Galindo's

      remorse;

   c.  Defense counsel's presentation of evidence regarding Mr. Galindo's

      drug use and addiction was more harmful than helpful;

   d.  The sentencing determination was tainted by impermissible victim

      impact evidence;

7.   Related to sentencing determination: ineffective assistance of counsel:

   a.  Failed to investigate, present evidence, and preserve legal arguments

      regarding Mr. Galindo's youth as a mitigating circumstance;

   b.  Failed to investigate and present mitigating evidence regarding Mr.

      Galindo's remorse;

   c.  Failed to effectively investigate and present evidence regarding Mr.

      Galindo's drug use and addiction as a mitigating circumstance;

   d.  The sentencing panel's failure to consider youth as a mitigating

      circumstance constitutes structural error mandating new sentencing

      proceeding

8.   The Eighth Amendment categorically prohibits the execution of

     individuals who were twenty-one years old or younger at the time of the

     offense;

9.      The imposition of the death penalty against Mr. Galindo is excessive and disproportionate;

10.     Nebraska's capital sentencing scheme, requiring a three-judge panel to make the findings necessary to impose death sentence, violates the Constitution;

11.     Because it places the sentencing determination exclusively in the hands of judges, Nebraska's capital sentencing scheme lies outside evolving standards of decency;

12.     The Admission of impermissible victim opinion evidence constitutes structural error mandating a new sentencing proceeding;

13.     Failure to grant change of venue;

14.     Failure to receive and consider "Baldus Report;"

15.     Failure to "life quality" the jury;

16.     It would be Constitutionally improper to execute Mr. Galindo after legislative repeal of the death penalty under which he was sentenced.

Before the trial court, Ms. Scout Richters joined as counsel for Mr. Galindo on the pleadings. Without an evidentiary hearing, the trial court, a judge that participated in none of the earlier proceedings, denied post-conviction relief adopting verbatim the State's proposed findings on April 28, 2021.

Mr. Galindo appealed denial of his Amended post-conviction Petition under Nebraska Supreme Court case number S-12-419. Mr. Galindo was originally represented by Mr. Adam J. Sipple and Ms. Scout Richters in the appeal. After Ms.

16

Richters withdraw, the representation continued with Mr. Sipple and Mr. David A. Tank in that appeal. He raised 17 AoEs, which encompassed 24 Propositions of Law, in the appeal are paraphrased here:

1. The district court erred by failing to grant Mr. Galindo an evidentiary hearing;

2. The district erred by re-weighing aggravators and mitigators and denying Mr. Galindo's claims based upon harmless error or lack of prejudice;

3. The district court erred by denying an evidentiary hearing on Mr. Galindo's claims the State failed to disclose material evidence;

   a. The district court erred by denying a hearing regarding Mr. Galindo's allegations the prosecutor withheld evidence Hector Abendano trafficked methamphetamine with Miguel Lopez.

   b. Regarding Mr. Galindo's allegations the prosecutor was involved with Abendano and Lopez in illicit activity;

   c. Regarding Mr. Galindo's allegations the prosecutor failed to disclose Abendano's status as an informant.

   d. Regarding Mr. Galindo's allegations the prosecutor withheld evidence of inducements provided to Abendano;

   e. Regarding Mr. Galindo's allegations the prosecutor withheld evidence of inducements provided to Courtney Barritt;

    f.   Regarding Mr. Galindo's allegations the prosecutor or state law-enforcement agents withheld material evidence regarding Kristi Petzold's ties to a N.D. drug ring;

    g.   Regarding Mr. Galindo's allegations the prosecutor or state law-enforcement agents withheld evidence regarding the search and forensic testing of Wiest's trunk for trace evidence of Lundell's body.

4. The district court erred by dismissing Mr. Galindo's post-conviction claims without conducting a hearing regarding the State's alleged ongoing *Brady* violation;

5. The district court erred by denying an evidentiary hearing on Mr. Galindo's claims the State violated his right to counsel by orchestrating the solicitation from him of statements regarding the Lundell death while Mr. Galindo was jailed;

6. The district court erred by denying an evidentiary hearing on Mr. Galindo's claims the State knowingly introduced false testimony from Abendano, Animas and Barritt;

7. The district court erred by denying an evidentiary hearing on Mr. Galindo's claims the prosecutor was burdened by a conflict of interest;

8. The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel was ineffective for failing to advise Mr. Galindo regarding or to pursue a potentially life-saving plea disposition;

18

9. The district court erred by denying an evidentiary hearing on Mr. Galindo's claim defense counsel was ineffective for allowing him to waive his privilege against self-incrimination and provide information to investigators regarding the location of Travis Lundell's body;

10. The district court erred by denying an evidentiary claim on Mr. Galindo's claim defense counsel was burdened by a conflict of interest;

11. The district court erred by denying an evidentiary hearing on Mr. Galindo's claim defense counsel provided ineffective assistance on appeal by failing to argue Galindo's rights were violated by the district court's denial of his Motion to Continue;

12. The district court erred by denying an evidentiary hearing on the following specific claims defense counsel provided ineffective assistance during trial of the Lundell allegation;

    a. Failing to subpoena a critical witness to impeach Daniel Animas;

    b. Failing to properly cross-examine Animas;

    c. Failing to properly cross-examine Abendano;

    d. Failing to properly cross-examine Lopez;

    e. Failing to properly cross-examine Barritt;

    f. Failing to properly cross-examine Petzold;

    g. Failing to properly cross-examine Wiest;

    h. Failed to subject the Lundell allegation to meaningful adversarial testing;

19

13. *The district court erred by denying an evidentiary hearing on Mr. Galindo's claim defense counsel provided ineffective assistance on appeal by failing to argue his trial objections regarding the (1)(d) aggravator;

14. The district court erred by denying an evidentiary hearing on Mr. Galindo's claim defense counsel provided ineffective assistance regarding the issue of his youth during the sentencing mitigation hearing and on appeal;

    a. Failing to assign on appeal the sentencing panel's explicit refusal to consider youth;

    b. Failing to elicit appropriate expert opinions regarding or to argue Galindo's youth as a mitigator.

15. The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel provided ineffective assistance regarding the issue of remorse during the sentencing mitigation hearing;

16. The district court erred by denying an evidentiary hearing on Mr. Galindo's claim defense counsel provided ineffective assistance regarding the issue of drug use during the sentencing mitigation hearing;

17. The district court erred by denying relief for other alleged constitutional deprivations established by the record;

    a. The Eighth Amendment categorically prohibits imposition of the death penalty for those 21 and under at the time of their offenses;

    b. Nebraska's three judge sentencing scheme is outside evolving standards of decency and violates the Eighth Amendment;

    c.   The Sentencing Panel's review of highly prejudicial and inadmissible victim impact statements constitutes structural error;and,

    d.   The sentences of death are grossly disproportionate to Mr. Galindo's offense in light of his age, cooperation, remorse and other circumstances.

On September 1, 2023, a sharply divided Nebraska Supreme Court affirmed denial of the post-conviction motion. *State v. Galindo*, 994 N.W.2d 562 (2023) (*Galindo II*). Rehearing was denied on November 29, 2023.

Relatedly, the death penalty ended in Nebraska.  In 2015, the Nebraska Legislature passed a bill abolishing the death penalty in Nebraska. However, a referendum was then held to invalidate that law. On December 4, 2017, Mr. Galindo joined a declaratory action related to the abolition of the death penalty filed in Lancaster County, Nebraska, under case number CR-18-3902. On January 25, 2019, the state district court denied that action. The Nebraska Supreme Court affirmed. *Sandoval et al. v. Ricketts et al.*, 922 N.W.2d 222 (2019). Mr. Galindo was represented by Amy Miller, Brett J. Williamson, Luann Simmons, Christopher Lee Eickholt and Brian Stull in those proceedings.

The United States District Court for the District of Nebraska previously appointed the Federal Public Defender's Office for the Western District of Missouri and as co-counsel the Federal Public Defender's Office for the District of Kansas to represent Mr. Galindo as federal habeas-corpus counsel on February 8, 2022 Case No. 8-22MC37 Sealed Order.

**Statement on Exhaustion**

Each claim in the petition is exhausted, whether because Mr. Galindo fairly presented the claim in state-court proceedings or because there appears to be no available avenue in state court for reviewing the claim. Record citations are provided below for those claims that Mr. Galindo fairly presented to the state courts.

**Claims for Relief**

For the following reasons, the Court should grant the petition for a writ of

habeas corpus and vacate Mr. Galindo's convictions and/or death sentence.

**Claim 1:  Mr. Galindo was deprived of his Sixth and Fourteenth Amendment rights when the State of Nebraska failed to grant change in venue.**

The right to jury trial "guarantees to the criminally accused a fair trial by a

panel of impartial, '*indifferent'* jurors." *Irvin v. Dowd*, 366 U.S. 717, 721 (1961)

(emphasis added). Furthermore, "adverse pretrial publicity can create such a

presumption of prejudice in a community that the jurors' claims that they can be

impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984)

(citing *Irvin*, 366 U.S. at 717). Situated in a small community saturated with

pretrial publicity, Mr. Galindo was inevitably deprived of a panel composed of

impartial jurors when the trial court overruled Mr. Galindo's motion for change in

venue. On direct appeal, the Nebraska Supreme Court erroneously concluded Mr.

Galindo's case does not rise to the level of "animus" in *Irvin*. *Galindo*, 278 Neb. at

639. The Nebraska Supreme Court's interpretation is contrary to and/or an

unreasonable application of clearly established Supreme Court law and/or an

unreasonable determination of the facts in light of the evidence presented. *See* 28

U.S.C. § 2254(d)(1)–(2).

According to U.S. Census data, the population of Norfolk, Nebraska in 2000

was 23,516 and the population of Madison County was 35,226. Norfolk inhabitants

made up 64% of the potential jury pool in Mr. Galindo's case. At the time of Mr.

Galindo's trial, Norfolk news outlets were releasing reports related to the murders

23

on a near-daily basis, giving information about Mr. Galindo's case and the cases of his three co-defendants. Mr. Galindo's voir dire was conducted immediately after the one-year anniversary of the murders, during a resurgence of media reports - some of which contained the views of Norfolk residents on the financial burden to the community, the rights that were being afforded Mr. Galindo and his co-defendants, and the length of time it was taking to "bring them to justice." Counsel for Mr. Galindo submitted evidence of hundreds of newspaper articles, television reports, and radio reports in support of his Motion for Change of Venue.

The case received national and regional media coverage, but the effect on Madison County residents was undoubtedly the greatest. After the shooting, the town of Norfolk tore down the bank and turned it into a memorial park dedicated to the victims. Prior to the bank tragedy, the welcome sign entering the town read: "Norfolk—A slice of the Good Life"; after the tragedy, the new sign reads, "Norfolk—A Community of Strength." News reports related to the memorial were being published around the time of Mr. Galindo's trial. In addition, a news report from Aurora, Nebraska, where Mr. Galindo's co-defendant Jose Sandoval was tried after a successful Motion for Change of Venue, noted how few spectators appeared at Mr. Sandoval's trial and cited as one possible reason the fact that very few local people were acquainted with the five victims.

In addition, trooper Mark Zach had committed suicide shortly after the U.S. Bank killings, and it was publicly alleged that he did so because of the guilt he felt over not apprehending the defendants when he confronted them prior to the

24

robbery. Pre-trial media reports were also publishing information about the disappearance of Travis Lundell and the possible participation of Mr. Galindo and his co-defendants in Lundell's murder.

There was so much publicity that co-defendant Sandoval received a change of venue **before** Mr. Galindo's trial commenced. After Mr. Sandoval was found guilty, co-defendant Vela waived jury and pled, again immediately **before** Mr. Galindo's trial commenced. Both of those news-worthy findings of guilt garnered even more media attention and occurred after the Sandoval change of venue. Yet and in dissonance to what was occurring, the trial court denied a change of venue to Mr. Galindo.

Potential jurors in Mr. Galindo's case were sent a supplemental jury questionnaire, and 98.5% of the venire reported that they had heard or read reports about the case; 38.5% of the potential jurors stated that they could not set aside their opinions of the case based on media reports; 33.5% of the potential jurors stated that they could not set aside their sympathy or prejudice and render a fair and impartial verdict. Some of the potential jurors who indicated they could not be fair and impartial were later asked by the court to set aside their prejudices and opinions, and some of them agreed to do so and actually sat on Mr. Galindo's trial.

Only 99 out of 161 potential jurors reported that they could set aside their knowledge of the case, and 24 of those 99 indicated that they were acquainted with one or more of the victims. Only 107 potential jurors reported that they believed they could set aside any sympathy or prejudice and render a fair and impartial

verdict, and 29 of those 107 indicated that they were acquainted with one or more of the victims.

Even these disturbing statistics bear closer scrutiny. For example, one of the potential jurors stated "I work in the Norfolk Police Station and have access to the police reports in this case. I have personally discussed details of this case with police employees," yet marked "yes" to both questions regarding the ability to be fair and impartial. Another potential juror disclosed she was on the State's witness list yet said she could still be fair and impartial. Another potential juror stated that he served on the U.S. Bank Advisory Board and attended three of the victim funerals, yet he could be fair and impartial. Another potential juror stated that "Christine Tuttle (Evonne's daughter) is going to be my daughter-in-law. Christine Tuttle has attended court through everything and . . . shared with me," yet indicated she could be fair and impartial.

Seventy-one potential jurors were randomly selected for the venire from the 153-person jury pool. Sixty-three potential jurors from the 153-person jury pool had stated on their supplemental questionnaires that they either could not render a fair and impartial verdict or that they were unsure whether they could render a fair and impartial verdict. Of the 71 potential jurors that were selected for the venire, 29 of them—or 40%—had a direct or indirect relationship with one of the victims and several more were acquainted with the attorneys or law enforcement personnel that had been actively involved in the case. Yet the defense had only twelve preemptory challenges that it could exercise to excuse those jurors.

The court excused 29 of the 71 members of the venire for cause. Twenty-one of the potential jurors that were excused had stated that they already decided that Mr. Galindo was guilty and could not render a fair and impartial verdict. Of the 42 people that passed the panel over which Mr. Galindo could exercise his preemptory challenges, many had stated in their supplemental questionnaires that they could not be fair and impartial but had reconsidered their position during voir dire. Eleven people had opined that Mr. Galindo was guilty during the voir dure, and sixteen had a relationship with the victims or their families; Mr. Galindo had only twelve preemptory challenges to use against these panel members.

Beyond obvious concerns of juror impartiality because of media, a change of venue was also necessary due to connections among witnesses, attorneys, and jurors. The State endorsed around 550 witnesses in its case against Mr. Galindo. That number represents more than one witness for every 43 inhabitants of Norfolk. In addition, County Attorney Joe Smith, who also was the prosecutor in co-defendant Erick Vela's trial, has subsequently been shown to have been closely and personally acquainted with one venire member and one sitting juror in Mr. Vela's case, facts which he did not disclose to the Court. The presiding juror in Mr. Vela's case was Mr. Smith's pastor, a fact not disclosed until jury deliberations had commenced on aggravation. Similarly, Mr. Smith failed to inform the Court that another member of the venire was, at the time of the proceedings, working as a confidential drug information for Mr. Smith.

Mr. Galindo's case is astonishingly similar to *Irvin*, where the Supreme Court found an abuse of discretion for the trial court's refusal to grant a change of venue. 366 U.S. at 729. The Nebraska Supreme Court acted contrary to and unreasonably applied *Irvin* to Mr. Galindo's case and also unreasonably applied the facts. *See* 28 U.S.C. § 2254(d)(1).

In *Irvin*, six murders occurred in Evansville, Indiana—a "rural county of approximately 30,000 inhabitants." 366 U.S. at 719. Due to the high-profile nature of Irvin's case, the "awaited trial . . . had become the *cause celebre* of th[e] small community." *Id*. at 725. Opinions on Irvin's guilt and what punishment he should receive were solicited by a reporter and broadcasted over local stations. *Id*. There was a "barrage of newspaper headlines, articles, cartoons and pictures" in the "six or seven months preceding [Irvin's] trial," with the newspapers delivered to approximately 95% of the homes in the county. *Id*. Media included details of Irvin's background, previous convictions, and his alleged confession to the murders. *Id*. at 726. Out of a voir dire panel of 430 people, 370 prospective jurors "entertained some opinion as to guilt . . . ranging in intensity from mere suspicion to absolute certainty." *Id*. at 727. Eight of the twelve jurors that sat on petitioner's trial had stated that they thought petitioner was guilty and were "familiar with the material facts and circumstances involved." *Id*. at 727–28. Even though there was "[n]o doubt each juror was sincere when he said that he could be fair and impartial to petitioner, . . . the psychological impact" only allows statements of impartiality to be given "little weight." *Id*. at 728.

28

In light of the pretrial publicity consuming Madison County, the statements of impartiality from Mr. Galindo's jurors too should have been afforded little weight. *See Id.* Just like *Irvin*, five murders were committed in the small town of Norfolk, Nebraska, where only 23,516 inhabitants resided. And the greater area of Madison, County—containing Norfolk—was home to only 35,000. Nearly 98.5% of the venire heard or read reports of the case. Extensive news coverage in the county calling the murders "the state's bloodiest bank robbery" aroused great excitement throughout Norfolk and Madison County. Mr. Galindo presented hundreds of newspaper articles, television reports, and radio reports in his motion for change of venue. Like in *Irvin*, daily media bombarded the Madison County jury pool with information about Mr. Galindo's case and the cases of Jose Sandoval, Erick Vela, and Gabriel Rodriguez. Additionally, media reports published information about the disappearance of Travis Lundell and the suicide of Trooper Mark Zach often in conjunction with the U.S. Bank killings. Notably, Mr. Galindo's co-defendant, Jose Sandoval, was granted a motion for change of venue and the effect of the media in Madison County was apparent—while a Madison County jury determined Mr. Galindo murdered Travis Lundell, a non-Madison County jury did not find that aggravator for Jose Sandoval.

Furthermore, jurors' statements of impartiality should have been scrutinized because multiple jurors fluctuated after the trial court forewent a video describing the trial process—the normal procedure prior to voir dire—and instead read a letter

29

to the editor about the "sacred obligation" of jury service prior to voir dire.[2] (694-696; 1563-1565). *See* Habeas Claim 2. Written in the Omaha World Herald on Memorial Day a few years prior, the letter to the editor stated potential jurors "dishonor" the memory of the American fighting men and women [who] died safeguarding our civil rights" by not serving on juries, and directs them to "[s]tep forward with pride and serve." After jurors expressed their partiality, the unconventional "pep talk" from the bench was seemingly designed to get reluctant jurors to serve.

Once the trial court read the article to potential jurors, numerous eventual sitting jurors, 75% (9 of 12), indicated that the trial court had influenced them in deciding that they could sit on the jury as impartial fact finders. Juror 4 (Tr. 897-98), Juror 5 (Tr. 928-29), Juror 7 (Tr. 1059), Juror 8 (Tr. 1089-90), Juror 9 (Tr. 1305-06), Juror 10 (Tr. 1488), Juror 11 (Tr. 1583-84), Juror 12 (Tr. 1718-19), Alternative Juror 1 who became Juror 8 (Tr. 1959-60), and Alternative Juror 2 (Tr. 2060-61; 2075) all expressed they recalled and/or were influenced by the Judge's speech. Juror 9 was "nervous before [the judge's speech]" but "took the speech to heart" (Tr. 1305-06). Juror 11 "set aside inconveniences" due to the judge's statement. (Tr. 1584). After the judge's comments, Alternative Juror 1—who became Juror 8—said he "could be fair to the victims" after hearing the judge's comments. (Tr. 1959-60). This same juror later referenced that he had checked he could not be fair – but now, after the trial court's admonition, realizes it is a "privilege." Tr. 1974. Alternative

---

[2] The Court referred to Mr. Galindo's case as "a bit of a unique trial" before informing the jury panel that it would depart from normal procedures and read the article. Tr. 694.

Juror 2 said he changed his position after the judge's speech. (Tr. 2060-61; 2075). Indeed, specifically attributing the change of view to the trial court's admonition. *Id.*

Additionally, the jury was not seated easily. 29 of 71 jurors individually voir dired were stricken for cause. (702-2096). Of the 42 from which Galindo was supposed to exercise his peremptory challenges, 16 had expressed an opinion of his guilt, but were asked by the Court to set it aside. Juror 146 (Tr. 716-717); Juror 80 (841-44); Juror 42 (Tr. 877); Juror 85 (Tr. 1127-1131); Juror 187 (Tr. 1195-1202); Juror 143 (Tr. 1238); Juror 52 (Tr. 17621764); Juror 150 (Tr. 1276-1277); Juror 117 (Tr. 1377-1381); Juror 95 (Tr. 14701472); Juror 71 (Tr. 1545-1546); Juror 65 (Tr. 1598-1599); Juror 137 (Tr. 1630-1632); Juror 140 (Tr. 1935, 1943-1948); Juror 110 (Tr. 2075); Juror 91 (Tr. 2099). Many jurors expressed an opinion that the defendant was guilty - but were asked to set that aside.

And once seated, the jurors were infected with partiality and predeterminations of guilt as a result of the media, personal connections, biases, and case discussions before trial even began.

| Juror Number | Media Exposure - 100% Juror Exposure | Knows Victims/Witnesses and # - over 50% Knew a victim or witness; 50% knew a victim. | Thoughts on Guilt/Involvement – 67% (not including the alternate that thought he was guilty) |
|---|---|---|---|
| Juror 1 | Yes (Tr. 734) | | Thought he was involved (Tr. 742) |

31

| Juror 2 | Yes (Tr. 756) | | |
|---|---|---|---|
| Juror 3 | Yes (Tr. 803, 817) | Yes (Tr. 802) 2 – Ms. Tuttle been to her house for dinner (Tr. 810) Saw Elwoods 32 times over the years (Tr. 812) | |
| Juror 4 | Yes (Tr. 895, 913-13) – describes as extensive | | Talked with others – none thinks not guilty (Tr. 906) |
| Juror 5 | Yes (Tr. 923, 944) | | Talked with others – community thinks he is guilty (Tr. 934) |
| Juror 6 | Yes (Tr. 987, 1001-02) – noted "everyone is its national" | Yes (Tr. 986) 2 – Told Mr. Sung's wife "I'm sorry" (Tr. 996) Rented to Officer Zach (Tr. 1002) | |
| Juror 7 | Yes (Tr. 1054-55, 1075) | Yes 1 Same pre-school as Officer Thorson (Tr. 1076) | Talked with others – community thinks he is guilty (Tr. 1070-71) |
| Juror 8 | Yes (Tr. 1085-86, 1096-97) | | Talked with others – community thinks he is guilty (Tr. 1101) |
| Juror 9 | Yes (Tr. 1287, 1312-13) | Yes – 2 Knows Ms. Koepke (Tr. 1310-11) | Inconsistently noted believed Mr. Galindo's co-defendants were guilty and, despite saying she had no |

| | | Went to school with Zach's first wife (Tr. 1312) | opinion on Mr. Galindo, she believed he was in the bank at the time of the shooting (Tr. 1303-05) Relieved because they caught the right people (Tr. 1301, 1303) |
|---|---|---|---|
| Juror 10 | Yes (Tr. 1485-86) | | |
| Juror 11 | Yes (Tr. 1580-81, 1603-04) | Yes – 6<br>  Worked with Ms. Tuttle (Tr. 1580)<br>  Worked with Mr. Sun's ex-wife (Tr. 1580)<br>  Notes his only problem is knowing the victims from this crime (Tr. 1595)<br>  Knows Ms. Koepke (Tr. 1600)<br>  Knows Ms. Cahoy (Tr. 1601)<br>  Knows Ms. Jere Anderson (Tr. 1601-02)<br>  Probably dealt with Ms. Mausbach (Tr. 1606-07) | Talked with others – community thinks he is guilty (Tr. 1598)<br>Appearance that Mr. Galindo is guilty (Tr. 1598)<br>No presumption of innocence (Tr. 1599) |
| Juror 12 | Yes (Tr. 1713, 1734-35) | Yes – 3<br>  Knows Mr. Rob Bryant (Tr. 1712)<br>  Knows Ms. Cahoy (Tr. 1732)<br>  Knows Ms. Jere Anderson (Tr. 1734) | Opinion is he is guilty (Tr. 1729, 1730) |

| | | | |
|---|---|---|---|
| Alt 1 (would become Juror 8) **\*Foreperson** | Yes (Tr. 1955-56, 1981-82) | Yes – 1  Knows Mr. Rob Bryant since childhood (Tr. 1955) | Assumes caught the right guys; never heard they got the wrong guys (Tr. 1972-73, 1975) |
| Alt. 2 | Yes (Tr. 2059) | | Opinion is guilty (Tr. 2061, 2075) |

Not included in the above categories, Juror 2 also explained they did not "think it was ever a good thing when five citizens are killed." (Tr. 756; 769). Juror 4 also acknowledged the negative community sentiment toward the codefendants, describing it as "natural" to feel that way and sharing in the sentiment at times. (Tr. 906-907). Juror 7's husband called her the day of the shooting warning her to be safe because she regularly drives around the U.S. bank, and she was "relieved" when Mr. Galindo and his co-defendants were taken into custody, because she did not have to be on the look-out. (Tr. 1057-58). Juror 7 interpreted the Judge's instructions as "telling [the jurors] to find them guilty." (Tr. 1060). Juror 8, who was later replaced by Alternate Juror 1 during trial, stated he was glad Mr. Galindo and his co-defendants were "caught" because he had been "scared." (T. 1088-89). Juror 9 also expressed relief when Mr. Galindo was caught. (Tr. 1289).  Juror 10's neighbor knew "all" the victims and talk with Juror 10 before she was impaneled on the jury. (Tr. 1490; 1501). These are the people that composed Mr. Galindo's jury.

Nonetheless, the Nebraska Supreme Court mistakenly concluded that impartiality in Mr. Galindo's case was less pervasive than *Irvin* because the

percentage of venire members expressing impartiality was less than 90 percent. *Galindo*, 774 N.W. 2d at 225. Using the percentage of jurors expressing impartial views as a measuring stick is arbitrary and fails to capture the entire picture. Instead, impartiality is more accurately measured based on the presence of jurors on Mr. Galindo's panel who expressed impartial opinions prior to trial. *Compare Irvin*, 366 U.S. at 727 (reasoning petitioner was deprived of impartial jury when eight of twelve jurors thought petitioner was guilty before trial yet declared they could be impartial) *with Mu'Min v. Virginia*, 500 U.S. 425, 428 (1991) (reasoning petitioner was not deprived of impartial jury when eight of twelve jurors had read or heard about the case but none indicated they had formed opinion as to guilt). Like *Irvin* and unlike *Mu'Min*, Mr. Galindo's panel contained jurors who had already thought Mr. Galindo was guilty before his trial. No pledges to impartiality—especially following the trial judge's speech on the sacrality of jury duty—were sufficient to overcome the impartiality that permeated Madison County and, as a result, the jurors. *See Irvin*, 366 U.S. at 728.

Furthermore, the Supreme Court of Nebraska erroneously reasoned that Mr. Galindo failed to demonstrate how the pretrial publicity was more than merely "factual" coverage and was "invidious or inflammatory" depriving of impartiality. *Galindo*, 774 N.W. 2d at 225. It is difficult to rationalize how the publicity in Mr. Galindo's case fails to rise to the level of "inflaming public passion against him such that the trial judge should have presumed prejudice for any potential juror." *Id.* at 226. Media exceeded the threshold for factuality when the Travis Lundell

35

disappearance—an unsolved disappearance with no proven connection to Mr. Galindo—was highlighted contemporaneous to coverage of Mr. Galindo's case. Similarly, providing coverage of Trooper Mark Zach's suicide—with no proven connection to Mr. Galindo—understandably would elicit passion and prejudice in an already-impassioned county.

The Nebraska Supreme Court's failure to recognize that *Irvin* necessitated a change of venue was contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should find *Irvin* and the Sixth and Fourteenth Amendments violated, grant habeas relief, and order a new trial with the empanelment of an impartial jury.

### Claim 2: Mr. Galindo was deprived of his Sixth and Fourteenth Amendment rights when the trial court made improper statements regarding the voir dire process.

The right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, *'indifferent'* jurors." *Irvin*, 366 U.S. at 721 (1961) (emphasis added). Situated in a small community saturated with pretrial publicity, Mr. Galindo was inevitably deprived of a panel composed of impartial jurors when the trial court improperly attempted to preemptively rehabilitate jurors prior to voir dire.

After potential jurors submitted answers to questionnaires but before in-person questioning, the Court read an aberrational introduction to the jury that had the obvious and sole purpose of convincing jurors to reject their original affirmations that they could not be fair and impartial. This violated Mr. Galindo's

rights to due process and a fair trial under the United States Constitution. The Supreme Court has made clear that, "a judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.  The discharge of the judicial function as at common law is an essential factor in the process for which the Federal Constitution provides." *Herron v. So. Pac. Co.*, 283 U.S. 91, 95 (1931). Despite this clear precedent, the Nebraska Supreme Court erroneously held that the trial court could influence jurors. *Galindo*, 774 N.W. 2d at 220. The state court's interpretation is contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1)–(2).

Prior to jury selection, the District Court made the following comments:

Before we get started, I'd like to make a few comments about jury duty generally. Many times we just show a video; I'm not going to show a video today of the trial process. This is a bit of a unique trial, but I just want to talk to you generally about jury duty. I believe that some people perceive Jury duty as being an inconvenience and an imposition in their work and daily lives. Some see it as a sacrifice that they are unwilling to make and find ways to seek to avoid jury service.

However, the greatest sacrifice was made by this county's founding fathers who by the 6th Amendment to the U.S. Constitution established the right of the accused to a trial by a jury of his or her peers and by the fighting men and women of our armed forces who have maintained that right since 1791.

There was an article that appeared in the Omaha World Herald a few years ago. It was written by an individual by the name of Phillip Bissett who was a former member of the House Judiciary Committee of the Maryland General Assembly. I think that this is instructive and it gives a good insight into jury duty responsibility. It was written for Memorial

Day, but I think it has meaning for any of us this day or any other day, and I'd like to read a portion of that article to you.

Mr. Bissett states, "The right to a trial by jury after all is one of the fundamental freedoms that Americans have fought and died for since the founding of our Republic. In a nation ruled by laws, not tyrants, jury duty ought to be considered a sacred obligation. Serving on a jury is one of the most important ways every American can serve his," and I'll add "or her country. Our justice system depends on citizens who answer the call of jury service. When you are selected to serve on a jury, you become an active participant in insuring fair and balanced justice in your community. Citizens with doubts about jury service should consider the words of Thomas Jefferson, 'the jury is the only anchor ever yet imagined by man by which a government can be held to the principles of its Constitution. The jury is the ultimate safeguard of our civil rights.' The American fighting men and women died safeguarding our civil rights. We dishonor their memory by not fulfilling the civil responsibilities that go hand in hand with those civil rights. If you're called to serve on a jury this year, remember it's far from the ultimate sacrifice. Step forward with pride and serve. It's a chance to participate in democracy that most of the world's 6.3 billion people would love to have."

Tr. 694-696, 1563-1565. Trial counsel objected to the improper comments.  Tr. 1559-1560.

The trial court influenced the jurors improperly. Once the trial court read the article to potential jurors, numerous of the eventual sitting jurors, 75% (9 of 12), indicated that the trial court had influenced them in deciding that they could sit on the jury as impartial fact finders. Juror 4 (Tr. 897-98), Juror 5 (Tr. 928-29), Juror 7 (Tr. 1059), Juror 8 (Tr. 1089-90), Juror 9 (Tr. 1305-06), Juror 10 (Tr. 1488), Juror 11 (Tr. 1583-84), Juror 12 (Tr. 1718-19), Alternative Juror 1 who become Juror 8 and ultimately the foreperson (Tr. 1959-60), and Alternative Juror 2 (Tr. 2060-61; 2075) all expressed they recalled and/or were influenced by the Judge's speech. Juror 9 was "nervous before [the judge's speech]" but "took the speech to heart" (Tr. 1305-

38

06). Juror 11 "set aside inconveniences" due to the judge's statement. (Tr. 1584). After the judge's comments, Alternative Juror 1—who became Juror 8—said she "could be fair to the victims" after hearing the judge's comments. (Tr. 1959-60). Alternative Juror 2 said she changed her position after the judge's speech. (Tr. 2060-61; 2075). Clearly, the jury was impacted by the trial court's exhortation not to "dishonor their memory" by refusing to serve.

The Nebraska Supreme Court's failure to recognize the error and the prejudicial impact of the trial court's admonition or exhortation was contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The trial court's attempt to preemptively rehabilitate a local jury panel that was predisposed not to give Mr. Galindo a fair trial was improper. This Court should find Mr. Galindo's Sixth and Fourteenth Amendment rights violated based on the trial court's improper exhortation, grant habeas relief, and order a new trial with the empanelment of an impartial jury.[3]

### Claim 3: The consideration of race has no place in a capital trial and its presence here violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United State Constitution.

Race should never be a factor in a capital sentencing proceeding. *Buck v. Davis*, 580 U.S. 100 (2017). Unfortunately, it was here.

*A potential juror expressed racial sentiments but the trial court failed to remove them for cause and a peremptory had to be exercised.*

---

[3] Undersigned received several pieces of evidence that are subject to a protective order. Those protected documents support the factual allegations contained herein. Shortly, undersigned will file a motion to file the materials under seal with the Court.

During voir dire, Juror #137 uttered racially insensitive tropes and made multiple racially charged observations. Juror #137, a white male, agreed there was negative sentiment towards Hispanics after this crime. Tr. 1641. He agreed they remain and that he "slightly" agrees with them. *Id.*

Juror #137 then stated: "The thing that bothers me the most is that we've probably had nine, ten, eleven murders in Norfolk, all of which may have been done by Hispanics. Some have already been proven guilty, and that bothers me somewhat." Tr. 1641. "That's right [I have negative feelings], that is the problem I have right there." *Id.* Trial counsel then asked: "And you admit that's a problem?" to which Jury #137 responded: "Yes. I don't like that." *Id.* He agreed with the statement "Hispanics tend to commit more crimes in our community." Tr. 1642.

In this case one thing would never change: the color of Mr. Galindo's skin. Mr. Galindo would always be a Latino of Mexican descent.[4] And according to Juror #137, that immutable characteristic carried with it a tendency to commit more crimes including murder. This admitted problem should have led to excusal for cause; yet the trial court denied the request. Tr. 1643.

Mr. Galindo raised this in his direct appeal brief p. 71– but because Juror #137 did not make the jury the Nebraska Supreme Court did not address the merits. *Galindo*, I 774 N.W.2d at 221. That failure permits this Court to consider the claim *de novo*.

---

[4] The juror improperly utilized the term "Hispanic" as a descriptor for race. For purposes of this claim, Mr. Galindo utilizes "Hispanic" in the same manner as the juror.

40

Juror #137 held a potent view appealing to a powerful racial stereotype—that of Hispanic men as "violence prone." *See Turner v. Murray*, 476 U. S. 28, 35 (1986) (plurality opinion). These expressions of racial bias should have ended the inquiry for the trial court – especially given Juror #137 tied these beliefs to guilt, the very question being considered by the jury. As noted in *Buck*, 580 U.S. at 121:

> In combination with the substance of the jury's inquiry, this created something of a perfect storm. Dr. Quijano's opinion coincided precisely with a particularly noxious strain of racial prejudice, which itself coincided precisely with the central question at sentencing. The effect of this unusual confluence of factors was to provide support for making a decision on life or death on the basis of race.

So too here: "[Juror #137]'s opinion coincided precisely with a particularly noxious strain of racial prejudice, which itself coincided precisely with the central question [at guilt-innocence]." The trial court committed error by ignoring the same "perfect storm" in Mr. Galindo's case, arguably made worse by the fact that the prejudice emanated directly from a decisionmaker's mouth rather than merely a witness. *See Pena-Rodriquez v. Colorado*, 580 U.S. 206 (2017) (vacating a jury verdict based on held Hispanic racial stereotypes).

The trial court utterly failed to perform its function. As noted by the Court in *Pena-Rodriquez*, at 221, "It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." The trial court had a clear statement and looked the other way, rather than fulfill the "duty to confront racial animus in the justice system." *Id.* at 222.

41

The trial court failed to comply with long-standing principles to eliminate race from infecting criminal proceedings. As noted in *Pena-Rodriguez*:

> [R]acial bias, a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice. This Court's decisions demonstrate that racial bias implicates unique historical, constitutional, and institutional concerns. An effort to address the most grave and serious statements of racial bias is not an effort to perfect the jury but to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy.

580 U.S. at 224.

The trial court erred in denying the challenge for cause. This Court should grant the writ, vacate the convictions and remand for proceedings free from the taint of race.

*Unequal treatment of minority jurors leading to their removal for cause and removal via a peremptory challenge.*

Mr. Galindo's jury panel contained only four minorities,[5] none of which were seated on the all-white jury that convicted him and rendered him death eligible.

| Juror # | Race/Gender | How removed |
|---|---|---|
| Juror #101 | Native-American/Female Tr. 979-80. | Perempt |
| Juror #64 | Hispanic/Female Tr. 1012. | Struck for Cause Tr. 1012. |
| Juror #132 | Hispanic/Male Tr. 1224. | Struck for Cause Tr. 1224. |
| Juror #46 | Filipino/Female Tr. 1874. | Perempt |

---

[5] The parties noted the race of the voir dire panel via questioning or stipulations.

While race should never be a factor in a capital sentencing proceeding, it was here in the jury selection process.  Clear *Batson* error occurred in this case, as demonstrated by the comparatively disparate voir dire conducted of the minority jurors – leading to their exclusion – in comparison to white jurors.

The State[6] violated Mr. Galindo's rights to a fair trial, an impartial jury, and the guarantee from cruel and unusual punishments through the racially motivated strikes of the two remaining minority jurors, Jurors #101 and #46. These rights and protections are found in the Sixth and Eighth Amendments and are incorporated to the states under the Fourteenth Amendment. "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016).

The Supreme Court has consistently and roundly sought to eliminate the improper exercise of a peremptory for a racially pretextual reason. *See Batson v. Kentucky*, 476 U.S. 79 (1986); *Powers v. Ohio*, 499 U. S. 400 (1991); *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*); *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (*Miller-El II*); *Snyder v. Louisiana,* 552 U. S. 472, 481-84 (2008); *Foster*, 578 U.S. 488; *Flowers v. Mississippi*, 139 S.Ct. 2228 (2019). This includes in civil cases (*Edmonson v. Leesville Concrete Co.*, 500 U. S. 614 (1991)), as well as by defense counsel in criminal cases. *Georgia v. McCollum*, 505 U. S. 42 (1992). Simply

---

[6] Mr. Galindo has been unable to gain access to the strike sheets. He will be moving for discovery in the future.

put, and according to clearly existing federal law from the Supreme Court, racism has no place in the selection of a jury.

The unmistakable principle of these precedents is that discrimination based on race, "odious in all aspects, is especially pernicious in the administration of justice," *Rose v. Mitchell*, 443 U. S. 545, 555 (1979) damaging "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State." *Powers*, 499 U. S. at 411.

In this case, the strike rate of minorities was 100%, 2 for 2 in strikes, both of whom happened to be women. *See. J.E.B. v. Alabama,* 511 U.S. 127 (1994) (cannot discriminate in peremptories on the basis of gender).

- A Native-American woman was removed via a peremptory strike Tr. 797-80;

- A Filipino women woman was removed via a peremptory strike Tr. 1874.

The rate of whites on the jury, 12 jurors and 2 alternates, was 14 for 14 white – or 100%. There was no representation on the jury.

Two Hispanics were quickly removed for cause with absolutely no genuine attempt at rehabilitation. Juror #64, a Hispanic Female, was removed after she disclosed prior contact with Mr. Galindo's family. Tr. 1011. The entirety of the voir dire covered approximately 3 pages. *See* Tr. 1009-12. The county prosecutor did not ask any questions. Tr. 1012.

Juror #132, a Hispanic Male, was removed due to a prior contact with the

44

Galindo family that "may" impact and his English language skills. Tr. 1223. The entirety of the voir dire covered approximately 5-6 pages. *See* Tr. 1218-24.  The county prosecutor did not ask any questions. Tr. 1223.

The treatment of these jurors contrasts starkly with the treatment of the white jurors, many of whom sat (*see* Habeas Claim 1) even though they knew multiple victims or testifying witnesses. This demonstrates the disparate treatment of jurors – and belies racially-motivated practices. *See Snyder*, 552 U.S. at 483 ("The implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious).

Both Hispanic Jurors, #64 and #132, received extremely truncated and superficial voir dire processes as compared to white jurors. They never received the same opportunity or faced exploring questioning to demonstrate their ability to serve. Further, Sitting Juror #8, a white male, was voir dired for 25 pages of transcript. *See* Tr. 1083-1108. Significantly, he went to school with Mr. Galindo (Tr. 1106-07) – but was found to be a passable juror. *See Snyder*.

The county prosecutor did not even deign to ask any questions to both Hispanic Jurors. It speaks volumes that the *only* potential jurors who possessed the same immutable characteristics as Mr. Galindo did not merit a single question from the county attorney.

This issue has not been raised in state court. The discrimination that occurred is an extraordinary circumstance that merits exploration. *Buck*.

Alternatively, this failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. This Court should grant the writ, vacate the convictions and death sentence with directions for a new trial with voir dire free of racial discriminatory practices.

### Claim 4: Mr. Galindo's rights, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by a conflict possessed by the county attorney

As noted by the Nebraska Supreme Court, "it would be a great understatement to say that the county attorney would be deserving of serious condemnation" with these allegations. *Galindo*, II 994 N.W.2d at 604. The Nebraska Supreme Court noted: "[a]t the heart of Galindo's prosecutorial conflict of interest claim is many of the same allegations regarding the county attorney's criminal activities and associations…[and] that as a result of the county attorney's involvement with State witnesses, the county attorney's personal interests influenced his decisions in Galindo's case." *Id.* at 598.

Dissenting Justice Papik noted the depth of the allegations:

Galindo's prosecutorial conflict of interest claim is rooted in allegations that the county attorney was involved in a criminal drug ring. Galindo does not challenge his underlying convictions but claims that the county attorney's criminal exposure influenced his decisions in the aggravation phase of Galindo's case. Specifically, Galindo's postconviction motion alleged that the aggravation phase of his case provided the county attorney with an opportunity to attempt to shield himself from federal scrutiny of his own criminal activities through the following scheme: Participants in the drug ring would testify against Galindo by implicating him in the death of Travis Lundell, and that testimony would allow the county attorney to recommend against further federal

46

investigation of the drug ring's participants and reduce the chances that federal authorities would discover his own connections to the drug ring.

*Id.* at 68-69 (Papik, J., dissenting).

The Nebraska Supreme Court unreasonably characterized the claim in constricting its harmlessness review and as noted by Justice Papik:

> In addition to allegations that the county attorney's alleged conflict undermines confidence in the jury's findings regarding the Lundell murder, Galindo's postconviction motion alleged that the county attorney's conflict affected the fairness of the proceedings and would have made the county attorney subject to a motion for disqualification had Galindo known of the conflict at the time. Galindo thus alleged that the county attorney's *participation* in the penalty phase of the proceedings violated his right to due process. Accordingly, I believe prejudice must be assessed by determining whether the same sentences would have been imposed had the case been prosecuted by a nonconflicted prosecutor.

*Id.* at 609 (Papik, J., dissenting).

The county attorney, Joe Smith, had personal connections to endorsed state's witness Jesse Padilla and other individuals involved in methamphetamine distribution in the Norfolk area in the time period before, during, and after Mr. Galindo's capital murder trial. Multiple sources have reported that the county attorney and Padilla had a close relationship, that the county attorney purchased drugs from Padilla and others (including jailhouse informant Hector Abendano, Animas and Lopez), that the county attorney was seen using or in the presence of illegal drugs with Padilla, and that the county attorney "protected" Padilla and did "favors" for him, including tipping him off when law enforcement planned to conduct searches or controlled buys at his mechanic shop. Sources have also reported that the county attorney offered to let Abendano plead to reduced charges if he agreed

47

not to talk about the county attorney's connections to the drug ring. This was done in conjunction with Mr. Scott Freese. *See also* Habeas Claims 6 & 7.

Prosecutors are charged with the duty to conduct criminal trials in a manner that provides any person with a fair and impartial trial. As succinctly stated by the Supreme Court, "The role of a prosecutor is to see that justice is done." *Connick v. Thompson,* 563 U.S. 51, 73 (2011) *citing to Berger v. United States*, 295 U.S. 78, 88 (1935). The Court "has recognized that prosecutorial misconduct may 'so infec[t] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

Although prosecutors are "traditionally accorded wide discretion ... in the enforcement process," "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *United States v. Farrell*, 115 F. Supp. 3d 746, 753 (S.D.W. Va. 2015) (*quoting Marshall v. Jerrico, Inc.*, 446 US. 238, 248 (1980). A prosecutor with a conflict of interest "creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Id.* (*quoting Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 803 (1987).

The county attorney's involvement with Padilla was so extensive that he was investigated by federal authorities for over three years, including a period of time when he was still prosecuting Mr. Galindo's case. Significantly, federal authorities

48

placed a wiretap on the county attorney's phone beginning in September 2004; Mr. Galindo was not sentenced to death until November 10, 2004.

According to U.S. Attorney Joe Stecher, the county attorney provided "quite extensive testimony" at the federal grand jury proceedings against Padilla, Freese, and others, and this testimony included "possibly some exculpatory or Brady information." Proposed Exhibit 662 (Transcript of Proceeding *U.S. v. Freese*, 8:05CR131, Hearing on Motion to Compel, 8:05CR131, April 7, 2006). That the county attorney provided substantial assistance in the prosecution of the Padilla drug ring defendants, while the county attorney was himself the subject of federal investigation regarding the same criminal conspiracy, raises a strong inference that the county attorney reached a deal with federal authorities in order to avoid criminal charges. Indeed, as noted by U.S. Attorney Stecher, the decision not to prosecute the county attorney was not based on "an assessment of whether Smith may have acted improperly."

Had this information been properly disclosed to defense counsel prior to trial, it would have provided a strong basis for discrediting the State's key witnesses in relation to the Lundell allegation, for moving to disqualify Smith from prosecuting Mr. Galindo's case, and for requesting other sanctions due to prosecutorial misconduct. Padilla, who had a close relationship with the county attorney, was an active informant for the county attorney and was housed at the Madison County Jail at the same time as Mr. Galindo, Vela, Abendano, Lopez, and other jailhouse

informants. Jail officials placed Padilla in the same cell with Vela, and new evidence indicates this was done under the county attorney's direction.

Neither the county attorney nor any other state agent disclosed to defense counsel any of this information at the time of trial or through the entirety of the post-conviction process. Rather, the State has universally refused Mr. Galindo's requests for the disclosure of any information pertaining to the county attorney's connections to Padilla or others involved in the drug distribution conspiracy with Padilla, including Abendano and Lopez.

Trial counsel could not have discovered this information prior to trial. The federal investigation of Padilla, Abendano, the county attorney, Freese and others was not publicly known prior to trial. Moreover, the State did not provide notice of its intent to prosecute the Lundell allegation until November 5, 2003, two months after the federally approved wiretap, a little over a month before trial, and did not notice Abendano as a witness in support of the allegation until November 26, 2003, close to three months after the federally approved wiretap. The State also caused significant confusion regarding Abendano's identity, thwarting defense counsel's efforts to adequately investigate Abendano's criminal history and associations with other relevant individuals. Accordingly, defense counsel had no reasonable basis to suspect that the county attorney was closely linked to Padilla or the other jail informants.

The county attorney's connections with the Padilla drug ring strongly suggests that: (1) the county attorney provided Padilla information about the

Lundell murder and/or used Padilla to obtain information from Vela, Scott Freese and/or others with knowledge about the Lundell murder; (2) Padilla then provided this information to other jailhouse informants, including Abendano, enabling the informants to fabricate false testimony implicating Mr. Galindo in the Lundell murder; (3) the county attorney then made witness deals with the jailhouse informants who knew about his close relationship with Padilla and the drug ring, in order to conceal his connections to the drug ring.

When considered in light of all the other undisclosed evidence, this information demonstrates that each of the State's aggravation phase witnesses who were involved in the Padilla drug ring with the county attorney (Hector Abendano, Miguel Lopez, Daniel Animas, and Courtney Barritt), have admitted to testifying falsely since trial, and/or had strong motivations to lie. The prosecutorial conflict infected the aggravation hearing before the jury.

"Prosecution by someone with conflicting loyalties 'calls into question the objectivity of those charged with bringing a defendant to judgment. It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion, for liberty itself may be at stake in such matters . . . appointment of an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general." *Young v. United States ex rel. Vuitton Et Fils S. A.*, 481 U.S. 787, 810-11 (1987) (hereinafter, *Vuitton*) *(citing Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). Recognizing the threat an interested prosecutor presents to

51

the integrity of the criminal justice system, the *Vuitton* opinion noted that prosecutors "'have available a terrible array of coercive methods to obtain information.'" *Id.* at 812; *see also, Berger v. United States*, 295 U.S. 78, 88 (1935)(stating prosecutors are also public officials; they too must serve the public interest).

Prosecution by an "interested prosecutor" is an "error so fundamental and pervasive [it requires] reversal without regard to the facts and or circumstances of the particular case." *Id.* at 809-10. In *Vuitton,* the court further held that when it can be shown that a prosecutor has conflicting loyalties, prejudice is presumed and cannot be overcome by a "harmless error" review, reasoning that a traditional "harmless error" analysis would be "virtually impossible" and "misses the point, for what is at stake is the public perception of the integrity of our criminal justice system." *Id.; see also, U.S. v. Gonzalez-Lopez,* 548 U.S. 140, 148, n. 4 (2006)(holding erroneous deprivation of the right to counsel of choice, "with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error'") (*quoting Sullivan v. Louisiana,* 508 U. S. 275, 282 (1993)); *United States v. Luger*, 837 F.3d 870, 877 (8th Cir. 2016)(holding involvement of a conflicted prosecutor in a criminal proceeding is a "fundamental constitutional error").

Conflict of interest issues have also arisen previously in at least one Madison County murder prosecution. In *Hunt v. Houston*, No. 4:98CV2354, 2008 WL 822401, at *30 (D. Neb. Mar. 26, 2008), *overruled on other grounds,* 563 F.3d 695 (8th Cir.

2009)(holding claims had been procedurally defaulted), the United States District Court for the District of Nebraska granted habeas relief based upon the falsification of evidence and conflicts of interests arising therefrom. In that case, the county attorney charged with prosecuting Hunt "completely fabricated at least a portion of" a police report. *Hunt,* at \*2. When defense counsel and the judge learned of the misconduct, neither called for a full investigation, conducted a hearing on the record, or informed the defendant but the judge did appoint a special prosecutor. *Id.* at \*2-3. Likewise, nobody brought the misconduct to the attention of the Nebraska Supreme Court on direct appeal, in Mr. Hunt's first state postconviction action, or on direct appeal of the denial of post-conviction relief by the same judge that presided over the trial. *Id.*

The United States District Court held the prosecutor's alteration of evidence constituted structural error, placing it beyond harmless error review. *Id.* at 100. Further, the court held that, "Once the misconduct occurred, the prosecutors operated under an actual conflict of interest in prosecuting the case," because their "duty to see that justice is done was at odds with their interest in concealing the [the prosecutor's] misdeed." *Id.* at 101. Additionally, the court held the "conflicted loyalties of the prosecutors," also amounted to structural error. *Id.* at 102. Similar to the prosecutor in *Hunt*, the county attorney in Mr. Galindo's case contested an evidentiary hearing in the post-conviction proceeding, as well as substitute counsel, despite appointed counsel's conflict of interest. And perhaps recognizing his conflict, albeit belatedly, the county attorney has since withdrawn from the case following

53

Mr. Galindo filing a motion to recuse him. (Smith letter to Stratton dated October 31, 2002).

The evidence-based allegations made by Mr. Galindo support an inference the county attorney: prosecuted the case in state court rather than allow prosecution by federal authorities to maintain control of Padilla, Abendano and/or Lopez; made the reward for their testimony contingent upon their non- disclosure of the county attorney's illicit activity; and employed "coercive methods" to solicit false testimony, all while burdened with a conflict of interest. Indeed, the conflict may have also influenced the county attorney's decision to even seek the death penalty against Mr. Galindo.

The county attorney initially believed Mr. Galindo to be the third most culpable participant and considered not pursuing the death penalty. (Notice of Withdrawal). However, the aggravation hearing provided the county attorney the opportunity to utilize Abendano as well as other witnesses, and thereby protect himself from the danger of those witnesses facing prosecution in federal court, which would have created the possibility Abendano would enter into a cooperation agreement with federal authorities. Such an agreement would likely lead to disclosure of a witness's alleged criminal involvement with the county attorney.

For these reasons, the county attorney's conflict of interest denied Mr. Galindo the right to a fair trial guaranteed the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly

established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new trial, aggravation and/or sentencing proceeding.

**Claim 5:** **Jorge Galindo is ineligible for the death penalty because he is intellectually disabled as defined by clinical standards relied on by the Supreme Court in *Atkins v. Virginia*, anc its progeny.**

**A. The execution of the intellectually disabled is Cruel and unusual punishment.**

In *Atkins*, the Supreme Court prohibited the execution of persons with intellectual disability under the Eighth Amendment's prohibition against cruel and unusual punishment. *Atkins*, 536 U.S. at 321. Underlying the prohibition of executing the intellectually disabled is the recognition that doing so would serve neither of the recognized purposes of capital punishment: retribution and deterrence. Unless the death penalty "measurably contributes to one or both of these goals, it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Atkins*, 536 U.S. at 318 (internal quotations omitted). According to the Supreme Court, the death penalty does not apply to the intellectually disabled with the same force it does for the able-minded offender:

> The theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct. Yet it is the same cognitive and behavioral impairments that make these defendants less morally culpable – for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses – that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information.

*Id*. at 320.

In setting forth the ban, the Court referred to two definitions of intellectual disability from the American Association on Intellectual and Developmental Disabilities (AAIDD) and the American Psychiatric Association (APA). *Id*. at 309, n. 3. The Court noted that "clinical definitions of mental retardation require not only subaverage intellectual function, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18." *Id*. at 318.

**B. The Supreme Court recognizes the critical role clinical standards play in properly defining intellectual disability.**

The Supreme Court has taken up three cases since 2002 dealing directly with the issues raised in *Atkins* and the appropriate way to handle intellectual disability claims. In each case, the Court relied upon scientific and medical texts and emphasized the importance of relying on experts in the field of intellectual disability to guide the ultimate outcome. *See Hall v. Florida*, 572 U.S. 701 (2014); *Brumfield v. Cain*, 576 U.S. 305 (2015); *Moore v. Texas*, 137 S.Ct. 1039 (2017).

In *Hall*, the Supreme Court highlighted the importance of the clinical definitions of intellectual disability in addressing the mandates of *Atkins*. The Court repeatedly cited relevant medical authorities in addressing the proper manner in which to evaluate claims of intellectual disability. *Hall*, 572 U.S. at 709. *Hall* presented the question of "how intellectual disability must be defined in order to implement these principles and the holding of *Atkins*." *Id*. *Hall* reinforced the three

56

traditional criteria for the medical community's definition of "mental retardation" originally expressed in *Atkins*: "significantly subaverage intellectual functioning, deficits in adaptive functioning (the inability to learn basic skills and adjust behavior to changing circumstances), and onset of these deficits during the developmental period." *Id*. at 710.

*Hall* further noted that it is unsurprising that "this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability." *Id*. In *Hall*, the Supreme Court repeatedly referred to the medical journals to guide the Court's analysis of the appropriate way in which to evaluate the use of IQ scores. *See generally, Hall* at 712-13. 722-23. In doing so, the Court ultimately invalidated the manner in which the Florida Supreme Court interpreted and enforced the intellectual disability statute by using an IQ "test score as a fixed number, thus barring further consideration of other evidence bearing on the question of intellectual disability." *Id*. at 714, 723. The manner in which it had been applied was inconsistent with medical evidence and violated the Eighth and Fourteenth Amendments. *Id*. at 723.

The Supreme Court again had an opportunity to review a case involving an intellectually disabled capital defendant and the procedural and factual roadblocks. *Brumfield*, 576 U.S. at 305. In *Brumfield*, the Court considered whether an IQ score of 75 was inconsistent with a finding that the defendant was intellectually disabled. The Court held that a score of 75 was "entirely consistent with intellectual disability." *Id*. at 314. In reaching this conclusion, the Court relied on expert

57

opinions and third-party sources such as the American Association on Mental Retardation (now the AAIDD) as well as the DSM-IV. *Id*. at 308. The Court in *Brumfield* thus continued its reliance on experts in the field of intellectual disability to guide the Court's jurisprudence on this complicated subject. *Id*. at 316.

The Supreme Court most recently addressed the scope of *Atkins* in *Moore v. Texas*, 581 U.S. 1, 137 S.Ct. 1039 (2017). In *Moore*, the Court evaluated the Texas state court's reliance on the *Briseno* factors for evaluating intellectual disability. *Id*. at 1048. The Court held the state court's reliance on the *Briseno* factors were invalid because the factors were based on outdated medical standards resulting in the "unacceptable risk that persons with intellectual disability will be executed." *Moore*, 137 S.Ct. at 1044 (quoting *Hall*, 572 U.S. at 704).

The Court in *Moore* re-affirmed the *Hall* opinion that the use of strict IQ cutoffs[7] was unacceptable in evaluating whether a defendant is intellectually disabled. *Moore*, 137 S.Ct. at 1050. Similarly, the Court noted that IQ is not definitive of intellectual disability and courts must "consider other evidence of intellectual disability where an individual's IQ score, adjusted for the test's standard error, falls within the clinically established range for intellectual-functioning deficits." *Id*.

---

[7] The use of strict IQ cut-offs in the intellectual disability realm is a dangerous practice as the vast majority (75-89%) of the intellectually disabled fall in the upper range of IQ scores for the diagnosis. *See Mental Retardation: Definition, Classification, and Systems of Supports*, 32 (10th ed. 2002). Because this group of individuals can and will score around 70 or just above, their 95% confidence level range scores on IQ tests are going to include numbers above 70. *Id*. at 59.

The Court also emphasized that intellectual disability determinations must adhere to *current* medical standards and recognized that current medical manuals for diagnosing intellectual disability "offer 'the best available description of how mental disorders are expressed and can be recognized by trained clinicians.'" *Moore,* 137 S. Ct. at 1054 (quoting DSM-5 at xli). The state court in Moore had deviated from prevailing medical standards when it relied on Mr. Moore's adaptive *strengths* to determine Moore did not meet the requirements for intellectual disability even though the medical community relies on an individual's adaptive *deficits*. *Id.* at 1050. The state court, for example, relied on Moore's life on the streets, that he was able to mow lawns, and his playing pool for money as evidence he was not intellectually disabled. *Id.* The Supreme Court rejected the approach the state court took in *Moore* and again relied on the medical community's prevailing standards when noting that the medical community additionally cautions against reliance on adaptive strengths developed "in controlled settings,'" such as a prison. *Id.* (quoting DSM-5, at 38).

The Supreme Court further found that the state court erred when it concluded that risk factors for intellectual disability present in Mr. Moore's life detracted from a determination that he had intellectual disability. *Id.* at 1051. Specifically, the state court had concluded that certain of Mr. Moore's life experiences—for example, that he had suffered from childhood abuse and had a record of academic failure—provided an alternate explanation for his adaptive deficits other than intellectual disability. Relying on prevailing medical standards,

the Court rejected the state court's reasoning, observing that Mr. Moore's traumatic experiences "count in the medical community as "risk factors" for intellectual disability," on which "[cl]inicians rely … as cause to explore the prospect of intellectual disability further, not to counter the case for a disability." *Id.* at 1051 (citing AAIDD-11 at 60.)

The Court ultimately held that the state court's reliance on unscientific standards hindered the proper evaluation of Mr. Moore, resulting in a significant risk that an intellectually disabled person will be put to death.

### C. The State of Nebraska

Nebraska Revised Statue § 28-105.01(2) states, "[n]otwithstanding any other provision of law, the death penalty shall not be imposed upon any person with an intellectual disability." The legislature went on to define intellectual disability relatively consistent with the medical community's standards and the Supreme Court decisions previously discussed. Section 28-105.01(3) states, "[a]s used in subsection (2) of this section, intellectual disability means significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior. An intelligence quotient of seventy or below on a reliably administered intelligence quotient test shall be presumptive evidence of intellectual disability."

The Nebraska Supreme Court found expert opinions essential to determining whether a person qualifies as intellectually disabled under the Nebraska Statute. *State v. Vela*, 777 N.W.2d 266 (Neb. 2010). In *Vela*, the court found that "[to] understand what these terms mean, how they are measured, and how they are to be considered in diagnosing mental retardation, clinical expertise is not only helpful,

60

but essential." *Vela*, 777 N.W.2d at 306. The *Vela* court also recognized that the Nebraska statute did not require a finding of the third prong for intellectual disability – onset before age 18. *Id*. at 307.

### D. Current clinical standards

The current clinical standards have coalesced around a common definition for Intellectual Developmental Disorder (Intellectual Disability). According to the American Psychiatric Association (DSM-5-TR; APA, 2022) and the American Association on Individual and Developmental Disabilities (AAIDD; Schalock et al., 2021), Criterion A requires significant cognitive deficits or significant limitation in intellectual functioning, typically established by IQ testing. Both authorities recommend reporting test results with a 95% confidence interval, which results in a range of +/- 5 points.

Criterion B or "adaptive functioning", according to the most recent AAIDD definition, is the collection of "conceptual, social and practical skills that people have learned so they can function in their everyday lives." According to the APA, deficits in adaptive functioning refer to how well a person meets community standards of personal independence and social responsibility, in comparison to others of similar age and sociocultural background. Adaptive functioning involves adaptive reasoning in three domains: conceptual skills, social skills, and practical skills. Criterion B is met when at least one domain if adaptive functioning is sufficiently impaired.

According to the APA, Criterion C simply requires onset of intellectual and adaptive deficits during the developmental period, which the AAIDD further

61

specifies as before the individual attains age 22. The state of Nebraska does not require a finding of Criterion C to support a finding of intellectual disability.

### E. Jorge Galindo is intellectually disabled

Dr. Diomaris E. Safi, Psy.D. is a bilingual neuropsychologist. Dr. Safi evaluated Jorge Galindo to determine whether he meets criteria for a diagnosis of Intellectual Developmental Disorder (Intellectual Disability). Her preliminary conclusion is that he does. *See* Habeas Exhibit C (Dr. Safi Preliminary report).

i.   Criterion A – Intellectual Functioning

Before Dr. Safi tested Jorge Galindo's cognitive abilities, she first assessed his language proficiency skills. It was important for Dr. Safi to determine his dominant language to help determine whether an English or Spanish cognitive test should be administered. Dr. Safi administered the Tests of Oral Language (TOL). The testing revealed that Mr. Galindo's language skills were underdeveloped in both languages. Nevertheless, the testing suggested that his English skills were slightly better developed than his Spanish skills. Based on these results and her clinical observations, Dr. Safi determined that English was the best language to capture his cognitive functioning. Dr. Safi administered the Woodcock-Johnson IV Test of Cognitive Abilities (COG). Jorge Galindo's Full-Scale IQ score was 73. With a 95% confidence interval, his score is 68-78. Dr. Safi found this score consistent with the possibility of Mild Intellectual Disability and therefore meeting Criterion A for Intellectual Disability.

ii.    Criterion B – Adaptive Functioning

In addition to conducting a comprehensive neuropsychological interview with Mr. Galindo, Dr. Safi reviewed his previous psychological evaluation, and conducted a series of semi-structured interviews with multiple informants who directly observed Jorge engaging in his typical behavior across specific developmental periods of time and in specific contexts. Dr. Safi developed a pre-determined set of open-ended questions which were asked to all informants.

Dr. Safi found ample examples from all sources describing multiple situations at different ages and contexts in which Mr. Galindo demonstrated significant impairment in the social domain of adaptive functioning. He was described by all of the collateral sources as a follower, gullible, often taken advantage of by others, and easily manipulated. Dr. Safi concluded that he met criterion B (adaptive deficits) on the basis of his long-standing history of social skills deficits. She also recognized that further investigation could lead to Mr. Galindo's qualification for adaptive deficits under conceptual and practical skills as well.

Independent investigation further supports the finding of adaptive functioning deficits in each of the three identified domains.

*Conceptual (Academic) Domain*

According to the APA (DSM-5-TR, 2022), this domain involves competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations among others. The AAIDD (Schalock et al., 2021) describes conceptual skills as language and literacy; money, time, and number concepts, and self-direction. There are several examples

63

of Jorge struggling with these concepts. His deficiencies were evident as a child in

Mexico.

*Santos Rodriguez Trejo* (Habeas Exhibit EE (Mr. Trejo Dec.))[8]

Santos was a childhood friend of Jorge's in Mexico. He first met Jorge when

he was twelve and Jorge was about five. He described Jorge's intellectual

functioning as follows:

> I can tell you without reservation that Jorge was retarded in school. He
> was a burro – he was as slow and as dumb as a donkey. When I say
> "retarded," I don't use that word casually or flippantly to be mean. My
> younger brother has Downs Syndrome, so I understand what it means
> to be around kids who have serious developmental problems; I have
> more experience than most people with what that word really means.
> When I tell you that Jorge was retarded, what I mean to say is that
> Jorge's behavior and his challenges in school were to the same degree as
> the behavior and challenges that I observed in my brother. Jorge was
> retarded in that he was severely delayed in his learning in the way that
> my brother was.

*Santa Elena Espriella Castillo* (Habeas Exhibit O (Ms. Castillo Dec.))

Santa Elena is Jorge's maternal first cousin. She is three years older than

Jorge, but they often attended classes together at *Escuela Matias S. Canales*. She

recalled the following regarding Jorge's intellectual functioning:

> That was the case with Jorgín and me—we weren't in the same grade,
> but we often shared a teacher and a classroom.  Jorgín was what we call
> a *burro* in school—slow and dumb like a mule.  He struggled to
> comprehend simple things, to "get" them, to learn them. Math was
> nearly impossible for him. It became more obvious around the 3rd or 4th
> grade, about the time that he was supposed to be learning the
> multiplication tables. But he *just couldn't do it*. The teacher could stand
> there and drill it into him over and over, *"2x4, 3x4, 4x4…"* and he *might*
> be able to recite it back on a short-term basis, but even if he could

---

[8] Declarations from Spanish-speaking witnesses are provided to the court in English and Spanish. The English versions
are fair and accurate translations of the signed Spanish declarations.

manage to keep it in his head one day, by the next day it was gone. Memorization was very hard for him. He struggled a lot with simple multiplication and division. I am certain he never learned how to do basic multiplication and division. I can't imagine that he would have ever been able to do long division. And he used to struggle with reading. He was a very late reader. But he enjoyed reading.  He enjoyed sketching drawings from the pictures in our Natural Sciences book.  He liked more workshop-type activities.   But even with group projects, more applied hands-on sorts of lessons that we all did together, *easy* things, he even struggled with those.

*Ponciano Estrada Lara* (Habeas Exhibit P (Mr. Lara Dec.))

Mr. Estrada Lara is a long-time educator in Mexico. He was first a teacher and then the principal at Escuela Matias S. Canales where Jorge attended grade school. Mr. Lara acted as Jorge's primary school classroom teacher and, later, his principal. He stated, "I vaguely recall Jorge maybe needing extra help in school, particularly math." He also observed that Jorge "liked to come up and work problems on the board, but he was usually not successful at solving them."

*Miguel Angel Ramirez Gonzalez* (Habeas Exhibit DD (Mr. Gonzalez Dec.))

Miguel and Jorge were childhood friends in Mexico. Their families knew one another. Miguel knew Jorge as "Jorgin." He stated that, "Jorgin and I were primary school classmates from the fourth grade until we graduated the sixth grade." They went to school together in Martires. Miguel described primary school in Martires as "very easy." He recalled that "[i]t was just memorizing and reciting information and copying things out of a book." Miguel continued, "[i]t didn't require any meaningful comprehension or critical thinking of any kind." "It didn't take any real effort to do well." Miguel observed that, even though their assignments were not difficult, "Jorgin always had difficulty and struggled with schoolwork, though."

65

Miguel recalled that, "Jorgin's mother, Aida, used to scold and hit Jorgin a lot because she got frustrated with how much trouble he had with his schoolwork." Miguel described how "she [Aida] always felt like Jorgin should be better than he was." Miguel surmised, "I believe that the only reason Aida permitted me to spend time with Jorgin was because she used to like for Jorgin to do his homework with me." To put Jorge's intellectual functioning into context at the time, Miguel revealed that "Jorgin used to copy off me, even though I wasn't that good at school, and I often made mistakes. He didn't even know how to copy.  Jorgín used to mess up copying."

_Ema Gonzalez Alvarez_ (Habeas Exhibit S (Ms. Alvarez Dec.))

Ms. Gonzalez Alvarez is Miguel's mother. She would see how her son interacted with Jorge. She also spent time with Aida and Jorge. She described how "Miguel would come home and tell me how Aida hovered over Jorgin, like a general, as he tried to work and hit Jorgin with a belt whenever he made a mistake." She explains that Miguel would relay how "[s]he [Aida] would scream at him, 'why are you so dumb?! Why aren't you smart like Miguelito?!'"

Ms. Gonzalez Alvarez heard these comments herself. She described it as follows:

> Aida was constantly minimizing Jorgin. Always telling him that he wasn't right; that he wasn't good; that something was wrong with him. She was constantly asking him in a chastising way why he wasn't as intelligent as Miguel.

_Marco Antonio Martinez Galindo_ (Habeas Exhibit X (Marco Galindo Dec.))

Marco Galindo is Jorge's cousin. They spent time together in Mexico as children and in Nebraska when they were older. Their education in Mexico was somewhat lacking. Marco explained, "_Escuela Matis S. Canales_, the school where Jorge and I went together, was considered the least prestigious and lowest performing school amongst the three options in our community."

Marco recalled the driving force behind any competence Jorge may have displayed at school was his mother, Aida. He explained:

> In school, Jorge may have been more prepared than I was, but it wasn't because he was smarter than me or performed better than I did. It was because his mom was always on top of him and very strict with him, and she was especially controlling about his homework. He had to study all the time. If he stopped, she would hit him with a switch or a belt; anytime he messed up, she used to hit him with a wire or chord or whip. My aunt Aida's command was the only reason why Jorge got his schoolwork done.

There was one assignment in particular that stuck out in Marco's mind – a Mother's Day poem. He described the event:

> I specifically remember how, every year in school, we had to memorize a little poem for Mother's Day. Even though it was always very hard for Jorge to remember things, he would strive to learn it – because he had to. I remember one time he had to recite the poem in front of the whole class. He managed to pull it off, but we all knew that there was no way that Jorge could have done that on his own; my aunt Aida would have been over his shoulder the whole time, pushing him, making him do it.

Jorge's deficiencies were also apparent as he grew older. After he moved to Madison, Nebraska, school did not get easier for him. The school was unprepared for the influx of Spanish speaking students it received. The language barrier

67

complicated the identification of intellectual deficits. Nevertheless, Jorge Galindo's

deficiencies are identifiable in hindsight.

*Will Baird* (Habeas Exhibit G (Mr. Baird Dec.))

Will Baird was a Madison Junior-Senior High School Counselor while Jorge

was a student there. He reflected on the ways in which the school failed Spanish-

speaking students with learning disabilities and cognitive limitations:

> We did not have any way of testing Spanish-speaking students for
> special education services of any kind. As far as I recall, there were no
> Spanish-speaking students in special education at Madison High School
> – how could there have been? We had no way of identifying or assessing
> their needs or referring them for special education placements.
>
> It did not occur to us that a student with low English proficiency might
> be struggling because of a learning disability or cognitive issues. Even if
> we had been able to test students for special education services in
> Spanish, it did not occur to us that it might be necessary. And since that
> testing was not available anyway, we would not have had the means to
> do it even if it had occurred to us. That is a crucial point to understand.
>
> The only thing the school did to help Spanish-speaking students was
> hire an ESL instructor, Mrs. Moyer. She had good intentions and cared
> for her students, but she was not a credentialed teacher, or a trained
> educator of any kind, and she did not speak Spanish. She created her
> own system and curriculum as she went along. Nobody ever questioned
> anything she did. There was no review or development of her program,
> she was not accountable to anyone.
>
> We did not want to fail students, so students would often be passed along
> even if they were struggling academically or had attendance issues. I
> believe we developed some sort of "Certificate of Attendance" as a kind
> of alternative diploma for the ESL kids.

When Jorge moved to Madison, his friends and teachers called him "George."

Mr. Baird recalled George's time at school as well as his struggles. He stated that,

"George's English proficiency was especially low." He estimated that "[o]f all the

ESL students at Madison High School, I would say that George had the lowest proficiency of anyone in the class." In hindsight he acknowledged, "I know now to ask more questions. To look deeper." He continued, "I understand that these are important signs that a student may be masking significant deficits." He concluded that "George got completely overlooked."

Mr. Baird candidly admitted that the school failed to accurately assess Jorge's deficits. He revealed the following:

> We did not test George for a learning disability or cognitive issues. His struggles in school were chalked up to his lack of English proficiency. Since we knew there was no way of testing him in Spanish, no one would have made a referral for testing even if someone has suspected his issues went beyond language. No one referred him for testing or special education services. We just were not prepared for a kid like George.

_James Crilly_ (Habeas Exhibit J (Mr. Crilly Dec.))

James Crilly is the current Madison High School Principal. He explained the limitations in reviewing Jorge Galindo's records over twenty years after he left the school. He explained that "Madison School records retention policy is to retain records for five to seven years after a student's graduation, after which they are destroyed." He further explained, "[w]e do not maintain any records from eighth grade." Nevertheless, Mr. Crilly deduced that Jorge failed the 8th grade. He stated, "Madison High School yearbooks report that Jorge Galindo was in the 8th grade in 1994 and in the 8th grade again in 1995."

Mr. Crilly did have access to Jorge's transcripts. He was also a teacher at Madison during the time that Jorge attended. He recalled that "social promotion in middle school is common, meaning that students may be promoted to the next grade

69

with the rest of their class even if they do not pass." With a critical eye, he concluded, "after looking at Jorge Galindo's transcript, it appears he was socially promoted."

*Stan Turner* (Habeas Exhibit KK (Mr. Turner Dec.))

Stan Turner was the Madison High School Principal at the time that Jorge attended school in Madison. His recollection of Madison's ability to assess Spanish speaking students was similar to Mr. Baird's memory. He stated, "I don't recall any Latin American students in the Special Education Program in Madison." He continued, "Their lack of English proficiency was a significant barrier to determining if services were needed because the standard tests to measure this were not available in Spanish."

When asked about Jorge Galindo, he relayed the following:

Jorge did not speak English or communicate well, and he was not an aggressive learner. He was placed in Ms. Moyer's ESL class because of his lack of English proficiency. He struggled to be on time for classes and had a lot of tardies and absences. At times, he barely came to school.

Mr. Turner considered how Spanish-speaking students are supported at Madison High School now, and how that compared to Jorge's time there. His final assessment was:

If Jorge were a student in Madison today, he would have been assessed for a learning disability and special education services. In hindsight, his behavior and struggles in school may have indicated a learning disability or cognitive deficits. It is possible that a learning disability or cognitive deficit was missed by the school, especially because of Jorge's lack of English proficiency at the time.

70

*Terri Gross* (Habeas Exhibit T (Ms. Gross Dec.))

Terri Gross was a Madison High School Counselor in the late 1990's and early 2000's. She briefly overlapped with Jorge Galindo at Madison High School during his last year there. After reviewing Jorge's school records, she stated that "based on Jorge's school records, it is apparent that he was in ELL class for the whole school day because he did not know English." She also noted that "[h]e also failed art class, which suggests either that he did not put in effort or he did not understand the assignments." Upon further reflection Ms., Gross concluded, "I think Jorge probably would have benefited from special education services, but at the time he was a student in Madison the school did not have the ability to test him for special education needs in Spanish."

*Marco Antonio Martinez Galindo* (Habeas Exhibit X (Mr. Marco Galindo Dec.))

Jorge's Cousin, Marco, attended school in Madison with him. He reflected on the lack of academic rigor that the ESL program contained:

> I was in the same ESL class with Mrs. Moyer that Jorge was, but I absolutely hated it. They would make us use these picture books that were like for babies – it was completely humiliating. And Mrs. Moyer, the teacher, didn't speak Spanish at all; she would just gesture with her hands like we were deaf and dumb or something. It was wasted time away from learning anything real in the other classes. After a year, I requested to be released from ESL. I was required by the school to test out, which I did.

In other words, Jorge's "average" grades in ESL class did not signify intellectual competence. Jorge Galindo's two years in the eighth grade and four semesters in the ninth grade further support that conclusion. (Habeas Exhibit RR (School Records)).

71

*Gilberto Samano* (Habeas Exhibit FF (Mr. Samano Dec.))

Gilberto Samano was a childhood friend of Jorge Galindo's when he moved to Nebraska. Gilberto shared, "[m]y family immigrated to Madison a year before Jorge arrived." He recalled, "I met Jorge at school, in the class that the middle school and the high school shared for Spanish-language students." Gilberto relayed the following information about the ESL class that he and Jorge attended at Madison:

> None of the students in Ms. Moyer's class could speak English, and Ms. Moyer didn't speak any Spanish. We spent four hours in her class everyday drawing pictures or watching movies. Eventually, Ms. Moyer brought a couple of books, like Spanish versions of textbooks, that we were supposed to use to do assignments. We didn't know what we were supposed to be doing, so we would just wait until she showed us specifically where the answer was in the book or did it for us. Everything was just copying. Nobody learned anything.

Gilberto described Jorge's difficulties in trying to adapt when he moved to Nebraska. He recalled that "[w]hen Jorge started school in Madison, he really struggled." Gilberto went on to disclose that "[h]e [Jorge] relied on me to be his translator and his guide for all the years that we were in school together; he was always leaning on me to interpret the world around him."

Teachers at Madison High School similarly observed both Jorge's limitations in intellectual functioning and the ineffectiveness of the ESL class in Madison at the time.

*Dallas Zimmer* (Habeas Exhibit NN (Mr. Zimmer Dec.))

Dallas Zimmer taught at Madison High School during Jorge's tenure. He recognized that Jorge had limitations at the time and more so in reflection. He recalled one assignment in particular he gave to Jorge:

72

I taught Jorge Galindo during the 1998-1999 school year. It was his
third year in high school, but he was only in the 9th grade academically.
I asked Jorge to give a report to his geography class about his trip to
Mexico. Jorge was not the best storyteller or communicator with his
peers. He was not very good about telling the story of his trip; he let [a]
statue tell the story. Regardless, I remember that I gave him a good
grade for effort. However, this inability was consistent with his usual
performance.

More generally speaking, Mr. Zimmer stated, "I could tell that Jorge did not
want to seem stupid and would insist on trying to do things without help, even if he
struggled." He continued, "[i]n hindsight, I think Jorge may have been hiding how
difficult it was for him to do the work." Mr. Zimmer further reflect that "he may
have been trying to mask his weakness because he was proud and did not want to
seem stupid."

Mr. Zimmer's observations about the Madison High School ESL program
support Gilberto's assertions. Mr. Zimmer stated, "In my opinion, the ESL teacher,
Ms. Moyer, hand-held the students and made things too easy for them. He
continued, 'They were not learning anything." One example he shared was that
"[o]nce, she wrote the answer on the board with a misspelled word and every
student had the same misspelled word on their paper." Other teachers also
recognized Jorge's struggles.

_Galen Kronhofman_ (Habeas Exhibit V (Mr. Kronhofman Dec.))

Galen Kronhofman was another teacher at Madison High School. He recalled
Jorge's deficient performance at school, but he did not know what to attribute it to.
Mr. Kronhofman disclosed that "Jorge struggled with his assignments and needed

help with them." He continued, "I am not sure whether that was because of his lack of English proficiency or because he was slow academically."

_Mike Sunderman_ (Habeas Exhibit II (Mr. Sunderman Dec.))

Mike Sunderman was a teacher and a coach at Madison High School. He more clearly identified Jorge's limited intellectual functioning. However, when he was called to testify at Jorge's trial, trial counsel did not request Mr. Sunderman to review records and address Jorge's intellectual functioning.

Mr. Sunderman stated that "I taught Jorge Galindo 8th grade math in 1993." He explained, "that was Jorge's first year in the Madison County School System and in the United States, and he ended up failing 8th grade." When asked about his interaction with Jorge's trial counsel, he stated, "I recall the defense attorneys did not ask me to review Jorge's school record." He continued, "If they had, I could have pointed out facts in the record including his poor English proficiency scores and poor academic functioning."

_Janet Harrington_ (Habeas Exhibit U (Ms. Harrington Dec.))

Janet Harrington taught math at Madison High School. She described Jorge as being a good kid. She differentiated that from his academic capabilities. She stated that "[e]ven though Jorge had a positive impact in my class, he did not perform well academically." She revealed, "I was teaching a 6th grade curriculum to high school students, but Jorge still ultimately failed the class." Ms. Harrington did not attribute Jorge's failure to a lack of effort. She shared, "Jorge did raise his grade from a 37 to a 66, which was evidence of his effort." Upon reflection she

acknowledged, "It is possible that Jorge was not capable of doing any better than that." She continued, "I felt that he was putting in effort in my class, but he still did poorly." She concluded with two thoughts – "He may have had learning problems we did not know about, and I don't think he believed in himself."

*Juventino Naranjo* (Habeas Exhibit Z (Mr. Naranjo Dec.))

One adult at Madison High School that spoke Spanish was Juventino Naranjo. He served as an interpreter for the school – even though he did not have formal training as such. He was certain that Jorge *wanted* to do well in school. He stated the following:

> Jorge did not speak English well and he was one of the students who really had a hard time understanding what was going on in class. This is often misinterpreted by teachers as a lack of motivation or unwillingness to try. As far as I could tell, his issue was his struggle with the language. I do not know whether there were other learning issues as well, but I do not believe the problem was an unwillingness to work or to try in school.

Regardless of the teachers' lay assessment of whether Jorge's struggles were attributable to a language barrier or because he suffered from cognitive impairments, the language proficiency testing conducted by Dr. Safi makes evident that Jorge's difficulties in school were not simply the result of being taught in a foreign language. She found that Jorge's oral language skills in Spanish – his native tongue, and the language predominately spoken within his family – were "very limited," and that his oral skills in English – which had become his dominant language over the past 20 years – were only slightly better. *See* Habeas Exhibit C

(Dr. Safi Preliminary report). In other words, the testing suggests that Jorge would have struggled in school whether he was taught in English or Spanish.

*Marcos Quijano* (Habeas Exhibit CC (Mr. Quijano Dec.))

Marcos Quijano was another friend of Jorge Galindo's in Nebraska. He also knew Jorge as "George" and saw his struggles. Marcos Quijano stated, "I met George in school in Madison during my seventh-grade year." He observed that "[e]ven though I started at least a grade behind George in school, and we were the same age, eventually I passed him, though I can't remember exactly when." Marcos also knew that Jorge's failures were frustrating to his family. He shared that "George's dad used to be really angry at him because of how George wasn't good at school and was always flunking everything."

*Michael Petzold* (Habeas Exhibit AA (Mr. Petzold Dec.))

Even people outside of school recognized Jorge's cognitive deficits. Michael Petzold only knew Jorge (whom he also called "George") from the streets. They did not attend school together. Nevertheless, Mr. Petzold shared the following:

> I was asked to describe George and I describe him as an airhead. He was slow. He was not a thinker. George did not put a lot of thought into the things he did. George could not follow conversations. I could tell he did not understand. He would just smile and nod.

Jorge Galindo's conceptual deficits, which have spanned over his lifetime, were apparent in the community. Multiple sources confirmed Jorge's deficits. Further investigation will likely reveal additional evidence of adaptive behavior that demonstrates deficits in conceptual functioning.

76

*Social Domain*

According to the APA (DSM-V-TR, 2022), this domain involves an awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The APA further notes that gullibility is often a feature, involving naivete in social situations and a tendency for being easily led by others. The AAIDD (Schalock et al., 2021) describes social skills as interpersonal skills, social responsibility, self-esteem, gullibility, naivete (i.e., wariness), social problem solving, and the ability to follow rules, obey laws, and avoid being victimized.

Dr. Safi, through her own APA approved structured interview process and independent investigation, confirmed Jorge Galindo's social deficits. These deficits were consistent across several areas of daily life. They also appeared during all phases of Jorge's life. Interviews with witnesses who knew Jorge throughout his childhood and adolescence consistently revealed an image of a boy who was a follower, gullible, easily influenced and manipulated by others, and significantly immature as compared to his peers.

*Marco Antonio Martinez Galindo* (Habeas Exhibit X (Mr. Marco Galindo Dec.))

Jorge's cousin described him in terms that were consistently used by most people that knew him: a follower and gullible. Marco confirmed that "[i]f you ask anyone that knew Jorge in Mexico, they will tell you the same thing: Jorge would go along with anything that anyone said." He went on to explain, "[t]hat was kind of like the game in school, to dare Jorge to do things. He could never say no to a dare."

77

Marco continued, "Jorge has always been a follower. Jorge was always, always, *always* giving into peer pressure. He never thought about the consequences of his actions. I have never once heard Jorge say no to anything." Marco gave a specific example, "When Jorge was maybe 14 or 15, he went and fought a white kid three times his size. Even though there was absolutely no way that he could win, he went and fought him because that's what everyone was encouraging him to do."

*Santa Elena Espriella Castillo* (Habeas Exhibit O (Ms. Castillo Dec.))

Santa Elena, Jorge's maternal first cousin recalled how Jorge was bullied in school. She described how Jorge was always afraid and needed his uncles to defend him. Santa Elena also stated, "I can't recall the details, but I remember an incident when Jorgin was goaded by other kids into drinking urine."

*Will Baird* (Habeas Exhibit G (Mr. Baird Dec.))

Will Baird, school counselor, succinctly stated, "I remember George as a student in Madison. He was easily influenced by other students." He continued:

> George was very much a follower. You could just see from his mannerisms, from the way he acted around other people. If there was a line to get in, there George would go. He never initiated anything. He never would have spoken up to state an opinion for himself unless someone else had stated that same opinion first. Not even to say, "oh, this is fun!" He wouldn't have demonstrated that level of personal or independent thought.

Mr. Baird also knew Jose Sandoval. In considering their relationship he recognized, "George was so easily influenced, and Jose was uniquely able to influence other people." He concluded, "It was a terrible combination."

*Galen Kronhofman* (Habeas Exhibit V (Mr. Kronhofman Dec.))

Galen Kronhofman, teacher, stated that "Jorge had a good personality, but he was less mature than his classmates his age." He further surmised, "Jorge was also easily influenced by other students and was a follower. He was never a leader." When asked to consider others' influence on Jorge, Mr. Kronhofman stated, "Over time, I observed Jorge gravitating to the wrong crowd in school." And regarding Jose Sandoval's influence on Jorge specifically he concluded, "I know Jorge would never be in this situation if it weren't for Jose and the influence he had over Jorge. Jose is the reason Jorge went down a bad path."

*Sheana Siegel* (Habeas Exhibit HH (Ms. Siegel Dec.))

Sheana Siegel was a Madison High School Spanish teacher. She shared similar observations about Jorge's susceptibility to manipulation. Mrs. Siegel stated, "I think Jorge got in with the wrong crowd. He was a follower and wanted to be like the other kids who pretended to be gangsters." She also commented on how the criminal act did not fit Jorge Galindo's personality or temperament. She stated, "I can picture Jorge sitting in class and smiling. He always made me laugh." She recalled, "I cried when I learned what happened because I don't think Jorge could have ever done something like that on his own." Her ultimate conclusion – "He was a follower."

*Mike Sunderman* (Habeas Exhibit II (Mr. Sunderman Dec.))

Mr. Sunderman, Jorge's high school coach and teacher, also identified him as a follower. He recalled, "Jorge was a chubby, happy, fun kid who wanted friends and

79

was easily led." Mr. Sunderman continued, "He wanted to be liked, accepted and to be part of a group, which made him easily led and influenced by others." Mike Sunderman considered Jorge's susceptibility to Jose Sandoval and stated:

> I believe Jorge is a person with a conscience who was led into committing this crime by Jose. My understanding is after he left school, Jorge was directionless and was sucked into a bad situation by Jose Sandoval who was older and more of a leader than Jorge. I don't think Jorge would ever have been involved in something like this had it not been for Jose's negative influence.

*Stan Turner* (Habeas Exhibit KK (Mr. Turner Dec.))

Mr. Turner, the Madison High School Principal, also recognized Jorge as a follower. He stated, "I recall that Jorge was a good-natured child who laughed a lot. He was a nice kid with no ill intent, but he was a follower and was very easily influenced." Mr. Turner went on to state that "[Jorge] parroted other students' behavior and did whatever other students around him were doing."

Stan Turner described other aspects of Jorge's cognition. He recalled, "Jorge was also very immature. His mental age was at least three years behind his chronological age. He was very naïve, and he often didn't see the seriousness of particular situations." That description would turn out to be prophetic. When asked, in particular, about the robbery Mr. Turner stated as follows:

> I believe Jorge was recruited by Jose to commit the bank robbery, and I don't believe it would have happened if it were not for Jose. It is widely known at school and within the community that Jose was the leader of this crime. Committing such a crime was extremely out of character for Jorge, but he was completely susceptible to Jose's influence and peer pressure.

*Dallas Zimmer* (Habeas Exhibit NN (Mr. Zimmer Dec.))

Dallas Zimmer, Madison High School Teacher, also clearly identified Jorge Galindo's follower status. Mr. Zimmer said, "Jorge was immature." He further stated, "I would describe him as a good soldier – he got along well with people, but he was not a leader at all. He was always clearly a follower." Again, when considering Jorge's role in the robbery, Mr. Zimmer concluded, "I believe Jorge was influenced by peer pressure from a bad crowd who led him in the wrong direction."

*Juventino Naranjo* (Habeas Exhibit Z (Mr. Naranjo Dec.))

Mr. Naranjo, Madison High School Interpreter, observed similar deficiencies. He stated that "Jorge was a follower, not a leader." He also recalled that "[i]f other kids started joking around, he was always quick to join in."

Mr. Naranjo explained that "Jorge was also very gullible and would believe anything." Mr. Naranjo expanded, "He was easy for other kids to trick. He was someone who needed protecting because of how gullible he was."

*Marcos Quijano* (Habeas Exhibit CC (Mr. Quinajo Dec.))

Marcos Quijano described another way in which Jorge's gullibility revealed itself. He stated, "George was a good friend; he would never say no; he would do whatever you ask." Marcos explained how that manifested itself in Jorge's relationship with Jose Sandoval (Baby Joe). He described how Mike Petzold and Baby Joe ended up on opposite sides of the methamphetamine game in Madison. Marcos stated that "George is a people-pleaser, so he didn't really know what to do with the kind of conflict that developed between Baby Joe and Mike – he didn't

81

know how to navigate the disharmony of divided loyalties." Marcos continued, "He ended up following Baby Joe. He followed him a lot. Sandoval was trying to create loyalty to himself, and George was an easy target." He concluded, "George didn't have the same sense of judgment about Baby Joe that everyone else did. He was more vulnerable to his manipulation. But he was always willing to do whatever Joe told him."

*Gilberto Samano* (Habeas Exhibit FF (Mr. Samano Dec.))

Jorge Galindo's childhood friend in Nebraska, Gilberto, reflected on Jorge's follower tendencies and his difficulty with regulating his behavior:

> Jorge thought I was the leader, but he couldn't recognize that I was drowning too. I tried to help Jorge as much as I could, but it was mostly helping him to try and regulate his behavior. I was always afraid to get in trouble, so when Jorge would act out too much – talk too much, act too much of the fool – I would try to cue him, "Hey, Jorge, calm down man."

Gilberto recalled that "Jorge was always very concerned about being liked, and he was willing to share whatever he had to make sure the people around him were happy." He also discussed how these cognitive deficits revealed themselves in Jorge's relationship with Jose Sandoval:

> When Sandoval came around and started creating a pressure that forced us all in one direction or another, Jorge didn't have the insight, or the ability keep pace with his friends who chose the other group. Jorge got unintentionally left behind like a sitting duck. It was Sandoval that literally manipulated Jorge. The one who is slow and dumb, that's the one they're going to manipulate. He was an easy target, plus he had money, so he was exploited. Jorge believed whatever Sandoval told him; he was so gullible, so impressionable, so susceptible; he bought into it so much. Jorge was stupid, he was very easy to manipulate. He left himself open to be taken by anything. If anyone ever bullied Jorge, it was Sandoval and his crew that bullied him.

82

*Amber Pfeifer* (Habeas Exhibit BB (Ms. Pfeifer Dec.))

Amber Pfeifer was another friend of Jorge Galindo's during his teenage years in Madison, Nebraska. She also recognized Jorge's social deficiencies. She recalled, "Looking back, I now realize that Jorge was immature for his age. Jorge was easily led and influenced by others." Amber, who was familiar with Jorge's abuse of methamphetamine, explained how she believed it played a role:

> I still believe that meth and Jose's influence are the reasons Jorge participated [in the bank robbery]. He was always a follower and was easily led by others, which I saw when he got involved in the furniture store burglary too. But the bank shooting was just never something he would have done had it not been for those influences.

*Michael Petzold* (Habeas Exhibit AA (Mr. Petzold Dec.))

Jorge's friend Michael Petzold also recalled Jorge as a follower. He directly stated, "George was a follower and a people pleaser. He was not a leader."

*Juan Villarreal* [(Habeas Exhibit LL (Mr. Villarreal Dec.))

Juan Villarreal worked with Jorge Galindo for his dad's business. Juan knew Jorge's dad as Don Jorge. Juan was also in the county jail with Jorge after Jorge was charged in the present case. Juan observed Jorge's adaptive functioning in both settings. In describing Jorge's functioning at work, he stated as follows:

> Once when I was still working with Don Jorge, Jorge got a little gig like riding around on the back of a garbage truck collecting trash. I would have found it [that job] humiliating. I imagine almost anyone would have. But Jorge used to ride around on that truck like he was in a parade. I suspect he thought that he was amusing people when they were likely really laughing at and making fun of him instead. He could not see how other people saw it.

Juan Villarreal was also familiar with Jose Sandoval. He described Jorge's relationship with Jose:

> Sandoval was something else. He was evil. And a manipulator. I can see how Jorge would have been brainwashed or manipulated by Sandoval into believing that he was going to make a lot of money. Jorge was someone who could be easily manipulated.

When Juan thought back about Jorge's behavior in the jail, Jorge's deficits were clear. Juan recognized that Jorge did not understand the position and influence Joe Smith held in the community, something that was common knowledge in Madison. Juan described these circumstances:

> And Jorge, man, Jorge never kept his mouth shut. He used to tell just anybody anything, whatever he thought they wanted to hear. He had no idea how to read the context of the environment; he had no appreciation of the situation he was in or sense of how to navigate it. He didn't have a normal sense of self-preservation. He didn't pick up on the code of conduct that most guys intuitively know to adhere to when they are on the inside [jail]. Jorge was not smart enough to know to shut up – that people would use him just like Sandoval had. Jorge had no comprehension of the politics, of Joe Smith's influence, like everyone else did. Joe Smith had his people working for him. I believe Smith manipulated cell assignments to capitalize on Jorge's deficits. Jorge's vulnerability was easily exploited by anybody who was willing to do Smith's dirty work and testify in exchange for lesser sentences.

Proof of Jorge Galindo's lifelong social deficits is abundant. The listed examples only enhance Dr. Safi's opinion based on her various structured interviews. Further investigation will likely reveal additional compelling evidence of Jorge's adaptive functioning deficits in the social domain.

*Practical Domain*

According to the APA (DSM-5-TR, 2022), this domain involves learning and self-management across life settings, including personal care, job responsibilities,

money management, recreation, self-management of behavior, and school and work task organization, among other things. The AAIDD (Schalock et al., 2021) describes practical skills as activities of daily living (personal care), occupational skills, healthcare, travel/transportation, schedules/routines, safety, use of money, use of the telephone. Independent investigation uncovered multiple examples of Jorge Galindo's struggles in this domain. These deficiencies revealed themselves in childhood and persisted into his early adult life.

*Marco Antonio Martinez Galindo* (Habeas Exhibit X (Mr. Marco Galindo Dec.))

Marco, Jorge's cousin, described how Jorge's ability to function at school as a child in Mexico was significantly dependent on his mother's controlling behavior. (*see, supra,* Conceptual Domain Section). Marco also recalled that Jorge struggled to understand basic childhood games in grade school. He explained, "During school, Jorge and I would usually play marbles or tops at recess – we were only in the first or second grade, so our play was simple. Still, Jorge was not good at either game compared to the other kids in school; he usually lost at both."

Marco also recalled how Jorge struggled with travel, safety, money management, and daily tasks as a child in Mexico. He shared an example about Jorge's deficits:

> In Mexico, it was typical for parents to send their kids off to the store to fetch things – that's always been the kids' job. For a little while, Jorge used to get sent out to buy things the same way that other kids did – usually to buy tortillas, but maybe for eggs or avocados – just not as often as other kids might have been. He would come back from the store, and he either wouldn't have gotten anything, or he would have gotten the wrong stuff, because he would spend all the money or forget what he was there for. Even with whoopings, he still brought back the wrong

things anyway; the beatings never changed his behavior. He'd still do the exact same thing the next time.

Marco was also able to contrast Jorge's capabilities from his own at the time. He explained as follows:

> I also had to take the bus to the nearby city, Mante, to buy things for my mother there. Beginning when I was around nine or ten years old, I had to go to Mante to buy the wholesale candy for my mom to sell. Again, it wasn't uncommon for kids to be sent into Mante to collect vending supplies for our parents. Jorge never rode the bus to Mante by himself. In fact, I can't even imagine Jorge being capable of doing that. Jorge operating with that kind of competence almost seems unfathomable to me when I think about it now.

When Marco and Jorge were together in Nebraska, Marco recognized that Jorge never caught up with the others. Although his parents allowed him more liberties and left him to his own devices, he was never able to grow into his new responsibilities. Marco shared:

> Jorge was given much more freedom in Nebraska. I remember once when he was maybe 15 or 16, Jorge got buzzed on alcohol and was trying to drive his dad's five-speed truck, but he couldn't do it. The drinking may have had something to do with him not being able to operate the truck, sure, but the thing is – he was trying to drive the truck *across the street*. Even though I kept telling him that we should just walk. That was how deficient Jorge's judgment was in the context of navigating his newfound freedom.

As the two of them got older, Marco was hired by Jorge's dad to work at the construction site. Marco described Jorge's work capabilities on the job: "When he would be on his dad's jobsites, Jorge would just kind of sit around and then say that his dad was going to get mad, so he would get up and start to work for a little while." Marco was also aware of Jorge's job at the meat-packing factory which was short-lived. Marco explained, "He worked at one of the meat-packing plants for a

86

little while, but that was third shift, when nobody really expects you to do anything, and it wasn't for very long."

In early adulthood, Marco observed the same deficiencies in Jorge and described how Jorge's parents accounted for them. He stated that "[h]is parents never entrusted him with any responsibilities." Marco continued, "For most of his adult life, he was living at the house that my uncle gave him, so he really didn't have to manage anything. I'm certain that my uncle was paying the bills directly, so that Jorge wouldn't have been doing any of that or managing any of the responsibilities in his life." He concluded by stating, "I don't think Jorge would have been capable of doing those things for himself."

*Santa Elena Espriella Castillo* (Habeas Exhibit O (Ms. Castillo Dec.))

Jorge's cousin Santa Elena, who observed him in primary school, could not imagine him successfully functioning in the world of work. She considered Jorge's potential:

> I don't know what kind of grades Jorgín got, but both Santos and I saw how delayed Jorgín was in his learning. I remember being really concerned about what was going to happen to Jorgín when he got older. I knew that he'd probably advance in school, because that's just how the system was in Mexico, but it was clear that he was just going to keep falling further and further behind. It was obvious that he was going to struggle; it was difficult to imagine what he might be able to do in life. He used to say that he wanted to be a carpenter like his dad, but how? I couldn't imagine Jorgín taking measurements or making calculations; he wouldn't have been able to do what a job like that requires.

Gilberto Samano (Habeas Exhibit FF (Mr. Samano Dec.))

Gilberto spent more time with Jorge as an adolescent in Nebraska. His assessment of Jorge's deficits was much blunter:

What I can tell you is that Jorge was handicapped in general; he was not right; he was what we call *tonto* in Spanish – he was dumb, slow, foolish, an idiot. Jorge was always looking for a guide. Jorge always needed a guide. Jorge was not competent in anything. Jorge did not have any strengths. There wasn't anything that Jorge could do well. That's why I say he was *tonto*.

Gilberto had a front-row seat to assess Jorge's adaptive skills. They spent time together engaged in activities that required some skill – but not complex skills.

Gilberto described as follows:

> He used to be at my house all the time. We usually played Super Nintendo; Street Fighter was one of our favorite games. Jorge wasn't any good at it; he didn't understand the strategy of the game. He almost always lost because he didn't have the competency to play it competitively. He could sometimes win if you gave him a chance and let him win on purpose without him realizing it.
> I tried to include Jorge in whatever activities I would do with my family or other friends. But Jorge couldn't play sports. He couldn't understand the rules.

Jorge's attempts at learning how to drive have remained in Gilberto's mind to this day. He shared his experience with Jorge in this way:

> I remember teaching Jorge how to drive. I didn't teach him how to operate the car, necessarily, but I tried to explain to him what traffic lights were, what the traffic signs meant, what a speed limit was; the rules of the road, so to speak. Whereas most of us just picked it up intuitively, Jorge always needed someone to explain things to him explicitly. I'm not sure to what extent he really understood, but he never had an accident. Madison was so small and empty that you could cruise around the whole town in three minutes and not see another car on the road. You didn't need to be able to understand how to properly drive to drive in Madison, because you really couldn't mess it up. There were 10, 11, 12-year-old kids who were all driving around.

Gilberto also spent time with Jorge at his father's jobsite. They were both expected to work doing truly menial tasks. Gilberto explained how Jorge struggled:

88

> I remember the first time I ever went to work on one of Jorge's father's jobsites with him. I expected that Jorge would know what he was doing and would be able to show me what I was supposed to do. When we got there, though, it was Jorge who want *me* to show *him* how to do it. It was very simple stuff – kid's work – just collecting trash from around the jobsite and putting it in the truck, removing screws, maybe helping to bust down some sheetrock walls. But he didn't understand. I had to lead Jorge through how to do what we were supposed to do, because I was the better one – even though it was my first time, and I had no idea what I was doing.

Gilberto had thought about his own experiences with difficult work as a child and young adult and considered how Jorge would have performed at such tasks. He concluded that "Jorge wouldn't have been able to work in the fields if he had to." Gilberto continued, "He would have needed someone to teach him, to accompany him; he would have needed a guide. Jorge would not have been capable of working cutting corn like the rest of us."

*Galen Kronhofman* (Habeas Exhibit V (Mr. Kronhofman Dec.))

Jorge Galindo's deficiencies with self-management and schedules impacted his education once he was left to his own devices in Nebraska. Galen Kronhofman recalled that "Jorge was often absent from classes and did not complete assignments on time."

*Mike Sunderman* (Habeas Exhibit II (Mr. Sunderman Dec.))

Mr. Sunderman shared similar observations, but he was quick to point out that these were not behavioral issues. Mr. Sunderman stated, "Jorge did not do well in school but was not a behavioral problem." He continued, "He was often absent or tardy and struggled to pay attention in class." Again, Mike Sunderman noted, "I recall that his problems were attendance and academics and not poor behavior."

89

*Marcos Quijano* (Habeas Exhibit CC (Mr. Quijano Dec.))

Marcos Quijano observed Jorge's functioning at work. He described his role in comparison to Jorge's. He explained the experience like this:

> I worked with George for his dad when I was about 17. I mostly did drywall, painting, roofing, things like that – things that were a little more sophisticated than the kinds of tasks that George did. Honestly, George didn't get much work done; he mostly just waited for the time to pass. George never managed to meet his dad's expectations.

*Juan Villarreal* (Habeas Exhibit LL (Mr. Villareal Dec.))

Much of Juan's interactions with Jorge were in the context of an employment setting. Clearly, Jorge was protected, in part, by working for his father. Similar behavior described by Juan in another setting would have resulted in Jorge's termination. Juan explained that he "worked with Jorge when he was about 19." He continued, "Jorge was a really nice guy. He was always late to the jobsite. Always. Like, every day. He was a clown. He moved slower than everyone else; he definitely worked at his own pace."

Juan's description of Jorge's assigned tasks and his performances on the jobsite are revealing. Juan described as follows:

> On jobsites, Jorge mostly did plastering and painting. He wasn't very good at it, even though it was the easiest part of the work. He would do the most simple and unskilled tasks. Jorge didn't really use tools too much. I'm not sure whether he would have known how to use tools. He wouldn't have known how to do sheetrock, that was too advanced for someone with his limited ability.

> Don Jorge (his father) would never send him to do anything on his own or entrust him with a significant piece of any project. He would never send him to handle a project or a jobsite by himself, like I used to do. Don Jorge always supervised Jorge very closely.

*Amber Pfeifer* (Habeas Exhibit BB (Ms. Pfeifer Dec.))

Amber provided some insight into Jorge's functioning as an "adult" in the family setting. She spent time with Jorge and his children's mother – Cortney Barritt. She explained that "[Jorge] leaned on Cortney to take care of him and their children." She stated frankly that "[h]e did not have the skills to take on that responsibility."

Jorge Galindo's practical deficits have appeared in all stages of his life. Various sources confirmed these deficits. Further investigation will likely reveal additional compelling evidence of Jorge's deficient functioning throughout childhood and early adulthood that demonstrate deficits in the practical domain.

### iii. Criterion C – Onset During Developmental Period

As discussed previously, Nebraska does not require the establishment of the developmental onset criterion. Nevertheless, Dr. Safi found that Jorge Galindo's deficits in intellectual and adaptive functioning were present before the age of 18. She based this conclusion on an integration of previous assessments, review of available records, risk factors, and collateral interviews. It is also apparent from the independent investigation surrounding adaptive deficits that those deficits were present and remained consistent throughout Jorge's childhood. Independent investigation and interviews of childhood friends, classmates, and teachers have also confirmed that conclusion.

### F.  Previous evaluation

Mr. Galindo's trial team hired Dr. Antolin M. Llorente, Ph.D., to evaluate him in 2004. Dr. Llorente did not diagnose Mr. Galindo with intellectual disability. Unfortunately, Dr. Llorente's evaluation was deficient in multiple regards.

First, Dr. Llorente was not provided with sufficient information to evaluate his adaptive deficits. The records provided to him were limited and he only conducted interviews of Mr. Galindo and his parents. Dr. Llorente was not provided reliable information from multiple informants who had directly observed Mr. Galindo engaging in his typical behavior across specific developmental periods of time and within specific contexts. *See* Habeas Claims 8.1, 8.2, 8.3, 8.4. In this regard, counsel were ineffective under the Sixth and Fourteenth Amendments. *See id.*

Second, although Dr. Llorente appropriately accounted for a 95% confidence interval in his test result (+/- 5 points), *Atkins* was not interpreted at the time to require consideration of the range of scores. Mr. Galindo's score, legally, should have been considered within the range of 74-84. Because this evaluation was conducted before *Hall* was decided, the parties did not understand that the courts would later acknowledge the variability in score that the science already did.

Third, Dr. Llorente failed to account for the now well-recognized "Flynn effect" when considering Mr. Galindo's overall IQ test score. The APA (DSM-5-TR, 2022, pg. 41) recognizes factors that may affect test scores – including the "Flynn effect" (i.e., overly high scores due to out-of-date test norms). This calculation for Dr.

Llorente's chosen test when he administered it to Jorge Galindo – although complicated – is significant.

The accepted rate at which the "Flynn effect" is calculated is .3 times the years of norm obsolescence. [AAIDD Book – intelligence chapter (McGrew)]. Dr. Llorente administered the Bateria Woodcock-Munoz-Pruebas de habilidad cognitiva-Revisada (WMPHC-R or BAT-R) to Mr. Galindo in 2004. The BAT-R used the Woodcock-Johnson – Revised (WJ-R) the norms via U.S. equated norms procedures. The mid-year of the WJ-R norming study [Table 8.4, AAID Book] is 1987 which results in 17 years of norm obsolescence. The Flynn value is then 5.1. With a score of 79 +/- 5, the adjusted "Flynn effect" score would be 73.9 +/- 5. Expressed with the appropriate confidence interval, it would be 68.9 – 78.9. This fact was not considered in Dr. Llorente's calculation.

With these limitations, Dr. Llorente's opinion was not fully informed. Today, the Supreme Court requires consideration of an IQ score expressed as a range. *See Hall*, 572 U.S. at 723. Nebraska recognizes a finding of intellectual disability with a score above 70. Currently, the medical community recognizes the "Flynn effect" as a valid factor in evaluating IQ scores. We know much more about Mr. Galindo's adaptive deficits today than Dr. Llorente did in 2004.

### G. Conclusion

Mr. Galindo has an intellectual disability. His IQ range is 68-78. He has extensive evidence of impaired adaptive functioning. The onset of these deficits were present before the age of 18. He has an intellectual disability as determined by standards set under the current requirements of the United States Constitution; the

93

current requirements of Nebraska law; and the current clinical definitions. Mr. Galindo's death sentences are contrary to *Atkins, Hall,* and *Moore*, and a violate the Eighth and Fourteenth Amendments.

**Claim 6: The State suppressed material and exculpatory evidence.**

The prosecution has a duty to disclose evidence that is favorable to the accused. *Brady v. Maryland*, 373 U.S. 83 (1963). This duty extends beyond direct evidence of innocence and applies to evidence that may be used to impeach the credibility of the prosecution's witnesses. *United States v. Bagley*, 473 U.S. 667, 682 (1985). *Brady* also imposes a critical concomitant duty on the prosecution to personally become aware of potentially exculpatory evidence in the possession of other government actors. *Kyles v. Whitley*, 514 U.S. 419 (1995). The State's failure to disclose exculpatory evidence violates federal due process if the suppressed evidence is constitutionally material. *Kyles*, *supra*.

"[E]vidence is 'material' within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine[ ] confidence in the outcome of the trial.'" *Id*. (quoting *Kyles*, 514 U.S. at 434). In determining whether the suppressed evidence was material, courts must consider the **cumulative effect** of all the suppressed evidence. *Kyles*, 514 U.S. at 434; *United States v. Madrigal*, 152 F.3d 777, 782 (8 Cir. 1998).

94

The state's duty to disclose exculpatory information is ongoing. *See, Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987). For evidence known to the state at the time of the trial, this ongoing duty to disclose extends throughout all legal proceedings that may affect either guilt or punishment, including post-conviction proceedings. *Steidl v. Fermon*, 494 F.3d 623, 630 (7 Cir. 2007). *See also Smith v. Roberts*, 115 F.3d 818, 820 (10 Cir. 1997)(*citing Ritchie* for the proposition that "the duty to disclose is ongoing and extends to all stages of the judicial process") and *High v. Head*, 209 F.3d 1257, 1265, n. 8 (11 Cir. 2001)(reiterating and applying language in *Ritchie* imposing upon the state an ongoing duty to disclose exculpatory information in habeas corpus proceedings).

The federal investigation of state-endorsed witness Jesse Padilla[9] and his associates (including the county attorney) was ongoing, as Hector Abendano and Miguel Lopez were being presented as witnesses at Mr. Galindo's trial,[10] and as Federal investigators attended the April 1, 2003, interview of Abendano. As one would expect, law-enforcement conducted a thorough investigation of the group, interviewing numerous witnesses, targeting Padilla's shop with search warrants, attempting undercover drug purchases, and wiretapping phones – eventually even targeting the county attorney's conversations for interception. As the investigation

---

[9] Padilla was incarcerated at the Madison County Jail at the same time as Mr. Galindo and his co-defendants, as well as jail informants Abendano, Lopez, and others relied on by the State. Jail officials placed Padilla in the same cell with Erick Vela, who reportedly made incriminating statements to him about the robbery. *See* Habeas Claim 7.

[10] Undersigned received several pieces of evidence that are subject to a protective order. Those protected documents support the factual allegations contained herein. Shortly, undersigned will file a motion to file the materials under seal with the Court.

continued, several of the targets, including the county attorney, provided sworn testimony to a federal grand jury.

The State withheld information regarding the circumstances surrounding the county attorney, as well as testifying witnesses Abendano[11] and Lopez, including the county attorney's connections to the Padilla drug ring; Abendano's connections to the Padilla drug ring and Miguel Lopez; and Lopez's connections to the drug ring and to Abendano. The State has never disclosed anything about the Padilla drug ring or the association of the county attorney, Abendano, or Lopez to the group, or the state investigative reports generated during the federal investigation. It has never disclosed any promise not to prosecute Cortney Barritt, never disclosed Trista Petzold's suspected involvement in the North Dakota drug ring, and never disclosed the forensic testing of Wiest's trunk which produced no results.

*The State Failed to Disclose The County Attorney's Personal Connections to the Padilla Drug Ring.*

The county attorney had personal connections to Jesse Padilla and other individuals involved in methamphetamine distribution in the Norfolk area in the time period before, during, and after Mr. Galindo's capital murder trial. Multiple sources have reported that the county attorney and Padilla had a close relationship, that the county attorney purchased drugs from Padilla and others (including jailhouse informant Abendano), that the county attorney was seen using or in the presence of illegal drugs with Padilla and others (*see e.g.* Habeas Exhibit L (Mr.

---

[11] The county attorney obfuscated Abendano's identity. The county attorney did not file his "jailhouse informant" notice until November 26, 2003, identifying Abendano as "Hector Feliz, aka Victor Valenzuela" and not Hector Abendano, the name used when calling him to the stand at trial.

Elznic Dec.)), and that the county attorney "protected" Padilla and did "favors" for him, including tipping him off when law enforcement planned to conduct searches or controlled buys at his mechanic shop. Sources have also reported that the county attorney offered to let a witness plead to reduced charges if he agreed not to talk about the county attorney's connections to the drug ring.

The county attorney's involvement with Padilla was so extensive that he was investigated by federal authorities for over three years, including a period of time when he was still prosecuting Mr. Galindo's case. Significantly, federal authorities placed a wiretap on the county attorney's phone beginning in September 2004 (*U.S. attorney confirms probe of Madison County attorney*, SIOUX CITY JOURNAL, June 5, 2005, available at https://siouxcityjournal.com/news/state-and-regional/u-s-attorney-confirms-probe-of-madison-county-attorney/article_a245ddd3-caa7-583c-9d81-5e7491cf52c2.html (last visited December 10, 2023). Mr. Galindo was not sentenced to death until November 10, 2004.

According to U.S. Attorney Joe Stecher, the county attorney provided "quite extensive testimony" at the federal grand jury proceedings against Padilla, Scott Freese (Padilla's and Abendano's lawyer), and others, and this testimony included "possibly some exculpatory or *Brady* information." Post-conviction Proposed Exhibit 662 (Transcript of Proceeding *U.S. v. Freese*, 8:05CR131, Hearing on Motion to Compel, 8:05CR131, April 7, 2006). That the county attorney provided substantial assistance in the prosecution of the Padilla drug ring defendants, while the county

attorney was himself the subject of federal investigation regarding the same criminal conspiracy, raises negative inferences regarding the county attorney.

Had this information been properly disclosed to Mr. Galindo prior to trial, it would have provided a strong basis for discrediting the State's key aggravation witnesses, for moving to disqualify the county attorney from prosecuting Mr. Galindo's case, and for requesting other sanctions due to prosecutorial misconduct. Padilla, who had a close relationship with the county attorney, was an active informant for the county attorney and was housed at the Madison County Jail at the same time as Mr. Galindo, Vela, Abendano, Lopez and other jailhouse informants. Jail officials placed Padilla in the same cell with Vela, and new evidence indicates this was done under the county attorney's direction. *See* Habeas Claim 7.[12]

Federal authorities investigated the county attorney for years, even after the wiretapping concluded. According to the county attorney's personal attorney James Martin Davis, it was a very "thorough investigation" that looked into everything from Smith's relationship to law enforcement and his informants, to his driving habits and sex life. Trisha Schulz, *No charges to be filed against county attorney*, NORFOLK DAILY NEWS, Apr 23, 2008, available at http://norfolkdailynews.com/news/no-charges-to-be-filed-against-county-attorney/article_2406d433-3db4-5d90-8d2c-fe7a729bcf51.html (last visited December 10, 2023).  In April 2008, the U.S. Attorney's Office announced it would

---

[12] Any citation to another section of this Petition also incorporates by express reference all of the factual allegations and relevant legal arguments contained in the cited section.

not be filing charges against the county attorney. However, this decision was not an exoneration of the county attorney, as U.S. Attorney Joe Stecher indicated "the decision was based on the availability of admissible evidence and not an assessment of whether Smith may have acted improperly." *Id.*

Considered separately and cumulatively with the other undisclosed evidence, *Kyles*, 514 U.S. at 434, the information about the county attorney's connections with the Padilla drug ring strongly suggests that: (1) the county attorney provided Padilla information concerning evidence to be presented at the aggravation phase and/or used Padilla to obtain information from Vela, Scott Freese and/or others relevant to the aggravation phase; (2) Padilla then provided this information to other jailhouse informants, including Abendano, enabling the informants to develop aggravation evidence implicating Mr. Galindo; (3) the county attorney then made witness deals with the jailhouse informants who knew about his close relationship with Padilla and the drug ring, in order to conceal his connections to the drug ring.

When considered cumulatively in light of all the other undisclosed evidence, this information demonstrates that each of the State's aggravation witnesses who claimed that Mr. Galindo made incriminating admissions (Abendano, Lopez, Daniel Animas, and Cortney Barritt) were either involved in the Padilla drug ring with the county attorney, have admitted to testifying falsely since trial, and/or had strong motivations to lie. Had the State not improperly withheld evidence, the State would not have been able to provide this incredibly damaging testimony at the aggravation phase.

Accordingly, had the State fulfilled its obligations under *Brady* and disclosed the information discussed above, there is a reasonable probability that the aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death.

> *The State Failed to Disclose Abendano's Connections to the Padilla Drug Ring, that He Was a Proven Snitch, and that He received Inducements for Testifying.*

Abendano, who provided damaging testimony at Mr. Galindo's aggravation stage including an alleged admission regarding a separate murder, conspired with Padilla, Lopez, and others to distribute large quantities of methamphetamines in the Norfolk area. Prior to and during Mr. Galindo's trial, Abendano was a target of a federal drug investigation involving Padilla, Freese, the county attorney, and others. It was reported that Abendano sold drugs to the county attorney, and that the county attorney provided Abendano favorable treatment in exchange for Abendano's testimony against Mr. Galindo and his agreement not to reveal the county attorney's involvement in the drug ring. The State did not disclose any of this information prior to trial as required by *Brady*.

Rather, the county attorney falsely argued that the aggravation witnesses were reliable because they were independent of each other, yet corroborated each other. *See* Tr. 3241-46, 3248. It is a violation of due process for the prosecution to use testimony to obtain a conviction that it knew, or should have known, was false. *Mooney v. Holohan,* 294 U.S. 103, 112 (1935). In *Mooney* and its progeny, the Supreme Court made clear that the deliberate deception of a court and jurors by the

100

presentation of known false evidence is incompatible with "rudimentary notions of justice." *Id.* A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Pyle v. Kansas*, 317 U.S. 21 3 (1942); *Alcorta v. Texas*, 355 U.S. 28 (1957); *Giglio v. U.S.,* 405 U.S. 150 (1972). In *Napue v. Illinois*, 360 U.S. 264, 269 (1959), the Supreme Court reaffirmed the expansive scope of this rule. stating that "[t]he same result obtains when the State, although not soliciting false evidence, allowed it to go uncorrected when it appears."

Abendano's connections to Padilla, the county attorney, and others in the drug conspiracy calls into question Abendano's credibility and motivations for testifying against Mr. Galindo. Furthermore, as discussed in Habeas Claim 7, given Abendano's jail placements with Lopez, Mr. Galindo, Vela, and others, and the fact that Abendano and Lopez were both represented by Freese, there is reason to believe that Abendano colluded with Lopez and/or others to fabricate false evidence or illicitly develop evidence under the county attorney's direction.

Further, Abendano, while represented by Freese, had previously acted as an informant for the county attorney. The failure to disclose that a witness for the prosecution was an informant, specifically a jailhouse informant, or had a deal with the prosecution regarding the witness's own criminal case violates a prosecutor's obligations under *Brady*. *Banks v. Dretke,* 540 U.S. 668 (2004) (failing to disclose

that key witness in the penalty phase was a paid informant and knowingly allowing the witness to testify falsely warranted a new trial).

Finally, the county attorney was not only involved in a criminal conspiracy with Abendano, but also provided inducements to Abendano for his testimony. Abendano informed another inmate about an agreement between he and the county attorney. The county attorney offered to help with Abendano's January 2003 Madison County charges if Abendano provided information about Mr. Galindo and his co-defendants; the county attorney offered to help Abendano if Abendano provided drug information about other people; and the county attorney offered to let Abendano plead to reduced charges if Abendano agreed not to talk about his history with the county attorney. The consideration Abendano received was not disclosed at the time of trial.

Had the State disclosed the information discussed above, the State would not have been able to provide Abendano's incredibly damaging testimony at the aggravation phase and would have been substantially impeached. Accordingly, had the State fulfilled its obligations under *Brady*, there is a reasonable probability that the aggravation proceeding would have yielded different results, and the sentencing panel would not have sentenced Mr. Galindo to death. Additionally, there is a reasonable likelihood that the false evidence could have affected the jury's aggravation determination and the panel's death verdict.

*The State Failed to Disclose Lopez's Connections to the Padilla Drug Ring.*

State's witness Miguel Lopez, who testified against Mr. Galindo at the aggravation phase, was involved in the drug distribution ring along with the county attorney, Abendano, Padilla, Freese, and others. Prior to trial, Lopez was incarcerated for selling drugs he had purchased from Abendano. The State failed to disclose any information regarding these criminal associations.

Rather, the county attorney falsely argued that the aggravation witnesses were reliable because they were independent of each other, yet, corroborated each other. *See* Tr. 3241-44. It is a violation of due process for the prosecution to use testimony to obtain a conviction that it knew, or should have known, was false. *Mooney*; *Pyle*; *Alcorta*; *Giglio*. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *E.g., Bagley,* 473 U.S. at 678.

Had this information been disclosed prior to trial, it would have impeached Lopez's credibility and raised a strong inference that Lopez colluded with Abendano, Freese, and/or others to fabricate false testimony in exchange for favorable treatment by the county attorney, or illicitly develop evidence under the county attorney's direction. Had this information been disclosed, the State would not have been able to provide such damaging testimony at the aggravation phase, and even if the testimony was presented, it would have been subject to powerful impeachment. Accordingly, had the State fulfilled its obligations under *Brady* and disclosed the information discussed above, there is a reasonable probability that the

103

aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death. Additionally, there is a reasonable likelihood that the false evidence could have affected the jury's aggravation determination and the panel's death verdict.

*The State Failed to Disclose a Favorable Witness Deal with Cortney Barritt.*

While testifying at the aggravation hearing, Cortney Barritt explicitly denied receiving anything from the State in exchange for her testimony, claiming she was testifying because it was "the right thing to do." Tr. 3093-94. However, when subsequently testifying against co-defendant Gabriel Rodriguez, she admitted that the county attorney told her she would not be prosecuted in exchange for her testimony. Trial Exhibit 231-236. Given Barritt's exposure to criminal liability as an accomplice or accessory to the bank robbery, Barritt's agreement with the county attorney would have provided powerful impeachment evidence. However, this information was never disclosed to defense counsel prior to trial.

Directly contradicting her testimony in Mr. Galindo's case, Barritt's admission provides direct evidence that she lied under oath when she falsely denied at Mr. Galindo's trial, under questioning first by the county attorney and then by defense counsel, that she had been offered anything in exchange for her testimony against Mr. Galindo. At no time prior to or after Mr. Galindo's trial did the State disclose the county attorney's promise not to prosecute Barritt in exchange for her testimony. Further, through questioning via the county attorney, Barritt minimized her involvement and knowledge regarding the bank robbery.

104

Nor did the State take any steps to correct Barritt's false testimony on her consideration or challenge her minimization of involvement. It is a violation of due process for the prosecution to use testimony to obtain a conviction that it knew, or should have known, was false. *See Mooney*; *Pyle*; *Alcorta*; *Giglio*. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." *E.g., Bagley,* 473 U.S. at 678.

Had this information been disclosed prior to trial, the State would not have been able to provide this incredibly damaging testimony at the aggravation phase. Had the State fulfilled its obligations under *Brady* and disclosed the information discussed above, there is a reasonable probability that the aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death. Additionally, there is a reasonable likelihood that the false evidence could have affected the jury's aggravation determination and the panel's death verdict.

*The State Failed to Disclose Material Information About Kristie Petzold's Involvement in Drug Trafficking.*

The State called Kristie Petzold to testify that around the time of the Lundell killing, she saw co-defendant Jose Sandoval and Mr. Galindo driving in Trista Wiest's car. Suppressed evidence reveals that as early as October 24, 2000, local law enforcement suspected Kristie Petzold, her brother Mike Petzold, and Ruben Fernandez—who testified for the State against Jose Sandoval—of drug trafficking between North Dakota and Nebraska. Based on the information available to post-

conviction counsel, Kristie Petzold knew she was suspected of drug trafficking at the time she testified for the State at Mr. Galindo's aggravation hearing.

The State never disclosed Kristie Petzold's criminal association with a North Dakota drug conspiracy. This information is material under *Brady* because it suggests a motive for Kristie Petzold to falsify or exaggerate her testimony for the State to avoid prosecution of either her or her brother. *See, e.g., Davis v. Alaska,* 415 U.S. 308 (1974)(recognizing the importance of "cross- examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to … the case at hand"). The criminal association between Kristie Petzold, Mike Petzold, and Ruben Fernandez, and Fernandez's status as an informant, was also material because it supports an inference that Fernandez influenced Petzold, or that the two colluded, to provide the county attorney favorable testimony against Mr. Galindo to avoid prosecution.

Had this information been disclosed prior to trial, the State would not have been able to provide this incredibly damaging testimony at the aggravation phase. Accordingly, had the State fulfilled its obligations under *Brady* and disclosed the information discussed above, there is a reasonable probability that the aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death.

> *The State Failed to Disclose Exculpatory Information Regarding the Forensic Testing of Trista Wiest's Car.*

The State called Trista Wiest to testify that she lent Jose Sandoval her car around the time Mr. Lundell was killed. The State's theory was that Sandoval, Vela

and Mr. Galindo used her car to transport Mr. Lundell's body after killing him, stopping at Petzold's home before or after doing so. The State failed to disclose significant exculpatory evidence that negates the State's theory and could have been used to impeach Wiest. Critically, a forensic examination for the presence of Lundell's blood in Wiest's car was negative. This information was never provided to defense counsel.

Prior to trial, the Douglas County Sheriff and/or other law-enforcement agencies, forensically examined the trunk of Wiest's car for trace evidence of Mr. Lundell's body. Amended PCR Motion at 44-46.[13] The examination, which included applying luminol to detect blood, was conducted at the direction of the county attorney after he traveled to Omaha to personally meet with and interview Wiest at her place of employment. *Id.* The results of this forensic testing were negative. *Id.* No trace evidence of Mr. Lundell's body was ever found in Wiest's trunk. *Id.* Neither the fact of the testing nor the results were disclosed to defense counsel. (Amended PCR Motion at 46).

Had this information been disclosed prior to trial, the credibility of the State's witnesses would have been thoroughly impeached by the forensic evidence. Accordingly, had the State fulfilled its obligations under *Brady* and disclosed the information discussed above, there is a reasonable probability that the aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death.

---

[13] Citing FBI's Trace Evidence Unit report dated, April 3, 2003; Detective D. Wichlep's crime scene search report dated, June 9, 2003

*Other Exculpatory Evidence.*

Given the history of suppression of evidence and the county attorney's clear conflict of interest, Mr. Galindo reasonably believes there may be additional exculpatory and material evidence to which he does not have access. He respectfully reserves the right to amend were he to obtain compulsory process, which he was never received. Such evidence would be properly before the Court once it was found to satisfy *Strickler v. Greene*, 527 U.S. 263 (1999).

*The State Presented Materially False Testimony Via Daniel Animas.*

The facts underlying Animas' false testimony are more fully laid out in Habeas Claim 16. In short, Animas falsely attributed an admission of involvement to the Lundell murder to Mr. Galindo. Since trial, Animas has twice reaffirmed his March 25, 2003, statements that Mr. Galindo had denied being personally involved. Tr. Exhibit 228; Tr. Exhibit 230. The recording of Animas' statement to Investigator Bos in Ventura County was not provided to defense counsel or introduced into evidence at trial. Amended PCR Motion at 32.[14] There is a reasonable probability that the aggravation proceeding would have yielded different results and the sentencing panel would not have sentenced Mr. Galindo to death.

*Conclusion*

The county attorney's failure to disclose the evidence discussed above violated Mr. Galindo's constitutional right to due process. *See Brady*, 373 U.S. 83; *Bagley*, 473 U.S. 667. As a result of the suppression of this evidence, viewed

---

[14] Citing Madison County Investigator Bos's interview of Daniel Animas, dated March 7, 2003.

separately and cumulatively, Mr. Galindo has undermined confidence in the integrity of the guilt, aggravation and/or sentencing phases. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new guilt, aggravation and/or sentencing phase.

### Claim 7: The State manipulated jail assignments to collect evidence in violation of *Massiah v. United States.*

The state violates the Sixth Amendment right to counsel when it surreptitiously obtains evidence against a defendant after the filing of criminal charges, unless counsel is present, or the defendant knowingly waives the right to have counsel present. *Massiah v. United States*, 377 U.S. 201 (1964); *United States v. Henry*, 447 U.S. 264 (1980). The Court has made clear that "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Massiah*, 377 U.S. at 205.

The State may not intentionally create a situation in which a defendant is likely to make incriminating statements outside the presence of counsel; nor may it knowingly exploit a situation that it did not intentionally create. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The fact that law enforcement may be "fortunate enough to have an undercover informant already in close proximity to the accused" does not excuse the use of investigative tactics designed to circumvent the right to counsel.

*Id.*, at 176-77 (quoting *Henry*, 447 U.S., at 272, n. 10). The defendant must show, however, that the State "took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986).

Jail officials, acting under the county attorney's direction, disregarded jail housing policies to place multiple informants with Mr. Galindo and his co-defendants. They did so to collect evidence or elicit incriminating statements for purposes of the State's presentation of that evidence at the aggravation phase of Mr. Galindo's trial. The State utilized Abendano and Padilla, members of a drug ring connected to the county attorney, to solicit incriminating statements from Mr. Galindo and his co-defendants, including Daniel Animas and Miguel Lopez, so that the other inmates, along with Abendano, could seek leniency or other reward in exchange for their testimony.

Here, the alleged movement of Padilla, Abendano and Lopez to cells with the bank robbery defendants, and with one another, constitutes an additional investigative tactic beyond "merely listening." Amended PCR at 15, 17-25, 28-30. The cell assignments simply could not have occurred by mere happenstance. Padilla and Abendano were each housed with co-defendant Vela. Amended PCR at 17. Abendano was then also housed with Mr. Galindo, Rodriguez, Lopez, and Roque Moreno – three of the bank robbery participants plus his co-conspirator and fellow witness, Lopez. Amended PCR at 19-20. Further, Lopez was housed with Abendano

and Animas after each had been housed with Mr. Galindo, raising the inference that they were going to get their stories straight. Amended PCR at 18.

There was a purpose with these choices. Abendano, Lopez and Padilla knew one another as members of the same drug conspiracy and both had been represented by Freese, who was convicted as a member of the conspiracy. *See Habeas* Claims 4, 6. [15] The county attorney visited Padilla at the mechanic shop while Padilla was on work release during relevant times. *Id.* Both Padilla and Abendano had a history of cooperating with Smith. *Id.* These facts support an inference the county attorney intentionally engaged Abendano to elicit incriminating statements or evidence from Mr. Galindo for purposes of the aggravation phase.

The actions of law enforcement at the Madison County Jail related to Mr. Jeff Houdek also are violative of *Massiah*. Jeff Houdek[16] approached jail personnel with information that he learned from third parties about Mr. Galindo's alleged planned escape attempt. The State then made him its agent and asked him to further incriminate Mr. Galindo. It is clear that jail staff allowed Mr. Galindo to continue his planning for a protracted period of time because they sought evidence of the planned escape attempt, and not because they intended to quash the planned escape attempt.

---

[15] Related to the sealed matters, a witness indicated that the county attorney kept a list of individuals involved with drugs that he could potentially use as a pool of available witnesses against Mr. Galindo.

[16] The county attorney has interfered with the development of this claim. On February 15, 2017, Houdek's wife told investigators that the county attorney instructed Houdek "not to talk to anyone about [Defendant's case]; keep your mouth shut, don't talk to anybody." Amended PCR at 17-18.

The State impermissibly and intentionally placed inmate Houdek in a cell with Mr. Galindo for the sole and express purpose of getting him, as an agent of the State, to elicit incriminating evidence of a planned escape attempt to be used against Mr. Galindo at his aggravation hearing. Officer Jon Downey confirmed the details of this approach in his testimony in rebuttal to the defense's mitigation presentation. Tr. 4143-4164.

As a result of the *Massiah* violation, where the State intentionally created a situation by circumventing Mr. Galindo's right to counsel, prejudicially violating the Sixth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and sentencing proceeding.

### Claim 8: Mr. Galindo's rights to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence.

"To prevail on a Sixth Amendment claim alleging ineffective assistance of counsel, a defendant must show that his counsels performance was deficient and that his counsels deficient performance prejudiced him." *Andrus v. Texas*, 590 U.S. --, 140 S. Ct. 1875, 1881 (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984). To show deficiency under *Strickland*, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, the defendant must show that

"there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. The Eighth Circuit has explained that under *Strickland*, "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993).

Defense counsel in a death penalty case are obligated to discover and present all substantial, available mitigating evidence. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); *Williams v. Taylor*, 529 U.S. 362, 394-98 (2000); *Kenley v. Armontrout*, 937 F.2d 1298, 1307-09 (8th Cir. 1991). "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). Moreover, "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (footnote omitted).

Relevant mitigating evidence "is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke,* 542 U.S. 274, 284 (2004). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are

113

attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (internal quotation omitted).

As more fully set forth below, Mr. Galindo's defense counsel failed to conduct any meaningful investigation into his life, character, background, or history. As a result, counsel failed to present a wealth of available mitigating evidence through lay or expert witnesses. Moreover, due counsel's lack of a meaningful mitigation investigation, they did not adequately prepare any of the witnesses they did present in the mitigation proceeding, foreclosing the presentation of relevant and helpful mitigating evidence to the sentencing panel.

### Claim 8.1: Mr. Galindo's rights to the effective assistance of counsel were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence through lay witness testimony

Jorge Galindo's early childhood in Mexico involved isolation, abuse, emotional neglect, and rejection. His migration to Nebraska added family separation, modeled substance abuse, and post-migration stressors to his childhood experience. Jorge experienced this life through the lens of significant learning, intellectual, and cognitive difficulties. Courts across the country have determined that this kind of evidence is meaningful to mitigation in capital case. Yet, trial counsel failed to investigate, develop and present this available evidence of Mr. Galindo's tragic childhood to the three-judge panel in mitigation. Counsel's failure to adequately investigate and present this evidence constituted ineffective assistance of counsel.

114

The Supreme Court has consistently held that evidence of a defendant's troubled childhood is evidence that has mitigating value. *See*, *e.g.*, *Wiggins*, 539 U.S. at 535-36. Thus, counsel's duty to investigate includes adequately investigating the defendant's social history and presenting available mitigating evidence regarding the defendant's troubled childhood. *See*, *e.g.*, *Id.*, 539 U.S. at 535-36. When a reasonable probability exists that omitted evidence of a defendant's troubled childhood would have caused one juror to balance the scales differently, counsel's failure to present the mitigating evidence prejudices the defendant. *Id.*, at 537.

Failing to interview witnesses relates to preparation and not strategy. *Kenley*, 937 F.2d at 1304. Lack of diligent investigation is not protected by a presumption in favor of counsel and cannot be justified as strategy. *Id*. at 1304. Furthermore, any decision to withhold available mitigating evidence must be based on adequate information. Counsel's failure to conduct the proper investigation that would have been necessary to determine whether to withhold mitigating evidence renders counsel's decision to withhold unreasonable. *Wiggins*, 539 U.S. at 523 (explaining that the proper focus of the *Strickland* inquiry in failure-to-present-mitigating-evidence-cases is "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable."). Foregoing the presentation of evidence because it contains something harmful is unreasonable when its harm is outweighed by its helpful value. *Williams*, 529 U.S. at 395-96 (holding that counsel were ineffective for failing to present

115

evidence of severe abuse of the defendant and the defendant's limited mental capabilities even though not all of the evidence was favorable to defendant).

Mr. Galindo's trial counsel failed to investigate his background in any meaningful way. Had they done so, witnesses in both Mexico and Nebraska would have been discovered and available for testimony. As explained below, these witnesses possessed mitigating evidence relevant to Jorge Galindo's case for life.

**Available Witnesses in Mexico Never Explored**

_Maria Torres Garcia_ (Habeas Exhibit JJ (Ms. Garcia Dec.))

Maria Garcia is a childhood friend of Aida – Jorge's mother. If trial counsel had interviewed her and called her as a witness, Maria would have testified about what type of person Aida was growing up – how she was closed off. She also would have described how Jorge, Sr. – Jorge's father - had a "wandering eye" for other women. Maria would have also provided compelling testimony about lack of nurturing, extreme isolation and neglect Jorge experienced as a young child, including being ignored by his mother when he was the victim of an attempted rape as a young child. Maria's testimony about Jorge's early childhood would have included the following:

> Aida's oldest son Jorge (we all call him "Jorgín") was born on May 18, 1981.  My oldest son, Rogelio, was born on May 24, 1981. They were born less than a week apart. Back then, both Aida and I had large patios, and it was the custom to wake up very early in the morning and begin the day by sweeping the patio. It took about half an hour from start to finish to sweep. I would sometimes swaddle Rogelio to my back while I swept, or sometimes he would be asleep inside. But what I started to notice immediately after our babies were born was that Aida always left Jorgín outside in his stroller while she swept. Even when he started to cry,

when he started to wail, she would refuse to pick him up. I'm talking about a newborn infant baby, a child of no more than days or weeks old in the beginning, crying out because they are hungry or wet or suffering in some way. That poor baby would be in his stroller crying, crying, crying and Aida would just keep sweeping until she was finished, sometimes for a half hour or longer. She would tell him, "*callate, callate!*" (shut up, shut up!), not necessarily yelling at him, using a softer, more cooing tone than that, but never going to comfort him or see what he needed, always just leaving him to cry and cry and cry. Even after she was finished, she still wouldn't pick him up. She would just push the stroller inside with the crying baby. This went on from the time she brought Jorgín home until about the time he started walking, I would say maybe for a year or two. She did not nurture her baby.

Aida did not breastfeed Jorgín. Jorgín was only bottle-fed. I know this because I saw Aida feeding Jorgín with a bottle often, and never once saw her breastfeed him, and because once Aida sort of implied to me that I should give Jorgín my own breast to feed him. To not breastfeed one's baby was very, very, very unusual for us in those times. It was unusual enough to stand out and be noticed. It was unusual in the way that it signaled something deeper was not right between a mother and her child.

I cannot tell you that Aida never carried or held Jorgín, but it would have been exceptionally rare. If they went out, it was always his father that carried him, and Aida would walk along behind them. Aida would hold Jorgín's hand when they walked, though, she was comfortable with that. But she always refused him any physical affection, or even any physical contact. I believe from the bottom of my heart that this is what harmed Jorgín—he was always lacking care and affection from his mother. Most mothers demonstrate their love and care towards their children openly. Aida was not loving or caring towards Jorgín at all. To the point that almost everyone in the neighborhood noticed and commented on how deprived Jorgín was. For example, once we were riding in the back of a pickup truck bed and we were getting thrown around because of the curves in the road, and Jorgín started to feel sick and scared. He reached out for his mother wanting her comfort. Aida refused him, pushing him off her, rejecting him emphatically, complaining to her husband that they boy was trying to grab for her again. That was the thing about Aida—her whole world was just her husband, just her "Papi." Always her husband; never her child. She focused all her love on her husband and didn't give any care or affection to her child. It was almost as if her child only mattered insofar as he gave her reason to bid for her husband's attention. I will tell you again:

she focused only on her husband and did not focus on her son ("*se enfocaba a su esposo no mas y a su hijo no*").

I remember when my youngest son, Israel, was a baby. He could always sense when I was in the room, or when I had left. Sometimes in the mornings I used to dash quickly down the block to the school while Israel was asleep to drop off lunch for my older kids, Rogelio and Lóida. Sometimes Israel would wake up and start to cry before I could get back. And Aida would come out and shout down the street to me that the baby was crying. I remember always thinking to myself, "how is it that she is concerned when other people's kids cry, but not her own?"

Jorgín was always very shut away. He was very rarely allowed to go out and play, and if he was allowed, he had a strict schedule. Let's say for the sake of example that he was permitted to play at the park for 20 minutes; at 20 minutes and one second, Aida would come out and shout at him to get in the house. After his father left to go the U.S., Jorgín always had very nice toys.  His father brought him a little kid's rifle, once. Jorgín and Rogelio liked to Use the rifle to try and shoot doves, which was a common thing to do in the villages. People hunt doves and then eat the meat. With Jorgín though, if he and Rogelio got a dove, he would leave it with me because he wouldn't have been allowed to take the meat home. People would sometimes say that Jorgín was the richest kid in the neighborhood because of all the things his father brought him, and the way that Aida would carry herself, kind of flaunting the status she felt they had because of the class of things her husband could afford. But rich in what? Jorgín lacked camaraderie, he lacked conversation, he lacked community, he lacked connection, he was missing friendship, he was missing love and affection, he was lacking exposure. And then to take him away from his home so abruptly to a completely unknown place? Jorgín went out into the world, and the world ate him up.

Once, when Jorgín was maybe five or six years old, after his father had left for the U.S., there was a kid that lived in the house that was next door to them—a different family, and a different house, then the one that's there now. The kid was about 16 or 17, I can't remember his name. But one day, I heard Jorgín crying and screaming in the street, and I saw Aida come out and yell at him, asking what was wrong. He told Aida that the kid wanted to rape him; that he had hurt him; that he had almost put his penis inside him ("*alcanza a meter la puntita decia Jorgín*"). I can't say for sure whether the boy actually did anything to Jorgín; I don't think that Aida even knows that I know this. It was clear from Aida's response that Aida did not believe Jorgín.  Jorgin's reaction

118

was something to be believed from such a young child—it was not something that he had ever said before or ever said again after.

Habeas Exhibit JJ (Ms. Garcia Dec.).

_Santa Elena Espriella Castillo_ (Habeas Exhibit O (Ms. Espriella Castillo Dec.))

Santa Elena Espreilla Castillo is Jorge Galindo's maternal first cousin. She is Maria Laura Espreilla Castillo's first-born child. She also knows Jorge as Jorgin. If trial counsel had interviewed her and called her as a witness, she would have confirmed much of what her mother had to say about the families and their relationships. Santa Elena would also have testified about Jorge's childhood experience as follows:

> Agapita [Aida's mother] tried to tell Aida that Jorge [Sr.] was not the right man for her; I'm sure Agapita could see the problems coming down the road. Aida told Agapita that she was going to get married _no matter what_, and she didn't care what she or anyone else said about it. Aida told Agapita, _"It's my decision, Jorge is going to be my husband, he is going to be my life, and I don't need anyone else or their advice!  All I need is my husband."_ I remember she spoke to her so forcefully; it was so ugly.

> For Aida, the only thing that she has ever cared about is what Jorge Sr. thinks or says. Aida was always 100% subservient to her husband. Aida's devotion to Jorge Sr. is something different than obedience, something beyond obsession. It's a total obliteration of self; _a complete willing submission._  If Jorge Sr. says that the wall is red—even though you're looking right at it with your own eyes and you know that the wall is yellow—then the wall is red. There is no telling him otherwise. And Aida is worse. Whatever Jorge Sr. says is how it is. What he says is _God,_ and Aida is like a self-chosen disciple. It didn't matter what it was. She seeks permission, permission for anything; permission to go out, permission _to go buy a tomato._ His permission fills her with glee. Aida would never deviate from Jorge Sr. She would never confront him in any circumstances.  Aida's ultimate priority in life is her husband's pleasure and approval.

I was three years old when Jorgín was born but—though our houses were no more than 50 yards apart—I was five by the time I met him. For the first two years of Jorgín's life, his father, Jorge Sr., forbid Aida from allowing us to see him.

Jorgín always preferred to spend time with our family when he was a kid over spending time with his father's family, or spending time at home. You could see it in his demeanor. You could see that when he was with us, when he came to Agapita's house, he felt peace, he felt love. It was a noticeable change in his personality—when you saw him trapped at his own house, he was always very sad and frustrated. After Aida and Jorgín left for Nebraska, whenever they would come back to visit, Jorgín would get very emotional. He always wanted to stay so badly.

Jorgín's father, Jorge Sr., has always been very cold. I would describe him as very dry, hostile, sour, and very rigid. It has always been very difficult for Jorge Sr. to demonstrate any kind of love or affection. I never saw Jorge Sr. show any affection towards Jorgín as a child.

Aida was not any better; in fact, she was worse. There's no way to say it nicely: Aida has never been able to tolerate any kind of affection or physical closeness with Jorgín at all. She always avoided his touch or any sort of physical contact with him, often screaming or crying or carrying on hysterically if ever Jorgín reached for her. It was *horrible* to watch when he was young. It was a very difficult situation. His mother constantly rejecting him and refusing him any nurturing; jerking her body away from him like he was a beggar tugging at her sleeve. We've always seen the preference; the preference that Aida had for her husband over her son. Aida neglected Jorgín and secluded herself completely with her husband instead.

Santa Elena would have also testified about Jorge Sr. and Aida's maladaptive behavior in trying to deal with Jorge's learning difficulties. She would have testified as follows:

Jorge Sr. and Aida just applied force over the problem.  Jorgín was constantly under pressure.  He was constantly shaking, trepidatious. He felt lonely, indifferent.  He used to wet the bed up until he was maybe 6 or 7 years old. They *knew* that something wasn't right in that sense. And Aida, instead of nurturing her distressed child, always threatened that she was going to hit him—hit him with the belt. Hit him *for wetting the bed*, hit him for not bathing, hit him for taking too long on the few

occasions he was allowed to ride his bike to the corner and back, hit him for not doing his homework.

Aida would hit Jorgin for things that had no cause. Normal, kid things. Things that no other child in Martírez would have been hit for. Things that needed nurturing, not punishment.

Jorgín was terrible about doing his homework, so he got hit a lot. The only reason he ever got his homework done was because his mom was so strict with him, always on top of him about it. If she wasn't standing over his shoulder forcing him, threatening to punish him, it just wouldn't have happened. Homework would have been the absolute last option for him.

Additionally, Santa Elena would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with Mr. Galindo's intellectual disability. Habeas Claim 5.

*Santos Rodriguez Trejo* (Habeas Exhibit EE (Mr. Trejo Dec.))

Santos is married to Jorge's cousin, Santa Elena. He has known Jorge since Santos was about twelve and Jorge was about five. Had counsel interviewed Santos and called him as a witness, he would have described the environmental toxin of "black wood" to which their family members, including Jorge, were exposed. He would have described how Jorge's father used it in building the family house. This information would have served a part of the basis for expert testimony as described *supra.* and in Habeas Exhibit A (Dr. Lugo Report). Additionally, Santos would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with Habeas Claim 5.

*Jesus Galindo Morales* (Habeas Exhibit R (Mr. Morales Dec.))

Jesus Galindo Morales is Jorge's paternal uncle. He lived in Mexico near Jorge and his family. He too refers to Jorge as Jorgin. If counsel had interviewed and called Mr. Galindo Morales as a witness, Jesus would have described the poverty in which he and his brother, Jorge Sr., grew up. He would have described his brother's relationship with their father and some of his early jobs. Jesus would have described the environmental toxin of "black wood" to which their family members, including Jorge, were exposed. This information would have served as part of the basis for expert testimony as described in Habeas Claim 8.2 and Habeas Exhibit A (Dr. Lugo report).

Jesus Galindo Morales would also have testified to the following regarding Jorge's early childhood experiences:

> After my brother Jorge left for the United States, my wife Prisca and I were the ones who took care of Aida and Jorgin. I recall that Aida and Jorgin would often sleep at our house instead of their own, to assuage Aida's fear and anxiety about being at home alone.
>
> Once Jorge left for the U.S., Aida felt very insecure about raising Jorgin by herself. She was abnormally strict and restrictive with Jorgin and would not permit him to do anything outside of the house or school. My enduring image of Jorgin as a boy is of a very isolated child longingly watching the outside world around him from inside his lonely bubble. He used to sit on this little cement wall that was close enough to the park to be able to watch the other kids playing on the soccer field. Jorgin wasn't allowed to play at the park, he wasn't allowed to interact with the other kids, so he would just sit and watch from afar and drink his Coke-a-Cola alone. Even if his cousins were there – even if Marco and Victor were running around on the field playing – Jorgin still wasn't allowed to go. Jorgin was only ever allowed to watch other kids have fun, and it was rare that he was even allowed to do that.

122

Economically, my wife Prisca and I supported Aida and Jorgin. After a while, my brother had made friends in the U.S. and was drinking and going out a lot, so he had forgotten about his family.'

In 2006, I obtained a visa and went to live in the United States. I recall Norfolk and Madison feeling like a very odd place to me, because of how lonely and isolated my brother and sister-in-law seemed to be there.

*Belin Maldonado* (Habeas Exhibit WW (Ms. Maldonado Dec.))

Belin is Jorge's paternal aunt by marriage. She lived in Mexico near Jorge's family and spent much time with his family when Jorge was young. She observed Jorge's family often and Aida's family on occasion. Ms. Maldonado also refers to Jorge as Jorgin. If counsel would have interviewed her and called her as a witness, she would have shared the following about Jorge's parents:

> The thing that you must understand in order to understand Jorgin's life is that Aida has always been super, super devoted to her husband – we often say that she is obsessed with Jorge [Sr.]. She is so in love with her husband – stuck to him, on top of him all the time, fixated on him like a teenager. Aida is very different from us. Most women, while we love our husbands, we're often frustrated or fed up with them, craving some space, just waiting for them to get out of our hair! But Aida was always right there. Sat beside Jorge Sr., doting on him. . . If Jorge Sr. got up from the table to go to the bathroom, Aida would tell him, "*I'll come with you, my love.*" And she would! She would follow him right to the bathroom and wait for him there. She was 100% dedicated to her husband. Him, him, always him, only him, everything for him. All her attention was focused on Jorge Sr. her whole life, all her love, was for her husband. Not for her children; for her husband. Her husband has always come first. To this day, Aida has never, never, ever once said anything bad about her husband. She's never complained that he mistreated her, or that he's had other women, all the things that most women discuss when they talk closely with each other. To Aida, Jorge Sr. is her God and she worships him like one.

She would have described how Jorge Sr. acted much like his father did and how Jorge Sr.'s mother treated his father much like Aida treated him. She would have described the neglect and lack of affection young Jorge endured as follows:

> This is the part of Jorgin's life that is the most difficult to talk about, because it causes us all such sadness. But you must know because it is the heart of the matter. Aida never held Jorgin. Not on her lap. She never let him lay his head on her chest. She never hugged him. She never carried him. She never pulled him in close. She never had any physical contact with him the way that a mother does with her child. She always rejected his touch; scolded him for trying to reach for her. From the time he was very, very, very small. It was all just for Jorge Sr. It isn't just me that knows it. It was extreme enough that it was a kind of shared sadness amongst all of us women in the *ejido*, because we all saw the way that Jorgin suffered, and as mothers, it was impossible to understand, and even harder to watch.

> Even though it's kind of a vulgar word, we used to lament amongst ourselves, "*She's crazy! Aida's CRAZY! She won't let the child get close to her!*" Once we were all in a truck driving to San Juan de Lagos together. Jorge Sr. was driving. Valente was in the front seat, and Aida and I were in the back with Jorgin. Jorgin was little, maybe 3 or 4 years old, so he fell asleep as all children do and his head kid of bobbed around and landed on Aida's shoulder to rest. Aida started hollering to Jorge Sr., "*Look, look, he's on top of me again!*" Jorge Sr. didn't say anything, didn't even acknowledge it really – he just kept driving. He never paid attention when Aida would freak out like that. He never defended Jorgin.

> I can't say for sure whether Aida breastfed Jorgin or not, but I never saw it. If she did breastfeed him, it couldn't have been for more than a few days, *possibly* a few weeks. It's difficult to imagine Aida being able to tolerate that kind of sustained contact and physical exposure at the same time. She was always peculiarly juvenile about her physical privacy.

Ms. Maldonado would also have described how Aida was closed off and always wanted to stay in the house. She would have further explained how that meant that Jorgin was always shut away. She would have described how Jorgin was

124

only allowed to walk to school and back. She would have further described as follows:

> It isn't that Jorgin was never permitted to play at *all*. But it was rare – *exceptionally* rare. And when he was allowed to play, it was for very short, prescribed periods of time. Maybe an hour at most. During the summer, most kids would be down at the river playing every afternoon. Jumping around the river, or in the canals, that was their game. There were tons of kids splashing and yelping and thrashing around, from all over the neighborhoods, all the time. But Jorgin was only ever allowed to go where Aida and Prisca went together, and Aida wouldn't have gone to the river.

Ms. Maldonado would have also described how Jorgin was starved of love and that his extended family tried to provide some to him while he was still in Mexico.

*Miguel Angel Ramirez Gonzalez* (Habeas Exhibit DD (Mr. Gonzalez Dec.))

Miguel Gonzalez was a childhood friend of Jorge's in Mexico. If counsel would have interviewed and called Miguel as a witness, he would have testified to the following about Jorge's [Jorgin's] childhood experience:

> I was never permitted to spend enough time with Jorgin to become as close as I would have liked. I was one of only two friends that Jorgin's mother, Aida, would allow him to have, and I was the only person that Aida ever really permitted to spend time with Jorgin at his house. Aida kept Jorgin very shut away. She was always very strict with him. He was never allowed to go anywhere or to do anything with other kids. Jorgin used to come from school, eat a snack, do his homework, maybe buy a Coke in a glass bottle, bathe, eat dinner, and go to sleep. That was his whole life. Occasionally, he was permitted to play for an hour or so.

> Jorgin used to be bullied when we were in school, possibly because he was very short and also very fat.

> Jorgin's mother used to scold and hit Jorgin a lot because she got frustrated with how much trouble he had with his schoolwork. She always felt like Jorgin should be better than he was. Looking back, now that I am older, I also believe that she had a lot of problems with Jorgin's father, Jorge, and she took her bitterness out on Jorgin as a boy.

125

I don't recall ever once seeing Jorgin with his father, though I do recall his father coming to visit very briefly from the United States.

Additionally, Miguel would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with intellectual disability.

*Ema Gonzalez Alvarez* (Habeas Exhibit S (Ms. Alvarez Dec.))

Ema Gonzalez Alvarez is the mother of Angel Ramirez Gonzalez - childhood friend of Jorge. She knew Jorge as Jorgin. If counsel would have interviewed and called her as a witness, she would have testified about Jorge's childhood experience as follows:

> My son Miguel was one of only two kids in the neighborhood who Jorgin was permitted to spend time with. Jorgin's mother, Aida, was extremely strict with him, especially after his father left to go to the United States. She kept Jorgin shut away from almost everyone and everything all the time. Come from school, eat a snack, do his homework, maybe have a bottle of Coca-Cola, bathe, eat dinner, and go to bed. Then wake up and go to school again. That was Jorgin's entire life for most of his childhood in Mexico. Jorgin was not allowed to play in the park or go to the river like other children were; I saw that he was almost never allowed to play at all.

> Aida was very committed to making sure that Jorgin did not have contact with other kids. Her attitude towards most kids in the neighborhood was as if they were common and dirty and poor, potential threats to the purity of her son, and so she shut him away behind closed doors and swatted them off like flies.

> She acted this way even towards the kids from her own family. Jorgin wasn't even really permitted to play with Marcos and Gracialea's kids, Marco and Victor – even though their fathers are brothers-in-law and they were away together in the U.S., and Marco and Victor are Jorgin's first cousins; Aida preferred that Jorgin did not associate with them outside of school and family gatherings.

126

Even with Miguel and Rogelio, Jorgin was only allowed to play for very short, irregular, and controlled periods of time. If Aida told Jorgin that he could play for 30 minutes but needed to be home by 1:00pm, you could see him become very nervous as the clock struck 12:45, 12:50, 12:55, 12:57. If he let himself get lost for a few moments in the lightheartedness of being a child, and he got home at 1:02, 1:03, 1:04, his mother would beat him. Jorgin would tell us about the beatings the next time he was allowed to come over and play – he would comment on it as he announced his curfew for the afternoon and asked for our help to watch the time.

As far as I'm aware, my son Miguel was the only child that regularly spent time inside Aida and Jorgin's house. I believe Aida considered Miguel to be from a respectable family, and approved of his performance at school, so she liked Miguel to come over after school to do his homework with Jorgin.

Jorgin is like a son to me. I know from my own experience and because Jorgin has told me from his own mouth that we were more a family to him than his own family ever was. Jorgin was always looking for a family. Jorgin was always missing a loving family. He was like a boy trying to follow the warmth of other suns. Aida never had friendships of her own; she was always very reclusive and isolated. She was close to her sister, Laura, but Laura drinks a lot, and when Laura drinks she loses her mind and runs around screaming in the streets. Aida mostly kept her distance from her sisters. She never visited her mother. She would never greet or acknowledge my son Miguel in public, no matter that he spent time in her house most afternoons. Aida was very smug; she believed herself to be better than others, to have more than other people had because of the things her husband bought for them. She carried herself as if she thought of others as low class and considered herself to be high class. She could never just be comfortable with the person who she was, she acted like someone she wasn't, she tried to represent herself as somebody perfect.

Aida used to excessively scold Jorgin and hit him all the time because of the problems that she had with Jorge Sr. Aida idolized Jorge Sr. He is like God to her. He is her singular point of obsession; all that matters to her is her husband's attention, affection, approval, the sense of inflated importance and infallibility that he holds in her eyes, and that she believes he holds in everyone else's too.

I can imagine that it was a great humiliation to Aida to be abandoned by her husband the way that she and Jorgin were. That they had been

127

left behind while Jorge Sr. was out behaving recklessly and running free. She will never accept that others see or understand the way he actually is; she will always defend him, even in the way she chooses what she believes to be true. Even if it has meant sacrificing her son.

Jorgin never had that place [where he was known and loved and safe] in his life, and though he did the best he could to borrow it wherever he could, his parents obstructed his access to other loving places too.

After Jorgin left for the United States, he used to come back with his parents to visit. We all saw how he was beginning to lose himself, how he was in real trouble and desperately needed help. It was during those years that he started to talk more openly with me about what life had been like for him when he was shut way with his mother. "You saw, you saw the way that she had me," he used to say, "that must be why I'm like this."

Additionally, Ms. Gonzalez Alvarez would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability. She would also have been able to testify about Jorge Sr.'s excessive drinking habits and the economic struggles he and Aida endured.

*Maria Laura Espriella Castillo* (Habeas Exhibit M (Ms. Espriella Castillo Dec.))

Maria is Jorge's maternal aunt. She also knew Jorge as Jorgin. If counsel had interviewed her and called her as a witness, she would have testified about the significant history of mental illness in Aida's family. She would also have revealed the sexual abuse she suffered at the hands of her and Aida's father. She would have been able to describe the controversial relationship of Aida and Jorge Sr., as well as describe Jorge Sr.'s excessive drinking and how he whisked Aida away from her

128

family at a young age. She would have testified about Jorge's childhood experience

as follows:

> Our parents were very strict with us – we were raised similarly to the way that Aida raised Jorgin; we were never permitted to go out. Aida never wanted to go out and work. She never liked to leave the house – she never went out; she never went around.
>
> It was right around the time that I first left for the border that Jorgin was born. That's why Santa Elena spent more time with Jorgin when he was a boy than I did. He was always extremely chubby, so whenever he would ask for a tortilla de maiz Aida would always be flabbergasted and scold him – "How can you be hungry again?!" – so Jorgin would sweetly ask me for one instead. I would always tell him, "Yes, of course, honey, here." He loved eating tortillas de maiz with beans and salsa.
>
> From the time Jorgin was an infant, Aida was always very cold towards her son. She never gave him affection, never showed him warmth or care. She was also exceedingly strict with him. Jorgin was never permitted to go anywhere or do anything. He was only allowed to move from the house to school and back to the house again; he never went anywhere else. On a rare occasion, he was allowed to go to the park and play, but only for an hour maximum, and only with explicit permission.
>
> Though it was Aida who enforced such restrictive control over Jorgin on a day-to-day basis, it wasn't just her that was strict with him. Aida and Jorge Sr. were both strict with Jorgin – it was his father who didn't want him running around out in the streets. It was Aida's natural personality to be reclusive, sure, but more than anything Aida is obedient, compliant, she does everything that her husband says. And Jorge Sr. was very explicit with Aida to keep Jorgin inside when he wasn't there. Whenever he was preparing to leave, he would always tell her, "Shut yourselves in? well. Be careful. Don't go out. You aren't going to let him run around in the streets. If something were to happen to him, I'm not going to be here. I'm going to be calling you to check up on you."
>
> After Jorge Sr. had been away in Nebraska for many years, it eventually came out that he had an affair with another woman there. Aida told me about it much later, maybe two or three years after Jorgin had already gone to prison. But there were rumors about it long before that. How that woman was wreaking havoc on his life, causing all kinds of trouble. I believe the reason that Aida left to go [to] the United States so suddenly is because she found out about her husband's other woman.

> And in the case of Jorgin, I believe that what ultimately went wrong is that his parents yanked him out of his pueblito, the only home and family that he had ever known, and took him over there to the other side, to a strange place, and then they left him completely on his own. They effectively abandoned him. How is a child supposed to survive that? When he left Mexico, Jorgin was a wonderful boy. Very obedient. Very loving. The kind of kid that you hardly ever see; there aren't kids like Jorgin anymore.

### _Maria Sanyesi Cavazos Espriella_ (Habeas Exhibit H (Ms. Cavazos Espriella Dec.))

Maria Sanyesi Cavazos Espriella is Jorge's younger maternal first cousin. She spent time with Jorge as a child in Mexico. She too knows him as Jorgin. If counsel had interviewed her and called her as a witness, she would have testified about her mother's psychiatric history and diagnosis of schizophrenia and the primitive cruel treatment her mother endured while the family attempted to "treat" the illness. She would have testified about the significant lack of affection in their family. And, she would have testified as follows regarding Jorge's childhood experience in Mexico:

> I have always felt a special attachment to my cousin Jorgin because of all the intentional love and support he showed me during my childhood. Jorgin really loved me a lot. Even though he was still a child himself, Jorgin always took very good care of me. He would come and take me around on his bicycle or his moped whenever he could. He would bring me lunch at school. He did anything he could think of to show me that he cared. I remember Jorgin with so much love and affection, from a place deep inside me that is still very scarred and vulnerable.
>
> Aida only really started to come around the family again once my uncle left for the United States. She and Jorgin would come and visit us in secret. When Aida would come, she would come in the afternoon and stay just long enough to drink a coffee, maybe a half hour. Then Aida would sneak them off again and go and spend days with her husband's family. When my uncle would come to visit, we wouldn't see Aida or

Jorgin at all. Then he would leave to go back to the other side, and they would be back with us again.

In my view, Aida and my uncle Jorge have always had a very toxic relationship. His pride was always more important to him than the needs of his family. My uncle Jorge despises people; it's like he detests us. He considered himself better than us; he acts as if people would judge him just for associating with us. My uncle is very authoritative. Jorge needs to be dominant. And Aida is very delicate. Aida submits to being dominated. My uncle is in charge of commanding, and my aunt is in charge of being commanded. A narcissist needs his dependent.

I believe my aunt Aida feared how my uncle Jorge would react if he found out that she and Jorgin had been with her family. She used to get very stressed. She would stay hidden all the time. It's really only been in the last four or five years that, when they come to visit, my uncle will tell Aida, "Why don't you go see your sisters?" And she'll come, but only for maybe 30 minutes. We don't' go to see them for the same reasons.

I remember on the occasions when Jorgin would come to Agapita's house, he always felt more relaxed. And he always wanted to eat. He loved tortillas with sugar. His mother would tell him that he could have just one, but no more. Jorgin would always say, "Mama, I want another gordita." And Aida would tell him, "No, you are already too fat! You aren't going to eat again until tomorrow!" My aunt was always scolding Jorgin for eating too much because he was so overweight. She was always withholding from him – withholding food, withholding love, withholding touch, withholding joy, withholding play. But sometimes you eat because you are missing something. I think that was Jorgin's way of coping with all the love that he wanted but never got. Jorgin never got love from his mother, or from his father.

_Petra Espriella Castillo_ (Habeas Exhibit N (Ms. Espriella Castillo Dec.))

Petra Espriella Castillo is Jorge Galindo's maternal aunt. She is the younger sister of Aida. She too knows Jorge as Jorgin. If counsel had interviewed her and called her as a witness, she would have testified about the significant lack of affection in their family. She would have testified as follows regarding Jorge's childhood experience in Mexico:

131

My nephew Jorgín did not grow up like a normal boy; he did not have normal development. He was very isolated. He grew up in a very closed circle, with only one or two little friends.  His parents used material rewards as a stand-in for affection or closeness to him.  The main message they communicated to Jorgín as a child was, *"if you behave well, we will buy you this."*

My brother-in-law was a good worker, and economically he provided for his family, but he was always very tough and macho, and he used to speak very forcefully to Aida and Jorgín. That's the old *machismo* term we use to excuse the kind of abusive verbal behavior that men often perpetrated against women and children in our culture.

Aida is a good and dignified woman, but Jorge mistreated her, and she always used to make excuses for him. They fought, and she justified it. Aida lived in a fortress. Jorge isolated Aida and Jorgín away and controlled their interactions. And despite the way he treated her, her husband was the darling of the house.

*Jose Ponciano Estrada Lara* (Habeas Exhibit P (Mr. Estrada Lara Dec.))

Mr. Estrada Lara was first a teacher and then the principal at *Escuela Matias S. Canales* where Jorge attended primary school while in Mexico. If counsel had interviewed him and called him as a witness, he would have testified to the nature of the educational system in Mexico and Jorge's school in particular. He would have testified as follows regarding his observations of Jorge's childhood:

What I remember about Jorge, whom everyone in school knew as Jorgín, is that he was a little shorty, and always came to school well-groomed and formally dressed—his mother always made sure his hair was combed back and his uniform was clean. He was very well-mannered and never acted out from malice. He was always joyful and friendly. I don't recall Jorge ever getting in trouble. Jorge's mother was very strict with him; it was sort of like he was held captive. He was very active in terms of class participation. I vaguely recall Jorge maybe needing extra help in school, particularly in math. He liked to come up and work problems on the board, but he was usually not successful at solving them.

132

School began every morning at 8:00am and went until 1:00pm, with a one-hour break for lunch and recreation. Many students would arrive around 7:30am. Most families in the area were extremely poor, and the school was a main food distribution point for most of our students, so we focused a lot on provision of breakfast and lunch (*desayuno descolar*). In some sense, feeding students was one of the more critical functions of the school in the community. [I]f a mother doesn't have oil for her frying pan, you must find a way to support the family's basic needs before you can think about the quality of a child's learning. So, it was critical that the school evaluate student performance in a way that facilitated families' access to the stipends. Students were therefore evaluated mainly on attendance, punctuality, class participation, and completion of homework assignments.

In the very beginning, grades were issued more like the American system (A, B, C, D, F). Soon though, we changed over to a numeric evaluation system, with students being given a mark between 1-10. The subjects we taught in class varied and were mostly up to the discretion of individual teachers, as was the amount of time spent on any given subject. Possible subjects included Math, Spanish, Art, Physical Education, History, Geography, and Natural Sciences. There was no English-language instruction. A lot of the instruction was in the style of what we would now refer to as "project-based learning." For the younger students, examples of school activities would include things like playing marbles, spinning tops, paper crafts, yoyo, soccer, dance, people-pyramids, or marching in line.

Additionally, Mr. Estrada Lara would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Marco Antonio Martinez Galindo* (Habeas Exhibit X (Mr. Martinez Galindo Dec.))

Marco is Jorge Galindo's paternal first cousin. Marco and Jorge grew up together in both Mexico and Nebraska. Their fathers left for the United States at the same time and worked, lived, and drank together for many years. Had counsel interviewed Marcos Galindo and called him as a witness he would have testified as

described in Habeas Claim 5 regarding Jorge's intellectual functioning as a child. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability. He would have described how strict Aida was with Jorge doing his homework as a young child; how she would sit beside him and supervise him working until it was complete – with a beating as the consequence of mistakes.

Marco would also have testified about Jorge's childhood experience in Mexico as follows:

> Apart from when he was at school, Jorge was basically shut away with his mother all of the time. He was almost never allowed to play with other kids. If he ever did get to play, it was only for very short periods of time before my aunt Aida would retrieve him, or he would get punished for coming back late. Most of the time, all Jorge was allowed to do was to go to school or to study.

> I can't say for sure, but I suspect that Jorge probably got 6's and 7's out of 10 in school—barely passing grades. My aunt Aida would have never shared that with anyone, she would have never admitted that Jorge struggled, but for those of us who were with him in school every day, it was obvious that he had an attention problem. He was always trying to entertain and perform for everyone around him. *Always*. Making faces at the teacher, whatever it took to make people laugh. He was always trying to please people. Jorge was so desperate and lonely at home that he would do anything to court favor or try and have fun. He would do anything for people to like him.

> During school, Jorge and I would usually play marbles or tops at recess—we were only in the first or second grade, so our play was simple. Still, Jorge was not good at either game compared to the other kids in school; he usually lost at both. We *kind of* played soccer, but it was only running around kicking a ball; we weren't good; we weren't playing a real game with structure or rules. Mostly, we'd just chase each other around, do stupid kid stuff like that. Jorge never really wanted to even play or run around much, though; he was always a bit on the chunky side, a bit lethargic, and his mom was constantly fussing about him getting sweaty or dirty at school.

She is nicer now, but my aunt Aida used to be very mean; she's changed a lot since we were growing up. When Jorge was a kid, she always physically pushed him away. Just like any normal child, like any of the rest of us kids, Jorge was always trying to hug his mom, to grab for her—he was always trying to get love and physical affection from her. But she would swat at him or push him away and tell him not to touch her, to get off her. She was always asking him why he kept trying to touch her. Over the years, our whole family has talked privately about what is "wrong" with Aida because of how withholding and neglectful she was towards Jorge; we've always thought that she must have been molested or something when she was young. Her reactions to Jorge's needs and gestures were outside the bounds of normal. As soon as I heard from Jorge's defense team that they would like to talk with me about Jorge's life, I knew that it was ultimately going to come down to the question of, "*What is wrong with Aida?*"

Jorge used to have really bad body odor as a kid. Back then in Mexico, they of course didn't believe in using deodorant or anything like that, so my aunt Aida used to rub lime in Jorge's armpits. That was one of the many excuses she used for why she didn't want Jorge close to her; she would tell him to get away from her because of how bad he smelled. But it was obvious to everyone that Aida's aversion to Jorge went much further than just because of his body odor.

The big thing with my aunt Aida was that she was always determined that her child would be *the best*. That's why I and the other kids from the neighborhoods were not allowed to hang out around Jorge—Aida would only let Jorge hang around the kids of professional families. If a kid's parents were not doctors or lawyers or accountants, Jorge wasn't allowed to have anything to do with them.

In my case, my father only has a second-grade education, so my aunt Aida would only *very* rarely allow me to play with him. Outside of school, we would mostly see each other on holidays or at our grandmother's house. Even though my father and Jorge's father were always together in lockstep, my brother Victor and I were grouped with our other cousins, the ones who lived on an actual ranch, and all the other kids from the neighborhoods who were deemed to be not good enough for Jorge to hang around with. My aunt would tolerate me coming over for short periods of time every now and again, but I wasn't really allowed in the house.

135

With our other cousins who, according to our aunt, were of an even lower station in life, Aida would be outright mean to them and chase them off, yelling at them to get out of there. If I went to Jorge's house after school to ask him if he could play, my aunt would shoo me away by saying, *"I just mopped! Don't come in here! I just finished mopping! Come back some other time."* Even after we all moved to Nebraska, my aunt Aida was still like that towards us, still cold and disapproving. It wasn't until many years later, after my family moved away to Kansas, that we were finally welcome in Nebraska.

Once our fathers left for the United States and they had access to a little more money, Jorge always had only the best. The nicest clothes, the most expensive toys. Jorge was notoriously known as the richest kid in the neighborhood. My aunt Aida insisted on it. With Jorge, even though he had all this fancy stuff, he was never allowed to play with any of the toys or other things that his father bought him. They were more just for show; they would sit up on a shelf like as if in a museum. If Jorge got something new, Aida would let him play with it for maybe 20 or 30 minutes a day, and then she would take it away and put it back on a shelf out of Jorge's reach. Instead of letting Jorge play with his toys, every Wednesday, Aida made Jorge shower, comb his hair back, and get dressed up to attend a sort of *brujeria* (witchcraft) ceremony at his maternal grandmother Agapita's house. Every week, he'd take a toy or offering that Aida gave to him off that shelf, presumably to use in the ceremony.

Once in a blue moon, Jorge was allowed to come over to my house to play. But he could only stay maybe 30 minutes or an hour, and then he would get anxious and say that he had to get home, or else he was going to get in trouble. In general, my brothers and cousins and I all got to have more freedom than Jorge did. We got to go to the river and play. Jorge lived much closer to the river than my family—so close, in fact, that the irrigation ditch in front of their house would often flood with river water and spill over on to their property. But I remember seeing Jorge at the river only one time ever, and I honestly don't know how it even would have happened that he was allowed to be there. I vividly remember Jorge being ecstatic the day that he got to play in the river.

Jorge's dad and my dad left together for the U.S., I believe sometime around 1987, when we were about five or six years old. Jorge and I were both abruptly left behind with our mothers, and we used to talk about it occasionally when we would play as kids. When our fathers first immigrated, they were living in south Texas close to the Tamaulipas border, working for a man named Eric Robinson. My dad used to say

136

that it was like indentured servitude working for that man; that he tried to own them.  He wouldn't let them use the bathroom while they were working; he would never let them enter his home.  Both of our fathers obtained their immigration papers through their employment with Eric Robinson, and as soon as they could, they followed the work from Texas to Nebraska so that they could get away from him.  After they moved to Nebraska, they were much further away, and it became a lot more difficult for them to get back to Mexico.  While they were still in Texas, they would come back maybe every third weekend or so.  Once they left Texas for Nebraska though, I remember there was a period of two or three years when they didn't come back at all; I remember Jorge and I just didn't see our fathers for more than two years.

My father was a terrible alcoholic.  My dad and Jorge's dad used to drink a lot together; they used to go out a lot together.  Even when they did come back to Mexico to visit, they'd just go straight to the bars or go drink at friends' houses. It seems like drinking was all that they did. They used to like to go to this one *cantina* called Gaspar's Bar in El Limón. They were always getting into fights.  My uncle Jorge is a little *chaparito* (a "shorty") and people used to pick on him when he was growing up, so he became a boxer and he liked to fight.  My dad liked to come home and fight with my mom when he was drunk.  Jorge told me his dad also liked to fight with his mom when he would come home drunk, but I personally never witnessed that.

I was very immersed in the stress and ugliness that was going on in my own family then, so I didn't really pay attention to whether similar problems may have also been going on in Jorge's family on account of his father's drinking.  It wasn't something that we spoke about explicitly, because it never occurred to Jorge that there was anything inappropriate about his father's behavior, but our families were in close enough proximity that I was able to observe his father's drinking habits. I don't think it would have necessarily been the same for Jorge as it was for me, in the sense that his parents wouldn't have fought about his dad's drinking in the same way that my parents did; my aunt Aida would have never confronted my uncle like that, she would have just cried about it instead.  I feel that my mom may have been worse than Aida in terms of being more subservient and suffering more abuse; I also believe that my dad was worse than Jorge's dad in terms of the severity of violence and physical abuse that he perpetrated on my mother.  My father wasn't working at the time, so he simply had more time to drink, and to get more drunk, then my uncle did.  At the same time, eventually my mother stood up and fought back.  She refused to take it anymore. She threatened to leave.  She defended my brothers' and my right to

have a better father and a more loving household. My father quit drinking. Things in our family changed, they got better. I cannot imagine Aida *ever* doing anything like that. She has always been so consumed with her husband; she would never place the wellbeing of her children over her relationship with her husband, her devotion to her beloved *"Papi."*

My aunt Aida has always had an odd obsession with my uncle Jorge. She always needs his attention, and she sometimes behaves in ways that I feel are very weird to try and get it. Once, when we were all at a family holiday gathering, Aida abruptly stood up in the middle of a conversation that was going on around the table, put her hand to her hip to model her waistline, and asked everyone if she looked skinny. Another time, she was in the passenger seat of the car with my uncle Jorge, and everyone had come outside and was gathered around to see them off, and out of nowhere Aida turned the volume up on the stereo to draw everyone's attention to how new and fancy the sound system was to show off that my uncle had bought it for her. These are just small examples to illustrate Aida's distorted relationship with my uncle, but the point is that I believe her fixation on her husband would have eclipsed her responsibility to protect Jorge from his dad's destructive habits.

Jorge's father was always disinterested in his wellbeing, apart from the way he criticized him. The clearest example that stands out in my mind to explain the difference between my father's relationship with us and my uncle's relationship to his family was the experience of our migration journey. I remember it like it was yesterday—how difficult and traumatizing it was. How scared I was. Aida and Jorge left alone with my uncle Jorge about a month before we left with my dad, but our grandmother died later that same month, so my aunt and uncle came back almost immediately for her funeral. Me, my mom, and my brothers ultimately ended up crossing with my aunt Aida and uncle Jorge after they came back and we all left Mexico together. The one thing I will never forget is how my dad never left our side for even a single minute during our journey, even though he already had papers. He stayed with us the whole time, walking, carrying my younger brother on his shoulders. My uncle Jorge drove the truck. Even though my aunt Aida was alone walking with us. Even after she got caught. My uncle Jorge was always up ahead rather than accompanying his family through one of the scariest and most traumatizing experience in our lives.

Additionally, Marco would have testified about environmental toxin exposure through drinking water, pesticides, and lead exposure. This information would have served a part of the basis for expert testimony as described in Habeas Claim 8.2 and expressed in Habeas Exhibit A (Dr. Lugo report). Marco also spent time with Jorge in Nebraska. He would have testified about their time in Nebraska as follows:

> Once we arrived in Nebraska, my family stayed with my aunt, uncle, and Jorge in the trailer, but only for maybe two weeks before Aida wanted us gone. I remember we didn't know where we were going to go, we had only barely arrived, when Aida insisted on putting us out. We ended up living in the attic of someone my dad had done some construction work for in the past, a practical stranger. I remember my dad would work on the house to help them fix it up as a gesture of gratitude for their hospitality on behalf of his family. This is why I say that I feel that my father communicated his care for his family through his actions much more deeply than my uncle ever did.

> I remember a few years after we got here, when Jorge and I were maybe 14 or 15, Jorge's dad was out drinking at a place in town called Angie's Bar, dancing with a transvestite that used to work there. Jorge and I were there with him, and Jorge asked his dad if we could use his truck to go out joyriding. I think his dad must have told him no at first, because Jorge told him that if he didn't let us take the truck, he was going to tell his mom what his dad had been up to. My uncle gleefully handed the keys over to him then, almost like he was *proud* of Jorge for extorting what he wanted from him like that. That was the sort of focus that my uncle had on Jorge's wellbeing.

> Jorge was the exact opposite of what his dad wanted. He didn't care about working. He wasn't interested in anything achievement oriented. He just always wanted to be with his friends. Whenever Jorge would mess up, get in trouble, fail at something, his dad's reaction was always, *"I told you he'd be doing something like that."* It always mattered more to my uncle that he had known, that he had been proven right, than it did that Jorge was struggling or needed support or was a sensitive person on the other side of that experience.

> I recall my aunt Aida going to work at IBP pretty quickly once we got to Nebraska. It was strange. My mother also worked at IBP after we got here, but she didn't start working until maybe 1995 or 1996—a couple

139

of years after we arrived. So, we had already settled in more. Me and my brother Victor were already a little more situated, a little more stable before our mom went to work. We had our bearings some. We were doing alright in school; we knew how to speak English; we had more or less transitioned into this new life of ours. That was our mother's main priority. That wasn't the case for Jorge. He was still very much overwhelmed and fumbling to find his way when his mother went to work for the first time.

Finally, Marco would have testified about the explicit racism in Madison and explained to the panel how that affected the lives of Mexican immigrant children there.

**Available Witnesses in Nebraska**

*Marcos Quijano* (Habeas Exhibit CC (Mr. Quijano Dec.))

Marcos Quijano is a childhood friend of Jorge's in Nebraska. Marcos also immigrated to Nebraska from Mexico, but he and Jorge did not know each other until they met in Madison. Marcos knew Jorge as George. Although Marcos was called to testify at trial, his testimony was limited. If counsel had competently interviewed him for purposes of mitigation, he would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as an adolescent. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

Additionally, Marcos would have been able to contrast what the prosecution described as a "gang" in aggravation at trial to what a gang really looked like and how this group was more similar to a friend group. *See also* Habeas Claim 21. He would have testified as follows:

What was going on in Norfolk then was nothing like what I saw in Utah. We had our group, and we had some rules that we adopted, and we had been involved in smalltime sales of marijuana and crank, but it was nothing like the kind of structured organization that I encountered in Utah. It was just stupid kids messing around, playing like wannabe gangsters. Nobody really worked, so selling drugs on the side was our way of sustaining each other. That was how we sometimes made money. But we just did it to get a little bit of cash to use to party ourselves. We didn't take it too seriously. We just did our thing. There wasn't too much pressure. There weren't really fights. We mostly just kicked back and every now and then we made some money. We were supposed to have "meetings," but I only ever went to one. I think the supposed consequence for missing a meeting back then was that you maybe got hit in the chest.

Whereas I witnessed real gang politics and behavior for the first time in Utah, Sandoval had picked it up in prison. He came back to the community with big new ideas. Sandoval was intent on replicating in Madison and Norfolk what he had learned about gangs and gang leadership while he was locked up. He was fixated on becoming like a "leader," a person that people feared. He demanded "respect," in the sense that demanding "respect" was the currency amongst gang members in prison. He wanted to set our friend group up like a gang; he wanted to convert us into real "Latin Kings."

We started to call ourselves "Latin Kings" sometime around the year 2000—around the time that Sandoval got out of prison. Jacob Segura, whom we called "Joker," and Gabriel Rodriguez, whom we called "Smiley," were already calling themselves "Latin Kings" before Joe showed up, but it was just a name; there was no connection to the real Latin Kings. Joker and Smiley had also picked up on the way that gang members carried themselves while they had been locked up. Jacob had been like the leader of the group before Joe got back, but he was calm. He didn't like fighting. He just smoked weed and was basically a normal guy. Joe didn't like that, but he didn't say anything to Jacob because he was his brother. Eventually, Jacob became addicted to meth. When Jacob would smoke meth, he would get extremely paranoid; he would lock himself up in the house for days, thinking that people wanted to fight or to kill him. Jacob started to use meth, and Sandoval moved in. Jacob became more of a follower of Joe.

If adequately interviewed and prepared for testimony, he also would have been able to better explain Jorge's substance abuse, and the hold

141

methamphetamine had on Jorge as an individual and that generation of kids in

Madison as a whole. He would have testified as follows:

> Jorge liked to party; he liked to have fun. We were around 14 or 15 years old when George and I started drinking. George and I both had a drinking problem from an early age—we drank often, a lot, and over a long period of time. We started drinking every now and then at first, and then eventually every weekend, and then it became every day. If we had the chance to drink, we would drink. We mostly drank forties of Bud Light and Old English, usually at Arturo's house. Later, when Ruben Fernandez and David de la Cruz got their own house, we took our drinking there. Drinking most often led to fights.
>
> George and I also started to smoke marijuana at around 15 or 16 years old. We would smoke between one and three joints a day when we did smoke, but it still wasn't an everyday thing back then.
>
> Whereas Job Corps was a very positive experience for me, and I was able to use the opportunity to build a skill set for myself, George came back from Job Corps very different from how he was before—he was even more distracted. It had opened his eyes to girls, to serious drinking, and to hardcore drugs.
>
> I recall the meth scene in Madison really taking hold around 1998 or 1999. When I left for Job Corps, nobody was using meth. When I came back, it was more and more. It was everywhere by then; people were totally hooked on it. Nobody wanted coke or weed anymore, everyone only wanted meth, so we saw an opportunity. We got involved in selling meth too. That's why we all became users. Meth is what went wrong for us all.
>
> I would say that it was around the year 2000 when George and I started to use meth. Before that, we would use coke together, but we didn't really get in fights. We would just hang around together and talk. By 2001, George and I were on meth really bad. Just smoking, smoking, smoking, like crack. We used to smoke meth five to seven days per week.
>
> Meth is like the devil. It completely takes over your body and your mind; it changes you and turns you into someone else. It changes your brain; it changes your face; it changes the way that you think. Emotionally, you don't care about anything. It makes you do things that you didn't know that you could do. If you have to steal, if you have to kill; it makes you so desperate you feel like you would do absolutely *anything*. It's the

142

same as crack, only stronger.  It makes you more angry, more paranoid.
It takes your happiness away; you can't find any sense for living without
it.  It affects everyone differently.  One guy might be out in the street
running around naked, and another guy, like Jacob, might be locked in
his room hiding under the bed.  But after you use meth, your mind is
never the same again.

George's meth addiction just kept getting worse and worse.  He was
worse than I was.  George was one of the people who got very paranoid
under the influence of meth.  I believe that may have been one of the
things that made it harder for George to walk away from Sandoval and
the rest of the group.  I was able to move in and out of the group for a
time without fear.  So were Ruben and Abraham and many of the others.
But it was different for George.  George feared leaving.  He told Ruben
that he wanted to leave but he was afraid.  He wanted to be a father to
Destiny.  He pulled away from the group some after she was born.  But
he just couldn't completely do it.  Once you see a lot of things, you see
what could happen to you too.  I believe George thought that Sandoval
might kill him if he tried to leave.  George told me once that he was
afraid they were going to kill him, and I knew he was talking about
Sandoval.

George was using a lot before the shooting.  Around the time of the
shooting, George and I were regularly smoking an ounce of meth
between us.  Or we would split two eight balls between two or three
guys.  We would be up for a week straight, running around all day and
all night.  No sleep, no food, hardly any water for six or seven days in a
row.  That's what really messes you up.

I believe George's meth use was a fundamental reason why he was
involved in the shooting. I do not believe that George would have been
capable of doing what he did if he had not been under the influence of
meth.

Finally, Marcos would have testified about Jose Sandoval. He would have

described, in no uncertain terms, Sandoval's malicious personality and

manipulative, domineering ways.

143

*Stan Turner* (Habeas Exhibit KK (Mr. Turner Dec.))

Stan Turner was the principal at Madison High School when Jorge Galindo attended. Mr. Turner was also called as a witness at Jorge's trial. Unfortunately, trial counsel did not adequately prepare him for his testimony. Because counsel failed to conduct a reasonable investigation and competently interview Mr. Turner, they failed to learn valuable information Mr. Turner could have provided regarding community and school dynamics with Mexican immigrants, Jorge's relationship with other students, and Jorge's academic struggles. Counsel also failed to ask Mr. Turner to review Jorge Galindo's records or Jose Sandoval's records before testifying. Had counsel done so, Mr. Turner would have testified to the following:

> In the 1990s, during the time Jorge was a student in Madison, the school became inundated with non-English speaking students, primarily from Mexico. We realized that we needed to modify our teaching to help the students who did not speak English, and we started an English as a Second Language (ESL) program in1991. . The program was still very new to our school when Jorge enrolled in school in Madison in 1993.

> We were learning on the run when it came to teaching ESL students. We struggled to correctly place students arriving from Mexico because they often did not have documentation from their previous schools. We had to rely on information from parents, questionnaires, ESL skills tests, and the student's age to try to determine the appropriate grade placement. But age was not always an accurate indicator for grade placement because the school systems in some Latin American countries are so different. The school was also full of undocumented students, but we did not ask about students' immigration status.

> The ESL class was taught by Ms. Moyer, who was a community member interested in helping kids. She did everything she could to meet the needs of all kids. Ms. Moyer did not speak Spanish and was working towards an ESL certification.

> Students were placed in ESL based on their lack of English proficiency. The ESL class had students of all different ages and different levels of

144

English proficiency. It was a three-to-four-hour daily immersion class, meaning that core classes such as [R]eading and English were given as part of the ESL class. Physical Education and Math were considered universal classes, so the ESL students were in regular classes for those subjects, with non-ESL students.

Some legislative measures were in place to support bilingual and economically disadvantaged students at the time Jorge was in school but extensive reform was needed and did not occur until after Jorge left school. We learned a lot over time about how to better help non-English proficient students.

There was racial tension in the community in the 1990s as a result of the influx of immigrants from Latin America. A lot of the Latin American immigrants worked at IBP, and although they were paid well, many people had to send money home to relatives in Mexico.

At the time Jorge was growing up, however, the communities were just beginning to create systems to help address the needs and social problems that arose from the large influx of people.

Most IBP employees at that time did not speak English well and relied on their children to help them communicate. I recall how difficult it was for people to get their green cards because of the hoops they had to jump through and the required travel to Omaha. Sometimes, one member of a family would spend all day on the phone with Immigration officials to take care of everyone in their household.

I also recall that many people lived in fear of Immigration agents after they came to Nebraska. Many of our students were undocumented. Teachers and administrators at the school often did not know the students' trauma histories or what they may have gone through.

Eventually, because Jorge was failing so many classes and was so frequently absent, he was not earning credits in school. I recommended that he apply to Job Corps as an alternative. Job Corps was a difficult program to get into at that time, and it was like a boot camp. Jorge was not there for long. Afterward, he returned to Madison High School but ended up dropping out.

My impression was that his father wanted Jorge to succeed, but Jorge fell into the wrong crowd.

145

Finally, Mr. Turner would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*James Crilly* (Habeas Exhibit J (Mr. Crilly Dec.))

James Crilly is the current principal at Madison High School and was a an eighth-grade teacher and football coach at the school when Jorge Galindo attended. Had counsel interviewed and called him as a witness, Mr. Crilly would have testified as follows:

> Just like the teachers, students who emigrate also struggle. The school days and methods are foreign to them. Not only is the school culture different, but the entire community is a novelty to the children. Those children, like Jorge, often receive inadequate support in their homes to assist them to succeed in the classroom.
>
> There were also racial tensions at the school and in the community at the time. The school used to be about 80% white at that time and 20% other ethnicities. Now, it's more diverse and multi-ethnic. There are many South Asian students and it's more like 20% white and 80% other ethnicities.
>
> Madison Public Schools have drastically changed since Jorge Galindo was in school. Today, there are far more resources, programs, and services to help kids who have recently arrived in the United States, at the national, state, and local levels. Our ELL program has improved tremendously as well.
>
> Testing and referrals for special education have changed over the years, too. Now, we do not only look at IQ scores to determine whether a student needs special education services; we also look at the kids' reading, learning, and comprehension. If it seems needed, we will make a referral to the Educational Service Unit 8, which is an outside agency with psychologists and specialized professionals come into the school to test and provide services. If the student qualifies, the parents must

146

approve.  Then, the student can be given modifications such as more time on tests.

Additionally, Mr. Crilly would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Will Baird* (Habeas Exhibit G (Mr. Baird Dec.))

Will Baird was a counselor at Madison High School when Jorge Galindo was a student there. Mr. Baird knew Jorge as George. Had counsel interviewed and called him as a witness, Mr. Baird would have testified about the struggles the students, school, and community had with one another because of language barriers. He would have also testified about Jorge's individual struggles. He would have testified to the following:

> Because of my many duties, as well as a lack of resources and low staffing, I did not feel that I was able to sufficiently attend to the emotional needs of students as their school counselor.  I believe any school counselor in rural Nebraska at that time would tell you something similar.  My experience in Madison stood in stark contrast to my experience at other school districts I have worked in.  In most schools, there are established procedures for dealing with the emotional needs of students, depending on what their specific need might be, and all that you must do is follow the protocol.  If a student is struggling academically, we might refer him or her to the special needs counselor; if they are experiencing abuse or family dysfunction, we immediately refer the student to the Vice Principal to contact child protection services.  I once had a student who was held in the hospital overnight just for observation, based only on the suspicion that they may have been suffering abuse.  We had nothing like that in Madison.  Absolutely nothing.
>
> The IBP plant sent recruiters to the border and promised people good paying jobs, good housing, great schools, and a new life in Madison if

147

they would come work at the plant, even though these were brazen misrepresentations. Although the pay was better than in Mexico, there was not enough housing for everyone who moved to the area. Multiple families ended up living in spaces that wouldn't even qualify as an apartment, until the meat processing plants eventually built trailer parks and apartments in towns like Madison, Columbus, and Schuyler.

In other towns, they would require proof that an aunt or uncle or some other extended family member lived nearby as a means of excluding Mexican students from matriculating in their schools. Or they would require that the student and their parents all showed proof of legal immigration status. They made up all kinds of policies to prevent Mexican students from accessing their legal right to public education in Nebraska.

In Battle Creek, a nearby town, they actively tried to displace all Mexicans who were enrolled in their schools. If a student tried to enroll in school there, the Sheriff would target the student and their family, following them around or through the town in a patrol car to terrorize them into leaving. Mexican immigrants clearly picked up on the message he was sending: "You are not welcome in Battle Creek."

Madison may have been better than the surrounding areas in terms of school enrollment policies, but there was certainly a great deal of anti-Mexican sentiment and prejudice in the community there too. The community as a whole was mad about "these Mexicans" living there and it was clear that they were not welcome nor wanted. It didn't spill over into the schools in the same way, in the sense that I never saw a parent or other community member come to a School Board meeting to protest that Mexican kids shouldn't be going to school there. But you constantly heard talk around town. Whenever an incident of theft or vandalism would occur, there were always whisperings that it was "the Mexicans," when in reality, time and time again, it was never them. It was always a local, homegrown, native Nebraskan boy. Whenever the actual culprit would come to light, the tone would immediately shift from talk of Mexican immigrants who were threatening community security to the idea that "boys will be boys."

There was even more suspicion and negative feelings towards the Mexican immigrants who settled there. The class system also fell along racial and ethnic lines, and it was obvious that certain kids thought they were better than others. Students already discriminated against their white peers based on economic status, and then the Mexican kids come along, and they were *way* below their level. They weren't viewed as

148

peers; they weren't even viewed as rivals. They were just Mexicans. He or she didn't have anything, so there was no point in even bothering to associate with them. I don't recall there being overt hate groups at the school, but there certainly was racism in a more insidious form.

There was no school counselor there whatsoever for many years, nor was there an English as a Second Language ("ESL") teacher.

We had no school psychologist to help students adjust or deal with their new environment, and teachers and administrators did not speak Spanish. The only thing the school did to help the Spanish-speaking students was hire an ESL instructor, Mrs. Moyer. She had good intentions and cared for her students, but she was not a credentialed teacher, or a trained educator of any kind, and she did not speak Spanish. She also never attempted to learn to speak Spanish; that would have been beyond her.

For students who had recently immigrated to the area, I don't believe that we had any real expectation that any of them graduate at all. There wasn't even a stated, realistic expectation that they actually be learning English. How were you supposed to meet with an ESL kid to discuss how he or she hadn't completed their sophomore English literature course yet? Those were issues that we just weren't thinking about; it was all so new. We felt lucky if we managed to prepare them to speak a little English.

Because of the language barrier, the Mexican students also didn't have access to any extracurricular activities. There was no band director, no coach, nobody to help provide mentorship or support, and no forum to be consistently interacting with English-speakers outside of their limited classroom experience. For the Spanish-speaking students, they would just cycle from class to class, maybe have a two-minute passing period, then go to the next class, then go home. There was no playground time or recess like in elementary school, academically. Their English-speaking peers disregarded them, at best. How were they supposed to learn? We saw very little progress. Even though our students were in high school, in reality, they probably should have been in grade school.

As a counselor at a school with a lot of racial tension and social hierarchy, I tried to find ways to bring students together. I developed what we called "Pride Groups," where students were divided into groups that were mixed in terms of ages and race and ethnicity. The purpose was for the students to learn about each other and try to foster some understanding and respect for each other. These groups were basically

group counseling, where students could bring up issues and talk about them.

Still, the activities of the group were mostly limited to students meeting amongst themselves after school to share and celebrate their culture with each other.

I do not recall any Mexican students ever participating in a mediation. There were no interpreters involved in the mediation groups, and it would have been difficult for a student to participate if he or she was not proficient in English. How do you tell your side of the story when there is no translator to assist you?

We also did not have interpreters for things like parent-teacher conferences. The student would be pressured to act as the interpreter in those conferences. If the school needed to reach out to parents to tell them their child was struggling, I believe Mrs. Moyer was generally tasked with the outreach. I believe she tried to do the best she could, but she did not speak Spanish. I do not believe she would have been able to communicate to non-English speaking parents that their child was struggling. When Tino Naranjo was hired to work at the school, he may have communicated with students' families on occasion, but to my knowledge, he mostly communicated with the students themselves.

Additionally, Mr. Baird would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Juventino Naranjo* (Habeas Exhibit Z (Mr. Naranjo Dec.))

Juventino Naranjo served as an interpreter at Madison High School. Even though he was not formally trained as such, he was the only Spanish-speaking adult for much of the time Jorge was there. Mr. Naranjo was a trained minister, but he wore many hats in the Madison community. Had counsel interviewed and called him to testify, Mr. Naranjo would have provided much context for the panel

150

regarding the difficulties immigrant families faced in Madison. He would have

testified as follows:

> Recruiters from the meat plants went to the border and promised people good wages, healthcare, and housing. But when workers arrived in Nebraska, there weren't enough affordable places for people to live and multiple families ended up living in single family homes. Eventually, those companies secured trailers to house them. At the same time, as the number of Hispanic workers in the meat industry grew, tensions grew in the community, too. There was resentment in the community against the Hispanic immigrants who had arrived to work in the plants.

> I was the pastor of a Hispanic Ministry that was housed in the Frist Presbyterian Church in Norfolk and a volunteer chaplain at the local jail. Being in all those roles, I witnessed many of the community struggles and cultural clashes in response to the increase of immigrants. Once, a neighbor actually called the police on me and I had to present my immigration papers, which was an awful and humiliating experience. The cultural clashes in the community only increased as the years went on.

> Tension between the Latin American community and the white community worsened after local officials and federal immigration services went door to door intimidating local residents.

> Mrs. Moyer did not speak Spanish, but I do not know whether she had any formal training to be an ESL teacher. Overall, the school was not equipped to teach ESL students and did not know what they were doing, although I think they did the best they could under the circumstances.

> The ESL students stayed in Mrs. Moyer's class for core subjects but attended some classes with the other students in the school like Physical Education (P.E.). At times, the students had no comprehension of what was going on in class because many of them were new to the United States. Coming to the United States was a shock for many of the children and for their parents. Many of the students had a difficult time adapting to United States culture, and their parents could not help them because they did not understand the culture or the language either.

> The language and cultural barriers between the Hispanic and non-Hispanic students, and within the school as a whole, became very stressful at times for the students and for the school. The Hispanic students' identity was a problem for many people, and some teachers

151

made no effort to try to understand them. Some even forbade the students from speaking Spanish in their classrooms. I thought it was very upsetting and problematic to take that away from the Spanish-speaking students. Their language was part of who they were, and for many of them it was the only way they could really communicate. From a child's perspective, it delegitimized who they were.

The students lied being in ESL class because they could be together and felt comfortable with one another. The ESL class was a safe space for the children. They could joke around and have fun. At the same time, though, Mrs. Moyer was a strict educator and would get frustrated when the students were joking and having fun. She felt that they were not listening to her. Still, she was more understanding than some of the other teachers were.

Additionally, Mr. Naranjo would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Gilberto Samano* (Habeas Exhibit FF (Mr. Samano Dec.))

Gilberto Samano was a childhood friend of Jorge Galindo's in Nebraska. He arrived in Madison before Jorge did. He moved away to Texas about three years after Jorge arrived. If trial counsel had interviewed and called Gilberto as a witness, he would have testified about the difficulties Spanish-speaking students faced in the community and the school at Madison. He would have also testified about his observations of Jorge. He would have stated:

Realistically, there were probably 4 or 5 Spanish-speaking kids in Ms. Moyer's class at the beginning, but I *felt* like I was the only kid in school who spoke Spanish. By the time Jorge came to the school, there were maybe 8 or 9 students in Ms. Moyer's class.

None of the students in Ms. Moyer's class could speak English, and Ms. Moyer didn't speak any Spanish. She was a nice lady; she was very

patient with us, but she was just a volunteer, like a helper; she was not a qualified teacher. She had good intentions, but she had no idea how to plan or follow a curriculum. She didn't have any kind of system. We spent our four hours in her class everyday drawing pictures or watching movies.

I recall going painfully hungry during my first week of school in Nebraska because I didn't understand where I was supposed to go to get my meals.  Even after I figured it out, I was still too afraid to grab a carton of milk because I was worried that there would be repercussions. Even in Ms. Moyer's class, which was the closest thing we had to a safe and familiar space within the school, it still felt like a kind of domination. Ms. Moyer was volunteering to help the teachers out of the goodness of her heart, but she was from a different society. Her husband was a prominent lawyer in town, and she traveled in professional circles. Occasionally, she would invite us to attend one of her social functions, so that we could be exposed to English in a real-world setting. But at the end of the night, she made us clean up the mess.

My school experience in Madison was very traumatic. All told, I repeated the sixth grade three times—once in Mexico, and twice in Nebraska after I failed the first time because I couldn't understand English. In the three years that I spent in Ms. Moyer's class in Madison, I did not learn English. I repeated the sixth grade three times, and I did not learn anything. In the tenth grade, I dropped out of school completely and went to work full-time cutting corn in the fields. There was no reason to keep trying to study; there was no purpose.  They didn't appreciate us at all. That school was failing us completely. I would have liked to be someone in life; I had the same goals for myself that any other kid in Madison would have had for themselves, too. But there was no way forward; there was no way to improve myself. My English wasn't there.

Many of the kids in our community felt a lot of pressure from our parents and other adults to help them navigate the English-speaking world. I was often fetched by members in our community whenever a letter from immigration or other important documents would arrive in the mail. Everyone was constantly anxious about missing an appointment with immigration in Omaha, so they would ask me to interpret the letters and tell them what they were supposed to do. I was just as puzzled by what the letters said as they were, but I had the sense to pull out my Spanish-English dictionary and look up words at random until I could decode one that would give me some clue about the context of the letter. I would find the word "fingerprints," for example, and I would deduce that they had to go to Omaha to have their fingerprints taken on a

153

certain day.  Often, they would ask me to go with them.  And I would. That was the way it was. Everyone had to rely on whatever we could offer each other for security, support, and survival.

Whenever Jorge and I hung out, it was always very lighthearted. For Jorge, it was always like he was leaving his problems behind him. Like he had been liberated from a prison. In Mexican culture, we're always very afraid to talk about what goes on in our households, so we didn't really talk about anything heavy, but Jorge used to get very emotional, like he was escaping—escaping from that household of loneliness, of discipline, of punishment, of being shut up and locked away. Even though you may be laughing, underneath your heart hurts, and I suspect that was the case with Jorge.

Jorge was always very afraid of his father. His father always wanted Jorge to go to work with him, but Jorge *hated* it. He just wanted to be in the ease and contentment of his friendships. He always yearned to be around his friends.  But being a good worker is a very important part of Mexican culture, so I used to encourage Jorge, *"Come on, man!  Let's go!"*  Once we got there, though, Jorge would just sit around with his arms folded across his chest and a silly smile on his face like a round chubby marshmallow while everyone else worked.

Jorge' family maintained a closed-door policy. It was only on very rare occasions that I was permitted to enter Jorge's home, and when I was, I had to take off my shoes and wash my hands, which was not something that I was used to doing at my own house or any of my friends or relatives' houses.  Jorge's house was always almost excessively clean. Most households in our community had two working parents who were too overwhelmed to be able to consistently clean to such a state of perfection. It was usually all that they could do to just sweep the clutter under the bed or into the corner; just shuffling things out of the way until there was time to do more. But Jorge's house, his clothes, his appearance, the truck—they were always polished an immaculate. Jorge's mother always kept him perfectly groomed, like he was going to meet the Queen every day. Jorge was always freshly bathed, he usually reeked of cologne, he always wore brand-name clothes and real gold rings.  Nobody else could afford things like that. Jorge was always a very spoiled kid.

Jorge would have been around 15 years old when I left, right around the time when things were really starting to change. Jorge and I were still hanging out then, but a lot less; we had started to drift apart. The major catalyst that influenced the change in Jorge and my relationship was

154

when Jose Sandoval got out of jail. After Jose came out of jail, it became like another Madison.

After Sandoval returned to the community, it was him that started all that "gang" nonsense. Before that, the Mexicans, the Chicanos, the white kids—yes, we had our conflicts from time to time, owing to the growing pains of a changing community, but we mostly got along. It was the language that was the problem; we literally couldn't understand each other. Sandoval, though, he went away to jail and when he came back, he had been indoctrinated in prison politics. He wanted to organize the community like the prisons—for everyone to claim their group based on their identity, and to incite violence between them, like some kind of race war. He wanted power and influence.  But none of it was real; he was making the whole thing up in his head. What Sandoval called the "Latin Kings" was nothing more than stupid child's play.  I used to tell him, *"What are you fighting for? What neighborhood are you 'protecting?'"* He wanted all of us to join his philosophy, but we weren't all willing to board the same boat. I wasn't afraid of Sandoval. I could see right through him; a lot of us could. If anything, Sandoval was afraid of me, because I knew who I was, I wasn't afraid to defend myself, and because I knew how to think for myself.

Additionally, Gilberto would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a teenager. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Dallas Zimmer* (Habeas Exhibit NN (Mr. Zimmer Dec.))

Dallas Zimmer was a teacher at Madison High School when Jorge Galindo was a student. He taught Jorge in his physical education, weightlifting, and geography classes. Had counsel interviewed him and called him as a witness, Mr. Zimmer would have testified about the issues facing immigrant families in the community and immigrant students in the school. He would have also testified about his experiences with Jorge. His testimony would have been as follows:

I remember thinking that I could not imagine what their experience was like when they crossed the border with the statue.

Jorge liked to joke and was always smiling, but he was also quiet and reserved most of the time. He was not looking for trouble and was not a behavioral problem.

Many of the parents of Latin American students in Madison worked at IBP. I cannot imagine the experiences many of the IBP employees and their families must have had both before they arrived in Madison and even afterward. As I recall, Jorge's parents worked at IBP. While teachers in Nebraska receive training in multicultural issues, there was nothing specific in our training at that time to the Latin American immigrant experience.

Employees worked long hours and their children often had to raise themselves. At that time, basic necessities and services were unavailable to the influx of immigrants into the community.

Locals in Madison resented the Latin American IBP employees because they felt they were taking their jobs. There was a lot of tension in the community at that time, and Hispanic residents were easy targets.

Additionally, Mr. Zimmer would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Mike Sunderman* (Habeas Exhibit II (Mr. Sunderman Dec.))

Mike Sunderman was a teacher and coach at Madison High School when Jorge Galindo attended. He taught Jorge's math class in 1993 and also taught his younger brother, Roosevelt. Although he was called as a witness at Jorge's trial, had trial counsel conducted reasonable investigation and competently interviewed Mr. Sunderman, he would have testified about how ill-equipped Madison High School

was to handle the sudden influx of Spanish-speaking students during Jorge's time there.

Had trial counsel asked him to review Jorge Galindo and Jose Sandoval's records, Mr. Sunderman would have provided more relevant information about Jorge's struggles and Jose's malicious, manipulative, and domineering behavior. Finally, Mr. Sunderman would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Terri Gross* (Habeas Exhibit T (Ms. Gross Dec.))

Terri Gross was a counselor at Madison High School during the last year that Jorge Galindo attended. If counsel had interviewed her and called her as a witness, Ms. Gross would have testified about the deficiencies in the school's ESL program at the time. She would have testified to the following:

> In my experience, different students react differently to being unable to understand what a teacher is asking of them. Some students seek help, while others may not tell the teacher they do not understand. Some students get frustrated, and some might act out.
> The school had a rule that students were not allowed to speak Spanish in class. The teachers wanted to be able to know and understand what students were saying in class, and they could not understand if students spoke Spanish.
>
> A large percentage of students at Madison High School were on the free lunch program. If one parent worked at the meat processing plant, the student would qualify for free lunch. To my knowledge, the student would not qualify if both parents worked at the plant. It was my impression that there were families who qualified for the program but were embarrassed to take advantage of it. Parents had to send in their

pay stubs and then the state would reimburse the school for the free meals.

Sometimes, parents with limited English ability were embarrassed to come to school and have their children act as interpreters for them. Eventually, the school hired a migrant liaison whose job was to speak with parents. The school started providing food and daycare to parents when they came to school. The migrant liaison would seek out parents wherever they were, including at the plants where the parents worked, to speak to them. That program did not start until after Jorge left school.

Additionally, Ms. Gross would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Sheana Siegel* (Habeas Exhibit HH (Ms. Siegel Dec.))

Sheana Siegel was a Spanish and English teacher at Madison High School when Jorge Galindo was a student. She was hired to teach Spanish but was also asked to teach English. Had counsel interviewed and called her as a witness, Ms. Siegel would have testified regarding her short time at Madison High School and her interaction with Jorge Galindo as follows:

In addition to teaching Spanish, I taught a 9th/10th grade English class. There were approximately eight students in that class including Jorge Galindo. However, it was more of a study hall because parents who were working at the factory didn't have time to help their children with things like homework.

Mrs. Moyer taught the ESL class at Madison High School. I don't know if she was certified. She didn't speak Spanish. I was the only teacher in the school who spoke Spanish.

I resigned after working at Madison High School for one semester. Even though I was hired to teach Spanish, staff frequently pulled me from

what I was doing to interpret or translate. It didn't matter if I was teaching a class or at lunch because there was no one else to help.

There was no advocate or liaison that I was aware of for Hispanic families in Madison to help them figure out how to do things like get on food stamps or find a babysitter. It would have helped Hispanic families to have help in the community.

Additionally, Ms. Siegel would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

## Galen Kronhofman (Habeas Exhibit V (Mr. Kronhofman Dec.))

Galen Kronhofman was also a teacher at Madison High School when Jorge Galindo was a student there. Had counsel interviewed him and called him as a witness, Mr. Kronhofman would have testified about Jorge's struggles at school, how he was a decent kid, and about his relationship with Jose Sandoval. He would have testified about Sandoval's influence over Jorge and how he misbehaved. He also would have testified about how the "gang" the state claimed Jorge was a part of was not really a gang. Additionally, Mr. Kronhofman would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

## Janet Harrington (Habeas Exhibit U (Ms. Harrington Dec.))

Janet Harrington was a teacher at Madison High School at the end of Jorge Galindo's tenure there. She taught high school math, even though she was only

159

certified to teach 4th-9th grade science. Had trial counsel interviewed her and called

her as a witness, Ms. Harrington would have testified to the following regarding

Jorge's academic struggles and his lack of behavioral issues:

> I was teaching a high school math class.
>
> Except for Jorge, most of the students in that class had behavioral problems. All of the students either later failed or dropped out of school, with the exception of one white student.
>
> The students were misfits who had previously failed the class. They struggled academically but needed the class to graduate. The school did not know what else to do with them. I remember that several of my colleagues expressed sympathy toward me since I had to teach a difficult group of students in a subject outside of my area of expertise.
>
> Jorge was one of the few students in that class who did not have behavioral problems. In terms of his behavior, attitude, and respect, he was a good student.

Additionally, Ms. Harrington would have testified as described in Habeas

Claim 5 regarding Jorge's intellectual functioning as a student. Such testimony

would have supported an expert opinion consistent with Mr. Galindo being a person

with intellectual disability.

*Juan Villarreal* (Habeas Exhibit LL (Mr. Villarreal Dec.))

Juan Villarreal was a co-worker of Jorge Galindo's and was also incarcerated

with him at the Madison County Jail from September 2002 to March 2003. Had

counsel interviewed and called him as a witness, Mr. Villarreal would have testified

about Jorge Galindo's difficulties on the job sight. He would have also described how

Jose Sandoval was a manipulator and Jorge Galindo was a follower. Furthermore,

he would have explained how the county attorney would move people to various jail

cells to try to induce self-incriminating statements. *See* Habeas Claim 7.

Additionally, Mr. Villarreal would have testified as described in Habeas Claim 5

regarding Jorge's intellectual functioning as a young adult. Such testimony would

have supported an expert opinion consistent with Mr. Galindo being a person with

intellectual disability.

*Amber Pfeifer* (Habeas Exhibit BB (Ms. Pfeifer Dec.))

Amber Pfeifer grew up in Madison and was a close friend of Jorge Galindo's.

Had counsel interviewed and called her as a witness, Amber would have testified

about how kind of a person Jorge was and how methamphetamine affected him. She

also would have testified about seeing Jorge just a few days before the robbery –

and concluding that he was very high. Her testimony about Jorge's character and

the influence methamphetamine and Jose Sandoval had on him would have been as

follows:

> I met Jorge when I was around 16 or 17 years old and he was about 18
> or 19. Jorge was a big marijuana smoker, and I was a big drinker at the
> time. We liked to laugh and have a good time. We weren't interested in
> doing anything that would harm other people. We would laugh and have
> fun while we cruised around town with other friends.
>
> Jorge is a really, really nice guy. He was warm and kind to my family
> and to everyone, even local police. He was a loyal and good friend. Jorge
> was respectful to everyone and I never saw him be violent to anyone. He
> was popular with people who knew him because of how nice he was. He
> laughed a lot and wanted to have fun. My father always like Jorge
> because he was kind and respectful to him. Jorge was one of those people
> who wanted to be liked.
>
> Our group of friends partied a lot. I was not interested in using meth
> because it scared me, but the rest of the group eventually started getting
> into meth and doing erratic things I did not like. Because of that, I

161

started distancing myself from the group when I became pregnant with my daughter, who was born in July of 2002.

To my knowledge, Jose Sandoval and his brothers used meth before Jorge did. I knew Jorge had started using meth, but I didn't ever see him use it. I did see that it changed Jorge's personality, though, and it began to affect his daily life and his relationship with Cortney and his kids. He became very nervous and paranoid, and he lost a lot of weight.

I heard the guys in the group talk about the Latin Kings, but I never took it seriously and I still don't. They called themselves that because they wanted to feel part of a group. Madison County at that time was very white and segregated, and it was hard to be a young Latino man there. Locals and the police judged Latino people harshly and said they were taking white peoples' jobs. I even got jeers and stares from strangers for hanging out with them.

I still believe that meth and Jose's influence are the reasons Jorge participated. He was absolutely not someone who would have participated in something violent like that except for the meth and someone else planning it.

Additionally, Amber would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a young adult. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

*Michael Petzold* (Habeas Exhibit AA (Mr. Petzold Dec.))

Michael Petzold was fried of Jorge Galindo's in Madison when they were in their mid to late teenage years. Had trial counsel interviewed and call Michael as a witness, he would have testified as described in Habeas Claim 5 regarding Jorge's intellectual functioning as a young adult. Such testimony would have supported an expert opinion consistent with Mr. Galindo being a person with intellectual disability.

All the included witness statements and declarations should have been presented to the sentencing panel as stand-alone mitigation. Additionally, such testimony would have supported expert opinions consistent with the experts presented *supra.*. In particular, these witnesses would have formed the foundation for testimony from a psychologist specializing in early childhood development – such as Dr. Peggy MacLean – to help explain how Jorge Galindo's tragic childhood experiences influenced his decisions that resulted in his participation in this offense.

**The Trial Team Was Deficient.**

There was no strategic reason for the team to ignore these important issues while investigating Mr. Galindo's mitigation case. The failure was based in lack of experience and resources. If there was a "decision", it was not based or supported by reasonable investigation.

*Andrew D. Weeks* (Habeas Exhibit MM (Mr. Weeks Dec.))

Andrew Weeks was one of Jorge Galindo's trial attorneys. He was the "second chair" attorney on the case. His responsibilities included gathering evidence and retaining experts for mitigation. Mr. Weeks had just graduated law school and Jorge Galindo's case was the first he worked on dealing with mitigation issues in the death penalty context. He stated, "We knew Mr. Galindo had lived in Mexico during the early years of his life, and knew we needed experts to help us present evidence of how that would affect his case based on his background, family, and life experiences."

163

Mr. Weeks explained, "Mr. Stratton and I relied on Ms. Fernandez [mitigation specialist] to develop evidence and witnesses for mitigation because of her experience and expertise." He continued, "Ms. Fernandez was the only mitigation investigator we hired to work on the case." As for the direction of mitigation investigation, Mr. Weeks stated, "Because I had no previous experience with mitigation at the time, my view was that Ms. Fernandez was the expert in mitigation, so I relied on her to handle the mitigation investigation."

In describing the role of experts in mitigation, Mr. Weeks said, "We relied on our experts to tell us what information they would need for their particular roles." Mr. Weeks further explained, "We did not investigate the possibility that Mr. Galindo may have been affected by environmental toxins, such as lead and pesticides, as a result of his childhood in Mexico." Finally, he recounted, "I do not recall exploring issues related to Mr. Galindo's early childhood development in Mexico or how it related to cultural issues and familial relationships. I also do not recall exploring specific issues related to his immigration experience and its impact on his development."

_Dhyana Fernandez_ (Habeas Exhibit Q (Ms. Fernandez Dec.))

Dhyana Fernandez was the sole mitigation specialist on Jorge Galindo's capital case. She was hired over a year after Mr. Galindo was charged. She describes the dynamics of the trial team and lack of mitigation strategy as follows:

> The attorneys, Mr. Stratton and Mr. Andrew Weeks, had not handled capital cases before and were not functionally familiar with mitigation work. At the time I was retained, they were still developing their understanding of what a "mitigation expert" was. They did not give me

164

much direction or input into the investigation I conducted; rather, they deferred to me. In short, they relied on me to educate them about the mitigation function, and to direct the mitigation investigation and strategy. I worked almost completely autonomously. Mr. Stratton's and Mr. Weeks's lack of guidance stands in stark contrast to the post-conviction work in which I had previously participated as a mitigation specialist, and all the trial work I have been involved in since. Overall, I recall feeling that I had nowhere to turn, and it felt awful.

It was apparent to me that Mr. Weeks was tasked with working on the mitigation aspect of the case. Although Mr. Stratton and Mr. Weeks were looking to me to provide guidance and expertise on capital mitigation investigations, at the time, I was also new to this kind of capital mitigation work. I had previously worked at the Texas Resource Center as a capital mitigation investigator for approximately a year or two, but the work there was very different, exclusively post-conviction, and my last experience in an actual post-conviction capital case was around 10 years before I took on Jorge's case.

I worked on between 10 and 20 capital cases while at the Texas Resource Center, but in each of those cases, I was part of a team of experienced professionals and was not managing or running the investigations on my own. My work at the Texas Resource Center exclusively involved cases at the post-conviction stage, not at the pre-trial level. Jorge's was my first trial capital case.

My complete lack of capital trial experience, along with the lack of experience of both Mr. Stratton and Mr. Weeks, made this case feel like a situation of the blind leading the blind. None of us really knew what we were doing.

I recall there being significant financial and time constraints in Jorge's case, and they unequivocally affected my approach to the investigation.

Largely owing to the short timeframe and lack of funding, I chose to focus my investigation on the Madison County area rather than interviewing witnesses or tracking people down outside of that radius. I prioritized witnesses based on who I was most readily and quickly able to identify, rather than on their relevance to developing the mitigating evidence in Jorge's case.

I especially did not have the time or money to go to Mexico to investigate this case, although if I were working on it now, I would absolutely make multiple trips there. The ability and willingness to conduct investigation in Mexico would be a prerequisite to my agreeing to work on a case like Jorge's today. Most of Jorge's family is still in Mexico, and

165

it is where he lived for the majority of his critical developmental stages, so I now recognize the importance of going there to get a full picture of who he was and the environment in which he grew up.

At the time, however, going to Mexico was never a viable topic of discussion. I recall presenting the idea of investigating in Mexico to Mr. Stratton and Mr. Weeks, but Mr. Stratton was not enthusiastic about it. He did not feel that it was necessary. Up to that point, I had not handled many international cases, so I did not have the confidence or the experience to push the issue. The possibility of investigation just fizzled out before it ever became a real consideration. Trial counsel did not support the need for me to conduct investigation in Mexico. Likewise, I did not firmly communicate to them the importance of such a trip.

I was not asked to prepare a social history, comprehensive chronology, or even a genogram to provide trial counsel or the experts we retained. It is standard of practice to prepare such documents. However, my limited investigation did not provide the necessary information to prepare such required documents.

## *Kari Converse* (Habeas Exhibit I (Ms. Converse Dec.))

Kari Converse worked with the Mexican Capital Legal Assistance Program (MCLAP) and was assigned to consult on Jorge Galindo's trial case. She describes Mr. Galindo's trial team and their strategy for mitigation as follows:

I recall that Mr. Stratton and his associate, Mr. Andrew Weeks, were completely inexperienced in capital cases and especially regarding mitigation. I found their lack of communication, experience, and preparation for the mitigation proceedings to be noteworthy and concerning.

In that [first] conversation with Mr. Weeks, it was clear they had not begun any kind of mitigation investigation. They had not hired a mitigation investigator, collected any of Mr. Galindo's records, interviewed any of Mr. Galindo's family members, hired any penalty-phase experts, or conducted any psychological evaluations. MCLAP provided Mr. Stratton and Mr. Weeks a list of bilingual mitigation specialists and mental health experts to assist them in getting started with the mitigation investigation.

166

In cases of Mexican Nationals facing the death penalty, it is standard practice for mitigation specialists to conduct an international investigation in Mexico. This is part of the reason having a bilingual mitigation specialist is so important.

Even in cases where the client came to the United States at a very young age, it is very important that an on-the-ground investigation be conducted in the environment where he or she lived in Mexico. That is absolutely true in cases like Mr. Galindo's, in which the client spent formative years of his life in Mexico. Mr. Galindo did not immigrate to the United States until he was 12 years old.

Conducting an investigation in Mexico is essential in order to interview family members, neighbors, friends, and other members of the community who may have known the client, his or her parents, and other relatives, as well as to understand and document the environment in which the client spent his or her formative years. Understanding the client's family history is critical, and it is not possible to adequately develop the necessary context without an in-person investigation in the community.

The standard practice of conducting an on-the-ground investigation in Mexico for cases involving Mexican National clients was in place well before Mr. Galindo's trial.

It is well known, and was well known years before Mr. Galindo's trial, that individuals living in Mexico face high rates of exposure to pesticides, lead, and other neurotoxins. This is another reason an in-person investigation in Mexico is critical to conducting an effective mitigation investigation in cases involving Mexican Nationals. It is important for the mitigation specialist to see and understand the environment in which the client and the client's family members lived in order to assess whether he or she may have been exposed to high levels of pesticides, lead, or other neurotoxins. The mitigation specialist must understand the proximity of sources of toxins—agricultural fields, smelting operations, railroad tracks, untreated water, etc.—to the client's home. The mitigation specialist also needs to seek out information about cultural practices such as the use of lead-glazed pottery, the ingestion of lead-infested earth during pregnancy, and commonly consumed lead-contaminated candies in the client's community.

167

Mr. Galindo's trial counsel were ineffective for not conducting a timely, thorough, and proper mitigation phase investigation. Counsel failed to even attempt to interview witnesses in Mexico, where Jorge Galindo spent the first twelve years of his life. Counsel failed to investigate any environmental toxins, childhood abuse, neglect, or delays endured or displayed by Jorge Galindo. Trial counsel also failed to adequately investigate Jorge Galindo's background, experiences, and adaptive deficiencies while living in Madison, Nebraska as an adolescent. This information should have been presented to the sentencing panel in mitigation.

Additionally, this information should have been used to inform trial counsel's decisions in hiring experts regarding environmental toxins and childhood development. *See* Habeas Claim 8.2. It also would have further informed the opinions and testimony of Dr. Llorente and Dr. Stalcup. *See* Habeas Claims 8.2, 8.3.

Reasonably effective counsel would have investigated each of these witnesses from Jorge Galindo's childhood to determine whether they possessed relevant mitigating information. *Wiggins*, 539 U.S. at 524. Instead, not a single trip to Mexico, where Jorge Galindo spent the first 12 years of his life, was made by any team member. Nor was adequate time and inquiry dedicated to seeking out and interviewing obviously important people in Jorge's life in Nebraska. Because each of these witnesses possessed mitigating evidence relevant to Jorge Galindo's case for life and because each of the witnesses was willing to provide information to the defense team and testify about what they knew, reasonable counsel would have presented their testimony to the three-judge sentencing panel.

168

Because the panel only heard testimony from Jorge Galindo's parents about his childhood in Mexico and his home life in Nebraska, and because these witnesses were not adequately interviewed and prepared for testifying, the panel was left with the false impression that Jorge's childhood and home life was unremarkable – even supportive and nurturing. Because the panel only heard testimony from a select few educators in Madison, and because these witnesses were not adequately interviewed and prepared for testifying, the panel was left with the impression that Jorge Galindo had excellent support at school.

Had trial counsel effectively investigated, prepared, and presented mitigation witnesses in Mr. Galindo's case, the three-judge panel would have heard a much different story. It would have learned about the severe isolation, emotional neglect, and emotional rejection Jorge endured as a young child in Mexico. It would have learned about the physical and emotional abuse he experienced in the home. The panel would have learned about Jorge Galindo's struggles and bullying at school as well as his deficits functioning in everyday life. It also would have learned about Jorge's loving character. The sentencing panel would have learned about the family separation, discrimination, and cultural shift Jorge was ill-equipped to navigate when he migrated to Nebraska. The panel would have understood the compounded difficulties Jorge endured trying to overcome a language barrier when he suffered form significant learning, intellectual, and cognitive difficulties. The three-judge panel would have better understood Mr. Galindo's susceptibility to peer influences given his intellectual and cognitive impairments, significant isolation as a child,

169

and continued emotional neglect by his parents. The panel would have also learned how Jorge's childhood, coupled with the modelling of substance abuse from his father, would put him at a greater risk of his own substance use disorder. Finally, the panel would have understood how this combination of experiences made it more likely that he found himself in front of them as they decided whether he would live or die.

Trial counsels' deficient performance in investigating and presenting mitigating evidence during the mitigation phase of Jorge Galindo's trial was prejudicial. *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. at 524. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387. The Eighth Circuit has explained that under *Strickland* "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Foster v. Lockhart*, 9 F.3d 722, 726 (8 Cir. 1993).

The Supreme Court recognizes capital counsel's obligation to thoroughly investigate and prepare mental health and other mitigating evidence. *Williams*, at 396. Such obligation cannot be met by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, at 524. Rather, counsel has an obligation to investigate to not only present mitigation, but also to

prepare to rebut aggravating circumstances put forth by the state. *Rompilla*, at 386. Mr. Galindo's trial counsel failed him in this regard.

**Claim 8.2: Mr. Galindo was deprived of his right to the effective assistance of counsel when counsel failed to adequately and properly investigate, develop, and present significant expert mitigating evidence.**

Mr. Galindo's trial counsel was ineffective for not conducting a timely, thorough, and proper mitigation phase investigation. Counsel, who had never before tried a capital case and was entirely unfamiliar with mitigation, failed to meet with potential mitigation witnesses, collect and review records, prepare a social history, develop a reasonable and coherent mitigation strategy, and seek appropriate expert evaluations of Mr. Galindo. Relying entirely on an inexperienced investigator, counsel did not conduct any mitigation investigation in Mexico, where Mr. Galindo spent the first 12 years of his life; did not speak to family, friends, or neighbors who knew Mr. Galindo as a child; and did not investigate the environment in which Mr. Galindo was raised, which was highly contaminated with lead, pesticides, and polycyclic aromatic hydrocarbons (PAHs). Because they conducted only a bare-bones mitigation investigation, *see* Habeas Claim 8.1, counsel failed to uncover evidence that would have revealed the need to retain appropriate expert witnesses to evaluate Mr. Galindo, assess the relevant evidence, and present expert testimony. As a result, Mr. Galindo's trial counsel was ineffective for failing to investigate, prepare, and present available mitigating evidence from a lead expert, an environmental toxicologist, a clinical psychologist, and an expert on adolescent brain development.

The Supreme Court recognizes capital trial counsel's obligation to thoroughly investigate and prepare mental health and other mitigating evidence. *Williams*, 529 U.S. at 396. Such obligation cannot be met by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. Rather, counsel has an obligation to investigate to not only present mitigation, but also to prepare to rebut aggravating circumstances put forth by the state. *Rompilla*, 545 U.S. at 386.

Courts have repeatedly found counsel ineffective for failing to properly prepare mental health experts with information gleaned through a comprehensive mitigation investigation. *See, e.g., Rompilla*, 545 U.S. at 391-93 (holding that had counsel conducted a competent mitigation investigation, they would have discovered evidence, including organic brain damage, extreme mental disturbance, and impairments stemming from fetal alcohol spectrum disorder, that "would have destroyed the benign concept of Rompilla's upbringing and mental capacity defense counsel had formed . . . [in part] from report of the mental health experts"); *Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (finding counsel ineffective for failing to conduct a comprehensive mitigation investigation, which resulted in a narrowly conscribed mental health evaluation); *Gray v. Branker*, 529 F.3d 220, 231 (4th Cir. 2008) (holding that counsel was ineffective for relying on Gray's "self-assessment of his mental health" and not providing a mental health expert with readily available evidence concerning Gray's mental deterioration and the circumstances surrounding the offense).

It is not sufficient for counsel merely to retain an expert and present expert testimony. Effective counsel must thoroughly investigate the defendant's life history to determine the types of experts to retain and then must adequately prepare expert witnesses and effectively present their testimony. *See Walbey v. Quarterman*, 3099 F. App'x 795 at 803, (5th Cir. 2009) (counsel ineffective for failing to adequately prepare mental health expert to testify and failed to rehabilitate expert when state elicited on cross-examination that the defendant could have antisocial personality disorder, an aggravating diagnosis); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (counsel retained expert shortly before trial, did not explore or test the basis for the expert's opinion, and thus, failed to take the requisite reasonable steps to present favorable expert testimony to the fact finder).

Here, trial counsel was required to conduct a thorough mitigation investigation and develop a comprehensive life history, which would detail Mr. Galindo's family history, including a history of mental illness and cognitive deficiencies; the physical environment in which he spent the first 12 years of his life, revealing his constant and longstanding exposure to neurotoxins such as lead, pesticides, and PAHs and their effects on his brain development; his traumatic migration and assimilation experience; and his childhood isolation and neglect. A competent mitigation investigation that involved interviewing family members and observing Mr. Galindo's childhood environment would have uncovered these significant mitigation themes, which would then have allowed counsel to make informed decisions about the experts needed to conduct evaluations and the

173

necessary scope of those evaluations. Counsel's complete failure to conduct a timely and comprehensive investigation, and failure to uncover even basic life history details, precluded counsel from being able to competently determine the types of experts to retain and the evaluations they should undertake. Counsel's failure amounted to deficient performance under *Strickland*.

Counsel's performance was not reasonably effective and cannot be considered strategic. Indeed, had counsel conducted investigation into Mr. Galindo's life history and discovered his exposure to toxins or other adverse life events, there would have been no tactical reason not to present them. Habeas Exhibit MM (Mr. Weeks Dec.) pp. 6-8. Counsel did not even begin to think about a mitigation investigation until over a year had passed from the commission of the offense. *Id.* at 2-3; Habeas Exhibit I (Ms. Converse Dec.) p. 2; Habeas Exhibit Q (Ms. Fernandez Dec.) p. 1. Even once the mitigation specialist was hired and the investigation begun, it was done without any real understanding on the part of trial counsel of what such an investigation should entail. Habeas Exhibit MM (Mr. Weeks Dec.) p. 3; Habeas Exhibit I (Ms. Converse Dec.) pp. 2-3; Habeas Exhibit Q (Ms. Fernandez Dec.) p. 2. The mitigation specialist, who received no direction from counsel, made only four trips to interview witnesses, never spoke to family members besides Mr. Galindo's parents, and made no investigative trips to the area in which Mr. Galindo spent the first 12 years of his life. Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 1-2, 8-10.

The investigation that resulted was hurried, surface-level, and incomplete. No social history, genogram, or detailed chronology of Mr. Galindo's psychosocial-

familial history was ever prepared, and counsel did not investigate or consider the information that would have been detailed in such a document in deciding what experts to retain. Habeas Exhibit MM (Mr. Weeks Dec.) p. at 5; Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 14-15. Likewise, the information conveyed to the experts counsel did retain was sparse and surface-level, and they received no psychosocial-familial history to provide context for their evaluations. Habeas Exhibit MM (Mr. Weeks Dec.) p. 5; Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 14-15. Counsel's failure to comply with these basic requirements "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 525. In any event, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91; *Williams*, 529 U.S. at 396 (not a tactical decision because counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background.").

Trial counsel in death penalty cases "have a duty to make reasonable investigations." *Wiggins*, 539 U.S. at 523. Here, as a result of counsel's failure to investigate, prepare, and present available mitigating evidence, trial counsel failed to adequately determine the proper experts to retain and failed to provide the experts they did retain with information necessary to evaluate Mr. Galindo and form reasoned expert opinions.

Trial counsel was appointed to represent Mr. Galindo immediately when he was charged with the September 26, 2002, offense, but it was not until a year later,

in September 2003, that counsel requested funding for a mitigation specialist. Tr. 588-91. Even when counsel made that request, the hearing transcripts reveal there was substantial confusion on the part of counsel as well as the prosecutor and judge about what a mitigation specialist would do and why such an investigator was necessary. *Id.* Once the mitigation specialist was hired in October 2003, counsel delegated the entire mitigation investigation to her and relied on her to tell them what needed to be done. Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 2-3.

Stretched thin between Mr. Galindo's case, seven other capital cases, and a full-time job as a researcher, and with no guidance from counsel, the mitigation specialist made only four total trips to interview witnesses and conduct the mitigation investigation over the course of the single year she worked on the case. *Id.* at 2-3, 5-6. She interviewed only Mr. Galindo and his parents to obtain information about his childhood, family dynamics, and his cognitive functioning, despite the likelihood that Mr. Galindo's parents would be motivated to paint themselves and his childhood in a positive light and would not be reliable reporters of all relevant information. And although the mitigation specialist knew Mr. Galindo struggled to remember details about his own life, she accepted his surface-level recollections without attempting to obtain deeper or more accurate information from collateral sources. *Id.* at 15.

No one from the trial team interviewed any of Mr. Galindo's family members in the United States or in Mexico to obtain additional information on his life history and his childhood. *See* Habeas Claim 8.1. They did not interview teachers or Mr.

176

Galindo's classmates in Mexico to ascertain how he performed in school there or whether he exhibited signs of cognitive deficits as a child. Counsel did not speak to any of Mr. Galindo's extensive network of aunts and uncles in Mexico or in the United States, nor to any of his cousins in either country, to determine whether the rosy picture of Mr. Galindo's childhood painted by his parents was accurate. Although counsel learned that Mr. Galindo's father had another child in Nebraska born to another woman, no family members were interviewed to uncover the true dynamics between Mr. Galindo's parents or their treatment of Mr. Galindo. *See* Habeas Claim 8.1.

As a result of counsel's failure to obtain information from witnesses aside from Mr. Galindo and his parents, Dr. Llorente, the neuropsychologist, was left completely unprepared for his testimony, particularly on cross-examination. The prosecutor was able to call into question many of Dr. Llorente's assertions and conclusions about Mr. Galindo's childhood, home life, potential malnutrition, and cognitive functioning, based on the lack of corroborating information available to support Dr. Llorente's report. Because counsel had not obtained information that would have corroborated the conclusions Dr. Llorente reached—even though such information was readily available had counsel interviewed family members besides Mr. Galindo's parents, in addition to teachers and classmates in Mexico—counsel could not rehabilitate Dr. Llorente when he was viciously cross-examined by the prosecutor.

Dr. Llorente suggested in his report that Mr. Galindo experienced childhood neglect on the part of his parents and that there was strife in their familial relationships. Tr. Ex. 541 (Llorente Rep. at 1-2). However, Dr. Llorente also noted that Mr. Galindo did not recognize he had been neglected, and his parents denied marital confrontations. *Id.* Dr. Llorente's note demonstrates why counsel's failure to interview mitigation witnesses outside of Mr. Galindo's parents was so detrimental—Mr. Galindo and his parents were not fully accurate reporters of their own experiences, whereas other family members and observers could have provided corroboration for Dr. Llorente's conclusions—which are, in fact, supported by all the reports of Mr. Galindo's extended family and members of his community in Mexico. *See* Habeas Claim 8.1.

In addition to supporting Dr. Llorente's conclusions and preempting the harmful cross-examination that took place in front of the sentencing panel, had counsel interviewed family and community members, they could have retained an expert to further explore Mr. Galindo's experience of neglect and its effect on him. An expert such as a developmental psychologist would have been able to explain to the sentencing panel the insidious effects of childhood neglect and their long-term impact. That information, presented in tandem with Dr. Llorente's evaluation and conclusions regarding Mr. Galindo's cognitive functioning and susceptibility to peer influences, would have been much stronger and more persuasive than Dr. Llorente's report alone. That is especially true given the prosecutor's cross-examination of Dr. Llorente, which would have been significantly mitigated had defense counsel

presented lay evidence and expert testimony corroborating Dr. Llorente—which was readily available but was never uncovered by counsel's surface-level mitigation investigation.

Moreover, by failing to interview witnesses from the town in which Mr. Galindo was born and by failing to conduct an on-the-ground investigation there, counsel failed to obtain important information about the environment in which Mr. Galindo spent the first 12 years of his life. This prevented counsel from uncovering the fact that Mr. Galindo was exposed to significant amounts of lead, pesticides, and PAHs on a constant basis until he left Mexico at age 12. Habeas Exhibit A (Lugo Rep.) pp. 36-39. At the time of Mr. Galindo's trial, there was already a considerable body of research detailing the high prevalence of neurotoxic exposure in individuals from rural Mexico, including exposure to lead, as well as studies on the links between such exposure and cognitive deficits, risk-taking behaviors, and criminal activity. Counsel also was aware that Mr. Galindo suffered acute respiratory disease as a child, which Dr. Llorente also included in his report. Yet counsel did nothing to investigate possible environmental causes of that illness, such as the ubiquitous yearlong burning of sugar cane in close proximity to Mr. Galindo's childhood home. *Id.* pp. 4, 6, 20-21. Had counsel uncovered evidence of Mr. Galindo's neurotoxic exposure, they could have retained appropriate experts to explain the sources and significance of that exposure on Mr. Galindo's cognitive functioning and his commission of the offense to the sentencing panel.

Likewise, had counsel conducted an adequate mitigation investigation and uncovered the prevalence of lead exposure in Mr. Galindo's community in Mexico, counsel could have sought lead testing, and could have presented the sentencing panel with quantitative medical evidence of Mr. Galindo's exposure. Based on the report by Dr. Specht, who conducted bone lead testing 20 years after the commission of the offense, Mr. Galindo's bone lead level at the time of trial would likely have been double what it was in 2022—an extraordinarily high level. Habeas Exhibit E (Specht Rep.). Presenting quantitative medical evidence to the sentencing panel showing that Mr. Galindo was suffering from toxic levels of lead exposure at the time he committed the offense would have been highly mitigating, but counsel did not present such evidence because they failed to conduct the basic level of investigation to recognize such testing was necessary.

A full and proper mitigation investigation would have resulted in substantial psychological, medical, cognitive, social, and education evidence being presented to the sentencing panel for consideration. It also would have given trial counsel the necessary basis to determine the appropriate experts to retain and allowed counsel to provide those experts with essential information to determine what testing or evaluation to conduct. A proper mitigation investigation also would have allowed counsel to adequately prepare the experts they did retain, mitigating the opportunity for damaging cross-examination and allowing corroborating lay evidence and expert testimony to be presented to the sentencing panel.

In stark contrast to the surface-level and abbreviated mitigation presented to the sentencing panel, which resulted in a bare-bones presentation of expert testimony, there was a wealth of mitigating evidence from lay witnesses and experts that could have tipped the sentencing scale in the eyes of the panel. *See* Habeas Claim 8.1. At least 14 witnesses who knew Mr. Galindo during his childhood in Mexico, including aunts, uncles, cousins, teachers, friends, and neighbors, would have been able and willing to testify about Mr. Galindo's isolation as a young child, his mother's noticeable aversion to touching or holding him even as a baby, his extreme gullibility, his struggles in school in Mexico, the corporal punishment inflicted on him as a child, and the long family history of mental illness, among other mitigating evidence. Many of those witnesses also would have been able and willing to testify about the physical environment in which Mr. Galindo lived—the proximity of the railroad tracks and sugar cane fields to Mr. Galindo's childhood home, the routine use of contaminated railway ties in building homes and in use for cooking and generating heat, the frequent pesticide application on the sugar cane crop, the burning of sugar cane fields on a regular basis, and the lack of running water in homes in the community and resulting use of minimally-treated river water for drinking, bathing, and cooking. Witnesses familiar with Mr. Galindo's performance in school in Mexico and with educational standards there would have been able to testify that he struggled with schoolwork and learning while in Mexico, and that his performance in school appeared better

than it was due to his copying from other children and because his mother forced him to study constantly at the risk of a beating. *See* Habeas Claim 8.1.

The evidence adduced by those lay witnesses could also have been used to properly prepare Drs. Llorente and Stalcup, the experts trial counsel retained, and could have provided for the retention of additional experts to evaluate Mr. Galindo and address, *inter alia*, his toxic bone lead levels and exposure to highly neurotoxic substances as well as the childhood neglect and migration-related trauma he experienced. There is a "particularly critical interrelation between expert psychological assistance and minimally effective representation of counsel." *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981) (citing *United States v. Fessel*, 531 F.2d 1275, 1279 (5th Cir. 1976); *see also Wolfs v. Britton*, 509 F.2d 304 (8th Cir. 1975) (agreeing that "[t]here is a critical interrelation between expert psychological assistance and minimally effective representation of counsel."). Had such evidence been presented to the sentencing panel, it is highly likely the sentencing panel's assessment of the mitigation evidence and its balancing of aggravating and mitigating factors would have been different. Indeed, the panel found only one mitigator was proved and gave it little weight, a highly unlikely outcome had the panel been presented with more than a bare-bones mitigation case. *Rompilla*, 545 U.S. at 392-93. The evidence that was available for counsel to present at the mitigation phase but was not uncovered due to counsel's failure to fully investigate, "adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury . . . the undiscovered 'mitigating evidence, taken as a

whole, might well have influenced the [sentencer's] appraisal of [Mr. Galindo's] culpability.'" *Id.* at 393 (citing *Wiggins*, 539 U.S. at 538).

## A.    Failure to Investigate, Retain, and Present a Lead Expert

Trial counsel failed to retain and present an expert on the measurement of lead in the human body. Dr. Aaron Specht, a medical physicist, conducted a scan of Mr. Galindo's tibia bone on January 9, 2022, and found that the amount of lead in his bone was 12.8 ug/g, 380% higher than that found in average adults. Habeas Exhibit E (Specht Rep.) p. 5. Due to the 20-year half-life of lead in bone, Dr. Specht concluded that Mr. Galindo's bone lead level in 2002, when the offense occurred, was around 25.6 ug/g, or 2800% higher than that in average adults. *Id.* at 6. Lead is known to affect neurodevelopment, especially in children, even at low levels of exposure. *Id.* at 2. Further, "the scientific community recognizes that there is no safe level of lead exposure." *Id.*

The dangers of lead exposure have been recognized in the United States for decades, and lead was banned from substances such as paint and gasoline in the 1970s. *See id.* at 2; Habeas Exhibit A (Lugo Rep.) p. 16. Testing for lead levels in blood and bone has been available for decades and was available at the time of Mr. Galindo's mitigation investigation in 2004. *See* Habeas Exhibit E (Specht Rep.) pp. 2-3. Moreover, since at least the 1990s, research has shown that individuals who live in Mexico, particularly in rural areas, are exposed to lead at higher rates than individuals in the United States, due in part to differences in governmental regulations and in cultural practices such as cooking with lead-glazed pottery.

Habeas Exhibit I (Ms. Converse Dec.) pp. 3-4; *See, e.g.,* L. Albert & F. Badillo,

*Environmental lead in Mexico*, 117 Rev. Environ. Contam. Toxicol. 1 (1991). Had

counsel conducted an adequate mitigation investigation, they would have known

there was a high likelihood that Mr. Galindo was exposed to lead during his

childhood in Mexico and could have retained an expert to conduct blood or bone lead

testing. That testing would have allowed counsel to present to the sentencing panel

persuasive quantitative, medical evidence of Mr. Galindo's exposure to lead, a

significant mitigating fact the panel should have had before it.

**B.    Failure to Investigate, Retain, and Present an Environmental Toxicologist**

Trial counsel failed to retain and present an expert on environmental toxins.

Dr. Andres Lugo, a toxicologist, reviewed relevant records, interviewed Mr. Galindo

and his parents, and traveled to Tamaulipas, Mexico, to investigate Mr. Galindo's

exposure to neurotoxins. Habeas Exhibit A (Lugo Rep.) pp. 14-16. In Mexico, Dr.

Lugo interviewed family members and neighbors from the town in which Mr.

Galindo spent the first 12 years of his life. *Id.* at 16-25. He interviewed medical

professionals, sugar cane workers, and water treatment officials, among other

witnesses. *Id.* Dr. Lugo also visited Mr. Galindo's childhood home and personally

observed its condition, the contaminated wooden beams used in construction, and

the proximity of the sugar cane fields and mills and the railroad tracks. *Id.*

Dr. Lugo found that Mr. Galindo was constantly exposed to high levels of

lead, pesticides, and PAHs during the first 12 years of his life, covering multiple

critical periods of brain development. *Id.* at 4-5, 7-12, 27-29, 36-29. Dr. Lugo's

184

findings of lead exposure were consistent with the extremely high level of lead in Mr. Galindo's bones, which Dr. Specht's examination quantified. *Id.* at 32-34.

Had trial counsel conducted a proper mitigation investigation, they would have known about Mr. Galindo's home's proximity to sources of significant lead, pesticide, and PAH exposure, and could have presented expert testimony to the sentencing panel regarding that exposure and its deleterious effects on Mr. Galindo's brain development during critical periods of his life. Due to their surface-level and inadequate investigation, trial counsel did not know the basic information about the environment in which Mr. Galindo lived and therefore could not present the sentencing panel with critical expert evidence of Mr. Galindo's neurotoxic exposure and its effects on his cognitive functioning and behavior.

## C.   Failure to Investigate, Retain, and Present a Clinical Psychologist

Trial counsel did not retain or present a clinical psychologist to discuss Mr. Galindo's childhood development and experiences of neglect. By relying only on Mr. Galindo's and his parents' reports regarding his childhood and failing to interview other family or community members who observed his childhood, counsel did not uncover the numerous witnesses and evidence supporting a finding that he experienced neglect and childhood trauma.

Dr. Peggy MacLean, a clinical psychologist, reviewed records, declarations of family, community members, and teachers, and conducted clinical interviews with Mr. Galindo. Her evaluation identified that throughout Mr. Galindo's childhood and adolescence, he was "exposed to many adverse life events, stressors, and traumas

and had few protective factors." Habeas Exhibit B (MacLean Rep.) p. 1. These adverse experiences included emotional neglect, parental rejection, and isolation, in addition to significant poverty, parental substance abuse, and significant post-migration stressors. *Id.* at 2. Mr. Galindo also experienced "[s]evere learning, intellectual, and cognitive difficulties" that were "unrecognized," leading to an "institutional failure to respond adequately to his educational needs and his needs as an immigrant student." *Id.* He also experienced racial discrimination upon his migration to the United States. Moreover, Mr. Galindo's "learning, intellectual, and cognitive difficulties" impacted his ability to learn English and made him more vulnerable to peer influences. *Id.* at 3-4. Had counsel conducted more than a bare-bones investigation of Mr. Galindo's childhood, they would have been able to present the sentencing panel with expert evidence on the negative effects caused by childhood neglect and lack of physical touch during critical stages of development, among other adverse experiences, and how those contributed to his later susceptibility to Sandoval's influence. Such testimony would have provided the panel with considerable mitigating evidence supporting Mr. Galindo's lack of leadership during the offense, his susceptibility to dominance and coercion by peers such as Sandoval, and also would have provided support for Dr. Llorente's conclusions.

**D.   Failure to Investigate, Retain, and Present an Expert in Brain Development.**

Trial counsel failed to retain and present expert evidence of brain and behavioral development in 21-year-olds and how substance abuse affects that

development. *See* Habeas Exhibit MM (Mr. Weeks Dec.) p. 8. Dr. Leah Somerville, an expert in developmental neuroscience, detailed the manner in which the brains of 21-year-olds are still developing in terms of risky decision-making, executive functioning, ability to make future-oriented decisions, and susceptibility to emotionally charged situations. Habeas Exhibit D (Somerville Rep.) pp. 1-7. Indeed, research indicates that brain development in 21-year-olds is similar to that of juveniles and executive functioning and impulse control is still developing, making them more likely to engage in risk-taking and criminal behavior than older adults. Id. at 3-4. Twenty-one year-olds are still developing in terms of psychosocial maturity and are more susceptible to making poor and impulsive decisions in emotionally charged situations than adults in their later 20s and older. Id. at 6-7. In addition, substance use impacts brain development and is associated with loss of brain tissue, including white and gray brain matter, affecting the brain's structure and its function. Id at 7-9.

Trial counsel's strategy in the mitigation phase—minimal though it was— was to prove that Mr. Galindo was affected by methamphetamine use and was susceptible to Sandoval's detrimental influence. It would have been squarely in line with that strategy to present expert testimony regarding Mr. Galindo's still-developing brain to explain his propensity toward risk-taking and impulsive behavior and his susceptibility to peer influence, as well as the impact of his significant substance abuse. In addition to providing independent scientific evidence of Mr. Galindo's underdeveloped brain, an expert in brain development could have

provided support for Dr. Stalcup's testimony regarding the long- and short-term effects of regular methamphetamine use on Mr. Galindo's brain and behavior.

There could be no strategic reason for counsel's failure to present expert testimony that would have supported the little mitigation they attempted to present. Rather, counsel's failure to present expert testimony on brain development was due to their lack of experience and competence in capital defense, not any strategic consideration.

Prevailing professional norms in capital cases dictate that counsel has a duty to investigate mitigating circumstances as well as to rebut aggravating evidence. *Wiggins*, 539 U.S. at 524. Contrary to those norms, Mr. Galindo's trial counsel failed to conduct more than a cursory mitigation investigation, and thereby also failed to present necessary expert testimony to support the mitigation case and provide counterweight against the aggravators previously presented by the state.

Counsel's failure prejudiced Mr. Galindo, resulting in the sentencing panel's finding that no statutory or non-statutory mitigators had been proved aside from cooperation with law enforcement, which it gave little weight. Given the wealth of available mitigating lay and expert evidence the panel never heard, it was no wonder it found the defense mitigation case inadequate. Had counsel conducted a legitimate mitigation investigation and presented available expert mitigating evidence, including of Mr. Galindo's lead and neurotoxic exposure and his experiences of childhood neglect and their impact on his brain development, it is likely the panel would have come to a different conclusion as to the strength of the

mitigation evidence and its balancing against the aggravation evidence. *Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Rompilla*, 545 at 392-93; *Wiggins*, 539 at 534-35.

### Claim 8.3: Mr. Galindo was deprived of his right to the effective assistance of counsel when counsel failed to adequately prepare their witnesses to testify at the mitigation proceeding due to their failure to meaningfully investigate

Compounding their failure to call family, friends, and community members who could provide a wealth of available information about Mr. Galindo's background, history, and character, Mr. Galindo's trial counsel were ineffective for failing to prepare the witnesses they did call to testify in the mitigation proceeding. Counsel's failure to conduct a meaningful mitigation investigation prevented their witnesses from presenting helpful evidence and, at numerous times, their presenting harmful evidence. Counsel's failure to prepare their witnesses for cross-examination likewise made them vulnerable to damaging attacks by the prosecutor, which could have been avoided had the witnesses been properly prepared.

An essential aspect of investigating and presenting mitigating evidence is adequately preparing witnesses to testify. *See Andrus,* 140 S. Ct. at 1883 (counsel ineffective for calling defendant's mother to testify despite being "ill-prepared for her testimony," which ended up being aggravating); *see also Richey v. Bradshaw*, 498 F.3d 344, 362 (6th Cir. 2007) ("the mere hiring of an expert is meaningless if counsel does not consult with that expert" to make informed decisions in the case). Presenting the testimony of unprepared witnesses may be akin to presenting no mitigation at all; even worse, witnesses who have not been informed of the purpose

189

of their testimony or the anticipated cross-examination may instead present harmful and even aggravating evidence. *See Andrus*, 140 S. Ct. at 1883 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment"); *Walbey v. Quarterman*, 3099 F. App'x 795, 803 (5th Cir. 2009) (counsel ineffective for failing to adequately prepare mental health expert to testify and failing to rehabilitate expert when state elicited aggravating information). Preparing witnesses, particularly expert witnesses, to testify is an essential part of effective assistance of counsel. *See Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) ("A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment.").

Although counsel presented a handful of lay and expert witnesses at Mr. Galindo's mitigation proceeding, counsel failed to prepare them to testify. The information Dr. Llorente and Dr. Stalcup were provided was sparse – Dr. Llorente reviewed school records and spoke to Mr. Galindo's parents, and Dr. Stalcup was given information from witnesses who used methamphetamine with Mr. Galindo. Neither expert was provided with a psychosocial history or family history, and indeed, no such document was ever prepared. Habeas Exhibit Q (Fernandez Dec.) p. 14; Habeas Exhibit MM (Weeks Dec.) p. 5. Aside from Dr. Llorente's phone call with Mr. Galindo's parents, neither expert independently interviewed witnesses. And due to the limited mitigation investigation conducted by the trial team, the

information provided to the experts by the mitigation specialist barely scratched the surface of what was available to inform their professional assessments.

As the prosecutor exploited on cross-examination, defense counsel did not have Dr. Stalcup interview Mr. Galindo. Tr. 3749. He was provided information from three witnesses about the amount of methamphetamine Mr. Galindo used around the time of the offense, but that information was easily called into question by the prosecutor after two of those witnesses, Carlos Flores and Claudia Solis, testified in court inconsistently with what Dr. Stalcup had been told. Because defense counsel failed to identify witnesses who had used methamphetamine with Mr. Galindo in the days leading up to the crime, despite the fact that such witnesses existed, Dr. Stalcup was given no information to corroborate the fact that Mr. Galindo was under the influence of methamphetamine at the time of the offense. *See* Habeas Claim 19.

Moreover, counsel did not provide Dr. Stalcup with jail records or police reports related to Mr. Galindo's presentation immediately after the crime. That allowed Dr. Stalcup's testimony about Mr. Galindo's methamphetamine crash to be easily discredited, even though his opinion about the influence of methamphetamine on Mr. Galindo's behavior did not depend on Mr. Galindo having suffered from a crash. Had Dr. Stalcup been aware of the evidence in the jail records and police reports, he could have provided helpful context to affirmatively explain that the behaviors observed by law enforcement did not negate the likelihood that Mr. Galindo was under the influence of methamphetamine. Instead,

191

he was left to respond to the prosecutor's questions in a defensive manner, making his testimony far less persuasive than it would have been had he been adequately prepared.

Also because of the inadequate and surface-level mitigation investigation, the mitigation specialist was unable to provide Dr. Stalcup with the information regarding risk factors for addiction that he specifically requested. Due to the lack of investigation in Mexico and the failure to interview family members besides Mr. Galindo's parents, counsel—and, as a result, Dr. Stalcup—was unaware of Mr. Galindo's family history of addiction, including alcoholism in a significant number of his relatives including his father.

As Dr. Stalcup testified, his opinion was based on the information he was given—and as the prosecutor pointed out on cross-examination, that information was limited, subjective, and called into question by the defense's own lay witnesses at the mitigation proceeding. Tr. 3775-76. Dr. Stalcup was forced to admit that if the information on which he based his opinion was untrue, he would have to reconsider his opinion. Tr. 3776. Ultimately, Dr. Stalcup conceded that his opinion that Mr. Galindo was intoxicated on methamphetamine and had not slept for days at the time of the offense was a "hypothetical," predicated only on the information he was given. Tr. 3787.

Dr. Llorente was similarly unprepared for his testimony at the mitigation proceeding. While Dr. Llorente reviewed the limited school records the mitigation specialist had been able to obtain, he did not interview teachers or family members

who could speak to Mr. Galindo's adaptive functioning. Due to the sparse mitigation investigation that was conducted, counsel had no information about Mr. Galindo's schooling in Mexico, his childhood development, his relationship with his parents, or his family history of mental illness and cognitive deficits to provide to Dr. Llorente. Importantly, Dr. Llorente was also not provided any information about Mr. Galindo's significant exposure to lead, pesticides, and PAHs during the first 12 years of his life. *See* Habeas Exhibit MM (Mr. Weeks Dec.) pp. 6-7.

This failure meant that Dr. Llorente lacked available information to corroborate many of his assertions, which the prosecutor easily exploited on cross examination. Although Dr. Llorente indicated Mr. Galindo had likely been neglected as a child, he was not provided information from numerous relatives and neighbors detailing his mother's lack of affection and refusal to touch him as a baby, his extreme isolation, and the strife between his parents' families and between his parents. And while Dr. Llorente's report and testimony suggested that Mr. Galindo's struggles in school were related to learning difficulties, counsel did not uncover or provide Dr. Llorente with information that revealed Mr. Galindo also struggled in school in Mexico. *See* Habeas Claim 5. All that evidence was available but was not uncovered by the defense, and therefore was not provided to Dr. Llorente to corroborate his assertions. That allowed the prosecutor to easily discredit Dr. Llorente on the stand, despite the ample support that actually existed for his conclusions.

The defense lay witnesses were equally unprepared to testify. Mr. Mike Sunderman, a teacher who testified on Mr. Galindo's behalf, was not asked to review Mr. Galindo's school records in advance of his testimony. Habeas Exhibit II (Mr. Sunderman Dec.) pp. 3-4. He did not know the questions defense counsel planned to ask him, nor did counsel prepare him for the questions the prosecutor would ask in cross-examination. *Id.* at 3. According to Mr. Sunderman, "The first time I heard the questions they wanted me to answer was when I was sitting in the witness chair." *Id.*

If counsel had prepared Mr. Sunderman, he could have provided helpful context about Mr. Galindo's academic struggles and difficulties with English, as well as his immaturity and quest "for a team." *Id.* at 4. Mr. Sunderman also could have provided context for Sandoval's leadership and charisma and the manner in which he exploited Mr. Galindo's nature as a follower looking for a team. *Id.* Mr. Sunderman could have testified that, based on his relationship with both Mr. Galindo and Sandoval, he did not believe Mr. Galindo "would ever have been involved in something like this had it not been for Jose's negative influence," and that Mr. Galindo was "easily led and influenced by others," including Sandoval. *Id.* at 2. Instead, due to the lack of preparation on counsel's part, defense counsel himself elicited from Mr. Sunderman that Mr. Galindo exhibited "a different type of leadership" from Sandoval, which undercut the mitigators defense counsel was trying to prove. Tr. 3643. Had Mr. Sunderman been properly prepared, defense counsel could have clarified that Mr. Sunderman viewed Mr. Galindo as a follower

194

and what Mr. Sunderman was actually referring to was Mr. Galindo's search for acceptance by his peers rather than actual leadership.

Mr. Stan Turner, the former principal in Madison, was also unprepared to testify on Mr. Galindo's behalf. Mr. Turner did not know what defense counsel wanted him to testify about, other than his general recollections regarding Mr. Galindo's school performance. Habeas Exhibit KK (Mr. Turner Dec.) p. 3. Mr. Turner was not asked to review Mr. Galindo's school records or Sandoval's disciplinary records before he testified. *Id.* at 3-4. Had Mr. Turner been provided with records to review, he would have been able to testify about the cognitive deficits Mr. Galindo's records demonstrate, and the possibility that the school failed to recognize Mr. Galindo's learning disability and cognitive deficits. *Id.* at 3. Counsel did not explain to Mr. Turner that Mr. Galindo's intellectual and adaptive functioning were important issues for the sentencing panel to consider. *Id.* The defense experts did not interview Mr. Turner. *Id.*

Because counsel did not prepare Mr. Turner by going through Mr. Galindo's school records with him or explain the relevance of Mr. Galindo's cognitive deficits and potential learning disability, the prosecutor elicited from him on cross-examination that Mr. Galindo was "lazy" and was able to learn but refused to do so. Tr. 3625. Had counsel adequately prepared Mr. Turner, he would have been able to discuss the possibility that Mr. Galindo's struggles were actually related to cognitive and learning issues. Habeas Exhibit KK (Mr. Turner Dec.) pp. 2-3. Moreover, had counsel adequately prepared Mr. Turner, he could have testified

195

about the lack of services available to non-English proficient students in Madison at the time Mr. Galindo was in school, leading to the likelihood that the school mistook Mr. Galindo's cognitive and learning deficits as language deficiencies and did not explore his need for special education services. *Id.*

Counsel failed to prepare Mr. Galindo's parents to testify in the mitigation proceeding, allowing the prosecutor to elicit harmful and even aggravating evidence that inaccurately painted Mr. Galindo's childhood and intellectual capabilities in a more positive light than the reality. Because of the surface-level mitigation investigation Mr. Galindo's legal team conducted, counsel was unable to redirect or correct Mr. Galindo's parents' skewed assertions and did not present other, more objective and accurate, evidence regarding Mr. Galindo's childhood, family dynamics, and intellectual and cognitive functioning.

It is clear from Mr. Galindo's parents' testimony that they did not understand counsel's purpose for calling them to testify, nor the information counsel was attempting to elicit from them. Dhyana Fernandez, the mitigation specialist, was the only bilingual member of Mr. Galindo's legal team and was the person in contact with Mr. Galindo's parents, who spoke little or no English. Yet counsel did not employ Ms. Fernandez's services to prepare Mr. Galindo's parents to testify at the mitigation proceeding, and there is no evidence to suggest counsel otherwise attempted to meet with them to prepare them. Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 18-19; Habeas Exhibit MM (Mr. Weeks Dec.) p. 7.

That lack of preparation is obvious from Mr. and Mrs. Galindo's testimony, which was largely unhelpful and contradicted testimony by other defense witnesses, including Dr. Llorente. Those contradictions were caused by Mr. and Mrs. Galindo's lack of preparation and understanding of the purpose of their testimony, which resulted in their reacting defensively to questioning by both defense counsel and the prosecutor, and painting themselves in a skewed, inaccurately positive light. *See Andrus*, 140 S. Ct. at 1883 (defendant's mother testified untruthfully that his childhood was tranquil, casting herself in a positive light); *Walbey*, 309 F. App'x at 803 (defendant's grandmother testified inaccurately that his childhood was normal, presenting "a seriously distorted view of his childhood that painted . . . her daughter [] as benign" rather than abusive).

Had counsel prepared Mr. Galindo's parents for their testimony, they would have understood that counsel's questions were not intended as accusatory attacks on their character or parenting and instead were intended to elicit accurate information that could help their son avoid a death sentence. Instead, perceiving that they were being criticized, they grew defensive and provided information that lacked context and was counterproductive to defense counsel's mitigation strategy, slim though it was. Because the mitigation specialist who primarily interfaced with Mr. Galindo's parents met with them at most four times throughout the case, *see* Habeas Exhibit Q (Ms. Fernandez Dec.) p. 2, the defense team did not have a sufficiently trusting relationship with Mr. Galindo's parents to counteract their defensive reaction in court. And because counsel had not conducted a thorough

mitigation investigation and never interviewed any other family members, counsel was unable to correct the misinformation conveyed by Mr. and Mrs. Galindo's testimony with other, more reliable sources.

For example, Mr. Galindo's mother testified that he was "very responsible" in school in Mexico and was "very intelligent" as a child. Tr. 3492, 3500-01, 3523. She denied that he ever had problems learning, denied that he experienced childhood neglect, and emphasized that Mr. Galindo always had enough food and material items. Tr. 3513-16. Mr. Galindo's father testified that "everything was perfect" for Mr. Galindo when he was in school in Mexico. Tr. 3535. Mr. Galindo's father suggested that Dr. Llorente's information was inaccurate and that he, or whoever provided that information to him, was "lying." Tr. 3546-47, 3557-58. Due to the lack of preparation by counsel, Mr. Galindo's parents' testimony ultimately was more harmful than helpful because it undercut the mitigation defense counsel was trying to present and contradicted the defense experts, which defense counsel could not remedy without having done a proper mitigation investigation.

The other mitigation witnesses were also ill prepared to testify. While Marcos Quijano met with the mitigation specialist before he took the stand, he never spoke to defense counsel. Habeas Exhibit CC (Mr. Quijano Dec.) p. 15. Although counsel called Quijano, as well as Claudia Solis and Carlos Flores, to talk about Mr. Galindo's methamphetamine use, none of them had used methamphetamine with him in the days leading up to the offense. That timing issue, which the prosecutor exploited on cross-examination, significantly undercut their usefulness to the

mitigation case as well as undermining Dr. Stalcup's testimony. And due to the lack of preparation by counsel, the prosecutor was able to elicit harmful and aggravating testimony about Mr. Galindo from both Solis and Flores.

Defense witness Theodore Pocwierz, the Corrections Director for Platte County Jail, testified that Mr. Galindo was helpful during his 6-month incarceration there, had no problems with staff or other inmates, and jail officials used Mr. Galindo to help communicate with Spanish-speaking inmates who were being booked into the jail. Tr. 3919. Although this testimony was mildly helpful, the prosecutor was then able to elicit extremely damaging and prejudicial information on cross-examination that, had defense counsel conducted adequate preparation with Pocwierz, would have precluded calling him as a witness.

The prosecutor elicited that Pocwierz only later found out about Mr. Galindo's alleged escape attempt from the Madison County jail, and that if he had known about that he never would have had Mr. Galindo assist other inmates and would not even have brought him out of his cell block. Tr. 3921-22. The prosecutor then questioned Pocwierz about jail policy if an inmate takes jail staff hostage, eliciting that a guard who is taken hostage by an inmate with a gun is, in the prosecutor's words, "expendable." Tr. 3923. Defense counsel did not object to this inflammatory and irrelevant line of questioning. *See* Habeas Claim 26. The prosecutor also showed Pocwierz the alleged weapon Mr. Galindo possessed and elicited testimony that it could have caused great harm to officers and other inmates. Tr. 3924. Ultimately, Pocwierz testified that Mr. Galindo was dangerous

and "a very high risk to any system." Tr. 3925. This completely undermined defense counsel's entire purpose for calling Mr. Pocwierz to testify and rendered any helpful testimony he gave on direct entirely worthless. Counsel could have avoided this damaging exchange had he adequately prepared Pocwierz. Had counsel known that Pocwierz had been unaware of Mr. Galindo's alleged escape attempt, and that it changed Pocwierz's assessment of Mr. Galindo's dangerousness, counsel never would have called him as a witness. Failing to adequately prepare the witness led counsel to cause far more harmful evidence to be before the sentencing panel than the mildly helpful testimony Pocwierz was called to provide.

Counsel's failures prejudiced Mr. Galindo. *Rompilla*, 545 at 392-93; *Wiggins*, 539 at 534-35; *Strickland*, 466 U.S. 668. Had counsel adequately investigated Mr. Galindo's life history and prepared the witnesses they called in the mitigation proceeding, including the expert witnesses, they would have been able to present considerably more persuasive testimony. And had counsel conducted more than a cursory mitigation investigation, *see* Habeas Claims 8.1, 8.2, the panel would have been presented with a wealth of evidence to corroborate the mitigation counsel attempted to present, including the expert testimony. Had counsel presented more than a surface level mitigation case and the witnesses been properly prepared, it is reasonably likely that the sentencing panel would have reached a different determination of the mitigators and given the mitigation evidence significantly more weight when balanced against the aggravators. *Porter v. McCollum*, 558 U.S.

200

30, 42-43 (2009); *Rompilla*, 545 U.S. at 393. This Court should order a new sentencing.

> **Claim 8.4: Counsel was ineffective for failing to work with the mitigation specialist hired to investigate Mr. Galindo's life history, depriving him of the effective assistance of counsel.**

Defense counsel appointed to represent Mr. Galindo in this capital case had never represented a defendant in a capital trial and was completely inexperienced with regard to mitigation. *See* Habeas Exhibit I (Ms. Converse Dec.) p. 2. Over a year into the case, shortly before Mr. Galindo's trial started, counsel hired a mitigation specialist to begin investigating Mr. Galindo's life in preparation for a mitigation hearing. *Id.* at 2-3; Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 1, 7; Habeas Exhibit MM (Mr. Weeks Dec.) p. 3. Once hired, the mitigation specialist, Dhyana Fernandez, was on her own in terms of making decisions as to the mitigation investigation. Habeas Exhibit Q (Ms. Fernandez Dec.) p. 2. Ms. Fernandez herself was inexperienced in conducting capital mitigation investigations, particularly pre-trial, resulting in a mitigation investigation best characterized as "the blind leading the blind." *Id.* at 4.

This resulted in a bare-bones, surface level mitigation investigation that failed to uncover scores of witnesses who would have been able to testify about Mr. Galindo's background, including a childhood filled with isolation, abuse, emotional neglect, and rejection; present evidence of his daily exposure to lead and other neurotoxins; provide information regarding adaptive deficits to support a diagnosis of intellectual disability and explain his cognitive difficulties; and present a far different picture of Mr. Galindo's life than the minimal mitigation evidence counsel

presented at sentencing. *See* Habeas Claim 8.1, 8.2, 8.3, 29. Counsel's failure to work with the mitigation specialist deprived Mr. Galindo of his right to the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments and deprived him of a fair sentencing proceeding. *Wiggins*, 539 U.S. at 524; *Williams;* 529 U.S. at 394-98; *Kenley;* 937 F.2d at 1307-09.

Counsel's duty to discover and present all substantial, available mitigating evidence includes adequately investigating the defendant's social history and presenting available mitigating evidence regarding the defendant's troubled childhood. *Wiggins*, 539 U.S. at 535-36. Counsel may be ineffective for failing to work with a mitigation specialist to conduct such an investigation. *Jells v. Mitchell*, 538 F.3d 478, 494 (6th Cir. 2008); *Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011). Indeed, the prevailing professional norms require defense counsel to work with a mitigation specialist to "ensure[] that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together." 2003 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 959 (2003). This joint approach allows the defense team to "develop a comprehensive and cohesive case in mitigation." *Id.*

Nothing of the sort occurred in Mr. Galindo's case. The need for a mitigation specialist, particularly a bilingual one, was especially great in Mr. Galindo's case due to the fact that his parents spoke little to no English and defense counsel did not speak Spanish proficiently. Habeas Exhibit MM (Mr. Weeks Dec.) p. 3; Habeas

Exhibit Q (Ms. Fernandez Dec.) pp. 1, 18-19. But counsel's failure to provide direction, strategy considerations, and meaningful input to Fernandez was akin to failing to work with a mitigation specialist at all, particularly given Fernandez's own admitted lack of experience. *See Jells*, 538 F.3d at 494; Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 2-4. Counsel deferred to Fernandez to "direct the mitigation investigation and strategy" and left her to work "almost completely autonomously." *Id.* at 2. Counsel looked to Fernandez to "educate them about the mitigation function." *Id.* They did not have regular or frequent meetings and only met in person at most four times, when Fernandez made investigative trips to Nebraska. *Id.* at 2-3; Habeas Exhibit MM (Ms. Weeks Dec.) p. 4.

Lead counsel delegated preparation for the mitigation phase to Andrew Weeks, a brand-new attorney who had just graduated from law school and was sworn in only months before Mr. Galindo's trial began. *Id.* at 1-2; Habeas Exhibit Q (Ms. Fernandez Dec.) p. 3; Habeas Exhibit I (Ms. Converse Dec.) p. 2. Counsel's view was that Fernandez was the mitigation expert and they "relied on her to handle the mitigation investigation." Habeas Exhibit MM (Mr. Weeks Dec.) p. 3. Fernandez determined which witnesses to interview, who to call to testify at the mitigation hearing, and advised counsel about how they would present on the stand. *Id.* at 5. But Fernandez had never managed a capital mitigation investigation on her own, had never worked on a capital trial case, and had not worked on any capital case in 10 years. *Id.* at 3-4.

Counsel's failure to work with Fernandez and inattention to the mitigation investigation deprived Mr. Galindo of the effective assistance of counsel. Counsel's complete reliance on an inexperienced mitigation specialist who was hired more than a full year after the case began, coupled with budgetary constraints imposed by the County Attorney's control over funding decisions, *see* Habeas Claim 24, led to a surface-level, bare-bones, minimalistic mitigation investigation. That, in turn, resulted in a surface-level, bare-bones, minimalistic mitigation presentation at sentencing. All of this was of course compounded by counsel's own complete lack of capital experience.

Fernandez did not travel to Mexico to investigate the environment in which Mr. Galindo spent his first 12 years or speak to family members. Habeas Exhibit Q (Ms. Fernandez Dec.) pp. 8-9. Indeed, she did not even speak to family members in the United States aside from Mr. Galindo's parents. *See id.*, Habeas Exhibit MM (Mr. Weeks Dec.) p. 5. The sentencing panel therefore did not hear significant evidence regarding Mr. Galindo's neglectful and isolated childhood, family history of mental illness and substance abuse, exposure to lead and neurotoxins, adaptive deficits in his everyday functioning and intellectual ability, and a wealth of other available evidence. *See* Habeas claims 8.1, 8.2, 8.3, 19.

Had counsel worked with the appointed mitigation specialist, a more thorough mitigation investigation would have been undertaken and presented to the panel. Indeed, the obligation to adequately investigate and present mitigation rests on counsel, not on investigators. *See, e.g., Rompilla*, 545 U.S. 387. Counsel's

failure prejudiced Mr. Galindo and prevented a presentation of considerable mitigating evidence to the panel; it is reasonably likely that, had the panel heard the available mitigating evidence, it would have reached a different conclusion as to Mr. Galindo's sentence. *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. at 524.

**Conclusion**

Trial counsel's deficient performance in investigating and presenting mitigating evidence during the mitigation phase of Mr. Galindo's trial was prejudicial. *Strickland*, 466 U.S. 668; *Wiggins*, 539 U.S. at 524; *Williams*, at 396. Counsel failed to conduct a timely and adequate investigation into Mr. Galindo's childhood, family history, experiences of parental neglect and isolation, exposure to lead and other neurotoxins, brain development, and other "aspect[s] of [Mr. Galindo's] character or record and any of the circumstances of the offense" as required by the Sixth, Eighth, and Fourteenth Amendments. *Lockett*, 438 U.S. at 604. Individually and taken together, these cumulative failures prevented the sentencing panel from hearing a wealth of evidence from lay and expert witnesses that would have provided "a basis for a sentence less than death," *id.*, including the fact that Mr. Galindo had been literally poisoned by his early childhood environment, affecting his brain development and cognitive function. *See* also Habeas claim 5. Counsel's deficiencies also precluded him from providing any meaningful rebuttal to the State's aggravation case. *Rompilla*, 545 U.S. at 386.

Had counsel worked with the mitigation specialist and conducted more than a bare-bones investigation—which would have allowed the presentation of more

than a surface-level, minimalistic mitigation presentation—there is a reasonable probability the sentencing panel would have reached a different determination of the mitigators and "struck a different balance" between the mitigating evidence and the aggravators. *Porter*, 558 U.S. at 42 (quoting *Wiggins*, 539 U.S. at 537); *Sears*, 561 U.S. at 954-55.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. On the merits, counsel performed deficiently and there is a reasonable probability that a sentence less than death would have been returned.  Therefore, this Court should grant the writ, vacate the death sentences and remand for imposition of a life sentence.

### Claim 9: Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously failed to strike certain members of the jury during jury selection.

The trial court violated Mr. Galindo's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when it refused to strike jurors 38 and 65 for cause. On review, the Nebraska Supreme Court determined that there was no evidence to indicate the juror's familiarity "would probably subconsciously affect his or her decision of the case adversely to the defendants." *Galindo*, 994 N.W.2d at 634-35. The Nebraska Supreme Court's holding was contrary to and/or an unreasonable application of clearly established

206

Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).[17]

Juror 38 reported to the court that he worked with Mr. Rob Bryant, the husband of Ms. Lisa Bryant who was one of the victims of the U.S. Bank murders, for eight months **after** the murders. Tr. 1712-1713, 1731. He saw Rob Bryant on a daily basis during that time, although he reported that he didn't necessarily converse with him daily. *Id.* However, Juror 38 did acknowledge that he talked about the crime with others. Tr. 1713.

Juror 38 "knows" Ms. Cheryl Cahoy, a state's witness. Tr. 1732. He banked with Ms. Cheryl Cahoy at the U.S. Bank. *Id.* He was aware she was one of the survivors of the robbery and was a witness to the crime. Tr. 1733.

Juror 38 went to high school with Ms. Jere Anderson. Tr. 1733. She is the daughter of the woman that Mr. Galindo had taken the car keys from after the murders. He was aware of the fact that Mr. Galindo took the keys from her parents. *Id.*

---

[17] The Nebraska Supreme Court unreasonably refused to consider the full context of the responses by all the jurors. Considering the totality of the voir dire was necessary to place the responses from Jurors 38 and 65 in context. Thus, it mattered that a fair percentage of jurors felt Mr. Galindo was guilty before the trial. It mattered that the number of witnesses meant that a fair percentage of this small county may be testifying in front of their peers. It mattered that a potential juror expressed racial sentiments but was not excused for cause.

In response to questions contained in the supplemental juror questionnaire regarding his ability to be fair, Juror 38 reported that he was "not sure" whether he could be impartial:

> 5. The law does not require that a juror be totally ignorant of the facts and issues involved. It is sufficient if the juror can lay aside his or her impressions or opinions and render a verdict based on the testimony and evidence presented in court. Can you do this?
> _____ Yes _____ No   Not Sure
>
> 6. If the Judge instructs you that your verdict must not be based on sympathy or prejudice, but only on the evidence and testimony presented in court during the trial of this case, will you be able to follow that instruction?
> _____ Yes _____ No   Not sure

Habeas Exhibit PP. He repeated in voir dire that "I'd have to say honestly say, yeah, I'm not real sure I could" could be impartial. Tr. 1714. He forthrightly conceded that he said such to avoid his "duty" to serve. *Id.*; see Habeas Claim 2. All Juror 38 could muster with the trial court was that he "thinks" he could be fair. Tr. 1715. After prosecutorial questioning relating back to the trial court's erroneous statement regarding duty, all Juror 38 could again muster was a "belief" he could be fair. Tr. 1720. This stands in stark contrast to where he decisively rejected anti-death penalty sentiments. *See* Tr. 1716.

Juror 38 noted he initially felt "disbelief" and agreed he was sad and felt anger by the crime. Tr. 1718. Juror 38 noted his opinion was that Mr. Galindo was guilty. Tr. 1729. He stated he "believes" he could set that aside, Tr. 1730, and said he was "not real sure" he could set aside what he had heard about Mr. Galindo's case or his thoughts or opinions about Mr. Galindo's case.

Juror 65 noted had previously worked with Ms. Evonne Tuttle, and Mr. Samuel Sun's ex-wife. Tr. 1580. Juror 65 agreed that when this occurred, she was sad, angry and scared, and that only decent people would feel that way. Tr. 1586. In response to the prosecutor, she indicated a "hesitation with respect to sitting on the jury" because "Just knowing some of the victims --… -- and some of the parties involved. Tr. 1594-95.

Juror 65 had been exposed to media reports and had talked about the case. Tr. 1598. No one talking about it had opined that Mr. Galindo was innocent, and she had never stated that. *Id.* Juror 65 noted: "There's the appearance that [Mr. Galindo] is involved" in the U.S. Bank Robbery. *Id.* She then conceded that she would "probably not" presume Mr. Galindo was innocent. Tr. 1599.

Juror 65 agreed that thinking about what had happened to people she knew would cause an "emotional response." Tr. 1599. Juror 65 used to work with and knew Ms. Micki Koepke. Tr. 1600.

Juror 65 also knew Ms. Cheryl Cahoy because they were both from Naper, NE. Tr. 1600.[18]  In response to a question regarding Ms. Cahoy's involvement, Juror 65 stated "she survived." Tr. 1601. She then agreed that she was sure it was "very scary" for her. *Id.* She also seemed to indicate that she may know someone else in the bank but could not recall the name. *Id.*

---

[18] Naper is a small town whose population was 300 in 1910, 105 in 2000, and currently rests at 89, according to census data.

Juror 65 knew Ms. Jere Anderson. Tr. 1602. In fact, Juror 65's mother-in-law lived next door to Ms. Anderson at the time of trial. *Id.* Juror 65 testified that she knows their family. *Id.*

She banked at U.S. Bank. Tr. 1607. She only occasionally went into the branch where the murders took place. *Id.* She dealt with Ms. Jo Mausbach at the U.S. Bank, via the drive through windows. *Id.*

In order to seat a juror who has indicated that he has formed or expressed an opinion as to guilt, Nebraska law dictates that a court affirmatively establish three things: first, that the opinion is not based upon conversations with witnesses or reading reports of their testimony or hearing them testify; second, that the juror shall say on oath that he feels able to render an impartial verdict; and third, that the Court is satisfied that the juror or alternate juror is impartial and will render an impartial verdict. See R.R.S. Neb. § 29-2006.

However, the U.S. Supreme Court has emphasized that in cases where there is a strong indication that jurors are partial against a defendant, an oath or affirmation from potential jurors that they will be impartial is not sufficient to satisfy the due process dictates of the Constitution. *Irvin*, 366 U.S. at 717. Mere technical compliance with a state statute is not enough to ensure a constitutionally fair trial. *Id.* The due process clause of the Fourteenth Amendment entitles a state criminal defendant to an impartial jury. *E.g., Morgan v. Illinois*, 504 U.S. 719, 726, (1992).

With regard to jurors 38 and 65, the evidence of partiality is manifest. *See id.* at 723–24. Juror 65 admitted that she was a friend of two of the victims, or at least their families. In another part of her voir dire, she stated that she was hesitant to sit on a jury because she knew one of the victims. Throughout her voir dire testimony, she actually named at least five victims that she was acquainted with. She also banked at the U.S. Bank and had interacted with a sixth victim. Even though she told the Court that she believed she could be impartial, she admitted to the Court that she probably did not presume that Mr. Galindo was innocent. That admission goes beyond an opinion as to guilt and is an admission that she would not afford Mr. Galindo the presumption of innocence required by the Fifth Amendment to the United States Constitution.

No reasonable court would presume, without further questioning, that Juror 65 was capable of rendering an impartial verdict in Mr. Galindo's case. She gave inconsistent answers to straightforward questions, such as how many of the victims she knew and whether she would be able to issue a fair and impartial decision.

Juror 38 clearly expressed he was "not sure" if he could be impartial. Juror 38's hesitation coupled with his relationship with a deceased victim's husband— which continued for eight months after the shooting—and his relationship with a shooting survivor should have been alarming. No promises to impartiality, no matter how sincere, were sufficient to overcome "the psychological impact" of having personal connections with victims and their families. *Morgan*, 504 U.S. at 728.

211

Nonetheless, the Nebraska Supreme Court erroneously rejected Mr. Galindo's claim, asserting there was no evidence indicated that both jurors had such a close relationship that "would probably subconsciously affect his or her decision[s] of the case adversely to the defendan[t]." *Galindo*, 994 N.W.2d at 635. The Nebraska Supreme Court's failure to recognize the jurors' self-serving claims of impartiality were insufficient to overcome the psychological impact of personal relationships with the victims and families was contrary to and/or constituted an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the convictions and death sentences, and remand for new proceedings in state court.

### Claim 10: The categorical exclusion of mitigation and the sentencing panel's failure to give effect to mitigation violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

In a capital case, the Sixth, Eighth, and Fourteenth Amendments require the sentencing authority to fully consider and give meaningful effect to any mitigating evidence that may justify the imposition of a life sentence rather than death. *E.g., Brewer v. Quarterman*, 550 U.S. 286, 289 (2007). "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The Court has made clear that although the sentencer "may determine the weight to be

212

given relevant mitigating evidence . . . they may not give it no weight by excluding such evidence from their consideration." *Eddings v. Oklahoma*, 455 U.S. 104, 114-115 (1982); *See also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (In striking a statute that precluded the consideration of a category of mitigation noted: "[We] conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.").

> *The Sentencing Panel's Failure to Consider Youth as a Mitigating Circumstance.*

The Supreme Court has held that "one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age[.]" *Stanford v. Kentucky*, 492 U.S. 361, 375 (1989) (quoting *Eddings*, 455 U.S. at 115-116). In *Eddings*, the Supreme Court recognized that "youth must be considered a relevant mitigating factor. But youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." 455 U.S. at 115-116.

Mr. Galindo was only twenty-one years old at the time of the robbery. Contrary to controlling authority in *Eddings*, *Lockett*, and their progeny, the sentencing panel expressly refused to consider Mr. Galindo's age as either a statutory or non-statutory mitigating circumstance. The sentencing panel explicitly refused to consider Galindo's age as a mitigating circumstance, specifically finding the statutory mitigating circumstance under Neb. Rev. Stat. § 29-2523(2)(d)

213

applicable only "to a person of advanced years, where senility may be involved." Sentencing Opinion p. 8. The sentencing panel relied upon the Nebraska Supreme Court's decision in *State v. Lotter,* 255 Neb. 456 (1998), which relied upon *State v. Simants,* 197 Neb. 549 (1977), a case decided prior to *Eddings, Lockett,* and *Stanford.*

The failure of the sentencing panel to consider Mr. Galindo's youth, his age-related characteristics, or how his youth related to his culpability, violated his rights to due process and his protection against cruel and unusual punishment as guaranteed by Sixth, Eighth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ, vacate the death sentence with directions for a new sentencing proceeding.

*The Sentencing Panel's Failure to Consider the Baldus Report as Mitigation.*

Mr. Galindo offered into evidence all first-degree murder sentencing orders in Nebraska as well as the contents of the "Baldus Report." Tr. 4406-4407; 4409-4412. The "Baldus Report" is a study that was written for the Nebraska Commission on Law Enforcement and Criminal Justice during the time that L.B. 1 was under consideration. Among other things, the study recounts the facts involved in all death-eligible cases prosecuted between 1973 and 1999.

The sentencing panel refused to receive or consider the report, holding that it would only review Nebraska's first-degree murder cases in which the death penalty

had been imposed. The trial court's refusal to consider Mr. Galindo's proffered evidence violated *Lockett*, and its progeny.  The information regarding the sentences imposed in other first-degree murder cases was directly relevant to the imposition of the sentence in his case.

The failure of the sentencing panel to consider the Baldus Report violated Mr. Galindo's rights to due process and protection against cruel and unusual punishment as guaranteed by Sixth, Eighth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).  This Court should grant the writ, vacate the death sentence with directions for a new sentencing proceeding.

**Claim 11: Mr. Galindo's Due Process, Confrontation and Jury Trial rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when the sentencing judges considered a Pre-Sentencing Investigation Report.**

The Constitution instills guardrails and procedures regarding the proper consideration of evidence in a capital sentencing proceeding. A defendant must be afforded the opportunity to be heard and the opportunity to rebut the evidence upon which a sentencing court may rely in imposing death.  The operation of the Nebraska Death Penalty Statute requiring consideration of a Pre-Sentence Investigation report to which a defendant cannot respond runs afoul of these principles.  The Nebraska Supreme Court's failure to hew to the language and requirements of Nebraska's Death Penalty statute is contrary to and/or an

215

unreasonable application of clearly established United States Supreme Court law and/or is premised upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

Sections 29-2261(1), 29-2521(3) and 29-2522(1) of the Nebraska Revised Statutes, as currently interpreted by the Nebraska Supreme Court, violate Mr. Galindo's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Nebraska's sentencing laws as modified by L.B. 1 require a three-judge sentencing panel composed of two non-presiding judges to fix a sentence for capital defendants by, *inter alia,* determining "[w]hether the aggravating circumstances as determined to exist justify imposition of a sentence of death." R.R.S. Neb. §§ 29- 2522(1), 29-2521(3). After the jury makes a finding that one or more aggravating factors exist, the sentencing panel holds a hearing to receive relevant "evidence of mitigation and sentence excessiveness or disproportionality" only. R.R.S. Neb. § 29-2521(3). This is seemingly to maintain compliance with *Ring*.

It is unambiguously clear, then, that in order to comply with *Ring* and its progeny, the Nebraska Legislature intended that the sentencing panel not consider evidence related to alleged aggravating factors in capital cases, including evidence contained in the presentence investigation report. The Nebraska Supreme Court has ignored the clear meaning of Sections 29-2521(3) and 29-2522(1) and instead looked to other portions of Nebraska's sentencing laws to hold that the sentencing panel may consider the entire presentence investigation report in weighing

216

aggravating against mitigating circumstances and in reaching its ultimate
sentencing determination, even though the presentence investigation report
contains information relevant only to the factual bases of alleged aggravating
circumstances. *Galindo,* 994 N.W.2d at 663-664; *see also* R.R.S, Neb. §§ 29-2261 (I),
29-2521(3). The state court in Mr. Galindo's case has therefore allowed the
sentencing panel to "determine" which aggravating circumstances exist based in
part on unconfronted hearsay evidence contained in the presentence investigation
report, in violation of the constitution. *See Ring*; *Gardner v. Florida,* 430 U.S, 349
(1977).

  " Due process . . . requires that [a defendant] be present with counsel, have
an opportunity to be heard, be confronted with witnesses against him, have the
right to cross-examine, and to offer evidence of his own" when a sentencing
proceeding, or portion thereof, constitutes a "new charge leading to magnified
criminal punishment. . . in an enhanced sentence proceeding." *Specht v. Patterson*,
386 U.S. 605, 608-611 (1967). By allowing the sentencing panel to consider evidence
of aggravating circumstances or the factual bases of aggravating circumstances
contained in the presentence investigation report, Nebraska sentencing laws
currently allow the sentencing panel to find essential facts relating to a "new charge
leading to magnified criminal punishment," but deny capital defendants their due
process rights to be present, to be heard, to confront witnesses against them, and to
offer evidence. *See Specht*, 386 U.S. 605; *Gardner*, 430 U.S. 349.

Alarmingly, the PSI included improper opinion evidence as to the appropriate sentence for Mr. Galindo. The Presentence Investigation file submitted to the sentencing panel contains opinions by the victims' family members about the defendant and the appropriate sentence. Several explicitly express their desire for imposition of a death sentence. The opinions include:

a. "These criminals have no right to go on living after taking the life of my precious daughter!"

b. "I agree with the jury that he should receive the death penalty for murdering Five [sic] people."

c. "As for the perpetrator Jorge Galindo has no purpose of being productive on earth or the human race."

d. The sentence should be "public execution by beheading."

In *Booth*, 482 U.S. 496, the Court held that it is constitutional error to present victim impact and opinion evidence. In *Payne*, 501 U.S. 808, the Court lifted the bar on victim impact evidence – but left in place the constitutional prohibition of victim opinion evidence. *Id.* at 830 n.2; *Williams*, 612 F.3d at 951 (recognizing that the Supreme Court "left intact the prohibition against statements about 'the crime, the defendant, and the appropriate sentence'; such statements violated the Eighth Amendment and were inadmissible."); *see also Parker*, 188 F.3d at 931 ("family members of the victim may not state 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' at the penalty phase").

218

Informing the sentencer as to the sentencing desires of the victims' family is unconstitutional and not tolerated by the Supreme Court. *Bosse*, 580 U.S. 1.

In not finding error, the Nebraska Supreme Court acted contrary to and/or unreasonably applied well established Supreme Court law and/or denied relief based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the death sentences, and remand for new sentencing proceedings in state court.

### Claim 12: Mr. Galindo's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when victim impact statements were read during sentencing.

The trial court violated Mr. Galindo's rights under the United States Constitution when it allowed victim impact statements to be read into evidence in violation of Nebraska law. The Supreme Court recognizes the introduction of victim impact statements only if such evidence adheres to "constitutional limitations defined by [Supreme Court] cases." *Payne v. Tennessee*, 501 U.S. 808, 824 (1991). Furthermore, "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. Because the victim impact statements introduced during Mr. Galindo's sentencing were highly prejudicial, the Nebraska Supreme Court acted contrary to and/or unreasonably applied well established Supreme Court law and/or denied relief based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

While the Eighth Amendment does not impose a *per se* bar on introducing victim impact statements, traditional limits on admissible evidence still govern to ensure a fair trial. *See Payne*, 501 U.S. at 827. In permitting the introduction of limited victim impact evidence—which "offer[s] 'a *glimpse of the life*' which a defendant 'chose to extinguish,' or demonstrat[es] the *loss to the victim's family and to society* which has resulted from the defendant's homicide," Payne, 501 U.S. at 822 (emphasis added)—the Court did not intend to eviscerate a capital defendant's Eighth Amendment right to a reliable, individualized sentencing determination. Nor did it intend for a capital sentencing proceeding to become a contest between the worth of the victim and that of the defendant.[19] Rather, the Court sought to strike a balance between victim impact evidence and the defendant's Eighth Amendment rights. Such a balance is to be safeguarded by the trial court's "authority and responsibility to control the proceedings consistently with due process" which includes restricting victim impact evidence so that the inherent emotion does not overwhelm the jury's responsibility to make a reliable, individualized sentencing determination based on a full and fair consideration of the mitigating and other aggravating circumstances. *Id.* at 836.

---

[19] In responding to Payne's concern that the comparative worth between victim and defendant should not be a relevant capital sentencing factor, the Court stated:

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind—for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

*Payne*, 501 U.S. at 823–24.

The Nebraska Constitution explicitly allows for the use of victim impact statements but leaves it to the State Legislature to establish laws governing how victim impact statements are to be used in sentencing proceedings. Article I, Section 28 of the Nebraska Constitution grants to victims of crimes the right to, *inter alia*, "make an oral or written statement at sentencing," but leaves it to the State Legislature to define a victim for these purposes.

The Nebraska Legislature responded by not only defining a "victim" for victim participation purposes, but by enacting a comprehensive set of laws governing victim impact evidence, called the Nebraska Crime Victim's Reparation Act (NCVRA). R.R.S. Neb, §§ 81-1801, el seq. Section 81-1848 of the NCVRA defines victims for victim participation purposes as those persons defined as victims under Nebraska Revised Statute Section 29-119. Section 29-119, in turn, defines a victim as, "a person who, as a result of a homicide . . . [is the] nearest surviving relative under law as provided by Section 30-2303 but does not include the alleged perpetrator of the homicide." Section 30-2303 defines nearest surviving relatives according to the rules of intestacy, as follows: surviving spouse, issue, parent, siblings, grandparents, aunts and uncles, et cetera.

Revised Statute Section 81-1848 also lays out the rights of victims in criminal sentencing proceedings. Of interest to the prosecution against Mr. Galindo is the right of victims to be notified by the county attorney of their "right to submit a written impact statement at the sentencing proceedings or to read his or her impact statement submitted pursuant to (I)(d)(iv) of this section at the sentencing

221

proceeding." R.R.S, Neb. § 81-1848(I)(d)(vii). Section (I)(d)(iv) grants victims the right to "make a written or oral impact statement to be used in the probation officer's preparation of a presentence investigation report concerning the defendant." R.R.S. Neb. § 8I-1848(I)(d)(iv). The NCVRA very specifically, then, limits the manner in which victims may participate in sentencing proceedings: they may submit a written impact statement or they may read the impact statement that was included in the presentence investigation report. It further limits victim participation to the nearest surviving relative according to the State's intestacy laws.

Due process guarantees to persons convicted of first-degree murder that they will not be sentenced by procedures that abrogate the State's sentencing laws. *Hicks v. Oklahoma*, 447 U.S. 343 (1980). *See Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (although full panoply of constitutional rights do not apply to prisoners, when the state creates a right for prisoners, due process demands that the "state-created right is not arbitrarily abrogated"). The NCVRA creates a liberty interest in persons convicted of first-degree murder whereby they will not be sentenced under proceedings that abrogate clearly-defined state sentencing laws that identify which victims may participate in the sentencing proceedings and the manner in which they can participate. A violation of the NCVRA is a violation of Mr. Galindo's rights to due process and a fair trial.

The trial court failed to comply with the Legislative requirements and did not demand that the prosecution make any showing that the persons who read or

222

submitted their victim impact statements at Mr. Galindo's sentencing proceedings qualified as victims under the NCVRA. As a result, it allowed persons that are not qualified as victims under the NCVRA to read or submit written statements. For example, Ms. Lisa Bryant's mother was allowed to give a victim impact statement even though Ms. Bryant was married at the time of her death, and her husband, who made no statement, was the proper "victim" for purposes of the NCVRA's rules on victim participation.

Additionally, and more troublesome, the victims that introduced statements were not limited to either submitting a written impact statement or reading the impact statement that was contained in the presentence investigation report. Specifically, victim impact witnesses were allowed to read statements that were not included in the presentence investigation report, despite the fact that statements not included in the presentence investigation report are only properly submitted to the court in writing.

These clear violations of the plain meaning of the NCVRA are not only due process violations. The evidence presented by these witnesses interjected a constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Galindo's sentence was the product of emotion overwhelming reason. Mr. Galindo's sentence "[was not], and [does not] appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 358 (1977). *See Payne*, 501 U.S. at 864 (Stevens, J., dissenting) ("Irrelevant victim impact evidence that distracts the sentencer from the proper focus of

sentencing and encourages reliance on emotion and other arbitrary factors necessarily prejudices the defendant.").  It therefore additionally violates the Eighth Amendment's ban against cruel and unusual punishment.

Further, in *Booth*, 482 U.S. 496, the Court held that it is constitutional error to present victim impact and opinion evidence. In *Payne*, 501 U.S. 808, the Court lifted the bar on victim impact evidence – but left in place the constitutional prohibition of victim opinion evidence. *Id.* at 830 n.2; *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010) (recognizing that the Court "left intact the prohibition against statements about 'the crime, the defendant, and the appropriate sentence'; such statements violated the Eighth Amendment and were inadmissible."); *see also Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999) ("family members of the victim may not state 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' at the penalty phase"). Informing the jury as to the sentencing desires of the victims' family is unconstitutional and not tolerated by the Supreme Court. *Bosse v. Oklahoma*, 580 U.S. 1 (2016). *See* Habeas Claim 11.

In not finding error, the Nebraska Supreme Court acted contrary to and/or unreasonably applied well established Supreme Court law and/or denied relief based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the death sentences, and remand for new proceedings in state court.

**Claim 13: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure to pursue a guilty plea which would have avoided the death penalty.**

Mr. Galindo's trial counsel were ineffective when they failed to pursue entry of a guilty plea at a time Judge Ensz was unwilling to impose the death penalty and the prosecutor was considering not pursuing the death penalty at all. The right to effective assistance extends to plea negotiations and other representation outside of the trial setting. *E.g., Missouri v. Frye*, 566 U.S. 134, 144 (2012); *Lafler v. Cooper*, 566 U.S. 156, 174 (2012*); State v. Alarcon-Chavez*, 295 Neb. 1014, 1024 (2017)("The U.S. Supreme Court has established that the right to effective assistance of counsel extends to the negotiation of a plea bargain"). A defendant is entitled to counsel capable of rendering competent, meaningful assistance in the preparation and trial of the pending charges, including appropriate evaluation and advice with reference to a plea of guilty. *United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983); *United States v. Livingston*, 425 F. Supp. 2d 554, 559 (D. Del. 2006).

"As a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *E.g., Frye*, 566 at 145. Similarly, defense counsel must also advise a defendant of his right to appeal, *Keys v. United States*, 545 F.3d 644, 648 (8th Cir. 2008), and of certain collateral consequences of a conviction. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)("It is quintessentially the duty of counsel to provide her client with available advice about an issue like deportation"). These duties are consistent with the ethical obligation of defense counsel to provide his client prompt

information regarding important decisions. Neb. R. Prof. Cond. 3-501.4, 3-502.1.

Mr. Galindo was ill-equipped to understand the legal proceedings he faced due to English being his second language and his intellectual disability. *See* Habeas Claim 5. He had also confessed his involvement in the robbery, never claimed a defense, never opposed pleading guilty to avoid the death penalty, and told his lawyer he wanted him to "handle everything." Yet, when defense counsel met with Mr. Galindo the day prior to the October 25, 2002 arraignment in district court, there was apparently no discussion regarding the potential benefit (avoiding a death sentence) of pleading guilty. Proposed Post-conviction Exhibit 617 (October 24, 2002 Stratton Conference Note). And even if the discussion would have occurred, Mr. Galindo would not have had the benefit of an interpreter.

Likewise, after Judge Ensz ruled in favor of Nazario Robles on October 31, where Robles avoided a death sentence, trial counsel did not meet with Mr. Galindo to discuss the ruling or the opportunity it provided, despite his receipt of the county attorney's letter expressing his belief Mr. Galindo was the third most culpable participant and that he may not pursue the death penalty against Mr. Galindo. Proposed Exhibit 620 (October 31, 2002 letter from Smith to Stratton). Instead, trial counsel filed an ill-fated Plea in Abatement, to which the county attorney responded by giving notice of aggravating circumstances qualifying Mr. Galindo for the death penalty. Proposed Exhibit 621 (Amended Information filed November 22, 2002).

As early as October 2002, days after the offense, Mr. Galindo did not oppose pleading guilty and entrusted the decision to defense counsel. In a letter dated June

13, 2003, trial counsel later reminded the county attorney that defense counsel had authority "from almost the very beginning" to accept on behalf of Mr. Galindo a plea agreement which would provide for removing the death penalty as a potential sentence. Proposed Exhibit 618 (June 13, 2003 letter from Stratton to Smith regarding plea negotiations).

There was no downside to pleading guilty. There was obvious upside, however. A guilty plea would further demonstrate Mr. Galindo's acceptance of responsibility for the robbery and provide at least some hope of avoiding a death sentence in accordance with the ruling in *State v. Robles*. Proposed Exhibit 619 (October 31, 2002 Order in *State v. Nazario Robles*). Nonetheless, instead of encouraging Mr. Galindo to pursue this opportunity, trial counsel filed a Plea in Abatement, providing the Legislature the opportunity to pass L.B. 1 and the prosecutor an opportunity to file an Amended Information seeking the death penalty.

Thus, trial counsel took a course of action that subjected their client to the death penalty. If Mr. Galindo had received adequate assistance of counsel regarding the available opportunity to plead guilty in front of a judge unwilling to impose the death penalty prior to the bill's passage, just as Nazario Robles did, Mr. Galindo could have avoided the death penalty. Mr. Galindo had instructed his counsel he was willing to plead guilty to avoid the death penalty and to "handle everything", yet despite this instruction, defense counsel failed to advise him of the opportunity to pursue the same path Robles used to save his life.

Clearly established law requires defense counsel to advise the criminally accused regarding far less consequential issues. Simply, just as defense counsel must advise a defendant of a formal plea offer, *Frye,* at 145, of the right to appeal, *Keys*, at 648*,* and of certain collateral consequences of a conviction, *Padilla*, at 371, defense counsel must also advise a defendant of legal developments presenting a viable strategy to avoid a death sentence.

The failure of trial counsel to explore and execute a guilty plea which would have avoided a death sentence deprived Mr. Galindo of his constitutional right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments. Trial counsel's inaction constituted deficient performance that prejudiced Mr. Galindo *See, Strickland; Frye; Lafler*. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).  This Court should grant the writ, vacate the death sentence with directions for imposition of a life sentence.

### Claim 14: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were adversely affected by a conflict of interest.

Judge Robert Ensz appointed Mr. Stratton to represent Mr. Galindo. Mr. Stratton employed Ms. Kerrie Koch as a paralegal actively participating in Mr. Galindo's representation. (Tr. 174). At relevant times, Ms. Koch was dating Mr. Scott Freese, a local criminal defense attorney who represented state witnesses Padilla and Abendano; Mr. Freese later was convicted in federal court of conspiring

with members of a drug ring with which Padilla, Abendano and Lopez were associated. Amended PCR at 49. Ms. Koch was an active participant in Mr. Stratton's representation of Mr. Galindo. Mr. Stratton mentioned her involvement during a September 19, 2003, pre-trial proceeding. Tr. 114. Ms. Koch later admitted sharing privileged attorney-client information with Mr. Freese regarding the investigation of the drug ring. Amended PCR at 49.

Mr. Galindo may have made privileged communications to his lawyer that were shared by his lawyer's paralegal with her boyfriend Mr. Freese, who pleaded guilty to membership in a conspiracy that may have involved prosecutor Smith, and state's witnesses Abendano and Lopez. Amended PCR at 49. The paralegal, who was an active member of the defense team, admitted sharing privileged information with Mr. Freese regarding the fact he was under investigation, though according to investigative reports this may have occurred subsequent to Galindo's trial. *Id.*

Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, including a duty to avoid conflicts of interest. *Cuyler v. Sullivan*, 446 U.S. 335, 346 (1980) (*citing Strickland v. Washington,* 466 U.S. 668, 688 (1984)). "The attorney's undivided loyalty is required because the type of effective 'assistance of counsel' the Sixth Amendment guarantees a criminal defendant is that which puts the government to its proofs in an adversarial manner, and for this counsel free of conflicts of interest is necessary." *United States v. Carr*, 322 F. Supp. 3d 612, 615 (E.D. Pa. 2018). In addition to the duty of loyalty, defense counsel must honor a duty of confidentiality. In an adversarial system of justice, a

229

defendant's ability to keep privileged communications with counsel insulated from the prosecution also protects the defendant's Sixth Amendment right to effective assistance of counsel.

Here, a member of Mr. Galindo's legal team had a close personal relationship with Mr. Freese, an attorney who represented an important state witness, Abendano, and who was himself convicted of a federal drug conspiracy Mr. Galindo alleges to have included both Abendano, the prosecutor, Smith, and other individuals from the state's witness list.  Providing the confidential communications or trial strategy to Mr. Freese represented an actual conflict and violated his right to effective assistance. Mr. Freese's objective in representing Abendano was to facilitate testimony (from Abendano and possibly Padilla or Lopez) against Mr. Galindo. Mr. Freese's duty was at odds with defense counsel's duties of loyalty and confidentiality since privileged information shared by defense counsel would further Mr. Freese's objectives.

Ms. Koch breached the duties of loyalty and confidentiality regarding Mr. Galindo's communications. By her own admission, she violated her duty to protect the firm's confidential information by sharing privileged information with Freese suggesting he was under investigation. This admission raises the question of whether she shared Mr. Galindo's confidential communications with Freese as well.

Trial counsel labored under an actual conflict of interest because members of the defense team were romantically involved with lawyers for State witnesses. Such members of the team were not screened from the case, but rather actively

participated in all aspects of the preparation of the case. Mr. Galindo was neither informed of this conflict, nor was he provided conflict-free counsel to advise him regarding this conflict. The trial court, though aware of the conflict, failed to inform Mr. Galindo of such, and failed to conduct any proceedings adequate to ensure that Mr. Galindo received conflict-free advice about such and conflict-free counsel through all phases of the pre-trial, trial, post-trial, and appellate proceedings.

The conflict of interest resulting from Ms. Koch's involvement in the case adversely affected the performance of defense counsel, as alleged above herein. *See, Cuyler v. Sullivan,* 446 U.S. 335 (1980)*; United States v. Cronic*, 466 U.S. 648 (1984). As a result of the conflict, Mr. Galindo was denied his right to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the convictions and death sentences and remand for conflict free state court proceedings.

**Claim 15: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to obtain consideration prior to offering assistance that incriminated Mr. Galindo and was utilized to obtain multiple death sentences.**

Trial counsel should have advised Mr. Galindo to maintain his privilege

against self-incrimination regarding the Lundell death. Mr. Galindo would have followed this advice had it been given. Trial counsel's failure to so advise Mr. Galindo was outside the range of competence demanded of attorneys representing defendants in capital cases. Any speculative sentencing benefit to be derived from Mr. Galindo's cooperation was overwhelmingly outweighed by the likelihood that Mr. Galindo's self-incrimination would lead to an unfavorable verdict regarding his alleged involvement in Lundell's death, and that such verdict would ensure imposition of a death sentence.

Mr. Galindo's trial counsel were ineffective when they advised Mr. Galindo to waive his right to remain silent regarding the Lundell homicide, thereby guaranteeing a death sentence. Defense counsel bears the responsibility for advising the defendant of his right to remain silent and the strategic implications of waiving that right. This advice is crucial because there can be no effective waiver of a fundamental constitutional right unless there is an "intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, (1938). If counsel believes that it would be unwise for the defendant to surrender his privilege, counsel should advise the client in the strongest possible terms to remain silent.

Trial counsel deficiently advised and permitted Mr. Galindo to help law-enforcement locate the body without receiving some form of consideration for the assistance. Rather, trial counsel naively and unreasonably thought something good would come from it. Thereby, trial counsel permitted the State to use this evidence, and Mr. Galindo himself, to establish an aggravating circumstance and to argue for

death before the sentencing panel. In this regard, trial counsel acted more like an agent of the State than competent counsel for Mr. Galindo.

Advice by trial counsel to cooperate without demanding any concessions from the county attorney constitutes unreasonable and deficient advice. It would be unreasonable to hope for a lesser sentence, and the county attorney flipped the cooperation into aggravation. There could be no reasonable fear that a refusal to cooperate would contribute to a death sentence, because as a weighing state Nebraska does not permit the consideration of non-statutory aggravation. Thus, there was no reasonable tactical basis to allow Mr. Galindo to waive his privilege.

As to the hope of a lesser sentence (an absurd belief), allowing a client to implicate himself in a separate murder *with no consideration* was no way for Mr. Galindo to ingratiate himself with the sentencing panel. The Sentencing Order reflects as much.[20] Advising Mr. Galindo to waive his privilege on the basis that the lack of assistance would be used against him would be wholly irrational, since Mr. Galindo could not be punished for exercising a constitutional right. *United States v. Jackson*, 390 U.S. 570 (1968).

Trial counsel's deficient performance prejudiced Mr. Galindo. After Mr. Galindo helped law-enforcement locate the body, the State filed a Supplemental Notice regarding aggravation on November 5, 2003. The Supplemental Notice was

---

[20] The Sentencing Order relies three times upon the Lundell death when making findings regarding whether a sentence of death would be imposed. First, the panel relied upon the jury's finding that Mr. Galindo had a "substantial prior history of serious assaultive or terrorizing criminal activity," a finding based solely upon the Lundell allegation. Second, as to whether Mr. Galindo had "no significant history of prior criminal activity," the panel noted, "the jury found during the aggravation hearing that the defendant participated in the murder of Travis Lundell." Finally, the panel relied upon the same finding when determining whether Mr. Galindo acted under the domination of Jose Sandoval.

the first time the State specifically alleged Mr. Galindo murdered Lundell or indicated, by court filing, its intention to prosecute this allegation in support of its pursuit of a death sentence. There is a reasonable probability the jury would not have found the (1)(a) aggravator in the absence of the evidence Mr. Galindo provided based upon the unreasonable advice of counsel.

Trial counsel's failure to protect Mr. Galindo's rights against self-incrimination deprived Mr. Galindo of his constitutional right to the effective assistance of counsel. Trial counsel's inaction constituted deficient performance that prejudiced Mr. Galindo. *See Strickland*. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ, vacate the death sentence with directions for a new aggravation and sentencing phase.

**Claim 16: Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's failure to investigate, develop a defense theory, and subject the State's aggravation case as to the death of Travis Lundell to meaningful adversarial testing.**

Trial counsel failed to provide Mr. Galindo with effective representation during the aggravation phase when he failed to investigate the aggravator related to the death of Travis Lundell, develop a clear theory of the defense, and meaningfully challenge the State's evidence as to the Lundell aggravator. The State's evidence linking Mr. Galindo to the uncharged, unadjudicated murder rested on the testimony of jailhouse informants and other witnesses who received benefits

234

from the State for their testimony. Yet due to the inadequate investigation and lack of a coherent theory, defense counsel failed to meaningfully question the witnesses on whose testimony the aggravator relied or challenge the State's case.

The right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of adversarial testing." *United Stated v. Cronic*, 466 U.S. 648, 657 (1985). Adversarial testing requires competent cross-examination of the State's witnesses. *E.g., California v. Green,* 399 U.S. 149, 158 (1970) (referring to cross-examination as "the greatest legal engine ever invented for the discovery of the truth.") (citations omitted)). The failure to cross-examine a witness regarding prior inconsistent statements or motives to falsify their testimony may constitute ineffective assistance of counsel. *E.g., Berryman v. Morton,* 100 F.3d 1089, 1099 (3d Cir. 1996) (counsel failed to raise victim's prior inconsistent identification testimony); *Blackburn v. Foltz,* 828 F.2d 1177, 1183 (6th Cir.1987) (same); *Nixon v. Newsome,* 888 F.2d 112, 115 (11th Cir. 1989) (counsel failed to confront the prosecution's star witness with inconsistent statements).

Because the testing process "generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies," the Court has noted that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). That duty includes adequately investigating and challenging evidence the prosecution presents in aggravation. *See Rompilla*, 545

235

U.S. at 389. Here, defense counsel's duty required investigation into the Lundell aggravator and the State's witnesses, enabling defense counsel to cross-examine the jailhouse informants and other witnesses regarding the credibility of their testimony and the true sources of their claims.

### A. Daniel Animas

Defense counsel did not cross-examine Animas regarding his opportunity to learn the circumstances surrounding Lundell's death when housed in a cell next to Gabriel Rodriguez, or when he was housed with co-defendant Vela, prior to being housed with Mr. Galindo. Tr. 3118-3124. Indeed, Animas had signed two statements prior to trial, one handwritten and one typewritten, that Galindo had denied involvement in Lundell's death and had only learned the circumstances of it from Vela. Tr. Exhibit 228, 230.

After being cross-examined regarding the typewritten statement he signed Tr. Exhibit 228, Animas impugned the integrity of the defense team when Smith examined him on redirect by suggesting the investigator, Newcomb, had changed the content of his statements when preparing the typewritten affidavit. Tr. 3121-3126. Though the handwritten statement initialed and signed by Animas Tr. Exhibit 230, wholly refuted that claim, defense counsel did not examine Animas regarding the handwritten statement or present testimony from Newcomb, who he had failed to subpoena. *Id*. Similarly, when Bos testified Animas' statements to him were inconsistent with the signed statement, Tr. Exhibit 228, defense counsel did not cross-examine him regarding the existence of the recorded statement his report refers to. Tr. 3131- 3138. Animas told defense investigators in postconviction on two

occasions, in March 2017 and May 2018, that his sworn statements in Tr. Exhibit 228 (and consistent with those in Tr. Exhibit 230) are accurate when they state that, by his account, Mr. Galindo did not participate in the Lundell murder and only learned of it from talking to Vela afterwards. Tr. Exhibit 228.

Such cross-examination would have furthered the only defense theory available to Mr. Galindo regarding the Lundell allegation– that the jailhouse informants were falsely attributing to Mr. Galindo statements made by Vela (or others) in exchange for leniency. Though Animas' signed statements offered a wellspring for that theory, defense counsel mishandled it. Additionally, defense counsel failed to cross-examine Animas regarding the fact that he was on probation or parole or inquire whether he had been offered any benefits by the county attorney or California authorities in exchange for his testimony.

### 1. Failure to subpoena a critical impeachment witness

In addition to the failure to meaningfully question Animas, defense counsel failed to subpoena a critical witness to impeach him. Animas suggested on re-direct examination the typewritten statement he signed had been drafted to change the content of his statements. Tr. Ex. 228, 230; Tr. 3121-3123. This testimony not only implicated Mr. Galindo in the Lundell murder, but also suggested to the jury that defense counsel or his investigator had wheedled an inaccurate sworn statement from him and then attempted to rely upon it at trial. Tr. 3120-3124.

When this occurred, defense counsel was unable to prove the circumstances surrounding the interview of Animas in California because he failed to subpoena

the private investigator, Leonard Newcomb, who had interviewed him with defense counsel. Tr. 3208. The record shows counsel moved for a continuance, explaining that he intended to call Newcomb, but he had failed to appear as agreed. The trial court denied the continuance, citing defense counsel's failure to serve Newcomb with a subpoena. Tr. 3208-11. Though defense counsel was able to persuade the State to stipulate that Animas' statements were "free and voluntary", Tr. 3213-14, this did not cure the prejudice.

Had he been called as a witness, Newcomb would have testified that defense counsel repeatedly told Animas he wanted only the truth, took notes as Animas related his statements, and prepared the handwritten voluntary statement at that time. (Tr. 230). He would have testified that Animas initialed several corrections on the handwritten statement after reviewing it, then read and signed the statement willingly. *Id.* Newcomb would have also testified he returned to the prison later that day with the typed statement, Tr. Exhibit 228, directed Animas to proofread the statement, and that Animas signed and returned the statement after confirming it was "correct." *Id.*

The handwritten statement and the testimony of Newcomb would have: (1) rebutted Animas' testimony that Tr. Exhibit 228 was not accurate; (2) rebutted Animas' testimony that he did not carefully read Tr. Exhibit 228 or know what he was signing; (3) rebutted the inference that defense counsel or Newcomb fooled Animas into signing an inaccurate statement; (4) provided compelling evidence as to why the jury should not rely upon the testimony of jailhouse informants generally;

and (5) demonstrated, consistent with the theory of defense, that a witness like Animas could be confused, mistaken or dishonest about whether Mr. Galindo admitted participating in the Lundell murder, or whether Mr. Galindo simply told Animas what he had learned from Vela or others. (Tr. 3120-3124). This would have made the State's case regarding Lundell a "house of cards" since, if the jury believed Animas' testimony could not be trusted, they likely would not have trusted Lopez or Abendano either. Additionally, it would have exonerated defense counsel of any misconduct.

Trial counsel's duty to provide effective representation includes the duty to subpoena critical witnesses. *E.g., Hanna v. State*, 585 S.W.3d 866, 872 (Mo. Ct. App. 2019)(affirming grant of state post-conviction relief based on failure of defense counsel to interview, investigate and subpoena witness critical to refuting State's timeline); *Gregg v. Rockview*, 596 F. App'x 72, 78 (3d Cir. 2015) (vacating conviction in state court for attempted murder based on, *inter alia*, defense counsel's failure to subpoena defendant's alibi witness); *Washington v. Smith*, 219 F.3d 620, 629 (7th Cir. 2000) (affirming issuance of federal writ vacating state conviction because defense counsel*, inter alia,* failed to produce critical alibi witness at trial); *State v. Charles*, 263 P.3d 469, 477 (Utah App. 2011) (finding defense counsel ineffective for, *inter alia*, failing to subpoena witness).

### B. Hector Abendano a.k.a. Victor Valenzuela

Counsel's cross-examination of Abendano was limited to the plea agreement related to his arrest on January 14, 2003. (Tr. 467). He was not cross-examined regarding his 2002 felony drug charge or his felony failure to appear on that charge;

about his exposure to federal prosecution or the presence of federal investigators at his April 1, 2003 interview; or regarding the promise disclosed by Smith in his Notice that he would inform the federal agents of Abendano's cooperation and help him get a visitor or witness visa. Tr. 3145-48.

Further, defense counsel failed to confront Abendano with available information advancing the defense theory that Vela and Rodriguez were the source of his claims. Despite notes reflecting his intention to so, defense counsel did not cross-examine Abendano about the fact he was housed with both Vela and Rodriguez prior to his April 1 statement to Investigator Bos. Amended PCR at 24. Mr. Galindo had not only cooperated at the time of his arrest, but he also led investigators on March 17, 2003, to the site where Vela, Rodriguez and probably Sandoval had buried Lundell. Imagine the animosity Vela and Rodriguez felt toward Mr. Galindo at this time – yet the record shows no cross-examination on these subjects.

### C. Miguel Lopez

The information about jail assignments in Habeas Claim 7 suggests that Lopez's testimony was derived exclusively from information learned from Animas, who could have learned it from Rodriguez or Vela. Amended PCR at 28[21]. But when Lopez testified at trial, defense counsel failed to examine him regarding the fact he was housed with Animas prior to making his September 3 statement, that he had been housed in a cell next to Rodriguez, that he knew Vela was upset with Galindo

---

[21] Citing Deposition of Miguel Lopez dated October 14, 2003

for cooperating with police after his arrest, or that he could have learned the circumstances surrounding the Lundell murder from Animas. Amended PCR at 29[22]. The failure to draw these connections enabled Smith to falsely claim during closing arguments that Lopez, Animas and Abendano were "three kind of independent-type people." Tr. 3245.

### D. Cortney Barritt

Like the testimony of Animas, there is good reason to believe the testimony of Courtney Barritt against Galindo was false. Indeed, Barritt admitted while under cross-examination during the trial of Gabriel Rodriguez that she lied to police, prosecutors, and Galindo's defense attorney, and while under oath in Galindo's trial, about her knowledge or participation in the bank robbery. Tr. Exhibit 236; Amended PCR at 37. This evidence Barritt lied during Galindo's trial should be considered in conjunction with the evidence showing she was apparently left alone with Smith on January 17 after she was arrested based upon information provided by Galindo, and that Smith arranged for her release on her personal recognizance. Amended PCR at 78.

Proper cross-examination of Barritt by Galindo's defense counsel may have similarly discredited her during trial of the Lundell allegation. Though Investigator Downey's report reveals Barritt initially lied to Downey and Smith about giving a stolen gun to Carlos Flores during the January 17 meeting, defense counsel did not examine her about that fact, about what happened when Downey left the room in

---

[22] Interview of Miguel Lopez dated September 3, 2003

the wake of the lie, or whether she was threatened with prosecution. Amended PCR at 36. Similarly, defense counsel did not examine Barritt regarding her exposure to prosecution as an accessory to the Outdoors Unlimited thefts or as an accomplice in the five murders that occurred in the bank, including the impact that a prosecution might have on her children. *Id.*

### E. Kristie Petzold

Reading the trial transcript, it would appear Petzold and Wiest were both unassailable sources of circumstantial evidence. Both were likely seen as innocent young locals caught up in the misdeeds of acquaintances. To the contrary, information available to defense counsel revealed Petzold was not only on probation for child abuse at the time she made her claims, but also that she shared a son with Sandoval's half-brother, Gabriel Rodriguez. Amended PCR at 40. In fact, Petzold watched a news story with Rodriguez on the night of the robbery which reported that he was wanted by police, a story likely triggering a conclusion one of his accomplices had "snitched." Id. Though all this information was available to Stratton, he asked no questions of Petzold on cross-examination. Tr. 3175.

### F. Trista Wiest

Similarly, though Trista Wiest had previously told investigators her claim she had loaned her car to Sandoval was a "bullshit rumor," Stratton did not confront her with this statement in front of the jury. Amended PCR at 45; Tr. 3170. Had he done so, he could have persuasively argued at closing the State's case regarding the Lundell murder was nothing more than a rumor started by Vela and Rodriguez in the jail. Tr. 3230-3254.

### G. Guilt-by-association testimony

Michael Bauer, a Norfolk police sergeant, testified that Vela had a blue watch in his possession when he was arrested, which corresponded with Hector Abendano's testimony about Vela taking Travis Lundell's watch when he was killed. Tr. 3191-92. Counsel did not cross-examine Bauer at all in response to this testimony, despite the fact that Vela's involvement in Lundell's murder did not prove Mr. Galindo's guilt. Even though the defense attempted to cast doubt on Mr. Galindo's participation in the murder and show that he only heard about it after the fact from Vela and the other co-defendants, counsel did nothing to challenge the guilt-by-association testimony regarding Vela's possession of the watch.

\* \* \*

Each of the foregoing failures is sufficiently prejudicial to require a new aggravation hearing. Considered cumulatively, they reflect a complete breakdown of the adversarial process on the Lundell allegation and warrant a presumption of prejudice: late notice, waiver of self-incrimination, insufficient time to prepare, no defense theory, no fact investigation of jailhouse informants, failure to subpoena a critical witness, no cross-examination regarding multiple prototypical forms of bias and prior inconsistent statements, and no cross-examination whatsoever of the vast majority of the State's witnesses. On top of all of it, defense counsel did not object when the prosecutor referred to the twenty-year-old Lundell throughout the trial as "the Lundell boy," "the boy," or the "little boy." *See,* e.g., Tr. 3154. This Court should order new aggravation and sentencing proceedings.

The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and/or sentencing proceeding.

**Claim 17: Defense counsel was ineffective for failing to investigate and raise the issues of Mr. Galindo's youth and remorse at sentencing and on direct appeal, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments**

In a capital case, the Sixth, Eighth and Fourteenth Amendments require the sentencing authority to be fully consider and give meaningful effect to any mitigating evidence that may justify the imposition of a life sentence rather than death. *E.g., Brewer v. Quarterman*, 550 U.S. 286, 289 (2007). "[I]n capital cases the fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The Court had previously made clear that although the sentencer "may determine the weight to be given relevant mitigating evidence . . . they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114-115; *See also Lockett*, 438 U.S. at 604 (In striking a statute that precluded the consideration of a category of mitigation noted: "[We] conclude that the Eighth and Fourteenth Amendments require that the sentence . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.").

It is defense counsel's duty to investigate and present all substantial, available mitigating evidence. *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 394-98; *Kenley*, 937 F.2d at 1307-09 (8th Cir. 1991). Moreover, counsel's failure to properly preserve a claim for appellate review constitutes ineffective assistance when the failure substantially deprives the defendant of his right to a fair trial. *Davis v. Secretary, Dept. of Corrections*, 341 F.3d 1310 (11th Cir. 2003). Despite these well settled principals, defense counsel did not investigate or present evidence of Mr. Galindo's youth to the sentencing panel, nor did he appeal the panel's *sua sponte* rejection of youth as a mitigator. Counsel also failed to investigate or present the evidence of Mr. Galindo's remorse at sentencing, despite the availability of numerous witnesses who conveyed evidence that Mr. Galindo had expressed remorse for the offense. These failures on counsel's part constituted prejudicial ineffective assistance of counsel. *Strickland*, 466 U.S. 668.

> *Ineffective for Failing to Investigate and Present Mitigation Evidence Regarding Mr. Galindo's Youth at Sentencing and on Appeal*

Seven years after *Eddings,* the Court affirmed that "one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age[.]" *Stanford v. Kentucky*, 492 U.S. at 375 (1989). Because his age is an "aspect of [Galindo's] character" supporting a lesser sentence, the potential to mitigate Mr. Galindo's sentencing based upon his age should have been obvious to defense counsel. Information available at the time of the 2004 sentencing proceedings

245

established that Mr. Galindo was immature and easily influenced by others, including Sandoval, who was two years older. Tr. 4436-4437. A teacher, Marylin Moyer, testified that when Mr. Galindo was a student in her class, "he was quite immature" and "exhibit[ed] some signs of a younger child emotionally." Tr. 3565-3566. At the age of twelve, Mr. Galindo played with toys and carried a childish backpack. *Id.* Yet, despite authority requiring consideration of age as mitigation during capital sentencing proceedings, defense counsel failed to solicit or introduce from his expert appropriate opinions on the issue of age and made no mention of it during his argument to the panel, or even in his proportionality brief. Tr. 3796-3915. Counsel also failed to retain an expert on adolescent and young-adult brain development, *see* Habeas Claim 8.2, and did not ask the expert he did retain, Dr. Llorente, to consider Mr. Galindo's age and how his age-related characteristics related to his culpability. *Id.* Had defense counsel solicited an opinion from Dr. Llorente or another expert regarding the relevance and significance of Mr. Galindo's age as a mitigating circumstance, the sentencing panel could have received a wealth of information establishing that individuals continue to develop both emotionally and psychologically well past the age of twenty-one. Tr. 3796-3915 Ex. 541.

Consequently, the sentencing panel explicitly refused to consider Mr. Galindo's age as a mitigating circumstance, specifically finding the statutory mitigating circumstance under Neb. Rev. Stat. § 29-2523(2)(d) applicable only "to a person of advanced years, where senility may be involved." Sentencing Order Pg. 8. The sentencing panel relied upon this Court's decision in *State v. Lotter,* 255 Neb.

246

456 (1998), which relied upon *State v. Simants,* 197 Neb. 549 (1977), a case decided prior to *Eddings, Lockett,* and *Stanford.* Though this was clearly erroneous, defense counsel did not appeal the issue.

The failure was prejudicial to Mr. Galindo. When a defendant challenges a death sentence, the question is whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Strickland,* 466 U.S. at 695. Here, it is likely that, had defense counsel properly presented the issue to the sentencing panel, the panel would have properly considered Galindo's age at the time of sentencing. Likewise, had counsel on appeal relied on the foregoing decisions of the United States Supreme Court, it is reasonably likely to have resulted in a reversal on direct appeal. *See Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (recognizing the right to effective assistance of appellate counsel); R*oe v. Delo*, 160 F.3d 416, 419-20 (8th Cir. 1998) (holding that counsel's failure to raise viable claim on appeal constitutes ineffective assistance of counsel).

> *Ineffective for Failing to Investigate and Present Mitigating Evidence Regarding Mr. Galindo's Remorse*

Despite arguing that Mr. Galindo had "real remorse" for his conduct, Tr. 3472, trial counsel failed to present any evidence whatsoever of his statements and expressions of remorse to multiple individuals. There is no conceivable strategic reason for failing to present testimony that supports a stated theory of mitigation.

Prior to trial, numerous witnesses informed defense counsel that Defendant deeply regretted his role in the bank robbery. During a pretrial deposition on

October 14, 2003, Miguel Lopez testified that while they were housed together in jail, Mr. Galindo cried and said he felt bad about the robbery. Proposed P.C. Exhibit 635 at 14, 30. Mr. Galindo acknowledged what he had done was wrong and cried every time his parents or children visited him. *Id.* Lopez said that he and other inmates sang to Mr. Galindo at night to keep him from being sad. *Id.*

Like Lopez, Hector Abendano testified in a pretrial deposition that Mr. Galindo told him "he very much regretted" the bank robbery. Proposed P.C. Exhibit 632, p. 13. Whenever Mr. Galindo remembered the robbery, "he'd get really serious" and start crying. *Id.* at 13. Abendano also testified that Mr. Galindo was afraid in the bank and startled when the shooting began, as neither he nor Vela expected any deaths. *Id.* at 14.

On May 5, 2004, Captain Terry Howell, who was in charge of the Madison County Jail, told a defense investigator that Mr. Galindo expressed remorse about the bank robbery to both Howell and another jail deputy. Howell believed that Mr. Galindo would not have been involved in the bank robbery if he had never gotten involved with Sandoval and Rodriguez. Howell described Sandoval as "the single most dangerous person he had ever been in contact with" and believed that Mr. Galindo was afraid of him.

Mr. Galindo's mother, Aida Galindo, also reported that he was extremely distraught over his role in the robbery. During a defense interview on October 22, 2003, Mrs. Galindo expressed concern that her son was "going crazy," noting that he would "tremble and shake" whenever she and Defendant's father went to visit him.

Proposed P.C. Exhibit 664 (October 22, 2003 Interview Memo by Dhyana Fernandez). She believed her son was severely depressed, suicidal, and that he wanted officers to shoot and kill him during an escape attempt. Upon his father's advice, Defendant agreed to pray to God to help the victims' families.

Given defense counsel's reference to remorse in his opening argument, it is clear that counsel's failure to present this evidence was not based on any reasoned strategy but an inexcusable oversight stemming from counsel's inexperience and inadequate trial preparations. *Cf. Strickland*, 455 U.S. at 681 (in determining whether particular strategic choices are reasonable, courts look at factors such as the experience of the attorney and the potential for prejudice from taking an unpursued line of defense); *Wiggins*, 539 U.S. at 526-27 (a "halfhearted," "shotgun" approach cannot be considered strategic).

But for counsel's error, there is a reasonable probability that the outcome of the sentencing proceeding would have been different. Indeed, the sentencing proceeding explicitly relied on the apparent lack of remorse to discount the important mitigating circumstance of Mr. Galindo's cooperation with law enforcement. Moreover, numerous studies indicate that a capital defendant is much more likely to be sentenced to death if the sentencer believes the defendant lacks remorse. *See*, *e.g.*, John H. Blume, Sheri L. Johnson, Scott E. Sundby, *Competent Capital Representation: The Necessity of Knowing and Heeding What Jurors Tell Us About Mitigation*, 36 Hofstra L. Rev. 1035, 1037, 1049-50 (2008); Scott E. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and*

*the Death Penalty*, 83 Cornell L. Rev. 1557, 1564 (1998); Mark Costanzo & Sally

Costanzo, *Jury Decision Making in the Capital Penalty Phase*, 16 L. & Hum. Behav.

185, 198 (1992); William S. Geimer & Jonathan Amsterdam, *Why Jurors Vote Life*

*or Death: Operative Factors in Ten Florida Death Penalty Cases*, 15 Am. J. Crim. L.

1, 51- 52 (1988); Craig Haney et al., Deciding to Take a Life: Capital Juries,

Sentencing Instructions, and the Jurisprudence of Death, 50 J. Soc. Issues 149, 163-

64 (1994).

Further, because of defense counsel's failure to present this evidence, the

sentencing panel was left with the impression that Mr. Galindo did "not

demonstrate remorse for his actions." Sentencing Order, p. 10. The panel expressly

relied on this supposed lack of remorse to offset the mitigating circumstance of Mr.

Galindo's cooperation with law enforcement.

Accordingly, the failure of defense counsel to solicit and present the

foregoing mitigating evidence of remorse deprived Mr. Galindo of his

constitutional right to the effective assistance of counsel, as guaranteed by

the Sixth, Eighth and Fourteenth Amendments. The Nebraska Supreme

Court's treatment of Mr. Galindo's claims that defense counsel was

ineffective for failing to raise the issues of his youth and remorse at

sentencing and on direct appeal, was an unreasonable application of clearly

established Supreme Court law and/or an unreasonable application of the

facts. *See* 28 U.S.C. § 2254(d)(1) and (2).  The Court should grant the writ,

vacate the death sentences and remand for a new sentencing proceeding.

**Claim 18: Defense counsel's arguments effectively conceding Mr. Galindo's guilt as to felony murder and as to two aggravators violated Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments**

At both the guilt and aggravation phases, defense counsel's closing arguments amounted to concessions of guilt. The Sixth Amendment guarantees Mr. Galindo the right to choose the objective of his defense and present a claim of innocence, even when defense counsel may believe confessing guilt offers the best chance of avoiding a death sentence. Here, counsel's failure to contest felony murder at the guilt phase, and his concession of two of the charged aggravators in the aggravation phase, deprived Mr. Galindo of his Sixth Amendment right to autonomy. *McCoy v. Louisiana*, 584 U.S. --, 138 S. Ct. 1500, 1508 (2018).

In his closing argument at the guilt phase, defense counsel argued only that the murders at the bank were not premeditated and made no argument whatsoever to contest Mr. Galindo's guilt as to felony murder, despite the fact that both premeditated murder and felony murder constitute first degree murder in Nebraska and both carry a potential death sentence. Tr. 2880-81.

In his aggravation phase argument, defense counsel conceded Mr. Galindo's guilt of the aggravators alleging that, "at the time of the murder, another murder had been committed," and that Mr. Galindo "knowingly created a great risk of death to at least several people." Tr. 3269-70. Counsel repeatedly stated, "Mr. Galindo is responsible for what he did in that bank." Tr. 3269-70. As to the multiple murders aggravator, counsel told the jury, "We know what he did, you know what he did, and I'm not going to say anything more." Tr. 3269.

251

Trial counsel's failure to contest felony murder at the guilt phase and his insistence, in the aggravation argument, that "Mr. Galindo is responsible for what he did in that bank," and his statement that the jury "know[s] what he did," violated Mr. Galindo's Sixth Amendment right to "[a]utonomy to decide that the objective of the defense is to assert innocence." *McCoy*, 584 U.S. at --, 138 S. Ct. at 1508. The Court has recognized that a defendant may "insist on maintaining her innocence" at trial, and that counsel may not admit a client's guilt over the client's objective to maintain his innocence. *Id.* at 1510.

This type of error is "structural," meaning that it is not subject to *Strickland*'s prejudice analysis or harmless error review. *Id.* at 1511. Structural error "affect[s] the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), and protects a defendant's fundamental rights. Trial counsel's violation of Mr. Galindo's right to autonomy under the Sixth Amendment, by conceding his guilt as to felony murder and two of the charged aggravators, deprived Mr. Galindo of due process and the right to a fair trial. Mr. Galindo is therefore entitled to a new trial as to guilt and as to the aggravators.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. As to the

merits, The Court should grant the writ, vacate the convictions and death
sentences, and remand for a new sentencing proceeding.

### Claim 19: Counsel failed to effectively investigate and present Mr. Galindo's substance use and addiction as a mitigating factor at sentencing, depriving Mr. Galindo of the right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments

Due to counsel's surface-level mitigation investigation, they failed to uncover
available evidence to support the mitigating factors they sought to prove, including
Mr. Galindo's drug use and addiction. Because of defense counsel's incomplete
mitigation investigation and failure to properly prepare Dr. Stalcup, defense
counsel's presentation of evidence concerning Mr. Galindo's drug use and addiction
was more harmful than helpful. *See* Habeas Claims 8.1, 8.2, 8.3, 8.4. Moreover, the
lay witnesses defense counsel called to testify about Mr. Galindo's drug use at the
time of the offense had not used drugs with him in the days leading up to the
robbery, and their testimony did not support the mitigating circumstance defense
counsel was trying to prove. *See* Habeas Claim 8.3. Counsel's inadequate
investigation prevented him from uncovering more appropriate witnesses who could
provide testimony relevant to this mitigating circumstance.

Defense counsel in a capital case has a duty "to conduct a thorough
investigation of the defendant's background," including interviewing relevant
witnesses and reviewing records. *Williams*, 529 U.S. at 396; *Andrus*, 140 S. Ct. at
1881 ("It is unquestioned that under prevailing professional norms at the time of
[defendant's] trial, counsel had an obligation to conduct a thorough investigation of
the defendant's background.") (quoting *Porter*, 558 U.S. at 32) (internal quotations

omitted); *Sears v. Upton*, 561 U.S. 945, 953-54 (2010); *Wiggins,* 539 U.S. at 524-25. This includes investigating evidence the prosecution may use in aggravation or to undermine any presentation of mitigation. *Rompilla*, 545 U.S. at 377.

Here, defense counsel had decided early on that Mr. Galindo's drug use was mitigating evidence they intended to present. Habeas Exhibit MM (Weeks Dec.) pp. 7-8; Habeas Exhibit Q (Fernandez Dec.) p.11. Yet the mitigation investigation counsel conducted was so sparse and surface-level that they failed to uncover witnesses who would be able to provide helpful and relevant testimony to support the mitigating factor they sought to prove. What is more, while counsel attempted to prove that Mr. Galindo was under the influence of methamphetamine at the time of the offense, counsel failed to review police reports and jail records of the hours and days just after Mr. Galindo's arrest, which would have provided useful information about his behavior and demeanor at that time.

These failures, due to defense counsel's inadequate mitigation investigation, prevented his substance abuse expert, Dr. Stalcup, from testifying effectively about Mr. Galindo's drug use. Dr. Stalcup was not provided with evidence from immediately after the offense, including police reports and jail records, which the State used to undermine his opinion about Mr. Galindo's methamphetamine intoxication at the time of the crime. *See* Habeas Claim 8.3. His testimony was called into question by the affidavits of numerous law enforcement officials who claimed Mr. Galindo appeared "normal" around the time of his arrest. Had defense counsel interviewed officers and other individuals who interacted with Mr. Galindo

in those hours and days after his arrest, and had counsel reviewed police reports and jail records, he would have been able to properly prepare Dr. Stalcup and refrain from relying on discredited information. *See* Habeas Claims 8.1, 8.2, 8.3, 8.4.

Moreover, because counsel failed to investigate and discover witnesses who would be able to provide favorable and helpful testimony regarding Mr. Galindo's drug use, defense counsel instead called witnesses who did not use drugs with Mr. Galindo the night before the offense and whose testimony therefore did not support the mitigating factor - including Marcos Quijano, Carlos Flores, and Claudia Solis. Not only was Solis unable to provide relevant testimony regarding whether Mr. Galindo was under the influence of drugs at the time of the robbery, her testimony was inconsistent with Dr. Stalcup's opinions and proved more harmful than helpful in many respects. An adequate investigation would have led counsel to decline to call witnesses like Solis and Flores, both of whom posed an elevated risk of giving damaging testimony and whose relevance to the mitigating circumstance was minor.

In addition, had counsel's investigation been adequate, they would have uncovered other witnesses who had used drugs with Mr. Galindo closer to the time of the offense or who observed Mr. Galindo's drug intoxication the night before the offense. Those witnesses would have been able to provide helpful and relevant testimony that none of the witnesses defense counsel called were able to provide, and without the risks of eliciting harmful evidence such as through Flores or Solis.

Counsel's failure to investigate and effectively present evidence of Mr. Galindo's drug use at the time of the offense and his addiction to methamphetamine "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 525. Counsel clearly intended to present evidence of addiction and impairment, but did so ineffectively due to the lack of an adequate investigation. *See* Habeas Exhibit MM (Weeks Dec.) p. 7-8; Habeas Exhibit Q (Fernandez Dec.) p.11. In any event, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *Williams*, 529 U.S. at 396 (not a tactical decision because counsel had not "fulfilled their obligation to conduct a thorough investigation of the defendant's background."). In *Chambers v. Armontrout*, the Eighth Circuit recognized that because "'strategic choices made after less than complete investigation are reasonable precisely as to the extent that reasonable professional judgment supports the limitations on investigation[,]'" when counsel fails to interview a witness, counsel's "decision not to call [the witness] thus is only as reasonable as [counsel]'s decision not to interview [the witness]." 907 F.2d 825, 831 (8th Cir. 1990) (quoting *Strickland*, 466 U.S. at 690-91).

Counsel's failures to adequately investigate Mr. Galindo's drug use and addiction prejudiced Mr. Galindo. *Andrus*, 140 S. Ct. 1t 1882 ("Although counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise."); *Sears*, 561 U.S. at 948

(2010) (fact that counsel presented "*some* mitigation" does not preclude prejudice finding). Had defense counsel properly investigated the circumstances surrounding Mr. Galindo's drug addiction and his drug usage around the time of the bank robbery, defense counsel could have presented additional information corroborating Dr. Stalcup's testimony and could have presented far more persuasive and relevant witness testimony than that which was presented. But for counsel's errors, there is a reasonable possibility that the sentencing panel would have found that Mr. Galindo's conduct at the time of the crime was impaired as a result of his drug use and found the existence of the mitigating circumstance under Neb. Rev. Stat. § 29-2523(2)(g), or otherwise considered his drug use and addiction as a non-statutory mitigating circumstance. *Sears*, 561 U.S. 945; *Andrus*, 140 S.Ct. at 1885–86.

The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established federal law or was an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new sentencing.

**Claim 20: The prosecutor knowingly presented the false testimony of Donnie Thorson, Norfolk Police Division Investigator, as rebuttal in Mr. Galindo's sentencing hearing, in violation of his constitutional rights to due process and to a reliable sentencing determination guaranteed by the Eighth and Fourteenth Amendments.**

The State knowingly presented or induced false testimony during Mr. Galindo's sentencing hearing and subsequently failed to correct it. The State called officer Donnie Thorson to testify to Mr. Galindo's involvement in prior criminal activity to refute mitigating evidence put forth during Mr. Galindo's sentencing hearing. Tr. 4217-4222.

257

While on the stand, Thorson testified to facts both he and the State knew to be unsupported and false.

Deliberate deception of the factfinder through presentation of evidence known to be false is "incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112 (1935)). "A conviction established through use of false evidence, known to be such by representative of the State, must fall under the Fourteenth Amendment." *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (citing *Mooney*, 294 U.S. at 112; *Pyle v. Kansas*, 317 U.S. 213 (1942); *Curran v. Delaware*, 259 F.2d 707 (3rd Cir. 1958)). The conviction violates due process and must be vacated even if the State does not solicit the false evidence but fails to correct it. *Napue*, 360 U.S. at 269 (citing *Alcorta v. Texas*, 355 U.S. 28 (1957). A "new trial is required if 'the false testimony could…in any reasonable likelihood have affect the judgment of the jury[.]'" *Giglio*, 405 U.S. at 154 (quoting *Napue*, 360 U.S. at 271).

In rebuttal to the defense mitigation case, the State called Officer Thorson to testify about Mr. Galindo's theft conviction in connection with an incident at Deets Furniture store in September 2000. Tr. 4219. His testimony -- which framed Adam Lantz, a Deets employee, as the "kid" victim of the theft who was forced into participating by "Hispanic subjects" who threatened to kill him -- was false, and in fact is belied by the police reports and contemporaneous record of that incident. Tr. 4219-21; Habeas Exhibit QQ (Deets Furniture Police Records) at 1-19. Thorson's claims that Lantz was "very scared, he was crying, very nervous, he was probably one of the most scared people I've ever dealt with in any of my investigations in the last nine years as an

258

officer," omitted the fact that when Lantz was interviewed by police—six times—they did not believe him, and ultimately subjected him to a polygraph which he failed. Tr. 4220; Habeas Exhibit QQ (Deets Furniture Police Records) at 11-12; 17-19. These records, which the State possessed and was well aware of given the prosecutor's involvement in the Deets prosecution, told an entirely different story from the one Thorson recounted on the stand.

Thorson testified that Lantz had received a phone call from a "Hispanic subject" who threatened him into giving him furniture, and that Lantz identified Mr. Galindo in a photo lineup as the person who threatened him. Tr. 4219-20. Thorson also testified that Lantz identified Mr. Galindo as one of the people who threatened him in Walmart. Tr. 4221. This was false. When the Deets owners initially reported the theft, they informed police they believed it was an inside job by Lantz. Habeas Exhibit QQ at 9. When police interviewed Lantz, he admitted he knew the driver of the truck that picked up the furniture, and that the driver's brother was nicknamed "Smiley." *Id.* at 11.[23] When Lantz was re-interviewed by police days later, police believed he was lying and asked him to submit to a polygraph test. *Id.* at 13; 17-19. Thorson told Lantz he could not "help him" unless he was honest, prompting Lantz to claim that the "Mexican Mafia" had threatened him. *Id.* He viewed a photo lineup and identified David de la Cruz as the person who threatened him. *Id.* at 14. During his later polygraph, Lantz was asked about the veracity of his story and whether he accepted money for the furniture to pay off a drug debt. *Id.* at 17-19. According to the polygraph results, Lantz's responses were

---

[23] Gabriel Rodriguez's nickname was Smiley and his brothers are Jose Sandoval, David de la Cruz, and Jacob Segura.

deceptive. *Id.* Lantz eventually admitted that he had been "messed up with drugs" and got in with "the wrong people." *Id.* at 13.

**At no time** during these interviews, nor in a subsequent interview three weeks later, did Lantz identify or mention Mr. Galindo. *Id.* It was only in a *later* police interview, more than a month after the theft, that Lantz identified Mr. Galindo as having been present at the furniture store. *Id.* at 17.

In all, police reports show that Thorson interviewed Lantz **six times**, and his story changed every time. But **at no time during any of those six interviews** did Lantz claim or even imply that Mr. Galindo was the man who threatened him over the phone, cornered him in a store, or engaged in **any** threat or intimidation whatsoever. *Id.* at 1-19. Lantz never connected Mr. Galindo with any of the threats or intimidation he claimed to have suffered at the hands of the "Mexican Mafia." *Id.* at 13-14. In fact, he told police he did not recognize Mr. Galindo when he came to the store. *Id.* at 11. According to Lantz, the extent of Mr. Galindo's participation in the theft was his presence at the furniture store when David de la Cruz—Jose Sandoval and Gabriel Rodriguez's older brother—took the furniture. *Id.* at 15-17.

Thorson's false testimony at Mr. Galindo's sentencing was prejudicial in at least three ways. First, it portrayed Mr. Galindo as a dangerous and violent criminal who threatened an allegedly terrified furniture store employee—a characterization that was false and was belied by the police reports. Even if, as Thorson claimed, Lantz was "one of the most scared people" Thorson had encountered as an officer, the evidence is clear that Mr. Galindo was not the subject of Lantz's fear.

Second, Thorson's testimony left out the fact that the actual perpetrator of the theft and of the alleged threats was David de la Cruz, Jose Sandoval and Gabriel Rodriguez's brother. This directly contradicted the State's claims that Mr. Galindo was a leader rather than a follower and that his prior criminal convictions and behavior were independent of the influence of Sandoval or anyone else. In reality, the true facts surrounding the Deets Furniture incident supported the defense's mitigation case about Mr. Galindo's gullibility and his follower tendency. The evidence demonstrated only that Mr. Galindo was present while de la Cruz, who was older and whom Mr. Galindo had lived with at various times, threatened Lantz and committed the theft.

Moreover, the incident supported the defense's mitigating evidence regarding Mr. Galindo's intellectual and cognitive deficits and is consistent with his intellectual disability diagnosis. When police interviewed Mr. Galindo about the furniture in his apartment,[24] which they suspected came from Deets, he explained that someone had offered to sell him furniture for $500 and he had accepted, and David de la Cruz had driven him to pick it up. *Id.* at 15-17. Although upon Thorson's questioning Mr. Galindo admitted this was suspicious and that a reasonable person would have known the items were stolen, *id.,* the fact that Mr. Galindo did not recognize the suspicious nature of the transaction at the time, did not ask questions, and naively believed he was buying

---

[24] Notably, the police saw the furniture there after being called to investigate a child neglect complaint regarding Cortney Barritt, Mr. Galindo's then-girlfriend, while he was visiting family in Mexico. Barritt told Thorson Mr. Galindo brought home the furniture when Thorson threatened to take custody of Barritt's children and charge her with possession of stolen property. Habeas Exhibit QQ at 15.

furniture for $500, is entirely consistent with the gullible nature and follower tendencies he has exhibited his entire life. *See* Habeas Claims 5 & 8.1.

Finally, Thorson's testimony about this incident, emphasizing that the people involved were "Hispanic subjects" and that Lantz, the 18-year-old "kid", was terrified of them, played into racist and anti-Hispanic tropes about dangerousness, while falsely attributing "victim" and "child" status to Lantz, who is white. This testimony on its own was improper, and in conjunction with the racially charged testimony of Strode and Nelson, who testified right before Thorson about the dangers of Hispanics congregating in prison, Tr. 4196-4216, resulted in a pervasive anti-Hispanic thread through the State's rebuttal case.

The State's presentation of false evidence by Thorson was wholly improper. There is no question the State knew Thorson's testimony was false. The State had access to the police reports and Thorson's investigation notes. The County Attorney personally appeared in court on both Lantz's and Mr. Galindo's Deets-related cases, as did his deputy.

The State had a duty to correct Thorson. *Napue,* 360 U.S. at 269. Whether the State solicited Thorson to present the fabricated story or just capitalized on his lies is immaterial, as *Napue* does not require the State's solicitation, just its complicity in failing to correct Thorson while he was on the stand. This misconduct by the State was only one example of numerous instances of prosecutorial misconduct throughout every stage of Mr. Galindo's trial and sentencing, including the prosecutor's own repeated misstatements of the evidence. *See* Habeas Claim 27. Moreover, to the extent this

exculpatory evidence regarding the Deets case was withheld from defense counsel, the State violated its obligations under *Brady*, violations that pervaded the case. *See* Habeas Claim 6. Defense counsel was also ineffective for failing to object to Thorson's exaggerated and racially charged testimony. *See* Habeas Claim 26.

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Pyle*, 317 U.S. 213; *Alcorta*, 355 U.S. 28 (1957); *Giglio,* 405 U.S. 150. Here, the prosecutor's elicitation of false testimony by Thorson and failure to correct that false testimony was highly prejudicial and deprived Mr. Galindo of a fair sentencing hearing. Thorson's false testimony presented the sentencing panel with a distorted picture of Mr. Galindo as dangerous and threatening that was entirely untrue, as the police reports and records showed. Thorson's misleading portrayal of the Deets incident also inaccurately shored up the prosecutor's attempts to make Mr. Galindo out to be a leader, when the records reflected that his participation in the Deets theft was minimal and that Sandoval's brother was the real perpetrator. Had the sentencing panel not heard this false testimony, or had they been presented with the true evidence surrounding the incident, there is a reasonably likelihood that they would have reached a different decision on the mitigating circumstances and that the weighing of aggravation and mitigation would have been different. Because the false testimony "could…in any reasonable likelihood have affect[ed] the judgment" of the sentencer, a new sentencing proceeding is proper. *Giglio*, 405 U.S. at 154 (internal quotations omitted) (quoting *Napue*, 360 U.S. at 271). This Court should order a new sentencing

263

proceeding. Assessment of this evidence should be in conjunction with, cumulative to, the other claims of misconduct. Habeas Claims 6, 7 & 26.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. Further, such evidence would be properly before the Court once it was found that Mr. Galindo can satisfy *Strickler v. Greene*, 527 U.S. 263 (1999). As to the merits, this Court Mr. Galindo should vacate the death sentences and remand for a new sentencing proceeding.

### Claim 21: Counsel was ineffective for introducing inaccurate and damaging evidence about Mr. Galindo's alleged gang membership and for failing to object to the State's introduction of such evidence, in violation of Mr. Galindo's rights to the effective assistance of counsel and a fair trial and sentencing under the Sixth, Eighth, and Fourteenth Amendments

Throughout the sentencing proceeding, both the State and defense counsel repeatedly made references to Mr. Galindo's alleged involvement in the Latin Kings, despite knowing there was no legitimate gang presence and no gang connection to the offense. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (Improper to solicit false evidence and allow it to go uncorrected). The State's use of this alleged gang evidence, and counsel's complicity in that use, imbued the trial with implicit racist tropes and prejudiced the sentencing panel. This deprived Mr. Galindo of a fair trial, the right to the effective assistance of counsel, and a reliable sentencing determination. *Strickland*, 466 U.S. at 690-91; *Dawson v. Delaware*, 502

264

U.S. 159 (1992); *United Stated v. Cronic*, 466 U.S. 648, 657 (1985); *see also Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018); *Johnson v. Mississippi*, 486 U.S. 578, 590, (1988).

Evidence of gang membership is only admissible if it is (a) relevant to a disputed issue, *United States v. Lemon*, 239 F.3d 968, 971 (8th Cir. 2001), (b) demonstrated by a preponderance of evidence, (c) similar to the charged offense, (d) recent in relation to the charged offense, *United States v. Sills*, 120 F.3d 917, 920 (8th Cir. 1997), and (e) not unfairly prejudicial. *Lemon*, 239 F.3d at 971 (citing *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991)). For evidence of gang membership to be unfairly prejudicial, the resulting unfair prejudice must outweigh the probative value of the evidence, *Id.* (citing *United States v. Sparks*, 949 F.2d 1023, 1026 (8th Cir. 1991), and create an "undue tendency to suggest decision on an improper basis" *United States v. Johnson*, 28 F.3d 1487, 1497 (8th Cir. 1994), *cert. denied*, 513 U.S. 1098 (1995) (quoting Fed. R. Evid. 403, Adv. Comm. Note). Regardless of the applicable criteria, it could never be met in Mr. Galindo's case because it is not true; he was **not** a member of the Latin Kings.

Setting that aside, Mr. Galindo's alleged gang affiliation was not related to the charged offenses and created an unfair prejudice, which any alleged probative value did not outweigh. As such, the State should not have been permitted to bring in inadmissible evidence of Mr. Galindo's alleged gang affiliation. *Dawson*, 502 U.S. 159. The State's emphasis on Mr. Galindo's alleged affiliation with the Latin Kings was a thinly veiled effort to emphasize his ethnicity and equate being Hispanic with

dangerousness—a tactic the State used throughout, including through the testimony of Officers Thorson, Strode, and Nelson in rebuttal to the mitigation presentation. *See* Habeas Claims 20, 26, 27.

Moreover, the State and defense counsel knew that there was no actual Latin Kings gang in Madison County and there was no real evidence suggesting the bank robbery was gang-related in any way. *See Napue*, Rather, law enforcement treated Hispanic friend groups as gangs. In addition, Sandoval called the friend group of which Mr. Galindo was a part the "Latin Kings," but in reality, the group had no actual affiliation to the real Latin Kings and did not engage in gang-related activity:

> But none of it was real; he was making the whole thing up in his head. What Sandoval called the 'Latin Kings' was nothing more than stupid child's play.

Habeas Exhibit FF (Mr. Samano Dec.) pp. 9-10.

> Since we never had any actual gangs or issues with gang activity in Madison in the past, we didn't know what it really looked like. The administration saw Jose as the ringleader of gang activity. . . .
>
> We had two students who moved to Madison from California. One of them had a father who was in prison in California and had experience with real gangs. He would sit in my office and complain to me that Jose was a 'wannabe' gang leader and his 'gang' wasn't really a gang. . . .
>
> Jorge was never accused of gang-related activity or any kind of violence that I know of.

Habeas Exhibit V (Mr. Kronhofman Dec.) pp. 3-4.

> I heard the guys in the group talk about the Latin Kings, but I never took it seriously and I still don't. They called themselves that because they wanted to feel part of a group. Madison County at that time was very white and segregated, and it was hard to be a young Latino man there. Locals and the police judged Latino people harshly and said they

> were taking white peoples' jobs. I even got jeers and stares from strangers for hanging out with them.

Habeas Exhibit BB (Ms. Pfeifer Dec.) p. 3.

> I think Jorge got in with the wrong crowd. He was a follower and wanted to be like the other kids who pretended to be gangsters. Even though the school had rules about gang-related clothing or hairstyles, I never witnessed any real gang activity.

Habeas Exhibit HH (Ms. Siegel Dec.) p. 1.

Nevertheless, witnesses for the State made references throughout sentencing to Mr. Galindo's alleged membership in the Latin Kings, and defense counsel failed to object to those references while also promoting the idea of Mr. Galindo's gang membership. Tr. 3475-76, 3521-22, 3837, 4154, 4203-06, 4473-74. Although counsel objected to the State's use of gang evidence before trial, counsel failed to object to such testimony during trial, even when it was obviously designed to play into racist tropes and stoke fears of "dangerous" Hispanics. *See* Habeas Claim 27. Counsel himself even elicited testimony and promoted the idea of Mr. Galindo's alleged gang membership at trial. Tr. 3611-14, 3635-36, 4270-71, 4348, 4352-53, 4431.

The State's use of false, irrelevant and unsupported gang evidence was improper, imbued the sentencing proceeding with racist tropes, and deprived Mr. Galindo of a fair sentencing proceeding. *Dawson*, 502 U.S. 159; *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Miller v. Pate*, 386 U.S. 1 (1967); *Berger v. United States*, 295 U.S. 78, 88 (1935); *Johnson*, 486 U.S. at 590. Counsel's failure to challenge the State's use of Mr. Galindo's alleged gang affiliation and his affirmative use of gang-related information deprived Mr. Galindo of the effective

assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. 668; *Cronic*, 466 U.S. at 657; *see also Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018). The improper gang-related information, which was not even true, falsely conveyed to the sentencing panel that Mr. Galindo was dangerous and violent, inevitably affecting the panel's decision regarding mitigating circumstances and the balance of aggravation and mitigation. This Court should order a new sentencing proceeding.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. The Court should grant the writ, vacate the death sentences, and remand for new sentencing proceedings in state court.

### Claim 22: The State's false accusation that Mr. Galindo smuggled a weapon into the courtroom, and counsel's failure to move for a mistrial, deprived Mr. Galindo of his rights to a fair sentencing proceeding and the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments

During the mitigation proceeding, in front of the sentencing panel, the prosecutor falsely accused Mr. Galindo of having a blade with him in the courtroom. Tr. 3954-57; Habeas Exhibit MM (Weeks Dec.) p. 9. Court officers restrained Mr. Galindo on the counsel table and searched Mr. Galindo in open court. *Id.* The officers "pushed [counsel] away" to pounce on Mr. Galindo. *Id.* No weapon was found. *Id.* This incident "falsely left the three-judge panel with the impression that Mr. Galindo was a threat even inside the courtroom," and deprived Mr. Galindo of a

fair sentencing proceeding under the Eighth and Fourteenth Amendments to the Constitution.

Hours after this incident occurred, defense counsel approached the presiding judge to raise his concerns about the prosecutor's accusation and the court officers' actions. Counsel explained that he was concerned because "here we had officers basically make him spread eagle in front of the judges," who were "my finders of fact." Tr. 3956-57. Co-counsel Weeks confirmed that at least one of the judges on the panel, Judge Cheavront, watched Mr. Galindo be handcuffed. Tr. 3956-57. Counsel understood at the time how damaging and prejudicial this was to Mr. Galindo, emphasizing, "this is my panel, this is the only one." Tr. 3957.

Despite recognizing that this incident threatened Mr. Galindo's ability to receive a fair sentencing proceeding, inexplicably, counsel did not move for a mistrial. A mistrial would have been appropriate and should have been granted, given the falsely dangerous and threatening impression of Mr. Galindo that was inevitably left with the panel after this incident. There could be no strategic reason for failing to move for a mistrial under these circumstances, and counsel's failure prejudiced Mr. Galindo by subjecting him to sentencing by a panel that was predisposed to believe he was dangerous even in the courtroom. *Strickland v. Washington*, 466 U.S. 668 (1984).

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will

argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. On the merits, counsel were clearly deficient in failing to move for a mistrial on a matter they knew was so prejudicial; and instead prejudiced Mr. Galindo by having the fact-finder tainted with improper evidence at a capital sentencing proceeding. This Court should vacate the death sentences and remand for a new sentencing proceeding.

**Claim 23: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by counsel's failure to investigate jail assignments and the manipulation of snitches by the State.**

Trial counsel was ineffective in failing to investigate the pretrial placements and criminal associations fully discussed in Habeas Claims 6 & 7. Discovering the nefarious nature of these placements would have undermined the State's aggravation and arguments for a death sentence.

Trial counsel failed to conduct any fact investigation regarding the jail placements of Animas, Abendano, or Lopez, and thus, missed the opportunity to present to the jury the available defense theories that: (1) co-defendants Vela and Rodriguez were potential sources of the claims made by the jailhouse informants regarding Mr. Galindo, and (2) that they colluded to falsely accuse Mr. Galindo because he cooperated at the time of his arrest. Amended PCR at 81. Documents from counsel's file show these theories had been constructed as early as June, 2003. *Id.* Yet despite all that we know about the jailhouse informants, the record shows trial counsel came nowhere near revealing the circumstances surrounding their testimony.

270

Trial counsel was ineffective by failing to move to suppress any testimony from the informants based on the violation of Mr. Galindo's right to counsel. Had trial counsel so moved, it is reasonably likely the trial judge would have found a violation of Mr. Galindo's right to counsel and precluded the aforementioned jailhouse informants from testifying. It is reasonably likely that, without their testimony, the jury would have reached a different result regarding a charged aggravator. Alternatively, there would have been a carry-over impact at the sentencing proceeding before the three-judge sentencing panel.

Trial counsel in death penalty cases "have a duty to make reasonable investigations." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003). "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla v. Beard*, 545 U.S. 374, 387 (2005). It is counsel's responsibility to conduct a thorough investigation in order to identify "opportunities to rebut the case in aggravation." *Andrus v. Texas*, 140 S. Ct. 1875, 1881–82 (2020). The Eighth Circuit has unerringly noted under *Strickland* that "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Cagle v. Norris*, 474 F.3d 1090, 1097 (8th Cir. 2007); *Lyons v. Luebbers*, 403 F.3d 585, 594 (8th Cir. 2005); *Foster v. Lockhart*, 9 F.3d 722, 726 (8th Cir. 1993). Failing to interview witnesses relates to preparation and not strategy. *Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991). Lack of diligent investigation is

not protected by a presumption in favor of counsel and cannot be justified as strategy. *Id.* at 1304.

Because trial counsel knew this aggravation theory was coming from these witnesses, they should have met the primary duty to neutralize this aggravating evidence. *Wiggins*, at 524; *Rompilla*, at 386; *Parker v. Bowersox*, 188 F.3d 923, 929-31 (8th Cir. 1999) (counsel ineffective for failing to present evidence that would have rebutted aggravation that victim was potential witness against Parker); *Andrus*, 140 S. Ct. at 1881–82.

The failure of trial counsel to investigate the jail placements deprived Mr. Galindo of his constitutional right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments. Trial counsel's inaction constituted deficient performance that prejudiced Mr. Galindo *See, Strickland; Wiggins; Rompilla; Andrus.* The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and/or sentencing proceeding.

### Claim 24: The county attorney's involvement in defense funding decisions violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution; and it represented a conflict for trial counsel.

In a capital case, a transcript should never reflect the following statement by a trial counsel: that he "can't afford" to call any experts for rebuttal because he "couldn't afford to have them sit here overnight. They're gone." Tr. 3954. In a capital

case especially, trial counsel should not be held hostage at the whim of a county

attorney – having not been paid for the first year of the representation.[25]

In contrast to the unlimited resources of both federal and state law

enforcement, Mr. Galindo was limited in what he could gain access to.  Alarmingly,

the county attorney, who had a self-interest in a pursuing the death penalty case *see*

Habeas Claim 4, was included and involved in the decisions regarding Mr. Galindo's

defense.

The county attorney's improper involvement in funding decisions for the

defense, including being present when funding requests were made and

participating in decision-making on defense requests for fees and expenses

unconstitutionally impeded Mr. Galindo's representation and defense.  The State

participated heavily in those discussions and played an improper and

significant role in fixing defense fees and expenses, which interfered with the

presentation of the defense. This occurred either actively through influencing

the decisions or passively by creating a financial disincentive for requesting

funds or doing work.

On October 2, 2003, trial counsel filed a Motion for In Camera Consideration

of Defense's Request for Approval of Expenses and a Motion for Leave to Proceed Ex

Parte on Application of Funds. On October 8, 2003, after a hearing, the trial court

denied the motion and denied, in part, the defense motion to limit the county

attorney's access to defense funding requests. As a result, throughout Mr. Galindo's

---

[25] Defense counsel was not paid any money for his services on behalf of Mr. Galindo until December 10, 2003, more than a year after counsel was appointed.

trial and appellate proceedings, the county attorney was allowed to observe, participate in, and decide whether fees and expenses sought by Mr. Galindo's counsel were approved.

But the county attorney's involvement was even more invasive. While the trial court permitted the filing of redacted invoices,[26] the trial court improperly withheld payment on any redacted bill until it was fully itemized and the county attorney could review it. Thus, a financial disincentive occurred if trial counsel were to act ethically and shield their detailed work-product. In short, while everyone else involved in the case received a paycheck, trial counsel were economically disadvantaged for the entirety of their active representation due to the county attorney's improper involvement in funding decisions. Furthermore, if trial counsel had challenged this improper process, they would have risked retaliation through the reduction of fees either in Mr. Galindo's case or in any other case they were appointed to, or through exclusion from the court-appointed counsel system altogether.

This system of defense funding, generally and as it applied to Mr. Galindo's case, completely subverted the right to counsel and the right to a fundamentally fair trial. Allowing the determination of what resources, fees, or expenses the defense will receive to be ultimately controlled by the prosecutor, who is the defense's adversary in the proceeding, completely undermines any notion of fairness and the right to a fair trial, meant to be a battle between equals. Such a

---

[26] Of course, even a redacted bill would provide some indications and information on the defense's legal work. It also would provide one-sided discovery to oppose the post-conviction process.

process resulted in a breakdown in the adversarial process, undermining Mr. Galindo's right to counsel, right to effective counsel, and right to conflict-free counsel.

Mr. Galindo's right to due process of law was violated by the county attorney's active role in the funding decisions for his defense, in violation of the State's obligation to provide criminal defendants with a disinterested, fair and impartial decision-maker on all issues. *Tumey v. Ohio.* 273 U.S. 510 (1926). The Supreme Court has found "no escape from the conclusion that the prosecutor in a case cannot be "the neutral and detached" decision-maker required by the Constitution. *Coolidge v. New Hampshire,* 403 U.S. 443, 453 (1971).

The county attorney's involvement in defense funding decisions also violated Mr. Galindo's Due Process right to "make an *ex parte* threshold showing to the trial court" that expenditures and expert services were reasonably necessary to his defense. *Ake v. Oklahoma,* 470 U.S. 68, 82 (1985). The right to make an *ex parte* showing is essential to protect Mr. Galindo's attorney-client privilege, work-product privilege, and other privileges necessary to obtain the effective assistance of counsel who has access to the basic tools of an adequate defense. As a result, Mr. Galindo was placed in the untenable position of being forced to waive his attorney-client and work product privilege in order to demonstrate and exercise his right to the basic tools of an adequate defense. *Ake.* This unfairly permitted the county attorney access to work-product and privileged material.

275

The county attorney's intimate involvement in the funding determinations violated Mr. Galindo's Sixth and Fourteenth Amendment rights to the effective assistance of counsel and to a fundamentally fair trial because it allowed the opposing party in an adversarial litigation battle to decide whether, and/or how much to arm the other opponent. Such a process violated Mr. Galindo's right to a fundamentally fair trial, *see Donnelly DeChristoforo,* 416 U.S. 637 (1974), and resulted in a complete breakdown in the adversarial process. *See Cronic* v. *United States,* 466 U.S. 648 (1984).

The prosecution's intimate involvement in defense funding also created an inescapable conflict for trial counsel—a financial disincentive to work.  And in a case where not much was done, and where the county attorney had a significant conflict of interest based on undisclosed associations with witnesses, *see* Habeas Claims 4, the adversarial impact of trial counsel's conflict is obvious. "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland,* 466 U.S. at 686; *see also, Holloway v. Arkansas.* 435 U.S. 475 (1978). "An attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." *Fisher v. Gibson,* 282 F.3d 1283 (10th Cir. 2002).

276

The funding process violated Mr. Galindo's rights to due process and protection against cruel and unusual punishment as guaranteed by Sixth, Eighth and Fourteenth Amendments This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court.  This Court should grant the writ, vacate the convictions and/or death sentences with directions for the appropriate proceedings.

**Claim 25: Mr. Galindo's rights to the effective assistance of counsel at trial and on appeal, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by the failure of trial and appellate counsel to preserve and present meritorious constitutional errors.**

*Counsel[27] was Ineffective for Failing to Preserve Objections to the Jury Instructions Regarding the (1)(a) Aggravator.*

Counsel provided ineffective assistance by failing to preserve an objection to the §29-2523(1)(a) instruction regarding "substantial prior history of serious assaultive or terrorizing criminal activity," in violation of Mr. Galindo's right to the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments.  Had counsel preserved the objection, and raised the issue on direct review, the Nebraska Supreme Court would have found the instruction erroneous and ordered a new aggravation trial.

---

[27] Mr. Galindo's trial counsel, Mr. Stratton and Mr. Weeks also represented him on his direct appeal of right to the Nebraska Supreme Court.

277

Section 29-2523(1)(a) is unconstitutionally vague and overbroad, as applied in this case, because it is unclear whether the statutory language "substantial prior history" applies to a single prior offense of aiding and abetting "serious, assaultive or terrorizing criminal activity" committed by others. The statute, and the trial court's instruction, fails to suitably direct and limit the discretion of the sentencing body so as to minimize the risk of wholly arbitrary and capricious action or provide clear and objective standards for distinguishing the few cases in which the death penalty is deserved from those where it is not.  *See Johnson v. United States*, 576 U.S. 591 (2015); *Sessions v. Dimaya*, 138 S.Ct. 1204 (2018); *United States v. Davis*, 139 S.Ct. 2319 (2019).

> *Counsel was Ineffective for Failing to Appeal His Objections to the Jury Instruction Regarding the (1)(d) Aggravator.*

Counsel properly objected at trial to the "heinous, atrocious, cruel" prong of the §29-2523(1)(d) instruction. Tr. 3445-48.  However, defense counsel provided ineffective assistance by failing to raise his objections to the subsection (1)(d) instruction on direct appeal. If he had, the Nebraska Supreme Court would have held the trial court's subsection (1)(d) instruction was erroneous and ordered a new aggravation trial.

Prior to Mr. Galindo's trial, the Nebraska Supreme Court held, in *State v. Rust*, 197 Neb. 528 (1977) and *State v. Hunt*, 220 Neb. 707 (1985) that for the (1)(d) aggravator to be present, "the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence"; rather the aggravator only applies to "murders involving torture, sadism, sexual abuse, or the

278

imposition of extreme suffering, or where the murder was preceded by acts 'performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time.'" *State v. Sandoval*, 280 Neb. 309 (2010)(*citing Rust*, 197 Neb. 528 (1977) and *Hunt*, 220 Neb. 707, 724-5 (1985)); *see also, State v. Simants*, 197 Neb. 549 (1977); *State v. Reeves*, 216 Neb. 206, 227 (1984) (aggravator applicable to victim who was able to struggle, suffering defensive wounds, and was sexually assaulted during the killing, but not applicable to victim whose death occurred "swiftly and suddenly" and was not otherwise assaulted); *Proffitt v. Florida*, 428 U.S. 242 (1976).

Despite Nebraska authority on this aggravator, the trial court instructed the jury that "mental anguish includes a victim's uncertainty as to his or her ultimate fate." (Tr. 3251). This was error. (See State v. Sandoval 280 Neb. 309, 788 N.W.2d 172 (2010) § 29-2523(1)(d)

The trial court failed to instruct the jury that the "heinous, atrocious, or cruel" portion of the aggravator applies only to conduct "unnecessarily torturous to the victim." As such, the instruction was plainly contrary to the decision of the Court in *Maynard v. Cartwright,* 486 U.S. 356, 363-64 (1988) and the prior decisions of the Nebraska Supreme Court limiting the reach of §29-2523(1)(d). The trial court's instruction regarding the section (1)(d) aggravator was unconstitutionally vague and failed to suitably direct and limit the discretion of the sentencing body so as to minimize the risk of wholly arbitrary and capricious action, or provide clear and objective standards for distinguishing the few cases in which

279

the death penalty is deserved from those where it is not. The instruction therefore violated Mr. Galindo's rights under the Eighth and Fourteenth Amendments of the United States Constitution.

*Counsel was Ineffective for Failing to Appeal the Trial Court's Denial of the Motion for New Trial.*

As noted in Habeas Claims 7 & 16, Barritt lied to the jury and the county attorney failed to correct the misinformation.[28] Once it was discovered, Mr. Galindo requested a new trial, which the trial court denied. However, counsel did not appeal the district court's order overruling the motion for new trial. If counsel had raised the issue, it is reasonably likely the appellate court would have granted a new aggravation trial.

The failure of defense counsel to assign as error the district court's decision overruling the motion for new trial deprived Mr. Galindo of his constitutional right to due process and to the effective assistance of counsel on appeal, as guaranteed by the Sixth and Fourteenth Amendments.

*Counsel was Ineffective for Failing to Appeal the Lack of Notice Regarding the Lundell Allegation.*

Because the right to effective counsel includes an "adequate investigation of the facts, consideration of viable theories, and development of evidence to support those theories," *e.g., Strickland*, 466 U.S. at 691, counsel must be given sufficient

---

[28] Barritt admitted during the Rodriguez trial she lied to police, prosecutors, and defense attorneys, and lied under oath about her knowledge of or participation in the bank robbery conspiracy numerous times, including when she testified at a deposition taken in Mr. Galindo's case that she had no knowledge of the robbery prior to its occurrence. Directly contrary to her testimony in Mr. Galindo's case, Barritt also testified in the Rodriguez case that the county attorney told her she would *not* be prosecuted.

time to investigate and prepare for trial. *E.g., Powell v. Alabama*, 287 U.S. 45 (1932) (a defendant, charged with a serious crime, must not be stripped of his right to have sufficient time to advise with counsel and prepare his defense); *Gardner v. Florida*, 430 U.S. 349, 362, (1977)(denial of a defendant's opportunity to meaningfully deny or explain evidence used to procure a death sentence is a denial of due process). Accordingly, a continuance must be granted when necessary to allow defense counsel adequate time to prepare a defense.

The State failed to provide notice of aggravation until a month before the trial. Counsel was overwhelmed, unprepared for cross-examination, and failed to conduct an adequate investigation of the State's witnesses. First, defense counsel averred in his affidavit, "It is impossible for me to determine, in a timely and effective manner, which of [late endorsed] witnesses need to be interviewed, deposed, etc." Tr. Exhibit 10. Mr. Stratton further averred, "I have not had sufficient time to properly prepare for the upcoming trial, particularly in light of Mr. Smith's strategy to utilize the Travis Lundell alleged murder either in his case in chief against Mr. Galindo or at any further stage of Mr. Galindo's trial." *Id.*

By failing to raise on appeal the issue of lack of timely notice, counsel provided ineffective assistance of counsel in violation of Mr. Galindo's rights guaranteed by the Sixth and Fourteenth Amendments. Had counsel raised the issue on direct review, the Nebraska Supreme Court would have ordered a new aggravation proceeding.

After trial was continued and set for October 14, 2003, defense counsel filed, on September 10, 2003, a motion to continue the trial. In an accompanying affidavit sworn by defense counsel on September 19, 2003, counsel averred that he had been able to devote only twenty-five to thirty percent of his time to Mr. Galindo's case. Tr. Exhibit 10. The affidavit also suggests that the research of legal issues related to L.B. 1 consumed much of that time. The affidavit also averred, "I simply cannot get all of my work done in time to prepare an adequate defense for Defendant." The affidavits submitted in support of the motion also set forth in detail the volume of police reports and information that had been provided by the county attorney, including over two-thousand pages of initial investigative reports followed by DNA reports, handwriting analysis reports, and additional investigative reports. The affidavit alleges, and the record confirms, that the State had endorsed over 520 witnesses.

Counsel's affidavit also alleged that as late as September 19, 2003, the county attorney had not filed any official notice of intent to prove Mr. Galindo's involvement in the Lundell murder, but acknowledges the county attorney had "continually provided" information regarding the Lundell investigation. Though this information was being provided by the county attorney, defense counsel had reason to believe based on communications with the county attorney, he would not present evidence of the Lundell murder in pursuit of a death sentence. This would include Mr. Galindo's immediate confession of involvement in the bank robbery, his assistance with finding the discarded firearms, his assistance in locating Lundell's

body, and the county attorney's perception of his relative culpability in relation to the other participants. Proposed Post-conviction Exhibit 620 (October 31, 2002 letter from Smith to Stratton). After hearing argument, the district court "reluctantly" continued trial fifty-four days to December 8, 2003. Tr. 116-117.

Between September 19 and December 8, 2003, the trial court conducted, on six separate dates, hearings on several pretrial motions involving the testimony of thirty-three witnesses, including suppression hearings conducted over three days involving thirty-two witnesses. Mr. Weeks did not provide any material assistance during these hearings.

The State did not file its Supplemental Notice announcing the intention to prosecute the Lundell allegation in support of aggravating circumstance 1(a) until November 5, 2003. The next day, the trial court issued subpoenas for an additional fifty-nine witnesses to appear and testify for the State.

On November 19, 2003, counsel filed another continuance motion. The State objected and the Court denied the motion on November 21, 2003. Tr. 622-23. On November 24, 2003, defense counsel sent Smith and Collins a letter to schedule depositions of four witnesses, including Daniel Animas, noting "Time is running short." On November 26, 2003, less than two weeks before trial, the State filed notice required under former Neb. Rev. Stat. §29-1929 of its intention to call eleven witnesses identified as jailhouse informants. These witnesses included Jeff Houdek, Hector Abendano, "Danial [sic] Animas," "Miquel [sic] Lopez" and Carlos Flores.

283

Trial began December 8, 2003. The lack of notice regarding the Lundell allegation and the limited time for preparation precluded defense counsel from subjecting the allegation to meaningful adversarial testing. During opening statements, counsel presented no defense theory regarding Mr. Galindo's role in the death, deficiencies in the State's case, or problems with the State's witnesses. Tr. 2925-31. Of the 31 witnesses who testified regarding the Lundell death, counsel asked no questions of 20, and only minimally cross-examined three others. Counsel failed to effectively cross-examine Animas, Abendano, Lopez, Barritt, Wiest, and Petzold. *See* Habeas Claims 16 & 26.

At the close of evidence, defense counsel objected to the trial court instructing the jury on the relevant aggravating circumstance (referred to as 1(a)) "because Jorge Galindo was forced to go to trial without proper notice of the offense and without the essential elements of the offense of the alleged murder of Travis Lundell being set forth in the Information." The State-induced ineffectiveness is the product of the delayed disclosure, followed by the trial court's failure to grant a continuance. As noted above, the lack of notice resulted in the denial of Mr. Galindo's opportunity to meaningfully deny or explain the evidence regarding the Lundell death. *See Gardner*, 430 U.S. at 362.

The lack of notice provided to defense counsel therefore violated Mr. Galindo's right to due process, to the effective assistance of counsel, and to a fair trial, in violation of the Fifth, Sixth, and Fourteenth Amendments. At the State's insistence, the trial court failed to afford defense counsel adequate time to

284

investigate and prepare a defense to the Lundell allegation, violating his right to due process and to the effective assistance of counsel.

*Conclusion.*

The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). As to portions which the State may allege a default, Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court due to the ineffectiveness of post-conviction counsel. This Court should grant the writ and order a new aggravation and/or sentencing phase.

**Claim 26: Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial.**

Trial counsel provided ineffective representation throughout each stage of Mr. Galindo's trial. The right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of adversarial testing." *United Stated v. Cronic*, 466 U.S. 648, 657 (1985). This process requires counsel in death penalty cases to "make reasonable investigations." *Strickland*, 466 U.S. at 690-91; *Wiggins*, 539 U.S. at 521; *Rompilla*, 545 U.S. at 387; *id.* at 393-96 (O'Connor, J., concurring) ("The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense," it is a constitutional mandate).

285

Counsel for Mr. Galindo failed to comply with this requirement when he, *inter alia*, made prejudicial arguments in opening and closing statements; failed to meaningfully cross-examine or impeach the State's witnesses; failed to object to numerous improprieties by the prosecutor; failed to cross-examine and object to improper testimony by the State's pathologist; incorrectly claimed it was counsel's decision and not Mr. Galindo's whether to testify, implying he believed Mr. Galindo was guilty; and, failed to move for a mistrial on numerous occasions when one was warranted. Each of these errors, individually and cumulatively, deprived Mr. Galindo of the effective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. 668; *Cronic*, 466 U.S. at 657; *see also Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018).

### A. Counsel was ineffective for making a prejudicial opening and closing arguments at each stage of Mr. Galindo's Trial

At every phase of Mr. Galindo's trial, defense counsel began his opening and closing statements by apologizing to the jury and, later, to the sentencing panel. In his opening at the guilt phase, counsel apologized to the jury, to Madison County, and to the Norfolk community and the families of the victims, for "putting everybody through this." Tr. 2181. Counsel went on to say that he did not "do this lightly" and that it was "the hardest thing I've ever had to do." Tr. 2182. He repeated this refrain in his closing argument, telling the jury that "to make the process work right," they "unfortunately" had to "go through a jury trial." Tr. 3879-80. Counsel stated, "Quite frankly I don't want to be here, and I'm quite sure you don't want to be here, and I know for a fact that the families of the victims don't

286

want to be here, and once again I'll apologize for that, that any of us have to go through that, that Madison County has to go through it . . . ." Tr. 2879-80. In his closing argument after the aggravation phase, counsel apologized again that the jury had to go through the trial process. Tr. 3254.

When Mr. Galindo was sentenced for the non-capital charges, defense counsel said he was not going to make any comment because "[o]ne of the hardest things I've had to deal with is the feelings in the community" and the family members of the victims, and he did not want to "insult them" by making any comments in Mr. Galindo's support at sentencing. Tr. 3317. Then, in counsel's opening statement at the mitigation proceeding, he again began by apologizing. Counsel apologized "to the victims and Madison County as a whole for being here" and said, "No one wants to be here." Tr. 3462. Counsel stated, "[U]nfortunately this isn't the first time I've had to drag Madison County through this process" but "[u]nfortunately that's how the system works." Tr. 3462.

Counsel's repeated remarks sent damaging messages to the jury and to the sentencing panel that the trial was a formality they had to get through and that Mr. Galindo was putting everyone, including counsel, in a terrible position by forcing them to go through a trial. This denigrated Mr. Galindo's right to a jury trial and communicated to both the jury and the sentencing panel that counsel believed Mr. Galindo's fate was all but guaranteed, requiring the parties merely to go through the motions "to get from point A to point B." Tr. 3462. Moreover, the fact that counsel felt the need to repeatedly apologize for his representation of Mr. Galindo

287

and the exercise of Mr. Galindo's right to a trial further demonstrates the unfairness of Mr. Galindo's trial and the violation of his right to due process due to the court's denial of the motion to change venue, *see* Habeas Claim 1.

Counsel's improper repeated remarks violated Mr. Galindo's right to due process and prejudiced him in the eyes of the jury and sentencing panel, which were both given the impression that even defense counsel did not believe Mr. Galindo should exercise his right to a trial and did not want to represent him. This resulted in a breakdown of the adversarial process mandated by the Sixth Amendment, which requires that the accused have "counsel acting in the role of an advocate." *Cronic*, 466 U.S. at 656 (quoting *Anders v. California*, 386 U.S. 738, 743 (1967). Counsel's repeated, damaging remarks deprived Mr. Galindo of the effective assistance of counsel. The Court should order a new trial and sentencing.

### B. Counsel was ineffective for failing to cross-examine and impeach the State's witnesses.................................................................................

Throughout the trial, at every stage, counsel conducted almost no cross examination of the State's witnesses. In the guilt phase, the State presented testimony from 44 witnesses, two of whom were called to the stand multiple times. Of those witnesses, defense counsel did not conduct *any cross-examination whatsoever* of 37 of the State's witnesses. During the aggravation phase, counsel failed to cross-examine 17 of the State's 27 witnesses, and in the State's rebuttal to the mitigation proceedings, counsel failed to cross examine 12 of the State's 15 witnesses, conducting a cross-examination of only *three* witnesses.

Even when counsel did cross-examine witnesses during trial, his questioning was minimal and did not serve to meaningfully subject the State's case to adversarial testing. This was so even with regard to jailhouse informants and other witnesses whose credibility was highly questionable in light of the benefits they were receiving in exchange for their testimony. *See* Habeas Claims 7, 16. Counsel also failed to meaningfully cross-examine—and in many cases, failed to cross-examine at all—State's witnesses whose testimony was intended to undermine the mitigation evidence defense counsel was attempting to prove.

In the mitigation proceeding, the State presented testimony from Scott Strode, an employee of the Department of Corrections, who claimed that Mr. Galindo "continually attempts to communicate" with other Hispanic inmates, who "tend to congregate around him" and therefore had taken a "leadership role" in the prison system. Tr. 4201-03. Strode also claimed Mr. Galindo was a security threat in the prison system due to this alleged leadership, and testified extensively about gangs as though he were offering expert testimony, despite not being presented as an expert witness. Tr. 4202, 4203-06. Strode further claimed that Mr. Galindo was a danger due to his alleged leadership and gang association "because what they'll do is go out and recruit other potential members to join the Latin Kings to make themselves stronger within the institutions." Tr. 4206. Another officer, Brad Nelson, testified that during an argument between a Black inmate and a Hispanic inmate, Mr. Galindo exhibited leadership tendencies, escalated the situation, and created a risk for inmates and staff by standing near another Hispanic inmate. Tr. 4214-15.

This testimony was highly inflammatory, speculative, baseless and, significantly, impermissibly conveyed that Mr. Galindo's ethnicity made him more dangerous. *Buck v. Davis*, 580 U.S. 100, 119-20 (2017). Strode admitted he had only ever spoken to Mr. Galindo once, and Nelson had only been on Mr. Galindo's unit a "few" times. Tr. 4207, 4211.

Yet defense counsel left Strode's and Nelson's racially charged claims that Mr. Galindo was a leader by virtue of his friendships with other Hispanic inmates wholly unchallenged. Inexcusably, counsel conducted no cross-examination whatsoever of Strode or Nelson, even though their claims were designed to undermine one of the primary mitigating circumstances counsel was attempting to prove and were ripe for impeachment. In addition to permitting the panel to hear racially biased testimony that associated Mr. Galindo's ethnicity with dangerousness, *Buck*, 580 U.S. at 119-20, counsel's failure to object to this testimony or cross examine the witnesses effectively amounted to abandonment of one of the primary mitigating circumstances the defense had attempted to present. Many of defense counsel's witnesses had testified about Mr. Galindo's follower tendencies, but counsel marshalled none of that mitigating evidence to challenge Strode's and Nelson's dubious claims that he exhibited "leadership" tendencies. In effect, counsel failed to pursue the defense theory that Mr. Galindo was a follower when the State advanced improper, racially biased, and misleading testimony to counter it.

290

Likewise, counsel conducted no cross examination of Donnie Thorson, who also gave racially charged and blatantly false testimony about Mr. Galindo's alleged participation in the Deets Furniture store theft. *See* Habeas Claim 20. Thorson claimed on the stand that Adam Lantz, a "kid," was the victim of this theft and had been threatened by "Hispanic subjects."  Tr. 4219-20. *See Buck*, 580 U.S. at 119-20. While Thorson noted that Lantz had also been charged in the theft, he claimed Lantz was "very scared, he was crying, very nervous, he was probably one of the most scared people I've ever dealt with in any of my investigations in the last nine years as an officer." Tr. 4220. Thorson's exaggerated and inflammatory testimony failed to mention that he did not believe Lantz, that Lantz never identified Mr. Galindo as the person who threatened him, that Lantz had been using illegal drugs, and that police reports and charging documents suggested Lantz's involvement in the offense was far greater than that of the victim Thorson made him out to be on the stand. *See* Habeas Claim 20. Yet defense counsel conducted no cross-examination of Thorson whatsoever.

The State also presented testimony from law enforcement officers who interacted with Mr. Galindo shortly after the offense, including arresting him, and who claimed he did not appear to be under the influence of methamphetamine. Ben Matchett, the O'Neill police chief, testified that he arrested Mr. Galindo and did not believe he was under the influence of methamphetamine. Tr. 4030-41. Despite the fact that counsel's mitigation strategy in large part depended on proving that Mr. Galindo was under the influence of methamphetamine at the time of the offense,

counsel did not conduct any cross-examination of Matchett. Tr. 4041. In addition to Matchett's testimony, six other law enforcement officers testified that Mr. Galindo did not appear to be under the influence of methamphetamine shortly after the crime, yet counsel cross-examined only one single officer, and only asked her a single question about what time Mr. Galindo went to sleep. Tr. 4140. Given the importance of the influence of methamphetamine on the defense mitigation case, there could be no strategic reason for counsel's abject failure to challenge the testimony contradicting it, especially when the officers offering the testimony had limited interactions with Mr. Galindo and, in a number of cases, had limited experience with methamphetamine. The Court should order a new trial and sentencing.

### C. Counsel was ineffective for failing to cross-examine and object to exaggerated and improper aggravation testimony by Dr. Jones, the State's forensic pathologist, and for failing to move for a mistrial

The State's forensic pathologist, Dr. Jerry Wilson Jones, testified three times – once during the culpability phase and twice in aggravation. Defense counsel asked Dr. Jones *two questions* over the course of his entire testimony, neither of which related to or was in response to Dr. Jones's inflammatory testimony.[29] Counsel did not object or cross-examine Dr. Jones during the guilt phase, despite Dr. Jones's claim that he had done over 7,000 autopsies, a number so high it strained credulity.

---

[29] The questions dealt with whether Dr. Jones had tested string found with Travis Lundell's body and had nothing to do with his testimony about the alleged suffering of the bank victims. Tr. 3042-43.

Tr. 2768. Nor did counsel conduct any cross-examination of Dr. Jones when he testified extensively about the manner in which the bank victims died and speculated as to what they were thinking as they died.

Dr. Jones's testimony about the "subjective" aspects of the bank victims' deaths went far beyond the scope of what a forensic pathologist can properly attest to, inflaming the jury and urging them to imagine what the victims felt and were thinking as they died. *See* Habeas Claim 27. Dr. Jones told the jury to imagine the "agony and suffering" the victims experienced, and, putting the jurors in the mindset of the victims, claimed, "as you're bleeding to death you're very anxious, you're very restless, . . . you have an impending sense of doom." Tr. 3180, 3182. He told the jury he could not "imagine a much more horrible type of death" than the manner in which the bank victims died. And critically, Dr. Jones even claimed that his testimony about these speculative and subjective imaginings was "to a scientific and medical certainty." Tr. 3178, 3180, 3182, 3185. Yet defense counsel did not object or ask Dr. Jones a single question or conduct any cross-examination to test the basis of this improper and unscientific testimony. By allowing Dr. Jones's exaggerated testimony to go untested, defense counsel failed to challenge the heinousness aggravator in any meaningful way, and all but assured the jury would find it had been proved. The Court should order a new aggravation proceeding and sentencing.

**D. Counsel was ineffective for failing to object to the prosecutor's inflammatory and improper opening and closing statements, pervasive presentation of hearsay evidence, and numerous instances of prosecutorial misconduct throughout all stages of trial and sentencing, and for failing to move for a mistrial**

Throughout Mr. Galindo's trial and sentencing, the prosecutor made improper opening statements and closing arguments, led witnesses during direct examination to the point of making himself a witness, and elicited hearsay from numerous witnesses. *See* Habeas Claim 27. Defense counsel failed to object to the vast majority of the prosecutor's misconduct and did not move for a mistrial when it was warranted. Counsel's failure to object to the pervasive prosecutorial misconduct amounted to ineffective assistance of counsel. *Baer v. Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018) (counsel ineffective for failing to object to prosecutor's improper arguments); *see Strickland*, 466 U.S. at 694; *Berger v. United States*, 295 U.S. 78, 88 (1935) (prosecutor's duty is to seek justice and he may not use "improper methods calculated to produce a wrongful conviction"); *Darden v. Wainwright*, 477 U.S. 168, 182 (1986) (prosecutor's arguments may not "manipulate or misstate the evidence" or implicate rights of the accused).

At every stage of Mr. Galindo's trial and sentencing, the prosecutor's opening statements were argumentative and inflammatory. *See* Habeas Claim 27. In the guilt phase, the prosecutor continually vouched for the State's witnesses, repeatedly emphasized that most of the victims were women despite there being no allegations of gender-based motivations for the offence, repeatedly called Mr. Galindo and his co-defendants "cowards," and equated "justice" with a conviction. Tr. 2139, 2145-46,

2149, 2152, 2155, 2166, 2180. In aggravation, he told the jury they may have already decided the aggravators despite the fact that no evidence had yet been presented, and he equated the jury's duty with finding the aggravators. Tr. 2925. In the mitigation proceeding, the prosecutor misleadingly claimed that "about a third of all the aggravators that have been committed since 1973 that resulted in death were committed by this defendant." Tr. 3473.

The prosecutor's closing arguments were more inflammatory still, again equating the jury's duty with a finding of guilt, denigrating Mr. Galindo and defense counsel, misstating the evidence, and mischaracterizing the defense arguments. Tr. 2884, 2888, 3278-79, 3281-82. These arguments were improper and constituted prosecutorial misconduct, in violation of Mr. Galindo's rights to due process, a fair trial, and to be free from cruel and unusual punishment. *See* Habeas Claim 27. Despite all of these improper arguments, defense counsel did not object or move for a mistrial.

When conducting direct examination, the prosecutor almost universally led the State's witnesses and frequently put words in the witnesses' mouths. *See* Habeas Claim 30. Yet despite the prosecutor's repeated instances of leading and making himself a witness, defense counsel rarely objected and did not move for a mistrial. Throughout the guilt, aggravation, and mitigation proceedings, the prosecutor also repeatedly elicited hearsay testimony from officers, jailhouse informants, and other witnesses, with no objection from counsel. Tr. 2747, 3091-95, 31113-18, 3131-34, 3140-44, 3153-56, 4143-4158, 4165, 4185-93, 4219-21.

By failing to register appropriate objections to the prosecutor's misconduct, defense counsel communicated to the court and jury his implicit approval of the prosecutor's actions and permitted them to hear improper and misleading statements without challenge. This prejudiced Mr. Galindo. *Strickland*, 466 U.S. 694; *Baer*, 879 F.3d at 789 ("Our confidence in the outcome of [defendant's] sentencing proceedings was undermined" by the prosecutor's misconduct, and counsel's failure to object to that misconduct prejudiced defendant). The Court should order a new trial and sentencing.

## E. Counsel was ineffective for incorrectly informing the jury that it was counsel's choice, not Mr. Galindo's, that Mr. Galindo did not testify, implying that counsel believed Mr. Galindo was guilty

Counsel informed the jury in his opening statement that he would decide whether Mr. Galindo would testify, and that it would be "my decision, not his decision." Tr. 2182. Mr. Galindo did not testify at trial. While defense counsel must advise a client on the risks of testifying or waiving the right to testify, it is ultimately a defendant's decision whether or not to testify. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987) ("it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense."); *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case," including whether "to testify in his or her own behalf"); *see also McCoy*, 138 S. Ct. 1500, 1508. By legally misinforming the jury otherwise, counsel gave the inevitable impression that he did not allow Mr. Galindo to testify because he believed Mr. Galindo was guilty. This

prejudiced Mr. Galindo in the eyes of the jury and rendered counsel ineffective. *Strickland*, 466 U.S. 668. The Court should order a new trial.

> **F. Counsel was ineffective for failing to move for a mistrial at numerous instances where a mistrial was warranted and should have been granted**

At numerous points throughout the trial, counsel failed to move properly or at all for a mistrial when one was warranted and should have been granted. These instances include, but are not limited to:

- When the prosecutor repeatedly referred to evidence not in the record in opening and closing statements, *see* Habeas Claim 30, including repeatedly claiming falsely that Mr. Galindo held a gun to Ms. Jere Anderson's head, which was inconsistent with her testimony. Tr. 2911, 3235-36.

- When the State's pathologist, Dr. Jones, was permitted to improperly testify to the thoughts going through the victims' minds after being shot and as they died. Tr. 3176-85. *See* Habeas Claim 27.

- After a State's witness was seen talking to a juror during a break from trial. Tr. 2599-2600.

- After the prosecutor wrongly accused Mr. Galindo of carrying a weapon to court and Mr. Galindo was handcuffed and searched in front of the sentencing panel. Tr. 3954-57. *See* Habeas Claim 22.

- When the court refused to permit the defense to rebut the State's evidence during the mitigation and sentencing proceedings. Tr. 3993.

- When the State knowingly presented false evidence, including false testimony by Animas, Abendano, Lopez, Barritt, Petzold, and Wiest, and

false testimony related to the Deets Furniture store theft. Tr. 3091-3104, 3108-26, 3138-49, 3149-64, 3167-75, 4217-22. *See* Habeas Claims 7, 20, 27.

- After the court improperly allowed victim impact statements that exceeded the scope of what was constitutionally permitted. Tr. 4379-4402; *see* Habeas Claim 12.

- When the court allowed the State to admit evidence that was created during trial and of which the defense was not given proper notice, including Officer Downey's testing of a magazine and firearm during trial and then testifying about it, Tr. 2573; Downey's videotape of the area where Travis Lundell's body was found and the view from the road, which was created in response to defense questioning, Tr. 3186-90; and the introduction of an incident report from the jail on the last day of Mr. Galindo's sentencing, Tr. 4404-06. *see* Habeas Claim 27.

All these instances of court error and prosecutorial misconduct warranted a mistrial, and counsel's failure to request one under these circumstances amounted to the ineffective assistance of counsel. *See Strickland, supra.* The Court should order a new trial and sentencing.

These numerous instances of ineffective assistance of counsel throughout all stages of Mr. Galindo's trial and sentencing violated his right to effective representation and a fair trial under the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. 668; *Cronic*, 466 U.S. at 657; *see also Baer v.*

298

*Neal*, 879 F.3d 769, 782-88 (7th Cir. 2018). The writ should issue and this Court should therefore order a new trial and sentencing.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. As to the merits, this Court should grant to writ, vacate the convictions and/or sentences, and remand for the appropriate state court proceedings.

**Claim 27: The state committed numerous instances of prosecutorial misconduct throughout Mr. Galindo's trial, depriving him of the rights to due process and a fair trial and to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.**

Throughout every phase of Mr. Galindo's trial, the prosecutor engaged in misconduct that deprived Mr. Galindo of a fair trial as to guilt, aggravation, and sentencing. At every stage, the prosecutor made improper opening statements and closing arguments, led witnesses during direct examination to the point of making himself a witness, elicited improper testimony from the State's pathologist Dr. Jones, and elicited hearsay from numerous witnesses. In addition, the prosecutor knowingly presented false testimony of numerous witnesses, *see* Habeas Claim 20. During the mitigation proceeding, the prosecutor also falsely accused Mr. Galindo of carrying a weapon to court, causing him to be handcuffed and searched in front of the sentencing panel. *See* Habeas Claim 22.  The prosecutor suffered from a conflict, (Habeas Claim 4), suppressed evidence (Habeas Claim 6), and manufactured

evidence (Habeas Claim 7).  In assessing this claim, as well as the others, this Court is to cumulate the  prejudice from the misconduct.

Prosecutors have the duty to prosecute cases with vigor, but they may not strike foul blows. *Berger v. United States*, 295 U.S. 78, 88 (1935). Attacks on defense counsel are improper. *United States v. Holmes*, 413 F.3d 770 (8th Cir. 2005). The State's presentation of false and misleading argument is likewise prohibited. *Miller v. Pate*, 386 U.S. 1 (1967). Prosecutorial misconduct in argument is unconstitutional when it "so infect[s] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Such argument may be so outrageous that it violates due process and the Eighth Amendment. *Newlon v. Armontrout*, 885 F.2d 1328, 1337 (8th Cir. 1989); *Antwine v. Delo*, 54 F.3d 1357, 1364 (8th Cir. 1995).

Here, the prosecutor's opening statements at every stage of the case were argumentative and inflammatory. During his guilt-stage opening, the prosecutor repeatedly vouched for the State's witnesses, emphasizing how "good" and "nice" the police officers and other witnesses were, describing the victims as "dead defenseless females" and repeatedly emphasizing that most of them were women, calling Mr. Galindo and his co-defendants "cowards" repeatedly, and equating "fair and balanced justice" with a conviction. Tr. 2139, 2145-46, 2149, 2152, 2155, 2166, 2180. In his opening at the aggravation phase, the prosecutor told the jury they may have already decided some of the aggravators, despite the fact that they had not yet heard any aggravation evidence. Tr. 2925. He went on to again equate the jury's

300

duty with finding the aggravators. Tr. 2925. And in his opening at the mitigation proceeding, the prosecutor misleadingly claimed that "about a third of all the aggravators that have been committed since 1973 that resulted in death were committed by this defendant." Tr. 3473.

The prosecutor's closing arguments were even more inflammatory. He again equated the jury's duty to give Mr. Galindo a fair trial to finding him guilty. Tr. 2888. He denigrated Mr. Galindo and defense counsel, sarcastically stating, "Doug's a good lawyer, he's done what he can for his client, he said everything nice he can say about his client." Tr. 2884. At the aggravation phase, the prosecutor misstated the evidence and testimony, mischaracterized the defense closing argument, and then again mischaracterized the evidence and vouched for the State's witnesses at the mitigation proceeding. He claimed, "Doug has said in argument to you, look, Joe Smith can't tell you every single detail about how Lundell died. Why? Because he says, why, because we buried him so successfully, we hid that crime from the police and from Joe Smith for nine months. And now, you know, we should profit from that." Tr. 3278. Counsel argued nothing of the sort, however. The prosecutor also greatly mischaracterized the defense argument about the unreliability of jailhouse informants, "Jailhouse rats, that's what . . . two of these people are at least according to Doug Stratton" and repeatedly falsely claimed defense counsel called witnesses "jailhouse rats." Tr. 3279, 3281. Later, the prosecutor went off on a tangent about how intolerable it is for bodies to be buried away from their families, equating Lundell's death with the Vietnam war and the search for his body as being

akin to the United States spending millions of dollars a year going to Vietnam to bring back "little pieces of dead bodies." Tr. 3282.

In his closing arguments at the mitigation proceeding, the prosecutor misleadingly claimed Mr. Galindo killed four people and later claimed it was only because of "happenstance" that he did not kill more people and mischaracterized the evidence to contend Mr. Galindo "bragged" about the Lundell death, contrary to witness testimony, Tr. 4460-61, 4489.

When conducting direct examination, the prosecutor led nearly all the State's witnesses and frequently put words in the witnesses' mouths. For example, when Sandoval's former roommate, John Matson, testified that he found ammunition in Sandoval's room, the prosecutor stated that it was 9mm ammunition. Tr. 2951-52. Likewise, the prosecutor repeatedly misstated Ms. Jere Anderson's testimony to falsely claim Mr. Galindo held a gun to her head. Tr. 2145, 2160, 2169, 2174, 2872-73, 2911, 3235. And despite Dr. Jones's testimony that he could not determine Travis Lundell's cause of death, the prosecutor asked repeated leading questions about ligature strangulation to the point that he effectively testified that the cause of death was ligature strangulation. Tr. 3041-42.

The prosecutor also had police officers create new evidence in the middle of trial with no notice to the defense. During the guilt phase, the prosecutor had Downey test a magazine to see which gun it fit, testing which was not conducted nor provided to defense counsel before trial. Tr. 2573. In the aggravation trial, in response to defense cross-examination, the prosecutor had Downey create a

videotape to play for the jury, over defense objection, of the location where Lundell's body was found, as seen from the road. Tr. 3186-90. Despite representations to defense counsel before trial about Mr. Galindo clearly not being the leader of the bank robbery and being less culpable than his co-defendants, the prosecutor presented the theory that he was the leader in front of the jury at trial and sentencing panel, without notice. Tr. 2339, 2700-01, 2704-06, 4248. At the last second during the mitigation hearing, the prosecutor called a corrections officer to provide hearsay testimony over defense objection about a conversation he overheard Mr. Galindo having on the way back from court the day before, without notice to the defense. Tr. 4404-06.

Throughout the guilt, aggravation, and mitigation proceedings, the prosecutor repeatedly elicited hearsay testimony from officers, jailhouse informants, and other witnesses, including Officers Balli, Bell, Downey, Bos, and Thorson, as well as Cortney Barritt, Daniel Animas, Hector Abendano, and Miguel Lopez, among other witnesses. Tr. 2303-22, 2548-53, 2747, 3091-95, 31113-18, 3131-34, 3140-44, 3153-56, 4143-4158, 4165, 4185-93, 4219-21. This hearsay testimony included claims from law enforcement regarding Mr. Galindo's alleged attempt to escape from jail, as well as testimony regarding Mr. Galindo's alleged prior bad acts, which the State heavily relied on to prove multiple aggravators, including the alleged prior history of serious assaultive or terrorizing criminal activity, and to disprove the defense's proffered mitigators. *Id.*

At the aggravation phase, through the State's pathologist, Dr. Jones, the prosecutor elicited highly speculative and improper testimony about the victims' subjective thoughts and feelings as they died. Dr. Jones told the jury to "imagine a struggle for life and a struggle for every breath" and "you can imagine again the agony and suffering that occurs with each second that goes by." Tr. 3180. He further claimed, "as you're bleeding to death you're very anxious, you're very restless, . . . you have an impending sense of doom." Tr. 3182.  Dr. Jones repeatedly opined as to what a "horrible type of death" the victims endured and stated he "really can't imagine a much more horrible type of death" than the shooting deaths in this case. Tr. 3178, 3180, 3182. Dr. Jones stated that these opinions, based solely on his "imagin[ation]" of what it would be like to die in this manner, were "to a scientific and medical certainty," a claim that was belied by the speculative nature of his comments. Tr. 3185.

In rebuttal to the defense's mitigation presentation, the prosecutor elicited racially biased testimony from Officer Donnie Thorson about the Deets Furniture store theft—testimony that was also knowingly false and belied by the police reports making clear that Adam Lantz, the so-called "victim" of the "Hispanic subjects," was actually a co-conspirator who repeatedly lied to police about his involvement. *See* Habeas Claim 20. Similarly, the prosecutor elicited racially biased testimony from corrections officers Scott Strode and Brad Nelson. *See* Habeas Claims 21, 26.

Despite interacting with Mr. Galindo only once, Strode claimed he took a "leadership role" in prison because he communicated with other Hispanic inmates

and "other Hispanic inmates will tend to congregate around him." Tr. 4201-03, 4207. Nelson, who had been stationed on Mr. Galindo's unit only a "few" times, likewise claimed Hispanic prisoners followed Mr. Galindo around and congregated near him. Tr. 4212-13. According to Nelson, during an argument between a Black inmate and a Hispanic one, Mr. Galindo exhibited leadership tendencies, escalated the situation, and created a risk for inmates and staff by standing near another Hispanic inmate. Tr. 4214-15. The prosecutor also elicited from Strode that Mr. Galindo was a threat to prison security because, due to his "leadership tendencies," he could "go out and recruit other potential members to join the Latin Kings to make themselves stronger." Tr. 4206. There was no evidence to support this bald assertion, and the prosecutor's use of Mr. Galindo's alleged gang ties—which were not real—was wholly improper. *See* Habeas Claim 21.

These numerous instances of prosecutorial misconduct, individually and cumulatively, deprived Mr. Galindo of due process, a fair trial, and his Eighth Amendment right to a reliable capital sentence. *Donnelly*, 416 U.S. at 643; *Berger,* 295 U.S. at 88; *see also United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003) (reversing for new trial due to prosecutor's improper and prejudicial argument); *United States v. Johnson*, 968 F.2d 768, 769 (8th Cir. 1992); *Newlon*, 885 F.2d at 1337; *Hernandez*, 779 F.2d at 458-59. Moreover, the prosecutor's pervasive misconduct rendered defense counsel ineffective in his representation of Mr. Galindo. *Strickland*, 466 U.S. 668. Mr. Galindo is thus entitled to a new trial and sentencing proceeding.

305

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. As to the merits, this Court should grant the writ, vacate the convictions and/or sentences, and remand for appropriate proceedings.

### Claim 28: Mr. Galindo's Due Process rights were violated when the State of Nebraska failed to comply with the Nebraska Death Penalty Statute and provide notice of aggravators.

The United States Constitution forbids a state from refusing to follow its own procedures. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion*, cf. Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State."). The Nebraska Supreme Court's failure to hew to the language and requirements of Nebraska's Death Penalty statute is contrary to and/or an unreasonable application of clearly established United States Supreme Court law and/or is premised upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and 2.

To execute Mr. Galindo would violate his right to due process under the United States Constitution because the original information filed against Mr. Galindo did not contain a notice of aggravation, in violation of R.R.S. Neb. § 29-1603. R.R.S. Neb. § 29-1603, the applicable law at the time of Mr. Galindo's arraignment, trial, aggravation and sentencing proceedings, provides as follows:

> (a) Any information charging a violation of Section 28-303 and in which the death penalty is sought shall contain a notice of aggravation which alleges one or more aggravating circumstances, as such aggravating circumstances are provided in Section 29-1602. It shall constitute sufficient notice to describe the alleged aggravating circumstances in the language provided in Section 29-2523.

> (b) The State shall be permitted to add to or amend a notice of aggravation any time up to and including the thirtieth day prior to the trial of guilt.

Nebraska Revised Statute § 29-1603 was signed into law on November 22, 2002. Its legal requirements applied at the time that Mr. Galindo was arraigned, at the time of the guilt-innocence phase of Mr. Galindo's trial, at the time of Mr. Galindo's aggravation hearing, and at the time of the sentencing hearings. According to the law in effect at that time, if no notice of aggravation was filed in the original information according to § 29-1603, "the district court shall enter a sentence of life imprisonment without parole." R.R.S. Neb. § 292520(1).

The Nebraska Supreme Court's failure to hew to the language and requirements of Nebraska's Death Penalty statute is contrary to and/or an unreasonable application of clearly established United States Supreme Court law and/or is premised upon an unreasonable determination of the facts. *See* 28 U.S.C. §

2254(d)(1) and (2). The Court should grant the writ, vacate the convictions and death sentences, and remand for new proceedings in state court.

**Claim 29: Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendment were violated when the State of Nebraska weighed non-statutory aggravators against mitigators.**

The trial court violated Mr. Galindo's rights to due process, a fair trial, and protection from cruel and unusual punishment as guaranteed by the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution when the sentencing panel weighed the mitigating circumstance that Mr. Galindo cooperated with law enforcement personnel following his arrest against the non-statutory aggravator that he lacked remorse for his actions, as evidence by his post-arrest behavior. Furthermore, weighing Mr. Galindo's alleged post arrest incarceration behaviors against the mitigating circumstance constituted a clear violation of the Eighth Amendment under *Furman v. Georgia*, at 256, requiring the legislature to specifically define aggravating circumstances which make a person eligible for death.

Furthermore, the United States Supreme Court has held that state legislatures must specifically define aggravating circumstances that make a person eligible for the death penalty. *See Godfrey v. Georgia,* 446 U.S. 420, 428 (1980) ("if a state wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty"). Aggravating factors must be alleged in the indictment and tried in front of a jury. *See Jones v. U.S., supra.* 526 U.S. at 254, n, 6; *Ring v. Arizona, supra,* 536 U.S. at 609.

308

Nebraska is a weighing state; it carefully specifies the aggravating circumstances that can be used in the death penalty weighing process. Nebraska law prohibits consideration of non-statutory aggravating circumstances. In its final sentencing order, the sentencing panel stated that it:

> [C]onsiders the non-statutory mitigating circumstance proffered by the defendant that the defendant cooperated with law enforcement personnel following his arrest. The panel determines that this mitigating circumstance does exist. This mitigating circumstance is offset, in part by the fact that the defendant does not demonstrate remorse for his actions. His cooperation has been tempered by his actions and behavior during his post-arrest incarceration. The panel gives this mitigating factor little weight in determining the sentences to be imposed.

Sentencing opinion p. 10. However, the Third Amended Information filed against Mr. Galindo did not allege an aggravating factor that Mr. Galindo showed no remorse for his actions, nor indeed is lack of remorse listed among the statutory aggravating factors that could have been alleged against Mr. Galindo. See R.R.S. Neb. § 29-2523. Defense counsel objected to the State's efforts indicating rebuttal in this manner was contrary to the Nebraska statute. Tr. 4005-06.

Over objection and contrary to the statute, the State argued Mr. Galindo lacked remorse during closing arguments of the sentencing phase, after mitigating evidence was presented. Tr. 4489, 4502-03. As a result, Mr. Galindo was not on notice that the State would assert those allegations or that the sentencing panel would consider evidence of those allegations, and he accordingly could not present evidence in rebuttal.

In denying relief, the Nebraska Supreme Court acted contrary to and unreasonably applied United States Supreme Court precedent and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2 The Court should grant the writ, vacate the death sentences, and remand for new sentencing proceedings.

### Claim 30: Mr. Galindo was penalized for exercising his right to a jury trial in violation of *United States v. Jackson* and *Ring.*

A statutory scheme that penalizes a defendant who exercises his constitutional right to a jury trial under the Sixth Amendment is itself unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the decision in *United States v. Jackson*, 390 U.S. 570 (1968), and its progeny. The separate findings lead to a *Ring* violation. The Nebraska Supreme Court's holding otherwise is contrary to and/or an unreasonable application of clearly established United States Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The aggravating circumstances in Nebraska Revised Statutes § 29-2523(1) provide for multiple "prongs" and facts that may exist to support the existence of the aggravating circumstances. The number and type of "facts" that might support an aggravating circumstance has been expanded by Nebraska Supreme Court opinions that have attempted to define aggravating circumstances. For example, aggravating circumstance 1 (d) may have between five and six different "facts" that would support a finding of the aggravator.

The Nebraska capital sentencing scheme provides that if a defendant waives his right to a jury trial as guaranteed by the Sixth Amendment to the United States Constitution, the defendant receives the procedural benefit of a unanimous determination of each "fact" in support of an aggravating circumstance made in writing.

Nebraska Revised Statute § 29-2521(2) states as follows:

> In the sentencing determination proceeding before a panel of judges when the right to a jury determination of the alleged aggravating circumstances has been waived, . . . The panel **shall** make written findings of fact based upon the trial of guilt and the sentencing determination proceeding, identifying which, if any, of the alleged aggravating circumstances have been proven to exist beyond a reasonable doubt. Each finding of fact with respect to each alleged aggravating circumstance shall be unanimous. If the panel is unable to reach a unanimous finding of fact with respect to an aggravating circumstance, such aggravating circumstance shall not be weighed in the sentencing determination proceeding. After the presentation and receipt of evidence and argument, the panel shall determine an appropriate sentence as provided in section 29-2522.

On the other hand, if a defendant exercises his Sixth Amendment right to a jury trial as provided in Nebraska Revised Statutes § 29-2520(e),(f), the jury is not required to unanimously find each "fact" in support of finding of an aggravating circumstance, but only that the aggravating circumstance exists. The jury is not required to make any written findings regarding the facts necessary to support the finding of an aggravating circumstance.

In this circumstance, Mr. Galindo's sentence of death was also imposed in violation of his right to trial by jury and his right to due process of law, as guaranteed by the Sixth and Fourteenth Amendments, and in violation of the Cruel

and Unusual Punishment Clause of the Eighth Amendment, because findings required under Nebraska law to elevate the maximum punishment for the crime of murder from life imprisonment to death were made by a panel of judges rather than a jury of his peers. *Ring*. There can be no assurances that the evidence relied upon is the same.

A statutory scheme that penalizes a defendant who exercises his constitutional right to a jury trial under the Sixth Amendment is itself unconstitutional under the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the decision in *United States v. Jackson*, 390 U.S. 570 (1968), and its progeny.

Nebraska's death sentencing scheme is structured such that if a defendant invokes his constitutional right to a jury determination of aggravating circumstances, he is in an inferior position tactically than if he waives his constitutional right to a jury determination of aggravating circumstances. In addition, and even more shockingly, the current interpretation of the law penalizes a defendant that invokes his constitutional right to a jury determination of aggravating circumstances by denying his very right to a jury because the sentencing panel that was not the fact-finder during the aggravation hearing nonetheless acts as the ultimate fact-finder on aggravating circumstances when it reviews all of the evidence from the aggravation proceedings as well as evidence of aggravation contained in the presentence investigation report, and re-weighs, re-finds and redefines that evidence in determining what sentence to impose on a

capital defendant. This practice, at the very least, "needlessly chill[s]" the exercise of his right to a jury. *See Jackson*, 390 U.S. at 582.

The Nebraska Supreme Court's holding otherwise is contrary to and/or an unreasonable application of clearly established United States Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). The Court should grant the writ, vacate the convictions and death sentences, and remand for new proceedings in state court.

### Claim 31: Mr. Galindo's was deprived of his rights under *Caldwell v. Mississippi* when the State of Nebraska minimized the jury's role.

The trial court erroneously lessened the individual juror's responsibility by stating to every potential juror that "a panel of judges, not the jury, must determine the sentence" imposed on Mr. Galindo if he was found guilty of first-degree murder. *See eg* Tr. 734. The Nebraska Supreme Court affirmed, reasoning that *Caldwell v. Mississippi*, 472 U.S. 320 (1985), was distinguishable and Nebraska law required the "existence or content of the notice of aggravation not be disclosed to the jury prior to the return of guilty verdicts." *Galindo*, 278 Neb. at 646. Disclosing the existence or content of a notice of aggravators is immaterial to establishing a *Caldwell* violation which prohibits a judge from "improperly describing the role assigned to the jury by local law." *Galindo*, 278 Neb. at 646 (citing *Romano v. Oklahoma*, 512 U.S. 1, 9 (1994)).

Because the trial court improperly minimized the impact of the jury's crucial role in determining aggravators, the Nebraska Supreme Court acted contrary to and unreasonably applied *Caldwell*, in denying Mr. Galindo relief. *See* 28 U.S.C. § 2254(d)(1). Further, the impact of the minimization of the jury's role came out in

voir dire; thus, there is also an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d) (2).

> During voir dire, the Court asked:

> If . . . Galindo is found guilty of first degree murder, a panel of three judges will determine his sentence, **not the jury**. Knowing that the panel of three judges, not the jury, must determine the sentence, do you have any personal beliefs which would prevent you from making a finding of guilty of first degree murder even if the evidence supports such a finding?

Tr. 734 (emphasis added). The court was incorrect—a jury finding guilt does not automatically trigger the empanelment of a three-judge sentencing body. In fact, Nebraska law dictates that a finding of first-degree murder presumptively results in a sentence of life without the possibility of parole. R.R.S. Neb. § 29-2520(1). It is only upon a further jury finding, in a separate trial, of the existence of one or more aggravating factors that three judges are empaneled to determine whether to sentence the defendant to death or to life without the possibility of parole. The jury in Mr. Galindo's case could have equally found that no aggravating factors existed and, in effect, no three-judge sentencing panel would have ever been involved in Mr. Galindo's case.

The Court's statement also omitted the very significant task that the jury would inevitably undertake upon conviction—determining Mr. Galindo's eligibility for a death sentence. After *Ring*, determining aggravators is arguably more critical than the sentencing panel's ultimate sentencing determination because the sentencing panel has no discretion to sentence a defendant to death absent a jury determination of at least one aggravator. To demonstrate the jury's importance in

314

sentencing: The jury is responsible for the only portion of sentencing proceedings requiring alleged facts to be proven beyond a reasonable doubt.

In *Caldwell v. Mississippi*, the U.S. Supreme Court held that a Court violates a capital defendant's Eighth Amendment right to be free from cruel and unusual punishment when it leads a sentencing authority to believe, "that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S at 329. The Court went on to state:

> In evaluating the various procedures developed by States to determine the appropriateness of death, this Court's Eighth Amendment jurisprudence has taken as a given that capital sentencers would view their task as the serious one of determining whether a specific human being should die at the hands of the State.

*Id.*

The U.S. Supreme Court revisited Caldwell in *Romano v. Oklahoma*, and clarified that, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the *jury improperly described the role assigned to the jury by local law.*" 512 U.S. 1, 9 (1994) (emphasis added).

The trial court here did exactly that—it improperly described the jury's role under local law in a way that significantly misled the jury to believe that it played no role in Mr. Galindo's sentencing determination. The court directly misstated Nebraska law when it counseled jurors that a sentencing panel would in all cases take on the burden of sentencing Mr. Galindo if the jury found that he was guilty of first-degree murder. It also omitted the fact that the jury's guilty verdict would automatically trigger an aggravation hearing, at which the jury would determine Mr. Galindo's eligibility for a death sentence. The court's reliance upon potential

315

jurors' responses to this misinformation in jury selection, when compounded with the Court's refusal to life-qualify the jury, failed to properly identify for disqualification all of those jurors that would impose a death sentence in every case where they found a defendant guilty of first-degree murder.

Voir dire disclosed how jurors became more comfortable with finding Mr. Galindo guilty once their role was minimized. Juror 117 stated that after hearing the court describe the more limited role – they "could do it so much more comfortable." Tr. 1377. In other words, the omission of information about the jury's critical role in the sentencing process made it "so much more comfortable" for the jurors to convict and to render the findings necessary for Mr. Galindo to be eligible for a death sentence.

> The Nebraska Supreme Court rejected Mr. Galindo's claim, acting contrary to and unreasonably applying *Caldwell. See* 28 U.S.C. § 2254(d)(1). The court reasoned the death qualification question deliberately did not inform the jury about its role in determining aggravators to comply with Neb. Stat. § 29-1603(2)(c), which requires the "existence or content of the notice of aggravation not be disclosed to the jury prior to return of guilty verdicts." *Galindo*, 278 Neb. at 646. However, not disclosing the "existence or content" of a notice of aggravation is not synonymous with blatantly distorting the role of the jury by stating the jury will not determine Mr. Galindo's sentence. But for the jury determining the presence of aggravators, Mr. Galindo would not be eligible for the death penalty. Further, the impact of the minimization of the jury's role came out in voir dire; thus, there is also an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d) (2). The writ must issue.

316

**Claim 32: Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously prohibited life qualification of the jury in violation of *Morgan v. Illinois*.**

Throughout voir dire, Mr. Galindo's counsel sought to "life qualify" the jury pursuant to *Morgan v. Illinois*, 504 U.S. 719 (1992). *See Galindo*, 278 Neb. at 641–42 ("Specifically, Galindo sought to inquire whether any of the potential jurors would automatically impose the death penalty in every first degree murder case."). The Nebraska Supreme Court erroneously reasoned that *Morgan* does not apply in Nebraska capital cases because Nebraskan juries do not ultimately weigh the aggravating circumstances against the mitigating circumstances in a capital murder trial. *Id.* at 642. However, this distinction is meaningless; the State of Nebraska acted contrary to and/or unreasonably applied clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

Just like in Mr. Galindo's case, the petitioner in *Morgan* requested that the trial court ask the venire members whether they would automatically impose death if they found him guilty. The trial court refused his request. *Morgan*, 504 U.S. at 723. The Supreme Court found error and reversed despite each of the empaneled jurors affirmatively stating they could be fair and impartial. *Id.* at 724. The Court explained:

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause

317

> any prospective juror who maintains such views. If even one juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

*Id.* at 729. Now, *Morgan* entitles defendants to question prospective jurors during voir dire whether they would impose death "regardless of the facts and circumstances of conviction." *Id.* at 735–36.

On direct appeal, the Nebraska Supreme Court distinguished *Morgan* because the Illinois death penalty scheme delegated the jury the task of weighing the aggravators against the mitigators to determine whether the death penalty should be imposed. *Galindo*, 278 Neb. at 642. Therefore, the court reasoned Galindo's desired line of questioning into a potential juror's stance on the death penalty is permissible but "not mandated by the principles of fundamental fairness that limit the trial court's discretion in governing voir dire." *Id.* However, the Supreme Court seemingly did not intend for differences in sentencing schemes to dilute the effect of *Morgan*—the Court recognizes there is not "any one right way for a State to set up its capital sentencing scheme." *Morgan*, 504 U.S. at 725–26. Instead, the Court's concern is whether a juror will automatically vote for the death penalty causing them to "fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.*

The Nebraska sentencing scheme requires jurors to consider evidence to determine the presence or absence of aggravating circumstances. Because a jury's finding of aggravators is necessary for a defendant to face the death

penalty, the jury's role should not be diminished. *See Caldwell*, 472 U.S. 320.

Here, Mr. Galindo was exposed to the death penalty only after the jury

determined the presence of aggravators. If a juror predetermined Mr.

Galindo's death sentence due to vehement support for the death penalty, "the

presence or absence of either aggravating *or* mitigating circumstances is

entirely irrelevant . . ." to their determination. *Morgan*, 504 U.S. at 729

(emphasis added).

> Juror 73 illustrates the problem:
>
> Q. Knowing this, do you have any personal beliefs as to the death penalty which would prevent you from making a finding of guilty of first-degree murder even if the evidence supports a finding of first-degree murder?
>
> A. If he's found guilty of first-degree murder, I'm totally in favor of the death penalty.

Tr. 1683. If in favor of death or an automatic death penalty juror, you can

stay. In contrast, being against the death penalty, the trial court removed the

jurors. *See* Tr. 1447-48. This is the height of illogic – and demonstrates the

unreasonableness of the state court's treatment of the claim.

Therefore, without Mr. Galindo's ability to life qualify, when the state

is allowed to death qualify, the trial court exposed Mr. Galindo to jurors

whose personal sentiments would directly impact their ability to follow

instructions, depriving him of a fair trial. *See Galindo*, 278 Neb. at 643.

Because the Nebraska Supreme Court acted contrary to and unreasonably

applied *Morgan* and/or an unreasonable determination of the facts. *See* 28

319

U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the

convictions and death sentences, and remand for new proceedings in state

court.

### Claim 33:  Mr. Galindo's death sentence violated the Eighth Amendment's prohibition on cruel and unusual punishment because he was 21 years old at the time of the offense, and defense counsel was ineffective for failing to raise this issue at sentencing or on direct appeal.

Mr. Galindo's brain was still developing and had not fully matured by the

time he committed this offense. Current scientific evidence supports the view that

the human brain does not fully mature until well after the age of 18, closer to an

individual's mid-twenties. The brain functions principally affected by this lack of

maturity are those governing decision-making, judgment, and impulse control. *See*

Habeas Exhibit D (Dr. Somerville Rep.). For these reasons, the same considerations

underpinning the prohibition on capital punishment for individuals under 18 apply

to those 21 and younger. Because Mr. Galindo was only 21 years old at the time of

the offense, he is categorically ineligible for the death penalty in light of controlling

Eighth Amendment jurisprudence, the evolving standards of decency, and scientific

evidence related to brain development in young adults. This is especially true in

light of the evidence of Mr. Galindo's specific indications of brain impairment due to

significant exposure to environmental neurotoxins including lead, and his early-

onset substance abuse.

Imposition of the death penalty is subject to the Eighth Amendment

protection, via the Fourteenth Amendment, from a state's imposition of cruel and

unusual punishments. *Roper v. Simmons,* 543 U.S. 551, 560 (2005). "While the

State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. *Trop v. Dulles*, 356 U.S. 86, 100 (1958). The Eighth Amendment's prohibition of cruel and unusual punishments "reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560. Because the Eighth Amendment "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice," *Weems v. United States*, 217 U.S. 349, 378 (1910), the Court has adopted "evolving standards of decency that mark the progress of a maturing society" as a measure to enforce the Constitution's protection of human dignity and to determine which punishments are so disproportionate as to be cruel and unusual. *Trop*, 356 U.S. at 100-01; *Woodson v. North Carolina*, 428 U.S. 280, 301 (1976).

In 2005, the Court held that the lack of maturity of persons under age 18 prohibits the imposition of the death penalty for crimes committed before age 18 because acts committed by immature persons have less moral culpability than acts committed by adults. *Roper*, 543 U.S. 551. Juveniles, by virtue of their diminished capacity to control and understand the consequences of their behavior, may not constitutionally be included in the group of "offenders who commit a 'narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper*, 543 U.S. at 568 (*quoting Atkins v. Virginia*, 536 U.S. 304, 319 (2002)).

Since its decision in *Roper*, the Court has continued to recognize that the adolescent brain is not fully formed in areas such as impulse control, advance

planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. 460, 476 (2012) ("youth is more than a chronological fact"); *Graham v. Florida*, 560 U.S. 48, 68 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"). The Court acknowledged that "only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior", as well as the "fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control." *Miller*, 567 U.S. at 471-72 (internal quotations omitted). Thus, "children are constitutionally different from adults for purposes of sentencing. Because juveniles have diminished culpability and greater prospects for reform, . . . 'they are less deserving of the most severe punishments.'" *Id.* at 471 (quoting *Graham*, 560 U.S. at 68).

Importantly, the Supreme Court recognized in *Roper* that although society and the legal system drew the line between childhood and adulthood at age 18, "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper,* 543 U.S. at 574. That recognition is in line with the Court's longstanding acknowledgment that "youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings*, 455 U.S. at 115-16. Moreover, social science research on brain development reveals that "brain development continues well beyond the age of 18," into "young adulthood," into an individual's mid-twenties. Habeas Exhibit D (Dr. Somerville Rep.) pp. 1-2. As a result, young adults, even

322

those in their early twenties, operate more like those of adolescents than fully developed adults. See John H. Blume et al., *Death by Numbers: Why Evolving Standards Compel Extending Roper's Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One*, 98 Tex. L. Rev. 921, 930-31 (2020).

In *Roper*, the Court found a national consensus against the execution of juvenile offenders based on three "objective indicia of consensus": (1) "the rejection of the juvenile death penalty in the majority of States;" (2) "the infrequency of its use even where it remains on the books;" and (3) "the consistency in the trend toward abolition of the practice." *Roper*, 543 U.S. at 567. The Court observed that a total of thirty states prohibited the juvenile death penalty, the same number of states it found established a national consensus against the execution of intellectually disabled offenders in *Atkins*. *Id.*, at 564. Accordingly, the Court determined that society had evolved to view juveniles as "categorically less culpable than the average criminal." *Id*.

As in *Roper*, a national consensus has emerged against the execution of individuals who were twenty-one years old or younger at the time of their crimes. First, 24 jurisdictions have abolished the death penalty altogether, and seven more have effectively abolished it as a sentencing option through executive moratoria. *See* Death Penalty Information Center, *States with and without the death penalty – 2023*, https://deathpenaltyinfo.org/states-landing. Even without considering actual sentencing practices in states that do retain the death penalty, in 31 states, people ages 21 and younger are protected from execution, a number greater than in

*Graham*, *Miller*, and *Roper*, where the Supreme Court found a national consensus. *See id.* at 937. Furthermore, in three states that retain capital punishment on the books—Montana, Wyoming, and Utah—there is no one on death row who was 21 years old or younger at the time of the offense. *See id.* Thus, in a total of 34 jurisdictions, the execution of offenders under twenty-two has either been abolished, or the possibility that an offender under 22 will be executed is virtually nil.

Moreover, in those states that have executed young adults, there is an emerging trend against executing those who were 21 years old or younger at the time of the offense. In 2007, 30 individuals under the age of 22 were sentenced to death. In 2018, that number was two, and in 2023, it was one. *See* Death Penalty Information Center, *Recent Death Sentences By Name, Race, County, and Year*, https://deathpenaltyinfo.org/facts-and-research/sentencing-data/death-sentences-by-year/2023-death-sentences-by-name-race-and-county. These numbers clearly demonstrate "consistency in the trend toward abolition of the practice" of sentencing under-22-year-olds to death. *Roper*, 542 U.S. at 567.

The Supreme Court has also held that the infliction of capital punishment is excessive if it "does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy v. Louisiana*, 554 U.S. at 441. As is the case with juveniles, the execution of youthful offenders between the ages of eighteen and twenty-one do not serve the purposes of retribution and deterrence. In *Roper*, the Court found that "[r]etribution is not proportional" with respect to the execution of juveniles, because their "culpability or

324

blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." 543 U.S. at 571. Current science demonstrates that like juveniles, individuals between eighteen and twenty-one have diminished culpability, and therefore, as with juveniles, their execution does serve the purpose of retribution.

Nor is deterrence a sufficient reason to impose capital punishment on offenders between eighteen and twenty-one. As the Court noted in *Roper*, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Id.* at 572. In light of the science related to brain development in young adults, the same reasoning applies to offenders between eighteen and twenty-one. Accordingly, as with juveniles, the execution of persons between the ages of eighteen and twenty-one serves no penological purpose and is unconstitutionally excessive.

These considerations are particularly relevant to Mr. Galindo, who was 21 years old at the time of the offense. They are all the more relevant when considered along with his intellectual disability, which renders his death sentence unconstitutional. *See* Habeas Claim 5. As Dr. Leah Somerville, PhD, an expert in developmental neuroscience, detailed in her report, 21 years is included in what is considered "an active window of brain development." Habeas Exhibit D (Dr. Somerville Rep.) p. 2. This "has significant consequences for psychological development, namely how individuals think, feel, and make decisions." *Id.* at 3. In fact, individuals over 18, including 21-year-olds and even up to age 23, are "'just as vulnerable to the effects on behavior (especially behavioral control) of the lack of

maturation of these brain structures and functions as are 17-year-olds.'" *Id.* at 3 (citing Gur RC. (2021). Development of brain behavior integration systems related to criminal culpability from childhood to young adulthood: Does it stop at 18 years?. Journal of Pediatric Neuropsychology, 7(1), 55-65.)).

Individuals in this age-range, such as 21-year-old Mr. Galindo, are more likely to engage in risk-taking behavior than older adults, due to the brain's elevated levels of "sensation-seeking." Habeas Exhibit D (Dr. Somerville Rep.) Furthermore, executive functioning skills—"cognitive skills that form the basis of our actions and decisions"—continue to develop into the mid-twenties, past the age of 21. *Id.* at 4. This includes working memory, which is related to decision-making and criminal behavior, including the "ability to consider the implications of one's actions along present and future timelines." *Id.* at 5. Executive functioning also includes impulse control, defined as the ability to consider the consequences of one's behavior before acting." *Id.* In addition, individuals up to age 22 are more susceptible to making poor decisions and responding adversely in emotionally charged situations, due to the manner in which the brain's ability to process information is disrupted and slowed by emotional responses. *Id.* at 6. They also lack psychosocial maturity to maintain restraint, which continues to increase throughout the twenties. *Id.* at 7. Brain development and cognitive processes are further impacted by the use of substances during youth, as in Mr. Galindo's case. *Id.* at 7-8.

Based on the scientific data regarding brain development of youths over age 18, including 21-year-olds, as well as the growing legal consensus surrounding the

impropriety in imposing the most severe punishment on young adults, Mr.

Galindo's death sentence for a crime he committed at age 21 violates the Eighth

Amendment's prohibition on cruel and unusual punishment. This is all the more

pronounced in light of his specific characteristics which further demonstrate the

unconstitutionality of his death sentence, including his intellectual disability. *See*

Habeas Claim 5.

This claim was raised below but the Nebraska Supreme Court failed to

address or reach the claim. This court reviews the claim *de novo. See* 28 U.S.C. §

2254(d)(1) and (2).  This Court should resentence Mr. Galindo to life without parole.

**Claim 34: Mr. Galindo was deprived of his rights under Article 1, Section 10, of the United States Constitution because L.B. 1 and the Repeal by Referendum of L.B. 268 are Bills of Attainder.**

A bill of attainder is a legislative act which inflicts punishment without a

judicial trial." *Cummings v. Missouri*, 71 U.S. 277, 323 (1866).  The Supreme Court

uses a three-factor test to identify a Bill of Attainder: a "legislative ac[t], . . . that (1)

appl[ies] either to named individuals or to easily ascertainable members of a group

in such a way as to (2) inflict punishment on them (3) without a judicial trial . . . ."

*United States v. Lovett*, 328 U.S. 303, 315 (1946). The State court's failure to find

L.B. 1 and Referendum 426, repealing L.B. 268, are Bills of Attainder is contrary to

and/or an unreasonable application of clearly established Supreme Court law and/or

an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

A.  L.B. 1 is a Bill of Attainder.

327

L.B. 1 is a Bill of Attainder because it was enacted specifically and expressly in response to the September 26, 2002, bank killings, targeted those involved in the crime, increased the punishment to which Mr. Galindo was subjected, and deprived Mr. Galindo of a defense that he had at the time of the crime. Mr. Galindo satisfies the three factors outlined by the Supreme Court in *Lovett* and, thus, the State of Nebraska acted contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

1. "Easily Ascertainable Members of a Group"

First, L.B. 1 was enacted specifically to target and punish a small and "easily ascertainable" group—Mr. Galindo and his co-defendants. Bills of attainders are not required to name the specific people they target and may affect a group of people. Even laws implicating prospective groups still target specific individuals when the bill levies a unique punishment to them. *U.S. v. Brown*, 381 U.S. 437, 462 (1965); *Crain v. City of Mountain Home*, Ark., 611 F.2d 726 (8th Cir. 1979). In *Crain* and *Brown*, the courts struck as bills of attainder laws that significantly lowered the salary of the city attorney and banned members of the Communist party from holding labor union positions, respectively. Even though the law at issue in *Brown* "inflict[ed] its deprivation upon more than three people," the Court still held it to be a bill of attainder because it specified (without naming) "the people upon whom the sanction it prescribes is to be levied." 381 U.S. at 461. And even though in *Crain* one of the laws at issue was "facially constitutional" and would have affected all future

328

city attorneys—a potentially infinite class—the court still held it to be a bill of attainder because its target and impetus was to punish one particular city attorney. *Id.* Similarly, while L.B. 1 affects all future capitally charged defendants, it specifically targeted Mr. Galindo and the nine other men currently on death row as evidenced by the media surrounding its passage.

After *Ring* invalidated Nebraska's capital sentencing scheme months before the U.S. bank shootings, the Governor and legislature knew that they needed to review the legislation in order to impose the death penalty in the future. *See* Leslie Reed, *Death Penalty Issues Remain: Support Is Still Strong For Capital Punishment Concerns Over Fairness*, OMAHA WORLD-HERALD, Nov. 17, 2002, at B1 ("Gov. Mike Johanns and State Sen. Ernie Chambers, despite their opposite stands on capital punishment, seem to agree on one thing in the special legislative session: Nebraska's death-penalty law, as it now stands, is unconstitutional."). Yet the legislature specifically decided not to address the issue in the special legislative session immediately following the *Ring* decision. Leslie Reed, *Johanns: Budget Is Sole Focus Of Session: He Rejects Suggestions That The Legislature Also Address The Death Penalty And Gambling*, OMAHA WORLD-HERALD, July 18, 2002, at B1.("Johanns said he spoke Wednesday with Judiciary Committee Chairman Kermit Brashear of Omaha, who agreed with Johanns' decision not to take up the death penalty until after the Nebraska Supreme Court rules on a pending request for clarification from the Nebraska Attorney General's Office."). It was not until March 28, 2003, that the Nebraska Supreme Court issued its first ruling discussing

the impact of *Ring* on Nebraska's capital sentencing statutes. *See State v. Gales*, 265 Neb. 598, 600 (2003). But after the U.S. Bank shootings, on September 26, 2002, the legislature took immediate action to call a special session and ensure that Mr. Galindo and his co-defendants could be sentenced to death.

It is obvious the legislation was enacted in response to the U.S. Bank killings, with the legislative debate specifically centered around imposing the death penalty on those involved. *See* Robynn Tysver, *Applying Execution Bill Is Next: It Will Be Up To Judges To Decide If The New Law Affects Pending Cases*, OMAHA WORLD-HERALD, Nov. 24, 2002, at B1 ("The new law passed Friday . . . was written with the hope that it can be applied to pending murder cases, including the four defendants charged in the Norfolk bank slayings. . . . Gov. Mike Johanns called the special session shortly after the Sept. 26 bank robbery attempt in Norfolk in which five people were killed."); Carlson, Brian G., *Lethal Injection Review Is Expected: All Sides Agree That Changes To The State's Sentencing Rules Will Be Challenged In Court*, LINCOLN JOURNAL STAR, Nov. 24, 2002, at A1 ("Among the legal issues Chambers raised during the two full days of floor debate on LB1: The law is written to apply retroactively—for example, to the four men charged with killing five people in a Norfolk bank on Sept. 26. . . . After the Ring ruling in June, Johanns said a special session on the death penalty was unnecessary. . . . But Johanns changed his mind and called for the special session two weeks after the Sept. 26 Norfolk murders . . . .").

    2.  Inflicts Punishment

L.B. 1 certainly inflicts punishment, as it retroactively exposed Mr. Galindo to the heightened penalty of death. Some types of harm are "punitive per se," and "the classic example is death." *Consol. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 351 (2d. Cir 2002). *See Nixon v. Adm'r of General Servs.*, 433 U.S. 425, 473 (1977); *ACORN v. US.*, 618 F.3d 125, 136 (2d Cir. 2010) ("The Supreme Court has recognized that certain types of punishment are 'so disproportionately severe and so inappropriate to nonpunitive ends that they unquestionably have been held to fall within the proscription of the [Bill of Attainder Clause].'"). Here, L.B. 1 allowed for the death penalty to be retroactively imposed. Thus L.B. 1 literally made the difference between life and death, as Mr. Galindo could only have been sentenced to life imprisonment under the statute in place at the time of the crime. Such a punishment clearly falls within the per se category of legislation that inflicts punishment and meets the second prong of the bill of attainder analysis.

3.  Lacks a Judicial Trial

The constitutional prohibition against bill of attainder was intended to serve as a "general safeguard against the legislative exercise of a judicial function." *United States v. Brown*, 381 U.S. 437, 442 (1965). Here, L.B. 1 was enacted specifically to increase maximum punishment that could be constitutionally imposed on Mr. Galindo from life imprisonment to death, and the legislation included the provision for retroactivity in order to increase the punishment specifically facing Mr. Galindo and his co-defendants. L.B. 1 allowed the legislature to expose Mr. Galindo to the death penalty when the courts were unable to do so,

while simultaneously stripping Mr. Galindo of the judicial protections he would have had at the time of the crime. This certainly constitutes "legislative exercise of judicial function," *Brown*, 381 U.S. at 442, without the "protections of a judicial trial." *Nixon*, 433 U.S. at 468. Therefore, as applied to Mr. Galindo, L.B. 1 is a bill of attainder in violation of the United States Constitution.

B.   The Repeal of L.B. 268 is a Bill of Attainder

The repeal by referendum of L.B. 268—via Referendum 426—is an unconstitutional bill of attainder targeting Mr. Galindo, among others, for execution. L.B. 268 had overturned the death penalty in Nebraska and resentenced the ten men on death row to life without parole. Its repeal by referendum targeted those ten men on death row and sentenced them anew to death through a legislative act rather than through judicial process. Mr. Galindo satisfies the three factors outlined by the Supreme Court in *Lovett* and, thus, the State of Nebraska acted contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

1.   "Easily Ascertainable Members of a Group"

Here, the question on the Nebraska ballot was not just whether the death penalty repeal should be allowed in the future but whether Mr. Galindo may be sentenced to death once more and executed. The original legislative bill specifically addressed the fate of the men already on death row, stating: "In any criminal proceeding in which the death penalty has been imposed but not carried out prior to

the effective date of this act, such penalty shall be changed to life imprisonment without possibility of parole." L.B. 268 § 23. The public campaign in support of the referendum, led by Nebraskans for the Death Penalty, left no question that the purpose of the referendum was to ensure that Mr. Galindo and the other death-row prisoners would be executed. *See* Vincent Pena, *Nebraska Voters Reinstate the Death Penalty in Landslide Vote*, Associated Press News (Nov. 9, 2016, 1:18 AM), https://apnews.com/article/nebraska-7f5e5b0db24246a893677726a6dfc415 ("Not long thereafter [LB286 was repealed and Governor Ricketts' veto was overridden], a pro-death penalty group called the Nebraskans for the Death Penalty and Ricketts launched a petition to put the issue on the ballot . . . ."). He was mentioned by name on television ads, websites, and in public debates. The campaign's focus on the individuals on death row—and the public's reaction to this campaign—made it clear that a vote for the referendum would impose a death sentence on Mr. Galindo.

Of course, bills of attainders are not required to name the specific people they target and may affect a larger group than just a single person. *Cummings v. Mo.*, 71 U.S. 277, 287 (1867). Courts have repeatedly held that even laws implicating prospective groups still target specific individuals when the bill levies a unique punishment to them. *See Brown*, 381 U.S. at 462; *Crain* 611 F.2d at 726. Furthermore, a statutory amendment sufficiently "specifies" an individual within the meaning of the Bill of Attainder clause if the "identity of the individual or class was easily ascertainable when the legislation was passed." *Palmer v. Clarke*, 293 F. Supp. 2d 1011, 1035 (D. Neb., 2003) (quoting *Brown*, 381 U.S. at 448–49). In

*Palmer*, the court found that, "although the statute does not single out Palmer by name," his identify could be easily ascertained when the statute was amended. F. Supp. 2d at 1035. Palmer introduced evidence from the legislative floor debate surrounding the statute's passage, evidence that the bill's introduction was precipitated by reversals in *Palmer I* and *Palmer II*, and legislative testimony by the prosecutor in support of the amendment. *Id.*

Similarly, it is indisputable that the campaign surrounding the repeal of L.B. 268 targeted Mr. Galindo and the nine other men on death row—an easily ascertainable group of individuals.

2.   Inflicts Punishment

The death penalty is the paradigmatic historic legislative punishment. "The classic example [of attainder] is death." *ACORN*, 662 F. Supp. 2d at 291. The repeal of L.B. 268 by referendum sentenced Mr. Galindo to death. He could not and would not have been executed without its passing.

The classic sources for considering whether there was a legislative intent to punish include "legislative history, the context or timing of the legislation, or specific aspects of the text or structure of the disputed legislation." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 478 (1977). The legislative history of and discussion surrounding the referendum reveals that resentencing the ten men to death was not a mere side effect of the legislation but its intent and the source of much of its support. But for the passing of the referendum Mr. Galindo would not face the ultimate punishment the State can inflict.

334

3.  Lacks a Judicial Trial

In the referendum, Mr. Galindo and the men on Nebraska's death row faced a de facto sentencing trial by legislature. Although he had once received a jury trial that included a penalty phase the passage of L.B. 268 changed his death sentence to one of life imprisonment. The referendum effectively re-litigated the question of whether Mr. Galindo should receive the death penalty or life in prison. If the referendum had been rejected, his sentence of life without parole would have been confirmed. If it passed, as it did, he would again be sentenced to death. Whether Mr. Galindo could be executed thus hinged on the results of the referendum vote, not on the verdict of a jury.

In *Brown*, the Supreme Court described the dangers of allowing the legislature to replace juries:

> Everyone must concede that a legislative body, from its numbers and organization, and from the very intimate dependence of its members upon the people, which renders them liable to be peculiarly susceptible to popular clamor, is not properly constituted to try with coolness, caution, and impartiality a criminal charge, especially in those cases in which the popular feeling is strongly excited,—the very class of cases most likely to be prosecuted by this mode.

*Brown*, 381 U.S. at 445 (internal quotation marks and citation omitted).

The referendum placed into the hands of the electorate that which is reserved specifically to juries, lacking the constitutional safeguards and "particularized consideration" that accompany the penalty phase of a trial. This is exactly the kind of legislation the framers were protecting against when they instituted bans on bills of attainder, and it cannot stand. The writ must issue.

335

**Claim 35: Mr. Galindo's Ex Post Facto and Due Process rights were violated when the State of Nebraska sentenced him to death even though the death penalty statute was declared unconstitutional at the time of the offense.**

The United States Constitution forbids a state from enacting an Ex Post Facto Law. *See* U.S. Const. Art. 1, § 10. The Supreme Court recognizes Ex Post Facto Laws to include any "law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, *when committed.*" *Stogner v. California*, 539 U.S. 607, 612 (2003) (emphasis added) (citations omitted). Nebraska did not have a constitutional capital sentencing scheme until nearly two months **after** Mr. Galindo was arrested for the offense, yet the State sentenced him to death (DA Brief 28). Therefore, the Nebraska Supreme Court's failure to find L.B. 1 constitutes an Ex Post Facto Law is contrary to and/or an unreasonable application of clearly established United States Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

On June 24, 2002, *Ring v. Arizona*, 536 U.S. 584 (2002), established the Sixth Amendment entitles "[c]apital defendants . . . to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. In effect, Arizona's capital sentencing scheme, requiring a judge to find the aggravating circumstances necessary to impose the death penalty, was declared unconstitutional. *Id.* at 584–85. In accordance with the Sixth Amendment, the jury is required to determine the existence (or not) of aggravating factors in a capital sentencing scheme. *Id.* Alongside Arizona, Nebraska's capital sentencing scheme, which similarly left "capital sentencing factfinding and the ultimate sentencing decision entirely to judges," was declared unconstitutional. *Id.* at 620

336

(O'Connor, J., joined by Rehnquist, C.J., dissenting) ("The Court effectively declares five States' [Colorado, Idaho, Montana, Nebraska, and Arizona] capital sentencing schemes unconstitutional.") (citations omitted).

On September 26, 2002, Mr. Galindo was arrested for the U.S. bank killings that occurred in Norfolk, Nebraska that same day. As of September 26, 2002, the Nebraska Legislature had failed to respond to *Ring*'s invalidation of the capital sentencing scheme and, thus, Nebraska did not have a constitutional capital sentencing scheme at the time of Mr. Galindo's offense. While *Ring* did not invalidate the death penalty as a maximum sentence for murder, the Supreme Court affirmatively required that a jury must find the "aggravating circumstance[s] necessary for imposition of the death penalty." *Ring*, 536 U.S. at 609. Without a constitutional capital sentencing scheme implemented, it was impossible to receive the death penalty for first degree murder in Nebraska—life in prison was the maximum punishment for first degree murder on September 26, 2002.

On November 22, 2022, nearly two months after Mr. Galindo's crime and five months after *Ring*, L.B. 1 was enacted. The Nebraska Supreme Court acknowledged that, "[b]ecause our statutory scheme, like Arizona's, committed to the judge or three-judge panel the determination of aggravating circumstances necessary to impose the death penalty, the Nebraska Legislature passed L.B. 1 to provide the right to a jury's finding of aggravating circumstances in a separate 'aggravation hearing.'" *State v. Galindo*, 278 Neb. 599, 615 (2009). Mr. Galindo was sentenced to death under L.B. 1.

Mr. Galindo raised this claim on direct appeal to the Nebraska Supreme Court. The court erroneously rejected Mr. Galindo's argument, concluding that L.B. 1 is "procedural in nature" and thus not an Ex Post Facto Law. *State v. Galindo*, 278 Neb. 599, 614–20. The U.S. Supreme Court recognizes "a procedural change may constitute an ex post facto violation if it affect[s] matters of substance by depriving a defendant of substantial protections with which the existing law surrounds the person accused of the crime or arbitrarily infringing upon substantial personal rights." *Collins v. Youngblood*, 497 U.S. 37, 45 (1990) (cleaned up). Therefore, even if L.B. 1 implemented a procedural change, its application to Mr. Galindo's case perpetrates substantive effects—Mr. Galindo was arbitrarily sentenced to death via a scheme that did not exist at the time of the crime.[30] *See Beazell v. Ohio*, 269 U.S. 167 (1925); *Calder v. Bull*, 3 U.S. 386 (1798).

L.B. 1 changed the punitive measure of the crime as well as revised the process and type of evidence heard during the sentencing phase. "The Constitution forbids the application of any new punitive *measure* to a crime already consummated, to the detriment or material disadvantage of the wrongdoer.'" *Lindsey v. Washington,* 301 U.S. 397, 401 (1937) (emphasis added) (citing *Kring,* 107 U.S. at 228-229; *In re Medley,* 134 U.S. 160, 171 (1890); *see also Calder,* 3 U.S.

---

[30] In *Collins*, the Court overruled *Kring v. Missouri*, 107 U.S. 221 (1883), which previously found a procedural change to violate Ex Post Facto. *Collins*, 497 U.S. at 47. But Galindo is distinguishable from *Kring v. Missouri*. At the time of Kring's offense, he could be tried and convicted of first-degree murder—it was a constitutionally-permissible punishment. *Id*. It was only by accepting a plea agreement, which was later vacated, that Kring was instead sentenced to second degree murder. *Id*. Whereas at the time of Galindo's offense, he could not be sentenced to death because there was no constitutionally permissible sentencing scheme.

338

at 390 ("Every law that... receives less, or different, testimony, than the law required at the time of the commission of the offense" is an ex post facto law).

If Mr. Galindo was sentenced between June 24, 2002, and November 22, 2002, he could not have received the death penalty. If Mr. Galindo immediately pled guilty to the offense and was sentenced before L.B. 1 was enacted, he could not have received the death penalty.

Additionally, under L.B. 1, courts receive different testimony to different actors than the law required at the time of the commission of the offense and apply a different punitive measure than was in place at the time of the offense. Furthermore, it is impossible to disentangle procedure with substance as the procedure dictates how aggravators—the elements necessary to sentence someone to death—are determined.

At the time of the bank shootings, Mr. Galindo was not on notice that he may be subject to the death penalty because there was no constitutionally viable method of imposing a death sentence in Nebraska. The courts have long "recognized that central to the ex post facto prohibition is a concern for 'the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated.'" *Miller v. Florida,* 482 U.S. 423, 430 (1987) (quoting *Weaver v. Graham,* 450 U.S. 24, 30 (1981)). In *Rogers v. Tennessee,* the Court noted that the Petitioner was "undoubtedly correct" in observing that "the Due Process and Ex Post Facto Clauses safeguard common interests-in particular, the interests in fundamental fairness (through notice and

fair warning) and the prevention of the arbitrary and vindictive use of the laws."
532 U.S. 451, 460 (2001).

Mr. Galindo had no notice or fair warning that he could be sentenced to death – there was no applicable statute on the books nor effort to pass a compliant one. To the contrary, there was notice of the most public kind, namely, throughout the local media, (a) that the Nebraska death penalty statute was unconstitutional, (b) that there was concern among prosecutors and law makers that the courts could no longer impose the death penalty, and (c) that despite the concern there was no legislative movement.

For all of these reasons, Mr. Galindo was on clear and express notice that there was no viable capital sentencing scheme in place in Nebraska on September 26, 2002, and thus no death penalty in Nebraska at the time the offense occurred. To impose this increased penalty on Mr. Galindo after the fact violates the Due Process Clause and Ex Post Facto Clause. L.B. 1 increased the punishment to which Mr. Galindo was exposed from life imprisonment to death, deprived Mr. Galindo of the constitutional defenses available to him at the time of the crime under *Ring,* and deprived him of fair warning and notice of his exposure to the death penalty in violation of the Due Process Clause of the United States Constitutions. The Due Process Clause safeguards "the fundamental elements of fairness in a criminal trial." *Spencer v. Texas,* 385 U.S. 554, 563-564 (1967).

The Nebraska Supreme Court erroneously relied on *Dobbert v. Florida*, 432 U.S. 282 (1977), to reject Mr. Galindo's argument that *Ring* retroactively

invalidated the state's capital sentencing scheme. *Galindo*, 278 Neb. at 617. Yet *Dobbert* is not applicable to Mr. Galindo's case because it is fundamentally different. In *Dobbert*, the defendant was sentenced under a capital sentencing statute that was constitutional at the time of the offense. 432 U.S. at 293–94. It was only after Dobbert's offense that *Furman v. Georgia*, 408 U.S. 238 (1972), struck down the Florida death penalty statute. Whereas at the time of Mr. Galindo's offense, the capital sentencing scheme was already declared unconstitutional. Without a constitutional death penalty statute in effect at the time of Mr. Galindo's crime, Mr. Galindo could not be sentenced to death.

The subsequent enactment of L.B. 1 did not change that fact. The legislative history for L.B. 1 shows that the legislature was called into an extraordinary session to enact laws to be retroactively applied against Mr. Galindo. The fact that L.B. 1 was enacted so that Mr. Galindo could receive the death penalty for a crime that had already been committed represents the epitome of unfair prosecution the Ex Post Facto Clause was included in the constitution to prevent. And while the Nebraska Supreme Court dismissed the timing differences between *Dobbert* and Mr. Galindo's cases, the timing is the crux of Mr. Galindo's Ex Post Facto Claim—it is indisputable that Mr. Galindo could not receive the death penalty at the time the offense was *"committed." See Stoner* 539 U.S. at 612 (emphasis added). The Nebraska Supreme Court's application of *Dobbert* to the facts of this case was an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

**Claim 36: Mr. Galindo's Sixth, Eighth, and Fourteenth Amendment rights were violated by the State of Nebraska when the district court did not receive and review sentencing orders from all Nebraska first degree murder cases for purposes of proportionality review.**

It is well settled law that, while the Eighth Amendment does not require a court to engage in a proportionality review (*Pulley v. Harris*, 465 U.S. 37 (1984)), where a state creates a right to proportionality review, the due process clause entitles the Defendant to "procedures that ensure that the right is not arbitrarily denied." *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) *citing Wolff v. McDonnell*, 418 U.S. 538, 557 (1974). *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) ("Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion*, cf. Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State."). What the Constitution does not allow is the application of confirmation bias in the proportionality review. Therefore, the Nebraska Supreme Court's failure to grant Mr. Galindo relief is contrary to or an unreasonable application of well-established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The plain language of Nebraska's sentencing statutes requires that the sentencing panel consider evidence related to the question whether a death

sentence in a particular case is "excessive or disproportionate to the penalty imposed in similar cases." R.R.S. Neb. § 29-2522(3). This creates a liberty interest in persons convicted of first-degree murder, forbidding a person to receive a death sentence before a sentencing panel compares the facts of the defendant's case with the facts and the penalties imposed in similar cases. The abrogation of such a liberty interest violates a defendant's right to due process and results in an arbitrarily imposed death-sentencing scheme.

Contrary to the plain language of the statute, the Nebraska Supreme Court erroneously interpreted Section 29-2522(3) to require the sentencing panel to limit its proportionality review only to other cases in which the death penalty has been imposed. *Galindo*, 278 Neb. at 672. The logical infirmity of this interpretation can be found in the Nebraska Supreme Court's own case law: "We have . . . repeatedly held that proportionality review under § 29-2521.03 looks only to other cases in which the death penalty has been imposed." *State v. Bjorklund*, 258 Neb. 432, 483 (2000) (citations omitted). Considering only those cases in which death has been imposed is an after the fact consideration: having first determined that the death penalty is the appropriate sentence, the sentencing panel looks to other cases in which the death penalty has been imposed to reach the tautological conclusion that the death penalty is not disproportionate to the death penalty. *See Stale v. Loiter*, 255 Neb. 456, 527 (1998) (Connolly, J., concurring) ("The obvious fallacy in this reasoning is that a death sentence cannot be 'greater than' or 'disproportionate to' another death sentence.").

Judicial deconstruction of a Legislative requirement is faulty. Indeed, Section 29-2522(3) demands more. It demands that the sentencing panel look at similar cases prior to deciding what penalty should be imposed and then subsequently determine whether imposing the death penalty would be excessive or disproportionate based on a comparative analysis.

The trial court's refusal to consider Mr. Galindo's proffered evidence of sentences imposed in similar cases is contrary to *Lockett v. Ohio*, 438 U.S. 586 (1978), and its progeny. First in *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976), a plurality of justices held that the Eighth Amendment "requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Two years later, *Lockett* held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest capital case, not be precluded from considering, as a mitigating factor . . . any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original). The Court went on to state that, "a statute that prevents the sentencer in all capital cases from giving independent mitigating weight to . . . circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Id.* at 605. The Nebraska Legislature has already recognized that the sentences imposed in similar cases are "factors which may call for a less severe penalty." *See* R.R.S. Neb. § 29-2522(3). The

344

Nebraska Supreme Court has also recognized the constitutional import of *Lockett* and has held that, "we now hold that the trial court shall, in addition to considering the aggravating and mitigating circumstances set forth in section 29-2523. R.R.S. 1943, likewise consider any matter relevant to the imposition of the sentence." *State v. Holtan*, 205 Neb. 314, 318 (1980).

When the State provides for a proportionality review, as Nebraska does, the defendant is entitled to put into evidence cases which he proffers as a basis for a sentence less than death. This is further supported by the consistent liberalization of mitigating evidence which may be proffered. *See Lockett*, 438 U.S. at 604. The State of Nebraska denied Mr. Galindo the right to compare his case to other death-imposed cases. Without the benefit of a comparison to other first degree murder cases in which a life sentence was imposed, Mr. Galindo was deprived of the opportunity to proffer evidence as a basis for a sentence less than death.

Therefore, the Nebraska Supreme Court's failure to grant Mr. Galindo relief is contrary to or an unreasonable application of well-established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1). The Court should grant the writ, vacate the death sentences and remand for a new sentencing proceeding.

**Claim 37: The Nebraska Death Penalty Statute is unconstitutional on its face and as applied in Mr. Galindo's case in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution.**

For the following reasons, the Nebraska Death Penalty statute is unconstitutional on its face and as applied in Mr. Galindo's case.

*The Imposition of the Death Penalty Against Defendant is Excessive and Disproportionate.*

Mr. Galindo was twenty-one years old and a habitual user of methamphetamine at the time of the offense. He had never been convicted of any offense involving the use or threat of violence toward another person. The evidence demonstrates that Mr. Galindo was immature and suffered from cognitive impairments that made him more susceptible to the influence of others.

Jose Sandoval, described as dangerous and evil by numerous witnesses, including educators, law-enforcement agents, and peers, organized and led the four participants of the robbery. The evidence is reasonably clear that, once Mr. Galindo had expressed to Sandoval some willingness to participate in a bank robbery, there was no way out. Mr. Galindo knew that Travis Lundell had been killed in preparation for the robbery, and that co-defendant Erik Vela had been beat nearly to death for mentioning the plan to others. When Vela expressed hesitance the morning of the robbery, Sandoval made a gesture with his gun.

This case involves a tragic bank robbery gone bad. As communicated between the codefendants prior to the robbery, the plan did not include intent to harm or kill anyone present. Mr. Galindo reacted instantaneously to the unanticipated shots fired by the group's leader, Sandoval. Mr. Galindo caused the death of Ms. Lola Elwood without meaningful reflection or premeditation. There is no evidence the murder was especially heinous, atrocious, cruel or manifested exceptional depravity.

Immediately, upon arrest, Mr. Galindo cooperated with law-enforcement by almost immediately providing details regarding the homicides, including the identity of an accomplice, Gabriel Rodriguez, and by assisting law-enforcement with locating firearms used during the robbery and subsequently discarded along a highway. Mr. Galindo's cooperation resulted in him receiving death threats while incarcerated. Despite these threats and the concern for his personal safety, he subsequently assisted law-enforcement with discovering the body of Travis Lundell and testified against Rodriguez at trial.

While awaiting trial, Mr. Galindo demonstrated to his parents, visitors, and other inmates his profound remorse for his participation in the robbery, visibly shaking and crying while expressing his regret. Under the circumstances of this case, the sentence imposed is grossly disproportionate to his actions during the offense. Mr. Galindo cannot be found one of the "worst of the worst" homicide offenders.

The sentences of death should therefore be vacated as arbitrary and disproportionately severe in violation of Mr. Galindo's protection against cruel and unusual punishment as afforded and guaranteed by Sixth, Eighth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).  This Court should grant the writ, and vacate the death sentence with directions to impose life.

347

*The Removal of The Jury from the Death Penalty Decision Deprives Mr. Galindo of His Constitutional Right To A Jury and Offends Contemporary Standards.*

Mr. Galindo was sentenced to die under a procedure in which a three-judge panel, rather than a jury, made the critical findings of fact necessary to impose a death sentence. Because a death sentence *cannot* be imposed without these additional judicial findings of fact, Nebraska's capital sentencing scheme violates the fundamental Sixth Amendment requirement that "a jury, not a judge, [] find each fact necessary to impose a sentence of death." *Hurst v. Florida*, 577 U.S. 92, 94 (2016). Nebraska's sentencing scheme also violates the due process requirement that any element of a crime, or fact necessary to a death sentence, must be found by a jury beyond a reasonable doubt. *Id.* at 97. As Nebraska is the only active death penalty jurisdiction that permits judges to make the ultimate life or death determination, Nebraska's capital sentencing scheme also violates the Eighth Amendment's evolving standards of decency.

This is a historical anomaly from the common law upon which our Nation was founded. Nebraska is an outlier under contemporary and historical standards.

The Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." *Hurst,* at 94*; Rauf v. State,* 145 A.3d 430, 435 (Del. 2016). In *Hurst*, the Court invalidated Florida's capital sentencing scheme, which preconditioned a death sentence on the trial court alone finding "the facts . . . [t]hat sufficient aggravating circumstances exist" and "[t]hat there are insufficient mitigating circumstances to outweigh the aggravating circumstances."

348

*Hurst*, at 100 (quoting Fla. Stat. §775.082(1)). The Court rejected the State of Florida's argument that the Sixth Amendment is satisfied where the jury implicitly finds an aggravating circumstance, noting that the Florida statute "does not make a defendant eligible for death until "findings *by the court* that such person shall be punished by death."' *Id. Hurst* thus clarified that the weighing of facts in aggravation and mitigation is a factual determination that must be made by a jury.

Following *Hurst,* the Delaware Supreme Court also struck down that state's death penalty statute under the Sixth Amendment—a statute essentially indistinguishable from Nebraska's. *Rauf*, 145 A.3d 430 (per curiam). Like the now-invalidated capital sentencing schemes in Florida and Delaware, Nebraska's capital sentencing statute preconditions a death sentence on a three-judge panel making critical findings of fact.

Under Nebraska law, the maximum sentence that a capital defendant can receive based on the jury's verdict alone is life imprisonment. Even where a jury finds one or more aggravating circumstances, a death sentence cannot be imposed unless a three-judge panel makes death-appropriate findings regarding: "(1) Whether the aggravating circumstances as determined to exist justify imposition of a sentence of death; (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Neb. Rev. St. § 29-2522. In contrast to the sentencing procedures followed in non-capital cases,

349

the statute also requires the sentencing panel to make written findings reflecting these factual determinations. Neb. Rev. Stat. § 29-2522.

The unconstitutionality of Nebraska's capital sentencing scheme is illustrated clearly by Mr. Galindo's case.  Here, two of the three judges on the sentencing panel did not hear the evidence presented to the jury in aggravation. Accordingly, to enable the panel to make factual findings regarding whether the aggravating circumstances justify a death sentence or are outweighed by mitigating factors, the State presented and the sentencing panel considered, transcripts of the testimony and exhibits introduced to the jury in aggravation. The panel relied upon this evidence to re-find, redefine, and re-weigh the aggravating circumstances necessary to impose death, as well as to weigh the aggravating factors against the mitigating factors. *See* Sentencing Order.

The Sentencing Order also includes a number of additional findings relied upon to determine a sentence of death should be imposed. These include findings based upon the testimony of Dr. Jerry Jones that all five victims "died agonizing deaths," as well as findings related to whether Mr. Galindo attempted to shoot Micki Koepke. Sentencing Order pp. 3-4.  The sentencing panel thus punished Mr. Galindo on the basis of matters not found by the jury.  Thus, Nebraska's capital sentencing scheme is unconstitutional under the Sixth, Eighth, and Fourteenth Amendments based on *Hurst*, and it is therefore void. The death sentences imposed herein must be vacated.

It is well-established that the Eighth Amendment draws its meaning from "'the evolving standards of decency that mark the progress of a maturing society.'" *Woodson, supra*, 428 U.S. at 301 (*quoting Trop v. Dulles*, 356 U.S. 86, 101 (1958)). The Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 183 (1976), articulated two benchmarks for gauging whether a punishment practice has fallen outside these evolving standards: (1) "objective ind[ices] of contemporary values," as evidenced by death penalty legislation and jury verdicts, and (2) whether or not the death penalty "comports with the basic concept of human dignity at the core of the Amendment.'" 428 U.S. at 180-181.

According to this standard, § 29-2521(1)(a) and (3) violates the Eighth and Fourteenth Amendments. Nebraska is the only active death penalty jurisdiction in the nation that places the death sentencing determination exclusively in the hands of judges. In the rest of the country, the states and federal government demonstrate a near uniform rejection of this practice. Because requiring a jury to determine whether a defendant deserves the ultimate punishment produces more reliable results that are reflective of the community's judgment, the vast majority of death penalty jurisdictions require a jury to determine whether to impose a death sentence. Nebraska is a clear outlier.

Applying the Supreme Court's two-part analysis to Nebraska's capital sentencing procedure, it is clear that Nebraska's sentencing procedure is out of step with contemporary standards of decency. There is now a strong national consensus against judge-imposed death sentences (49-1), reflecting recognition that jury

sentencing determinations are necessary to meet the heightened reliability requirements the Eighth Amendment demands. In almost every jurisdiction that does authorize capital punishment, a death sentence may only be imposed if a jury determines the sentence is warranted. While Montana has a statutory scheme similar to Nebraska's, in which a judge exclusively determines whether a death sentence should be imposed, *see* Mont. Code Ann. 46-1-401, 46-18-301 (2001), no defendant has been sentenced to death there in over 20 years.[31] Therefore, although it has statutory authorization for the death penalty, Montana is functionally abolitionist because it never utilizes the penalty. *Cf. Hall v. Florida*, 572 U.S. 701, 716 (2014) (counting Oregon as abolitionist because it has suspended the death penalty and executed only two individuals in fifty years).

This consensus is consistent with a clear abandonment of judicially-imposed death sentences in virtually all jurisdiction except Nebraska. Since the last time the Supreme Court visited the question of whether judge-only capital sentencing violated the Eighth Amendment, in *Spaziano v. Florida*, 468 U.S. 447 (1984), overruled in part by *Hurst*, eight of the nine states that had capital sentencing schemes in which judges alone made the factual findings necessary to impose a death sentence—Alabama, Arizona, Colorado, Delaware, Florida, Idaho, Indiana, and Montana—have abandoned this practice, while Nebraska remains the sole outlier. Arizona, Colorado and Idaho amended their statutes after *Ring v. Arizona*

---

[31] See DPIC, Death Sentences in the United States From 1977 By State and By Year, https://deathpenaltyinfo.org/death-sentences-united states-1977-present (showing no death sentences imposed in Montana since 1996).

to require jury sentencing on all findings necessary to impose the death penalty. Florida, Alabama, and Indiana abolished judicial override procedures that permitted a judge to override a jury's life verdict. Indiana modified its statute in 2002 after *Ring*, and Florida and Alabama did so in 2017 following *Hurst*. Delaware struck down its judge-only capital sentencing scheme after *Hurst*, in *Rauf*, *supra*, 145 A.3d 430, and then invalidated all remaining death sentences in *Powell v. Delaware*, supra,153 A.3d 69. This leaves Nebraska alone as the only active death penalty jurisdiction that places the death sentencing determination exclusively in the hands of judges.

That only one active death penalty jurisdiction permits a death sentence to be imposed by a judge, rather than a jury, and that there is a noticeable trend away from judicial death sentencing, weighs heavily against its constitutionality. The scarcity of state laws permitting capital sentencing without a jury penalty verdict is "strong evidence of consensus that our society does not regard this [procedure] as proper or humane." *Hall*, 572 U.S. at 718.

In addition, death sentences imposed by judges fail to reflect the community consensus and are not sufficiently reliable to comply with the Eighth Amendment. "[C]apital punishment is an expression of society's moral outrage at particularly offensive conduct," Gregg, 428 U.S. at 183, and a sentence of death thus "expresses the community's judgment that no lesser sanction will provide an adequate response to the defendant's outrageous affront to humanity." *Harris v. Alabama*, 513 U.S. 504, 518 (1995) (Stevens, J., dissenting) (citing *Gregg*, supra, 428 U.S. at

184). For this reason, jurors "possess an important comparative advantage over judges . . . [because] they are more likely to express the 'conscience of the community' on the ultimate question of life or death." *Ring*, *supra*, 536 U.S. at 615-16 (Breyer, J., concurring in the judgment) (citation omitted); *see also Woodward v. Alabama*, 134 S.Ct. 405, 409 (2013) (Sotomayor, J., dissenting from denial of certiorari) (noting that "[b]y permitting a single trial judge's view to displace that of a jury representing a cross-section of the community, Alabama's sentencing scheme has led to curious and potentially arbitrary outcomes").

The severity and irrevocability of a death sentence "argues strongly for procedures that will help assure that, in a particular case, the community indeed believes application of the death penalty is appropriate, not 'cruel,' 'unusual,' or otherwise unwarranted." *Ring*, *supra*, at 618 (Breyer, J., concurring in the judgment). Because the jury is "uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand." *id*. (Breyer, J, concurring in judgment), concerns about reliability demand that "the decision to impose the death penalty is made by a jury rather than by a single governmental official." *Spaziano v. Florida*, 468 U.S. 447, 469 (1984), overruled in part by *Hurst v. Florida*, *supra*, 136 S.Ct. 616 (Stevens, J., concurring in part and dissenting in part).

Mr. Galindo's death sentence was imposed by a three-judge sentencing panel. No jury was able to act on its own collective conscience to express the conscience of

the community by determining whether the death penalty was appropriate and warranted in his individual case.

Where, as in Nebraska, a death penalty scheme is contrary to the national consensus, fails to adequately implement Supreme Court precedent, and undermines rather than promotes the reliability of capital sentencing proceedings, that practice is necessarily invalid under the Eighth Amendment. *See Hall*, at 723-24. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ, vacate the death sentence with directions to impose life.

> *The Trial Court Improperly Shifted the Burden and The Statute Improperly Deprives and Deprived Mr. Galindo of the Opportunity to Respond to Rebuttal Evidence.*

Mr. Galindo was told to bear the burden – but then never had the opportunity to respond to the State's rebuttal evidence. This is a dramatic misapplication or perversion of standards that deprived Mr. Galindo of a sentencing hearing resembling due process. Mr. Galindo's conviction and sentences were obtained in violation of his right to due process, confrontation and individualized sentencing under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments because the Court impermissibly denied Mr. Galindo and his counsel the right to rebut evidence presented to the sentencing panel during the mitigation and sentencing phases of trial.

Nebraska bifurcates the sentencing of a capitally convicted defendant. In the first post-conviction phase of trial, the prosecution bears the burden of proving the existence of at least one statutory aggravating circumstance. R.R.S. Neb. § 29-2520 (2002). If the jury finds that no aggravating circumstances have been proven beyond a reasonable doubt, or if the jury is unable to reach a unanimous verdict, the court shall enter a sentence of life imprisonment without parole. *Id.*

If the jury finds that the prosecution has proven the existence of one or more aggravating circumstances beyond a reasonable doubt, the court convenes a panel of three judges which makes the ultimate sentencing determination. *Id.;* R.R.S. Neb. § 29-2521 (1). The state and the defendant and his counsel have the right to present evidence and argument relevant to (1) mitigation, (2) sentence excessiveness, and (3) proportionality. R.R.S. Neb. § 29-2521(3). Nebraska has no established sentencing procedure, and leaves to the court to "set forth the general order of procedure at the outset of the sentencing determination proceeding." *Id*. This leads to arbitrary and capriciousness. In Mr. Galindo's, the trial court placed the burden of proof on Mr. Galindo.

At sentencing, Mr. Galindo presented his case-in-chief related to mitigating circumstances, sentence excessiveness, and proportionality. The State was then allowed to rebut Mr. Galindo's case-in-chief on all three issues, and was allowed, in addition, to present its own non-rebuttal evidence on sentence excessiveness, proportionality, and non-statutory aggravating circumstances, including victim impact statements and evidence of future dangerousness. Mr. Galindo's counsel

were denied the right to rehabilitate the evidence presented in their case-in-chief, and were denied the right to rebut the State's case even though they bore the burden of proof.

Due Process requires that the Court give the defendant sufficient notice of which party will have the burden of proof and the burden of going forward prior to the outset of the sentencing determination proceeding. However, that acceptable practice was not employed in Mr. Galindo's trial. *See California v. Lombetta,* 467 U.S. 479, 485 (1984) ("Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense."); *See Ford v. Wainwright,* 477 U.S. 399, 414, 425 (1986) (noting "the heightened concern for fairness and accuracy that has characterized our review of the process requisite to the taking of a human life" and "this Court's decisions imposing heightened procedural requirements on capital trials and sentencing proceedings.")

During Mr. Galindo's sentencing proceedings, in addition to the late notice of which sentencing procedures the trial court would employ—and consequently, which party bore the burden of going forward and the burden of proof—the trial court switched the order of closing arguments midway through Mr. Galindo's case-in-chief so that Mr. Galindo's counsel presented first. Until that time, the parties believed that the State would initiate closing arguments. Thus, up until

357

midway through Mr. Galindo's sentencing case-in-chief, the procedures the trial court enunciated were inconsistent with one another, without any clear scheme allocating burdens, and made it impossible to know which party bore the burden of proof.

Neither the State, nor the trial court, nor Mr. Galindo's trial counsel, had any idea who needed to do what. Tr. 3326-27. Trial counsel failed to object to and/or request a hearing and/or request an opportunity to present briefing on the burden of proof during the mitigation and sentencing phases of the trial, despite the fact that the trial court expressed on the record that it did not understand the distinction between burden of proof and burden of non-persuasion, and that the trial court unconstitutionally imposed the burden of proof on the defense at sentencing.

Additionally, the trial court's refusal to allow Mr. Galindo's counsel to rehabilitate their evidence from the sentencing case-in-chief and/or to provide additional evidence to rebut the State's sentencing case-in-chief, which included substantial new evidence of alleged aggravating circumstances, violated Mr. Galindo's rights to due process, confrontation, and individualized sentencing.

In *Lockett,* the Court held that because capital defendants have the right to individualized sentencing, the sentencing authority in a capital defense case must have full access to all relevant mitigation evidence that the defense proffers. 438 U.S. at 603-604. *Lockett's* progeny strongly endorse that principle. *See Eddings,* 455 U.S. 154; *Skipper v. South Carolina,* 476 U.S. 1 (1986); *Penry v. Lynaugh,* 492 U

.S. 302 (1989); *Tennard,* 542 U.S. 274. Mr. Galindo therefore had a constitutional right to present mitigating evidence that could rebut the State's evidence in favor of a death sentence, whether that evidence was a rehabilitation of the evidence initially proffered as mitigating, or a rebuttal to the State's evidence proffered as aggravating.

The sentencing panel ultimately issued a sentencing decision based on factual conclusions that were, in turn, based at least in part on the State's evidence that a death sentence was not excessive or disproportionate and the State's evidence of non-statutory aggravators. However, the sentencing panel made that decision, and the factual findings supporting it, after denying Mr. Galindo the right to present all relevant evidence in mitigation. This violated Mr. Galindo's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. This Court should grant the writ, vacate the death sentence with directions to impose life.

*Reinstating a Death Sentence After it is Legislatively Vacated Via*
*A Referendum is Constitutionally Suspect.*

359

Just as he was not eligible for death during the crime but for inept trial counsel's failure to pursue a plea, Mr. Galindo has the further distinction of having his death sentence subject to legislative repeal only to be reinstituted by a voter referendum.

On May 27, 2015, the Nebraska Legislature overrode Governor Pete Ricketts' veto and enacted LB 268, a law aimed at abolishing the death penalty in Nebraska. Laws 2015, LB 268. The act also expressed the legislative intent that the sentences of those already on death row, including Defendant, would be changed to a sentence of life imprisonment. Laws 2015, LB 268 §23. The legislation was set to formally go into effect after three months, on August 30, 2015. *See Neb. Const. art III, §27.*

On November 8, 2016, Nebraska voters rejected the death penalty repeal as the result of a referendum campaign orchestrated by Governor Ricketts and others. With the Governor's official proclamation of those results on December 5, 2016, capital punishment in the state was effectively reinstated.

Nebraska's legislative repeal of the death penalty and the declaration that Mr Galindo's death sentences were changed to sentences of life-imprisonment, followed by the reinstatement of death sentences pursuant to the referendum, subjects Mr. Galindo to extreme psychological and emotional harm in violation of the prohibition against cruel and unusual punishments under the Eighth and Fourteenth Amendments.

To put Mr. Galindo in the position where his death sentence was gone but then returned "involve[s] the unnecessary and wanton infliction of pain." *Gregg v.*

360

*Georgia*, 428 U.S. 153, 173 (1976). The State created a substantial risk of serious emotional and psychological harm to Mr. Galindo by re-imposing a death sentence after the Legislature enacted a law reforming his death sentence to life imprisonment, and after the Department of Corrections provided notice to him that he would not be executed because his sentence had been reduced to life in prison.

The Founders adopted the Eighth Amendment not only to prohibit the government from inflicting physical pain on the people, but also to prevent "exercises of cruelty . . . other than those which inflicted bodily pain or mutilation." *Weems v. United States*, 217 U.S. 349, 373 (1909). The Eighth Amendment forbids laws and punishment subjecting a person to "circumstance[s] of degradation," *id.* at 366, or to "circumstances of terror, pain, or disgrace" that are "superadded" to a sentence of death. *Id.* at 370 (emphasis added). Although decided under the Ex Post Facto Clause rather than the Eighth Amendment, the Court in *In re Medley*, 134 U.S. 160 (1890), found that not telling a prisoner the time and date of his execution was unconstitutional. The Court's reasoning focused on the additional psychological pain and suffering, noting that "secrecy [about the time of execution] must be accompanied by an immense mental anxiety amounting to a great increase in punishment." *Id.* at 172.

The Government shall not "deprive any person of life, liberty, or property, without due process of law; nor deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Nebraska Legislature provided a mass abolition of death sentences for capital prisoners that prison

361

officials and prisoners alike acted upon. Due process forbade the State from reinstating the capital sentences *en masse*. *See Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (finding state mandatory sentence violated the prisoner's right to liberty and due process of law). Rather, both state and federal law guaranteed each individual to a new sentencing procedure. *Id.*; *see also Gardner v. Florida*, 430 U.S. 349, 357-58 (1977) (discussing importance of individualized sentencing procedures in capital trials); *State v. Reeves*, 258 Neb. 511, 523-35 (2000) (holding that state resentencing process requires an individualized hearing to take place in the original district court).

No resentencing hearing took place in the district court in this case. Instead, the Legislature through appropriate legislative action removed capital punishment as an option in all murder cases, and thereby reduced Mr. Galindo's sentence to life imprisonment without the possibility of parole. A ballot referendum sought to reinstate the death sentence as an option for punishing first degree murder. The referendum, however, did not alter the existing statute, which mandates that only the district court where the original trial was held may impose a sentence of death. Neb. Rev. Stat. § 29-2520.

Nebraska's failure to provide Mr. Galindo with an individualized resentencing hearing exposed him to the same defects that caused the Supreme Court to find capital punishment unconstitutional in *Furman v. Georgia*, 408 U.S. 238 (1972). Every capital case must disclose the rationale for imposing the death sentence; if the death sentence is vacated, the district court must articulate the

rationale for reinstating a sentence of death. *Gardner*, 430 U.S. at 361; *Reeves*, 258 Neb. at 531. Anything less violates due process. *Id*.

This issue has not been raised in state court. This failure occurred due to the ineffective assistance of Mr. Galindo's postconviction counsel. Should the state assert that this ground is not properly before this Court for review, Mr. Galindo will argue that under *Martinez v. Ryan*, 1566 U.S. 1 (2012), he is entitled to develop and present this ground for relief in this Court. This Court should grant the writ, vacate the death sentence with directions to impose life.

## Prayer for Relief

WHEREFORE, Mr. Galindo prays for the following relief:

1. Issue a show-cause order;

2. That discovery be granted as is necessary for a full and fair resolution of the claims contained in this petition;

3. That leave to amend this petition be granted as appropriate;

4. That an evidentiary hearing be conducted on all disputed issues of fact;

5. That his convictions be vacated; be resentenced to life without parole; and

6. That the aggravation findings be vacated;

7. That his sentences be vacated; and

8. That all other appropriate relief be granted.


Dated:  December 11, 2023

Respectfully submitted,

*/s/ Meredith Schlacter*_____          */s/ Tim Burdick*_____

363

MEREDITH SCHLACTER
Assistant Federal Public Defender
*/s/ Laurence  E. Komp*
LAURENCE E. KOMP
Capital Habeas Unit, Chief
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-471-8282
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org

TIM BURDICK
Assistant Federal Public Defender
Federal Public Defender,
District of Kansas
201 U.S. Courthouse
500 State Ave.
Kansas City, KS 66101
913-551-6712
Tim_Burdick@fd.org

*Counsel for Petitioner Jorge Galindo*

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2023, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by cooperation of the CM/ECF system.

*/s/ Meredith Schlacter*
Meredith Schlacter
Counsel for Petitioner

364

## VERIFIATION OF PETITIONER

I, Jorge Galindo, declare under penalty of perjury of the laws of the United States

that the facts set forth in the foregoing Petition Under 28 U.S.C. 2254 for a Writ of Habeas

Corpus (Death Penalty) are true and correct to the best of my knowledge.

Executed this __ day of December 2023

*Jorge A. Galindo*
Jorge Galindo # 60009

*Sarah N Jopolski*
Witness

JS 44   (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Jorge A. Galindo | Rob Jeffreys, Director, Nebraska Department of Correctional Services |

| **(b)**  County of Residence of First Listed Plaintiff   Johnson | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
| | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)**  Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| See attachment | See attachment |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | Liability | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | **PERSONAL PROPERTY** | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☒ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V.  ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 USC § 2254
Brief description of cause:
Petition for Writ of Habeas Corpus

## VII.  REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*   JUDGE _____   DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 12/11/2023 | /s/ Meredith Schlacter |

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

Attachment to Civil Cover Sheet Form JS 44 Reverse (Rev. 04/21)


I(c).  Attorneys

Attorneys for Petitioner Jorge A. Galindo

Meredith Schlacter NY Bar Number 5321625
Assistant Federal Defender
Federal Public Defender
Western District of Missouri
1000 Walnut Ste 600
Kansas City, MO 64106
(816) 675-0923
E-mail: meredith_schlacter@fd.gov

Laurence Komp MO Bar Number 40446
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
1000 Walnut Ste 600
Kansas City, MO 64106
(816) 675-0923
E-mail: Laurence_komp@fd.gov


Timothy Burdick MO Bar Number 50116
Assistant Federal Defender
Federal Public Defender District of Kansas
201 US Courthouse
500 State Ave
Kansas City, KS 66101
(8913) 551-6712
E-mail: tim_burdick@gd.gov


Attorneys for Rob Jeffreys, Director, Nebraska Department of Correctional Services

Michael T. Hilgers, Nebraska Attorney General
James D. Smith, Senior Assistant Attorney General
State of Nebraska Office of the Attorney General
2115 State Capitol Building
Lincoln, NE 68509
(402) 471-2682