***CAPITAL CASE***

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

No. 23-cv-03241-JFB-RCC

JORGE GALINDO,

Petitioner

v.

ROB JEFFREYS, Director,

Nebraska Department of
Correctional Services

Respondent

---

**RESPONSE IN SUPPORT OF PETITION
FOR A WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2254**

---

LAURENCE E. KOMP
Capital Habeas Unit, Chief
MEREDITH SCHLACTER
Assistant Federal
Public Defender
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-675-0923
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org

TIM BURDICK
Assistant Federal Public
Defender
Federal Public Defender,
District of Kansas
201 US Courthouse
500 State Ave
Kansas City, KS 66101
913-551-6712
Tim_Burdick@fd.org

*Counsel for Jorge Galindo*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...........................................................................................i

Introductory Statement............................................................................... 1

Statement Of Facts....................................................................................... 2

Procedural History ...................................................................................... 3

Attorney General Drafting the Order........................................................ 4

Procedural Default ....................................................................................... 7

Martinez as Cause and Prejudice ........................................................... 11

AEDPA is Unconstitutional....................................................................... 20

Counterstatement Regarding AEDPA Standards................................. 20

Statement Regarding Need for Discovery and An Evidentiary
Hearing....................................................................................................... 31

Habeas Claims for Relief .......................................................................... 38

    Claim 1:  Mr. Galindo was deprived of his Sixth and
                    Fourteenth Amendment rights when the State of
                    Nebraska failed to grant a change in venue. .........................38

    Claim 2:  Mr. Galindo was deprived of his Sixth and
                    Fourteenth Amendment rights when the trial court
                    made improper statements regarding the voir dire
                    process. ......................................................................................68

    Claim 3:  The consideration of race has no place in a capital
                    trial and its presence here violated Mr. Galindo's
                    rights as guaranteed by the Sixth, Eighth and
                    Fourteenth Amendments of the United State
                    Constitution..............................................................................74

    Claim 4:  Mr. Galindo's rights, as guaranteed by the Sixth
                    and Fourteenth Amendments of the United States
                    Constitution were violated by a conflict possessed
                    by the county attorney................................................................84

    Claim 5:  Galindo is intellectually disabled and his trial
                    counsel was ineffective for failing to investigate the
                    life history information needed for an adequate
                    evaluation and diagnosis, and post-conviction

counsel was ineffective via total inaction on the issue, excusing any default. ........................................ 96

Claim 6:   The State suppressed material and exculpatory evidence................................................................. 109

Claim 7:   The State manipulated jail assignments to collect evidence in violation of *Massiah v. United States*. ............. 117

Claim 8:   Mr. Galindo's rights to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence. ................................................. 123

Claim 9:   Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously failed to strike certain members of the jury during jury selection. ........... 148

Claim 10:  The categorical exclusion of mitigation and the sentencing panel's failure to give effect to mitigation violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution. ................. 164

Claim 11:  Mr. Galindo's Due Process, Confrontation and Jury Trial rights as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution were violated when the sentencing judges considered a Pre-Sentencing Investigation Report. ................................................. 183

Claim 12:  Mr. Galindo's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when victim impact statements were read during sentencing................................................................. 188

Claim 13:  Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure to pursue a guilty plea which would have avoided the death penalty........................................................ 190

ii

Claim 14:  Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were adversely affected by a conflict of interest. .................................................................. 197

Claim 15:  Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure to obtain consideration prior to offering assistance that incriminated Mr. Galindo and was utilized to obtain multiple death sentences. ......................... 202

Claim 16:  Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's failure to investigate, develop a defense theory, and subject the State's aggravation case as to the death of Travis Lundell to meaningful adversarial testing. .......................................... 209

Claim 17:  Defense counsel was ineffective for failing to investigate and raise the issues of Mr. Galindo's youth and remorse at sentencing and on direct appeal, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments. ................................... 216

Claim 18:  Defense counsel's arguments constructively conceding Mr. Galindo's guilt as to felony murder and as to two aggravators violated Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments. ............................................................. 224

Claim 19:  Counsel failed to effectively investigate and present Mr. Galindo's substance use and addiction as a mitigating factor at sentencing, depriving Mr. Galindo of the right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. ............................................................. 233

Claim 20:  The prosecutor knowingly presented the false testimony of Donnie Thorson, Norfolk Police Division Investigator, as rebuttal in Mr. Galindo's sentencing hearing, in violation of his

constitutional rights to due process and to a reliable sentencing determination guaranteed by the Eighth and Fourteenth Amendments. ............................ 241

Claim 21:   Counsel was ineffective for introducing inaccurate and damaging evidence about Mr. Galindo's alleged gang membership and for failing to object to the State's introduction of such evidence, in violation of Mr. Galindo's rights to the effective assistance of counsel and a fair trial and sentencing under the Sixth, Eighth, and Fourteenth Amendments. ...................... 249

Claim 22:   The State's false accusation that Mr. Galindo smuggled a weapon into the courtroom, and counsel's failure to move for a mistrial, deprived Mr. Galindo of his rights to a fair sentencing proceeding and the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. ............................................................. 258

Claim 23:   Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by counsel's failure to investigate jail assignments and the manipulation of snitches by the State. ........................................... 264

Claim 24:   The county attorney's involvement in defense funding decisions violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and it represented a conflict for trial counsel. ............................ 266

Claim 25:   Mr. Galindo's rights to the effective assistance of counsel at trial and on appeal, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by the failure of trial and appellate counsel to preserve and present meritorious constitutional errors. ......................................... 278

Claim 26:   Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial. ................................................................... 285

**Claim 27:** The state committed numerous instances of prosecutorial misconduct throughout Mr. Galindo's trial, depriving him of the rights to due process and a fair trial and to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution. ...........................................301

**Claim 28:** Mr. Galindo's Due Process rights were violated when the State of Nebraska failed to comply with the Nebraska death penalty statute and provide notice of aggravators...............................................314

**Claim 29:** Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the State of Nebraska weighed non-statutory aggravators against mitigators................................................317

**Claim 30:** Mr. Galindo was penalized for exercising his right to a jury trial in violation of *United States v. Jackson* and *Ring.* ....................................................319

**Claim 31:** Mr. Galindo was deprived of his rights under *Caldwell v. Mississippi* when the State of Nebraska minimized the jury's role..........................................326

**Claim 32:** Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously prohibited life qualification of the jury in violation of *Morgan v. Illinois*.....................................................................331

**Claim 33:** Mr. Galindo's death sentence violated the Eighth Amendment because he was twenty-one years old at the time of the offense. .......................................335

**Claim 34:** Mr. Galindo was deprived of his rights under Article 1, Section 10, of the United States Constitution because L.B. 1 and the Repeal by Referendum of L.B. 268 are Bills of Attainder.....................339

**Claim 35:** Mr. Galindo's *ex post facto* and due process rights were violated when the State of Nebraska sentenced him to death even though the death penalty statute was declared unconstitutional at the time of the offense...............................................343

Claim 36:  Mr. Galindo's Sixth, Eighth, and Fourteenth
          Amendment rights were violated by the State of
          Nebraska when the district court did not receive
          and review sentencing orders from all Nebraska
          first degree murder cases for purposes of
          proportionality review................................................................358

Claim 37:  The Nebraska Death Penalty Statute is
          unconstitutional on its face and as applied in Mr.
          Galindo's case in violation of the Fifth, Sixth,
          Eighth, and Fourteenth Amendments of the United
          States Constitution. ...................................................................362

Prayer for Relief............................................................................................366
CERTIFICATE OF SERVICE .........................................................................367

**Introductory Statement**

Respondent glosses over significant errors in Galindo's case. It is not hyperbole to aver that Galindo was prosecuted by a conflicted county attorney who was federally investigated for involvement in a drug conspiracy along with testifying State's witnesses. An obvious conflict where, despite Galindo's diligence and through no fault of his own, the extent and impact of the nefarious conduct was not completely developed. As even the Nebraska Supreme Court noted: "It would be a great understatement to say that the county attorney would be deserving of serious condemnation." Doc. 30-4 p. 64.

Respondent does little to dispute the enormity of the impact of the offense on the community and refute that Galindo's trial never should have occurred there. As will be explained more fully below, the media accounts were overwhelming and subjected the jury to coverage that included repeated recitations of victim and community opinion that a death sentence was the only option. Also, the ugly reality is that the bare faced racial bias was not only a part of the media coverage but expressed in voir dire by a juror passed for cause. Doc. 31-2 p. 42 ("The thing that bothers me the most is that we've had probably nine, ten, eleven murders in Norfolk, all of which may have been done by Hispanics. Some have already been proven guilty, and that bothers me somewhat.")

Yet trial counsel did little to nothing to contextualize Galindo's life experiences and present him as a human being beyond his race and ethnicity. Perhaps due to the conflicted county attorney's participation in the funding decisions of Galindo's case, no appreciable investigation ever occurred, which had a

1

detrimental impact on the mitigation evidence gathered. The retained mitigation specialist, greatly restricted in what she could do, opined that defense counsel was best described as "the blind leading the blind." Doc. 4-3 p. 4.

## Statement Of Facts

This case arises from the frantic, botched bank robbery tragically leaving five people dead—Ms. Lisa Bryant, Ms. Lola Elwood, Ms. Jo Mausbach, Mr. Samuel Sun and Ms. Evonne Tuttle—on September 26, 2002, in Norfolk, NE. It is undisputed that Galindo fired the weapon causing the death of one bank employee, Ms. Elwood, and fired in the direction of a customer fleeing the bank, Ms. Micki Koepke. It is an unspeakable tragedy orchestrated by a single leader. Indeed, Galindo and Respondent agree that co-defendant Sandoval was the "leader." Doc. 46 p. 3.

Galindo disagrees with aspects of Respondent's recitation of the facts in this case and, where appropriate, will highlight those discrepancies in the arguments below. Nothing is so brazen that it needs to be addressed here.

However, Galindo notes the stark contrast between the presentations of the State and his trial counsel in those weeks preceding Christmas 2003. At the guilt phase, the State presented 50 witnesses. And even though cross-examination is "the greatest legal engine ever invented for the discovery of truth" (*see Maryland v. Craig*, 497 U.S. 836, 846 (1990)), trial counsel only cross-examined 8 of those witnesses. In response to the State's case, Galindo's counsel presented **0 witnesses and 0 exhibits**.

At the aggravation phase, the State presented 33 additional witnesses, of which defense counsel cross-examined only a third. The State accurately described

2

the State's aggravation hearing as "extensive." Doc. 46 p. 6. In response to the State's "extensive" case, Galindo's counsel presented **0 witnesses and 0 exhibits**.

At the mitigation phase, Galindo's counsel presented 18 witnesses, of which the State subjected 15 to cross-examination. In rebuttal, the State again presented more, 20 witnesses, of which Galindo's trial counsel subjected only 3 to cross-examination.

### Procedural History

Galindo has a few matters to add to the procedural history. On December 19, 2025, Galindo filed in state court a Motion to Vacate or Modify the State District Court's Judgment, and alternatively requested consideration of the filing as a successor.[1] On January 21, 2026, the state post-conviction court ordered a response from the State. The State complied. After two non-evidentiary hearings (March 13, 2026, and April 10, 2026) and supplemental briefing by the parties, on April 16, 2026, the state post-conviction court rubber-stamped without any change the State's proposed order. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) ("criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties."); *Jefferson v. Upton*, 560 U.S. 284, 293-294 (2010). The state post-conviction court addressed both the main and the alternative bases requested.

A party opponent drafting findings exonerating them and their proceeding of any error heightens the unfairness and implicates the policies underlying *Tumey v.*

---

[1] Galindo will be filing shortly a Motion to Supplement the record pursuant to Habeas Rule 5 to file the relevant state court materials with the Court.

*Ohio*, 273 U.S. 510 (1927). This is especially true in a case where there existed an obvious conflict and corruption by the trial prosecutor.

Respondent omits from the procedural history some significant facts which bear on the merits and/or the procedural questions this Court is tasked with considering. First, when the crime occurred, there was no constitutional death penalty in Nebraska. Rather, it had been invalidated by the Supreme Court in *Ring v. Arizona*, 536 U.S. 584 (2002). This indisputable fact is relevant to Galindo's Habeas Claim 35.

Second, Nebraska passed legislation in 2015 removing death sentences and replacing them with life sentences. Galindo challenged the reimposition of death with no formal legal proceeding after his death sentence was reimposed. *See* Habeas Claim 34. The Nebraska Supreme Court decided the matter adversely to Galindo's interests. *Sandoval et al. v. Ricketts et al.*, 922 N.W.2d 222 (2019).

Third, there was a significant struggle for Galindo to even secure post-conviction counsel. It took years and extensive litigation to even receive the limited and deficient counsel that he ultimately did. *See* Doc. 30-3. Which returns full circle to the above-mentioned Motion to Vacate: Galindo never received what he was entitled to by the Nebraska Legislature: his statutory right to the effective assistance of postconviction counsel provided by Neb. Rev. Stat. § 29-3004.

### Attorney General Drafting the Order

The post-conviction court erred when its judgment denying post-conviction relief failed to demonstrate it was a product of independent judgment and instead adopted verbatim the State's twenty-page proposed order. *See, e.g., United States v.*

4

*El Paso Nat. Gas Co.*, 376 U.S. 651, 656 n.4 (1964) (decisions adopting findings of fact from prevailing parties verbatim "won't be worth the paper they are written on."). The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson v. Upton*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted the State's findings.

The Eighth Circuit "expressed its disapproval of a district court's mechanical adoption of the proposed findings and conclusions of a party" because "[i]mportant evidence is more likely to be overlooked or inadequately considered when factual findings are not the product of personal analysis and interpretation by the trial judge" *Jones v. International Paper Co.*, 720 F.2d 496, 499 (8th Cir. 1983); *see also Askew v. U.S.*, 680 F.2d 1206, 1209 (8th Cir. 1982) ("we disapprove of the court placing its imprimatur on such proposed findings by wholly adopting them as the court's own."); *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (reiterating the *Jones* warning).

The adoption of party-drafted findings and conclusions is doubly inappropriate when done by successor judges, particularly when there are witness credibility issues presented. In 1946, the Eighth Circuit recognized that estimations of witness credibility create the possibility that a successor judge lacks sufficient information to avoid a new trial when they did not observe the challenged witnesses themselves. *St. Louis Southwestern Ry. Co. v. Henwood*, 157 F.2d 337, 342-43 (8th

Cir.1946). Ten years later, the Eighth Circuit recognized that "There might well be a criminal case in which the testimony would be of such a character that a successor judge [who had not viewed the witnesses] could not fairly pass upon the questions" if "the credibility of the government witnesses was a serious issue." *Connelly v. United States*, 249 F.2d 576, 580 (8th Cir.1957). When credibility is at issue, a litigant has the right to a new trial when a successor judge who was not present at trial issued a judgment without findings and conclusions *from the original judge* in the record. *See In re Higginbotham*, 917 F.2d 1130, 1132 (8th Cir. 1990);. *Cf. Medicare Glaser Corp. v. Guardian Photo, Inc.*, 936 F.2d 1016, 1019 (8th Cir. 1991) (finding new trial was not required because "upon a review of the record, . . . no credibility determinations are required").

Nebraska law is in accordance with the Eighth Circuit and arguably adheres to more stringent rules. In *Liljestrand v. Dell Enterprises, Inc.*, 842 N.W.2d 575 (Neb. 2014), the Nebraska Supreme Court adopted the "general rule . . . that a successor judge may not make a decision based on conflicting evidence that a predecessor judge heard" because "due process entitles a litigant to have all the evidence submitted to a single judge who can see the witnesses testify and, thus weigh their testimony and judge their credibility." *Id.* at 580. Not even reviewing a transcript provides a successor judge with sufficient grounds to render judgment where "the issues involved the credibility of witnesses." *Id.* Where a successor judge improperly enters judgment under these circumstances, a new trial is appropriate. *Id; see also Newman v. Rehr*, 630 N.W.2d 19 (Neb. Ct. App. 2001), *aff'd on other grounds* 638 N.W.2d 863 (Neb. 2002) (finding new trial was warranted "when Judge

6

Ashford entered a judgment based on evidence Judge Ashford did not hear himself.").

Based on these authorities, Galindo submits that, especially in a capital post-conviction proceeding, the court's judgment should be a product of independent judgment. Here, the court's verbatim adoption of a twenty-page proposed order suggests that was not the case. Furthermore, a successor judge who never observed contested witnesses cannot satisfy any independent judgment requirement with respect to credibility findings. Here, Galindo challenged the credibility of government witnesses. Accordingly, this Court should review both factual findings and legal conclusions drawn by the district court *de novo* as well as those also endorsed by the Nebraska Supreme Court in reliance upon the findings

### Procedural Default

Where applicable, Galindo will respond to any fairly presented allegation of procedural default. "'[T]he adequacy of state procedural bars to the assertion of federal questions,' is not within the state's prerogative finally to decide; rather, adequacy 'is itself a federal question.'" *Lee v. Kemna*, 534 U.S. 362, 375 (2002) (quoting *Douglas v. Alabama*, 380 U.S. 415, 422 (1965)).

To the extent Respondent has failed to plead or lacked the required specificity in its assertion, any available procedural default should be deemed waived. Such defenses are subject to waiver by Respondent. *See* 2 Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice & Procedure, § 22.1 at 1247 (7th ed. 2017) ("The Supreme Court has repeatedly held that habeas corpus defenses are not jurisdictional and can be waived, either expressly or by neglect.").

7

When a state fails "to advance a procedural default argument, such argument is waived." *Robinson v. Crist*, 278 F.3d 862, 865 (8th Cir. 2002). *See also Jones v. Norman*, 633 F.3d 661, 666 (8th Cir. 2011).

While Galindo will more fully develop below his arguments regarding *State v. Sims*, 761 N.W.2d 527 (Neb. 2009), he simply previews that Respondent is overstating its reach. Post-conviction in Nebraska is a civil creature. Nothing in the statute, the rules, or Nebraska Supreme Court precedent prohibits the filing of a post-judgment motion. A state procedural ruling meets the due process requirement of adequacy **only if** it is firmly established and regularly followed. *Lee*, 534 U.S. at 376 ("[t]o be adequate, a state's procedural rule must be proclaimed in advance and regularly followed").

To the extent the Nebraska Supreme Court may finally announce such on Galindo's appeal of the State's Order regarding his Motion to Vacate or Modify, it could not serve as a valid procedural default because such a rule was **unannounced** at the time that Galindo pursued the post-judgment motion. *Ford v. Georgia*, 498 U.S. 411 (1991) (A rule that was unannounced at the time of Ford's trial is therefore inadequate to serve as an independent state ground for a procedural default). The Eight Circuit has cited with approval and has not disputed this principle. *Oglesby v. Bowersox*, 592 F.3d 922, 924 (8th Cir. 2010).

The adequacy of a rule to limit all review of a constitutional claim itself depends upon the timely exercise of Nebraska's power to clearly announce the procedure. In *James v. Kentucky*, 466 U.S. 341, 348-51 (1984), the Supreme Court held that only a "firmly established and regularly followed state practice" may

8

prevent subsequent review by a federal court of a federal constitutional claim. *See also Barr v. City of Columbia*, 378 U.S. 146, 149 (1964) (state procedural rules "not strictly or regularly followed" may not bar our review); *NAACP v. Alabama ex rel. Flowers*, 377 U.S. 288, 297 (1964) (procedural rule no bar to our review when state court had never applied it with the "pointless severity shown here"). "Novelty in procedural requirements cannot be permitted to thwart review in this Court applied for by those who, in justified reliance upon prior decisions, seek vindication in state courts of their federal constitutional rights." *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 457-458 (1958). The underlying principle not met here is "that failure to follow state procedures will warrant withdrawal of a federal remedy only if those procedures provided the habeas petitioner with a fair opportunity to seek relief in state court." *Easter v. Endell*, 37 F.3d 1343, 1347 (8th Cir. 1994).

Galindo can demonstrate that the State has not satisfied this principle. Indeed, the Nebraska post-conviction statute explicitly provides: "The attorney or attorneys *shall* be *competent* and *shall* provide *effective* counsel." Neb. Rev. Stat. § 29-3004 (emphasis added). Under Nebraska law, "shall" means "shall." The use of "'shall' is considered to indicate *a mandatory directive*, inconsistent with the idea of discretion." *State v. Jackson*, 29 N.W.3d 232, 238 (Neb. 2026) (emphasis added); *McDougle v. State ex rel. Bruning*, 853 N.W.2d 159, 168 (Neb. 2014) (same); *Rice v. Bixler*, 854 N.W.2d 565, 574 (Neb. 2014) (same). There is no reason to believe that the Nebraska Supreme Court will depart from the above language as did the State's prepared order accepted by the trial court.

9

Such a result would contrast with the Nebraska Supreme Court's recent actions where it relied upon the failure to file a post-judgment civil motion in a capital post-conviction action as a basis for a waiver. In *State v. Trail*, 21 N.W.3d 61, 67 (Neb. 2025), the court faulted the petitioner for not filing a post judgment motion, deeming his arguments waived as a result, and therefore the Nebraska Supreme Court has acknowledged that post-judgment motions are in fact cognizable in post-conviction. *Trail*, 21 N.W.3d at 67 (faulting petitioner for not filing a motion to alter and amend). Assuming corners are squared in a consistent fashion, Galindo has precedent to support his civil post-judgment motion.

Finally, as will be asserted below, Galindo can alternatively establish cause and prejudice for any default. Even if a state court's refusal to reach the merits of a habeas petitioner's claim is premised on an "adequate and independent" state law ground, courts recognize an equitable exception to the bar when a habeas applicant can demonstrate cause and prejudice for the procedural default. *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (noting that "the cause and prejudice requirement shows due regard for States' finality and comity interests while ensuring that fundamental fairness remains the central concern of the writ of habeas corpus"). A procedural default can be excused in certain circumstances where the factual predicate of the claim has been presented to a post-conviction court and the petitioner has made an effort to bring it to the attention of appropriate state courts. *Clemmons v. Delo*, 124 F.3d 944, 946 n.1, 948-50 (8th Cir. 1997); *Easter v. Endell,* 37 F.3d 1343, 1345(8th Cir. 1994)  (stating "[f]ederal courts always have the equitable power to look

10

beyond a state procedural bar and proceed to the merits of a habeas corpus

petition"). Galindo made that effort.

### Martinez as Cause and Prejudice

While failure to raise grounds for relief in state court can bar consideration of

the claims in a federal habeas petition, such procedural default can be overcome if

Galindo can demonstrate cause for the default and actual prejudice as a result of

the alleged constitutional violation. *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).

Among the ways to show legal "cause" to avoid a default, the Supreme Court

recognized a federal equitable right in *Martinez v. Ryan*, 566 U.S. 1 (2012). Because

Galindo premises many of his cause and prejudice arguments on *Martinez*, the

applicable standard is discussed in general here. The specific arguments as to the

substantiality of the claims and as to prejudice are presented in the discussion of

each individual claim.

In *Martinez*, the Court held that when a substantial claim of ineffective

assistance of trial counsel must be raised for the first time in state post-conviction

proceedings, but was not raised in those proceedings, cause to overcome a

procedural default can be established by showing that post-conviction counsel's

failure to raise the claim was ineffective under the *Strickland* standard. Justice

Kennedy elaborated, "When the issue cannot be raised on direct review . . . , a

prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial

review collateral proceeding cannot rely on a court opinion or the prior work of an

attorney addressing that claim. . . . *To present a claim of ineffective assistance at*

*trial in accordance with the State's procedures, then, a prisoner likely needs an*

11

*effective attorney.*" *Martinez*, 566 U.S. at 11-12 (emphasis added) (internal citations omitted). Thus, *Martinez* held that ineffective assistance by post-conviction counsel—in a case like Galindo's, where ineffective assistance of trial counsel could not be raised on direct appeal because appellate counsel also served as trial counsel—will provide the "cause" necessary to overcome a procedural default in a subsequent 28 U.S.C. § 2254 proceeding. *See State v. Jaeger*, 973 N.W.2d 751, 764 (2022) (post-conviction is the only place to raise ineffective assistance of trial counsel because trial counsel was also direct appeal counsel).

In *Martinez*, the Court recognized the importance of factual development and presentation of evidence outside the trial record in post-conviction proceedings. "Ineffective-assistance claims often depend on evidence outside the trial record. Direct appeals, without evidentiary hearings, may not be as effective as other proceedings for developing the factual basis for the claim. 566 U.S. at 13.

To perform effectively under *Strickland*, post-conviction counsel is required to conduct a proper investigation and review of the record. In *Trevino v. Davis*, 829 F.3d 328, 348-49 (5th Cir. 2016), the Fifth Circuit held that "[i]f state habeas counsel is not subject to the same *Strickland* requirement [as trial counsel] to perform some minimum investigation prior to bringing the initial state habeas petition, the *Martinez/Trevino* rule would have limited utility . . ." *Id.* The court held that state post-conviction counsel performed deficiently because "[t]he deficiency in [trial counsel's] investigation would have been evident to any reasonably competent habeas attorney." *Id.* at 349. Likewise, the Eleventh Circuit has emphasized the duty of post-conviction counsel to perform a full investigation,

12

holding, "As we see it, post-conviction counsel's failure to take any step to investigate the IAC-trial claim was objectively unreasonable in light of the information that Sullivan had provided him and, indeed, based on even the most cursory review of the trial record." *Sullivan v. Sec'y, Fla. Dep't of Corrs.,* 837 F.3d 1195, 1205 (11th Cir. 2016).

Importantly, post-conviction counsel's failure to conduct an adequate investigation into facts trial counsel also failed to investigate cannot insulate post-conviction counsel from a finding of ineffectiveness. To the contrary, "[t]here is a serious danger . . . that a state trial counsel's failure to investigate (and put into the record) mitigation evidence could insulate state habeas counsel from an ineffective assistance claim simply because the evidence was missing. That would only compound the problem with state trial counsel's failure to conduct a reasonable investigation in the first place." *Trevino,* 829 F.3d at 349. Moreover, that post-conviction counsel raised some claims, or did some investigation into certain claims, is not enough to excuse the failure to investigate a petitioner's life history and mitigating evidence. *See Wiggins v. Smith,* 539 U.S. 510, 521 (2003) ("strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation") (quoting *Strickland,* 466 U.S. at 690-91); *Sears v. Upton,* 561 U.S. 945, 946 (2010); *Andrus v. Texas,* 590 U.S. 806, 814-15 (2020). Considering that post-conviction is the only means to raise claims of ineffective assistance of counsel when trial counsel also serves as direct appeal counsel, it is deficient performance to fail to investigate all such possible claims. Further, because prejudice from post-

13

conviction errors is analyzed cumulatively, there is no advantage in winnowing post-conviction claims, particularly claims of ineffective assistance of trial counsel. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 10.15.1E.4.

Federal court is Galindo's opportunity to present the evidence related to the cause and prejudice component of the *Martinez* test—a federal question. The Supreme Court recognized this very issue in *Martinez*, noting, "When an attorney errs in initial-review collateral proceedings, it is likely that no state court at any level will hear the prisoner's claim." *Martinez*, 566 U.S. at 10. An evidentiary process, including discovery, is necessary to assess post-conviction counsel's ineffectiveness as cause for the default of Galindo's substantial and meritorious claims. This is complicated in Nebraska which provides for a statutory right to effective counsel. Neb. Rev. Stat. § 29-3004.

Ten years after *Martinez*, the Supreme Court had the chance to reverse *Martinez* and did not do so. *Shinn v. Ramirez*, 596 U.S. 366 (2022). In *Shinn*, the Court addressed a challenge by the state of Arizona to the district court's grant of an evidentiary hearing under *Martinez*. The state successfully argued the petitioner was not entitled to an evidentiary hearing because the claim he raised did not meet the AEDPA standards, namely 28 U.S.C. § 2254(e)(2). In a 6 to 3 ruling, the majority held that a federal court may not hold an evidentiary hearing unless the petitioner satisfies § 2254(e)(2) requirements. *Shinn*, 596 U.S. at 371. The majority thus limited the opportunity for petitioners to pursue a *Martinez* hearing while still retaining the opportunity to pursue *Martinez* claims so long as the evidence in

14

support thereof had been presented in some state court proceeding or the petitioner had diligently tried to do so. The *Shinn* court acknowledged, however, that § 2254(e)(2) only applies when a petitioner "has failed to develop the factual basis of a claim," and a petitioner "fails" if he "bears responsibility for the failure to develop the record." *Id.* at 382 (internal quotation marks omitted).

After *Shinn*, the Eighth Circuit addressed the standard this Court is to employ when determining whether a petitioner has established cause to excuse procedural default under *Martinez*:

> (1) the claim of ineffective assistance of trial counsel was a "substantial claim; (2) the cause consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the "initial" review proceeding with respect to the "ineffective-assistance-of-trial-counsel claim."

*Marcyniuk v. Payne*, 39 F.4th 988, 996 (8th Cir. 2022). The court explained that "a substantial claim is one with some merit, and *Martinez*'s some-merit requirement means that whether the claimant's trial counsel was ineffective . . . must at least be debatable among jurists of reason." *Id.* (citing *Dorsey v. Vandergriff*, 30 F.4th 752, 756 (8th Cir. 2022) (internal quotes and brackets omitted). Thus, to show that an ineffective assistance of trial counsel claim is substantial, the petitioner must show "that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 997 (citing *Strickland*, 466 U.S. at 697).

To demonstrate prejudice, a petitioner does not need to show a reasonable probability of a different outcome, but instead that his trial counsel's error rendered

15

his trial "fundamentally unfair." *Marcyniuk*, 39 F.4th at 997. Under *Strickland*, this is less than a preponderance of the evidence. *Strickland*, 466 U.S. at 694.

In a footnote, Respondent alleges that *Martinez* and *Trevino* do not apply in Nebraska because ineffective assistance of trial counsel claims must be raised on direct appeal when trial and appellate counsel differ. Doc. 46 p. 126 n.31. Respondent cites to dicta in a footnote of a district court opinion for this proposition. *Mason v. Boyd*, No. 4:18CV3139, 2019 WL 692943, n.2 (D. Neb. Feb. 19, 2019). First, this is inapposite in Galindo's case, where he was represented by the same counsel at trial and on direct appeal and thus could not raise ineffectiveness claims against his trial counsel on direct appeal. *Jaeger*, 973 N.W.2d at 764.

Second, Respondent's suggestion is incorrect in light of Supreme Court precedent. In *Trevino v. Thaler*, 569 U.S. 413, 423-24 (2013), the Court held that *Martinez* applies even in states that do not require ineffective assistance of trial counsel claims to be raised in collateral proceedings but instead permit them to be raised on direct appeal. In so deciding, the Court noted that "the trial court record will often fail to contain the information necessary to substantiate the claim." *Id.* at 424. Moreover, "[i]n the vast majority of cases, the undeveloped record on direct appeal will be insufficient for an appellant to satisfy the dual prongs of *Strickland*." *Id.* (internal quotation marks and citation omitted). This is true in Nebraska. *State v. Reames*, 953 N.W.2d 807, 811-12 (Neb. 2021) (when a petitioner is appointed a new attorney on direct appeal, "whether a claim of ineffective assistance of counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing.")

16

Finally, the dicta in *Mason* is not controlling, nor does it squarely address the relevant question; the district court there went on to explain that the default in that case was due to claims not being raised on post-conviction appeal after being raised in the district court in post-conviction proceedings. *Mason*, 2019 WL 692943, n.2. Thus, Respondent's suggestion that *Martinez* does not apply must be rejected, and this Court should consider the equitable interest set forth in *Martinez* in assessing cause and prejudice here.

In Galindo's case, the post-conviction court appointed Mr. Adam Sipple to represent him in his post-conviction proceedings. Mr. Sipple filed a lengthy motion for post-conviction relief challenging the State's aggravation phase evidence due to corruption by the County Attorney. Mr. Sipple suffered from tunnel vision and failed to investigate or raise various meritorious claims for post-conviction relief, including numerous ineffective assistance of trial counsel claims related to the trial and sentencing phase. He failed to collect readily available evidence that humanized Galindo and contextualized his actions.

For example, post-conviction counsel failed to investigate, or even consider, Galindo's intellectual disability, which makes him ineligible for the death penalty altogether, and he failed to raise trial counsel's ineffectiveness for their failure to adequately investigate and evaluate Galindo's intellectual disability. He also failed to investigate or raise Galindo's history of traumatic adversity and family history laden with trauma; the significant exposure to lead and other environmental toxins that Galindo experienced during his first 12 years living in Mexico, likely affecting his brain development; nor any other mitigating evidence. As a result, post-

17

conviction counsel failed to raise significant evidence of trial counsel's ineffectiveness even though the post-conviction proceedings were the first and only opportunity at which Galindo could do so because he was represented by the same attorney both at trial and on appeal. *See Jaeger*, 973 N.W.2d at 764.

Post-conviction counsel's failure to investigate or present evidence of trial counsel's ineffectiveness directly impacted the outcome of Galindo's post-conviction proceedings. Post-conviction counsel presented compelling evidence related to the County Attorney's misdeeds and how it affected the integrity of Galindo's case. But it did not matter because counsel failed to present any mitigating evidence for the Court to weigh on the other side of the scale.

As the Nebraska Supreme Court noted in its decision affirming the denial of post-conviction relief, Galindo's post-conviction claims "begin[] and end[] with a prejudice analysis." Doc, 30-4 p. 43. Because post-conviction counsel failed to conduct any mitigation investigation, the Nebraska Supreme Court was left to conclude there was "no . . . reasonable probability" the sentencing panel would have sentenced Galindo to a sentence less than death, even taking as true the post-conviction arguments. *Id*. P. 51. But had post-conviction counsel investigated Galindo's life history, adaptive functioning and intellectual deficits, or history of traumatic adversity, counsel would have been able to provide the evidence of prejudice the Nebraska Supreme Court was looking for.

While counsel focused on the sentencing stage of Galindo's criminal proceedings, he improperly concluded it was sufficient to only challenge the aggravating evidence presented at trial. Counsel fundamentally failed to

18

understand the legal significance of Galindo's intellectual disability, life history, and other mitigating evidence. He therefore did nothing to investigate or present it, including failing to present trial counsel's ineffectiveness for their own failures to investigate and present such evidence.

Without investigating and presenting mitigating evidence, post-conviction counsel was unable to demonstrate that the County Attorney's corruption prejudiced the proceedings. That mitigating evidence, and particularly evidence of Galindo's intellectual disability, seriously undermines the role and level of culpability the State attributed to Galindo at trial and it demonstrates trial counsel's abject ineffectiveness in their failure to investigate and present such information. Yet post-conviction counsel failed to provide the court with that information because he did not attempt to investigate it. Indeed, post-conviction counsel did even *less* than trial counsel regarding Galindo's intellectual disability, declining to even seek an evaluation by an expert despite being on notice and having ample reason to investigate Galindo's intellectual and adaptive functioning. Post-conviction counsel thus fundamentally failed to investigate and raise the inadequacy of trial counsel's evaluation of Galindo's intellectual disability. Post-conviction counsel's failure provides cause for the procedural default of Mr. Galindo's claims under *Martinez*, as will be examined in more detail in the discussion of each claim.[2]

---

[2] Subsequent to the filing of his amended federal habeas petition, through new post-conviction counsel, Galindo presented the evidence of trial counsel's ineffectiveness, his intellectual disability, and the other claims raised in these federal proceedings,

19

## AEDPA is Unconstitutional

In his Amended Petition, Galindo challenged the constitutionality of 28 U.S.C. § 2254. In summary, Galindo asserted that the principles of *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), reestablished the contours of the Article III power in the AEDPA context. Federal courts possess the sole adjudicative authority to say what the law is. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Under *Loper Bright*, the Supreme Court determined that non-Article III entities cannot share in the Article III power. Rather, Article III courts are duty-bound to use their independent judicial judgment in determining *all* parts of a habeas case and not surrender its judgment to the state courts. While Galindo firmly believes Article III powers have been subjugated and improperly delegated, via the non-delegation clause, to the states, he recognizes that the Eighth Circuit has rejected this argument but continues to assert it for preservation's sake. *Piper v. A.G. of South Dakota*, 174 F.4th 1070 (8th Cir. 2026).

## Counterstatement Regarding AEDPA Standards

Without conceding its constitutionality, Galindo offers the following counterstatement regarding AEDPA. Respondent's Answer offers an overly restrictive description of this Court's review. Although the specific application of

---

that original post-conviction counsel had not raised previously. His motion to vacate the previous post-conviction judgment or, in the alternative, successive post-conviction motion, was filed on December 19, 2025. The state court denied Galindo's motion on April 16, 2026. His state court counsel is currently pursuing an appeal of the denial to the Nebraska Supreme Court. In order to permit the state court to adjudicate Galindo's motion, Galindo may move this Court for a stay pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005) and will seek to expand the record pursuant to Habeas Rule 5.

20

§ 2254(d) will be discussed regarding each of Galindo's constitutional claims, Galindo hopes to assist the Court to set out the general parameters of the statute and the appropriate analysis that the Court should employ in determining whether habeas relief is warranted.

Because Galindo has filed his petition after the effective date of the AEDPA, under 28 U.S.C. §2254(d), this Court must grant relief on any claim the state court has "adjudicated on the merits," if Galindo satisfies one of the three conditions identified in §2254(d)(1) or (d)(2): the state decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). To apply the standard, the Court must first ascertain the clearly established law and then determine whether the state court's decision satisfied (d)(1) and/or (d)(2).

When making this assessment, it is important that this Court review the correct state court ruling. In *Winfield v. Roper*, 460 F.3d 1026, 1038-1039 (8th Cir. 2006), the Eighth Circuit determined that for AEDPA purposes the decision to review is the "last reasoned decision of the state courts." The Eighth Circuit reaffirmed this principle in *Worthington v. Roper*, 631 F.3d 487, 497 (8th Cir. 2011). This Court should consider only the "last reasoned decision."

The Supreme Court has held that the clauses "contrary to" and "unreasonable application of" have independent meaning. *Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Williams v. Taylor*, 529 U.S. 362, 385 (2000). The "contrary to"

21

clause applies when a state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases;" and the "unreasonable application of" clause applies when the state applies the correct legal standard but applies it unreasonably. *Williams*, 529 U.S. at 405.

Where the Nebraska courts did not apply the proper legal test or pertinent legal rules established by the Supreme Court, Galindo is entitled to relief under the "contrary to" clause if this Court independently determines that a non-harmless constitutional violation occurred. *See, e.g.*, *Williams v. Anderson*, 460 F.3d 789, 801-805 (6th Cir. 2006). In other words, if this court finds that the "contrary to" clause applies to a claim for relief, it is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation occurred. *Id*. A state court's adjudication of a claim can be both "contrary to" and an "unreasonable application of" clearly established federal law. *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 258 (2007). If a claim challenges the state court's findings of fact, the court must determine if the state court's decision was based on an unreasonable determination of the facts.

AEDPA only limits the ability to grant relief on claims adjudicated on the merits by the state court. 28 U.S.C. § 2254(d); *Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'") Thus, this Court is tasked with determining, on a claim-by-claim basis, whether § 2254(d) applies; when § 2254(d) does not apply, this Court conducts *de novo* review of the claim.

22

Finally, the limitation-on-relief provisions of § 2254(d) were not intended to be a federal court rubber-stamp for state court decisions that are demonstrably flawed. Such a standard would effectively render federal habeas review superfluous. As the Supreme Court noted: "Deference does not by definition preclude relief. A federal court can disagree with a state court's [decision] and, when guided by AEDPA, conclude the decision was unreasonable." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

### *§2254(d) only applies to claims and subparts of claims adjudicated on the merits.*

Whether § 2254(d) applies to a claim depends on how the state court addressed the claim. Section 2254(d) provides: "an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was *adjudicated on the merits . . .*" (emphasis added). If the state court failed to resolve the merits of the claim entirely or failed to reach any component of the standard prescribed for the claim by federal law, then § 2254(d) is inapplicable and review is *de novo. Wiggins,* 539 U.S. at 534 (addressing an ineffective assistance of counsel claim under *Strickland* and reviewing prejudice *de novo* because the state courts never reached the issue of prejudice); *Cone*, 556 U.S. at 472 ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'"); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005) (ruling in the context of an ineffective assistance of counsel claim that

23

"[b]ecause the state courts found the representation adequate, they never reached the issue of prejudice, and so we examine this element of the *Strickland* claim *de novo*"); *Nooner v. Norris*, 402 F.3d 801, 810 (8th Cir. 2005) ("Because the Arkansas Supreme Court never reached the prejudice issue, we review that issue *de novo*.")

*"Clearly established law."*

If an adjudication on the merits has occurred in state court, § 2254(d)(1) still requires relief where a state court's adjudication is "contrary to" or an "unreasonable application of" "clearly established law." "Clearly established" is not limited to an explicit statement from the Supreme Court or where Supreme Court precedent rests factually "on all fours." *White v. Coplan*, 399 F.3d 18, 25 (1st Cir. 2005); *Lewis v. Johnson*, 359 F.3d 646, 655 (3d Cir. 2004). "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007); *Carey v. Musladin*, 549 U.S. 70, 81 (2006) (Kennedy, J., concurring in judgment); *White v. Woodall*, 572 U.S. 415, 427 (2014).

Rather, Supreme Court cases, in combination, can create the "clearly established" law. The Supreme Court explained in *Wright v. Van Patten,* 552 U.S. 120, 126 (2008), that federal law is "clearly established" when the Court's case law already provides a "clear answer" to the question presented. A habeas court is not limited to one Supreme Court case in making its decision. It may rely on a matrix of cases from the Court to identify the controlling principle in the case before it. *Abdul-Kabir,* 550 U.S. at 257-258 (Finding a state court's "formulation of the issue"

24

unreasonable due to inattention to "the fundamental principles established by [this Court's] most relevant precedents"); *see also Tyler v. Cain*, 533 U.S. 656, 666 (2001).

While Respondent relies on *Woodall*, 572 U.S. 415, to restrict the above (Doc. 46 p. 15), this ignores specific language in *Woodall*, at 427[3] and the recent Supreme Court decision of *Andrew v. White*, 604 U.S. 86 (2025). *Andrew* refutes Respondent's limitation.

In *Andrew*, the Supreme Court ruled that a circuit court decision finding that the general or abstract rule at issue there could not satisfy AEDPA's "clearly established law" requirement was "wrong." *Id.* at 88. The Court reiterated: "To the extent that the Court of Appeals thought itself constrained by AEDPA to limit [the decision of this Court on which the petitioner relied] to its facts, it was mistaken." *Id.* at 94. The Court ruled that § 2254(d)(1) does not exclude abstract or general principles from qualifying as clearly established law. *Id.*; *see also id.* at 95 (citing *Taylor v. Riojas*, 592 U. S. 7, 9 (2020) (per curiam) ("'[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question'" (quoting *Hope v. Pelzer*, 536 U. S. 730, 741 (2002)))). The Court noted that when it relies on a legal rule or principle to decide a case, that principle is a holding of the Supreme Court for purposes of AEDPA. *Id.* at 92, citing *Lockyer v. Andrade*, 538 U. S. 63, 71-72 (2003). The Supreme Court remanded the

---

[3] "This is not to say that § 2254(d)(1) requires an "'identical factual pattern before a legal rule must be applied.'" *Panetti v. Quarterman*, 551 U.S. 930, 953 [] (2007). To the contrary, state courts must reasonably apply the rules "squarely established" by this Court's holdings to the facts of each case. *Knowles v. Mirzayance*, 556 U.S. 111, 122 [] (2009)."

25

case to the circuit court for a determination of whether the state-court decision unreasonably applied the Supreme Court's general rule. *Id.* at 95-96.

*"Contrary to"*

In *Williams*, the Court held that a decision is "contrary to" clearly established law "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the United States Supreme Court] and nevertheless arrives at a result different from our precedent," *Williams*, 529 U.S. at 406, 413; *Jackson v. Norris*, 651 F.3d 923, 925 (8th Cir. 2011); *Davis v. Coyle*, 475 F.3d 771, 776 (6th Cir. 2007), or "if the state court applies a rule that contradicts the governing law set forth in [United States Supreme Court] cases." *Williams* 529 U.S. at 405, 413; *Lafler v. Cooper*, 566 U.S. 156, 173 (2012); *Storey v. Roper*, 603 F.3d 507, 515 (8th Cir. 2010). This occurs where the state court identified the wrong precedent (*see Williams*, 529 U.S. at 406; *Fernandez v. Roe*, 286 F.3d 1073, 1076-78 (9th Cir. 2002) (state court relied upon wrong rule in assessing petitioner's *Batson* claim)); misstated or misunderstood the rule established by the governing precedent (*see Turrentine v. Mullin*, 390 F.3d 1181, 1190 (10th Cir. 2004) (Oklahoma Court of Criminal Appeals' decision that instructional error was harmless was "contrary to" *Chapman v. California* because it assessed harmlessness by determining whether eight pieces of evidence supported verdict, and "placed on the petitioner the burden of demonstrating prejudice"); *Darks v. Mullin*, 327 F.3d 1001, 1009 (10th Cir. 2003) ("The question under *Beck* . . . is whether there was sufficient evidence to warrant instructing the jury on the lesser included offense not [as the state court saw it] whether there was sufficient evidence to support the first degree murder

26

conviction"));, incorrectly determined that the governing precedent had been modified (*see Williams*, 529 U.S. at 391 (holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993) modified or in some way supplanted the rule set down in *Strickland*")); selected the wrong governing rule because of a defective determination of the facts (*Wiggins*, 539 U.S. at 528; *Miller-El v. Dretke*, 545 U.S. 231, 266 (2005)); or made some other mistake in selecting or stating the governing federal rule. "The addition, deletion, or alteration of a factor in a test established by the Supreme Court . . . constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of [2254(d)(1)]." *Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002); *see also Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 307, 310 (3rd Cir. 2016) (*en banc*) (same).

*"Unreasonable application of"*

According to the Supreme Court, a state-court decision involves an "unreasonable application of" clearly established law in at least two circumstances. One situation is when the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. *Williams*, 529 U.S. at 407-09. The second situation is when the state court unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply. *Id.* at 407-09. Being wrong is not enough. Rather, the state court's application must be "objectively unreasonable." *Id.* at 409.

Although not exclusive, a state court's application of federal law is "objectively unreasonable" under any of the above circumstances or when the state court (1) fails to consider all record facts legally relevant to the federal question, *id.*

27

at 397-98; (2) fails to recognize or appreciate the impact of legal principles made relevant, but not necessarily controlling by the facts of the case, *id.* at 397-98; or (3) assumes a necessary part of the relevant constitutional standard has been satisfied in lieu of actually determining that this is so on the basis of relevant record evidence. *Wiggins*, 539 U.S. at 526-27.

Further, a federal court's "reasonableness" analysis may be influenced by the scope and level of generality of the clearly established rule upon which the petitioner's claim relies.

> The range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). But "even a general standard may be applied in an unreasonable manner." *Panetti*, 551 U.S. at 953; *Macrum v. Luebbers*, 509 F.3d 489, 504 (8th Cir. 2007). Indeed, 2254(d) "does not prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those in which the principle was announced." *Panetti*, at 953; *Lockyer v. Andrade,* 538 U.S. 63, 76 (2003). This was the basis of the *Andrew* decision discussed above. 604 U.S. 86.

When assessing the reasonableness of a state court's decision, this Court's inquiry is limited to an examination of facts and inferences actually relied upon by the state court. In other words, the state's proffer of ways in which the state court

could have, but did not actually, interpret the record have "no bearing" on the questions posed by 2254(d). *Wiggins*, 539 U.S. at 529-30; *Dennis*, 834 F.3d at 283 ("When the state court pens a clear, reasoned opinion, federal habeas courts may not speculate as to theories that 'could have supported' the state court's decision.") The Supreme Court removed any doubt about this principle in *Wilson v. Sellers*, 584 U.S. 122 (2018). In *Wilson*, the Supreme Court noted: "This is a straightforward inquiry when the *last state* court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion. In that case, a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable." *Id.* at 125. It is necessary for reviewing courts to review case law from lower courts because such an inquiry is relevant to whether the state court unreasonably applied existing Supreme Court precedent. *See, e.g.*, *Carter v. Bowersox*, 265 F.3d 705, 715 (8th Cir. 2001); *Engesser v. Dooley*, 457 F.3d 731, 737 (8th Cir. 2006); *Atley v. Ault*, 191 F.3d 865, 871 (8th Cir. 1999).

In summary, the "unreasonable application" standard must be interpreted in a manner that allows meaningful review of state court decisions. To hold the contrary renders this proceeding a futile and empty formality, and unconstitutional because it eliminates this Court's ability to say what the law is pursuant to *Loper Bright* and *Marbury*.

*"Unreasonable determination of facts"*

In connection with several of Galindo's grounds for relief, this Court must also address whether the Nebraska Supreme Court decision "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). If the Court

29

determines that the Nebraska Supreme Court decision rests upon a significant factual flaw, this Court is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation has occurred. *See, e.g., Gabaree v. Steele*, 792 F.3d 991, 999 (8th Cir. 2015); *Simmons v. Luebbers*, 299 F.3d 929, 937-38 (8th Cir. 2002); *Ward v. Sternes*, 334 F.3d 696, 703-704 (7th Cir. 2003); *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

The question of whether the state court's decision resulted from an unreasonable determination of the facts in light of the evidence presented in the state court proceeding can be more simply stated as whether the state court's decision rests on factual determinations that are somehow inconsistent with, or unsupported by, the evidence presented to the state court. *Miller-El II*, 545 U.S. at 265-66 ("It is true that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence . . . is viewed cumulatively its direction is too powerful to conclude anything but discrimination."); *Wiggins*, 539 U.S. at 528; *see also, e.g., Gabaree*, 792 F.3d at 999 (citing *Wiggins*, 539 U.S. at 526-27) (State court's "post hoc rationalization of counsel's conduct" was an unreasonable determination of fact); *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1048 (7th Cir. 2005) (State court decision was based on unreasonable determination of the facts where state court finding was "unsupported by sufficient evidence" and rebutted by record); *Newman v. Harrington*, 726 F.3d 921, 930-31 (7th Cir. 2013) (State court unreasonably determined facts by "ignoring a wealth of evidence" supporting defendant's claim of mental retardation and incompetence); *Guidry v. Dretke*, 397 F.3d 306, 328 (5th Cir. 2005) (granting relief in capital case where state court's

decision was based on factual finding that ignored countervailing record evidence). As the Seventh Circuit noted in *Ward*: "A state court decision that rests upon a determination of fact that lies against the clear weight of the evidence is, by definition, a decision 'so inadequately supported by the record' as to be arbitrary and therefore objectively unreasonable." 334 F.3d at 704.

**Statement Regarding Need for Discovery and An Evidentiary Hearing[4]**

Galindo sought and was denied the opportunity to develop facts related to any of his post-conviction claims. Because the state courts effectively staged a complete denial of evidentiary development at the insistence of the State, Galindo comes to this Court with clean hands. While Galindo avers more than one of his habeas claims are entitled to factual development, one claim deserves particular attention here.

In Habeas Claim 4, Galindo alleges the trial prosecutor labored under a conflict and acted in a manner designed to insulate himself from a corruption probe. Doc. 39 pp. 61-70. As noted by the Nebraska Supreme Court, "it would be a great understatement to say that the county attorney would be deserving of serious condemnation" based on these allegations. Doc. 30-4 p. 64. The Nebraska Supreme Court noted: "[a]t the heart of Galindo's prosecutorial conflict of interest claim is many of the same allegations regarding the county attorney's criminal activities and associations…[and] that as a result of the county attorney's involvement with

---

[4] Galindo will separately file a motion for discovery and an evidentiary hearing.

31

State witnesses, the county attorney's personal interests influenced his decisions in Galindo's case." *Id.* P.52.

> Dissenting Justice Papik noted the depth of the allegations:
>
> Galindo's prosecutorial conflict of interest claim is rooted in allegations that the county attorney was involved in a criminal drug ring. Galindo does not challenge his underlying convictions but claims that the county attorney's criminal exposure influenced his decisions in the aggravation phase of Galindo's case. Specifically, Galindo's postconviction motion alleged that the aggravation phase of his case provided the county attorney with an opportunity to attempt to shield himself from federal scrutiny of his own criminal activities through the following scheme: Participants in the drug ring would testify against Galindo by implicating him in the death of Travis Lundell, and that testimony would allow the county attorney to recommend against further federal investigation of the drug ring's participants and reduce the chances that federal authorities would discover his own connections to the drug ring.

*Id.* p. 68, 69 (Papik, J., dissenting). Yet, the Nebraska Supreme Court unreasonably characterized the claim by constricting its harmlessness review; as noted by Justice Papik:

> In addition to allegations that the county attorney's alleged conflict undermines confidence in the jury's findings regarding the Lundell murder, Galindo's postconviction motion alleged that the county attorney's conflict affected the fairness of the proceedings and would have made the county attorney subject to a motion for disqualification had Galindo known of the conflict at the time. Galindo thus alleged that the county attorney's *participation* in the penalty phase of the proceedings violated his right to due process. Accordingly, I believe prejudice must be assessed by determining whether the same sentences would have been imposed had the case been prosecuted by a nonconflicted prosecutor.

*Id.* p. 72 (Papik, J., dissenting).

The Supreme Court in *Williams v. Taylor* explained that "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." 529 U.S.

32

420, 432 (2000). The overall standard for 2254(e)(2) is higher than the cause and prejudice test developed in *Kenney v. Tamayo-Reyes*, 504 U.S. 1 (1992). *Williams*, 529 U.S. at 433. But the meaning of "failure to develop" mirrors the Court's earlier discussion in *Kenney*. *Id.* Therefore, the "failure to develop" analysis is entirely a function of whether the petitioner has "made a reasonable effort to discover the claims to commence or continue state proceedings." *Id.* at 443. A petitioner is not at fault if he does not "bear[] responsibility" for his failure to develop the factual intricacies of his claims. *Id.* at 432. Here, Nebraska "bears responsibility" for the failure to factually develop the facts surrounding the prosecutor's conflict and its impact.

*Shinn* later clarified that the negligence of a petitioner's state post-conviction counsel is attributable to that petitioner for the purposes of 2254(e)(2). 596 U.S. at 386-87. However, attorney negligence is not present where the state creates an obstacle to the development of a petitioner's factual claim, as happened in Galindo's circumstance. And, *Shinn* confirmed the sustaining principle from *Williams*:

> Namely, §2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim." We interpret "fail," consistent with Keeney, to mean that the prisoner must be "at fault" for the undeveloped record in state court. 529 U. S., at 432, 120 S. Ct. 1479, 146 L. Ed. 2d 435. A prisoner is "at fault" if he "bears responsibility for the failure" to develop the record. *Ibid.*

*Shinn*, 596 U.S. at 382; *see also Martinez v. Whitmore*, 2025 U.S. Dist. LEXIS 30967 *32-*33 (Neb. 2025); *Torres v. Jeffreys*, 2025 U.S. Dist. LEXIS 30967 *32-*33 (D. Neb. Feb. 21, 2025).

In *Williams v. Norris*, the Eighth Circuit was already applying the agency theory for negligence that the Court approved in *Shinn*. 576 F.3d 850, 862 (2009). The Eighth Circuit justified its finding that Williams failed to develop the factual predicate for his claims in state court because "the hearing record reveals no state court ruling or other state-created impediment that prevented Williams" from developing his claims. *Id.* Exactly the opposite situation occurred here.

The facts in Galindo's case suggest that the county prosecutor, acting within a broader context of corruption, prevented the discovery of details about his own federal prosecution, his interactions with numerous prosecution witnesses, and his contacts with prison administrators. As noted by Justice Papik: "I believe prejudice must be assessed by determining whether the same sentences would have been imposed had the case been prosecuted by a nonconflicted prosecutor." *Id.* p. 72 (Papik, J., dissenting).

*Williams v. Taylor* should be considered instructive in its discussion of state-imposed barriers to factual development. Justice Kennedy wrote in his opinion for the Court that if "the prosecution concealed the facts," then a petitioner who nevertheless remained diligent in pursuing his claim in state court would be entitled to a federal evidentiary hearing. 529 U.S. at 434. Obviously, County Attorney Smith was not forthcoming with information about the federal investigation into him and his use of drugs—or presence around drugs—with key witnesses in Galindo's case. In this respect, prosecutorial misconduct itself prevented the development of the factual basis for Galindo's claims in state court,

34

not any lack of diligence on his or his counsel's part. Indeed, that was the reason for the prosecutor's involvement—to shift attention from himself.

Consequently, this habeas proceeding is particularly well-suited to yield an evidentiary hearing, where demonstrable state-court bias overcomes AEDPA's federalism and comity concerns. As noted by the Eighth Circuit, "Diligence in this context 'depends upon whether the prisoner made a reasonable attempt, in light of the information available at the time, to investigate and pursue the claims in state court; it does not depend . . . upon whether those efforts could have been successful.'" *Marcyniuk*, 39 F.4th at 999 (quoting *Williams*, 529 U.S. at 435).

Because Galindo diligently pursued his claims and was only precluded from doing so because of state-imposed barriers, § 2254 (e)(2) does not apply. *See Williams*, 529 U.S. at 437. He is thus exempt from "showing compliance with the balance of the subsection's requirements." *Id.*

Further, Habeas Rule 6 authorizes district court judges to grant discovery requests where "good cause" exists. Rules Governing Section 2254. "A party requesting discovery must provide reasons for the request. The request must also include any proposed interrogatories and requests for admission and must specify any requested documents." *Id.*

In *Bracy v. Gramley*, the Supreme Court clarified the "good cause" standard: "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." 520 U.S. 899, 908 (quoting *Harris v.*

35

*Nelson*, 394 U.S. 286, 300 (1969)). The Court there decided that Bracy had met the requirements under Habeas Rule 6(a).

The facts of *Bracy* are comparable to those here. In *Bracy*, the petitioner alleged significant corruption on the part of the trial judge, Thomas J. Maloney, who was ultimately convicted of taking bribes from defendants in other criminal cases. 520 U.S. at 899. The Court explained that the typical presumption that public officials "properly discharge[] their official duties" was not applicable under those circumstances. *Id.* at 909. Similarly, here, Smith was subject to a federal investigation for his participation in the Padilla drug ring. Even though Smith was not indicted, prosecutors still maintain a recognized responsibility to "see that justice is done," thus, Galindo has also met the threshold for an evidentiary hearing on a corruption-based claim. *Connick v. Thompson*, 563 U.S. 51, 73 (2011).

The Court in *Bracy* also emphasized that the petitioner had evidence that the then-judge Maloney "was actually biased in petitioner's own case." 520 U.S. at 909. Galindo likewise has evidence that Smith's criminal involvement affected his trial, especially because of the existing relationship between Smith and Abendano and other witnesses. The similarities between *Bracy* and Galindo's cases are legally relevant in indicating that evidentiary hearings are warranted even where judicial actors outside of the defense are the source of factual details for a petitioner's claim.

In *Smith v. United States*, the Eighth Circuit noted that the petitioner's "request for production of documents merely listed the records he sought to obtain." 618 F.2d 507, 509 (8th Cir. 1980). The record transcripts also affirmatively disproved the petitioner's claims of error and contained the "appellant's admission

36

to the crimes charged, and his description of how he committed them." *Id.* at 510.

However, given Justice Papik's dissent joined by Justice Miller-Lerman, where he

noted the "lack of any evidence at this stage as to what a nonconflicted prosecutor

would have done," Galindo's claim raises an unanswered factual question in a way

that *Smith v. United States* simply did not. Doc. 30-4 p. 73. In short, the scope and

extent of discovery in Galindo's case is a matter vested to the discretion of this

Court. *See Bracy,* 520 U.S. at 909.

**Habeas Claims for Relief**

For the following reasons and as set forth more fully in his Amended Habeas Petition, the Court should grant the petition for a writ of habeas corpus and vacate Mr. Galindo's convictions and/or death sentence.

**Claim 1:  Mr. Galindo was deprived of his Sixth and Fourteenth Amendment rights when the State of Nebraska failed to grant a change in venue.**

"Around Norfolk, a regional shopping and business hub of 23,500 people in northeast Nebraska, many people say there's **little question of the suspects' guilt and little doubt that they all deserve the death penalty**." Doc. 32-6 p. 39 (Omaha World Herald, Sep. 24, 2003) (emphasis added).

This is the sentiment Galindo faced. However, the right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, '*indifferent*' jurors." *Irvin v. Dowd*, 366 U.S. 717, 721 (1961) (emphasis added). Furthermore, "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton v. Yount*, 467 U.S. 1025, 1031 (1984) (citing *Irvin*, 366 U.S. at 717). Galindo's rights in this regard were violated when the media was similar in volume, kind, and worse in effect than in *Irvin* and *Patton*. Respondent properly concedes the argument before this Court is on the merits. Doc. 46 p. 49.

Respondent notes that "*Irvin* was one of those rare cases." Doc. 46 p. 57. The trial court commented to all jurors the "uniqueness" of Galindo's case. Doc. 30-50 p. 95; Doc. 31-1 p. 164. It is indeed rare that one crime would lead to the reestablishment of the death penalty within months of its occurrence, and because it remains so ensconced in the public's mind, would be a central basis of a public

38

referendum against abolition a decade and a half later. Galindo's circumstances mirror those of *Irvin* regarding its rarity. Additionally (as will be demonstrated), the facts herein equate if not surpass those of *Irvin*.

Galindo agrees with the Nebraska Supreme Court on two points:

- There was an absolute resurgence of publicity at the time of Galindo's trial, driven by the crime's anniversary and the co-defendant's trials. Doc. 30-1 p. 8;

- The overwhelming public sentiment at the time included the opinion that Galindo deserved the death penalty. *Id.*

Galindo's case is astonishingly similar to *Irvin*, where the Supreme Court found an abuse of discretion for the trial court's refusal to grant a change of venue. 366 U.S. at 729. Here, the Nebraska Supreme Court's conclusion is contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts considering the evidence presented. *See* 28 U.S.C. § 2254(d)(1)–(2).

The Nebraska Supreme Court erred when it failed to meaningfully consider the jurors who were impaneled when it found the jury pool was impartial. An examination of the impaneled jurors' voir dire in the context of the substance of the substantial prejudicial publicity establishes the unreasonableness of the state court's *conclusion made without a citation to the trial record. See* Doc. 30-1 pp. 29-32; *Williams*, 529 U.S. at 397-98 (state court acts unreasonably when it fails to consider all record facts legally relevant to the federal question); *Gabaree,* 792 F.3d at 999; *Simmons*, 299 F.3d at 937-938.

39

The Nebraska Supreme Court failed to consider and examine what the sitting jurors explicitly stated, on the record, during voir dire. Galindo reproduces from his Amended Petition a chart of the impaneled jurors' exposure to prejudicial media (100%), victims, family or witnesses (>50%), and guilt (67%), none of which was mentioned by the Nebraska Supreme Court or contested by Respondent.

| Juror # | Media Exposure - 100% | Knew victims or witnesses - 50% | Guilt/Involvement – 67% |
|---|---|---|---|
| Juror 1 | Yes. Doc. 30-50 p. 135. | | Thought he was involved. Doc. 30-50 p. 143. |
| Juror 2 | Yes. Doc. 30-50 p. 157. | | |
| Juror 3 | Yes. Doc. 30-51 pp. 4, 18. | Yes. Doc. 30-51 p. 3. **2** – Ms. Tuttle been to her house for dinner. *Id.* p. 11; Saw Elwood 32 times over the years. *Id.* p. 13. | |
| Juror 4 | Yes. Doc. 30-51 pp. 96, 114-15 (describes as extensive) | | Talked with others, no one thinks not guilty. Doc. 30-51 p. 107. |
| Juror 5 | Yes. Doc. 30-51 pp. 124, 145. | | Talked with others, community thinks he is guilty. Doc. 30-51 p. 135. |
| Juror 6 | Yes. Doc. 30-51 p. 187; 30-52 pp. 2-3 – noted "everyone is its national" | Yes. Doc. 30-51 p. 187. **2** – Told Mr. Sun's wife "I'm sorry." Doc. 30-51 p. 197. Rented to Officer Zach. Doc. 30-52 p. 3. | |
| Juror 7 | Yes. Doc. 30-52 pp. 55-56, 76. | Yes; **1** – Same pre-school as Officer Thorson. Doc. 30-52 p. 77. | Talked with others – community thinks he is guilty. Doc. 30-52 pp. 71–72. |

40

| Juror 8 | Yes. Doc. 30-52 pp. 86-87, 97-98. | | Talked with others – community thinks he is guilty. Doc. 30-52 p. 102. |
|---|---|---|---|
| Juror 9 | Yes. Doc. 30-53 pp. 88, 113-14. | Yes. **2** – Knows Ms. Koepke. Doc. 30-53 pp. 110–11. Went to school with Zach's first wife. Doc. 30-53 pp. 113. | Inconsistently noted believed Galindo's co-defendants were guilty and, despite saying she had no opinion on Galindo, she believed he was in the bank at the time of the shooting. Doc. 30-53 pp. 104-06. Relieved because they caught the right people. Doc. 30-53 pp. 102, 104. |
| Juror 10 | Yes. Doc. 31-1 pp. 86-87. | | |
| Juror 11 | Yes. Doc. 31-1 pp. 181-82; Doc. 31-2 pp. 4-5. | Yes. **6** – Worked with Ms. Tuttle. Doc. 31-1 p. 180. Worked with Mr. Sun's ex-wife. *Id.* His only problem is knowing the victims from this crime. *Id.* p. 196. Knows Ms. Koepke. *Id.* p. 201. Knows Ms. Cahoy Doc. 31-2 p. 2) Knows Ms. Jere Anderson. *Id.* pp. 2-3. Probably dealt with Ms. Mausbach. *Id.* pp. 7-8. | Talked with others – community thinks he is guilty. Doc. 31-1 p. 199. Appearance that Galindo is guilty. *Id.* No presumption of innocence. *Id.* p. 200. |
| Juror 12 | Yes. Doc. 31-2 pp. 114, 135-36. | Yes. **3** – Knows Mr. Rob Bryant. Doc. 31-2 p. 113. | Opinion is he is guilty. Doc. 31-2 pp. 130, 131. |

41

| | | Knows Ms. Cahoy. *Id.* p. 133.<br>Knows Ms. Jere Anderson. *Id.* p. 135. | |
|---|---|---|---|
| Alt 1 (became Juror 8) *Fore-person | Yes. Doc. 31-3 pp. 156-57, 182-83. | Yes. **1** – Known Mr. Rob Bryant since childhood. Doc. 31-3 p. 156. | Assumes caught the right guys; never heard they got the wrong guys. Doc. 31-3 pp. 173–74, 176. |
| Alt. 2 | Yes. Doc. 31-4 p. 60. | | Opinion is guilty. Doc. 31-4 pp. 62, 76. |

Additionally, Juror 4 also acknowledged the community sentiment toward the codefendants calling for guilt and death, describing it as "natural" to feel that way and sharing in the sentiment at times. Doc. 30-51 pp. 108-08. Juror 7's husband called her the day of the shooting warning her to be safe because she regularly drives around the U.S. bank, and she was "relieved" when Galindo and his co-defendants were taken into custody, because she did not have to be on the look-out for the shooters. Doc. 30-52 pp. 58-59. Juror 7 interpreted the Judge's instructions as "telling [the jurors] to find them guilty." Doc. 30-52 p. 61. Juror 8, who was later replaced by Alternate Juror 1 during trial, stated he was glad Galindo and his co-defendants were "caught" because he had been "scared." Doc. 30-52 pp. 89-90. Juror 9 also expressed relief when Galindo was caught. Doc. 30-53 pp. 90. Juror 10's neighbor knew "all" the victims and talked with Juror 10 before she was impaneled on the jury. Doc. 31-1 pp. 91, 102.

The Nebraska Supreme Court improperly minimized and mischaracterized the substance of the pervasive media accounts. As noted above, every juror sitting at Galindo's trial was exposed to prejudicial media coverage, 100%. Specifically, the

42

court unreasonably stated the media was not "invidious or inflammatory." Doc. 30-1 p. 30. This is simply wrong. While mentioning it in passing, the Nebraska Supreme Court failed to meaningfully address the victim opinion evidence from multiple family members (universally wanting death) portrayed in the media.

That evidence was overwhelming and unremitting that Galindo and the others should be executed and that the death penalty should be enforced.

a. "Said Dave Mausbach of Humphrey, whose wife, Jo, was killed: 'If she got killed by a drunk driver, I could deal with that. But they just wanted to kill everyone. That's all they went in there for.'" Doc. 32-6 p. 14.

b. "'I get tired hearing about their rights,' he said of the four men charged in the bank slayings. 'I thought, what the hell's this? I feel you should have no rights after you kill someone.'" (Dave Mausbach, husband of Jo Tichy Mausbach) Doc. 32-6 p. 20.

c. "Yet, he and Larry agree on one thing — the **killers deserve the death penalty**." Doc. 32-6 p. 20. (Lisa Bryant's father) (emphasis added)

d. "'That's the scary part, where you have a jury and they can say he's innocent. You know he's not,' Bryant said. 'So that's where I got a little relief when he pleaded guilty to all the charges. **Now I just hope he gets the death penalty**.'" Doc. 32-6 p. 22 (emphasis added).

e. "Rob Bryant, whose wife, Lisa, was shot and killed by Vela inside the bank, said the verdict on the aggravating circumstances was expected yet gave him little reason to rejoice. 'It ain't going to change anything,' Bryant said Tuesday. '**It just means he gets what he deserves**.'" Doc. 32-6 p. 39 (emphasis added).

f. "The jury's decision this week that one of the men charged in the bank slayings qualified for **the death penalty has brought some small comfort**, [Evonne Tuttle's sister] said." Doc. 32-6 p. 50 (emphasis added).

g. "Some of the 10 families and friends of the victims sobbed as Moore argued that the murders weren't cruel enough to warrant execution." Doc. 32-14 p. 10.

h. "Afterward, members of the **victims' families** expressed gratitude for the verdicts and **voiced hope that the three judge panel would impose the death sentence**. "It was all there in black and white for everyone to see," Evonne Tuttle's sister, Angie Chart of Omaha, said of Sandoval's involvement. "We're hoping that the three-judge panel will agree. '[Sandoval] **doesn't deserve to live**,' said Christine Tuttle, Evonne Tuttle's daughter." Doc. 32-14 p. 9 (emphasis added).

i. "There's nothing they can do that will take away the pain that we have. **Death is not a severe enough punishment for them**." Sara Sun (ex-wife of Samuel Sun) ST. Ex. 7 p. 334 (emphasis added).[5]

j. "This was the first time Bryant's husband, Rob, saw Vela in person. He said –– quote –– 'At least he can admit he had done the crime.' **He says Vela deserves the death penalty**. Bryant's mother –– Coni Johnson of O'Neill –– says she was glad Vela entered guilty pleas –– but it didn't come soon enough. She says guilty pleas months ago would have been a sincere effort on Vela's part if he is truly remorseful." ST. Ex. 7 p. 908 (emphasis added).

k. "In the wake of the Norfolk bank slayings, Gov. Mike Johanns is wondering whether a debate on Nebraska's death penalty law can wait until 2003." Doc. 32-3 p. 45.

l. "One question is whether a special session is necessary for the death penalty to be pursued against the four men charged in the Norfolk slayings of five." Doc. 32-3 p. 45.

m. "Did you see the smirk on the face of one of the suspects? It makes you want to ... **We should just string them up and be done with it**. Their victims didn't get a fair trial, why should they?" Doc. 32-3 p. 46 (emphasis added).

---

[5] ST Ex. 7 was not filed with the record. Galindo will file a Rule 5 Motion to supplement the record with this missing portion of the relevant state court record.

n.  "Demand justice for the five victims of the US Bank robbery and to not stand for legal games or endless court appeals. **Work to restore the death penalty to Nebraska**, given that its legality has been questioned by a recent court ruling, in hopes that it will serve as an effective deterrent." Doc. 32-3 p. 46 (emphasis added).

o.  "Any momentum that might have been gathering for repeal of the death penalty in Nebraska **was exploded by the same bullets** that killed five people in that attempted bank holdup in Norfolk, Neb., last week. There is, instead, new momentum for amending Nebraska's capital punishment law, if necessary, to make sure it meets a new test imposed by a U.S. Supreme Court decision. . ." Doc. 32-3 p. 62 (emphasis added).

p.  "If readers participating in a nonscientific Daily News survey had their way, the death penalty in Nebraska would be clarified. The latest question asked, 'What's the best way to deal with **the tragedies that have occurred in Norfolk** recently?' A total of 56.9 percent responded 'Push state senators to **restore the death penalty** to Nebraska.'" Doc. 32-3 p. 103.

q.  "Rather than lethal injection, **I suggest that our lawmakers consider the guillotine**. Consider it, not use it. Those who advocate changing Nebraska's mode of execution from electrocution to lethal injection argue that the latter is more humane. If a kinder, swifter mode of killing is the aim, **the guillotine would really be the better way**." Doc. 32-3 p. 128 (emphasis added).

r.  "Life in prison is a free ticket to murder. Nebraskans need to take a stand and let criminals know that when they break the law and kill someone, **they might very well die as well**. There should be no excuses for the guilty. Life in prison for murder is a free meal at the taxpayers' expense." Doc. 32-3 p. 140 (emphasis added).

s.  "Yes, as individuals we are commanded to 'turn the other cheek.' But the Bible clearly supports a government's responsibility and duty to punish evildoers. God's chosen people, the Jewish nation, had death penalties directly given to them by God for certain crimes. And, yes, Jesus was crucified "wrongly," but if you read the Bible closely, you would soon see that Jesus Himself declared that He needed to die. That was why He came. I don't support the death penalty because it costs less. **I support the death**

45

4:23-cv-03241-JFB-RCC    Doc # 53    Filed: 06/26/26    Page 53 of 374 - Page ID # 13304

**penalty** because it promotes righteousness, justice and adherence to the law." Doc. 32-3 p. 146 (emphasis added).

t.  "A person takes somebody's life and they deserve to die," Soucie [Vela's attorney,] read from one of the responses. "**These people killed five people and need to pay for what they did with their lives**," another one said. Others said the **electric chair wasn't enough of a punishment**. One suggested **taking them to an isolated area and shooting them**; another suggested a firing squad. "**They want them dead**," Soucie said of the responses. Doc. 32-3 p. 267 (emphasis added).

u.  "'He never gave the victims a chance, why should we?' was one of the responses that [Vela's attorney] read in court." Doc. 32-3 p. 276.

v.  "The fact that they are not yet in prison, or better yet, dead, is a constant reminder of the true injustice of our judicial system. Each and every day I hope for the end of their trials when, hopefully, justice finally will be served." Doc. 32-6 p. 31.

w.  "Madison County Attorney Joe Smith said he was proud of the jury for being able to find the bank slayings heinous enough to warrant the death penalty." Doc. 32-6 p. 27.

x.  "Smith, however, told the jury to 'do your duty' and find that Vela deserves the death penalty. 'Don't forget the five people who died Sept. 26,' he told jurors." Doc. 32-6 p. 28.

y.  "For that crime, **she thinks the guilty parties should get the punishment they deserve** for killing five people inside the U.S. Bank branch on Sept. 26, 2002 — **the death penalty**" Doc. 32-6 p. 41 (Juanita Ramirez, bank employee) (emphasis added).

z.  "[Sgt. Don] Clyde testified that as he and Matchett were detaining Vela and Galindo, passers-by who were aware of the Norfolk slayings hollered, '**You ought to just hang them!**'" Doc. 32-10 p.10 (emphasis added).

46

aa. "One picture has been in the paper several times and I pose this question to all electrical engineers: **How much electricity does it take to remove a smirk from someone's face?**" Doc. 32-10 p. 52 (referring to Sandoval) (emphasis added).

The Nebraska Supreme Court acted in a manner contrary to and/or unreasonably applied *Bosse v. Oklahoma*, 580 U.S. 1 (2016) and *Booth v. Maryland*, 482 U.S. 496 (1987). As noted in *Boose*, 580 U.S. at 3, victim opinion evidence is prohibited in a capital case; it is barred. Opinion evidence as to the appropriate sentence for the defendants does not relate to personal characteristics and *per se* violates the Eighth Amendment. Multiple courts have recognized that principle. *United States v. Savage*, 970 F.3d 217, 298 (3d Cir. 2020); *Baer v. Neal*, 879 F.3d 769, 785 (7th Cir. 2018); *United States v. Harrell*, 2023 U.S. App. LEXIS 10810 at *5 (9th Cir. 2023); *Harris v. Sharp*, 941 F.3d 962, 1007 (10th Cir. 2019). The Eighth Circuit in *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010), recognized that the Supreme Court left intact the prohibition against opinions about the appropriate sentence.

The statements from victims' family members, along with the greater community sentiment that Galindo deserved the death penalty, violate principles set forth in both *Irvin* and *Bosse*. Every juror empaneled at Galindo's trial had media exposure, and that media included frequent, consistent inclusions of those prejudicial sentencing opinions. The expression of opinions here were more than those found to constitute *per se* error in *Booth*, 482 U.S. at 508 (the victims' son stated he "[didn't] think anyone should be able to do something like that and get

47

away with it" and their daughter said she didn't "feel that the people who did this could ever be rehabilitated.") *Id.*

The statements from victims' family members to the media prior to Galindo's trial, while extrajudicial, go far and above the remarks in *Booth*. The death or "kill them" opinions represented a particular danger here given the voir dire answers provided by some of the jurors. As noted, 50% of the jurors had some contact with the victims or the victims' families. And some of those jurors had relationships with those suggesting that Galindo should be killed.

| Juror # | Relationship disclosed in voir dire | Content of Media Statement |
|---|---|---|
| 3 | Been to Ms. Tuttle's house for dinner. Doc 30-51 p. 11. | "The jury's decision this week that one of the men charged in the bank slayings qualified for the death penalty has brought some small comfort, [**Evonne Tuttle's sister**] said." Doc. 32-6 p. 50. "Afterward, members of the victims' families expressed gratitude for the verdicts and voiced hope that the three judge panel would impose the death sentence. "It was all there in black and white for everyone to see," Evonne Tuttle's sister, Angie Chart of Omaha, said of Sandoval's involvement. **"We're hoping that the three-judge panel will agree. '[Sandoval] doesn't deserve to live**,' said Christine Tuttle, Evonne Tuttle's daughter." Doc. 32-14 p. 9 |
| 6 | Told Mr. Sun's wife "I'm sorry." Doc. 30-51 p. 197. | "There's nothing they can do that will take away the pain that we have. **Death is not a severe enough punishment** for them." Sara Sun (ex-wife of Samuel Sun) ST. Ex. 7 p. 334 |
| 11 | Worked with Ms. Tuttle. Doc. 31-1 p. 180. Worked with Mr. Sun's ex-wife. *Id.* | See both cells above |

48

| | | |
|---|---|---|
| 12 | Knows Mr. Rob Bryant. Doc. 31-2 p. 113. | Yet, he and Larry agree on one thing — the killers deserve the death penalty." Doc. 32-6 p. 20. (Lisa Bryant's father) "'That's the scary part, where you have a jury and they can say he's innocent. You know he's not,' Bryant said. 'So that's where I got a little relief when he pleaded guilty to all the charges. Now I just hope he gets the death penalty.'" Doc. 32-6 p. 22 "Rob Bryant, whose wife, Lisa, was shot and killed by Vela inside the bank, said the verdict on the aggravating circumstances was expected yet gave him little reason to rejoice. 'It ain't going to change anything,' Bryant said Tuesday. 'It just means he gets what he deserves.'" Doc. 32-6 p. 39. "This was the first time Bryant's husband, Rob, saw Vela in person. He said — quote — 'At least he can admit he had done the crime.' **He says Vela deserves the death penalty**. Bryant's mother — Coni Johnson of O'Neill — says she was glad Vela entered guilty pleas — but it didn't come soon enough. She says guilty pleas months ago would have been a sincere effort on Vela's part if he is truly remorseful." ST. Ex. 7 p. 908. |
| 8 (former Alt-1) | Known Mr. Rob Bryant since childhood. Doc. 31-3 p. 156. | See above cell. |

Five of the empaneled jurors had a relationship with a victim whose family expressed their opinion in the media that Galindo should be executed. That opinion would have carried more for someone with a prior relationship with the decedents. Further, because all jurors were exposed to this coverage, its impact cannot be ignored. "[T]hese emotionally charged opinions as to what conclusions the jury should draw" affected their deliberations and likely contributed to the ultimate

49

sentence. *Booth*, 482 U.S. at 508. Such opinions "serve no other purpose than to inflame the jury" and thus violated Galindo's right to a fair and impartial trial. *Id.* It is precisely what the Court said in *Irvin*, even though there was "[n]o doubt each juror was sincere when he said that he could be fair and impartial to petitioner, . . . the psychological impact" only allows statements of impartiality to be given "little weight." *Irvin*, 366 U.S. at 728. Given this record, it is incredible the Nebraska Supreme Court concluded no media "inflamed public passion against him." Doc. 30-1 p. 31.

The Nebraska Supreme Court should have concluded that Galindo was entitled to a change of venue after finding "[s]ome people interviewed . . . expressed their opinion that the defendants all deserved the death penalty." Doc. 30-1 p. 8. As demonstrated above, it was not just "some people" who expressed that opinion to the media, it was members of the victims' families, with whom many jurors had close contact. Exposure to statements by victim family members that they wanted the defendants dead went far and above press coverage merely "factual in nature," as the Nebraska Supreme Court held. *Id.* p. 31. The Court's conclusion was simply not supportable. *See Williams*, 529 U.S. at 397-98 (state court acts unreasonably when it fails to consider all record facts legally relevant to the federal question); *Miller-El II*, 545 U.S. at 265-266 (In the *Batson* context noting: "It is true that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence . . . is viewed cumulatively its direction is too powerful to conclude anything but discrimination."); *Wiggins*, 539 U.S. at 528; *see also, e.g., Gabaree*, 792 F.3d at 999 (citing *Wiggins*, 539 U.S. at 526-27) (State court's "post hoc

50

rationalization of counsel's conduct" was an unreasonable determination of fact); *Ben-Yisrayl v. Davis*, 431 F.3d 1043, 1048 (7th Cir. 2005) (State court decision was based on unreasonable determination of the facts where state court finding was "unsupported by sufficient evidence" and rebutted by record.).

The Nebraska Supreme Court ignored a critical principle of clearly existing federal law: the Supreme Court has found that where public opinion created a "circus atmosphere" that was "entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness," the Court "rejects the verdict of a mob." *Murphy v. Florida*, 421 U.S. 794, 799 (1975). The pervasive media statements opining on the need for a death sentence reflect just such a mob mentality and total lack of solemnity and sobriety:

> "We should just **string them up** and be done with it." Doc. 32-3 p. 46 (emphasis added);

> "I suggest that our lawmakers **consider the guillotine**…[if a] swifter mode of killing is the aim, the guillotine would really be the better way." Doc. 32-3 p. 128 (emphasis added);

> "These people killed five people and need to pay for what they did with their lives…**electric chair wasn't enough of a punishment**…taking them to an isolated area and shooting them; another suggested a firing squad…they want them dead." Doc. 32-3 p. 267 (emphasis added);

> "You ought to **just hang them**!" Doc. 32-10 p.10 (emphasis added); and,

> "How much electricity does it take to remove a smirk from someone's face?" Doc. 32-10 p. 52.

These and the myriad of additional comments that saturated the press coverage about the case created the kind of unfair and prejudicial atmosphere about which the Supreme Court warned in *Murphy*. The Nebraska Supreme Court's

51

conclusion was contrary to or an unreasonable application of clearly established law and rested on an unreasonable determination of the facts. *Williams*, 529 U.S. at 397-98; *Miller-El II*, 545 U.S. at 265-266.

After inaccurately characterizing the press coverage as merely "factual in nature," the Nebraska Supreme Court then almost immediately stated that Galindo did not argue the publicity displayed animus or hostility to him. Doc. 30-1 p. 31. This is simply not the case. He raised the claim and argued that the media coverage was "extremely prejudicial." Doc. 30-12 p. 77. The Court made an unreasonable determination and it is rebutted by the record.

The Supreme Court has held that "adverse pretrial publicity can create such a presumption of prejudice in a community that the jurors' claims that they can be impartial should not be believed." *Patton*, 467 U.S. at 1031 (citing *Irvin*, 366 U.S. 717). As detailed above, substantial media coverage that included the community's opinion—and importantly, the opinion of victims' family members—that Galindo deserved the death penalty is of such a nature to create a presumption of prejudice – just as it would if exposure occurred in the jury box.

The pretrial publicity also included overwhelming and unremitting racially inflammatory comments and frequent comparisons to the terrorist attacks of 9/11.

> a. "I hope the white community understands that there is Spanish trash. I hope innocent people among the Hispanic community aren't negatively affected by the actions of a few idiots." Doc. 32-3 p. 17 (community member Abraham Montalvo Jr.).

> b. "Two of the men were associated with a gang, the Latin Kings, while in prison." Doc. 32-3 p. 53.

c.  "There have been some reports that the four suspects may have been in the country illegally, but Madison County Sheriff Vern Hjorth said that doesn't appear to be the case." Doc. 32-3 p. 61.

d.  "Norfolk's Hispanic population has grown mightily in recent years, a growth that doubtless brings with it all the bruises and growing pains that ordinarily arrive with an influx of newcomers. Now there's this prayer—Por favor no dejes que el sea Hispano—that has gone unanswered. Now evil's latest incarnation has Hispanic surnames." Doc. 32-3 p. 87. (article also references Jeffrey Dahmer, the Oklahoma City bombing, and 9/11).[6]

e.  "Some have argued that the real reason Johanns called the session was the September bank slayings in Norfolk. Four men have been charged in the deaths of five people. It was shortly after the bank slayings that Johanns began to consider a special session at the request of Sen. Gene Tyson of Norfolk. 'As soon as there was a cross-racial homicide,' Chambers said, 'everything changed and we had to come in here.' The four suspects in the Norfolk slayings are Hispanic." Doc. 32-3 p. 134.

f.  "The lyrics are often violent in content, contain several profanities and misspellings in both English and Spanish, and speak of his allegiance to the 'Latin Reys.' That is a Spanish reference to the Latin Kings, a gang introduced to Rodriguez and his brother, Jose Sandoval, a fellow suspect in the Norfolk slayings, while they served prison sentences for burglaries in Madison, where they grew up." Doc. 32-3 p. 136.

g.  "The system can't predict accurately which small-time thugs may turn into killers. But the Norfolk suspects show several common risk factors . . . Drug abuse. Galindo had seven convictions on charges relating to alcohol or drugs." Doc. 32-3 p. 86.

---

[6] "Consider that in 1991, a man named Jeffrey Dahmer was arrested for killing more than a dozen men and boys. He had sex with the corpses, dismembered them, ate some of the remains. Dahmer was white; almost all his victims were black. . . There was no apology white to black . . . Similarly, how many Muslims breathed a sigh of relief when the Oklahoma City bomber turned out not to be a Middle Eastern terrorist? And winced in pain when the Sept. 11 hijackers were found to be exactly that?" Doc. 32-3 p. 87.

h.  "Exacerbating low-grade tensions, three major crimes in Norfolk before the robbery involved Hispanics. In November 1999, three Hispanic men were charged with murdering another Hispanic man in his home near downtown Norfolk. In September 2001, two Hispanic men were executed west of town, and three Hispanics have been charged in the drug-related murders. Two months later, a local Hispanic man's body was dumped along U.S. 275 and three Hispanics have been charged in that incident." Doc. 32-3 p. 281–82.

i.  "It is not politically correct to say, but the Hispanic influence has not been good for Norfolk. We have too many problems with illegal aliens. Close and lock the border." Doc. 32-6 p. 30.

j.  "'The people who did that were out of their minds,' Valdez said. 'They were not a part of our people.'" Doc. 32-6 p. 39.

k.  "One woman said she believed Grand Island has a high Hispanic population, that it has caused problems and that she believes Hispanics are more likely to commit crimes than non-Hispanics. She was retained after saying she could be impartial to ethnicity while hearing the evidence and making her decision." Doc. 32-10 p. 35.

l.  "She says this was NOT a Hispanic action but one of individuals. Martinez says it appeared one of the men had made gang related signs with his hands as he was transferred by authorities. She says she is at the hearing to help both the Hispanic community and the Norfolk community in whatever way she can." ST. Ex. 7 p. 574.

m.  "Norfolk native Lori Bear says noticeably absent from the crowd were Hispanic faces, which peppered the parade route last year. Bear, an American Indian, says **some Hispanics do NOT yet want to go out in public**. All the suspects in Thursday's deadly bank robbery are Hispanic. **Some local leaders are concerned that others will see the killings as a racial issue**." ST. Ex. 7 p. 579 (emphasis added).

n.  "Authorities said three of the suspects were born in the United States, while Galindo's country of origin was NOT immediately known." ST. Ex. 7 p. 748.

o.  One community member "called the bank shooting 'a small 9/11' for this town." Doc. 32-3 p. 282.

p.  "Just as God was with the victims of last year's terrorist attacks, [Rev. Jerome] Meyer said, God was in the bank that day with Lisa." Doc. 32-3 p. 51.

q.  "Last year, as 2001 drew to a close, it was impossible to look back on the year's news without focusing on the Sept. 11 terrorist attacks on the United States. It was an event that attracted the focus of Northeast Nebraskans and every American. Today, a year later, we look back at 2002 and find that another single, tragic event has defined the year for Norfolkans. It was Sept. 26, a Thursday morning, when three men stepped into the US Bank facility at 13th Street and Pasewalk Avenue. Our community will never again be the same." Doc. 32-3 p. 168.

r.  "9-11 All Over Again" (Diane Becker, "Madison County Farm Wife") Doc. 32-3 p. 54.
    i.   "It was like Sept. 11 for Northeast Nebraska last Thursday when gunmen shot and killed five people at US Bank in Norfolk."

    ii.  "Like Sept. 11, it was a frightening day when a person didn't know what was going to happen next."

    iii. "I had to think where we kept our guns and if I'd ever have the nerve to use them."

s.  "Since the tragedy of Sept. 11, 2001, Nebraskans have endured the killing of five people in Norfolk last year in a bank robbery. It's time the State of Nebraska acknowledges the Bill of Rights and grant a citizen's right to carry a concealed weapon. Nebraska is fortunate to have a large majority of law-abiding citizens. But the occasional predator slips through. I support and respect law enforcement officers. But police can rarely prevent crimes and usually respond to a crime already committed. The bad guys are already carrying guns. I'm a good, regular citizen. I believe that, if I qualify, if I pass the safety and proficiency tests that would be required, I might feel safer carrying a concealed weapon. This year, unlike any before, Nebraska's Fraternal Order of Police is officially neutral on

55

the issue. It's time that Nebraska loosed a few guard dogs among the flock." Doc. 32-3 p. 216.

t.  "'There are also memories etched in our mind that are lifechanging,' Lund said. For his parents, it was Pearl Harbor. For him, President John F. Kennedy's assassination. Many people alive today will never forget the terrorist attacks of Sept. 11, 2001. But family, friends and neighbors of those murdered at the U.S. Bank in Norfolk will have Sept. 26, 2002, forever etched in their memories." Doc. 32-6 p. 49.

u.  "The date Sept. 26, 2002, is to Norfolk what Sept. 11, 2001, is to the nation." Doc. 32-6 p. 50.

In ignoring the racial aspects of the media coverage, the Nebraska Supreme Court acted in a manner contrary to and/or unreasonably applied the long-standing principles that race should have no part in the jury process. Race should never be a factor in a capital proceeding. *Buck v. Davis*, 580 U.S. 100 (2017). Most recently, in *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 212 (2017), a juror "expressed anti-Hispanic bias toward [the defendant and his] alibi witness" during deliberations. The same type of remarks and the underlying sentiment were present in Galindo's case via media inundation, to which the jurors were exposed. "[T]he psychological impact" necessarily enters the jury room. *Irvin*, 366 U.S. at 728. "The theory of our [trial] system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado ex rel. Attorney General of Colo.*, 205 U.S. 454, 462 (1907). Exposure to inflammatory pretrial publicity, specifically the racially pernicious commentary sewn throughout local reporting, deprived Galindo's of his right to a fair and impartial jury.

56

"[D]iscrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" *Pena-Rodriguez,* 580 U.S. at 223 (citing *Rose v. Mitchell,* 443 U. S. 545, 555, (1979)). "[R]acial bias, [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice." *Pena-Rodriguez,* 580 U.S. at 223. All of the jurors that ultimately participated in deliberations in Galindo's trial were exposed to prejudicial media coverage, two-thirds felt that he was guilty, and half knew the victims. As discussed above, this media coverage was not merely factual, but included pervasive racial animus. "Permitting racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Id.* (internal citations omitted).

The Nebraska Supreme Court's endorsement of Galindo's jury despite pretrial racial animus permitted racial prejudice to infect the trial itself. "[A] defendant has the right to an impartial jury that can view him without racial animus." *Georgia v. McCollum*, 505 U.S. 42, 58 (1992). Because the empaneled jurors were all exposed to media coverage saturated with racial animus, they were unable to deliberate impartially. Combined with the improper victim impact statements and other prejudicial pretrial publicity, jurors were so inflamed that Galindo was deprived of a fair trial.

In addition to racial animus, there was other hostile media coverage. It was also overwhelmingly inflammatory:

    a. "Five people were killed Thursday morning in what Norfolk police were describing as an 'extremely violent and heinous crime.'" Doc. 32-3 p. 7.

57

b.  "'This has been an extremely, extremely violent and heinous crime that was committed here in Norfolk and we are going to do everything within our power to identify the people who did that and apprehend them,' [Mizner] said." *Id.*

c.  "Mayor Gordon Adams offered his condolences to the families of five victims 'who were needlessly and stupidly taken from us.'" Doc. 32-3 p. 10.

d.  "'On behalf of the entire state, I offer my sympathies to the families of the victims,' [Governor Mike Johanns] said. "This is an enormous, tragic event that occurred here. . . These are very, very tragic deaths," [Johanns] said, "but Nebraskans are just not about to go out and seek retribution against innocent people." Doc. 32-3 p. 11.

e.  "'You don't know what the robbers' mind-set is. They may think, "We've already killed five people and robbed a bank. Let's pull off the Interstate and hit this one, too,"' Gaeth [assistant vice president for Fremont National Bank] said." Doc. 32-3 p. 16.

f.  "'These are people we knew. We did business there,' [Norfolk School Board Member Alfredo Ramirez] said. 'It makes me angry when something like this happens.'" Doc. 32-3 p. 17.

g.  "It was an innocent mistake by a law officer — incorrectly entering the serial number of a suspected stolen handgun confiscated from a man during a traffic stop last week. The mistake helped lead to the release of the man, one of four men later charged in the deadly U.S. Bank shootings. And the mistake prompted the distraught lawman to kill himself." Doc. 32-3 p. 34.

h.  "**Satan** was trying to bring about fear, despair, hatred and destruction." Doc. 32-3 p. 107 (emphasis added).

i.  "'In my estimation, continued frivolous appeals breed disrespect for the law,' Johanns said. 'Victims' families deserve closure, and taxpayers should not have to pay for endless appeals when **guilt is not in doubt**.'" Doc. 32-3 p. 217 (emphasis added).

58

j.  "'This wasn't just a murder, a murder of five people. It was a massacre,'
Smith said." Doc. 32-3 p. 278.

k.  "We also hope that the seating of this jury will resolve similar issues that
may be presented by the attorneys for the other three defendants in this
case. Change of venue motions should be greeted with skepticism, given
what has happened with the Vela jury selection process. A year has
passed since that horrific day. The suspects in the crime were caught yet
the same day that the shootings occurred. It is well past time for their
cases to proceed to trial, right here in Madison County." Doc. 32-6 p. 24.

l.  "I'm sickened every time I read an article about the suspects. **I have
quickly learned that 'innocent until proven guilty' now is not
possible in my head.**" Doc. 32-6 p. 30 (emphasis added).

m. "A prosecutor said today (Thursday) that death sentences would — quote
— 'seem appropriate' — for the men charged with the murders of five
people inside a Norfolk bank last month." ST. Ex. 7 p. 610.

n.  "The prosecutor handling the legal case in Norfolk's deadly attempted
bank robbery says **a special session needs to be called to remove any
cloud that may be over Nebraska's death penalty law**." ST. Ex. 7 p.
615 (emphasis added).

o.  "Norfolk Mayor Gordon Adams commented this (Friday) afternoon on the
suicide of a Nebraska State Patrol Trooper 'in connection' with the killings
of five people at a Norfolk bank. Adams says it is dreadful and is the kind
of fallout you get sometimes with these tragic events. Adams says **logic
tells him it is like the suspects killed six people NOT five**, but that
is not what the law would say. He says more than anything, the emotional
stress of involvement in something like the killings would lead a law
officer to take his life." ST. Ex. 7 p. 969 (emphasis added).

This inflammatory public sentiment was continuously pervasive and

accelerated as the trial approached. Coverage leading up to Galindo's trial included

both Sandoval's and Vela's penalty phase trials, as well as commemorative accounts

for the anniversary of the crime. This renewed coverage in the lead-up to Galindo's

trial increased the already pervasive saturation of prejudicial and inflammatory media coverage that all empaneled jurors were exposed to. Accounts included inflammatory responses to jury forms, as well as the victims' families' thoughts on the anniversary of the crime and the outcomes of the co-defendants' trials.

Inconsistencies between what prospective jurors shared and their own assessments of whether they could be fair and impartial lends further support to Galindo's claim. A potential juror stated, "I work in the Norfolk Police Station and have access to the police reports in this case. I have personally discussed details of this case with police employees," yet marked "yes" to both questions regarding the ability to be fair and impartial. *See* Doc. 31-1 pp. 116-17. Another potential juror disclosed she was on the State's witness list yet said she could still be fair and impartial. Doc. 30-12 p. 78. Another potential juror stated that he served on the U.S. Bank Advisory Board and attended three of the victim funerals, yet he could be fair and impartial. Doc. 30-50 p. 2. Another potential juror stated that "Christine Tuttle (Evonne's daughter) is going to be my daughter-in-law. Christine Tuttle has attended court through everything and . . . shared with me," yet indicated she could be fair and impartial. Doc. 30-12 p. 78. Jurors' assessments about whether they could be fair and impartial therefore do not necessarily reflect the totality of their statements or the reality.

The trial court's coercive admonition[7] further supports this Claim. *See* Habeas Claim 2. While mentioning the trial court's admonition, the Nebraska

---

[7] There is some irony in the fact that the coercive admonition is from a media source.

60

Supreme Court failed to consider its full impact in assessing Galindo's argument. *Williams*, 529 U.S. at 397-98 (state court acts unreasonably when it fails to consider all record facts legally relevant to the federal question).

Respondent relegates the admonition to a footnote (Doc. 46 p. 49) and replaced it with an ellipse when describing the Nebraska Supreme Court's opinion. *Id.* p. 50. The admonition had a major impact; juror attitudes shifted in the State's favor. Doc. 30-1 p. 8 (Noting "several" jurors shifted when "they reconsidered this position during the voir dire."). The trial court poisoned the well, making answers more problematic to assess in considering whether there was a level of impartiality—and again, this shift occurred with all things remaining the same but for the court's coercive admonition.[8]

The Nebraska Supreme Court also failed to fully consider that Sandoval received a change of venue. *Williams*, 529 U.S. at 397-98 (state court acts unreasonably when it fails to consider all record facts legally relevant to the federal question); *Miller-El II*, 545 U.S. at 265-266; *Wiggins*, 539 U.S. at 528. Likewise, the State also seeks to minimize that Sandoval received a change of venue **before** Galindo's trial commenced. Doc. 46 p. 59 n. 16. Just because the trial prosecutor

---

[8] As Galindo has previously fully described (*see* Doc. 39 pp. 42-43), the response to the admonition by empaneled jurors demonstrates his ability to receive a fair and impartial jury was impaired. In the context that potential jurors were sent a supplemental jury questionnaire, and 98.5% of the venire reported that they had heard or read reports about the case; 38.5% of the potential jurors stated that they could not set aside their opinions of the case based on media reports; 33.5% of the potential jurors stated that they could not set aside their sympathy or prejudice and render a fair and impartial verdict. As previously described, the jurors' exposure to media and its impact was overwhelming. *See* Doc. 39 pp. 37-39, 43.

said he agreed so long as there were no delays does not make it any less important to the consideration of Galindo's motion. Doc. 32-9 pp. 1-2. Ultimately, regardless of his primary reason, the prosecutor agreed to a change of venue in Sandoval's case at a minimum with race of the community as a consideration (*see* Doc. 32-9 p. 5), which, as previously explained, was part of the media attention consumed by Galindo's all-white jury.

Setting that aside, before Galindo's trial, Sandoval was found guilty and co-defendant Vela waived jury and pled—again immediately **before** Galindo's trial commenced. It was unreasonable to deny the change of venue after all those events that even the Nebraska Supreme Court noted resulted in a "resurgence of publicity" at the time of Galindo's trial. Doc. 30-1 p. 8.

The exacerbating coverage of Sandoval and Vela's legal proceedings, and rose to the level of a "barrage of inflammatory publicity immediately prior to trial . . . amounting to a huge . . . wave of public passion" that resulted in "a trial atmosphere . . . utterly corrupted by press coverage." Doc. 30-1 p. 30 (citing *Patton*, 467 U.S. at 1033; *Murphy*, 421 U.S. at 798, and *Irvin*, 366 U.S. at 728). Nonetheless, the Nebraska Supreme Court mistakenly concluded that partiality in Galindo's case was less pervasive than in *Irvin* because the percentage of venire members expressing partiality was less than 90%. *Id.* Using the percentage of jurors self-reporting partial views as a measuring stick is arbitrary and ignores the reality of the prejudicial sentiments empaneled jurors carried with them into the jury box.

Instead, partiality is more accurately measured based on the presence of jurors on Galindo's panel who expressed partial opinions prior to trial while

factoring in the nature of the coverage which included improper victim opinion information and racial bias. *Compare Irvin*, 366 U.S. at 727 (reasoning petitioner was deprived of impartial jury when eight of twelve jurors thought petitioner was guilty before trial yet declared they could be impartial) *with Mu'Min v. Virginia*, 500 U.S. 425, 428 (1991) (reasoning petitioner was not deprived of impartial jury when eight of twelve jurors had read or heard about the case but none indicated they had formed opinion as to guilt). Like *Irvin* and unlike *Mu'Min*, Galindo's panel contained jurors who had already thought Galindo was guilty before his trial and almost half knew victim family members from families that expressed they wanted death. No pledges to impartiality—especially following the trial judge's speech on the sacrality of jury duty—were sufficient to overcome the partiality that permeated Madison County and, as a result, the empaneled jurors. *See Irvin*, 366 U.S. at 728.

The refusal to change venue prejudiced Galindo, and the Nebraska Supreme Court's contrary finding was unreasonable under the law and the facts. When entire communities, particularly victims' families, become involved in pretrial publicity, the risk of prejudice increases. In *Coleman v. Kemp*, 778 F.2d 1487, 1539 (11th Cir. 1985), knowledge that the victims' family wanted the death penalty "pervaded the community," which was "particularly prejudicial because Seminole County [was] a small community in which the victims' family was well known and respected, and the voir dire revealed that several jurors knew the family." Norfolk, like Donalsonville, was a "small community [that] was overwhelmed and saturated with

63

prejudicial and inflammatory publicity." *Id.* The Norfolk Daily News referred to the crime as the top story[9] of 2002. Doc. 32-3 p. 168.[10]

Pretrial publicity rose to the same level, if not higher, in Norfolk than in *Coleman*. Indeed, similar remarks made by the victims' families and the greater community as to their desired sentence demonstrates the prejudice against Galindo. Newspaper accounts included that "[s]ome people interviewed by the media expressed their opinion that the defendants all deserved the death penalty." Doc. 30-1 p. 8. Again, it was more than "some people," it was members of the victims' families publicly stating that they wanted all defendants involved to get the death penalty. As described above, there was also prevalent racial animus contributing to prejudicial, anti-defendant sentiment.

Respondent's reliance on *Ybarra v. McDaniel*, 656 F.3d 984 (9th Cir. 2011), does not hold up in comparison to Galindo's circumstances. *Ybarra* neither involved victim opinion statements nor racialized statements in the media, and the "tone [was not] as vehement as that at issue in other [Supreme Court] cases." *Id.* at 993 (citing *Irvin*, 366 U.S. at 725). In contrast, it is hard to imagine a tone more "vehement" than expressions from the community, elected officials, and especially victims' family members desiring death sentences for all defendants, as in Galindo's case. Further, it did not involve racial overtones. Galindo's circumstances far surpass *Ybarra*.

---

[9] That the crime was a "top story" in local media was similarly discussed in *Coleman*, 778 F.2d at 1509, 1511.
[10] Multiple other articles refer to the crime as the top story. *See* Doc. 32-3 pp. 160, 169.

64

The Nebraska Supreme Court wrote that "Galindo does not argue that the publicity displayed animus or hostility toward him." Doc. 30-1 p. 31. That was an improper standard under *Irvin*, *Patton*, and *Murphy*, requiring more than the petitioner's burden of demonstrating "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Irvin*, 366 U.S. at 723; *Murphy*, 421 U.S. at 800. Requiring evidence of animus is not an element of proving partiality or prejudice, and the Nebraska Supreme Court imposed an additional requirement on Galindo out of whole cloth. The Nebraska Supreme Court's interpretation is contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1)–(2).

Even if it is not an articulation of the wrong standard, it is an unreasonable determination of the facts because the media coverage overwhelmingly displayed animus and hostility towards Galindo. As noted above, the coverage expressed that the victims' families specifically and the community more broadly wanted him dead, and it was racially animated. The Nebraska Supreme Court's conclusion to the contrary is not supported by the record and is refuted by a reasonable reading of the record. *Miller-El II*, 545 U.S. at 265 ("It is true . . . that at some points the significance of Miller-El's evidence is open to judgment calls, but when this evidence . . . is viewed cumulatively its direction is too powerful to conclude anything but discrimination."); *Wiggins*, 539 U.S. at 528; *see also*, *e.g.*, *Gabaree*, 792 F.3d at 999

(citing *Wiggins*, 539 U.S. at 526-27) (State court's "post hoc rationalization of counsel's conduct" was an unreasonable determination of fact).[11]

The Nebraska Supreme Court erred in its conclusion that Galindo was not entitled to a change of venue. There are multiple unreasonable findings of fact, which led to unreasonable application of clearly established federal law— particularly the *Irvin* line of cases. 28 U.S.C. § 2254(d). The Nebraska Supreme Court itself acknowledged "[s]ome people interviewed . . . expressed their opinion that the defendants all deserved the death penalty." Doc. 30-1 p. 8. Unreasonably and contrary to law, the court then reached a diametrically opposed legal conclusion that media coverage of this type would not have inflamed the jury. The Court unreasonably failed to consider the facts and consider those facts when determining prejudice.

The Nebraska Supreme Court also erred in ignoring the number of jurors who were removed for cause, particularly due to their views that Galindo was guilty prior to hearing any evidence. Twenty-nine jurors were removed for cause, and another sixteen were asked by the court to set aside their opinions of Galindo's guilt. These jurors not only believed that Galindo was guilty, but were exposed to repeated, thorough community sentiment that all defendants deserved the death penalty. To find prejudice for an individual juror, federal courts primarily look at

---

[11] The Nebraska Supreme Court did not accurately compare *Irvin* to Galindo's case. For instance, the court noted the papers were different because they only expressed that they wanted to see him punished. Doc. 30-3 p. 30. This is a third true. In reality, they expressed the opinion the defendants should be dead. This is an unreasonable mischaracterization of the record by omission of the genuine factual basis.

66

three factors. *Skilling v. United States*, 561 U.S. 358, 382–84 (2010). All three weigh in favor of finding prejudice, in Galindo's favor—the size of the community, the prejudicial information in the news coverage, and the time between the crime and the three defendants' trials. *Id.*

Media coverage here rose to the level of other cases where a change of venue was granted. *Irvin*, 366 U.S. 717. The coverage was neither merely factual nor was there a decrease in attention leading up to Galindo's trial. Because the Nebraska Supreme Court erred to such a degree, Galindo's claim must be reviewed *de novo*. *Panetti v. Quarterman*, 551 U.S. 930, 954 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d)(1) is satisfied. A federal court must then resolve the claim without the deference AEDPA otherwise requires.").

Even if AEDPA deference applies, the Nebraska Supreme Court's failure to recognize that *Irvin* necessitated a change of venue was contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should find *Irvin* and the Sixth and Fourteenth Amendments violated, grant habeas relief, and order a new trial with the empanelment of an impartial jury.

67

**Claim 2:   Mr. Galindo was deprived of his Sixth and Fourteenth Amendment rights when the trial court made improper statements regarding the voir dire process.**

The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, *'indifferent'* jurors." *Irvin*, 366 U.S. at 721 (1961) (emphasis added). Norfolk was a small community saturated with negative pretrial publicity that equated the crimes with Nebraska's 9/11. *See* Habeas Claim 1.[12] Galindo was inevitably deprived of a panel composed of impartial jurors when the trial court improperly coerced the jurors prior to voir dire to serve by acknowledging the "unique" (Doc. 30-50 p. 95; Doc. 31-1 p. 164) circumstances of this case and the blood and sacrifice "Americans" have lost to secure the rights of a jury trial (Doc. 30-50 pp. 95, 96; Doc. 31-1 pp. 164, 166), lest the jurors "dishonor their memory" and their "ultimate sacrifice." Doc. 30-50 p. 96; Doc. 31-1 pp. 166. Respondent properly concedes that trial court error is properly before this Court on the merits. Doc. 46 pp. 43, 46.

*Voir dire* should play a critical function in assuring Galindo's Sixth Amendment right to an impartial jury will be honored. "Without an adequate voir dire, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981). While a trial court does have discretion in conducting *voir dire*, this discretion is subject to

---

[12] There is a nationalistic undertone to the trial court's comments directed at the jury box, further building a wall between the citizens in the courtroom and the Hispanic defendant from Mexico seated at defense table.

68

constitutional requirements, including ensuring fairness and impartiality. *Mu'Min*, 500 U.S. 415.

The Supreme Court has made clear that, "a judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law. The discharge of the judicial function as at common law is an essential factor in the process for which the Federal Constitution provides." *Herron v. So. Pac. Co.*, 283 U.S. 91, 95 (1931). Respondent asserts that *Herron* is not the correct applicable principle to apply. Doc. 46 p. 47. Contrary to Respondent's view, Galindo suggests that a trial court is never permitted to act in a coercive way to influence a juror, in any context.

Though not specifically limited to the context of *voir dire*, in *Jenkins v. United States*, 380 U.S. 445 (1965), the Court emphasized that jurors must not be coerced into surrendering conscientiously held views. The Court concluded that the trial judge's statement in that case had a coercive effect, reversed the judgment, and remanded the case for a new trial, underscoring the principle that coercion of jurors is impermissible. *Id.* The Court relied on "the principle that jurors may not be coerced into surrendering views conscientiously held is so clear as to require no elaboration." *Id.* at 446.

While *Jenkins* did not directly involve *voir dire*, it established a broader principle against coercion of jurors by the trial court. Any willingness to accord substantial deference to a trial court's finding of juror impartiality should rest on the expectation that the trial court will conduct *voir dire* in a manner to determine the credibility of a juror professing to be impartial. Galindo's point is that the

69

fulfillment of this expectation requires neutrality by the trial court and not a coercive statement admonishing jurors for dishonoring the deceased heroes of our country by not serving on a jury.

This is where Respondent and the Nebraska Supreme Court act in a manner that is contrary to and/or unreasonable under the law: a trial court is not allowed to influence a jury. The Nebraska Supreme Court called it "absurd to imply that the trial judge is prohibited from influencing the jury in any manner whatsoever." Doc. 30-1 p. 25. Frankly, it is "absurd" and an unreasonable corruption of the law that the Nebraska Supreme Court suggests a trial court *can* influence a jury. And to be clear, the trial court did not do this to "benefit" Galindo, as the court suggested; rather, the trial court did this so the State would not have to change venue. *See* Habeas Claim 1.

The principle of judicial neutrality is a Constitutional cornerstone. Losing neutrality creates an impermissible risk of bias, as the judge cannot be "wholly disinterested" in the outcome of the case. The Supreme Court emphasized that "justice must satisfy the appearance of justice" and that even the probability of unfairness is sufficient to violate due process. *In re Murchison*, 349 U.S. 133, 136 (1955). As *Murchison* clearly states: "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases." *Id.* Fairness takes a leave of absence when a trial court is allowed to influence jurors into serving—or, as Respondent argues, "persuade" jurors— especially when they were otherwise unqualified due to their bias. Doc. 46 p. 48 n.14.

70

Despite this clear precedent, the Nebraska Supreme Court erroneously held that the trial court could influence jurors. Doc. 30-1 p. 25. The state court's interpretation is contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1)–(2). *Miller-El II*, 545 U.S. at 265-266; *Wiggins*, 539 U.S. at 528.

Consistent with the Nebraska Supreme Court's unreasonable holding, Respondent does not legitimately contest that the trial court did influence the *voir dire* process to the State's benefit. The trial court influenced the jurors improperly into agreeing they could serve; and indeed, the Nebraska Supreme Court and Respondent believed it "absurd" that the trial court could not do it here.

After the coercive statement, 75% (nine of twelve) of the sitting jurors, indicated that the trial court had influenced them in deciding that they could sit on the jury as impartial fact finders. Juror 4 (Doc. 30-51 p. 98-99), Juror 5 (Doc. 30-51 pp. 129-30), Juror 7 (Doc. 30-52 p. 60), Juror 8 (Doc. 30-52 pp. 90-91), Juror 9 (Doc. 30-53 p. 106-07), Juror 10 (Doc. 31-1 p. 89), Juror 11 (Doc. 31-1 pp. 184-85), Juror 12 (Doc. 31-2 pp. 119-20), Alternate Juror 1 who become Juror 8 and ultimately the foreperson (Doc. 31-3 p. 160-161), and Alternate Juror 2 (Doc. 31-4 pp. 61-21, 76) all expressed they recalled and/or were influenced by the judge's speech. Juror 9 was "nervous before [the judge's speech]" but "took the speech to heart" (Doc. 30-53 pp. 106-07). Juror 11 "set aside inconveniences" due to the judge's statement. Doc. 31-1 p. 185. After the judge's comments, Alternate Juror 1—who became Juror 8—agreed he "could be fair to victims" after hearing the judge's comments. Doc. 31-3 p. 160-

71

161. Respondent does not seriously contest this factual basis of Galindo's argument in its Answer.

However, Respondent did concede that at least one juror who sat as an alternate was influenced by the trial court's statement. Doc. 46 p. 48 n.14. Alternate Juror 2 said he changed his position after the judge's speech. Specifically, he said: "I kind of got that change yesterday when you kind of read your little deal about a juror." Doc. 31-4 p. 62. Respondent suggests the totality of the *voir dire* evinces that he had not viewed jury service seriously but did not have a fixed opinion. Galindo respectfully suggests having read the portions of the record cited by Respondent, they do not support the assertion. He did say he "kind of" changed his view, but what changed was never explored. *Id.* p. 62. A fairer reading of this Alternate Juror's statement is that he thought his preconceived notions of Galindo's guilt made him not a good juror (*see id.* p. 76) ("Well, from the papers, the things I read, yes [Galindo is guilty.]") – but the trial court's statement made him agree he could be a juror.

Clearly, the trial court influenced and impacted a super-majority of the jury by the trial court's coercive exhortation not to "dishonor the memory" of "Americans" who paid the "ultimate sacrifice" by refusing to serve. Respondent suggests the *voir dire* was meant to "ferret[] out" unqualified jurors (*see* Doc. 46 p. 48), and Galindo agrees, but would add the ability to "ferret out" those jurors was impacted due to the improperly coercive statement by the trial court that actually influenced jurors.

72

The Nebraska Supreme Court held that the trial court's actions were "not inappropriate" because they did not "encroach on the juror's role as the fact finder and arbiter of guilt." Doc. 30-1 p. 25. The Nebraska Supreme Court completely and unreasonably ignored that a trial court is also constitutionally bound not to influence the juror's partiality. The state court seemed oblivious to the legal requirement that the right to jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, *'indifferent'* jurors." *Irvin*, 366 U.S. at 721 (1961) (emphasis added). In this manner, the Nebraska Supreme Court also acted contrary to and unreasonably applied the principles of *Irvin. See Williams*, 529 U.S. at 406 (finding it unreasonable when a state court "modified or in some way supplanted" the Court's rule); *Miller v. Dormire*, 310 F.3d 600 (8th Cir. 2002).

The Nebraska Supreme Court's failure to recognize the error and the prejudicial impact of the trial court's admonition or exhortation was contrary to and/or an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The trial court's attempt to preemptively rehabilitate a local jury panel that was predisposed not to give Galindo a fair trial was improper. This Court should find Galindo's Sixth and Fourteenth Amendment rights violated based on the trial court's improper exhortation, grant habeas relief, and order a new trial with the empanelment of an impartial jury.

73

**Claim 3:    The consideration of race has no place in a capital trial and its presence here violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United State Constitution.**

Racism is a primary force of evil and has no place in our legal system. As noted in *Pena-Rodriquez*, 580 U.S. at 224, "[R]acial bias, [is] a familiar and recurring evil that, if left unaddressed, would risk systemic injury to the administration of justice."

Respondent does not dispute that race should never be a factor in a capital sentencing proceeding. *Buck v. Davis*, 580 U.S. 100 (2017). But according to Respondent and the Nebraska Supreme Court, racism does not matter as long as it never made it to Galindo's final jury box. This is not even close to a fair reading of what the Constitution and clearly existing federal law expects.

   A. *A potential juror expressed racial sentiments, but the trial court failed to remove them for cause and a peremptory had to be exercised.*

Respondent does not contest that Juror 137, a white male, expressed racial sentiments. As described fully in the Amended Habeas (Doc. 39 p. 54), Juror 137 agreed with multiple racially charged observations. Respondent cannot contest the record supports that Juror 137 recognized negative community sentiment towards Hispanics following the crime, with which he explicitly agreed. Doc. 31-2 p. 42. The most alarming and racially ignorant statements were as follows:

- "The thing that bothers me the most is that we've probably had nine, ten, eleven murders in Norfolk, all of which may have been done by Hispanics. Some have already been proven guilty, and that bothers me somewhat." *Id.*;

- He agreed with the statement, "Hispanics tend to commit more crimes in our community." *Id.* p. 43.

74

Incredibly, Juror 137 was cut off by defense counsel when Juror 137 stated, "Would you ask me why?" to which defense counsel replied, "Well, I don't think I need to do that." *Id.* Inexplicably and without explanation, the trial court denied the request to remove the juror. *Id.* p. 44 ("Okay. That motion and the objections will be overruled.").

Respondent wrongly suggests that the Nebraska Supreme Court addressed the merits of a claim when it specifically stated, "we consider only jurors Nos. 65 and 28." Doc. 30-1 p. 26. The court meant what it said – any argument regarding Juror 137 was not addressed.

Respondent relies on authority that green lights a court's failure to address the denial of challenges for cause, as a basis for the Nebraska Supreme Court not to act. Doc. 46 p. 64. However, the reason for a court's failure to address the merits cannot be equated with an actual merit ruling. Indisputably, the claim was presented (Doc. 30-12 p. 91), but the argument as to Juror 137 was not addressed. Accordingly, this Court may consider the claim *de novo. Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings.'")

Respondent wrongly suggests the Nebraska Supreme Court acted reasonably when it relied on authority that said there is no Sixth Amendment implication when a peremptory strike is exercised to remove a tainted juror. Doc. 46 pp. 64-65. Again, this authority was relied upon by the court as a basis not to address the claim, not as a basis to deny the merits of the claim; setting that aside, the through-

75

line of that authority is there is no "claim," "so long as" the jury that ultimately sits is impartial. *See e.g. United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000) citing *Ross v. Oklahoma*, 487 U.S. 81, 88 (1988). But neither *Martinez-Salazar*, *Ross*, nor *Skilling v. United States*, 561 U.S. 358 (2010), concerned any allegation of racial bias by a prospective juror. Race is different and makes this Court's assessment of Galindo's claim more nuanced. Juror 137's expressions of racial bias should have ended the inquiry for the trial court.

Juror 137's racially biased beliefs cut to the quick of the problem with Respondent's position because there were not enough peremptory strikes available to defense counsel to keep all unbiased jurors off the jury. As noted in the appellate brief (filed by trial counsel and providing an unimpeached, contemporaneous insight into the circumstances they faced), "think about that. You are on trial, literally for your life, and before you there are 16 people who think you are guilty and you only have 14 peremptory strikes. Who would you use you [sic] peremptory strikes on?" Doc. 30-12 p. 80.

Two authorities cited by Respondent do implicate race, and they both support Galindo's allegation of error here. In *Rivera v. Illinois*, 556 U.S. 148, 153-54 (2009), the Court considered an argument where the denied peremptory was utilized by defense counsel in violation of *Batson*. Echoing *Martinez-Salazar* and *Ross*, the Court noted that there was no indication that the defendant was tried by a single biased juror. *Rivera*, 556 U.S. at 157. *Rivera* did not fault a trial court for protecting a proceeding from racism. It hewed to its previous precedent that defendants are

76

entitled to a jury on which no biased juror sits. *See id.* at 159. Galindo, however, was not afforded that unbiased jury to which he is entitled.

There are two supportive principles from *Rivera*. The Court noted that "Rivera recognizes, neither Gomez nor any other member of his jury was removable for cause." *Id.* at 159. So, the starting point in *Rivera* was that there was no basis to remove the juror for cause, ***unlike*** in Galindo where racial statements were made by a prospective juror constituting a basis for cause. In fact, rather than a basis to remove the juror in *Rivera* for cause, the question at issue was whether defense counsel's attempted strike was impermissible under *Batson*. *Id.* at 153. Second, *Rivera* noted it was considering what "reflected a good-faith, if arguably overzealous, effort to enforce the antidiscrimination requirements of our *Batson*-related precedents." *Rivera*, 556 U.S. at 160. Thus, the Court again held the line that race should not play a part in jury selection—and promoted protecting against it—as opposed to what the trial court did here.

Rather than support Respondent's position, *Pena-Rodriquez*, 580 U.S. 206, demonstrates the significance of the error here. As noted by the Court in *Pena-Rodriquez*, "It must become the heritage of our Nation to rise above racial classifications that are so inconsistent with our commitment to the equal dignity of all persons." 580 U.S. at 221. The Nebraska trial court had before it a clear statement of racial bias and looked the other way, rather than fulfill the "duty to confront racial animus in the justice system." *Id.* at 222. Instead, the trial court utterly failed to perform its function and chose a path that pushed away "the

77

promise of equal treatment under the law that is so central to a functioning democracy." *See id.* at 224.

The trial court erred in denying the challenge for cause. This Court should grant the writ, vacate the convictions, and remand for proceedings free from the taint of race. The exercise of the peremptory permitted otherwise partial jurors to serve.

### B. The State's disparate treatment of minority jurors.

The State engaged in unequal treatment of minority jurors leading to their removal for cause and removal via a peremptory challenge. *The State successfully ensured Galindo faced an all-white jury with the removal of all four minorities.*

| Juror # | Race/Gender | How removed |
|---|---|---|
| Juror 101 | Native-American/Female Doc. 30-51 pp. 180-81 | Perempt; Doc. 31-4 p. 123 |
| Juror 64 | Hispanic/Female Doc. 30-52 p. 13 | Struck for Cause Doc. 30-52 p. 13 |
| Juror 132 | Hispanic/Male Doc. 30-53p. 25 | Struck for Cause Doc. 30-53 p. 25. |
| Juror 46 | Filipina/Female Doc. 31-3 p. 75. | Perempt; Doc. 31-4 p. 123 |

The rate of white people on the jury, twelve jurors and two alternates, was fourteen of fourteen —or 100%. There was no minority representation on the jury. The strike rate of minorities was 100%, two for two in strikes.

Respondent does not contest that "The Constitution forbids striking even a single prospective juror for a discriminatory purpose." *Foster v. Chatman*, 578 U.S. 488, 499 (2016). The Supreme Court has consistently and roundly sought to eliminate the improper exercise of a peremptory strike for a racially pretextual

78

reason. *See Batson v. Kentucky*, 476 U.S. 79 (1986); *Powers v. Ohio*, 499 U. S. 400 (1991); *Miller-El I*, 537 U.S. at 339; *Miller-El II,* 545 U.S. at 252; *Snyder v. Louisiana,* 552 U. S. 472, 481–84 (2008); *Foster*, 578 U.S. 488; *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019). Existing federal law from the Supreme Court makes clear that racism has no place in the selection of a jury.

Here, two Hispanic individuals were quickly removed for cause with absolutely no genuine attempt at rehabilitation, *in stark contrast to the way white jurors who knew the victims and their families were treated*. Juror 64, a Hispanic Female, was removed after she disclosed prior contact with Galindo's family. Doc. 30-52 p. 12. The entirety of the voir dire covered approximately 3 pages. *See* Doc. 30-52 pp. 10-13. The county prosecutor did not ask any questions. Doc. 30-52 p. 13.

Juror 132, a Hispanic Male, was removed due to a prior contact with the Galindo family that "may" impact him and for his English language skills. Doc. 30-53 p. 24. The entirety of the voir dire covered approximately five to six pages. *See* Doc. 30-53 pp. 19-25. The county prosecutor did not ask any questions. Doc. 30-53 p. 24. As discussed further below, while his language skills were cited as a basis to strike him for cause, the transcript suggests the prospective juror understood the questions asked and responded clearly, casting doubt on the language-based reason for his dismissal. *Id.*

The treatment of these jurors contrasts starkly with the treatment of the white jurors, many of whom sat (*see* Habeas Claim 1) even though they knew multiple victims or testifying witnesses. While there were extensive attempts to rehabilitate those jurors, including preemptively through the court's admonition

79

(*see* Habeas Claim 2), no such attempts were made with regard to the Hispanic jurors. The county prosecutor did not even deign to ask any questions of either Hispanic Juror. It speaks volumes that the *only* potential jurors who possessed the same immutable characteristics as Galindo did not merit a single question from the county attorney. This demonstrates the disparate treatment of jurors—and portrays racially-motivated practices. *See Snyder*, 552 U.S. at 483 ("The implausibility of this explanation is reinforced by the prosecutor's acceptance of white jurors who disclosed conflicting obligations that appear to have been at least as serious).

Both Hispanic Jurors, 64 and 132, received extremely truncated and superficial voir dire processes as compared to white jurors. They never received the same opportunity or faced exploring questioning to demonstrate their ability to serve. Further, Sitting Juror 8,[13] a white male, was voir dired for twenty-five pages of transcript. *See* Doc. 30-52 pp. 84-109. Significantly, he went to school with Galindo, *Id.* p.107–08, but was found to be a passable juror. *See Snyder.* Respondent says this juror ultimately indicated he could be fair. Doc. 46 p. 67. This confirms again that the length of the voir dire conducted to accomplish this was comparatively different than the 0 questions asked by the State of Jurors 64 and 132.

Respondent defends the exclusion of Juror 132 as based on a language barrier. Doc. 46 p. 66. That cannot be squared by Juror 132's response "yes, I do" to

---

[13] Respondent indicated Galindo misidentified the juror. However, Galindo referenced this juror as "Sitting Juror 8," which is a correct characterization. The juror numbers changed between voir dire and when they were seated.

the trial court asking, 'Can you understand what I'm saying?" Doc. 30-53 p. 19. Despite Juror 132's eventual statement that he spoke English with 75% or 80% fluently, at no point did the trial court or Juror 132 suggest a problem with understanding or comprehension, and the transcript reveals clear communication by the juror. The trial court admonished "And you tell me if you're having difficulty understanding anything that I ask you alright?" (*id.* p. 20) – to which Juror 132 responded "all right." *Id.* Importantly, although the prosecutor and trial court tied the dismissal to language, when the court asked Juror 132 if he would have trouble understanding, Juror 132 said "no," and then expressed not wanting to sit on the jury because he did not "feel like being a juror." *Id.* pp. 20-21. This was tied to his knowing the Galindo's parents and a feeling "I can't even describe to myself" of discomfort due to that association. *Id.* pp. 21, 23. Throughout this exchange, there were no indications Juror 132 did not comprehend the compound and hyper technical questions posed by the trial court; language was not a true barrier to service.

Respondent touts Juror 64 as an example of consistency. Doc. 46 p. 66. Juror 64 expressed that she indicated in her questionnaires that she could not be fair. Doc. 30-52 pp. 11-12. The State accepted her indication without any follow-up or attempt at rehabilitation, in stark contrast to the way white jurors who made similar indications were treated. The minority jurors' statements in their questionnaires of potential bias were accepted at face value, while the white jurors who expressed similar viewpoints were pushed hard to change. The fact that no questions were asked, as Respondent acknowledges (*see* Doc. 46 pp. 66-67),

81

demonstrates a comparatively disparate practice. It is not that "there was no basis on which to rehabilitate," as Respondent suggests (Doc. 46 p. 66); rather, rehabilitation was only attempted by the trial court and the prosecution when the jurors were white.

Galindo agrees with Respondent that this issue was not presented on direct appeal. Doc. 46 p. 66. Trial counsel failed to preserve this issue at trial or raise it on direct appeal. By not objecting, he did not preserve the issue for direct appeal and could not raise his own ineffectiveness for the failure against himself. Thus, post-conviction was the first place this claim could have been meaningfully raised, and post-conviction counsel inexplicably failed to raise it. While this claim is not one of ineffective assistance of counsel, the logical underpinning of the equitable right in *Martinez v. Ryan* applies.

To satisfy *Martinez*, a claim must be substantial. "A substantial claim is one with some merit" meaning it "must at least be debatable among jurists of reason." *See Marcyniuk*, 39 F.4th at 996. For the reasons above, the improper exclusion of prospective jurors on the basis of race is substantial; jurists of reason could, at the very least, debate whether Galindo's constitutional rights were violated by the disparate treatment and exclusion of minority jurors, leading to his trial before an all-white jury. Post-conviction counsel failed to raise this claim due to his tunnel vision, focusing on the aggravation phase of the case to the exclusion of viable trial and penalty phase issues. That failure precluded any court from hearing Galindo's claim of race-based exclusion of jurors; this Court should find an equitable basis, as in *Martinez*, to excuse that default and consider Galindo's claim.

82

Galindo has raised this claim in state court and thus § 2254(e)(2) does not preclude this Court from considering the claim. After previous post-conviction counsel ceased representing him, Galindo filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing, raising this and other claims prior post-conviction counsel had failed to raise. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. It denied the request for evidentiary processes. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Contrary to Respondent's suggestion (Doc. 46 p. 130), Galindo has satisfied 28 U.S.C. § 2254 (e)(2) and controlling Supreme Court and Eighth Circuit precedent, because he has not "failed to develop" the factual basis of these claims in state court. *Williams v. Taylor*, 529 U.S. 420, (2000); *Johnston v. Luebbers*, 288 F.3d 1048 (8th Cir. 2002). Galindo's requests were denied and therefore he is not barred from obtaining a federal evidentiary hearing—he diligently sought it, and any opportunity to present evidence or obtain a hearing in the state court proceedings was denied. *Johnston*, 288 F.3d at 1058. This Court may thus consider the merits of Galindo's claim.

83

**Claim 4:    Mr. Galindo's rights, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by a conflict possessed by the county attorney.**

The trial prosecutor in Galindo's case, County Attorney Joe Smith, possessed a conflict of interest that violated due process and rendered Galindo's case fundamentally unfair, and the state court's denial of an evidentiary hearing on this issue was unreasonable. Indeed, even now, without discovery or an evidentiary hearing, Galindo cannot know the extent of the prosecutor's conflict of interest and how much it corrupted the entire penalty phase proceeding. While the facts as presently known establish existing due process violations, at issue is whether the extensive web of the prosecutor's conflict, if revealed in its entirety and taken as a whole, critically degraded the integrity of the adversarial process and offended fundamental notions of fairness.

Respondent correctly notes this claim is properly before this Court on the merits. Doc. 46 pp. 123-24. Respondent alleges, as did the Nebraska Supreme Court, that the argument that the conflict of interest affected the prosecutor's decision to pursue the death penalty is procedurally defaulted. Doc. 46 pp. 120, 123; 30-4 p. 57. As discussed more fully below, there is no default.

As set forth more fully in Galindo's Amended Petition, the county attorney, Joe Smith, had personal connections to endorsed state's witness Jesse Padilla and others involved in methamphetamine distribution in the Norfolk area in the time before, during, and after Galindo's capital murder trial. Doc. 4-11 pp. 1–4; Doc. 5-7 pp. 1-2, 4. Multiple sources have reported that the county attorney and Padilla had a close relationship, that the county attorney purchased drugs from Padilla and

84

others (including jailhouse informant Hector Abendano, Animas and Lopez), that the county attorney was seen using or in the presence of illegal drugs with Padilla, and that the county attorney "protected" Padilla and did "favors" for him, including tipping him off when law enforcement planned to conduct searches or controlled buys at his mechanic shop. Doc. 4-11 p. 3; Doc. 5-7 pp. 3-4. Sources have also reported that the county attorney offered to let Abendano plead to reduced charges if he agreed not to talk about the county attorney's connections to the drug ring. This was done in conjunction with Mr. Scott Freese. See also Habeas Claims 6 & 7.

Justice Papik singled out the allegations and claims related to the prosecutor's conflict and corruption as warranting further evidentiary development. The ability to assess the prejudice stemming from the prosecutor's conflict could not be complete without the opportunity to present evidence. As Justice Papik noted in his dissent from the Nebraska Supreme Court's majority opinion, this conflict cannot be assessed by simply "analyzing the evidence introduced at trial and the aggravating and mitigating circumstances found by the jury and the sentencing panel and determining whether the absence of a particular aggravating circumstance would have affected the ultimate sentences imposed." Doc. 30-4 p. 72. Rather,

> Given the substantial discretion that is invested in prosecutors and, more importantly, the lack of any evidence at this stage as to what a nonconflicted prosecutor would have done, I do not see a basis to now determine that Galindo could not establish that the outcome of the penalty phase would have been different with a disinterested prosecutor. . . . I would grant him an evidentiary hearing on his claim that the county attorney's conflict of interest violated his due process rights.

85

*Id.* p. 73. As Justice Papik's dissent indicates, the question of harm is not simply related to a single aggravator or the count of aggravators against mitigators; it is a question of whether the conflict of interest so pervaded the case that it rendered the entire trial fundamentally unfair, particularly with regard to the aggravation and mitigation phases. The Nebraska Supreme Court has long held that "[t]he balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors." *State v. Joubert*, 399 N.W.2d 237, 252 (Neb. 1986).

Justice Papik further pointed out that while, as the majority and Respondent note, there is "not a great deal of authority" around due process and prosecutorial conflicts of interest, "it follows from general due process principles that Galindo's allegations, if proved, could form the basis of a due process violation." Doc. 30-4 p. 69. Moreover, state action violates due process if it "violates those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Dowling v. United States*, 493 U.S. 342, 353 (1990). The prosecutor's conflict of interest in Galindo's case is, at minimum, such an impropriety that it defies these fundamental conceptions of justice and warranted an evidentiary hearing.

For these reasons, the Nebraska Supreme Court's analysis of Galindo's prosecutorial conflict of interest claim was contrary to or involved an unreasonable application of clearly established federal law under § 2254(d)(1). Galindo acknowledges that, as Respondent and the majority point out, *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787 (1987) did not rest on constitutional due process

86

principles. Doc. 46 pp. 118-119. Nevertheless, the *Vuitton* plurality's consideration that "an interested prosecutor creates an appearance of impropriety that diminishes faith in the fairness of the criminal justice system in general" implicates due process principles. *Vuitton*, 481 U.S. at 811.

It should be beyond dispute that having a trial prosecutor with connections to a drug ring whose members he presents as witnesses diminishes faith in the fairness of the criminal justice system in general. Even the majority noted, "It would be a great understatement to say that the county attorney would be deserving of serious condemnation." Doc. 30-4 p. 64. The actions here deserve serious condemnation because they are so far beyond the line of what is appropriate that one cannot even see the due process line in the rearview mirror. The due process principle is in place; the outlier is not Galindo's argument, it is the extreme depth of the corruption here. That it is hard to come by precedent with identical factual circumstances is because the corruption here is unprecedented, not because it is not a due process violation.

Importantly, the Supreme Court has recently held that "[g]eneral legal principles can constitute clearly established law for purposes of AEDPA so long as they are holdings of this Court." *Andrew v. White*, 604 U.S. at 94. The Court further explained that "certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt." *Id.* at 95 (internal citations and quotation marks omitted). In other words, principles may be considered clearly established federal law even if the "factual permutations" underpinning those principles differ between cases. *Id.*

87

Considering this framework, the Supreme Court has long held that "[d]ue process of law is a summarized constitutional guarantee of respect for those personal immunities which . . . are so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Rochin v. California*, 342 U.S. 165, 169 (1952) (internal quotation marks omitted). Moreover, "due process of law requires an evaluation based on a **disinterested** inquiry pursued in the spirit of science, on a balanced order of facts exactly and fairly stated, [and] on the detached consideration of conflicting claims." *Id.* at 172 (internal quotation marks omitted, emphasis added).

While, as the Nebraska Supreme Court and Respondent point out, the precise contours of Galindo's prosecutorial conflict issue may not have arisen in other cases—and indeed are not yet fully known, given the state court's denial of an evidentiary hearing and discovery—he is not constrained to presenting a case with identical facts in order to show the existence of clearly established federal law. *Andrew*, 604 U.S. at 94. As Justice Papik pointed out in dissent and as later confirmed by the Supreme Court in *Andrew*, the Supreme Court's due process jurisprudence supports Galindo's due process argument, and the Nebraska Supreme Court's holding otherwise is contrary to or involved an unreasonable application of clearly established federal law under § 2254(d)(1).

In *Dowling*, the Court considered whether the due process violation—in that case, the introduction of certain evidence—"is so extremely unfair that its admission violates 'fundamental conceptions of justice.'" *Dowling*, 493 U.S. at 352 (quoting *United States v. Lovasco*, 431 U.S. 783, 790 (1977)). The consideration of

"fundamental conceptions of justice" suggests, as in the plurality opinion in *Vuitton*, that such violations of due process are indeed structural errors. But even if a due process claim based on a prosecutor's conflict of interest is subject to a prejudice analysis, it was premature for the Nebraska Supreme Court to conduct such an analysis without any evidentiary development regarding the extent of the prosecutor's conflict. Without an evidentiary hearing, the court could not properly analyze the claim or determine, as Justice Papik put it, "what would have happened if the case was prosecuted by a nonconflicted prosecutor." Doc. 30-4 p. 72.

As Justice Papik also pointed out, Galindo's allegation is not just about the County Attorney's proof regarding the Lundell aggravator; it is about the fairness of the proceedings overall, including the County Attorney's "*participation* in the penalty phase of the proceedings." *Id.* This echoes the plurality in *Vuitton*, which noted that appointment of an interested prosecutor is "an error whose effects are pervasive" and "requires scrutiny of[] the conduct of an entire prosecution, rather than simply a discrete prosecutorial decision." 481 U.S. at 812.

The Nebraska Supreme Court's treatment of prejudice by merely excising the aggravator was insufficient to address the breadth of the due process violation. Indeed, even now, without discovery or an evidentiary hearing, Galindo cannot know the extent of the prosecutor's conflict of interest and how much it corrupted the entire penalty phase process. For these reasons, and those laid out in Justice Papik's dissent, discovery and an evidentiary process were necessary before the Nebraska Supreme Court could address prejudice, and Galindo will move this Court for discovery on this issue pursuant to Habeas Rule 6.

89

Regarding the allegation by Respondent and the finding by the Nebraska

Supreme Court that the argument that the prosecutor's conflict may have affected

the prosecutor's decision to pursue the death penalty (Doc. 46 pp. 120, 123; 30-4 p.

57), there was no default.

First, as Justice Papik noted in his dissent, Galindo's allegation about the

prosecutor's conflict is not just that it affected the proof regarding the Lundell

aggravator but that it raises the question of "what would have happened if the case

was prosecuted by a nonconflicted prosecutor." Doc. 30-4 p. 72. The post-conviction

motion "alleged that the county attorney's conflict affected the fairness of the

proceedings and would have made the county attorney subject to a motion for

disqualification had Galindo known of the conflict at the time." *Id.* This allegation

about the effect on the fairness of the proceedings and a motion for disqualification

is an allegation that the conflict affected the entirety of the case and proceedings,

which necessarily includes the question of whether to seek the death penalty.[14] This

argument was therefore part and parcel of the allegations in Galindo's amended

motion and was properly part of the arguments made to the Nebraska Supreme

Court.

Second, the argument that the conflict of interest affected the prosecutor's

decision to pursue the death penalty is just that—an argument, addressing the

---

[14] It must also be noted that without any evidentiary development, Galindo could
not know the extent of the conflict nor the extent of its effects on his case; thus,
without discovery or an evidentiary hearing, he was forced to allege only what he
could have known at the time, which was limited by the court's denial of evidentiary
process.

90

prejudice component of the prosecutor's conflict of interest, which is relevant only if the Court does not believe the error is structural. This argument is not a claim. *See Coleman v. Thompson*, 501 U.S. 722, 731 (1991) (requiring exhaustion of "available state remedies as to any of his federal claims"); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court").

A valid procedural default requires both an adequate and independent basis for the state procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989). The Nebraska Supreme Court's ruling cannot be adequate if it violates a principle of Nebraska Law. Under *Wainwright*, a state court ruling that a claim is procedurally defaulted can only be considered an "adequate" ground to bar federal habeas review if the state procedural rule in question is firmly established and consistently applied. *See Ford v. Georgia*, 498 U.S. 411, 423-24 (1991). This principle ensures that the procedural rule is not arbitrary or applied in a manner that violates the state's own legal principles. The adequacy of a state procedure presents a question of federal law. *Williams v. Lockhart*, 873 F.2d 1129, 1131 (8th Cir. 1989).

The Nebraska Supreme Court's finding of a procedural default as to this argument was not based on an adequate and independent state law. *See Coleman*, 501 U.S. at 731. The court's citation to *State v. Ammons*, 990 N.W.2d 897 (2023) was inapposite because, although that case made reference to "arguments or theories," it dealt with a **claim** of whether trial counsel was ineffective for failing to consult with the defendant. *Id.* at 439. The post-conviction motion did not raise a claim alleging

91

trial counsel was ineffective for failing to consult with the defendant, nor did the motion "mention facts that would support such a claim." *Id.* at 441.Thus, the Nebraska Supreme Court's citation to *Ammons* to hold Galindo's argument was defaulted ignored the fact that *Ammons* dealt with a claim, not merely an argument.

The case cited by the court in *Ammon, Elbert v. Young*, 977 N.W.2d 892 (2022), is even less relevant. *Elbert* was a civil tort case dealing with allegations of defamation, civil conspiracy, and a scheme to portray the plaintiff in a false light. *Id.* at 903. Due to particularities of such claims in Nebraska, the false light claim was subsumed by the defamation claim, which the plaintiff did not oppose. *Id.* On appeal, the plaintiff for the first time raised the claim that his false light claim should be considered a separate claim rather than be subsumed by the defamation, making new factual allegations to support that claim which were not raised below. *Id.* at 903. Like *Ammons*, *Elbert* dealt with a claim, not merely an argument.

Given that the Nebraska Supreme Court's cited cases dealt with treatment of **claims** not raised in the trial court, Nebraska law does not require that every "argument," particularly arguments related to prejudice, be explicitly stated in a trial court in order to be argued on appeal, as the Nebraska Supreme Court held in Galindo's case. The Nebraska Supreme Court's procedural default finding is therefore not based on an adequate state law ground and this Court is not barred from considering the prejudice-related argument that the conflict of interest may have affected the prosecutor's decision to pursue the death penalty. Even if this Court does find that argument is not properly before it, however, the claim itself is

92

properly before this Court on the merits and, as Justice Papik's dissent clearly set forth, the prejudice Galindo alleges goes beyond the Lundell aggravator and infected the fairness of the proceedings overall, including "what would have happened if the case was prosecuted by a nonconflicted prosecutor." Doc. 30-4 p. 72.

For these reasons, the county attorney's conflict of interest denied Galindo the right to a fair trial guaranteed the Fifth, Sixth and Fourteenth Amendments of the United States Constitution. The Nebraska Supreme Court's treatment of this claim was contrary to, or an unreasonable application of, clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order new proceedings, including a new trial, aggravation, and sentencing proceedings.

In addition, because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and requested discovery and a hearing. Galindo listed his proposed exhibits. Doc. 30-43 pp. 9-28 n.17-59, pp. 54-59 n.109. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. As to the allegation related to the county attorney's corruption, Galindo specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claims the prosecutor was burdened by

93

a conflict of interest." *Id.* pp. 73-76. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted the State's findings. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

This is particularly problematic here, where the post-conviction judge was not the trial judge and did not view the actions of the corrupt trial prosecutor during the original trial. In *Liljestrand*, 842 N.W.2d at 580, the Nebraska Supreme Court adopted the "general rule . . . that a successor judge may not make a decision based on conflicting evidence that a predecessor judge heard" because "due process entitles a litigant to have all the evidence submitted to a single judge who can see the witnesses testify and, thus weigh their testimony and judge their credibility." *Id.* at 580. Not even reviewing a transcript provides a successor judge with sufficient grounds to render judgment where "the issues involved the credibility of witnesses." *Id.* Where a successor judge improperly enters judgment under these circumstances, a new trial is appropriate. *Id.*

94

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

**Claim 5:**   **Galindo is intellectually disabled and his trial counsel was ineffective for failing to investigate the life history information needed for an adequate evaluation and diagnosis, and post-conviction counsel was ineffective via total inaction on the issue, excusing any default.**

Jorge Galindo is intellectually disabled. The Eighth and Fourteenth Amendments prohibit his execution. Additionally, his trial counsel were ineffective in their presentation of Galindo's intellectual disability.

He meets the three-pronged criteria for this diagnosis. His full-scale IQ score on the Woodcock-Johnson IV Test of Cognitive Abilities was 73 with a 95% confidence interval, producing a score range of 68-78, demonstrating "significantly subaverage general intellectual functioning." Neb. Rev. Stat. § 28-105.01(3). His Flynn-corrected score is 70.3. Based on interviews with 15 informants in two countries; including family members, teachers, neighbors, friends, and other people who knew him during his childhood, Galindo demonstrates deficits in the conceptual, social, and practical domains of adaptive functioning. The onset of these deficits occurred during the developmental period. Had trial counsel conducted an adequate investigation and provided critical information related to Galindo's adaptive functioning to their expert, Dr. Antolin Llorente, he would have diagnosed Galindo with an intellectual disability rather than borderline intellectual functioning. Because counsel did not investigate Galindo's life history, including his cognitive and adaptive functioning, counsel did not provide the necessary information for Dr. Llorente to assess Galindo's adaptive functioning, an essential criterion for a diagnosis of intellectual disability.

96

Respondent does not dispute that Galindo is intellectually disabled. Nor does Respondent dispute trial counsel's ineffectiveness in failing to establish intellectual disability at trial. Rather, Respondent spends a single paragraph addressing Galindo's intellectual disability claim, contending it is procedurally defaulted because it was not raised on direct appeal and the ineffective assistance of trial counsel claim was not raised in state post-conviction proceedings. Doc. 46 p. 162. Because Galindo can demonstrate cause and prejudice to excuse the default under *Martinez*, this Court may consider the claim. And because Galindo is intellectually disabled, he is categorically excluded from the death penalty under the Eighth Amendment and Supreme Court precedent. *Atkins v. Virginia,* 536 U.S. 304 (2002); *Hall v. Florida*, 572 U.S. 701 (2014); *Brumfield v. Cain*, 576 U.S. 305 (2015); *Moore v. Texas*, 581 U.S. 1 (2017); *Moore v. Texas*, 586 U.S. 133 (2019).

*Martinez* provides that when a substantial claim of ineffective assistance of trial counsel should have been raised in state post-conviction proceedings and was not raised, cause to overcome a procedural default can be established by showing post-conviction counsel's failure was ineffective under *Strickland. Martinez*, 566 U.S. at 11. To show a claim is substantial, Galindo must show "that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 997 (citing *Strickland*, 466 U.S. at 697)

   A. *The claim is substantial.*

Galindo's claim as to his trial counsel's failure to adequately investigate, evaluate, and present his intellectual disability claim is substantial. In 2023,

testing administered by Dr. Diomaris Safi determined that Galindo's Full-Scale IQ score was 73; his Flynn-corrected score was 70.3. Doc. 39-1 p. 4, 21. With a 95% confidence interval, his score range is 68–78. This score is consistent with a diagnosis of Intellectual Developmental Disorder and meets the first prong of the diagnostic criteria for such a diagnosis. *Id*. p. 4; Doc. 2-3 p. 4. In assessing the second diagnostic criteria, adaptive functioning, Dr. Safi and Dr. Selena Sermeño interviewed 15 individuals who observed Galindo's adaptive functioning and interacted with him during the developmental period; Dr. Safi concluded Galindo possesses deficits in all three domains of adaptive functioning; he therefore meets prong two for a diagnosis of intellectual disability "on the basis of his longstanding conceptual, social, and practical deficits." Doc. 39-1 pp. 4, 29-30. And although under Nebraska law there is no requirement that the deficits be present during the developmental period, Dr. Safi found that Galindo's deficits in intellectual and adaptive functioning were present before the age of eighteen, satisfying the third prong of the diagnostic criteria for intellectual disability. *Id*. p. 30.

The findings by Drs. Safi and Sermeño as to Galindo's adaptive functioning were corroborated by lay witness testimony of Galindo's cousins, aunts and uncles, childhood friends and neighbors, teachers, and school administrators, in both Mexico and Nebraska. Two of Galindo's fellow students in Mexico, one of whom was also Galindo's cousin, described Galindo as a "burro" in school—"slow and dumb as a donkey." Doc. 5-5 p. 1; Doc. 4-1 p. 6. He was "severely delayed in his learning." Doc. 5-5 p. 2. His cousin explained that he "struggled to comprehend simple things, to 'get' them, to learn them." Doc. 4-1 p. 6. Another schoolmate in Mexico revealed

98

that Galindo would copy his friends' assignments, but "[h]e didn't even know how to copy. Jorgín used to mess up copying." Doc. 5-4 p. 2.

Galindo's struggles in school continued (and worsened) after his move to Madison, Nebraska, where he struggled to learn English and performed poorly in school, even in classes that were not considered difficult. Doc. 3-2 p. 16; Doc. 5-11 p. 2; Doc. 4-6 p. 3; Doc. 5-6 pp. 1, 4. He was socially promoted after failing 8th grade twice. Doc. 3-5 p. 2. He continued to struggle with assignments in high school, despite making adequate effort. Doc. 4-7 p. 3; Doc. 5-14 p. 1, 3; Doc. 4-8 p. 1; Doc. 5-9 p. 3-4.

Galindo's deficits were apparent to lay witnesses in the social domain as well. Without fail, nearly every individual who knew Galindo in any capacity noted his gullibility, desire to please others, and follower tendencies. He was bullied in school in Mexico, leading his uncles to have to defend him. Doc. 4-4 p. 7. His cousin Marco explained, "[i]f you ask anyone that knew Jorge in Mexico, they will tell you the same thing: Jorge would go along with anything that anyone said." Doc. 4-10 p. 4. Marco observed that this trait continued even after they moved to Nebraska, leading Galindo to give into peer pressure to "fight a white kid three times his size," even though there was "absolutely no way that he could win." *Id.* p. 22. Teachers and school administrators identified Galindo as being "easily influenced by other students." Doc. 3-2 p. 15; *see also* Doc. 3-6 p. 1. Mr. Kronhofman noted that Galindo was "easily influenced by other students and was a follower. He was never a leader." Doc. 4-8 p. 2. Other teachers, including Ms. Siegel, Mr. Sunderman, and

99

Mr. Zimmer, shared that Galindo was a follower who was easily influenced by others. Doc. 5-8 p. 1-2; Doc. 5-9 p. 2; Doc. 5-14 p. 3.

The principal, Stan Turner, observed that Galindo was a follower who "'parroted other students' behavior and did whatever other students around him were doing." Doc. 5-11 p. 2. Mr. Turner also noted that Galindo was immature; "[h]is mental age was at least three years behind his chronological age." *Id.* p. 2. Mr. Juventino Naranjo, a translator at the school, stated Galindo was "very gullible and would believe anything. He was easy for other kids to trick. He was someone who needed protecting because of how gullible he was." Doc. 4-12 p. 5. Galindo's gullibility, follower tendencies, and susceptibility to peer pressure were also noted by friends. Doc. 5-3 pp. 10-11; Doc. 5-1 p. 1; Doc. 5-6 pp. 4, 6, 11; Doc. 5-2 pp. 1, 3; Doc. 5-12 pp. 3, 4, 6.

Additionally, Galindo exhibited deficits in the practical domain; he struggled handling money, travel, and daily tasks that other children easily accomplished. Doc. 4-10 pp. 3, 5, 7, 9. While in school in Nebraska, he struggled with attendance and punctuality even though he *lived across the street from the school*, and he did not complete assignments on time. Doc. 4-8 p. 2; Doc. 5-9 pp. 3-4. He had difficulty understanding the rules or strategy to sports and other games, and when he was learning to drive he even needed his friend to explain basic, intuitive things like "what traffic lights were, what the traffic signs meant, what a speed limit was; the rules of the road, so to speak." Doc. 5-6 pp. 4-6, 10-11. His struggles with daily tasks continued into Galindo's teenage and young adult years, preventing him from

100

successfully holding a job, even with his own father. Doc. 4-10 pp. 23-24; Doc. 5-6 pp. 7-8; Doc. 5-12 pp. 2-3; Doc. 5-3 p. 4.

Galindo's cognitive deficits were apparent enough to trial counsel that they hired Dr. Antolin M. Llorente, Ph.D., to evaluate him in 2004. Trial counsel, however, failed to provide Dr. Llorente with almost any of the requested information as to adaptive functioning, prong two of an intellectual disability claim. But largely due to this lack of information, Dr. Llorente did not at that time diagnose Galindo with intellectual disability. Doc. 39-1 pp. 62-63. Dr. Llorente explained,

> If trial counsel had provided the information regarding Mr. Galindo's adaptive behavior that has now been provided by current counsel as I had requested in 2004, I would not have ruled out a diagnosis of intellectual disability as I did in 2004. The newly provided adaptive information from the developmental period demonstrates that Mr. Galindo is, and always has been, an intellectually disabled person.

Id. at 63. Dr. Llorente's 2004 evaluation was limited by the insufficiency of the information provided to him by trial counsel.

The records provided to him by trial counsel were minimal and Dr. Llorente only conducted interviews of Galindo and his parents. Dr. Llorente was not provided reliable information from additional informants who had directly observed Galindo engaging in his typical behavior across specific developmental periods and within specific contexts. Had Dr. Llorente been provided this available, relevant information at the time of trial when he requested it that he was provided years later, he "would not have ruled out a diagnosis of intellectual disability." Doc. 39-1 p. 63. That information, which would have been available to trial counsel had they

101

conducted any investigation into Galindo's adaptive functioning and life history, would have led Dr. Llorente to a different conclusion than the one he reached in 2004. *Id.*

Moreover, the scores Dr. Safi obtained in her evaluation reflected "no increase in scores over time" from those Dr. Llorente obtained, despite the fact that Galindo has been living in "a controlled environment where appropriate nutrition and other critical variables are regularly provided" and he is "no longer in an environment with continuous exposure to noxious substances." *Id.* The consistency in Galindo's neuropsychological profile over time supports a diagnosis of IDD rather than Borderline Intellectual Functioning. *Id.* Dr. Llorente further noted that applying the Flynn Effect adjustment to the score he obtained in 2004—the version of the test administered at that time had been normed 17 years earlier—"corrects the score from 79 ±5 to 73.9 ±5 (range: 68.9–78.9), which is convergent with the Flynn Effect corrected score of 70.3 ±5 (range: 65.3–75.3) obtained by Dr. Safi in 2023." *Id.* at 5. *See Jackson v. Payne*, 9 F.4th 646, 654 (8th Cir. 2021) (recognizing Flynn Effect).

Dr. Llorente's 2004 evaluation resulted in a diagnosis of borderline intellectual functioning instead of intellectual disability on account of trial counsel's ineffectiveness. Counsel failed to investigate Galindo's life history, failed to interview or attempt to interview any family members aside from his parents, made only surface-level inquiries into Galindo's schooling and education, and made no effort whatsoever to investigate Galindo's first 12 years of life in Mexico, including that he was exposed to high levels of lead and other neurotoxins during that critical

102

developmental period. Counsel's failures precluded them from providing the necessary information to Dr. Llorente to be able to render a diagnosis in accordance with the diagnostic criteria set forth by the APA and the AAIDD.[15] Had counsel provided that necessary information to Dr. Llorente, he would have rendered a diagnosis of intellectual disability, rendering Galindo ineligible for the death penalty under *Atkins*. Given the categorical bar on executing the intellectually disabled, and considering counsel's failure to investigate Galindo's life history, there was no strategic reason for counsel's failure in this regard.

The evidence of Galindo's intellectual disability and trial counsel's failure to provide information that would have allowed their expert to conduct an adequate evaluation constitutes deficient performance under *Strickland*. At a minimum, reasonable jurists could debate whether Galindo is entitled to relief, the standard for a substantial claim under *Martinez*. 566 U.S. at 14.

B. *Post-conviction counsel was ineffective.*

Like trial counsel, post-conviction counsel had reason to recognize Galindo's cognitive limitations. Yet post-conviction counsel did even less than trial counsel in this regard, failing to even engage an expert to evaluate Galindo's cognitive, intellectual, and adaptive functioning. Indeed, post-conviction counsel did no investigation into Galindo's adaptive functioning, life history, or any other

---

[15] The current clinical standards are found in the DSM-5-TR (American Psychological Association, 2022) and the AAIDD Manual 12th Edition (American Association on Intellectual and Developmental Disabilities, Schalock, et al., 2021). The clinical standards in 2004, when Dr. Llorente conducted his evaluation, were found in the DSM-IV-TR and the AAMR Manual 10th Edition (2002) (at the time, referred to as the American Association on Mental Retardation).

103

mitigating circumstances or exemptions from the death penalty. Galindo's appointed counsel in post-conviction proceedings had a duty, pursuant to Neb. Rev. Stat. § 29-3004, to act competently and "provide effective counsel." *Id.* Post-conviction counsel, however, ignored Galindo's intellectual disability entirely, and consequently failed to investigate and raise trial counsel's ineffectiveness for their failure to adequately investigate and raise Galindo's intellectual disability at trial. Considering the clear, longstanding guidance from the Supreme Court that intellectual disability is an absolute bar to the death penalty, the conspicuousness of Galindo's intellectual limitations, and that post-conviction was the first and only opportunity for Galindo to challenge the effectiveness of his trial counsel's representation, post-conviction counsel's absence of action on this claim was a critical failure of their duty to provide effective counsel.

For these reasons, post-conviction counsel's failure to investigate and raise trial counsel's ineffectiveness as to Galindo's intellectual disability provides cause under *Martinez* to excuse the default of his claim.

Respondent contends that Galindo's *Atkins* claim is procedurally defaulted because it was not raised on direct appeal. Doc. 46 p. 162. But this argument makes little sense considering trial counsel's failures. Galindo was represented on direct appeal by the same counsel who represented him at trial. Trial counsel failed to conduct an adequate investigation into Galindo's adaptive functioning and failed to provide that necessary information to their own expert, who was then unable to conduct an adequate evaluation into Galindo's intellectual disability. Considering trial counsel's failures, there would have been no basis or legally viable avenue for

104

that same counsel to raise an issue on direct appeal that they did not adequately investigate at the time of trial. *Jaeger*, 970 N.W.2d at 764. The only place this could have been raised was in post-conviction proceedings, but post-conviction counsel did even less than trial counsel to investigate Galindo's background and consider his cognitive deficits.

C. *Galindo has presented the evidence in state court.*

Galindo has presented the evidence of his intellectual disability and trial counsel's ineffectiveness in state court. Galindo continued to be represented by post-conviction counsel through the appeal to the Nebraska Supreme Court and the petition for writ of certiorari in the United States Supreme Court. Counsel's representation ended upon denial of certiorari and issuance of the mandate by the Nebraska Supreme Court on December 20, 2024. Galindo, through new post-conviction counsel, filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing. Neb. Rev. Stat. § 25-2001. In the alternative, Galindo asked the state court to construe his motion as a successive motion for post-conviction relief and grant an evidentiary hearing. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004. Galindo also asked the court to exercise its inherent equitable authority to reopen the proceedings. In support of his motion, Galindo moved to introduce into evidence the affidavits and expert reports that have been submitted in these federal habeas proceedings, including those underlying his intellectual disability claim.

105

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Galindo timely filed a notice of appeal to the Nebraska Supreme Court, and the case has been docketed under Case Number S-26-400. Briefing has not yet been initiated but the Bill of Exceptions and Transcripts, including Galindo's motion and exhibits, have been filed.[16]

Galindo could not have filed his state court motion while prior post-conviction counsel continued to represent him, and counsel cannot raise claims of ineffective assistance of counsel against himself. *Jaeger*, 970 N.W.2d at 764. Galindo diligently filed his motion in state court after procuring new post-conviction counsel, who needed to get up to speed on the complex procedural history and voluminous record of the case. While the district court denied Galindo's request to reopen the proceedings or grant an evidentiary hearing, the correctness of that denial remains to be litigated in the Nebraska Supreme Court.

This procedure distinguishes Galindo's case from the recent decision in *Torres v. Jeffreys*, 17-cv-03078-RFR-MDN (Doc. 133). There, in discussing *Martinez*, the court noted that "none of the potential evidence cited to support the [claim] was part of the state-court record, and because Torres did not seek to develop it in this federal case, . . . this Court cannot consider that potential evidence when determining if the [claim] is substantial." *Id.* p. 35. Unlike in *Torres*, Galindo

---

[16] Galindo will move this Court pursuant to Habeas Rule 5 to expand the record to include the Nebraska Supreme Court filings.

presented the ample evidence regarding his intellectual disability and trial counsel's ineffectiveness in state court. Moreover, in diagnosing intellectual disability, in addition to relying on evidence gathered more recently, Dr. Safi relied on information presented at trial, including testimony that revealed Galindo's adaptive deficits by witnesses such as Ms. Marilyn Moyer and Mr. Stan Turner. The fact that these witnesses provided information at trial that could have been considered in relation to Galindo's cognitive functioning is further evidence of trial counsel's ineffectiveness as well as that of post-conviction counsel; trial witnesses testified about red flags that counsel at both stages completely missed. *See Wiggins Smith*, 539 U.S. at 525 (trial counsel was ineffective for failing to pursue leads that were apparent from their limited investigation). For these reasons, § 2254(e)(2) does not preclude this Court from considering Galindo's intellectual disability and trial counsel's ineffectiveness in failing to provide for an adequate evaluation and presentation of intellectual disability.

In closing, there is substantial evidence that Galindo is intellectually disabled and thus constitutionally barred from execution under *Atkins*. Galindo's misdiagnosis of borderline intellectual functioning by the defense expert at trial was largely due to the trial counsel's failure to conduct an adequate investigation into the evidence necessary for a diagnosis. This failure to properly investigate Galindo's intellectual disability by trial counsel and along with post-conviction counsel's oversight of the claim entirely constitute deficient performance under *Strickland* and the *Martinez* standard for a substantial claim. This failure to investigate and properly raise Galindo's exemption from the death penalty as an intellectually

disabled individual demonstrates ineffectiveness of counsel at both stages. Under *Martinez*, Galindo is entitled to present this ground for relief.

Galindo prays that this Court determine that he is exempt from execution because he is intellectually disabled and the Eighth and Fourteenth Amendments require his sentence of death is modified accordingly. Additionally, Galindo respectfully requests this Court hold an evidentiary hearing on the issue of his intellectual disability and on the issue of whether he was provided effective counsel as required under the Sixth Amendment.

**Claim 6:    The State suppressed material and exculpatory evidence.**

The trial prosecutor was subject to an ongoing *federal* criminal investigation. Federal investigators were also involved in the response to the bank robbery and killings—a federal crime. It is improper to minimize this conflict when considering any of the prosecutorial misconduct claims. Respondent correctly notes the entirety of this claim is properly before the Court on the merits. Doc. 46 pp. 87, 96, 124.

Respondent failed to explicitly contest the extent of the suppressed and materially false evidence that was related to the trial prosecutor's corruption. The federal investigation of state-endorsed witness Jesse Padilla and his associates (including the county attorney) was ongoing at the time that Hector Abendano and Miguel Lopez were being presented as witnesses at Galindo's trial, and while federal investigators attended the April 1, 2003, interview of Abendano. As one would expect, law enforcement conducted a thorough investigation of the group, interviewing numerous witnesses, targeting Padilla's shop with search warrants, attempting undercover drug purchases, and wiretapping phones—eventually even targeting the county attorney's conversations for interception. As the investigation continued, several of the targets, including the county attorney, provided sworn testimony to a federal grand jury.

The State withheld information regarding the circumstances surrounding the county attorney, as well as testifying witnesses Abendano[17] and Lopez, including the county attorney's connections to the Padilla drug ring; Abendano's connections to the Padilla drug ring and Miguel Lopez; and Lopez's connections to the drug ring and to Abendano. The State has never disclosed anything about the Padilla drug ring nor the association of the county attorney, Abendano, or Lopez to the group, nor the state investigative reports generated during the federal investigation. It has never disclosed any promise not to prosecute Cortney Barritt, never disclosed Kristie Petzold's suspected involvement in the North Dakota drug ring, and never disclosed the forensic testing of Trista Wiest's trunk, which produced no results.

Galindo alleges that:

- The State Failed to Disclose the County Attorney's Personal Connections to the Padilla Drug Ring;
- The State Failed to Disclose Abendano's Connections to the Padilla Drug Ring, that He Was a Proven Snitch, and that He Received Inducements for Testifying;
- The State Failed to Disclose Lopez's Connections to the Padilla Drug Ring;
- The State Failed to Disclose a Favorable Witness Deal with Cortney Barritt; and
- The State Failed to Disclose Material Information About Kristie Petzold's Involvement in Drug Trafficking.

In addition, the corrupt trial prosecutor knowingly presented false evidence from Daniel Animas, who has twice reaffirmed his March 25, 2003 statements that Galindo

---

[17] The county attorney obfuscated Abendano's identity. The county attorney did not file his "jailhouse informant" notice until November 26, 2003, identifying Abendano as "Hector Feliz, aka Victor Valenzuela" and not Hector Abendano, the name used when calling him to the stand at trial.

had denied being personally involved in Lundell's murder, contrary to Animas's testimony at trial. Doc. 32-19; Doc. 32-20.

Given the history of suppression of evidence and the county attorney's clear conflict of interest, Galindo reasonably believes there may be additional exculpatory and material evidence to which he does not have access. Such evidence would be properly before the Court once it was found to satisfy *Strickler v. Greene*, 527 U.S. 263 (1999). Respondent does not dispute that there may be additional evidence being suppressed.

Respondent does not contest the factual allegations and instead skips to the conclusion, as did the Nebraska Supreme Court, that there simply can be no prejudice. Doc. 46 pp. 94-96 (citing Doc. 30-4 pp. 49-51). But it is well settled that *Brady v. Maryland*, 373 U.S. 83 (1963) represents a multi-prong test; thus, this Court should conduct the other prongs of the *Brady* test *de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla*, 545 U.S. at 390 ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). Therefore, this Court reviews the first prong, whether the prosecution suppressed exculpatory evidence, *de novo*.

Respondent distilled the Nebraska Supreme Court's ruling that the three remaining aggravating factors were enough because only one would be needed. Doc.

111

46 p. 95 (citing Doc. 30-4 p. 49).[18] Galindo does not dispute that this is what unreasonably occurred; an improper numbers game, as opposed to an evaluation of the relative weight of aggravators and mitigators. This simple math equation is contrary to Nebraska law, which prohibits such a perversion of the weighing process. *See State v. Joubert*, 399 N.W.2d 237, 252 (Neb. 1986) ("The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors.").

There is another problematic aspect of the Nebraska Supreme Court's assessment; it is littered with references and deference to the original sentencing entry. *See* Doc. 30-4 pp. 49-50. Incredibly, the Nebraska Supreme Court relied upon and deferred to a sentencing trial court that was corrupted by the *Brady* violations. This is unreasonable and rewards the trial prosecutor's misconduct by reliance on an earlier sentencing discussion corrupted by the suppression of evidence.

It was premature of the Nebraska Supreme Court to engage in the prejudice analysis without an evidentiary hearing. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry by ignoring the principle that a *Brady* claim is evaluated using a cumulative, totality-based materiality standard rather

---

[18] Habeas Rule 2(c) provides: "The petition must: (1) specify all the grounds for relief available to the petitioner; (2) state the facts supporting each ground; (3) state the relief requested; (4) be printed, typewritten, or legibly handwritten; and (5) be signed under penalty of perjury by the petitioner or by a person authorized to sign it for the petitioner under 28 U.S.C. § 2242." Contrary to Respondent's contention (*see* Doc. 46 p. 96), neither Habeas Rule 2 nor any other Habeas Rule requires a point-by-point rejoinder of a state court opinion under AEDPA.

112

than analyzing each piece of suppressed evidence in isolation. *Wearry v. Cain*, 577 U.S. 385 (2016); *Youngblood v. West Virginia*, 547 U.S. 867 (2006). Without a complete disclosure, this could not occur.

The correct principle presently stated is consistent with the dissents of Justice Papik and Justice Miller-Lerman. Dissenting Justice Papik noted the depth of the allegations and the impact on the penalty phase:

> Galindo's prosecutorial conflict of interest claim is rooted in allegations that the county attorney was involved in a criminal drug ring. Galindo does not challenge his underlying convictions but claims that the county attorney's criminal exposure influenced his decisions in the aggravation phase of Galindo's case. Specifically, Galindo's postconviction motion alleged that the aggravation phase of his case provided the county attorney with an opportunity to attempt to shield himself from federal scrutiny of his own criminal activities through the following scheme: Participants in the drug ring would testify against Galindo by implicating him in the death of Travis Lundell, and that testimony would allow the county attorney to recommend against further federal investigation of the drug ring's participants and reduce the chances that federal authorities would discover his own connections to the drug ring.

Doc. 30-4 pp. 68-69 (Papik, J., dissenting). Justice Papik further noted:

> I do not believe we can assess whether a prosecutorial conflict of interest prejudiced Galindo based solely on asking whether the sentencing panel would have imposed death sentences even if the Lundell murder was taken out of the equation. In addition to allegations that the county attorney's alleged conflict undermines confidence in the jury's findings regarding the Lundell murder, Galindo's postconviction motion alleged that the county attorney's conflict affected the fairness of the proceedings and would have made the county attorney subject to a motion for disqualification had Galindo known of the conflict at the time. Galindo thus alleged that the county attorney's *participation* in the penalty phase of the proceedings violated his right to due process. Accordingly, I believe prejudice must be assessed by determining whether the same sentences would have been imposed had the case been prosecuted by a nonconflicted prosecutor.

113

*Id.* p. 71. As noted above, it is not enough to defer to what had been corrupted as a basis to affirm.

The lack of a hearing also restricted the *Napue* test announced by the United States Supreme Court: "prejudice analysis requires a 'cumulative evaluation' of all the evidence, whether or not that evidence is before the Court in the form of an independent claim for relief, these documents reinforce our conclusion that the *Napue* error here prejudiced the defense." *Glossip v. Oklahoma*, 604 U.S. 226, 251 (2025) (citing *Kyles v. Whitley*, 514 U. S. 419, 441 (1995)); *Wearry*, 577 U.S. 385; *Youngblood*, 547 U.S. 867. Without an evidentiary hearing, there could not be an assessment of the cumulative evidence that exists because matters remain solely in the control of the State.

Setting that aside, in making the prejudice component outcome determinative the Nebraska Supreme Court failed to apply the correct test. As recently noted, the test in *Napue* is not so outcome determinative – rather, the question of materiality "always requires courts to assess whether 'the error complained of' could have contributed to the verdict." *Glossip*, 604 U.S. at 253. It is unreasonable under (d)(2) when a court incorrectly modifies governing precedent. *Williams*, 529 U.S. at 391 (holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart v. Fretwell*, 506 U.S. 364 (1993) modified or in some way supplanted the rule set down in *Strickland*").

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and requested discovery and a hearing. Galindo listed his proposed exhibits. Doc. 30-43

114

pp. 24-30 nn.17-41, pp. 32-59 nn.43-59, 62-68, 71-83, p. 69, pp. 76-80 n.115. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo specifically noted: "Galindo's allegations the State failed to disclose material evidence, in violation of Galindo's rights to due process and to a fair trial, are plainly sufficient to require an evidentiary hearing." *Id.* pp. 57-68. He specifically asserted the court's error in denying an evidentiary hearing as to the *Brady* claims related to the county attorney's ties to the Padilla drug ring and as to Abendano, Lopez, Barritt, Petzold, Wiest, and Animas. *Id.* He further asserted, "The district court erred by dismissing Galindo's post-conviction claims without conducting a hearing regarding the State's alleged ongoing *Brady* due process violation." *Id.* pp. 66-68. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-294, the Court reiterated its criticism of adopting

115

verbatim findings, remanding a capital case where a trial court simply adopted State's findings. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process. The county attorney's failure to disclose the evidence discussed above violated Galindo's constitutional right to due process. *See Brady*, 373 U.S. 83; *Bagley*, 473 U.S. 667. As a result of the suppression of this evidence, viewed separately and cumulatively, Galindo has undermined confidence in the integrity of the guilt, aggravation, and/or sentencing phases. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and sentencing phase.

116

**Claim 7:**   **The State manipulated jail assignments to collect evidence in violation of *Massiah v. United States.***

In its lead-in, Respondent omits (as did the Nebraska Supreme Court) that the investigation into the county attorney was not just "an ongoing criminal investigation" (Doc. 46 p. 81), it was an ongoing ***federal*** criminal investigation. It is worth noting as well that federal investigators were also involved in the response to the bank robbery and killings because federal prosecutors are usually tasked with prosecuting bank robberies and killings that take place during bank robberies. It is necessary to recognize and improper to minimize this conflict when considering any of the prosecutorial misconduct claims.

Before getting to the misconduct allegation, Galindo agrees that it is "rather complicated" to unpack what the mischievous trial prosecutor did to manipulate jail assignments to obtain testimony from what appear to be his federal drug conspirators. Doc. 46 p. 83 (quoting Doc. 30-4 p. 11). This matter is made more complicated when there was no discovery nor an evidentiary hearing before the state court. And it was made even more complicated by the post-conviction court's verbatim adoption of the State's "proposed" dismissal findings. *See* Doc. 30-23 pp. 40-41. That verbatim adoption was made even more complicated by the fact that the state post-conviction court was not the same judge who presided over the original trial, and thus, had no previous observations upon which to rely. *See Liljestrand*, 842 N.W.2d at 580 ("[G]eneral rule . . . that a successor judge may not make a decision based on conflicting evidence that a predecessor judge heard" because "due process entitles a litigant to have all the evidence submitted to a single judge who

117

can see the witnesses testify and, thus weigh their testimony and judge their credibility."). The state post-conviction court neglected its function regarding evidentiary development—which Justice Papik and Justice Miller-Lerman pointed out in their separate dissents. Doc. 30-4 pp. 68-73.

Respondent properly concedes this claim (with one exception about the Houdek aspect of the claim, which Galindo hereby withdraws) is properly before this Court on the merits. Doc. 46 p. 85. The State manipulated jail assignments to collect evidence in violation of *Massiah v. United States*, 377 U.S. 201 (1964); *United States v. Henry*, 447 U.S. 264 (1980). The Court has made clear that "[a]ny secret interrogation of the defendant, from and after the finding of the indictment, without the protection afforded by the presence of counsel, contravenes the basic dictates of fairness in the conduct of criminal causes and the fundamental rights of persons charged with crime." *Massiah*, 377 U.S. at 205. The State may not intentionally create a situation in which a defendant is likely to make incriminating statements outside the presence of counsel; nor may it knowingly exploit a situation that it did not intentionally create. *Maine v. Moulton*, 474 U.S. 159, 176 (1985). The Nebraska Supreme Court acknowledged these principles. Doc. 30-4 pp. 10-11.

The Nebraska Supreme Court unreasonably relied upon *Kuhlmann v. Wilson*, 477 U.S. 436 (1986) to deny relief. It is unreasonable to assume that these co-drug conspirators with the trial prosecutor were instructed only to listen. The *Kuhlmann* "listening post" exception is strictly limited to scenarios where the informant and the police remain entirely passive. *Id.* at 439. It also involved a single informant—

118

not the parade of numerous co-conspirators that were continuously shuffled around as we have here.

As the Nebraska Supreme Court noted, "The district court denied postconviction relief for this claim without an evidentiary hearing." Doc. 30-4 p. 13. Consequently, the State's actions have been shielded from view due to a State-prepared order. *See* Doc. 30-23 pp. 40-41. In that regard, it was unreasonable for the Nebraska Supreme Court to fault Galindo for failing to allege the "how." *Id.* The "how" remains in the hands of the county officials, officials who were the corrupt trial prosecutor's "friend," and they were shielded from having to provide records and or testimony due to the State-prepared dismissal order.

In his Amended Motion, Galindo specifically requested discovery and a hearing to attempt to develop the "how," but the post-conviction court and the State prevented that development from being possible:

- "Defendant respectfully moves the Court pursuant to Neb. Rev. Stat. §29-3001 et seq. to: (1) determine the issues raised by his motion, conduct an evidentiary hearing, including an opportunity to conduct discovery prior thereto… ." Doc. 30-43 p. 10;

- "Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto;" *Id.* p. 134.

Setting that aside, the Nebraska Supreme Court unreasonably discounted the evidence that was not uniquely in the possession of the State, which documented the improper movements of Padilla, Abendano, and Lopez to cells with the bank robbery defendants, and with one another, which constituted an additional

119

investigative tactic beyond "merely listening." *See* Doc. 30-43 pp. 15, 17–25, 28–30.[19] The cell assignments simply could not have occurred by mere happenstance. Padilla and Abendano were each housed with co-defendant Vela. *Id.* p. 17. Abendano was then also housed with Galindo, Rodriguez, Lopez, and Roque Moreno—three of the bank robbery participants plus his co-conspirator and fellow witness, Lopez. *Id.* pp. 19-20. Further, Lopez was housed with Abendano and Animas after each had been housed with Galindo, raising the inference that they were going to get their stories straight. *Id.* p. 18. Because the Nebraska Supreme Court's decision rests upon a significant factual flaw as to the how and why the jail manipulation occurred, this Court is free to review the claim *de novo* and grant relief if a non-harmless constitutional violation has occurred. *See, e.g.*, *Gabaree*, 792 F.3d at 999; *Simmons*, 299 F.3d at 937-38.

Rather than being so favorably coincidentally beneficial to the State, there was an invidious purpose to the jail assignment choices. Abendano, Lopez, and Padilla knew one another as members of the same drug conspiracy and two of them had been represented by Freese, who was later convicted in federal court for his participation in the conspiracy. See Habeas Claims 4, 6. The county attorney visited Padilla at his mechanic shop while Padilla was on work release during relevant times. Doc. 30-43 p. 18. Both Padilla and Abendano had a history of cooperating

---

[19] Respondent suggests Galindo failed to address the basis of the Nebraska Supreme Court's opinion in his Amended Habeas Petition. Doc. 46 p. 86. As previously noted, nothing in Habeas Rule 2 requires a point-by-point rejoinder of a state court opinion under AEDPA.

120

with Smith. *Id.* These facts support the inference the county attorney intentionally engaged Abendano to elicit incriminating statements or evidence from Galindo.

The Nebraska Supreme Court's alternative finding unreasonably determined there was no prejudice. Such a determination requires a consideration of the totality of the circumstances, which could not occur in the circumstances of the truncated post-conviction process received here. Galindo specifically challenged the failure to afford him evidentiary process in this regard. Doc. 30-23 pp. 68-70. Further, the Nebraska Supreme Court unreasonably failed to comply with its own law regarding the proceedings below. The court ignored the principle from *Liljestrand*, 842 N.W.2d at 580, that the "general rule . . . that a successor judge may not make a decision based on conflicting evidence that a predecessor judge heard" because "due process entitles a litigant to have all the evidence submitted to a single judge who can see the witnesses testify and, thus weigh their testimony and judge their credibility."

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted the State's findings. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41. And as previously noted, Galindo

121

challenged the trial court's failure to allow evidentiary development on this specific claim. *Id.* pp. 68-70.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

As a result of the *Massiah* violation, the State circumvented Galindo's right to counsel, prejudicially violating the Sixth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. See 28 U.S.C. § 2254(d)(1) and (2). This Court should permit discovery and grant an evidentiary hearing; on the merits, the Court should grant the writ and order a new aggravation and sentencing proceeding.

122

**Claim 8:**   **Mr. Galindo's rights to the effective assistance of counsel at trial as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution were violated by trial counsel's failure to adequately investigate, prepare and present available mitigation evidence.**

A wealth of life history evidence existed to provide the sentencing panel with ample reason to find that, due to Galindo's background and character, he should receive "a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). Galindo's early childhood was marked with isolation, emotional neglect, physical abuse, and parental rejection, in addition to exposure to environmental toxins such as lead. He later experienced family separation, familial substance abuse, and stressors related to his family's immigration to the United States.

Longstanding Supreme Court precedent and professional norms required trial counsel to investigate Galindo's life history. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387; *see also Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 394–98; *Kenley v. Armontrout*, 937 F.2d 1298, 1307–09 (8th Cir. 1991). Counsel's obligation cannot be met by relying on "only rudimentary knowledge of [the defendant's] history from a narrow set of sources." *Wiggins*, 539 U.S. at 524. And counsel was further obligated to prepare to rebut aggravating circumstances argued by the State, which required sufficient investigation. *Rompilla*, 545 U.S. at 386.

Yet counsel utterly failed to conduct more than a cursory, surface-level investigation into Galindo's life and potential mitigating circumstances. Counsel did

123

not attempt to interview any family members who knew Galindo or observed his childhood, other than Galindo's parents. They did not even interview Galindo's family members in the United States. They made no attempt to view or experience the area in Mexico where Galindo spent the first 12 years of his life, and where he was exposed to high levels of lead and other neurotoxins. Although counsel, through their hired mitigation specialist, spoke to a few of Galindo's educators in Madison and some of his friends there, they merely scratched the surface of witnesses who could speak to Galindo's home life, his cognitive limitations, his struggles with substance abuse, and his true character, among other contextualizing mitigating factors.

Lead trial counsel outsourced the sentencing issues, including mitigation, to a brand-new attorney who "had no previous experience with mitigation." Doc. 5-13 pp. 1-3. The hired mitigation specialist likewise lacked trial experience and was unaccustomed to trial counsel's unfamiliarity with mitigation and resulting hands-off approach; she described the dynamic as "the blind leading the blind." Doc. 4-3 pp. 4-5. The surface-level mitigation investigation did not begin until over a year into the case, and the mitigation specialist spent only thirteen days total in the field interviewing witnesses about Galindo's life history. *Id.* p. 7; Doc. 3-4 p. 2.

Due to trial counsel's lack of a meaningful investigation into Galindo's life history, counsel also failed to hire necessary experts to evaluate aspects of Galindo's life and failed to adequately prepare the experts that counsel did hire. *See Rompilla*, 545 U.S. at 391–93 (had counsel conducted competent mitigation investigation, they would have discovered evidence to rebut the "benign concept of

124

Rompilla's upbringing and mental capacity" formed in part due to expert report); *Ferrell v. Hall*, 640 F.3d 1199, 1227 (11th Cir. 2011) (counsel's failure to conduct comprehensive mitigation investigation resulted in a narrow mental health evaluation); *Gray v. Branker*, 529 F.3d 220, 231 (4th Cir. 2008) (ineffective to rely on self-assessment of mental health and not provide expert with readily available evidence of mental deterioration); *Walbey v. Quarterman*, 309 F. App'x 795 at 803, (5th Cir. 2009) (ineffective to fail to adequately prepare mental health expert to testify); *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) ("[T]he mere hiring of an expert is meaningless if counsel does not consult with that expert" to make informed decisions in the case).

Due to counsel's lack of preparation and lack of investigation, counsel failed to prepare their witnesses to testify on Galindo's behalf. Without adequate information and context about Galindo's life history, counsel prevented their witnesses from presenting helpful information and at times led them to present harmful evidence, while leaving them vulnerable to avoidable and damaging cross-examination by the prosecutor. An essential aspect of investigating and presenting mitigating evidence is adequately preparing witnesses to testify. *See Andrus,* 590 U.S. at 817–18. (counsel ineffective for calling defendant's mother to testify despite being "ill-prepared for her testimony," and "[c]ounsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment.").

Counsel presented expert testimony by Dr. Llorente and Dr. Alex Stalcup, but they were each only provided minimal information and records upon which to

125

base their testimony. Dr. Llorente reviewed school records and spoke to Galindo's parents, and Dr. Stalcup was given information from witnesses who used methamphetamine with Galindo, although not in the days immediately leading up to the crime (*see also* Habeas Claim 19). Neither expert was provided with a psychosocial history or family history; nothing of the sort was ever prepared. Doc. 4-3 p. 5; Doc. 5-13 pp. 1-2. Aside from a phone call from Dr. Llorente to Galindo's parents, neither Dr. Llorente nor Dr. Stalcup independently interviewed witnesses; Dr. Stalcup did not even interview Galindo.

Like the experts, the lay witnesses called by counsel were unprepared to testify and thus did not testify helpfully in numerous respects. Witnesses including Mr. Mike Sunderman and Mr. Stan Turner did not know what counsel planned to ask them and were not given the opportunity to review Galindo's school records prior to testifying; if they had, they would have been able to testify about Galindo's cognitive struggles, the fact that he was "easily led and influenced by others," including his co-defendant Jose Sandoval, and the ways in which the school district failed to meet Galindo's needs. Doc. 5-9 p. 2; Doc. 5-11 pp. 2-4.

Counsel even failed to prepare Galindo's parents for their testimony, leading them to inaccurately paint Galindo's childhood and cognitive capacity in a more positive light than was reality, and contradicting the testimony by other witnesses including Dr. Llorente. *See Andrus*, 590 U.S. at 817–18 (defendant's mother testified untruthfully that his childhood was tranquil, casting herself in a positive light); *Walbey*, 309 F. App'x at 803 (defendant's grandmother testified inaccurately that his childhood was normal, presenting "a seriously distorted view of his

126

childhood that painted . . . her daughter [] as benign" rather than abusive). Because of counsel's failure to prepare Galindo's parents and ensure they understood the purpose of his questions, they perceived they were being criticized and grew defensive, providing information that lacked context and did not accurately illustrate Galindo's life history.

Indeed, trial counsel's mitigation presentation was so weak, due to the inadequacy of the investigation into mitigating circumstances, that the sentencing panel found no statutory or non-statutory mitigators had been proved aside from cooperation with law enforcement, which it gave little weight. Having presented the equivalent of nothing, it was no wonder the sentencers found the defense mitigation case inadequate. Had counsel conducted an adequate mitigation investigation and presented available expert mitigating evidence, including that related to Galindo's lead and neurotoxic exposure, his experiences of childhood adversity, including trauma and neglect and their impact on his brain development, and his brain-based language disorder and executive dysfunction, it is likely the panel would have come to a different conclusion as to the strength of the mitigation evidence and its balancing against the aggravation evidence. *Lockett*, 438 U.S. at 586; *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Rompilla*, 545 at 392–93; *Wiggins*, 539 at 534–35.

Respondent alleges procedural default. Doc. 46 pp. 126-27. Under *Martinez*, Galindo can show that post-conviction counsel's own failure to conduct any investigation whatsoever into mitigating circumstances establishes cause to excuse the default.

127

### A. The claim is substantial.[20]

*Martinez* may provide cause for a procedural default if the claim is substantial, meaning it has "some merit;" if it is "at least debatable among jurists of reason whether trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 996-97.

#### 1) Claim 8.1: Failure to adequately investigate, prepare, and present available mitigation evidence

Galindo grew up isolated, abused, emotionally neglected, and rejected, often by his own mother. He was exposed to lead and other environmental neurotoxins. When he moved to Nebraska, he faced family separation, substance abuse, and post-migration stressors. Galindo had significant learning, intellectual, and cognitive difficulties. This evidence is meaningful to mitigation in capital cases and, had counsel investigated and presented it, would have led to a different balance of aggravating and mitigating evidence. *See, e.g., Wiggins,* 539 U.S. at 535-36.

As fully described in Galindo's Amended Habeas Petition, rather than accurately presenting Galindo's life history to the sentencing panel, counsel conveyed the opposite of Galindo's reality. Contrary to the picture he and the witnesses he presented painted, Galindo endured a lack of nurturing, extreme isolation, and neglect during his time in Mexico and in Nebraska. Eight witnesses could have been called to testify, including: Maria Laura Espriella (Galindo's

---

[20] Galindo addresses the substantiality of each of his mitigation-based claims—raised in claims 8.1, 8.2, 8.3, and 8.4—individually in this section. For the sake of efficiency, he then addresses post-conviction counsel's wholesale failure to raise *any* of the claims below in section B.

128

maternal aunt), Santa Elena Espriella (Galindo's maternal first cousin), Maria

Torres Garcia (childhood friend of Aida), Belin Maldonado (Galindo's paternal aunt

by marriage), Ema Gonzalez Alvarez (the mother of Galindo's childhood friend,

Miguel Angel Ramirez Gonzalez), Petra Espriella Castillo (Galindo's maternal aunt

and the younger sister of Aida), Mr. Estrada Lara (Galindo's former teacher and

principal of primary school Galindo attended in Mexico), and Marco Martinez

(Galindo's paternal first cousin who lived near him in both Nebraska and Mexico).

Had counsel conducted an investigation into Galindo's childhood, he would have

been able to present testimony by those witnesses that, *inter alia,* Galindo's mother

withheld affection and physical contact, rarely allowed Galindo to play with other

children, and beat him when he did not comply with her strict timing and rules, or

when he wet the bed or did not bathe. Doc. 3-8 p. 7; Doc. 5-10 pp. 4-6; Doc. 4-9 pp. 7-

8; Doc. 5-4 pp. 1-2; Doc. 4-5 pp. 1-3; Doc. 4-10 pp. 3-4; Doc. 4-1 pp. 8-9.

Had counsel investigated Galindo's life once he moved to Nebraska, he would

have uncovered and been able to present evidence that Galindo was suddenly on his

own in an unfamiliar place where he did not speak the language. Doc. 4-10 pp. 18-

19, 21, 26. He also would have been able to present evidence that the abuse Galindo

suffered as a child in Mexico continued once he was in Nebraska, now at the hands

of his father. *See* Doc. 5-6 pp. 6-7. As one of his friends put it, whenever he spent

time with friends it was "like he was escaping—escaping from that household of

loneliness, of discipline, of punishment, of being shut up and locked away." Doc. 5-6

pp. 6-7.

129

Counsel did not present these witnesses because counsel did not investigate Galindo's life history. *See Wiggins*, 539 U.S. at 524. The trial team operated like "the blind leading the blind" due to their lack of experience. Doc. 4-3 pp. 4-5; *see also* Doc. 3-4 p. 2. Their failure to present mitigating information to the sentencing panel was due to their inexperience and ignorance, not for any tactical or strategic reason. *Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014). Had trial counsel effectively investigated, prepared, and presented mitigation witnesses in Galindo's case, the three-judge panel would have heard a much different story than the inaccurate and incomplete picture painted in the penalty phase, and there is a reasonable probability such evidence would have changed the balance of aggravating and mitigating factors, especially considering that the panel did give weight to any mitigating circumstances with the bare-bones and meek presentation counsel conducted. *Porter*, 558 U.S. at 42 (quoting *Wiggins*, 539 U.S. at 537); *Sears*, 561 U.S. at 954–55.

> 2) *Claim 8.2: Failure to investigate, develop, and present significant expert mitigating evidence.*

Trial counsel failed to conduct a timely, thorough, and proper mitigation investigation, including a failure to retain and prepare appropriate expert witnesses. Counsel did not investigate Galindo's exposure to environmental toxins, intellectual disability, language disorder, or the effects of trauma that Galindo faced. Trial counsel failed to present critical mitigating evidence regarding Galindo's neurodevelopmental deficits, trauma history, and susceptibility to peer influence. Due to counsel's failure to retain and present experts in lead exposure,

environmental toxicology, clinical psychology, trauma, speech-language pathology, and adolescent brain development, none of this critical mitigation evidence was presented. Galindo was greatly prejudiced by counsel's failure. The sentencing panel considered an incomplete and misleading picture of Galindo's background and impairments due to counsel's failure to present this expert evidence.

### a) Failure to Investigate, Retain, and Present a Lead Expert

Trial counsel failed to retain and present an expert on the measure of lead in the human body. A lead expert could have quantified Galindo's toxic lead exposure, which was 2800% higher than that of average adults at the time of the offense, as found by Dr. Aaron Specht. Lead affects neurodevelopment, especially in children, even at low levels of exposure. Doc 3-1 p. 2.

### b) Failure to Investigate, Retain, and Present an Environmental Toxicologist

Trial counsel failed to retain and present an expert on environmental toxins. An environmental toxicologist could have detailed the neurotoxic exposure present in Galindo's childhood environment. Dr. Andres Lugo, a toxicologist, reviewed records and interviewed many family and community members from Galindo's childhood town. Doc. 2-1 pp. 14-25. Dr. Lugo also interviewed multiple people connected to the municipality, including medical professionals, sugar cane workers, and water treatment officials, and visited Galindo's childhood home personally to observe its condition. *Id.* Dr. Lugo found Galindo was constantly exposed to high levels of lead, pesticides, and PAHs during the first twelve years of his life, which covers multiple critical periods of brain development. *Id.* pp. 4-5, 7-12, 27-29, 36-29.

131

If trial counsel properly conducted a mitigation investigation, they would have known about these environmental toxins near Galindo's home and how they would have had deleterious effects on Galindo's brain development during critical developmental stages. Since trial counsel did not know about Galindo's childhood environment, they could not present the sentencing panel with this important information.

### c) Failure to Investigate, Retain, and Present a Clinical Psychologist

Trial counsel failed to retain or present a clinical psychologist. A clinical psychologist could have explained the long-term effects of neglect, trauma, and intellectual disability on Galindo's behavior. Trial counsel incorrectly relied only on Galindo's and his parents' reports regarding his childhood, despite the numerous witnesses available to describe neglect and childhood trauma.

Two clinical psychologists, Dr. Peggy MacLean and Dr. Selena Sermeño, reviewed records, conducted multiple four-hour long interviews with Galindo, and interviewed his parents. Doc. 39-1 pp. 66, 235-36 Dr. Maclean reviewed declarations of community members and teachers, and Dr. Sermeño conducted clinical interviews with numerous family and community members located in Mexico over a course of five days. *Id.*

Dr. MacLean's review of Galindo's life history led her to identify that Galindo was "exposed to an exceptional number of adverse life events and traumas and had few protective factors." Doc. 39-1 p. 188. Galindo dealt with emotional neglect, emotionally rejecting behaviors by his mother, verbal and emotional abuse, and

132

physical abuse. *Id.* p. 188. Due to what Galindo faced, he was vulnerable to peer influences like delinquency and early substance abuse. *Id.* at p. 188, 190. Galindo faced adverse experiences (poverty, the absence of his father, parental substance abuse, and the abrupt, unsupported immigration experience, which led to him having significant acculturative stress). *Id.* pp. 188-89. Dr. MacLean found that Galindo was exposed to trauma and adversity, which set the course for poor outcomes. *Id.* p. 191. He also had severe, unrecognized learning and intellectual impairments, which meet the diagnostic criteria of intellectual disability. *Id.* p. 190. Dr. MacLean found that when Galindo started to use substances, to which he was particularly vulnerable due to his chronic trauma, his intellectual disability resulted in executive dysfunction that made Galindo "vulnerable to coercion, manipulation, and poor choices under stress." *Id.* pp. 185, 187.

Dr. Sermeño described Galindo's life as being shaped by chronic and complex trauma and as having no benefit from meaningful professional interventions or protective factors. Doc. 39-1 p. 245. Galindo faced "multigenerational trauma, extreme poverty, exposure to environmental toxins, substance misuse, serious mental illness, family estrangement, and *machismo*." *Id.* Dr. Sermeño found that Galindo was neglected and spent his childhood "desperate for love, affection and a sense of belonging." *Id.* pp. 245-46. Dr. Sermeño identified thirteen types of trauma and risk factors that Galindo faced in early life. This includes multigenerational trauma, family estrangement, familial mental illness, profound maternal neglect, physical abuse by his mother and father, social isolation, paternal abandonment and machismo, bullying, racism, susceptibility to peer pressure and substance

133

misuse, extreme poverty, lack of educational resources, and toxic stress (identified as constant fear). *Id*. pp. 247-56.

Based on the Adverse Childhood Experiences Study (ACES) Dr. Sermeño noted that Galindo faced at least seven of ten recognized factors, including physical abuse, emotional abuse, severe emotional neglect, exposure to mental illness, parental substance misuse, witnessing emotional abuse of his mother, and prolonged parental separation. *Id*. p. 257. In addition to these factors, Galindo spent his childhood in a hypervigilant state where he was forced to focus on survival. This made it difficult for Galindo, as a child, to learn and develop foundational skills essential for emotional regulation, impulse control, and other markers of psychological well-being. *Id*. p. 26.

Due to counsel's failure to investigate Galindo's childhood, they failed to present this information to the sentencing panel. This testimony would have provided the panel with considerable mitigating evidence supporting Galindo's susceptibility to Sandoval's influence, his susceptibility to dominance and coercion by peers, and would have provided support for Dr. Llorente's conclusions.

#### d) Failure to Investigate, Retain, and Present an Expert in Speech Language Pathology

Trial counsel failed to investigate, retain, and present an expert in speech-language pathology. A speech-language pathologist could have demonstrated Galindo's language disorder and its impact on his decision-making and susceptibility to manipulation.

134

At the time of trial, Galindo had a documented history of learning and academic struggles; Dr. Llorente noted that Galindo's reading level was that of a fifth-to-sixth grader and his scores on language tests revealed impairments. *See* Doc. 33-5 pp. 4-5. Dr. Llorente noted that Galindo suffers from impairments in language skills and executive skills, which affect his ability to make appropriate judgments. *Id.* p. 8. Dr. Llorente also found that Galindo may suffer from organic brain damage. *Id.* Dr. Llorente indicated this to trial counsel, and they failed to follow up in any way, including hiring a speech-language pathologist to determine if Galindo should be diagnosed with a language disorder, and failed to consider the impact it would have on his decision-making and his susceptibility to manipulation if he does have a language disorder.

A bilingual speech-language pathologist, Dr. Genesis D. Arizmendi, presently administered several standardized evaluations and found Galindo presents a brain-based language learning disorder in both expressive and receptive domains. Doc. 39-1 pp. 45-46. Dr. Arizmendi administered a comprehensive speech—language evaluation in both Spanish and English. *Id.* p. 33. Galindo was found to struggle with tasks that required increased cognitive-linguistic effort and used comprehensive strategies to determine the answers to the questions. *Id.* p. 34. The comprehensive strategies are used to mask Galindo's underlying difficulty with language in conversation with others. *Id.* Galindo inquired about his response to see if he was correct, which showed his people-pleasing nature and desire for external validation. *Id.*

135

Dr. Arizmendi's evaluation showed Galindo's performance on all composite measures was below the mean in Spanish and in English, and all but one Spanish measure was at least one standard deviation below the mean. *Id.* p. 39. Galindo's language limitations are the result of limitations in the underlying brain-based cognitive capacities in language learning. *Id.* p. 43. Galindo has difficulty with future abstraction and use of future-oriented language, and his language deficits point to executive dysfunction, which can cause difficulties with cognitive skills. *Id.* p. 45. Galindo's ability to understand and predict the consequences of his or another's actions or to perceive cause-and-effect relationships is limited by his interrelated language disorder, executive dysfunction and his intellectual disability. The limitations reflected in Dr. Arizmendi's evaluation were also noted by family members and friends, who specifically discussed Galindo's people-pleasing nature and susceptibility to manipulation, and his inability to perceive the consequences of his actions. Doc. 39-1 pp. 26-27.

Trial counsel's failure to retain an expert in speech-language pathology resulted in the sentencing panel receiving a limited picture of Galindo. The sentencing panel did not hear about Galindo's cognitive deficits, brain-based language disorder, and executive dysfunction, which directly affect his susceptibility to peer pressure and his inability to think abstractly or understand the consequences of his and others' actions. Counsel's failure to pursue such evidence could not have been a strategic decision because the expert testimony about Galindo's language disorder and executive dysfunction would have been squarely in line with the mitigation theory trial counsel presented. Trial counsel wanted to

136

demonstrate Galindo's susceptibility to Sandoval's influence, which this expert

testimony would have substantially supported.

### e) Failure to Investigate, Retain, and Present an Expert in Brain Development

Trial counsel failed to retain and present expert evidence of brain

development. An expert in adolescent brain development could have highlighted the

immaturity and impulsivity of Galindo's still-developing 21-year-old brain. *See* Doc.

5-13 p. 8. An expert in developmental neuroscience, Dr. Leah Somerville, detailed

how the brains of 21-year-olds are still developing in terms of risky decision-

making, executive functioning, ability to make future-oriented decisions, and

susceptibility to emotionally charged situations. Doc. 2-4 pp. 1-7. Brain development

in 21-year-olds is similar to that of juveniles; in both cases, executive functioning

and impulse control are still developing. *Id.* pp. 3-4. 21-year-olds are more

susceptible to making poor and impulsive decisions in emotionally charged

situations than adults in their later 20s and older. *Id.* pp. 6-7. Additionally,

substance use impacts brain development and affects the brain's structure and

function. *Id.* pp. 7-9.

There would be no strategic reason not to present this evidence, as trial

counsel was trying to prove that Galindo was affected by methamphetamine use

and was susceptible to Sandoval's influence. This expert testimony would have been

squarely in line with the trial counsel's strategy. An expert in brain development

could have provided support for Dr. Stalcup's testimony regarding the long and

short-term effects of persistent methamphetamine use on Galindo's brain and

behavior. Trial counsel did not present this expert testimony due to their lack of experience and competence in capital defense.

Counsel has a duty to investigate mitigating circumstances as well as to rebut aggravating evidence. *Wiggins*, 539 U.S. at 524. Galindo's trial counsel failed to conduct more than a cursory mitigation investigation and failed to present necessary expert testimony to support the mitigation case. The sentencing panel heard nothing regarding Galindo's lead and neurotoxic exposure, his experiences of childhood adversity, including trauma and neglect, and their impact on his brain development, his brain-based language disorder, and his executive dysfunction. Given this wealth of available mitigating lay and expert evidence the panel never heard, it is likely the panel would have come to a different conclusion as to the strength of the mitigation evidence and its balancing against the aggravating evidence. *Lockett*, 438 U.S. at 586; *Eddings*, 455 U.S. 104; *Rompilla*, 545 at 392–93; *Wiggins*, 539 at 534–35.

3) *Claim 8.3: Failure to adequately prepare mitigation witnesses.*

Counsel's failure to conduct a meaningful mitigation investigation prevented their witnesses from presenting helpful evidence and at times led to presenting harmful evidence. Counsel's failure to prepare the witnesses they called to testify, due to their lack of investigation, made them vulnerable to avoidable damaging attacks by the prosecutor.

An essential aspect of investigating and presenting mitigating evidence is adequately preparing witnesses to testify. *See Andrus,* 590 U.S. at 817–18. (counsel ineffective for calling defendant's mother to testify despite being "ill-prepared for

138

her testimony," which ended up being aggravating); *see also Richey*, 498 F.3d at 362. Presenting the testimony of unprepared witnesses may be akin to presenting no mitigation at all; even worse, witnesses who have not been informed of the purpose of their testimony or the anticipated cross-examination may instead present harmful and even aggravating evidence. *See Andrus*, 590 U.S. at 817 ("Counsel's introduction of seemingly *aggravating* evidence confirms the gaping distance between his performance at trial and objectively reasonable professional judgment."); *Walbey*, 309 F. App'x at 803 (same). Preparing witnesses, particularly expert witnesses, to testify is an essential part of effective assistance of counsel. *See Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) ("A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment.").

Galindo's witnesses were all unprepared and uniformed, resulting in contradictory or harmful testimony.

- Community members and teachers, like Mike Sunderman and Stan Turner, were not provided  records to review or informed of the reason or relevance of their testimony – preventing them from discussing Galindo's cognitive deficits, his search for acceptance and follower tendencies, and his character.

- Mr. Pocwierz testified that Galindo was a helpful inmate; because Counsel did not adequately prepare him to testify about the escape attempt, ultimately described Galindo as a "very high risk to any system. Doc. 31-13 p. 124. This was entirely avoidable.[21]

---

[21] As Respondent noted, the testimony of Theodore Pocwierz was presented in the penalty phase at trial, and his testimony, like that of numerous other witnesses who testified on Galindo's behalf, reveals that trial counsel failed to prepare the witness

139

- Although counsel sought to prove that Galindo's intoxication at the time of the offense prevented him from appreciating the wrongfulness of his conduct, he called three witnesses to testify about Galindo's methamphetamine use, none of whom had used methamphetamine with him in the days leading up to the offense. *See* Habeas Claim 19.

- Even Galindo's parents were not adequately informed of the purpose behind their testimony and therefore reacted defensively to questioning and painted themselves in a skewed positive light that was both inaccurate and unhelpful. *See Andrus*, 590 U.S. at 817-18; *Walbey*, 309 F. App'x at 803.

If properly prepared, they would have realized that accurate information could have helped inform the sentencer why Galindo should not be sentenced to death.

Critically, since counsel failed to perform an adequate investigation into Galindo's adaptive functioning, Dr. Llorente ruled out intellectual disability, which he would not have done had he been provided information about Galindo's adaptive functioning. There is thus a reasonable likelihood Galindo would have been rendered ineligible for the death penalty had counsel adequately investigated and

---

to testify. This was true of other witnesses at trial as well, including Dr. Stalcup, Carlos Flores, Claudia Solis, Dr. Llorente, Mike Sunderman, Stan Turner, Marilyn Moyer, Aida Galindo, Jorge Galindo, Sr., and Marcos Quijano. While the wealth of mitigating evidence was never investigated nor presented at trial, and is in the process of being presented in state court now, trial counsel's failure to adequately prepare their witnesses and provide necessary context for those witnesses to be able to testify helpfully is apparent from the trial record. Respondent calls Pocwierz's testimony "cumulative" (Doc. 46 p. 126 n.32), but due to counsel's ineffectiveness it was cumulative only of the State's rebuttal evidence, not of any mitigation presentation. When a previous sentencing hearing was devoid of background details or featured no mitigation evidence at all, any subsequently proposed mitigation cannot be considered cumulative, as it provides the sentencer with an entirely new factual profile of the defendant—a factual profile that the sentencer previously found had not been proven. *See Sears*, 561 U.S. at 954 (if original mitigation presentation was merely "a superficially reasonable mitigation theory," prejudice is a robust consideration).

140

prepared his expert. *Atkins*, 536 U.S. at 321. Additionally, Dr. Llorente lacked available information to corroborate many of his assertions, such as those surrounding the neglect Galindo experienced as a child. *See* Habeas Claim 5. Without that critical information, the prosecutor discredited Dr. Llorente.

This was undoubtedly prejudicial. The sentencing panel found no statutory mitigating factors and gave no weight to any non-statutory mitigating factors. This is no surprise given the unhelpful, at times incoherent, and altogether bare-bones mitigation presentation by counsel—based on an investigation that was far from reasonable or sufficient. Had counsel investigated and prepared for the mitigation phase, it is reasonably likely that the sentencing panel would have reached a different determination of the mitigating circumstances and given the mitigation evidence significantly more weight when balanced against the aggravators. *Porter v. McCollum*, 558 U.S. 30, 42-43 (2009); *Rompilla*, 545 U.S. at 393.

### 4)  Claim 8.4: Failing to work with the mitigation specialist

Although defense counsel received funding for and hired a mitigation specialist to investigate Galindo's life history, the investigation was "the blind leading the blind." Doc. 4-3 p. 2. Given that Galindo's parents spoke little to no English, it was necessary for counsel to work with a bilingual mitigation specialist. But counsel provided no meaningful direction, input or strategic information to her, akin to failing to work with her at all. *See Jells v. Mitchell*, 538 F.3d 478, 494 (6th Cir. 2008); *Foust v. Houk*, 655 F.3d 524 (6th Cir. 2011). As a result, the mitigation investigation and presentation were surface-level and failed to uncover or present

141

witnesses who could have testified about the substantial and interrelated mitigation themes set forth in detail above.

All these failures by trial counsel prevented the sentencing panel from hearing about Galindo's life history in any meaningful way and instead left the panel with misguided impressions about his life and family as well as his character. As a result, the panel found no statutory mitigating circumstances and gave little weight to any non-statutory mitigating circumstances. Had counsel investigated and presented the wealth of mitigation evidence inherent in the full picture of Galindo's life history, a member of the sentencing panel would have had a basis to impose a sentence less than death. *Lockett*, 438 U.S. at 604. Had counsel conducted a constitutionally adequate investigation, there is a reasonable probability that at least one member of the panel would have reached a different determination of the mitigating circumstances and balanced the mitigating and aggravating factors differently. *Porter*, 558 U.S. at 42; *Sears*, 561 U.S. at 954-55.

### B. Post-conviction counsel was ineffective for failing to raise the claim.

Just as it is well-settled that counsel in a capital trial has a duty to investigate potential mitigating circumstances, so too does capital post-conviction counsel. Where post-conviction proceedings are the first and only place to raise ineffective assistance of trial counsel claims, it is essential for post-conviction counsel to investigate the claims trial counsel failed to adequately investigate and present. Because Galindo's post-conviction counsel failed to investigate Galindo's life, character, background, or history, he could not adequately challenge trial

142

counsel's ineffectiveness for failing to do so. Post-conviction counsel did not even seek funding for an investigation into mitigating evidence. Likewise, post-conviction counsel did not request funds for expert services, even though red flags already existed in the trial record regarding Galindo's cognitive deficits. By failing to conduct any investigation into Galindo's life history and background, post-conviction counsel made it impossible for himself to prove trial counsel's ineffectiveness in this regard.

Neb. Rev. Stat. § 29-3004 provides Galindo a statutory right to competent and effective post-conviction counsel. By failing to conduct any investigation into Galindo's life history, post-conviction counsel compounded trial counsel's errors instead of providing Galindo an avenue to challenge them, contrary to the purpose of the post-conviction proceedings and post-conviction counsel's statutory duty.

Post-conviction counsel's failure to investigate and present evidence of trial counsel's ineffectiveness directly impacted the outcome of Galindo's post-conviction proceedings and appeal. While post-conviction counsel presented compelling evidence related to the corruption and misdeeds of the trial prosecutor, and the *Brady* and *Napue* violations that featured in Galindo's case, *counsel was unable to prove that those violations would have made a difference at sentencing because he had no mitigating evidence to present on the other side of the scale.* The Nebraska Supreme Court noted that Galindo's post-conviction claims, both with regard to allegations of ineffective assistance of trial counsel and Brady violations, "begin[] and end[] with a prejudice analysis." Doc. 30-4 p. 43. The court went on to explain that: taking as true Galindo's allegations of ineffective assistance of trial counsel

143

and the State's withholding of evidence; omitting the aggravating circumstance infected by prosecutorial misconduct; adding the mitigating circumstance of remorse advanced in Galindo's post-conviction motion (the scant mitigation evidence presented in post-conviction proceedings); and assessing the remaining aggravators against the remaining mitigators; there is "no . . . reasonable probability" the sentencing panel would have sentenced Galindo to a sentence less than death. *Id.* p. 45.

Post-conviction counsel's inability to prove that the myriad of injustices presented in the post-conviction proceedings prejudiced Galindo, such that a sentence less than death would have been reasonably likely, is a direct result of the abject failure to investigate Galindo's life history and background. Had post-conviction counsel performed effectively and conducted the necessary investigation , the mitigating side of the scale would have weighed far more heavily than the scant record presented at trial and in post-conviction proceedings.

### C. Galindo has presented the evidence in state court.

Galindo has presented the considerable mitigating evidence and evidence of trial counsel's ineffectiveness for failing to investigate mitigation in state court. As previously noted, Galindo continued to be represented by post-conviction counsel through the appeal to the Nebraska Supreme Court and the petition for writ of certiorari in the United States Supreme Court. Counsel's representation ended upon denial of certiorari and issuance of the mandate by the Nebraska Supreme Court, on December 20, 2024. Galindo, through new post-conviction counsel, filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction

144

relief without an evidentiary hearing. Neb. Rev. Stat. § 25-2001. In the alternative, Galindo asked the state court to construe his motion as a successive motion for post-conviction relief and grant an evidentiary hearing. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004. Galindo also asked the court to exercise its inherent equitable authority to reopen the proceedings. In support, Galindo moved to introduce into evidence the affidavits and expert reports that have been submitted in these federal habeas proceedings, including those underlying his intellectual disability claim.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Galindo timely filed a notice of appeal to the Nebraska Supreme Court, and the case has been docketed under Case Number S-26-400. Briefing has not yet been initiated but the Bill of Exceptions and Transcripts, including Galindo's motion and exhibits, have been filed.[22]

Galindo could not have filed his state court motion while prior post-conviction counsel continued to represent him, as it is well-settled that counsel cannot raise claims of ineffective assistance of counsel against himself. *Jaeger*, 970 N.W.2d at 764. Galindo diligently filed his motion in state court after procuring new post-

---

[22] Galindo will move this Court pursuant to Habeas Rule 5 to expand the record to include the Nebraska Supreme Court filings.

conviction counsel, who needed to get up to speed on the complex procedural history and voluminous record. While the district court denied Galindo's request to reopen the proceedings or grant an evidentiary hearing, the correctness of that denial remains to be litigated in the Nebraska Supreme Court.

This procedure distinguishes Galindo's case from the recent decision in *Torres v. Jeffreys*, 17-cv-03078-RFR-MDN (Doc. 133). There, in discussing *Martinez*, the court noted that "none of the potential evidence cited to support the [claim] was part of the state-court record, and because Torres did not seek to develop it in this federal case, . . . this Court cannot consider that potential evidence when determining if the [claim] is substantial." *Id.* p. 35. Unlike in *Torres*, Galindo has presented the wealth of mitigating circumstances evidence and the evidence of trial counsel's ineffectiveness in state court. Thus, § 2254(e)(2) does not preclude this Court from considering the evidence of Galindo's traumatic adversity, exposure to neurotoxins, and other mitigating circumstances, nor is this Court precluded from addressing trial counsel's ineffectiveness for failing to investigate substantial mitigation evidence in this capital case.

In closing, Galindo's trial counsel conducted a constitutionally defective investigation into the mitigating evidence that would have provided a member of the sentencing panel a basis for a sentence less than death. *Lockett*, 438 U.S. at 604, *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 394-98; *Rompilla*, 545 U.S. at 387. This failure to investigate and present mitigating evidence, along with post-conviction counsel's failure to conduct any investigation into Galindo's life history and raise trial counsel's ineffectiveness, constitute deficient performance and

146

prejudiced Galindo under *Strickland* and the *Martinez* standard for a substantial claim. Under *Martinez*, Galindo is entitled to present this ground for relief. Galindo respectfully requests this Court permit discovery and hold an evidentiary hearing on the issue of whether he was provided effective counsel as required under the Sixth Amendment.

**Claim 9:    Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously failed to strike certain members of the jury during jury selection.**

The trial court violated Galindo's rights when it refused to strike Jurors 38 and 65 for cause. Impartiality represents a fundamental precept of our jury system, without which confidence in the system lessens. Juror 65 and Juror 38 both demonstrated they could not serve as neutral decisionmakers with their multiple personal connections to individuals involved in the case, expressed doubts about the presumption of innocence, and opinions that Galindo was guilty.

Rather than express a clear and unequivocal ability to set that aside, both jurors hesitated on their assurances of fairness. A juror's equivocations and inconsistencies regarding fairness are not matters that can be overlooked—they must be carefully scrutinized; the law demands nothing less in light of the jury's foundational role in our Nation's history and system of justice. The guarantee of an impartial jury includes the requirement that each juror be able to unequivocally commit to fairness and impartiality and to afford to the defendant the presumption of innocence rather than, as here, a consistent assumption of guilt (4 times by one juror).

This represents a factually intensive inquiry for this Court. To aid in this Court's examination, Galindo will address the voir dire record of each juror in separate sections. He will then describe the minimal treatment by the trial court and the erroneous conclusions of the Nebraska Supreme Court that are clearly rebutted by the record. The circumstances of this Court's consideration of the claim

148

are impacted by the entirety of the voir dire and the atmosphere that existed around it. *See* Habeas Claims 1, 2 and 3. In denying his allegations, the Nebraska Supreme Court unreasonably denied Galindo what is sacrosanct: his right to a jury trial with impartially empaneled jurors.

   A. *Juror 65 was not qualified to serve.*

   In response to one of the few non-leading questions posed by the prosecutor, Juror 65 indicated a "hesitation with respect to sitting on the jury" because "Just knowing some of the victims --… -- and some of the parties involved." Doc. 31-1 p. 196. Juror 65 early stated she only "thinks" she would be able to just listen to the evidence and decide the case. *Id.* p. 182. The prosecutor reminded Juror 65 of the trial judge's instructions about what juries do before answering **any** questions on whether she could be fair and impartial. *Id.* p. 185.[23] Juror 65 agreed that when the offense occurred, she was sad, angry and scared, and that only decent people would feel that way. *Id.* pp. 186-87.

   Juror 65 noted she had previously worked with Ms. Evonne Tuttle, and Mr. Samuel Sun's ex-wife. Doc. 31-1 p. 181. Curiously, throughout the entirety of the trial court's and prosecution's voir dire, she only disclosed those 2 contacts, despite having prior relationships with multiple others involved in the case, as became clear later.

   Juror 65 had been exposed to media reports and had previously discussed the case. Doc. 31-1 p. 199. No one ever suggested Galindo was innocent in those

---

[23] Recall, the trial prosecutor asked 0 questions of Hispanic jurors. See Habeas Claim 2.

149

discussions, and Juror 65 had never stated that. *Id.* Juror 65 noted: "There's the appearance that [Galindo] was involved" in the U.S. Bank Robbery. *Id.* She then conceded that she would "probably not" presume Galindo was innocent. *Id.* p. 200.

Juror 65 agreed that thinking about what had happened to people she knew would cause an "emotional response." Doc. 31-1 p. 200. Juror 65 then revealed she used to work with and knew Ms. Micki Koepke. *Id.* p. 200. Juror 65 also knew Ms. Cheryl Cahoy because they were both from Naper, NE. Doc. 31-2 p. 2. In response to a question regarding Ms. Cahoy's involvement, Juror 65 stated, "She survived." *Id.* She then agreed that she was sure it was "very scary" for her. *Id.* She admitted that she believes she knew another person in the bank but does not "know their name." *Id.*

Juror 65 also knew Ms. Jere Anderson. Doc. 31-2 p. 3. Juror 65's mother-in-law lived next door to Ms. Anderson—whose vehicle was stolen from the driveway of the house—at the time of trial. *Id.* Juror 65 testified that she knows their family. *Id.* She banked at U.S. Bank. Doc. 31-2 p. 8. She only occasionally went into the branch where the murders took place. *Id.* She dealt with Ms. Jo Mausbach at the U.S. Bank, via the drive through windows. *Id.*

Juror 65 originally disclosed 2 but ultimately shared **7** people she knew who were either directly or indirectly victimized by the events of the crime. She never described them simply as acquaintances. Rather, she "hesitated" to sit on the jury due to those relationships.

  B. *Juror 38 was not qualified to serve.*

  Juror 38 reported to the court that he worked with Mr. Rob Bryant, the

150

husband of Ms. Lisa Bryant, who was one of the victims of the U.S. Bank murders, for eight months after the murders. Doc. 31-2 pp. 113-114, 132. He saw Mr. Bryant daily during that time. *Id.* He purposefully did not bring up the pain of this tragic event with his co-worker – it was a "subject he stayed away from." *Id.* p. 132.

Juror 38 did acknowledge that he talked about the crime with others, and no one talked about innocence. Doc. 31-2 p. 129. Juror 38 "knows" Ms. Cheryl Cahoy, a state's witness. *Id.* p. 133. He banked with Ms. Cheryl Cahoy at the U.S. Bank. *Id.* He was aware she was in the bank and was a witness to the crime. *Id.* p. 134.

Juror 38 went to high school with Ms. Jere Anderson. Doc. 31-2 p. 134. She is the daughter of the woman that Galindo had taken the car keys from after the murders. He knew Galindo took the keys from her parents. *Id.*

In response to questions contained in the supplemental juror questionnaire regarding his ability to be fair, Juror 38 reported that he was "not sure" whether he could be impartial. Doc. 5-16 pp. 1-3. He repeated in voir dire that "I'd have to say honestly say, yeah, I'm not real sure I could" be impartial. Doc. 31-2 p. 115. He forthrightly conceded that he did not want to avoid his "duty" to serve. *Id.*; *see* Habeas Claim 2.

All Juror 38 could muster in response to the trial court's question whether he could base his verdict on the evidence along was, "[y]eah, probably so" and that he "think[s]" he could be fair. Doc. 31-2 p. 116. After prosecutorial questioning relating back to the trial court's erroneous exhortation regarding duty, again all Juror 38 could muster was a "belie[f]" he could be fair. *Id.* p. 121. Juror 38 noted he initially felt "disbelief" about the incident and agreed he was sad and felt angered by the

151

crime. *Id.* p. 119.

Juror 38 opined numerous times that Galindo was guilty:

1. "Basically" in response to "and that opinion is that he's guilty?" Doc. 31-2 p. 130;

2. References his opinion of Galindo's guilt as "those feelings." *Id.* p. 131;

3. Agreed his past opinion was Galindo was guilty. *Id.*;

4. When asked, "You still do?" responded, "In my opinion". *Id.*

**Four** times, Juror 38 said he believed Galindo was guilty, and agreed he still held that belief during voir dire.

Juror 38 equivocated, stating only that he "believe[s]" he could set that aside, Doc. 31-2 p. 131, despite previously saying he was "honestly…not real sure" he could set aside what he had heard about Galindo's case or his thoughts or opinions. *Id.* p. 115. And as he previously mentioned, he did not want to "cause any trouble." *Id.*

Juror 38 shared he knew *3* people, including the husband of one of the victims who he worked with daily after the crime, during the acute stages of his grief. He never described them simply as acquaintances. Juror 38 opined Galindo was guilty no less than four times during voir dire. He was not qualified to serve.

C. *State courts unreasonably failed to remove for cause the unqualified jurors.*

While appellate courts generally defer to a trial court's findings on juror impartiality, that deference is only warranted when the record as a whole supports the trial court's determination, something the record in this case fails to do. *Wainwright v. Witt*, 469 U.S. 412, 431 (1985). When reviewing the voir dire, it is

important to closely examine the entirety of the juror's voir dire and focus on their precise word usage.

The Nebraska Supreme Court (as well as Respondent) indicated that the trial court credited each juror's demeanor. Galindo agrees that, where they are appropriately made, such findings should be credited. The problem here is the trial court made ***no such findings***. The trial court's ruling was at best cursory:

- Regarding Juror 38: "Motions and objections will be overruled." Doc. 31-2 p. 141;

- Regarding Juror 65: "And the motions and objections will be overruled." Doc. 31-2 p. 12.

It is unreasonable to rely on a fictional finding regarding demeanor when no such finding occurred.

Rather, the Nebraska Supreme Court reduced itself to providing a post-hoc basis to affirm. In analogous circumstances, the Supreme Court has stated: "[C]ourts may not indulge 'post hoc rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 108 (2011) (quoting *Wiggins*, 539 U.S. at 526-27). In *Gabaree,* 792 F.3d at 999, the Eighth Circuit held: "We cannot impute to counsel a trial strategy that the record reveals she did not follow." Similarly, it is unreasonable to impute to the trial court a basis for a ruling not supported by the record – indeed, a record that clearly and convincingly rebuts the basis.

Setting that aside, deference to credibility findings is not absolute and does not permit a reviewing court to disregard material facts or to accept juror assurances where the record as a whole demonstrates substantial evidence of bias

153

or manifest error. *Miller-El II*, 537 U.S. at 340. When a juror's responses are equivocal, the trial court must assess whether the juror's later assurances of impartiality are credible and sufficient to overcome earlier hesitation. *Patton*, 467 U.S. at 1036. The discretion a trial court has is not unfettered and must be exercised with due regard for the totality of the circumstances. *Id.* at 1031.

Equivocal or inconsistent statements about impartiality, especially when not unequivocally resolved, require removal for cause. *United States v. Sithithongtham*, 192 F.3d 1119, 1120-21 (8th Cir. 1999) (finding a juror's statements, "I would probably give [law enforcement witnesses] the benefit of the doubt if something was questionable," and "I could probably be fair and impartial," were insufficient to establish impartiality and that the district court erred by not striking the juror for cause). A juror does not need to reveal their bias with unmistakable clarity, as ambiguities and equivocations are strong indications that a juror cannot be relied upon to act impartially. *United States v. Nelson*, 277 F.3d 164, 201-02 (2d Cir. 2002) (finding that juror who "said that although he 'would like to think' of himself as objective and able to give the defendants a fair trial, he '[h]onestly ... [didn't] know' whether he could do so. . ." should have been excused for cause when defendant challenged the juror).

A particular point of unreasonableness is laid bare by Juror 38's expression **four** times that Galindo is guilty but he could set it aside. The Supreme Court in *Irvin v. Dowd* established that the reliability of jurors' statements of impartiality may be called into question where there is evidence of prior hesitation or external pressure: "No doubt each juror was sincere when he said that he would be fair and

154

impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." 366 U.S. at 728.

Similarly, Juror 65 could not be fair and impartial. Her responses revealed a clear hesitation about serving on the jury. Juror 65 stated she would "probably not, no" assume Galindo is innocent. Doc. 31-1 p. 200. Thus, Juror 65 likely viewed all the evidence in a light favorable to her belief: that Galindo was guilty. Additionally, she was only given leading instructions to affirm she could be impartial. Her assurances should not be credited; the only time she responded to a non-leading question by the prosecutor, Juror 65 expressed "hesitation". Doc. 31-1 p. 196. The prosecutor's leading questions prompted the desired "yes."

The state court's failure to remove these jurors for cause was an unreasonable application of clearly established federal law and an unreasonable application of fact. Juror 65 knew *seven* people related to the case, while initially only disclosing *two*. Juror 38 knew *three* people related to the case. No promises of impartiality, no matter how sincere, were sufficient to overcome "the psychological impact" of having multiple personal connections with victims and their families. *Irvin*, 366 U.S. at 728.

The presumption of correctness afforded to state court factual findings is rebutted by clear and convincing evidence of the jurors' relationships with victims and the resulting risk of bias. 28 U.S.C.S. § 2254(e)(1). The court's determination that the jurors could be impartial despite their significant relationships with the victims and witnesses was not supported by the facts because they were not merely

155

"acquaintances."

Further, the Nebraska Supreme Court's determination that they were only acquaintances does not hold up under scrutiny. Doc. 30-1 p. 26. To state such, the Nebraska Supreme Court noted that there was no specific evidence that they had a "particularly close" relationship. *Id.* This is incorrect and directly refuted by the record. When asked about other witnesses, Juror 38 specifically utilized the term "acquaintance[s]." Doc. 31-2 p. 140 ("We're just acquaintances.") He used no such modifiers for the three people he knew with connections to the crime – including the husband of one of the victims with whom Juror 38 worked closely right after the crime. As noted above, this is another post-hoc determination not supported by the record – and indeed, rebutted by the record.

Setting that aside, in cases where a potential juror knew or had a meaningful relationship with a victim or witness, courts have found that a statement that the person can be fair and impartial is insufficient. *United States v. Cannon*, 987 F.3d 924, 945 (11th Cir. 2021) (affirming dismissal of juror for cause where potential juror said she could be fair and impartial but she knew defendant's wife and the wife styled her hair on a regular basis).

The Nebraska Supreme Court minimized the significance of these relationships unreasonably describing them as simple "acquaintance[s]." Doc. 30-1 p. 26. Respondent claims that the Nebraska Supreme Court accurately characterized the relationships Juror 38 had with individuals connected to the crime as "acquaintances." Doc. 46 pp. 71, 73. But the Nebraska Supreme Court's approach of giving deference to the "trial court's finding" (Doc. 46 p. 70) is belied by

the record given that there  were no actual findings by the trial court, minimized

the significance of Juror 38 and 65's relationships, refuted by Juror 38's use of

"acquaintances" and is not consistent with the searching context-sensitive inquiry

required by federal law.

Both jurors knew multiple people who were victims or connected to the case.

Both hesitated about their ability to be fair during voir dire and Juror 38 indicated

he could not be fair on the supplemental juror questionnaire. Doc. 5-15 pp. 1-3.; Doc.

31-1 p. 200; Doc. 31-2 p. 115. With hesitation, in combination with multiple

connections to key individuals in the case, the risk of subconscious bias is

heightened. *Irvin,* 366 U.S. at 728.

The sheer number and volume of the latticed and layered relationships

between the jurors and the victims demonstrate the unreasonable nature of the

Nebraska Supreme Court's determination. The record shows that Jurors 38 and 65

were not merely socially acquainted with the victims and witnesses but knew

multiple individuals involved in the case and expressed hesitation about their

ability to be impartial. Juror 65 and 38 had connections with multiple victims or

their families which are circumstances that fundamentally undermine the

reliability of the trial court's determination and dispel any presumption of

correctness that might otherwise attach to its findings.

Respondent's position that Juror 65's statements were not an admission of

inability to afford the presumption of innocence is simply incorrect. Juror 65 stated

"Probably not, **no**," when asked if she would be presuming Galindo is innocent when

walking into the courtroom. Doc. 31-1 p. 200 (emphasis added). No means no – and

that means Juror 65 could not accord the presumption of innocence, just as she said.

Respondent's position that Juror 65's later assurances cured any earlier equivocation unreasonably misconstrues the controlling Supreme Court standard. *See Murphy v. Florida*, 421 U.S. 794, 800 (1975). Equivocal or inconsistent statements about impartiality—especially those that directly implicate the presumption of innocence—raise a constitutional problem that cannot be cured by later assurances alone. *Id.*; *Mu'Min.,* 500 U.S. at 422. The psychological impact of requiring a declaration of impartiality from a juror who has already expressed bias or equivocation means that the assurances of impartiality must be given little weight where the record as a whole demonstrates substantial connections or preconceptions. *Irvin,* 366 U.S. at 728. The Due Process Clause of the Fourteenth Amendment requires the presumption of innocence. *Taylor v. Kentucky*, 436 U.S. 478, 489 (1978). The presumption of innocence in favor of the accused is "undoubted law, axiomatic and elementary" and is a foundation of the administration of criminal law. *Coffin v. U.S.*, 156 U.S. 432, 453 (1895).

The trial court and the Nebraska Supreme Court's reliance on Juror 65's ultimate assurances of impartiality, without meaningful engagement with the substance and context of her prior statements and relationships, was an unreasonable application of law and/or facts of the Supreme Court's totality of the circumstances test. *See Irvin*, 366 U.S. at 721. Juror 65 stated she was "probably not, no" assuming Galindo was innocent when they entered the courtroom. Her statement means she likely viewed every piece of evidence through the lens of a preexisting belief in guilt, interpreting the entire trial in a manner that reinforced

158

the verdict she had already reached.

The Nebraska Supreme Court also determined that there was no evidence to indicate the juror's familiarity "would probably *subconsciously affect* his or her decision of the case adversely to the defendants." Doc. 30-1 p. 27 (emphasis added). However, the Supreme Court has emphasized that in cases where there is a strong indication that jurors are partial against a defendant, an oath or affirmation from potential jurors that they will be impartial is not sufficient to satisfy the due process dictates of the Constitution. *Irvin*, 366 U.S. at 728. "Eight out of the 12 thought petitioner was guilty. With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." *Id.* at 727.

Juror's 38 declaration that he had a belief he could be fair and impartial should not have been credited over his repeated affirmative statements that he was not sure whether he could be fair and impartial, Doc. 31-2 p. 115, or his repeated statements indicating he already thought Galindo was guilty. Doc. 31-2 p. 130. After the prosecutor questioned Juror 38 and related the questioning back to the trial court's erroneous statement regarding civic duty, Juror 38 only stated he "believe[s]" he could be fair. Doc. 31-2 p. 131 As *Irvin* makes clear, Juror 38 would be fighting his mind to exclude the preconception of guilt from the deliberations.

It strains reasonableness to require evidence of a subconscious state to establish a constitutional violation. The very nature of subconsciousness makes it

impossible to produce evidence of such. This goes to the heart of what the *Irvin* Court addressed: there, the jurors who had opined the petitioner was guilty later said they could be fair and impartial. The Court noted, "No doubt each juror was sincere" in that statement. 366 U.S. at 728. But given the psychological impact of the jury selection process and the case—"accounting for the frailties of human nature"—those attestations could be given little weight. *Id.* at 727-28. In other words, the subconscious state is clear based on human nature and the context of the situation, not something about which direct evidence can be produced as unreasonably required by the Nebraska Supreme Court.

All context matters. The context herein establishes coercive voir dire statements of the trial court, along with pointed reminders by the prosecutor, compounded by the jurors' equivocation. Doc. 31-1 pp. 196, 200; Doc. 31-2 p. 115. The trial court's admonition to prospective jurors not to shirk their civic duty impermissibly pressured individuals to remain on the panel, thereby undermining the voluntariness and reliability of any subsequent assurances of impartiality they may have offered. *See* Habeas Claim 2.

Jurors often give answers during voir dire that conform to social norms and portray them as fair and likeable, rather than candidly revealing attitudes that may seem extreme or biased. Courtroom Sciences, *Social Desirability Bias in Voir Dire: Why Jurors Don't Always Say What They Really Think*, Courtroom Sciences, April 24, 2026, https://www.courtroomsciences.com/litigation-consulting-1/social-desirability-bias-in-voir-dire-why-jurors-dont-always-say-what-they-really-think/. Consequently, when a juror enters the courtroom already inclined toward guilt or

160

innocence, that preconceived bias distorts the juror's evaluation of new evidence, causing even neutral or conflicting facts to be interpreted in a way that confirms the verdict the juror already favors. L. J. Curley, et al., *Verdict spotting: Investigating the effects of juror bias, evidence anchors and verdict system in jurors*. PSYCHIATRY PSYCH. & L., 29(3), 323-344 (2022). An instruction that pressures jurors to serve, regardless of their true feelings about their ability to be impartial, risks undermining the integrity of the voir dire process.

The trial court had an impact on both Jurors 65 and 38 by putting pressure on the jurors not to skirt their civic duty. The trial court gave erroneous instructions to the jury, in which the Court worked to convince jurors to reject their original affirmations that they could not be fair and impartial. *See* Habeas Claim 2. As noted in the oral argument for *Morgan v. Illinois*, a juror is "not going to say that he would not obey the instructions. There's a tremendous amount of pressure." Transcript of Oral Argument at 4:11-4:15, *Morgan v. Illinois*, 504 U.S. 719 (1992) (No. 91-5118), https://www.oyez.org/cases/1991/91-5118. The trial court's admonition only increased that pressure, as evidenced by Juror 38 and 65.

The prosecutor seized upon this advantage and reminded the jurors of their absolute duty as pronounced by the trial court, before asking Juror 65 and Juror 38 any questions about fairness and impartiality. Doc. 31-1 p. 184-85; Doc. 31-2 p. 119-20. The prosecutor emphasized the improperly coercive instructions the judge gave them. There was immense pressure to give the "right" answer, that they could be impartial, due to the erroneous instructions given by the judge and the prosecutor reiterating them. It had an impact—as noted by Juror 38, he believed he could serve

161

because of "the way it's been explained today" Doc. 31-2 p. 130.

The trial court gave jury instructions that emphasized that a person should not evade their civic duty of serving on a jury because of having emotions or opinions. Outside the pressure of the courtroom, Juror 38 and Juror 65 each openly questioned their ability to be fair and impartial based on their opinions. Yet, despite their expressed doubts, after leading questioning by the prosecutor they agreed they would put their feelings aside and decide the case based on evidence presented. Considering the trial court's instructions and the totality of the questioning of each juror, the circumstances strongly suggest that this willingness to proceed was not rooted in confidence or genuine impartiality but can reasonably be construed as a response to a perceived obligation to serve notwithstanding their admitted concerns. They were under pressure to state the correct answer: that they could serve despite their opinions. *Irvin*, 366 U.S. at 728.

### D. Conclusion.

Considering the totality of the voir dire, Juror 38 and Juror 65 should have been dismissed for cause. Each had multiple overlapping relationships with victims and their families, one admitted hesitation on the presumption of innocence, and another expressed an opinion of Galindo's guilt four times.

The Nebraska Supreme Court's affirmation of the denial of for-cause challenges to Juror 38 and 65 was contrary to, and involved an unreasonable application of, clearly established federal law as determined by the U.S. Supreme Court, and was based on an unreasonable determination of the facts considering the evidence presented. The state court failed to apply the totality of the circumstances

162

test required by *Irvin, Patton,* and *Murphy*, gave undue weight to juror assurances of impartiality and deferred to non-existent trial court credibility findings, and unreasonably minimized the significance of the jurors' relationships and equivocal statements. Erroneous denial of a for-cause challenge results in the seating of a juror who should have been dismissed for cause and requires reversal. *Martinez-Salazar*, 528 U.S. at 316.

The Nebraska Supreme Court erroneously rejected Galindo's claim, failing to recognize that the jurors' self-serving claims of impartiality were insufficient to overcome the psychological impact of personal relationships with the victims and families was contrary to and/or constituted an unreasonable application of clearly established Supreme Court law and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the convictions and death sentences, and remand for new proceedings in state court.

163

**Claim 10: The categorical exclusion of mitigation and the sentencing panel's failure to give effect to mitigation violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.**

    A.   *The Supreme Court prohibits the exclusion of categories of mitigation pursuant to the Eighth and Fourteenth Amendments.*

It is a constitutionally indispensable requirement that "the character and record of the individual offender" be considered in capital sentencing. *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). The Court has made clear that although the sentencer "may determine the weight to be given relevant mitigating evidence . . . they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114-15; *see also Lockett*, 438 U.S. at 604.

In capital cases, the Eighth and Fourteenth Amendments forbid the categorical exclusion of any form of mitigating evidence. As the Supreme Court noted in *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986), "[t]here is no disputing that this Court's decision in *Eddings* requires that in capital cases" the sentencer cannot be prevented from considering any relevant mitigating factor offered as a basis for a sentence less severe than death. Youth is among the mitigating factors that must be considered in capital sentencing.

    B.   *Nebraska improperly excludes youth a mitigating factor in violation of the Eighth and Fourteenth Amendments.*

        1)  *The Supreme Court recognizes youth as a constitutionally relevant mitigating factor*

*Lockett* involved a statute that restricted the sentencer's ability to evaluate mitigating factors, specifically the person's age when the crime was committed. 438 U.S. at 594. Ms. Lockett, who was described as "a 21-year-old with low-average or

164

average intelligence," was sentenced to death without consideration of her age because the trial judge proclaimed that "he had 'no alternative, whether [he] [liked] the law or not' but to impose the death penalty." *Id.*

The Supreme Court held that the statute violated the Eighth and Fourteenth Amendments because it prevented the sentencer from considering all relevant mitigating factors, which included age. *Id.* at 609. The Court stressed, "[in] discharging his duty of imposing a proper sentence, the sentencing judge is authorized, *if not required*, to consider all of the mitigating and aggravating circumstances involved in the crime." *Id.* at 603 (quoting *Williams v. Oklahoma*, 358 U.S. 576, 585 (1959).

Similarly, in *Eddings*, the Supreme Court further emphasized that the sentencing judge must consider all mitigating circumstances about a person's character or background that are offered as the basis for a sentence less severe than death. 455 U.S. at 115. The Court in *Eddings*, however, was faced with a sentencing judge who erroneously treated youth as the *only* mitigating factor and refused to also consider Mr. Eddings' violent upbringing and family history. *Id.*

The Supreme Court ultimately reversed Mr. Eddings' death sentence and held that a person's age is indisputably a relevant mitigating factor, especially given the immaturity and susceptibility to influence that are characteristic of youth. *Id.* The Court recognized the indisputability of youth as a mitigator: "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete

165

with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults." *Id.* at 115–116.

Additionally, the Supreme Court considered testimony that illustrated that Mr. Eddings's "mental and emotional development were at a level several years below his chronological age." *Id.* at 116. The Court emphasized that, "the imposition of the ultimate penalty [of death]" necessitates a consideration of both a person's "chronological age" as well as their mental and emotional development. *Id.*

The Supreme Court also reversed the death sentence in *Roberts v. Louisiana* where the statute did not allow consideration of mitigating factors particular to the person being sentenced, specifically the person's "youth." 431 U.S. 633, 637 (1977). Again, the Court expressed the principle that "it is essential that the capital-sentencing decision allow for consideration of whatever mitigating circumstances may be relevant to either the particular offender or the particular offense." *Id.* Over a decade later, the Supreme Court again noted that "one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age[.]" *Stanford v. Kentucky*, 492 U.S. 361, 375 (1989).

Moreover, the Supreme Court in *Johnson v. Texas* asserted that "youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of *Lockett* and *Eddings*." 509 U.S. 350, 367 (1993). Although the death sentence was ultimately upheld in that case, the Court nonetheless reiterated that "[a] sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence." *Id.*

166

The Supreme Court in *Burger v. Kemp* discussed youth more broadly and determined that a person's actual age as well as their mental age can be relevant mitigating factors because they both stem from the "diverse frailties of humankind." 483 U.S. 776, 821 (1987) (citations omitted). There, the petitioner "had an IQ of 82 and functioned at the level of a 12-year-old child." *Id.* at 779. The Court pointed out that youth, "measured by chronological, emotional, or intellectual maturity … [is] extraordinarily germane to the individualized inquiry that the sentencing jury constitutionally is required to perform." *Id.* at 821; *see also Tennard v. Dretke*, 542 U.S. 274, 288 (2004) (citing to *Burger* and emphasizing that youth is a fundamental aspect of a person's characteristics and cognitive capabilities and is therefore essential to consider when imposing the death penalty).

Galindo does not suggest a particular weight needed to be applied to his youth, but youth must be on the scale; youth cannot be categorically excluded from consideration. The Supreme Court again recently recognized this requirement when it reversed the Ninth Circuit, finding: "*Eddings* held that a sentencer may not 'refuse to consider . . . any relevant mitigating evidence.' *Id.*, at 114. It did not hold that a sentencer cannot find mitigating evidence unpersuasive. See *id.* at 114-115 (emphasizing that '[t]he sentencer . . . may determine the weight to be given relevant mitigating evidence')." *Thornell v. Jones*, 602 U.S. 154, 164-65 (2024). Applying *Thornell*, Galindo prevails.

Galindo was only twenty-one years old at the time of the robbery. Contrary to controlling authority in *Eddings*, *Lockett*, *Roberts*, *Johnson*, *Stanford*, *Burger*, and *Tennard*, the sentencing panel expressly refused to consider Galindo's youth as

167

either a statutory or non-statutory mitigating circumstance. The failure of the sentencing panel to consider Galindo's youth, his age-related characteristics, or how his youth related to his culpability, violated his rights to due process and his protection against cruel and unusual punishment as guaranteed by Sixth, Eighth and Fourteenth Amendments.

> 2) *Galindo presented a mitigation theme tied to youthfulness and it was categorically excluded from consideration.*

During the mitigation hearing, trial counsel introduced evidence of Galindo's youth and immaturity as compared to the older, mature, and charismatic Sandoval, who planned the bank robbery and unexpectedly killed three of the bank employees. Galindo's counsel presented evidence Galindo was immature and easily influenced by others, including Sandoval, who was two years older. Doc. 31-16 pp. 37-38. A teacher, Ms. Marilyn Moyer, testified that when Galindo was a student in her class, "he was quite immature" and "exhibit[ed] some signs of a younger child emotionally." Doc. 31-11 pp. 166-167. At the age of twelve, Galindo played with toys and carried a childish backpack. *Id.* Galindo also presented expert testimony that he was cognitively immature and demonstrated an elevated risk of undue influence by others because of his "dampened intellect." Doc. 31-13 pp. 28-31.

The sentencing panel explicitly refused to consider Galindo's age as a mitigating circumstance, specifically finding the statutory mitigating circumstance under Neb. Rev. Stat. § 29-2523(2)(d) applicable only "to a person of advanced years, where senility may be involved." Doc. 30-36 p. 117. The sentencing panel relied upon the Nebraska Supreme Court's decision in *State v. Lotter,* 586 N.W.2d 591

(Neb. 1998), which relied upon *State v. Simants,* 250 N.W.2d 881 (Neb. 1977), a case decided prior to *Eddings, Lockett,* and *Stanford.*

Unquestionably, Galindo's youth was not considered. Before the United States Supreme Court, the State noted, "to be sure, the sentencing panel's order did not specifically address its findings as to youth in the section of its order addressing non-statutory mitigating circumstances." Doc. 30-30 p. 21. When a court says it did not consider something in one section of an opinion (Doc. 30-36 p. 117), does not mention it later (Doc. 30-36 pp. 118-119), and finds the existence of "no other non-statutory mitigating circumstances" aside from the one it explicitly mentioned (Doc. 30-36 pp. 118-119), it is beyond question that youth was not considered. *See also* Doc. 30-4 p. 33 ("In sentencing Galindo, the panel declined to consider his chronological age as a statutory mitigating circumstance under § 29-2523(2)(d)").[24]

The sentencing panel's refusal to consider Galindo's age was particularly invidious here. Galindo's chronological age, combined with his immaturity, suggestibility, and mental age provides a nexus for his actions under the influence of Sandoval and would have provided a basis for at least one member of the panel to vote for a sentence less than death. *Lockett*, 438 U.S. at 604; *Porter*, 558 U.S. at 42; *Sears*, 561 U.S. at 954-55.

---

[24] The Nebraska Supreme Court's conclusion that this was proper because the sentencing panel could have considered youth as a non-statutory mitigating factor (Doc. 30-4 p. 35) is belied by the sentencing order, which makes clear that the panel only considered cooperation with law enforcement as a non-statutory mitigator and explicitly found "the existence of no other non-statutory mitigating circumstances." Doc. 30-36 pp. 118-119. This is an unreasonable determination of fact by the Nebraska Supreme Court, rebutted by the record.

169

Nebraska is an outlier. Nebraska literally stands alone in its exclusion of youth as a mitigator in capital cases. Nebraska's statute has been interpreted by the Nebraska Supreme Court to categorically exclude youth, contrary to the Supreme Court's longstanding precedent.

> 3) *Nebraska's legal position is not only an outlier; it is contrary to and an unreasonable application of clearly existing Supreme Court precedent.*

The Supreme Court has consistently defined the mitigating factor of "age" to include youth. Every other jurisdiction has followed the Supreme Court's unequivocal treatment of youth as a mitigating circumstance. Every polity, acting either through their Legislatures or their courts, include youth within the definition of age as a mitigator. This even held true in the pre-*Furman* practices of jurisdictions that no longer allow imposition of a death penalty.

It is not an exaggeration to contend that Nebraska acts contrary to every other jurisdiction that has defined "age" in the context of capital sentencing mitigation. Nebraska's refusal to consider youth as mitigation stands alone. Including federal and military court systems, there are **29** jurisdictions that currently have the death penalty. Of those jurisdictions, **28** allow consideration of youth as a mitigating factor. Nebraska is the ***only*** modern death penalty jurisdiction that has not authorized consideration of youth in mitigation.

After *Furman v. Georgia*, 408 U.S. 238 (1972) and *Gregg v. Georgia*, 428 U.S. 153 (1976), **14** jurisdictions retained or reinstated the death penalty and then later abolished it as a potential penalty. Every single one of those jurisdictions either

170

explicitly considered youth as mitigation or did not object to its consideration prior to abolition.[25]

Finally, there are **10** jurisdictions that allowed the death penalty pre-*Furman* but did not reinstate it after *Gregg*. Every single one of those jurisdictions considered youth as mitigation. Those jurisdictions did so even prior to the decisions in *Lockett* and *Eddings*. The Nebraska Supreme Court thus stands contrary to both the Supreme Court's binding precedent and the approach of every other jurisdiction to have considered the issue in the Nation's history—all 52 of them.

| Post-Gregg Jurisdictions that Currently Allow the Death Penalty | | | |
|---|---|---|---|
| **State** | **Statute** | **Law** | **Is Youth Mitigating?** |
| Alabama | ALA. CODE § 13A-5-51 (2024). | *Jackson v. State*, 133 So. 3d 420, 442 (Ala. Crim. App. 2012) | Yes |
| Arizona | ARIZ. REV. STAT. ANN. § 13-751 (2024). | *State v. Tucker*, 215 Ariz. 298, 322 (2007) | Yes |
| Arkansas | ARK. CODE ANN. § 5-4-605 (West 2024). | *Giles v. State*, 261 Ark. 413 (1977) | Yes |
| California | CAL. PENAL CODE § 190.3 (West 2024). | *People v. Burney*, 47 Cal. 4th 203 (2009) | Yes |
| Florida | FLA. STAT. ANN. § 921.141 (West 2024). | *Campbell v. State*, 679 So. 2d 720, 725-26 (Fla. 1996) | Yes |
| Georgia | GA. CODE ANN. § 17-10-30 (West 2023). | *Sears v. Humphrey*, 294 Ga. 117, 124, 135 (2013) | Yes |
| Idaho | IDAHO CODE § 19-2515 (West 2024). | *State v. Beam*, 109 Idaho 616, 619, 624 (1985) | Yes |
| Indiana | IND. CODE ANN. § 35-50-2-9 (West 2023). | *Gross v. State*, 769 N.E. 2d 1136, 1140-41 (Ind. 2002) | Yes |
| Kansas | KAN. STAT. ANN. § 21-6625 (West 2024). | *State v. Spain*, 263 Kan. 708, 720-21 (1998) | Yes |

---

[25] Neither Rhode Island nor the District of Columbia utilized the death penalty after *Furman* although they did not abolish it until after *Gregg*, so the modern aggravation/mitigation framework was not utilized in those jurisdictions.

171

| Kentucky | KY. REV. STAT. ANN. § 532.025 (West 2023). | *Moore v. Commonwealth*, 634 S.W.2d 426, 434-35 (Ky. 1982) | Yes |
|---|---|---|---|
| Louisiana | LA. CODE CRIM. PROC. ANN. Art. 905.5 (2023). | *State v. LaCaze*, 824 So. 2d 1063, 1083-84 (2002) | Yes |
| Mississippi | MISS. CODE ANN. § 99-19-101 (West 2024). | *Garcia v. State*, 300 So. 3d 945, 952 (Miss. 2020) | Yes |
| Missouri | MO. ANN. STAT. § 565.032 (West 2023). | *State v. Reuscher*, 827 S.W.2d 710, 716 (Mo. 1992) | Yes |
| Montana | MONT. CODE ANN. § 46-18-304 (2)(West 2024). | *State v. Keith*, 231 Mont. 214, 232 (1988) | Yes |
| **Nebraska** | **NEB. REV. STAT. ANN. § 29-2523 (West 2024).** | ***State v. Galindo**, 315 Neb. 1, 35 (2023)* | **No** |
| Nevada | Nev. Rev. Stat. Ann. § 200.035 (West 2023). | *Emil v. State*, 105 Nev. 858, 868 (1989) | Yes |
| North Carolina | N.C. Gen. Stat. Ann. § 15A-2000 (West 2023). | *State v. Gainey*, 335 N.C. 73, 105 (2002) | Yes |
| Ohio | OHIO REV. CODE ANN. § 2929.04 (West 2021). | *State v. Graham*, 164 Ohio St. 3d 187, 229-34 (Ohio 2020) | Yes |
| Oklahoma | OKLA. STAT. tit. 21, § 701.10 (West 2013). | *Revilla v. State*, 877 P.2d 1143, 1154 n.3, 1156 (Ok. 1994) | Yes |
| Oregon | OR. REV. STAT. ANN. § 163.150 (West 2019) | *State v. Farrar*, 309 Or. 132, 135 (1990) | Yes |
| Penn. | 42 PA. CONS. STAT. ANN. § 9711 (West 2024). | *Commonwealth v. Lesko*, 609 Pa. 128, 233 (2011) | Yes |
| South Carolina | S.C. CODE ANN. § 16-3-20 (2024). | *State v. Morgan*, 433 S.C. 435, 438 (Ct. App. 2021) | Yes |
| South Dakota | S.D. CODIFIED LAWS § 23A-27A-1 (2024). | *State v. Page*, 709 N.W.2d 739, 759 (S.D. 2006) | Yes |
| Tennessee | TENN. CODE ANN. § 39-13-204 (West 2023). | *State v. Hawkins*, 519 S.W.3d 1, 52 (Tenn. 2017) | Yes |
| Texas | TEX. CODE CRIM. PROC. ANN. art. 37.071 (West 2024). | *Williams v. State*, 273 S.W.3d 200 (Tex. Crim. App. 2008) | Yes |
| Utah | UTAH CODE ANN. § 76-3-207 (4)(e) (West 2023) | *State v. Nuttall*, 861 P.2d 454, 457 (Utah Ct. App. 1993) | Yes |
| Wyoming | WYO. STAT. ANN. § 6-2-102 (West 2024) | *Olsen v. State*, 67 P.3d 536, 557 (Wyo. 2003) | Yes |

172

| United States of America | Does not reference age as a mitigating factor. See 18 U.S.C. § 3592 (West) | *United States v. Roof*, 2016 WL 8678863 (S.C. Oct. 14, 2016) (Noting Government concedes youth is a proper mitigator) | Yes |
| U. S. Military Courts | R.C.M. 1004(d) | *United States v. Rojas*, 15 M.J. 902, 920-21 (N.M. Ct. Mil. Rev. 1983) | Yes |

| Jurisdictions that Abolished the Death Penalty Post-*Gregg v. Georgia* (1976) | | | |
|---|---|---|---|
| **State/Year of Abolition** | **Previous Statute** | **Law** | **Was Youth Mitigating?** |
| Colorado (2020) | COLO. REV. STAT. ANN. § 18-1.3-1201 (West 2020) | *People v. Dunlap*, 975 P.2d 723, 738 (Colo. 1999) | Yes |
| Connecticut (2012) | CONN. GEN. STAT. ANN. § 53a-46a (West 2012) | *State v. Ross*, 269 Conn. 213, 371 (2004) | Yes |
| Delaware (2016) | DEL. CODE ANN. tit. 11 § 4209 (West 2016). | *Zebroski v. State*, 715 A.2d 75, 83 (Del. 1998) | Yes |
| District of Columbia (1981) | N/A | The District of Columbia did not utilize the death penalty after *Furman*, although it was not officially repealed until 1981; it did not develop a delineated mitigation framework after *Gregg. See District of Columbia*, Death Penalty Information Center (last visited June 25, 2026) https://deathpenaltyinfo.org/state-and-federal info/state-by-state/district-of-columbia | N/A |
| Illinois (2011) | 720 ILL. COMP. STAT. 5/9-1 (1991) | *People v. Terrell*, 185 Ill. 2d 467, 518 (1998) | Yes |
| Maryland (2013) | MD. CODE ANN. CRIM. LAW. § 2-303 (2005) | *Bryant v. State*, 374 Md. 585, 631 (2003) | Yes |
| Mass. (1984) | MASS. ANN. LAWS ch. 279, § 69 (West 1984) | Massachusetts has not issued a death sentence since *Gregg. See Massachusetts,* Death Penalty Information Center (last visited | Never precluded consideration of youth as |

173

| | | June 25, 2026) https://deathpenaltyinfo.org/state-and-federal-info/state-by-state/massachusetts; *Cf. Commonwealth v. Mattis*, 493 Mass. 216, 224 N.E.3d 410 (2024) (holding it unconstitutional to sentence individuals from eighteen to twenty years of age to life without the possibility of parole) | mitigating factor. |
|---|---|---|---|
| New Hampshire (2019) | N.H. REV. STAT. ANN. § 630:5 (1991). | *State v. Addison*, 165 N.H. 381 (2013) | Yes |
| New Jersey (2007) | N.J. STAT. ANN. § 2C:11-3 (West 2002). | *State v. Ramseur*, 106 N.J. 123, 275 (1987) | Yes |
| New Mexico (2007) | N.M. Stat. Ann. § 31-20A-6 (2006). | *State v. Clark*, 990 P.2d 793, 806 (N.M. 1999) | Yes |
| New York (2004) | N.Y. CRIM. PROC. LAW § 400.27 (McKinney 2004) | *People v. Davis*, 43 N.Y.2d 17 (1977) | Yes |
| Rhode Island (1984) | R.I. Gen. Laws § 11-23-2 (1956). | Rhode Island's death penalty statute was deemed unconstitutional in 1979 because it did not allow for consideration of mitigating factors. *See State v. Cline*, 121 R.I. 299 (1979). The death penalty was officially abolished in 1984. *See Rhode Island*, Death Penalty Information Center (last visited June 25, 2026) https://deathpenaltyinfo.org/state-and-federal info/state-by-state/rhode-island. Therefore, Rhode Island never implemented the mitigating/aggravating statutory scheme mandated by *Gregg*. | N/A |
| Virginia (2021) | Va. Code Ann. § 19.2-264.4 (West 2020). | *Jones v. Commonwealth*, 293 Va. 29, 36 (2017) | Yes |

174

| Washington (2023) | WASH. REV. CODE ANN. § 10.95.070 (repealed). | *State v. Benn*, 120 Wash. 2d 631, 683-84 (1993) ("Clark Hazen…was 18 at the time of his crime…Mitigating factors offered were the youth of the defendant, history of his being abused as a child, and an organic brain dysfunction."). | Yes |

| Jurisdictions that Abolished the Death Penalty Pre-*Furman* | | | |
|---|---|---|---|
| **State** | **Non-Capital Statute** | **Law** | **Is Youth Mitigating in Non-Capital?** |
| Alaska (1957) | ALASKA STAT. ANN. § 12.55.155 (West 2024). | *Page v. State*, 657 P.2d 850, 854 (Alaska Ct. App. 1983) | Yes |
| Hawaii (1957) | N/A | *State v. Pacquing*, 129 Haw. 172, 178 (2013) | Yes |
| Iowa (1965) | N/A | *State v. Lemvan*, No. 99 1987, 2002 WL 181181 (Iowa Ct. App. Feb. 6, 2002) | Yes |
| Maine (1887) | N/A | *State v. Shortsleeves*, 580 A.2d 145, 150-51 (Me. 1990) | Yes |
| Michigan (1847) | N/A | *People v. Fields*, 448 Mich. 58, 63-78 (1995) | Yes |
| Minnesota (1911) | N/A | *State v. Donnay,* 600 N.W.2d 471. 474 (Minn. App. 1999) | Yes |
| North Dakota (1973) | N/A | *State v. Garcia*, 561 N.W.2d 599 (N.D. 1997) (Noting youth considered as a sentencing factor) | Yes |
| Vermont (1972) | VT. STAT. ANN. tit. 13, § 2303 (West 2023). | *State v. Hughs*, 194 A.3d 1181 (Vt. 2018) | Yes |
| West Virginia (1965) | N/A | *State v. Miller*, 178 W. Va. 618, n. 1 (1987) | Yes |
| Wisconsin (1953) | N/A | *State v. Barbeau*, 370 Wis. 2d 736, n.8 (2016) | Yes |

175

Had Galindo faced a death sentence in any of the other 49 states, before the federal government, a military tribunal, or in the District of Columbia, a sentencing hearing requiring that his youth be considered as mitigation would have occurred. Instead, Nebraska, contrary to the law and unreasonably failing to apply the law, found his youth mitigation to be categorically excluded from consideration when deciding whether he should die. The Nebraska Supreme Court has decided an important federal question in a way that conflicts with ***every*** other state court.

4) *There is no procedural default, and alternatively, procedural default does not bar this Court's consideration of this claim.*

Respondent alleges that Galindo's allegation regarding the failure to consider youth as mitigation is procedurally defaulted. Doc. 46 p. 162. Respondent fails to adequately plead a procedural default. Respondent has not cited the rule allegedly violated and the state court's application of such a rule. The doctrines of procedural default require both an *adequate* and *independent* basis for the state procedural default. *Wainwright*, 433 U.S. 72; *Harris*, 489 U.S. at 262. Not having adequately alleged the procedural default – this Court can stop there. *Thomas v. Payne*, 960 F.3d 465, 472-73 (8th Cir. 2020).

Setting that aside, the Nebraska Supreme Court seemingly addressed the merits. The court explained that "§ 28-105.01 narrowed the application of the mitigating circumstance in § 29-2523(2)(d) to persons of advanced years. We concluded that only a capital defendant who was a person of advanced years at the time of the homicide could receive the benefit of this statutory mitigating circumstance." Doc. 30-4 p. 34. The court went on to justify non-compliance with

176

this Court's precedent on the basis that: "the sentencing panel correctly read *Lotter* in deciding that the mitigating circumstance in § 29-2523(2)(d) did not exist in Galindo's case because he was not a person of advanced years." *Id.* p. 35. In denying the claim, the Nebraska Supreme Court again held that youth is not mitigating in Nebraska.

In *Lannert v. Jones*, 321 F.3d 747, 751 (8th Cir. 2003), the court held that because the state court had reached the merits of Lannert's claim despite procedural default, federal review was not barred. *Lannert* endorsed *Sweet v. Delo*, 125 F.3d 1144, 1150 (8th Cir. 1997), a capital case which held: "When a state court decides an issue on the merits despite a possible procedural default, no independent and adequate state ground bars consideration of that claim by a habeas court." *Lannert* further relied on *Hadley v. Caspari*, 36 F.3d 51, 51 (8th Cir.1994): "Claims presented in a habeas corpus petition will not be procedurally barred so long as the state appellate court has given 'at least cursory consideration' to them."

Alternatively, the Nebraska Supreme Court's analysis is not independent of the underlying claim. Thus, the merits were necessarily addressed. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) (concluding that "if the state-law rule subsumes the federal standard—that is, if it is at least as protective as the federal standard— then the federal claim may be regarded as having been adjudicated on the merits."); *Harris*, 489 U.S. at 269 (holding that if the last state court to be presented with a federal claim reaches the merits of the claim, there is no procedural bar to federal review because it is presumed that the state decision rested on federal law); *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("State procedural bars are not immortal . . .

177

they may expire because of later actions by state courts.") And as more fully explained below, even if the claim was procedurally defaulted, trial counsel's ineffectiveness provides cause for the failure.

Finally, appellate counsel failed to raise a "dead bang winner." There can be no credible dispute as to the through-line of the Supreme Court's almost 50 years of precedent: youth is mitigating. *Lockett*, 438 U.S. 586; *Eddings*, 455 U.S. 104; *Stanford*, 492 U.S. 361; *Johnson*, 509 U.S. 350; *Tennard*, 542 U.S. 274. This is a through-line reasonable counsel would have raised as constitutional error on direct appeal.

As noted above, the Nebraska Supreme Court improperly denied this claim on the basis that Nebraska law barred it. However, the Supreme Court was conscientiously enforcing youth as mitigation in the early 2000s when Galindo was sentenced. *See e.g. Johnson*, 509 U.S. 350; *Tennard*, 542 U.S. 274. Thus, if the Nebraska Supreme Court had affirmed on direct appeal, certiorari would have been granted and the decision vacated to pull Nebraska in line with everyone else. Appellate counsel was therefore ineffective in failing to raise a dead-bang winner. See *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise "dead-bang winner" claim on appeal constitutes ineffective assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims); *Clemons v. Delo*, 124 F. 3d 944 (8th Cir. 1997) (same).

Nebraska denied the ineffectiveness claim without a hearing, holding as a matter of law that there was no constitutional violation where the sentencing panel expressly refused to consider Galindo's youth either as a statutory or non-statutory

178

mitigating factor. This erroneous and outlier legal determination rejected 50 years of Supreme Court precedent.

Even if the claim was procedurally defaulted, counsel's ineffectiveness in failing to present the claim provides cause to excuse the default of this claim. It is well established that trial counsel's ineffectiveness may serve as cause to excuse a procedural default. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To do so, the ineffectiveness claim must itself be exhausted—as it was here. *Edwards v. Carpenter*, 529 U.S. 446, 450–54 (2000).

As the Eighth Circuit has noted, the Supreme Court has not required the federal courts to apply 2254(d) to a state court's adjudication of an ineffectiveness claim when counsel's ineffectiveness is offered as cause to excuse a procedural default. *Clemmons v. Luebbers*, 381 F.3d 744, 752 n.4 (8th Cir. 2004). Section 2254(d) limits relief on "any *claim* adjudicated on the merits in State court proceedings." In the context of cause, trial counsel's ineffectiveness is not a "claim." The "claim" here is the denial of the Eighth and Fourteenth Amendments. Counsel's ineffectiveness supports, rather than a "claim," a federal cause and prejudice response to the impediment to presenting the due process claim pursuant to state procedural rules. AEDPA did not change the federal courts' role in independently assessing whether there is cause to excuse procedural default. *See Visciotti v. Martel*, 862 F.3d 749, 768–69 (9th Cir. 2017).

It is premature to discuss the prejudice without an evidentiary hearing and a consideration of the totality of the circumstances. This is especially so given that a new judge reviewing a cold record, rather than the original trial judge, presided

179

over the post-conviction proceedings, and that a wealth of important mitigating

evidence as well as evidence of Galindo's intellectual disability were not presented

to the sentencing panel nor the post-conviction court.

Setting that aside, the failure to consider a critical piece of evidence was

prima facie prejudicial to Galindo. Had the sentencing panel been permitted to

consider Galindo's youth as mitigation, there is a reasonable likelihood, in looking

at the totality of the evidence, the at least one panel member would have concluded

that the balance of aggravating and mitigating circumstances did not warrant

death. Moreover, had counsel on appeal relied on the foregoing Supreme Court

decisions, it is reasonably likely to have resulted in a reversal on direct appeal. *See*

*Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985) (recognizing the right to effective

assistance of appellate counsel).

Indeed, the Nebraska Supreme Court specifically held that youth was never

considered as mitigation here. Specifically, the Nebraska Supreme Court found that

the sentencing court "did not find Galindo's age, cognitive function or cognitive

development to be mitigating circumstances *in any way*." Doc. 30-4 p. 32 (emphasis

added).

The record supports this reading of the Nebraska Supreme Court's decision.

The sentencing panel in Galindo's case did not engage in any discussion of his youth

or the evidence of his attendant deficiencies in any context other than to reject its

consideration as mitigation. *See* Doc. 30-36 pp. 117-119. That rejection was

explicitly based on the Nebraska Supreme Court's limitation of the consideration of

age to advanced age. Despite the evidence of Galindo's youth, the panel never considered that evidence as a non-statutory mitigating factor either. *Id.*

Nebraska never considered Galindo's youth as a mitigating factor in any context because the Nebraska Supreme Court forbade it from doing so. The Nebraska Supreme Court's fictional account that youth may have been considered as a non-statutory mitigator without reference is rebutted by the sentencing order, revealing that it was not considered at all.

The Nebraska Supreme Court premised the ineffectiveness claim's denial on an error of law – that the mitigating factor of age does not include youth as a matter of Nebraska law. Nebraska bound the denial of the ineffectiveness claim on a legal basis contrary to Supreme Court precedent. Nebraska should not be heard to complain that the legal error they committed is unreviewable. The review of the ineffectiveness claim requires a review of the underlying basis – which in this case is 50 years of precedent from this Court demonstrating in an unblemished line that Nebraska is wrong.

C. *Nebraska improperly excluded mitigating evidence from the Baldus study*

   1) *Nebraska improperly excluded a category of mitigation evidence.*

Galindo offered into evidence all first-degree murder sentencing orders in Nebraska as well as the contents of the "Baldus Report." Doc. 31-16 pp. 7-8, 10-13. The "Baldus Report" is a study that was written for the Nebraska Commission on Law Enforcement and Criminal Justice during the time that L.B. 1 was under consideration. The sentencing panel refused to receive or consider the report, holding that it would only review Nebraska's first-degree murder cases in which the

181

death penalty had been imposed. The trial court's refusal to consider Galindo's proffered evidence violated *Lockett*, and its progeny.  The information regarding the sentences imposed in other first-degree murder cases was directly relevant to the imposition of the sentence in his case.

The Baldus Report addressed race and the death penalty in Nebraska. Given the confluence of race in Galindo's case, the failure of the sentencing panel to consider the Baldus Report violated Galindo's rights to due process and protection against cruel and unusual punishment as guaranteed by Sixth, Eighth and Fourteenth Amendments. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ, vacate the death sentence with directions for a new sentencing proceeding.

**Claim 11:  Mr. Galindo's Due Process, Confrontation and Jury Trial rights
as guaranteed by the Fifth, Sixth, Eighth and Fourteenth
Amendments to the United States Constitution were violated
when the sentencing judges considered a Pre-Sentencing
Investigation Report.**

The Constitution instills guardrails and procedures regarding the proper
consideration of evidence in a capital sentencing proceeding. A defendant must be
afforded the opportunity to be heard and the opportunity to rebut the evidence upon
which a sentencing court may rely in imposing death. The operation of the
Nebraska death penalty statute requiring consideration of a Pre-Sentence
Investigation report to which a defendant cannot respond runs afoul of these
principles.

Respondent properly notes that portions of the claim are properly before this
Court on the merits. Doc. 46 p. 165. The Nebraska Supreme Court considered the
sum and substance of the sentencing court's consideration of the PSI and **all** that it
contained and found no prejudicial error.

Galindo stands on his earlier suggestion that under the Nebraska death
penalty statute, the sentencing panel should not consider evidence related to
alleged aggravating factors in capital cases, including evidence contained in the
presentence investigation report. The Nebraska Supreme Court has therefore
allowed the sentencing panel to "determine" which aggravating circumstances exist
based in part on unconfronted hearsay evidence contained in the presentence
investigation report, in violation of the constitution. *See Ring*; *Gardner v. Florida,*
430 U.S. 349 (1977).

183

"Due process . . . requires that [a defendant] be present with counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own" when a sentencing proceeding, or portion thereof, constitutes a "new charge leading to magnified criminal punishment. . . in an enhanced sentence proceeding." *Specht v. Patterson*, 386 U.S. 605, 608–611 (1967). By allowing the sentencing panel to consider evidence of aggravating circumstances or the factual bases of aggravating circumstances contained in the presentence investigation report, Nebraska sentencing laws currently allow the sentencing panel to find essential facts relating to a "new charge leading to magnified criminal punishment," but deny capital defendants their due process rights to be present, to be heard, to confront witnesses against them, and to offer evidence. *See Specht*, 386 U.S, 605; *Gardner*, 430 U.S. 349.

Respondent wrongly suggests that Galindo has somehow procedurally defaulted his victim opinion evidence arguments. Doc. 46 pp. 166-67. Critically, the Nebraska Supreme Court found that the PSI was "considered," but rejected the assertion that there was prejudice from anything negative in the report. Doc. 30-1 p. 47. In sum, the court concluded the PSI was not used "for any prohibited purpose." *Id.* p. 48. The PSI and all of its contents were considered by the Nebraska Supreme Court and thus are fair game for Galindo.

There is no procedural default here. A procedural default does not bar federal habeas review of a federal claim unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar. *Harris,* 489 U.S. 255. If a state court declines to find that a claim has been

184

waived or defaulted under its state procedural rules, federal courts must show

respect for that judgment and decline to apply a procedural bar. *Cone v. Bell*, 556

U.S. 449 (2009). To enforce a state procedural bar, the default must have been

actually imposed by the state court; it is not sufficient that the state court could or

should have imposed it under state law. *Clemons v. Luebbers*, 381 F.3d 744 (8th Cir.

2004).

In response to Galindo's arguments regarding the PSI and the victim

testimony, the Nebraska Supreme Court specifically referenced *Payne v. Tennessee*,

501 U.S. 808 (1991), when discussing the victim impact aspects of the claim. Doc.

30-1 p. 50 n.205. The Nebraska Supreme Court cited *Payne* for the proposition that:

"The U.S. Supreme Court has held that victim impact statements considered at

sentencing show the personal characteristics of the victim or the emotional impact

of the crime on the family do not violate the U.S. Constitution." *Id.* Galindo is

permitted to challenge whether this premise leading to the Nebraska Supreme

Court's analysis is contrary to or an unreasonable application of federal law. And it

is.

*Payne* does not permit victim ***opinion*** evidence. At a capital sentencing

hearing, victim opinion evidence is not admissible. The Eighth Amendment

prohibits a jury, during the sentencing phase of a capital trial, from considering any

"victim impact" evidence relating to the personal characteristics of a murder victim

and the emotional impact of the crime on the victim's family. *Booth,* 482 U.S. 496;

*see also South Carolina v. Gathers*, 490 U.S. 805, 109, 2207 (1989). The Court

carved out an exception in *Payne*, 501 U.S. 808, permitting evidence and argument

relating to the victim and the impact of the victim's death on the surviving family. However, *Payne* did not sanction victim **opinion** evidence. In *Bosse,* 580 U.S. 1, the Court affirmed it had never overruled the prohibition of evidence relating to victim opinion evidence.

The Eighth Circuit recognizes this prohibition. In *Williams v. Norris*, 612 F.3d 941, 951 (8th Cir. 2010), the court held that the Supreme Court "left intact the prohibition against statements about 'the crime, the defendant, and the appropriate sentence'; such statements violated the Eighth Amendment and were inadmissible." This echoed the court's earlier decision in *Parker v. Bowersox*, 188 F.3d 923, 931 (8th Cir. 1999), which also held that "family members of the victim may not state 'characterizations and opinions about the crime, the defendant, and the appropriate sentence' at the penalty phase"). Informing the sentencer as to the sentencing desires of the victims' family is unconstitutional and not tolerated by the Supreme Court.

Contrary to this principle, the PSI here included improper opinion evidence as to the appropriate sentence for Galindo. Several victims expressed their opinions in favor of the imposition of a death sentence:

a.    "These criminals have no right to go on living after taking the life of my precious daughter." Doc. 25–9 p. 79;

b.    "I agree with the jury that he should receive the death penalty for murdering five people." *Id.* p. 80;

c.    "I feel he should be punished to the fullest extent of the law, which in Nebraska is the death penalty." *Id.* p. 88;

186

d.      "As for the perpetrator Jorge Galindo has no purpose of being productive on earth or the human race. I propose using the guillotine method on him, with public viewing." *Id.* p. 91;

e.      "Off with the perpetrator's head so closure can come to us." *Id.* p. 92.

In not finding error, the Nebraska Supreme Court acted contrary to and/or unreasonably applied well established Supreme Court law and/or denied relief based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the death sentences, and remand for new sentencing proceedings in state court.

**Claim 12:   Mr. Galindo's Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated when victim impact statements were read during sentencing.**

Due process guarantees to persons convicted of first-degree murder that they will not be sentenced by procedures that abrogate the State's sentencing laws. *Hicks v. Oklahoma*, 447 U.S. 343 (1980); *see Wolff v. McDonnell*, 418 U.S. 539, 557 (1974) (although full panoply of constitutional rights do not apply to prisoners, when the state creates a right for prisoners, due process demands that the "state-created right is not arbitrarily abrogated"). Contrary to Respondent's position, the trial court departed from Nebraska's death penalty statute. The trial court failed to comply with the statute's requirements and did not demand that the prosecution make any showing that the persons who read or submitted their victim impact statements at Galindo's sentencing proceedings qualified as victims under the statute. Additionally, the victims who introduced statements were not limited to either submitting a written impact statement or reading the impact statement that was contained in the presentence investigation report.

Respondent correctly notes this aspect of the claim is properly before the Court on the merits. Doc. 46 p. 167.[26] The Nebraska Supreme Court's opinion is bereft of analysis – so much so there was nothing for even the Respondent to provide. Rather, the ruling is a simple declaration that the statute does not mean what it says. Doc. 30-1 p. 52. The Nebraska Supreme Court is simply wrong.

---

[26] Respondent also asserts that if there is an aspect of this claim related to victim opinion evidence it is procedurally defaulted. Doc. 46 p. 167. Galindo did not intend to raise such a claim here.

188

Revised Statute § 81-1848 also lays out the rights of victims in criminal sentencing proceedings. The county attorney must notify victims of their "right to submit a written impact statement at the sentencing proceedings or to read his or her impact statement submitted pursuant to (I)(d)(iv) of this section at the sentencing proceeding." Neb. Rev. Stat. § 81-1848(I)(d)(vii). Section (I)(d)(iv) grants victims the right to "make a written or oral impact statement to be used in the probation officer's preparation of a presentence investigation report concerning the defendant." Neb. Rev. Stat. § 81-1848(I)(d)(iv). This is unambiguously clear.

The failure to comply with the Nebraska statute violated Galindo's constitutional right to due process. *See Hicks*, 447 U.S. 343. The Nebraska Supreme Court's discounting of Nebraska's statutes because they imposed an inconvenience upon the State's sentencing efforts was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new sentencing phase.

189

**Claim 13:  Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure to pursue a guilty plea which would have avoided the death penalty.**

There was a window of time in Galindo's case when, if trial counsel had been effective, Galindo could have avoided the death penalty via a guilty plea. However, trial counsel failed to seize upon this advantage during the time period when, as even the Nebraska Supreme Court recognized, the State "did not seek the death penalty." Doc. 30-4 p. 19.

While Respondent waffles regarding whether the claim should be considered on the merits (*see* Doc. 46 p. 114), the Nebraska Supreme Court clearly went through the factual basis of Galindo's claim and concluded (unreasonably) that "the facts alleged in Galindo's motion for postconviction relief do not demonstrate a violation of this right . . . We do not view counsel's representation here to be deficient as alleged by Galindo."  Doc. 30-4 p. 23. This is a merits determination.

The starting point is that before the offense took place, *Ring* "**effectively invalidated Nebraska's statutory capital sentencing procedure**." Doc. 30-4 p. 19 (emphasis added). The court also recognized *Ring* "prompted changes to Nebraska's death penalty procedure." *Id.* p. 20. While recognizing this, the Nebraska Supreme Court then indicated that it would have been a "misapplication of *Ring*" for a court to accept a plea that avoided the death penalty before a new constitutional statute was in place. *Id.* p. 23. This is nonsensical and unreasonable. The law was either valid or invalid, and at the time of the ineffectiveness, it was invalid.

190

The Nebraska Supreme Court mixes apples and oranges. The death penalty may have been "hypothetically" on the books even after *Ring*, but there was no procedure available to constitutionally impose a death sentence, as evidenced by the State not pursuing the death penalty in Galindo's case until after L.B. 1's passage. That defense counsel did not seek a plea during the time when even the State acknowledged it could not seek death demonstrates counsel's ineffectiveness. It would not have been a "misapplication" of law (Doc. 30-4 p. 23) for counsel to rely on the State's clear indication it did not believe the death penalty could be sought at that time (which was then supported by the same trial judge determining the death penalty did not apply and accepting a plea in a different case under similar circumstances during that same time period); it would have been a pursuit of a plea under then-existing sentencing procedures which did not permit the imposition of a death sentence.

A reasonable trial court could have imposed life sentences, the highest sentence then allowed by Nebraska procedures. There is no reason to believe that a trial court would unreasonably decline to impose the most severe sentence then allowed by law had the court been presented with a guilty plea at that time.

It is unreasonable for the Nebraska Supreme Court to conclude otherwise given the factual findings that: 1) the State did not initially seek the death penalty before L.B. 1 went into effect; and 2) when L.B. 1 took effect, the State immediately initiated procedures to pursue the death penalty. A reasonable application of those facts should have led to the conclusion that there was a window in which a guilty

191

plea to a life sentence was viable because the invalidated statute did not permit the State to pursue death—as the contemporaneous actions of the State bear out.

The Nebraska Supreme Court failed to do what is required: to "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,' which **includes** context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins*, 539 U.S. at 523 (quoting *Strickland*, 466 U.S. at 688) (emphasis added); *Ortiz v. United States*, 664 F.3d 1151, 1169 (8th Cir. 2011). At the time trial counsel could have acted, L.B. 1 did not exist, and the State was not pursuing death because it was not available.

Respondent noted that the Nebraska Supreme Court, when assessing the performance prong, found that if Galindo had entered a plea he would have lost the opportunity to raise defenses in the motion to quash. Doc. 30-4 p. 24. This finding by the court far surpasses unreasonableness to the level of nonsensicalness. A review demonstrates that Galindo's Motion to Quash and the supplements challenged application of the new L.B. 1. *See* Doc. 30-33 pp. 27-47. The deficiency of counsel lies in the fact that there would be no need to file a motion to quash the operation of a new statute that subjected his client to the death penalty when he could have avoided it altogether by negotiating a plea before L.B. 1 went into effect. Again, the Nebraska Supreme Court acted in an unreasonable manner. *Wiggins*, 539 U.S. at 523; *Ortiz*, 664 F.3d at 1169.

As noted by Respondent, a basis of the Nebraska Supreme Court's ruling is that the trial court would never have accepted a plea given the denial of Galindo's

pretrial motion to quash. Doc. 30-4 pp. 21, 25. The problem with the Nebraska Supreme Court's determination is that the motion to quash in question was filed months *after* the passage of L.B. 1, on January 24, 2003. *See* Doc. 30-33 p. 27. The court did, in fact, determine that the death penalty did not apply before L.B. 1 was enacted in another case that was initially charged as first-degree murder, suggesting it would have done so again here. That the court later came to a different conclusion regarding the motion to quash sheds no light on what it would have done had counsel negotiated a plea before L.B. 1 took effect. Counsel's belated challenge in the form of the motion to quash, instead of negotiating a plea earlier, demonstrates the efficacy of the colloquialism: "too little, too late."

Reliance on the court's later denial of the motion to quash is an unreasonable post hoc evaluation of the record. *Gabaree*, 792 F.3d at 999 (citing *Wiggins*, 539 U.S. at 526-27) (State court's "post hoc rationalization of counsel's conduct" was an unreasonable determination of fact). Indeed, the *Strickland* analysis must be premised upon the record. It is inappropriate to provide *post hoc* rationalizations for any attorney's actions. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland,* 466 U.S. at 689. "[C]ourts may not indulge 'post hoc rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions." *Harrington v. Richter*, 562 U.S. 86, 108 (2011) (quoting *Wiggins*, 539 U.S. at 526-27).

193

Because the Nebraska Supreme Court failed to act in a reasonable manner, this Court may assess the claim *de novo*. Trial counsel deficiently failed to pursue a strategy to save Galindo's life. Nothing would have been lost had counsel attempted to pursue a plea—there was only gain.

Competent counsel would have been aware of the law and pursued the plea before the passage of L.B. 1. *Hinton*, 571 U.S at 274 (ignorance is not a basis for attorney inaction); *Mayfield v. United States*, 955 F.3d 707, 713 (2020). The Eighth Circuit, for example, has upheld a finding that counsel was not professionally reasonable in advising a client to plead guilty based on a mistaken understanding about parole, where "[m]inimal research would have alerted counsel to the correct parole eligibility date." *Garmon v. Lockhart*, 938 F.2d 120, 121 (8th Cir. 1991). In *Mayfield*, the Eighth Circuit found deficient performance "when rudimentary research" would have uncovered the legal basis undermining a plea, ultimately remanding for a hearing. 955 F.3d at 712.

A state trial court's imposition of the maximum sentence permitted by law in a plea agreement context should be considered the reasonable expectation, and that would have been the result had counsel pursued a plea to a life sentence before L.B. 1 took effect. Because a life sentence was within the statutory limits established by the legislature at the time, trial counsel should have proceeded. The prejudice is clear: Galindo would not have faced a death sentence.

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and requested discovery and a hearing. Galindo listed his proposed exhibits. Doc. 30-43

194

pp. 18-20 n.3-8. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. As to this claim, Galindo specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel was ineffective for failing to advise Galindo regarding or to otherwise pursue a potentially life-saving plea disposition." *Id.* pp. 76-79. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-294, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. *See also Liljestrand*, 842 N.W.2d 575. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the

195

(e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

For the reasons above, the Nebraska Supreme Court's ruling was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order imposition of a life sentence.

**Claim 14: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were adversely affected by a conflict of interest.**

Respondent accurately recites the facts underpinning this claim. Doc. 46 p. 115. In short, Galindo's trial counsel, Mr. Stratton, employed Ms. Kerrie Koch as a paralegal, who actively participated in Galindo's representation. Doc. 30-47 p. 115. Koch dated Mr. Scott Freese, a local criminal defense attorney who represented State's witnesses Padilla and Abendano; Freese was later convicted in federal court of conspiring with members of a drug ring with which Padilla, Abendano, and Lopez were associated—and of which the prosecutor was also allegedly a participant. Doc. 30-43 p. 49.

Ms. Koch was an active participant in Mr. Stratton's representation of Galindo. Mr. Stratton mentioned her involvement during a September 19, 2003, pre-trial hearing. Doc. 30-47 p. 115. Koch later admitted to sharing privileged attorney-client information with Freese regarding the investigation of the drug ring.[27]

The Nebraska Supreme Court unreasonably excluded one of the most salient facts when it considered this claim: ***all of the sentencing witnesses it discussed and Freese were connected to the corrupt prosecutor***. They were all participants in the same alleged drug ring for which the trial prosecutor was being federally investigated. The Nebraska Supreme Court's exclusion of this fact from its

---

[27] Galindo will be filing the federal investigation materials subject to a protective order under seal.

analysis was unreasonable. *Williams*, 529 U.S. at 397-98 (state court acts unreasonably when it fails to consider all record facts legally relevant to the federal question).

Notably, the Nebraska Supreme Court hinged its finding, in part, on the fact that the alleged conflict concerned "a drug distribution ring of which Galindo was not a member." Doc. 30-4 pp. 19-20. This erroneously skewed the appropriate inquiry, which customarily ought to focus on the adversarial process. The import of this conflict did not hinge on whether *Galindo* was a member of the drug ring; rather, it mattered because the *prosecutor* was allegedly a member, and defense counsel's paralegal was dating another member of that drug ring. The Nebraska Supreme Court's focus on Galindo directed the inquiry in the wrong direction.

It was unreasonable for the state court to decline factual development of this claim. The Supreme Court has noted there are special dangers in multiple representations within a drug conspiracy. While "permitting a single attorney to represent codefendants . . . is not *per se* violative of constitutional guarantees of effective assistance of counsel," *Holloway v. Arkansas*, 435 U.S. 475, 482 (1978), a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant intervention, *see id.* at 484; *see also Cuyler v. Sullivan*, 446 U.S. 335 (1980). This principle is amplified when, as here, (1) a corrupt trial prosecutor *is a part of* the drug conspiracy, and (2) is presenting other individuals from the drug conspiracy as witnesses, while (3) another member of the conspiracy is in a romantic relationship with an acting

198

member of the defense team, (4) who admittedly provided privileged information to her paramour about the investigation into the drug conspiracy.

Respondent incorrectly argues the claim is procedurally defaulted. Doc. 46 p. 116. The Nebraska Supreme Court clearly commenced its consideration of the claim by citing the Sixth Amendment (Doc. 30-4 p. 16) and then examined the factual basis for the claim (*id.* pp. 17-18), concluding (unreasonably) that there was no "justification" for a hearing on this issue, even if the paralegal "behaved in a way we cannot condone" *(id.* p. 18). The court further concluded Galindo's claim would not render the judgment void or voidable. *Id.* p. 19. This is a merits determination. At minimum, it is not a clear and express statement of a state procedural bar. *See Harris*, 489 U.S. at 263.

For the sake of argument, however, the procedural default doctrine is not satisfied here because a state court's procedural default finding requires both an adequate and *independent* basis for the state procedural default. *Wainwright*, 433 U.S. at 81; *Harris*, 489 U.S. at 262. There is no independent ground for a state court decision when the decision fairly appears to rest primarily on federal law (here, the Sixth Amendment), or to be interwoven with federal law. *Byrd v. Delo*, 942 F.2d 1226, 1231 (8th Cir. 1991).

It is difficult to discern whether the Nebraska Supreme Court conducted a performance or prejudice analysis. To the extent it is one or the other, the remaining *Strickland* prong is *de novo. See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo.*"); *Rompilla*, 545 U.S. at 390 ("Because

199

the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). Regardless, whether the court's consideration is best interpreted as performance or prejudice analysis, it was an unreasonable application of *Strickland* and the facts pursuant to 28 U.S.C. § 2254(d)(1) and (2).

Just as the other claims related to the corruption demonstrate, something seriously and genuinely corrupt was happening. As noted in Habeas Claim 4, additional factual development is needed.

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim. *See* Doc. 30-43 pp. 62, 96. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, Galindo reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. As to this allegation, Galindo specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel was burdened by a conflict of interest." *Id.* pp. 15, 81. He also generally requested an evidentiary hearing. *Id.* p. 106.

The problematic nature of the state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the

200

findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. *Liljestrand,* 842 N.W.2d 575. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

The Nebraska Supreme Court's ruling was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order imposition of a life sentence. Alternatively, this Court should commence discovery and/or order a hearing to assess the performance and the prejudice prongs *de novo*.

201

**Claim 15:   Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by trial counsel's failure to obtain consideration prior to offering assistance that incriminated Mr. Galindo and was utilized to obtain multiple death sentences.**

Trial counsel should have advised Galindo to maintain his privilege against self-incrimination regarding the Lundell death. Instead, trial counsel deficiently advised Galindo and permitted him to help law-enforcement locate the body without receiving any form of consideration for the assistance. Rather than appropriately advise his client in defense of his interests, trial counsel naively and unreasonably thought something good would come from helping law enforcement without securing any assurances of this from the prosecutor. This was blatant ignorance, which violates the Sixth Amendment right to effective counsel. *See Hinton*, 571 U.S. at 274–75. Galindo's efforts to assist the State not only did not help his case, but they were turned against him as a basis to argue lack of remorse—utilized by the prosecutor to present him as self-serving and calculating. *See* Doc. 46 p. 94 n.27 (citing Doc. 30-4 pp. 40-41). Respondent correctly notes this claim is properly before the Court on the merits. Doc. 46 pp. 87, 96.

The trial court relied three times upon the Lundell death when making findings regarding whether a sentence of death would be imposed. First, the panel relied upon the jury's finding the aggravator that Galindo had a "substantial prior history of serious assaultive or terrorizing criminal activity," a finding based solely upon the Lundell allegation. Doc. 30-36 p. 114. Second, as to whether Galindo established the mitigator of "no significant history of prior criminal activity," the

202

panel noted, "the jury found during the aggravation hearing that the defendant participated in the murder of Travis Lundell." *Id.* p. 115. Finally, the panel relied upon the same finding when rejecting the mitigation of whether Galindo acted under the domination of Jose Sandoval. Doc. 30-36 pp. 115-16.

Respondent does not contest the factual allegations and instead skips to the conclusion, as did the Nebraska Supreme Court, that there simply can be no prejudice. Doc. 46 pp. 94-96 (citing Doc. 30-4 pp. 49-51). But *Strickland*, 466 U.S. 668, represents a two-prong test; thus, this Court should conduct the performance prong *de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla*, 545 U.S. at 390 ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). This Court reviews the performance prong *de novo* after discovery and hearing from trial counsel.

Respondent distilled the Nebraska Supreme Court's ruling that the three remaining aggravating factors were enough because only one was needed. Doc. 46 p. 95 (citing Doc. 30-4 p. 49). Galindo does not dispute that this is what unreasonably occurred, but it was an improper numbers game as opposed to an analysis of their relative weight. This simple math equation is contrary to Nebraska law, which prohibits such a perversion of the weighing process. *See Joubert*, 399 N.W.2d at 252 ("The balancing of aggravating circumstances against mitigating circumstances is

203

not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors.").

It was premature of the Nebraska Supreme Court to engage in a prejudice analysis without an evidentiary hearing. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry by ignoring the principle that making this determination requires consideration of the "totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695. The "totality of the evidence" includes consideration of both the evidence adduced at trial and the evidence adduced in the post-conviction proceeding in reweighing against the evidence supporting a death sentence. *Williams*, 529 U.S. at 397-98. The court must then assess whether those deficiencies "alter[ed] the entire evidentiary picture" for the jury. *Strickland*, 466 U.S. at 695-96.

A different result means a "reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 538; *see also Williams*, 529 U.S. at 398; *Buck*, 580 U.S. at 119; *Andrus*, 590 U.S. at 823. The Eighth Circuit has consistently applied the one-juror standard. *Nelson v. United States*, 909 F.3d 964, 980-981 (8th Cir. 2018); *Purkey v. United States*, 729 F.3d 860, 868 (8th Cir. 2013). The Nebraska Supreme Court unreasonably failed to assess the impact of this ineffectiveness at the aggravation phase, instead focusing solely on the sentencing. It also failed to apply the correct standard under Nebraska's framework—one juror at the aggravation phase, or one judge at the sentencing phase.

204

Additionally, in making the prejudice component outcome determinative, the Nebraska Supreme Court failed to apply the correct test. A reasonable probability under *Strickland* does not mean Galindo had to show that "[c]ounsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. **This standard is less than a preponderance standard**. *Id.* at 694 (unreliability or unfairness demonstrated "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"); *Williams*, 529 U.S. at 406 (noting the preponderance standard is higher than the *Strickland* standard); *see also Skaggs v. Parker*, 235 F.3d 261, 271 (6th Cir. 2000) ("[A] petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different"). In *Paulson v. Newton Corr. Facility*, 703 F.3d 416, 420-21 (8th Cir. 2013), the court remanded for a determination by the district court if the state court acted contrary to *Williams* by requiring a preponderance standard.

Here, the Nebraska Supreme Court acted unreasonably. It is unreasonable under § 2254 (d)(2) for a court to incorrectly modify governing precedent. *Williams*, 529 U.S. at 391 (rejecting an outcome-determinative consideration of prejudice and holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart* modified or in some way supplanted the rule set down in *Strickland*")

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and

205

requested discovery and a hearing. Galindo listed his proposed exhibits. Doc. 30-43 p. 21 n. 9-12. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, Galindo reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel was ineffective for allowing Galindo to waive his privilege against self-incrimination." *Id.* pp. 15, 79. He also generally requested an evidentiary hearing. *Id.* p. 106.

The impropriety of the state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-294, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. See *Liljestrand,* 842 N.W.2d 575. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

Trial counsel acted in a deficient manner. Counsel failed to advise Galindo of the risks of assisting the State without any consideration and how it would lead to negative evidence. *See United States v. Cook*, 771 F.2d 378 (1985) (Finding counsel ineffective when they present negative evidence regarding the client). Furthermore, trial counsel was deficient in failing to fully investigate the possibility of securing benefits from the prosecutor in exchange for cooperation in the Lundell matter. *See Hinton*, 571 U.S. at 274-75. Because of trial counsel's deficient performance, evidence of Galindo's cooperation in the Lundell matter became a sword, satisfaction of Nebraska's *corpus delicti* requirements, and a shield for the state, preventing the consideration of mitigation.

In short, through trial counsel's deficiency, Galindo became a tool for the State against himself. The prejudice was immediate. Not long after Galindo helped law-enforcement locate the body, the State filed a Supplemental Notice regarding aggravation on November 6, 2003. Prior to that, Lundell was not a significant driver in the case. As noted above, the prejudicial impact was devastating – supporting statutory aggravation and utilized to rebut statutory and non-statutory mitigation. Galindo's counsel should not have put him in the position to harm himself in this way.

207

Trial counsel's failure to protect Galindo's rights against self-incrimination deprived Galindo of his constitutional right to the effective assistance of counsel. Trial counsel's inaction constituted deficient performance that prejudiced Galindo. *See Strickland*, 466 U.S. 668. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and vacate the death sentences with directions for a new aggravation and sentencing phase. Alternatively, this Court should commence discovery and/or a hearing to assess the performance and prejudice prongs *de novo*.

**Claim 16: Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's failure to investigate, develop a defense theory, and subject the State's aggravation case as to the death of Travis Lundell to meaningful adversarial testing.**

The trial prosecutor was subject to an ongoing ***federal*** criminal investigation. Federal investigators also had jurisdiction over the aftermath of the bank robbery and killings—a federal crime. It is improper to minimize this conflict when considering any of the prosecutorial misconduct claims or ineffective assistance of counsel claims. Respondent correctly notes almost the entirety of this claim is properly before the Court on the merits. Doc. 46 pp. 87-88, 96. Galindo hereby withdraws the allegation related to Michael Bauer.

Respondent does not contest the factual allegations and instead skips to the conclusion, as did the Nebraska Supreme Court, that there simply can be no prejudice. Doc. 46 pp. 94-96 (citing Doc. 30-4 pp. 49-51). But *Strickland* represents a two-prong test; thus, this Court should consider the performance prong of *Brady de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla*, 545 U.S. at 390 ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). Therefore, this Court reviews the performance prong *de novo*.

209

Respondent failed to explicitly contest the extent of trial counsel's ineffectiveness. "Cross-examination of a witness is a matter of right." *Alford v. United States*, 282 U.S. 687, 691 (1931) (citing *The Ottawa*, 70 U.S. 268 (1865)). The Sixth Amendment requires a court to allow a defendant to expose the jury to facts from which it could draw adverse inferences relating to that witness's reliability. *Delaware v. Fensterer*, 474 U.S. 15, 19 (1985) (citing *Davis v. Alaska*, 415 U.S. 308, 315 (1974)). Indeed, the Supreme Court has recognized that cross-examination is the "'greatest legal engine ever invented for the discovery of truth.'" *California* v. *Green*, 399 U.S. 149, 158 (1970), quoting 5 J. Wigmore, Evidence § 1367, p. 29 (3d ed. 1940). Galindo's trial counsel did not turn on the engine, and not turning on the engine was the result of an utter lack of preparation.

Under *Strickland*, strategic decisions made after a less-than-complete investigation are reasonable only to the extent that professional judgment supports the decision to limit the investigation. *Wiggins*, 539 U.S. 510. Because Galindo's counsel's failure to conduct an effective cross-examination stems from a complete failure to investigate or prepare, their performance falls outside the wide range of professional acceptability. *Kimmelman v. Morrison*, 477 U.S. 365 (1986).

Galindo's trial counsel failed to cross-examine and challenge the testimony of the following key State witnesses:

- Daniel Animas[28] – regarding how he may have learned the details of Lundell's death and how he signed two statements saying Galindo

---

[28] Galindo is simply summarizing the different witnesses. The full explanation with citations is in the Amended Petition. Doc. 39 pp. 295-303. Also, the State attempted to protect many of these witnesses by suppressing exculpatory impeachment evidence. *See* Habeas Claim 6.

210

denied involvement; statements which could have been corroborated by Leonard Newcomb but for trial counsel's failure to properly serve him with a subpoena.

- Hector Abendano – regarding his connections to the Padilla drug ring, and the corrupt prosecutor, that he was a proven snitch, and that he received inducements for testifying.
- Miguel Lopez – regarding the source of his knowledge, how it was based on the manipulation of jail assignments, not from Galindo.
- Cortney Barritt – regarding the lies she fed the State and the consideration she received for her cooperation, contrary to her testimony, and the reason she was not treated as the accessory to the crimes it appeared she was.
- Kristie Petzold – that she was on probation for child abuse at the time she made her claims, and that she shared a son with Sandoval's half-brother.
- Trista Wiest – regarding her statements related to the use of her car at the time of Lundell's disappearance and murder.

Trial counsel did not serve their bedrock function of subjecting the State's witnesses to meaningful cross-examination.

The Eighth Circuit heeds the Supreme Court's guidance that, "'[a]bsent competent counsel, ready and able to subject the prosecution's case to the 'crucible of meaningful adversarial testing,' there can be no guarantee that the adversarial system will function properly to produce just and reliable results.'" *Driscoll v. Delo*, 71 F.3d 701, 706 (8th Cir. 1995) (quoting *Lockhart*, 506 U.S. at 377 (Stevens, J., dissenting)). In that vein, "[t]he Eighth Circuit has found constitutionally deficient performance of trial counsel based on ineffective cross-examination where counsel allowed inadmissible devastating evidence before the jury or when counsel failed to cross-examine a witness who made grossly inconsistent prior statements." *Whitfield v. Bowersox*, 324 F.3d 1009, 1017 (8th Cir. 2003), *vacated in part on other grounds*

211

*by*, 343 F.3d 950, 950 (8th Cir. 2003) (citing *Hadley v. Groose*, 97 F.3d 1131, 1135-36 (8th Cir. 1996); *Driscoll*, 71 F.3d at 709; *see also United States v. Orr*, 636 F.3d 944 (8th Cir. 2011).

Respondent distilled the Nebraska Supreme Court's ruling that excising the affected aggravating circumstances, the three remaining aggravating factors were enough because only one would be needed. Doc. 46 p. 95 (citing Doc. 30-4 p. 49).[29] Galindo does not dispute that this is what unreasonably occurred; an improper numbers game as opposed to an assessment of their relative weight. This simple math equation is contrary to Nebraska law, which prohibits such a perversion of the weighing process. *See Joubert*, 399 N.W.2d at 252 ("The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors.").

It was premature of the Nebraska Supreme Court to engage in a prejudice analysis without an evidentiary hearing. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry without hearing from trial counsel, which would include probing into how the cross-examination may impact the entirety of the State's case and not just the Lundell aggravator.

The lack of a hearing also restricted the assessment of the *Strickland* test. Without an evidentiary hearing, there could not be an assessment of the totality of

---

[29] Contrary to Respondent's contention (*see* Doc. 46 p. 96), nothing in Habeas Rule 2 nor any other Habeas Rule requires a point-by-point rejoinder of a state court opinion under AEDPA.

the circumstances. This is required by the Eighth Circuit. Either prong requires courts to evaluate the claim by looking at the "totality of the circumstances" and the "totality of the evidence." *Lawrence v. Armontrout*, 31 F.3d 662, 666 (8th Cir. 1994); *Otey v. Grammer*, 859 F.2d 575, 577 (8th Cir. 1988).

Setting that aside, in making the prejudice component outcome determinative the Nebraska Supreme Court failed to apply the correct test. The test announced in *Strickland* is not outcome determinative. Directly on point to the issue presented here, the Supreme Court has found it unreasonable under § 2254(d)(2) for a court to incorrectly morph *Strickland* into an outcome determinative test. *Williams*, 529 U.S. at 391 (rejecting an outcome-determinative consideration of prejudice and holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart* modified or in some way supplanted the rule set down in *Strickland*").

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim, requested discovery and a hearing, and listed his proposed exhibits. Doc. 30-43 pp. 9-12 n.15-16, pp. 24-46 n.51-100. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo

213

specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel provided ineffective assistance during trial of the Lundell allegation." *Id.* pp. 87-97. He specifically argued the court erred in denying a hearing on the issues of counsel's failure to meaningfully cross-examine Abendano, Lopez, Barritt, Petzold, and Wiest, and counsel's failure to subject the Lundell aggravation evidence as a whole to meaningful adversarial testing. *Id.* He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. *See Liljestrand*, 842 N.W.2d 575. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. § 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

The Nebraska Supreme Court's treatment of this claim was an unreasonable

214

application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and/or sentencing phase.

**Claim 17:  Defense counsel was ineffective for failing to investigate and raise the issues of Mr. Galindo's youth and remorse at sentencing and on direct appeal, in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments.**

Galindo raises two claims here. The first relates to appellate counsel not fairly presenting on appeal the sentencing court's refusal to consider evidence of Galindo's youth and immaturity. The second relates to trial counsel arguing remorse as a mitigator but not presenting any evidence in support of it. Respondent correctly notes this claim is properly before the Court on the merits. Doc. 46 pp. 87-88, 97.[30]

The Supreme Court has previously made clear that although the sentencer "may determine the weight to be given relevant mitigating evidence . . . they may not give it no weight by excluding such evidence from their consideration." *Eddings*, 455 U.S. at 114–15; *see also Lockett*, 438 U.S. at 604 (In striking a statute that precluded the consideration of a category of mitigation, the Court noted: "[We] conclude that the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.") (emphasis in original). Nebraska's utter failure to follow the law regarding youth and immaturity is also discussed in Habeas Claim 10.

---

[30] Contrary to Respondent's contention (*see* Doc. 46 p. 96), nothing in Habeas Rule 2 nor any other Habeas Rule requires a point-by-point rejoinder of a state court opinion under AEDPA.

216

The Nebraska Supreme Court made two unassailable findings that the
sentencing panel refused to consider youth and immaturity:

- "The sentencing panel did not find Galindo's age, cognitive function, or
  cognitive development to be mitigating circumstances **in any way**."
  Doc. 30-4 p. 32;

- "[T]he panel declined to consider his chronological age as a statutory
  mitigating circumstance." *Id.* p. 33.

These findings are supported by the record. The sentencing panel explicitly refused
to consider Galindo's age as a mitigating circumstance, specifically finding the
statutory mitigating circumstance under Neb. Rev. Stat. § 29-2523(2)(d) applicable
only "to a person of advanced years, where senility may be involved," and
considering only one non-statutory mitigator which did not include youth. Doc. 30-
36 pp. 117-119.

Respondent's only argument regarding the failure of appellate counsel to
raise a dead bang winning appellate issue is a factual assertion: that the sentencing
panel "considered" evidence but did not "find" the evidence supported mitigation.
Doc. 46 p. 102. This simply is not true. It stands in contravention to the Nebraska
Supreme Court's finding that the "the panel declined ***to consider*** his chronological
age as a statutory mitigating circumstance." Doc. 30-4 p. 33 (emphasis added).[31]
Respondent argues against a specific Nebraska Supreme Court factual finding,

---

[31] The Nebraska Supreme Court's conclusion that this was proper because the
sentencing panel could have considered youth as a non-statutory mitigating factor
(Doc. 30-4 p. 35) is belied by the sentencing order, which makes clear that the panel
only considered cooperation with law enforcement as a non-statutory mitigator and
explicitly found "the existence of no other non-statutory mitigating circumstances."
Doc. 30-36 pp. 118-119.

"declined to consider," clearly supported by the record. Additionally, the Nebraska Supreme Court made an additional finding that the sentencing court did not find youth to be mitigating "in any way." *Id.* p. 32.

As noted above, the Nebraska Supreme Court improperly denied this claim on the basis that Nebraska law barred it. However, the Supreme Court was conscientiously enforcing youth as mitigation in the early 2000s when Galindo was sentenced. *See e.g. Johnson*, 509 U.S. 350; *Tennard*, 542 U.S. 274. Thus, if the Nebraska Supreme Court had affirmed on direct appeal, certiorari would have been granted and the decision vacated to pull Nebraska in line with every other jurisdiction. Appellate counsel were therefore ineffective in failing to raise a dead-bang winner. See *Banks v. Reynolds*, 54 F.3d 1508, 1515 (10th Cir. 1995) (failure to raise "dead-bang winner" claim on appeal constitutes ineffective assistance of appellate counsel even though counsel may have raised other strong but ultimately unsuccessful claims); *Clemons v. Delo*, 124 F. 3d 944 (8th Cir. 1997) (same).

The state court denied the ineffectiveness claim without a hearing, even though the Nebraska Supreme Court held as a matter of law that there was no constitutional violation where the sentencing panel expressly refused to consider Galindo's youth either as a statutory or non-statutory mitigating factor. This erroneous and outlier legal determination rejected 50 years of Supreme Court precedent.

A theory of the mitigation phase was to present remorse. While arguing that Galindo had "real remorse" for his conduct, Doc. 31-11 p. 73, trial counsel failed to present any evidence whatsoever of his statements and expressions of remorse to

218

multiple individuals. There is no conceivable strategic reason for failing to present testimony that supports a stated theory of mitigation.

Respondent does not contest the factual allegations and instead skips to the conclusion, as did the Nebraska Supreme Court, that there simply can be no prejudice. Doc. 46 pp. 94-95, 96-97, 102-03. *Strickland*, 466 U.S. 668, represents a two-prong test; thus, this Court should conduct the performance prong *de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla*, 545 U.S. at 390 ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). This Court reviews the performance prong *de novo* only after discovery and hearing from trial counsel.

Given defense counsel's reference to remorse in his opening statement, counsel's failure to present this evidence was not based on any reasoned strategy but is an inexcusable oversight stemming from counsel's inexperience and inadequate trial preparations. *Cf. Strickland*, 466 U.S. at 681 (in determining whether particular strategic choices are reasonable, courts look at factors such as the experience of the attorney and the potential for prejudice from taking an unpursued line of defense); *Wiggins*, 539 U.S. at 526–27 (a "halfhearted," "shotgun" approach cannot be considered strategic).

Trial counsel in death penalty cases "have a duty to make reasonable investigations." *Wiggins*, 539 U.S. at 523. "It is the duty of the lawyer to conduct a

prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla*, 545 U.S. at 387. It is also counsel's responsibility to conduct a thorough investigation to identify "opportunities to rebut the case in aggravation." *Andrus*, 590 U.S. 806, 814 (2020).

Respondent's sole argument is a distillation of the Nebraska Supreme Court's ruling that the aggravation will always outweigh the mitigation. Doc. 46 p. 95 (citing Doc. 30-4 p. 49). This is unreasonable. There is no automatic death penalty, and the weighing of aggravators and mitigators is not a mere numbers game. The Supreme Court prohibits such. People who have committed serious crimes with significant aggravating circumstances have had their death sentences reversed by the Court for their counsel's failure to pursue mitigation theories:

> *Williams*, 529 U.S. at 367-68 – Mr. Harris Stone was bludgeoned with a mallet over a few dollars, and there were serious assaults of elderly women, leaving one in a vegetative state, as well as a series of arsons.

> *Wiggins,* 539 U.S. at 514 – Ms. Florence Lacs, a seventy-seven-year-old woman, was drowned in her own tub in her ransacked apartment.

> *Rompilla*, 545 U.S. at 377 – James Scanlon was stabbed repeatedly, and his body was set on fire.

> *Sears v. Upton*, 561 U.S. at 963-64 – Ms. Gloria Ann Wilbur was kidnapped, raped, and tortured.

> *Porter*, 558 U.S. at 32 – Ms. Evelyn Williams and Mr. Walter Burrows were shot in a domestic dispute.

> *Hinton*, 571 U.S. at 264 – Two murders of after-hour restaurant managers occurred, and a third attempted murder.

> *Andrus*, 590 U.S. at 808 – Mr. Avelino Diaz and Mr. KimPhuong Vu Bui were murdered during an attempted car-jacking.

220

Terry Nichols, responsible for 168 deaths in the Oklahoma City Bombing, received less than death.

It was premature of the Nebraska Supreme Court to engage in a prejudice analysis without an evidentiary hearing. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry without hearing from trial counsel and considering the evidence in open court. This is particularly important given that the post-conviction judge was not the same judge who had presided over the trial and sentencing proceedings. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry without hearing from trial counsel, which would include inquiry into how evidence of Galindo's remorse would impact the entirety of the State's case.

Setting that aside, in making the prejudice component outcome determinative the Nebraska Supreme Court failed to apply the correct test. The test in *Strickland* is not outcome determinative. Directly on point to the issue presented here, the Supreme Court has found it unreasonable under § 2254(d)(2) for a court to incorrectly morph *Strickland* into an outcome determinative test. *Williams*, 529 U.S. at 391 (rejecting an outcome-determinative consideration of prejudice and holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart* [] modified or in some way supplanted the rule set down in *Strickland*").

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and requested discovery and a hearing. Galindo listed his proposed exhibits. *See* Doc. 30-43 pp. 102-106 n.128, 130, 133, 134, 136, 138-144, 145. Galindo specifically

requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo specifically noted: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel provided ineffective assistance regarding the issue of Galindo's youth during the sentencing mitigation hearing and on appeal." *Id.* pp. 98, 100. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties." In *Jefferson*, 560 U.S. at 293-294, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. *Liljestrand, 842 N.W.2d 575.* Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop

222

facts in the state court rests with the trial court's verbatim acceptance of the

Attorney General's proposed findings without any evidentiary process.

The Nebraska Supreme Court's treatment of this claim was an unreasonable

application of clearly established Supreme Court law and/or an unreasonable

application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant

the writ and order a new sentencing phase. Alternatively, this Court should

commence discovery and/or a hearing to assess the performance and the prejudice

prongs *de novo*.

**Claim 18:  Defense counsel's arguments constructively conceding Mr. Galindo's guilt as to felony murder and as to two aggravators violated Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments.**

Respondent contends the claim is procedurally defaulted. Doc. 46 p. 128. Galindo can demonstrate cause and prejudice for the default.

At both the guilt and aggravation phases, defense counsel's closing arguments amounted to concessions of guilt, contrary to Galindo's defense objective. The Sixth Amendment guarantees Galindo the right to choose the objective of his defense and present a claim of innocence, even when defense counsel may believe confessing guilt offers the best chance of avoiding a death sentence. Here, counsel's complete failure to contest felony murder at the guilt phase, and his concession of two of the charged aggravators in the aggravation phase, deprived Galindo of his Sixth Amendment right to autonomy. *McCoy v. Louisiana*, 584 U.S. 414, 422 (2018).

In his closing argument at the guilt phase, defense counsel argued only that the murders at the bank were not premeditated and made no argument whatsoever to contest Galindo's guilt as to felony murder, despite the fact that both premeditated murder and felony murder constitute first degree murder in Nebraska and both carry a potential death sentence. Doc. 31-8 pp. 81-82.

In his aggravation phase argument, defense counsel conceded Galindo's guilt of the aggravators alleging that, "at the time of the murder, another murder had been committed," and that Galindo "knowingly created a great risk of death to at least several people." Doc. 31-10 pp. 70-71. Counsel repeatedly stated, "Mr. Galindo is responsible for what he did in that bank." *Id.* As to the multiple-murders

224

aggravator, counsel told the jury, "We know what he did, you know what he did, and I'm not going to say anything more." *Id.* p. 70.

Trial counsel's total failure to contest felony murder at the guilt phase and his insistence, in the aggravation argument, that "Mr. Galindo is responsible for what he did in that bank," and his statement that the jury "know[s] what he did," violated Galindo's Sixth Amendment right to "[a]utonomy to decide that the objective of the defense is to assert innocence." *McCoy*, 584 U.S. at 422. The Court has recognized that a defendant may "insist on maintaining her innocence" at trial, and that counsel may not admit a client's guilt over the client's objective to maintain his innocence. *Id.*

Respondent wrongly suggests Galindo cannot meet the standard set forth in *McCoy*. Doc. 46 pp. 128-29. At trial, Galindo's clear defense objective was to assert his innocence. To begin with, Galindo pleaded not guilty. Though trial counsel's failure to pursue a guilty plea to avoid the death penalty constituted ineffective assistance of counsel, *see* Habeas Claim 13, the failure itself is evidence that the defense objective before trial was trained on asserting Galindo's innocence. Regardless, Galindo's openness to a plea deal has no bearing on his right to autonomy to determine the objective of his defense at trial, after the window for a plea agreement was slammed shut. *See McCoy*, 584 U.S. at 419 n.2 ("Encouraging a guilty plea pretrial, of course, is not equivalent to imparting to a defendant counsel's strategic determination to concede guilt should trial occur."). The objective of innocence was clear through the end of the trial, when trial counsel argued for an acquittal as to the charged offenses. Doc. 31-8 pp. 81-82.

225

Against this background, it is unreasonable to conclude that Galindo's defense objective was anything other than asserting innocence. Where, as here, innocence was asserted on one theory of guilt, it is evident that the trial strategy was innocence, not to concede guilt on an alternative theory. Where innocence is the defense objective, defense counsel's constructive concession of guilt by completely failing to contest a theory of guilt is as damaging as an explicit admission of guilt by counsel. The same outcome, as happened here, results: the jury is overwhelmingly likely to believe defense counsel.

This type of error is "structural," meaning that it is not subject to *Strickland*'s prejudice analysis or harmless error review. *McCoy*, 584 U.S. at 427. Structural error "affect[s] the framework within which the trial proceeds," *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991), and protects a defendant's fundamental rights. Trial counsel's violation of Galindo's right to autonomy under the Sixth Amendment, by conceding his guilt as to felony murder and two of the charged aggravators, deprived Galindo of due process and the right to a fair trial. Galindo is therefore entitled to a new trial as to guilt and as to the aggravators.

Galindo can show cause and prejudice for the procedural default of the claim. *Martinez*, 566 U.S. 1, held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id*. at 17. This is because "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims."

226

*Id.* at 11; *see also Franklin v. Hawley*, 879 F.3d 307, 312 (8th Cir. 2018) ("The primary concern . . . is the prisoner's potential inability . . . to present the merits of his ineffective assistance claim to some court with the authority to decide the matter." (quoting *Martinez*)). Furthermore, the Court reasoned, "a prisoner likely needs an effective attorney" to adequately present an ineffective-assistance-at-trial claim. *See Martinez*, 566 U.S. at 12. An attorney is necessary because ineffective assistance claims "often require investigative work and an understanding of trial strategy" and "a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim." *Id.* at 11-12. The Court was concerned that those "unlearned in the law [] . . . may misapprehend the substantive details of federal constitutional law" or will be "in no position to develop the evidentiary basis for a claim . . . which often turns on evidence outside the trial record." *Id.* at 12. Finally, *Martinez's* exception is justified because "the right to counsel is the foundation for our adversary system" within which "[d]efense counsel tests the prosecution's case . . . while *protecting the rights of the person charged*." *Id.* (emphasis added).

Galindo's *McCoy* claim is covered by the logic of *Martinez*. Galindo's state post-conviction proceedings were his first opportunity to present claims against his trial counsel because he was represented by the same counsel at trial and on direct appeal. *State v. Henderson*, 920 N.W.2d 246, 255 (Neb. 2018) ("When, as here, a defendant was represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a

motion for postconviction relief."). To prevent Galindo from being able to show cause for the procedural default of his *McCoy* claim is to foreclose the claim being heard by any court, contrary to the "primary concern" of *Martinez*. *See Martinez*, 566 U.S. at 11; *Franklin*, 879 F.3d at 312.

*McCoy* claims are like ineffective-assistance-at-trial claims in needing an attorney's assistance to prepare. An attorney's training is required to understand the "substantive details of federal constitutional law," *Martinez*, 566 U.S. at 12, such as the difference between trial strategy and core defense objectives. Additionally, Galindo could not benefit from prior court records or attorney work product because his first opportunity to raise his *McCoy* claim was in post-conviction proceedings. Furthermore, Galindo will likely need to develop evidence beyond what is in the existing record to support his *McCoy* claim, but he cannot adequately do so, especially while incarcerated, without the assistance of counsel. *See U.S. v. Hashimi*, 110 F.4th 621, 630-31, 630 n.4 (4th Cir. 2024) (finding an evidentiary hearing necessary on a *McCoy* claim for "further factual development" because of a "murky" record and rejecting the need for "outbursts" from a client against his attorney). Finally, if the Court is right that defense counsel's "bedrock" role in our adversarial system is equally the testing of the prosecution's case and the protection of rights, *see Martinez*, 566 U.S. at 12, then *McCoy* claims, which vindicate core Sixth Amendment rights, are equally a part of *Martinez's* logic just as the core Sixth Amendment right to effective counsel is.

Alternatively, Galindo's *McCoy* claim can be understood as a breed of ineffective-assistance-of-trial-counsel claims. If effective counsel's role in the

228

adversarial system is to test the prosecution's case and protect their client's rights, *see id.*, then it logically follows that violating a client's rights is a form of ineffectiveness. Thus, concession of guilt without strategic purpose and against a client's wishes, as happened to Galindo, can be characterized as a kind of ineffectiveness. What *McCoy* then makes clear, on the heels of *Nixon*, is the constitutional gravity of this category of ineffectiveness by excepting *McCoy* claims from the typical *Strickland* analysis. *See McCoy*, 584 U.S. at 426.

To show cause for procedural default by virtue of state post-conviction counsel ineffectiveness, a petitioner must demonstrate

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the initial review proceeding with respect to the ineffective-assistance-of-trial-counsel claim.

*Marcyniuk*, 39 F.4th at 996 (citation omitted) (cleaned up). Galindo easily meets the third *Martinez* requirement because his post-conviction proceedings were his first opportunity to raise claims pertaining to his trial counsel.

Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. *See Barnett v. Roper*, 904 F.3d 623, 631 (8th Cir. 2018) (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness." *Id.* (citation omitted). In *Barnett*, post-conviction counsel admitted that the post-conviction motion "was not properly drafted" because of easily avoidable inadequacies. The court found this sufficient to find deficient performance. Here, post-conviction counsel completely failed to identify and raise a substantial constitutional claim in

229

Galindo's post-conviction motion. If drafting inadequacies are sufficient to show deficiency, then surely post-conviction counsel here was deficient in failing to bring Galindo's substantial *McCoy* claim.

Because *McCoy* claims are "structural," prejudice need not be shown to grant relief. *McCoy,* 548 U.S. at 428. Thus, the second prong of ineffectiveness, prejudice, can be assumed satisfied within the *Martinez* analysis. Additionally, if the court requires Galindo to make a showing of prejudice as to post-conviction counsel's failure to raise the *McCoy* claim, then the *McCoy* claim is subjected to a harsher standard than it otherwise would have been had it been properly raised by post-conviction counsel. In causing a substantial change to the standard by which the *McCoy* claim is adjudicated, post-conviction counsel's deficient performance clearly harmed the likelihood that Galindo will prevail on an otherwise meritorious claim, a concern which pierces the heart of *Martinez.*

Alternatively, post-conviction counsel's failure to raise Galindo's *McCoy* claim was prejudicial. Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *See Barnett*, 904 F.3d at 631. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Titus v. Jeffries*, No. 8:23CV36, 2025 WL 384709, at *5 (D. Neb. Feb. 4, 2025) (citation omitted) (cleaned up). For the reasons stated above, there is good reason to believe Galindo's *McCoy* claim has a reasonable factual basis. And, because *McCoy* claims are normally excepted from prejudice analysis and harmless error review, it is reasonable to conclude that a *McCoy* claim with a reasonable factual basis presents a reasonable probability of a

230

different procedural outcome had it been presented in the amended post-conviction motion. At the very least where, as here, the parties contest the merits of the *McCoy* claim and the record is in dispute, the state court could have reasonably ordered an evidentiary hearing to develop the record, like the court did in *Hashimi.* Thus, Galindo can show prejudice because there was a reasonable probability that the amended post-conviction motion would have produced a different outcome, either by outright prevailing on the claim or by producing an evidentiary hearing, had post-conviction counsel raised the *McCoy* claim. With prejudice satisfied, Galindo has thus proven the second requirement of *Martinez.*

Finally, "[a] substantial claim [the third *Martinez* requirement] is one with some merit" meaning the underlying claim "must at least be debatable among jurists of reason." *See Marcyniuk*, 39 F.4th at 996. If the Court decides the underlying claim should be adjudicated using the typical *McCoy* standard, then for the reasons given above, there is good reason to believe Galindo suffered a *McCoy* violation of his Sixth Amendment right to autonomy in selecting his defense objective. Thus, the claim is reasonably debatable, and the third *Martinez* requirement is satisfied.

Alternatively, if the Court decides that the underlying claim should be adjudicated using *Strickland's* ineffectiveness analysis, then Galindo must show that "it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Id.* Galindo's trial counsel was deficient because violating a client's Sixth Amendment right to autonomy in selecting their defense objective falls below any

231

reasonable standard of representation. Trial counsel's concessions of guilt at the guilt and aggravation stages were overwhelmingly prejudicial because "the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt." *See McCoy*, 584 U.S. at 428. With deficiency and prejudice shown, Galindo has satisfied the third *Martinez* requirement.

Contrary to Respondent's suggestion (*see* Doc. 46 p. 128), Galindo's *McCoy* claim is not *Teague* barred because Galindo is not seeking retroactive application of *McCoy*. In *Martinez* analysis, "timing matters." *See Hartman v. Payne*, 8 F.4th 733, 736 (8th Cir. 2021) (citations omitted). Here, Galindo's *McCoy* claim became procedurally defaulted at the state post-conviction stage. Galindo's amended motion for state post-conviction relief was not filed until May 8, 2019. *McCoy* was decided on May 14, 2018, a full year before Galindo's amended post-conviction motion was filed. Thus, *McCoy* was fully available as a remedy when Galindo's *McCoy* claim was defaulted, and Galindo's *McCoy* claim is not *Teague* barred.

For the foregoing reasons, the Court should find that, under *Martinez*, Galindo has shown cause for the procedural default of his *McCoy* claim and that the claim is not *Teague* barred. As to the merits, the Court should grant the writ, vacate the convictions and death sentences, and remand for a new sentencing proceeding.

232

**Claim 19:   Counsel failed to effectively investigate and present Mr. Galindo's substance use and addiction as a mitigating factor at sentencing, depriving Mr. Galindo of the right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.**

One of the statutory mitigating circumstances trial counsel sought to prove was that, at the time of the crime, Galindo lacked the capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law as a result of intoxication. Respondent spends four pages detailing what trial counsel presented to prove this mitigating factor. Doc. 46 pp. 103-06. But none of the evidence counsel presented actually satisfied the elements of the mitigating factor. And Stalcup, the defense expert, was easily discredited because counsel failed to adequately investigate and provide him with the full picture of the evidence, including the testimony from law enforcement officers that Galindo did not seem impaired after the offense.

Although this was one of only three statutory mitigating circumstances trial counsel sought to prove, by failing to adequately investigate, present witnesses who could address the elements of the mitigating factor, or prepare the expert witness, it was no surprise the sentencing panel found the mitigating circumstance had not been proven. That counsel presented *some* evidence—as Respondent's and the Nebraska Supreme Court's recounting of the facts attempts to emphasize—did not obviate the need to conduct an *adequate* investigation and prove the existence of the mitigator. *Andrus*, 590 U.S. at 815 ("Although counsel nominally put on a case in mitigation in that counsel in fact called witnesses to the stand after the prosecution

233

rested, the record leaves no doubt that counsel's investigation to support that case was an empty exercise."); *see also Sears*, 561 U.S. at 954.

The sentencing panel found Stalcup's testimony was not supported by the evidence because Galindo's actions were "deliberate" and he participated in planning and in the attempted getaway after the robbery; in addition, the law enforcement officers who interacted with him after the robbery testified that Galindo did not seem impaired. Doc. 30-36 p. 118. Thus, Galindo had failed to prove "an inability to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." *Id.*

Respondent correctly notes the Nebraska Supreme Court decided this claim on the merits. Doc. 46 p. 108. The Nebraska Supreme Court held counsel did not perform deficiently because Stalcup said the reports by law enforcement that Galindo did not appear to be under the influence of drugs would not have changed his opinion and could still be consistent with methamphetamine. Doc. 30-4 pp. 29-30. The court also concluded Solis's testimony about the effects of methamphetamine were not inconsistent with Stalcup's testimony because Stalcup testified about a possible range of symptoms. *Id.* at p. 30. The panel "simply did not accept Stalcup's explanation of Galindo's behavior." *Id.* at p. 29. It did not believe him in light of the other evidence presented.

This is no surprise. Stalcup's testimony was uninformed, due to counsel's failure to investigate and provide necessary information; it was not consistent with the reports of law enforcement officers or the defense witnesses. Stalcup's statement that the additional evidence was not inconsistent with his opinion about Galindo's

methamphetamine usage was not persuasive when his testimony was given without the full picture. It would have been far more persuasive—and, most essentially, relevant to the mitigating factor at issue—had his opinion been rendered with the benefit of the information in the law enforcement reports and testimony by witnesses who had actually been around Galindo using meth in the hours leading up to the bank robbery, and not days or weeks before.

Indeed, the sentencing panel did not dispute the idea that Galindo was addicted to methamphetamine. It disputed the idea that his drug use affected his capacity to understand the wrongfulness of his actions or conform his conduct to the law. All Stalcup could testify about, based on the evidence from the defense witnesses, was that Galindo was a regular methamphetamine user. But that was not the mitigating factor counsel was trying to prove. He was attempting to prove that Galindo's intoxication affected his intent at the time of the crime, and yet none of the information he provided to Stalcup or presented to the panel addressed Galindo's meth use in the hours leading up to the crime.

The witnesses trial counsel called, and on whom Stalcup relied, could not speak to the essential elements of the mitigating factor. Had counsel conducted a reasonable investigation, he would have been able to provide the expert with relevant information from witnesses who were with Galindo closer in time to the offense. Counsel would have been able to provide his expert with adequate information—both helpful and potentially harmful—to permit him to formulate a considered and far more credible professional opinion. Specifically, Stalcup would have been positioned to render an opinion that effectively *accounted* for the

235

information from law enforcement officers rather than merely responding to it by contending it did not change the conclusion he had already reached.

The Nebraska Supreme Court's holding that this did not amount to deficient performance was unreasonable and contrary to clearly established federal law. Respondent attempts to distinguish Galindo's cited cases, but the facts of counsel's failures need not be identical for precedent to be clearly established law for purposes of § 2254(d)(1). *Andrew*, 604 U.S. at 94-95. Respondent overstates the distinctions between Galindo's cited cases and his own. Doc. 46 p. 111.

Galindo's attorneys conducted only a bare-bones investigation into any aspects of his life; indeed, a retained participant in that investigation described their work as "the blind leading the blind." Doc. 4-3 p. 2. The intoxication mitigating factor was one of the primary focuses of that minimal investigation, and yet counsel still did not undertake an adequate investigation to present any evidence tied to the elements of the mitigating circumstance. Counsel's deficient performance here is not meaningfully distinguishable from the cases in which the Supreme Court has delineated counsel's responsibility to adequately investigate and present mitigating evidence. *Williams*, 529 U.S. at 396 (duty to conduct a thorough investigation of the defendant's background"); *Andrus*, 590 U.S. at 814 (same); *Porter*, 558 U.S. at 32 (same); *Sears*, 561 U.S. at 953–54; *Wiggins,* 539 U.S. at 524–25; *Rompilla*, 545 U.S. at 377.

Respondent contends that Galindo does not name who counsel should have investigated, and that none of the people counsel should have investigated would have changed the panel's finding as to the mitigator or, ultimately, the death

236

sentence, highlighting the panel's statement that Galindo's actions were "deliberate." Doc. 46 pp. 110-12.

First, Galindo was deprived of any evidentiary process in state court; the Nebraska Supreme Court's decision as to this issue was premature without an evidentiary hearing. Post-conviction counsel should have been afforded the opportunity to present the witnesses trial counsel should have investigated and called.[32]

Second, Respondent's suggested prejudice test is improperly outcome-determinative, and because the Nebraska Supreme Court did not reach prejudice, this Court's assessment is *de novo*. *Wiggins*, 539 U.S. at 534 (reviewing prejudice de novo because the state courts never reached the issue of prejudice); *Nooner v. Norris*, 402 F.3d 801, 810 (8th Cir. 2005) ("Because the Arkansas Supreme Court never reached the prejudice issue, we review that issue de novo."). An evidentiary hearing is warranted.[33]

Further, Respondent is setting the prejudice bar higher than what the law requires. Galindo did not have to show that "[c]ounsel's deficient conduct more likely than not altered the outcome of the case." *Strickland*, 466 U.S. at 693. Rather, a reasonable probability that the result of the proceeding would be different "is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. This is

---

[32] If Galindo is permitted an evidentiary hearing, he intends to present testimony from Michael Petzold and Tara Kvidera regarding methamphetamine usage immediately preceding the crime; and Arturo Salinas, who interacted with Galindo the night before the crime.

[33] Galindo presented this claim in state court and therefore § 2254(e)(2) does not apply.

237

less than a preponderance of the evidence standard—the proceeding can be unfair "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.* at 694; *Williams*, 529 U.S. at 406 (noting the preponderance standard is higher than the *Strickland* standard); *see also Skaggs*, 235 F.3d at 271 ("[A] petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different.").

Moreover, an adequate investigation into Galindo's drug use at the time of the offense and how it impacted his ability to appreciate the wrongfulness of his actions—the elements of the mitigating circumstance—would put Galindo's actions into context and cast significant doubt on the assumption that his actions were inconsistent with the mitigating factor. And even if, with an adequate investigation and presentation of Galindo's drug use, the sentencing panel would not conclude he met the elements of the statutory mitigating factor, it is a fiction that the only way evidence of intoxication would be relevant is if it establishes the statutory mitigating circumstance. Evidence of Galindo's intoxication at the time of the offense, if adequately investigated and presented, could have provided a basis to find a non-statutory mitigating factor.

Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*. Galindo pursued this claim and requested discovery and a hearing. Doc. 30-43 pp. 93, 104-05. Galindo specifically requested discovery and an evidentiary hearing at the end of his Amended Petition.

238

*Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo specifically raised the claim: "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel provided ineffective assistance regarding the issue of drug use during the sentencing mitigation hearing." *Id.* pp. 102-03. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. *Liljestrand,* 842 N.W.2d 575. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process.

Trial counsel's failure to adequately investigate and present evidence of Galindo's intoxication to support the mitigating circumstance that he lacked the capacity to appreciate the wrongfulness of his actions constituted deficient performance that prejudiced Galindo under *Strickland*. The Nebraska Supreme Court's treatment of this claim was contrary to or an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and vacate the death sentence with directions for a new aggravation and sentencing phase.

**Claim 20:** **The prosecutor knowingly presented the false testimony of Donnie Thorson, Norfolk Police Division Investigator, as rebuttal in Mr. Galindo's sentencing hearing, in violation of his constitutional rights to due process and to a reliable sentencing determination guaranteed by the Eighth and Fourteenth Amendments.**

Respondent fails to contest or dispute that the testimony elicited by the corrupt trial prosecutor was false. Deliberate deception of the factfinder through presentation of evidence known to be false is "incompatible with rudimentary demands of justice." *Giglio v. United States*, 405 U.S. 150, 153 (1972) (quoting *Mooney v. Holohan,* 294 U.S. 103, 112 (1935)). "A conviction established through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue,* 360 U.S. at 269 (citing *Mooney*, 294 U.S. at 112; *Pyle v. Kansas*, 317 U.S. 213 (1942)).

The police reports/PSI records show that Thorson interviewed Lantz **six times**, and his story changed every time. But at no time during any of those six interviews did Lantz claim or even imply that Galindo was the man who threatened him over the phone, cornered him in a store, or engaged in any threat or intimidation whatsoever. Doc. 25-3 pp. 46-65. Lantz never connected Galindo with any of the threats or intimidation he claimed to have suffered. *Id.* pp. 58-59. In fact, he told police he did not recognize Galindo when Galindo came to the store. *Id.* pp. 56-57. According to Lantz, the extent of Galindo's participation in the theft was his presence at the furniture store when David de la Cruz—Jose Sandoval and Gabriel Rodriguez's older brother—took the furniture. *Id.* pp. 61-63.

241

Respondent is correct that the unsealed portions of the PSI are verbatim of Habeas Exhibit QQ, although they appear to be generated from a different computer program. Doc. 46 p. 129. However, this does not change the nature of the state's presentation of false evidence – or that it was brazenly and knowingly made, given that the State filed the reports that demonstrated the falsity of the testimony. Thus, there is no question that Galindo can prove the knowing element required by *Napue*.

The prosecutor had a duty to correct Thorson. *Napue,* 360 U.S. at 269; *see also Glossip*, 604 U.S. at 246. Whether the State solicited Thorson to present the fabricated story or just capitalized on his lies is immaterial, as *Napue* does not require the State's solicitation, just its complicity in failing to correct false testimony.

However, Respondent's recognition that the police reports were filed does demonstrate two other points. First, the fact that it was in the PSI means there is absolutely no excuse for defense counsel, if they had been effective, to correct the false testimony immediately. The lack of action, given their knowledge of the information in the reports, demonstrates their ineffectiveness because either they did not really read the PSI or they failed to recall what was in the PSI. Second, it demonstrates the sentencing panel was unaware of the false nature of the testimony—because if they had known they would have corrected it themselves.

Respondent wrongly relies on *Long v. Pfister*, 874 F.3d 544 (7th Cir. 2017) (*en banc*). Doc. 46 p. 129. *Long* did not dispute the underlying principle that the state is prohibited from presenting false evidence and has an obligation to correct. *Long*

simply found in that case that under AEDPA the state court's harmlessness analysis sufficed.

Here, there is prejudice. The prosecutor's elicitation of false testimony by Thorson and failure to correct that false testimony was highly prejudicial. The false testimony presented the sentencing panel with a distorted picture of Galindo as dangerous and threatening that was entirely untrue, as the police reports and records showed. Thorson's misleading portrayal of the Deets incident also inaccurately shored up the prosecutor's attempts to make Galindo out to be a leader, when the records reflected that his participation in the Deets theft was minimal and that Sandoval's brother was the real perpetrator. Because the false testimony "could . . . in any reasonable likelihood have affect[ed] the judgment" of the sentencer, a new sentencing proceeding is proper. *Giglio*, 405 U.S. at 154 (internal quotations omitted) (quoting *Napue*, 360 U.S. at 271); *see also Glossip*, 604 U.S. at 246.

Respondent correctly notes that this claim was not raised on direct appeal. Doc. 46 p. 129. Galindo can demonstrate cause and prejudice for the default.

First, as noted above and in Habeas Claim 26, trial counsel was ineffective for failing to object to the prosecutor's presentation of false evidence and failing to subject that presentation to meaningful adversarial testing in the form of cross-examination—particularly given that trial counsel had the police reports demonstrating the falsity of the testimony in his possession. In failing to preserve objections to these instances of misconduct, trial counsel also precluded himself from being able to raise the claims on direct appeal; he could not argue his own

243

ineffectiveness for failing to preserve objections to the misconduct, and the claim was unexhausted for appellate review.

As a result, post-conviction was the first opportunity the claims could have been meaningfully raised, yet post-conviction counsel did not raise them. While *Martinez* does not explicitly apply to *Napue* claims, the reasoning underlying *Martinez*—that there is an equitable basis to excuse procedural default when post-conviction is the first meaningful opportunity to raise a claim and post-conviction counsel, due to ineffectiveness, fails to raise the claim. *See Strickler*, 527 U.S. at 282 (addressing cause and prejudice for procedurally defaulted *Brady* claim). Because of trial counsel's ineffectiveness, post-conviction proceedings offered the first meaningful opportunity to raise this claim.

This is especially noteworthy given the constitutional importance of a *Napue* violation such as this. It is long established that prosecutors are "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). In *Martinez*, the Court expressed the concern that when an attorney fails to raise a claim in initial-review collateral proceedings and that attorney's error does not establish cause to excuse the default, "no court will review the prisoner's claim[]." 566 U.S. at 10. While *Martinez* dealt specifically with ineffective assistance of trial counsel claims, the same logic is true as to this *Napue* violation, and the same concerning

244

result would apply if no court were able to review this constitutional violation. Such a result would be a miscarriage of justice.

Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. See *Barnett*, 904 F.3d at 631 (citation omitted). Representation is deficient when it falls "below an objective standard of reasonableness," *id.* (citation omitted), such as when "ignored issues are clearly stronger than those presented," *see Smith v. Robbins*, 528 U.S. 259, 288 (2000). Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Titus*, 2025 WL 384709, at *5 (citation omitted).

Post-conviction counsel focused most of his investigation and motion on the prosecutor's corruption and conflict of interest. Given that focus, there could have been no strategic reason to ignore the fact that the prosecutor introduced and failed to correct false testimony about the Deets furniture theft and Galindo's alleged role, and the fact that trial counsel utterly failed to subject the falsehoods to adversarial testing despite having the police records underlying the testimony. Presenting that information in post-conviction could have only strengthened counsel's presentation of the prosecutor's widespread misconduct and corruption. It would also have provided evidence of the prejudice to Galindo wrought by the prosecutor's misdeeds, given that this testimony was used to rebut the mitigation presentation. To prevent Galindo from being able to show cause for the procedural default of his *Napue* claim is to foreclose the claim being heard by any court, contrary to the "primary concern"

245

of *Martinez*, and prejudicing him given the reliance on false testimony to counter the mitigating evidence presented. *See Martinez*, 566 U.S. at 11.

Like an ineffective assistance of counsel claim, a *Napue* claim of this nature requires an attorney's assistance to prepare. Galindo did not have access to the police reports nor did he have any knowledge of the falsity of Thorson's testimony regarding Adam Lantz, and he could not have obtained that information without the assistance of counsel. Because of trial counsel's ineffectiveness in failing to object or cross-examine the witness, and because of post-conviction counsel's failure to raise the claim, the prosecutor's unchecked presentation of false testimony will continue to go unchecked. This Court should thus consider this claim with the equitable considerations set forth in *Martinez* and find that Galindo has established cause and prejudice for the default.

Galindo has raised this claim in state court and thus § 2254(e)(2) does not preclude this Court from considering it here. After previous post-conviction counsel ceased representing him, Galindo filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing, raising this and other claims prior post-conviction counsel had failed to raise. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. It denied the request for evidentiary processes. The court denied the second or successive motion

246

for post-conviction relief without an evidentiary hearing. Contrary to Respondent's suggestion (Doc. 46 p. 130), Galindo has satisfied 28 U.S.C. § 2254 (e)(2) and controlling Supreme Court and Eighth Circuit precedent, because he has not "failed to develop" the factual basis of these claims in state court. *Williams v. Taylor*, 529 U.S. 420, (2000); *Johnston*, 288 F.3d 1048. Galindo's requests were denied and therefore he is not barred from obtaining a federal evidentiary hearing—he diligently sought it, and any opportunity to present evidence or obtain a hearing in the state court proceedings was denied. *Johnston*, 288 F.3d at 1058. Galindo timely filed a notice of appeal to the Nebraska Supreme Court, and the case has been docketed under Case Number S-26-400. Briefing has not yet been initiated but the Bill of Exceptions and Transcripts, including Galindo's motion and exhibits, have been filed.[34]

Galindo could not have filed his state court motion while prior post-conviction counsel continued to represent him, as it is well-settled that counsel cannot raise claims of ineffective assistance of counsel against himself. *Jaeger*, 970 N.W.2d at 764. Galindo diligently filed his motion in state court after procuring new post-conviction counsel, who needed to get up to speed on the complex procedural history and voluminous record. While the district court denied Galindo's request to reopen the proceedings or grant an evidentiary hearing, the correctness of that denial remains to be litigated in the Nebraska Supreme Court.

---

[34] Galindo will move this Court pursuant to Habeas Rule 5 to expand the record to include the Nebraska Supreme Court filings.

247

This procedure distinguishes Galindo's case from the recent decision in *Torres v. Jeffreys*, 17-cv-03078-RFR-MDN (Doc. 133). There, in discussing *Martinez*, the court noted that "none of the potential evidence cited to support the [claim] was part of the state-court record, and because Torres did not seek to develop it in this federal case, . . . this Court cannot consider that potential evidence when determining if the [claim] is substantial." *Id.* p. 35. Unlike in *Torres*, Galindo has presented the identical evidence filed with this Court and it has been accepted as part of the Nebraska Supreme Court record.

For the foregoing reasons, the Court should find that, under *Martinez*, Galindo has shown cause for the procedural default of this claim. As to the merits, the Court should grant the writ, vacate the convictions and death sentences, and remand for a new sentencing proceeding.

**Claim 21:  Counsel was ineffective for introducing inaccurate and damaging evidence about Mr. Galindo's alleged gang membership and for failing to object to the State's introduction of such evidence, in violation of Mr. Galindo's rights to the effective assistance of counsel and a fair trial and sentencing under the Sixth, Eighth, and Fourteenth Amendments.**

Throughout its answer memorandum, Respondent is dismissive of the racial overtones of this trial. It took place in a community inundated with media reflecting that bias (*see* Habeas Claim 1), before a jury culled of minorities until it was all white (Habeas Claim 3) and before a trial court that provided an implied "us against them" statement at the beginning of voir dire. Habeas Claim 2. Now, Respondent justifies the State's reliance on racial stereotypes to rebut evidence of Galindo being a follower. Doc. 46 p. 132. This cannot be.

Galindo noted the procedural problems in his Amended Petition and does not dispute that there is a potential procedural default, as Respondent suggests. Doc. 46 pp. 130-133. Galindo can demonstrate cause and prejudice for the default.

The State and defense counsel knew that there was no actual Latin Kings gang in Madison County and there was no real evidence suggesting the bank robbery was gang-related in any way. *See Napue*; *Glossip*. Rather, law enforcement and the trial prosecutor treated Hispanic friend groups as gangs. Young Hispanic men should not be subjected to such racial stereotyping and profiling. In addition to being untrue, it is an untruth ensconced in racial bias due to an immutable characteristic of Galindo. The State's use of false, irrelevant, and unsupported gang evidence was improper, imbued the sentencing proceeding with racist tropes, and deprived Galindo of a fair sentencing proceeding. *Dawson*, 503 U.S. 159; *Donnelly*,

416 U.S. at 643; *Miller v. Pate*, 386 U.S. 1 (1967); *Berger*, 295 U.S. at 88; *Johnson*, 486 U.S. at 590. Counsel's failure to challenge the State's use of Galindo's alleged gang affiliation and his affirmative use of gang-related information deprived Galindo of the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. *Strickland*, 466 U.S. 668; *Cronic*, 466 U.S. at 657; *see also Baer*, 879 F.3d at 782–88. The improper gang-related information, which was not even true, falsely conveyed to the sentencing panel that Galindo was dangerous and violent, inevitably affecting the panel's decision regarding mitigating circumstances and the balance of aggravation and mitigation.

An objection under *Dawson* is meritorious if the prosecution introduces evidence of a defendant's abstract beliefs or group associations because the jury sentencer finds those beliefs morally reprehensible, without linking the association to any issue in the case. 503 U.S. at 166. For instance, in *Dawson*, admitting a narrow stipulation that the defendant was a member of the Aryan Brotherhood was constitutional error because the victim and the defendant were both white (meaning racial animus was not involved), and the state failed to prove the gang committed or endorsed any unlawful or violent acts, leaving the evidence totally irrelevant to future dangerousness or any other aggravating circumstance. *Id.*

The same can be said here. Setting aside that the gang evidence simply was not true, even if it was accurate, the fact that Galindo is a follower had nothing to do with gang membership. There was no nexus to the facts at issue.

In *Martinez*, 566 U.S. 1, the Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at

trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id*. at 17. This is because "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." *Id*. at 11; *see also Franklin*, 879 F.3d at 312 ("The primary concern . . . is the prisoner's potential inability . . . to present the merits of his ineffective assistance claim to some court with the authority to decide the matter." (quoting *Martinez*)). Furthermore, the Court reasoned, "a prisoner likely needs an effective attorney" to adequately present an ineffective-assistance-at-trial claim. *See Martinez*, 566 U.S. at 12. An attorney is necessary because ineffective assistance claims "often require investigative work and an understanding of trial strategy" and "a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim." *Id*. at 11-12.

The Court was concerned that those "unlearned in the law[] . . . may misapprehend the substantive details of federal constitutional law" or will be "in no position to develop the evidentiary basis for a claim . . . which often turns on evidence outside the trial record." *Id*. at 12. Finally, *Martinez's* exception is justified because "the right to counsel is the foundation for our adversary system" within which "[d]efense counsel tests the prosecution's case . . . while *protecting the rights of the person charged*." *Id*. (emphasis added).

*Martinez* provides that when a substantial claim of ineffective assistance of trial counsel should have been raised in state post-conviction proceedings and was

251

not raised, cause to overcome a procedural default can be established by showing post-conviction counsel's failure was ineffective under *Strickland*. *Martinez*, 566 U.S. at 11. To show a claim is substantial, the petitioner must show "that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 997 (citing *Strickland*, 466 U.S. at 697).

Galindo's claim as to his trial counsel's failure to adequately investigate and uncover the falsity of the Latin King evidence and to challenge the prosecutor's improper use of it is substantial. Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. *See Barnett*, 904 F.3d at 631 (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness." *Id.* (citation omitted). In *Barnett*, post-conviction counsel admitted that the postconviction motion "was not properly drafted" because of easily avoidable inadequacies. The court found this sufficient to find deficient performance. Here, post-conviction counsel completely failed to investigate, identify and raise a substantial constitutional claim in Galindo's post-conviction motion. If drafting inadequacies are sufficient to show deficiency, then surely post-conviction counsel was deficient in failing to bring Galindo's substantial ineffectiveness claim related to *Dawson*.

Available witnesses overwhelmingly support that Galindo was part of a group of kids, not a branch of the Latin Kings. The group had no actual affiliation to the real Latin Kings and did not engage in gang-related activity:

252

But none of it was real; he was making the whole thing up in his head. What Sandoval called the "Latin Kings" was nothing more than stupid child's play.

Doc. 5-6 pp. 9-10.

Since we never had any actual gangs or issues with gang activity in Madison in the past, we didn't know what it really looked like. The administration saw Jose as the ringleader of gang activity. . . .

We had two students who moved to Madison from California. One of them had a father who was in prison in California and had experience with real gangs. He would sit in my office and complain to me that Jose was a "wannabe" gang leader and his "gang" wasn't really a gang . . .

Jorge was never accused of gang-related activity or any kind of violence that I know of.

Doc. 4-8 pp. 3–4.

I heard the guys in the group talk about the Latin Kings, but I never took it seriously and I still don't. They called themselves that because they wanted to feel part of a group. Madison County at that time was very white and segregated, and it was hard to be a young Latino man there. Locals and the police judged Latino people harshly and said they were taking white peoples' jobs. I even got jeers and stares from strangers for hanging out with them.

Doc. 5-2 p. 3.

I think Jorge got in with the wrong crowd. He was a follower and wanted to be like the other kids who pretended to be gangsters. Even though the school had rules about gang-related clothing or hairstyles, I never witnessed any real gang activity.

Doc. 5-8 p. 1.

This evidence is substantial; and derives from disinterested third-party witnesses.

Respondent suggests this evidence cannot be considered. However, it has

been presented to the Nebraska courts and currently sits as part of the record in an

appeal to the Nebraska Supreme Court. Galindo continued to be represented by Mr.

253

Sipple, post-conviction counsel, through the petition for writ of certiorari in the Supreme Court. After counsel's representation ended, Galindo, through new post-conviction counsel, filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing. Neb. Rev. Stat. § 25-2001.

Alternatively, Galindo asked the state court to construe his motion as a successive motion for post-conviction relief and grant an evidentiary hearing. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004. Galindo also asked the court to exercise its inherent equitable authority to reopen the proceedings. In support of his motion, Galindo moved to introduce into evidence the aforementioned affidavits that have been submitted in these federal habeas proceedings.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. It denied the request for evidentiary processes. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Contrary to Respondent's suggestion (Doc. 46 p. 130), Galindo has satisfied 28 U.S.C. § 2254 (e)(2) and controlling Supreme Court and Eighth Circuit precedent, because he has not "failed to develop" the factual basis of these claims in state court. *Williams v. Taylor*, 529 U.S. 420; *Johnston*, 288 F.3d 1048. Galindo's requests were denied and therefore he is not barred from obtaining a federal evidentiary hearing—he diligently sought it,

254

and any opportunity to present evidence or obtain a hearing in the state court proceedings was denied. *Johnston*, 288 F.3d at 1058.

Galindo timely filed a notice of appeal to the Nebraska Supreme Court, and the case has been docketed under Case Number S-26-400. Briefing has not yet been initiated but the Bill of Exceptions and Transcripts, including Galindo's motion and exhibits, have been filed.[35]

Galindo could not have filed his state court motion while prior post-conviction counsel continued to represent him, as it is well-settled that counsel cannot raise claims of ineffective assistance of counsel against himself. *Jaeger*, 970 N.W.2d at 764. Galindo diligently filed his motion in state court after procuring new post-conviction counsel, who needed to get up to speed on the complex procedural history and voluminous record. While the district court denied Galindo's request to reopen the proceedings or grant an evidentiary hearing, the correctness of that denial remains to be litigated in the Nebraska Supreme Court.

This procedure distinguishes Galindo's case from the recent decision in *Torres v. Jeffreys*, 17-cv-03078-RFR-MDN (Doc. 133). There, in discussing *Martinez*, the court noted that "none of the potential evidence cited to support the [claim] was part of the state-court record, and because Torres did not seek to develop it in this federal case, . . . this Court cannot consider that potential evidence when determining if the [claim] is substantial." *Id.* p. 35. Unlike in *Torres*, Galindo

---

[35] Galindo will move this Court pursuant to Habeas Rule 5 to expand the record to include the Nebraska Supreme Court filings.

presented the identical evidence filed with this Court and it has been accepted as part of the Nebraska Supreme Court record.

Galindo's *Napue* claim should also be considered covered by the logic of *Martinez. See Strickler*, 527 U.S. at 282 (addressing cause and prejudice for procedurally defaulted *Brady* claim). Galindo's state post-conviction proceedings were his first opportunity to present claims against his trial counsel because he was represented by the same counsel at trial and on direct appeal. *Cf. State v. Henderson*, 920 N.W.2d at 255 ("When, as here, a defendant was represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief."). To prevent Galindo from being able to show cause for the procedural default of his misconduct claim is to foreclose the claim being heard by any court, contrary to the "primary concern" of *Martinez. See Martinez*, 566 U.S. at 11; *Franklin*, 879 F.3d at 312.

*Napue* claims are like ineffective-assistance-at-trial claims in needing an attorney's assistance to prepare. An attorney's training is required to understand the "substantive details of federal constitutional law," *Martinez*, 566 U.S. at 12, such as the difference between trial strategy and core defense objectives. Additionally, Galindo could not benefit from prior court records or attorney work product because his first opportunity to raise his *Napue* claim was in post-conviction proceedings. Furthermore, Galindo will likely need to develop evidence beyond what is in the existing record to support his *Napue* claim, but he cannot adequately do so, especially while incarcerated, without the assistance of counsel.

256

*See Glossip*, 604 U.S. at 269-75 (describing extensive factual development necessitated by a *Napue* claim that was only raised in a fifth state successive action).

Finally, if the Supreme Court is right that a prosecutor's "bedrock" role in our adversarial system is equal to the protection of rights, *see Martinez*, 566 U.S. at 12, then *Napue* claims, which vindicate core Sixth Amendment rights, are equally a part of *Martinez's* logic just as the core Sixth Amendment right to effective counsel is. Pursuant to the United States Supreme Court, the bedrock function of a trial prosecutor is to ensure that "justice shall be done" and operate as "servant of the law;" it is not to win at any cost. *Berger*, 295 U.S. at 88; *United States v. Agurs*, 427 U.S. 97 (1976).

As noted above, this represents a substantial claim and under the framework of *Martinez*, this Court should not be barred from considering it. Galindo respectfully requests this Court permit discovery and hold an evidentiary hearing on his trial counsel's ineffectiveness and the prosecutor's knowing use of racialized gang evidence despite there being no nexus to the offense, in violation of Galindo's Sixth, Eighth, and Fourteenth Amendments.

For the foregoing reasons, the Court should find that, under *Martinez*, Galindo has shown cause for the procedural default of this claim. As to the merits, the Court should grant the writ, vacate the convictions and death sentences, and remand for a new sentencing proceeding.

257

**Claim 22:    The State's false accusation that Mr. Galindo smuggled a weapon into the courtroom, and counsel's failure to move for a mistrial, deprived Mr. Galindo of his rights to a fair sentencing proceeding and the effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments.**

The facts underlying this claim are stunning. The prosecutor falsely accused Galindo of having a blade with him in the courtroom. Doc. 31-13 pp. 156-59; Doc. 5-13 p. 9. Court officers restrained Galindo on the counsel table and searched Galindo in open court. Doc. 5-13 p. 9. The officers "pushed [counsel] away" to pounce on Galindo. *Id.* No weapon was found. *Id.* This incident "falsely left the three-judge panel with the impression that Mr. Galindo was a threat even inside the courtroom." *Id.*

Counsel explained that he was concerned because "here we had officers basically make him spread eagle in front of the judges," who were "my finders of fact." Doc. 31-13 pp. 157–58. Co-counsel confirmed that at least one of the judges on the panel  watched Galindo be handcuffed. *Id.* p. 158. Counsel understood at the time how damaging and prejudicial this was to Galindo, emphasizing, "[T]his is my panel, this is the only one." *Id.* Trial counsel should also have moved for a mistrial.

Respondent asserts that there is no basis for misconduct here. Doc. 46 p. 133 n.35. This unreasonably ignores the record. The transcript reflects that the corrupt trial prosecutor brought the supposed issue to the court's attention in the "morning," shortly before lunch. Doc. 31-13 p. 156. Trial counsel noted it would have been easy to wait a minute to allow the judges to leave. *Id.* The misconduct presents itself by the timing—Galindo had been in the courtroom all morning and there was no suggestion of any threat all morning. Even if the prosecutor only learned about

258

the issue shortly before lunch, given that there was no threat throughout the day, why could they not wait just two more minutes given nothing had happened the entire morning in court?[36]

Galindo noted the procedural problems in his Amended Petition and does not dispute that there is a potential procedural default as Respondent suggests. Doc. 46 pp. 133-34. Initially, because Galindo's trial counsel also represented him on his direct appeal, he could not raise claims they did not properly object to and could not raise the misconduct claim on the direct appeal. *Jaeger*, 970 N.W.2d at 764. Therefore, not raising a claim on direct appeal would be an improper basis upon which to rely on a procedural default because the claim could not be raised.

Setting that aside, Galindo can demonstrate cause and prejudice for the default. Nothing could be more prejudicial than being physically attacked in the courtroom, demonstrating for the sentencer that you are a future danger. The false weapon allegation conveyed to the sentencing panel that Galindo was dangerous and violent even in the controlled environment of the courtroom, inevitably affecting the panel's decision regarding mitigating circumstances and the balance of aggravation and mitigation.

It is essential to the administration of criminal justice that dignity, order, and decorum are maintained in the courtroom. *Illinois v. Allen*, 397 U.S. 337 (1970).

---

[36] The timing of when the prosecutor was informed of the issue, and when the jail officials discovered it, is unclear from the transcript. But regardless of the precise timing, there is no indication of any issue throughout the morning's proceedings and no reason the inquiry could not wait until the judges were out of the courtroom before physically pouncing on Galindo.

259

A mistrial request would have been meritorious in the above contrived circumstance.

In *Martinez*, 566 U.S. 1, the Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.* at 17. This is because "if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims." *Id.* at 11; *see also Franklin*, 879 F.3d at 312 ("The primary concern . . . is the prisoner's potential inability . . . to present the merits of his ineffective assistance claim to some court with the authority to decide the matter." (quoting *Martinez*). Furthermore, the Court reasoned, "a prisoner likely needs an effective attorney" to adequately present an ineffective-assistance-at-trial claim. *See Martinez*, 566 U.S. at 12. An attorney is necessary because ineffective assistance claims "often require investigative work and an understanding of trial strategy" and "a prisoner asserting an ineffective-assistance-of-trial-counsel claim in an initial-review collateral proceeding cannot rely on a court opinion or the prior work of an attorney addressing that claim." *Id.* at 11-12.

The Court was concerned that those "unlearned in the law[] . . . may misapprehend the substantive details of federal constitutional law" or will be "in no position to develop the evidentiary basis for a claim . . . which often turns on evidence outside the trial record." *Id.* at 12. Finally, *Martinez's* exception is justified because "the right to counsel is the foundation for our adversary system" within

260

which "[d]efense counsel tests the prosecution's case . . . while *protecting the rights of the person charged." Id.* (emphasis added).

*Martinez* provides that when a substantial claim of ineffective assistance of trial counsel should have been raised in state post-conviction proceedings and was not raised, cause to overcome a procedural default can be established by showing post-conviction counsel's failure was ineffective under *Strickland. Martinez*, 566 U.S. at 11. To show a claim is substantial, the petitioner must show "that it is at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Marcyniuk*, 39 F.4th at 997 (citing *Strickland*, 466 U.S. at 697).

Galindo's claim as to his trial counsel's failure to move for a mistrial is substantial. Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. *See Barnett*, 904 F.3d at 631 (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness." *Id.* (citation omitted). In *Barnett*, post-conviction counsel admitted that the postconviction motion "was not properly drafted" because of easily avoidable inadequacies. The court found this sufficient to find deficient performance. Here, post-conviction counsel completely failed to investigate, identify and raise a substantial constitutional claim in Galindo's post-conviction motion. If drafting inadequacies are sufficient to show deficiency, then surely post-conviction counsel was deficient in failing to bring Galindo's substantial ineffectiveness claim related to the failure to move for a mistrial.

Galindo's current claim is also covered by the logic of *Martinez*. Galindo's state post-conviction proceedings were his first opportunity to present claims against his trial counsel because he was represented by the same counsel at trial and on direct appeal. *See supra* at 5; *cf. Henderson*, 920 N.W.2d at 255 ("When, as here, a defendant was represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief."). To prevent Galindo from being able to show cause for the procedural default of his misconduct claim is to foreclose the claim being heard by any court, contrary to the "primary concern" of *Martinez*. *See Martinez*, 566 U.S. at 11; *Franklin*, 879 F.3d at 312.

The misconduct claim here is like ineffective-assistance-at-trial claims in needing an attorney's assistance to prepare. An attorney's training is required to understand the "substantive details of federal constitutional law," *Martinez*, 566 U.S. at 12. Additionally, Galindo's first opportunity to raise his misconduct claim was in post-conviction proceedings. Furthermore, Galindo will likely need to develop evidence beyond what is in the existing record to support this claim. *See Glossip*, 604 U.S. at 269-75 (describing extensive factual development necessitated by a *Napue* claim that was only raised in a fifth state successive action).

Finally, if the Supreme Court is right that a prosecutor's "bedrock" role in our adversarial system is equal to the protection of rights, *see Martinez*, 566 U.S. at 12, then misconduct claims, which vindicate core Sixth Amendment rights, are equally a part of *Martinez's* logic just as the core Sixth Amendment right to effective counsel is. And it is. Pursuant to the United States Supreme Court, the bedrock function of

a trial prosecutor is to ensure that "justice shall be done" and operate as "servant of the law;" it is not to win at any cost. *Berger*, 295 U.S. 78; *Agurs*, 427 U.S. 97. As noted above, this represents a substantial claim.

For the foregoing reasons, the Court should find that, under *Martinez*, Galindo has shown cause for the procedural default of this claim. As to the merits, the Court should grant the writ, vacate the convictions and death sentences, and remand for a new sentencing proceeding.

**Claim 23: Mr. Galindo's rights to the effective assistance of counsel at trial, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by counsel's failure to investigate jail assignments and the manipulation of snitches by the State.**

Respondent incorrectly asserts this claim is only connected to Habeas Claim 16. Doc. 46 p. 135. The aspects related to Habeas Claim 16 are, as Respondent correctly notes, properly before the Court on the merits. Doc. 46 p. 135. However, Galindo's claims more closely rely on Habeas Claims 6 and 7, which Respondent also agrees are (mostly) properly before this Court on the merits. *Id.* pp. 85 (Habeas Claim 7), 87, 96, 124 (Habeas Claim 6). Galindo withdraws aspects of this claim related to trial counsel's ineffectiveness for failing to move to suppress.

Trial counsel in death penalty cases "have a duty to make reasonable investigations." *Wiggins,* 539 U.S. at 523. "It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." *Rompilla,* 545 U.S. at 387. It is counsel's responsibility to conduct a thorough investigation in order to identify "opportunities to rebut the case in aggravation." *Andrus,* 590 U.S. at 814. The Eighth Circuit has unerringly noted under *Strickland* that "[r]easonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories." *Cagle v. Norris,* 474 F.3d 1090, 1097 (8th Cir. 2007); *Lyons v. Luebbers,* 403 F.3d 585, 594 (8th Cir. 2005); *Foster v. Lockhart,* 9 F.3d 722, 726 (8th Cir. 1993). Failing to interview witnesses relates to preparation and not strategy. *Kenley v. Armontrout,* 937 F.2d 1298, 1304 (8th Cir. 1991). Lack of diligent

264

investigation is not protected by a presumption in favor of counsel and cannot be justified as strategy. *Id.* Trial counsel failed to conduct a sufficient investigation here.

Galindo incorporates his responses to Habeas Claim 6, 7 and 16 here. The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and/or sentencing proceeding.

**Claim 24:  The county attorney's involvement in defense funding decisions violated Mr. Galindo's rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments of the United States Constitution, and it represented a conflict for trial counsel.**

In a capital case, a transcript should never reflect the following statement by a trial counsel: that he "can't afford" to call any experts for rebuttal because he "couldn't afford to have them sit here overnight. They're gone." Doc. 31-13 p. 155.

In a capital case especially, trial counsel's decision making should not be held hostage at the whim of a county attorney—having not been paid for the first year of the representation.[37]

In contrast to the unlimited resources of both federal and state law enforcement, Galindo was limited in what he could gain access to. Alarmingly, the county attorney, who had a self-interest in pursuing the death penalty case, *see* Habeas Claim 4, was included and involved in the funding decisions regarding Galindo's defense.

The county attorney's improper involvement in funding decisions for the defense, including being present when funding requests were made and participating in decision making on defense requests for fees and expenses, unconstitutionally impeded Galindo's representation and defense. The State participated heavily in those discussions and played an improper and significant role in fixing defense fees and expenses, which interfered with the presentation of

---

[37] Defense counsel was not paid any money for his services on behalf of Galindo until December 10, 2003, more than a year after counsel was appointed. *See* Docket Sheet, Case No. CR 02 0000235.

266

the defense. This occurred either actively through influencing the decisions or passively by creating a financial disincentive for requesting funds or doing work.

On October 2, 2003, trial counsel filed a Motion for Appointment and Funding of Mitigation Expert; a Motion, Submitted In Camera, for the Appointment of a Neuropsychologist, Psychiatrist, or Psychologist; Motion for In Camera Consideration of Defense's Request for Approval of Expenses; and a Motion for Leave to Proceed Ex Parte on Application of Funds. Doc. 30-34 pp. 12-30. On October 8, 2003, after a hearing, the trial court granted funding but denied the motion to limit the county attorney's access to defense funding requests. Doc. 30-49 pp. 188-92. As a result, throughout Galindo's trial and appellate proceedings, the county attorney was allowed to observe, participate in, and influence whether fees and expenses sought by Galindo's counsel were approved.[38]

But the county attorney's involvement was even more invasive. While the trial court permitted the filing of redacted invoices,[39] the trial court improperly withheld payment on any redacted bill until it was fully itemized and the county attorney could review it. Doc. 31-11 pp. 4-13. Thus, a financial disincentive occurred if trial counsel were to act ethically and shield their detailed work-product. In short, while everyone else involved in the case received a paycheck, the defense was economically disadvantaged for the entirety of their active representation due to the

---

[38] This should be contrasted with post-conviction proceedings where once the Attorney General entered the case – they wanted no part in reviewing the voucher requests.

[39] Of course, even a redacted bill would provide some indications and information on the defense's legal work and strategy. It also would provide one-sided discovery to oppose the future post-conviction process.

267

county attorney's improper involvement in funding decisions. Furthermore, if trial counsel had challenged this improper process, they would have risked retaliation through the reduction of fees either in Galindo's case or in any other case to which they were appointed, or through exclusion from the court-appointed counsel system altogether. *See U.S. v. Zhadanov*, No. 93-240-3, 1998 WL 633698, at *2 (E.D. Pa. Aug. 11, 1998) (recognizing a lawyer's pecuniary interest creates "potential conflicts" and *Strickland* is the proper course of analysis (collecting cases)).

This system of defense funding, generally and as it applied in Galindo's case, completely subverted the right to counsel and the right to a fundamentally fair trial. Allowing the prosecutor (Galindo's adversary) to control what resources, fees, and expenses the defense will ultimately receive, completely undermines any notion of fairness. This is especially the case because this arrangement grants the prosecutor insight into otherwise privileged components of the defense. Galindo was denied his right to a fair trial, which is meant to be a battle between equals.

Galindo's right to due process of law was further violated by the county attorney's active role in the funding decisions for his defense, in violation of the State's obligation to provide criminal defendants with a disinterested, fair and impartial decision-maker on all issues. *Tumey v. Ohio.* 273 U.S. 510 (1926). The Supreme Court has found "no escape from the conclusion that the prosecutor in a case cannot be "the neutral and detached" decision-maker required by the Constitution. *Coolidge v. New Hampshire,* 403 U.S. 443, 453 (1971).

The county attorney's involvement in defense funding decisions also violated Galindo's due process right to "make an *ex parte* threshold showing to the trial

court" that expenditures and expert services were reasonably necessary to his defense. *Ake v. Oklahoma,* 470 U.S. 68, 77, 82 (1985) ("mere access to the courthouse doors does not by itself assure a proper functioning of the adversary process," and "a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense.").

The right to make an *ex parte* showing under these circumstances was essential to protect Galindo's attorney-client privilege, work-product privilege, and other privileges necessary to obtain the effective assistance of counsel who has access to the basic tools of an adequate defense. As a result of being denied such an opportunity, Galindo was placed in the untenable position of being forced to waive his attorney-client and work product privilege in order to demonstrate and exercise his right to the basic tools of an adequate defense. *Ake*, 470 U.S. at 76 ("[J]ustice cannot be equal where, simply as a result of his poverty, a defendant is denied the opportunity to participate meaningfully in a judicial proceeding in which his liberty is at stake."). The county attorney's role in the funding decisions in Galindo's case unfairly permitted the county attorney access to work-product and privileged material. Significantly, these violations would not have occurred if Galindo were able to afford his own defense, had he not been indigent—in direct contravention of *Ake*, 470 U.S. at 76. The county attorney's intimate involvement in the funding determinations violated Galindo's Sixth and Fourteenth Amendment rights to effective assistance of counsel, to due process, and to a fundamentally fair trial. *See Donnelly*, 416 U.S. 637; *see also Cronic,* 466 U.S. 648.

269

The prosecution's intimate involvement in defense funding also created an inescapable conflict for trial counsel—a financial disincentive to work. And in a case in which significant stones were left unturned, there were large gaps in what counsel did, and where the county attorney had a significant conflict of interest based on undisclosed associations with witnesses, *see* Habeas Claim 4, the adversarial impact of trial counsel's conflict is obvious. "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." *Strickland,* 466 U.S. at 686; *see also Holloway v. Arkansas,* 435 U.S. 475 (1978). "An attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition." *Fisher v. Gibson,* 282 F.3d 1283 (10th Cir. 2002).

These issues are fully cognizable under *Martinez* because the claims flowing from the county attorney's involvement in defense funding are properly presented as and derivative of trial counsel's ineffective assistance. The Eighth Circuit has repeatedly recognized that deficient representation in pursuing *Ake* funding is reviewable as a claim of ineffective assistance under *Strickland. See Nance v. Norris*, 392 F.3d 284, 292-93 (8th Cir. 2004); *Davis v. Norris*, 423 F.3d 868, 878 (8th Cir. 2005). The Supreme Court has agreed. *See Hinton*, 571 U.S. 263.

The wisdom of reviewing *Ake* and similar issues under *Strickland* here becomes apparent within *Strickland's* analytical framework; it clarifies that these

270

issues are fundamentally derivative of the ways in which the funding process in this case rendered trial counsel ineffective. Because Galindo's *Ake*-related claim is properly presented as a *Strickland* ineffective assistance claim, Galindo's first opportunity to present this claim was in his state post-conviction proceeding, not on direct appeal. This is because Galindo was represented by the same counsel at trial and on direct appeal. *Jaeger*, 970 N.W.2d at 764. Therefore, because the subsidiary issues in this claim are properly raised under the framework of an ineffective-assistance-of-trial-counsel claim, and Galindo's first opportunity to raise the claim was on initial collateral review, the claim is properly raised here through the *Martinez* gateway.

Under *Martinez*, to show cause for a procedural default of an ineffective-assistance-of-trial-counsel claim, a petitioner must demonstrate

> (1) the claim of ineffective assistance of trial counsel was a substantial claim; (2) the cause consisted of there being no counsel or only ineffective counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the initial review proceeding with respect to the ineffective-assistance-of-trial-counsel claim.

*Marcyniuk*, 39 F.4th at 996 (citation omitted) (cleaned up). Galindo easily meets the third *Martinez* requirement because his post-conviction proceedings were his first opportunity to raise claims pertaining to his trial counsel. *See Henderson*, 920 N.W.2d at 255 ("When, as here, a defendant was represented both at trial and on direct appeal by the same counsel, the defendant's first opportunity to assert ineffective assistance of counsel is in a motion for postconviction relief.").

Galindo meets the second *Martinez* requirement because the claim became procedurally defaulted due to post-conviction counsel's ineffectiveness. Post-

271

conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. *See Barnett*, 904 F.3d at 631 (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness," *id.* (citation omitted), such as when "ignored issues are clearly stronger than those presented," *Smith*, 528 U.S. at 288. Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Smith*, 528 U.S. at 286. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Titus*, 2025 WL 384709, at *5 (citation omitted). This is less than a preponderance of the evidence. *Strickland*, 466 U.S. at 694.

Galindo's post-conviction counsel was deficient because he failed to recognize the collapse of the adversarial process caused by the county attorney's involvement in defense funding, and this deficiency prevented post-conviction counsel from bringing claims clearly stronger than the claims he actually brought. Fundamentally, post-conviction counsel was deficient in failing to recognize how the county attorney's involvement in defense funding rendered trial counsel's mitigation representation ineffective, as discussed below. Post-conviction counsel's failure to recognize this breakdown had a cascading effect because it prevented him from bringing the strongest available claims. For example, post-conviction counsel recognized that trial counsel was ineffective because he possessed a conflict of interest, *see* Habeas Claim 14, but failed to raise the more significant claims caused by that ineffectiveness. *See, e.g.,* Habeas Claims 5, 8. Similarly, post-conviction counsel recognized that there were deficiencies in trial counsel's mitigation efforts,

*see* Habeas Claims 17, 19, but failed to raise the most substantial mitigation claims caused by those deficiencies. *See* Habeas Claims 5, 8. Moreover, post-conviction counsel raised issues related to the prosecutor's corruption and conflicts of interest and trial counsel's related ineffectiveness, *see* Habeas Claims 4, 6, 7, 23, yet failed to recognize how those issues compounded the problems with the prosecutor's involvement in defense funding decisions.

If post-conviction counsel had recognized the county attorney's involvement in funding decisions as the constitutional violation that it was, post-conviction counsel could have recognized the degree to which trial counsel was rendered totally ineffective in his mitigation representation. Instead, post-conviction counsel's deficiency in failing to recognize these issues left these serious claims hidden, only to be uncovered through adequate mitigation representation performed over two decades later.

Post-conviction counsel's deficiency was prejudicial to Galindo because the claims that counsel failed to raise are so substantial as to undermine confidence in the trial court proceedings. Habeas Claim 5 demonstrates that Galindo is intellectually disabled. Habeas Claim 8 demonstrates that trial counsel's mitigation investigation and presentation failed to identify critical information and witnesses. Evidence of intellectual disability, alone, leads to a reasonable inference that the proceedings would have turned out otherwise because *Atkins* prohibits the execution of people with intellectual disabilities. Add in trial counsel's completely ineffective mitigation efforts and one is forced to conclude that the fact finders in Galindo's case were deprived of information that had a reasonable chance of

273

changing at least one panel member's balancing of aggravating and mitigating factors.

Where, as here, new information that was readily available during the penalty phase comes to light that would have changed this balancing, the only reasonable conclusion is that the proceedings were undermined by the deficiency in information presented to the fact finders. *See Hill v. Lockhart*, 28 F.3d 832, 846-47 (8th Cir. 1994) (Court "unwilling to declare that, if the jury had found at least one mitigating circumstance, it would have found, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating circumstances" and holding, "In short, we find that because Mr. Hill's lawyers failed to present evidence with respect to his history on anti-psychotic drugs . . . the penalty phase of his state court trial was rendered fundamentally unfair"); *Wiggins*, 539 U.S. at 537; *Porter*, 558 U.S. at 42; *Rompilla*, 545 U.S. at 393; *Sears*, 561 U.S. at 954–55; *see also Loyd v. Whitley*, 977 F.2d 149, 160 (5th Cir. 1992) ("The absence of this mitigating evidence undermines our confidence in the outcome of Loyd's penalty phase . . . We now hold that there is enough evidence proving mental disease and defect that the balance of aggravating and mitigating factors in this case must be weighed by a jury in a new sentencing hearing."). Thus, Galindo was prejudiced by post-conviction counsel's failure to raise claims that would have undermined the court's confidence in the penalty phase proceedings. Galindo has therefore satisfied the second *Martinez* requirement.

To satisfy the third *Martinez* requirement, the underlying ineffective-assistance-of-trial-counsel claim must be substantial. "A substantial claim is one

274

with some merit" meaning it "must at least be debatable among jurists of reason." *See Marcyniuk*, 39 F.4th at 996. Under the *Strickland* framework, then, it must be "at least debatable among jurists of reason whether his trial counsel's performance was deficient and whether this deficient performance prejudiced him." *Id.*

Galindo's trial counsel was rendered deficient by the county attorney's involvement in defense funding because (1) trial counsel's mitigation representation was significantly stunted and (2) trial counsel was deprived of his ability to adequately fulfill his role in the adversarial system. Trial counsel's deficiencies were prejudicial because they deprived the fact finders of information that would have reasonably changed the balancing of aggravating and mitigating factors.

The county attorney's involvement in defense funding rendered trial counsel ineffective due to the insufficient funding that resulted from the county attorney's involvement. The incontrovertible fact that trial counsel could not afford to keep the experts he managed to hire at trial to hear the State's evidence in rebuttal demonstrates that funding was inadequate. *See* Doc. 31-13 p. 155 ("couldn't afford to have them sit here overnight. They're gone."). And if trial counsel could not even afford to keep these insufficiently-prepared experts, it begs the question what else he could not afford. *See, e.g.*, Habeas Claim 8.2. At bottom, the funding proceedings reveal a procedure by which trial counsel was forced by the opposing party to be deficient in his mitigation representation.

The deprivation of these cornerstone constitutional rights fundamentally undermines the soundness of the trial court proceedings and there is accordingly clear prejudice as a result. *See Holloway*, 435 U.S. at 490 ("The mere physical

275

presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters" and "the evil—it bears repeating—is in what the advocate finds himself compelled to refrain from doing."); *Ake*, 470 U.S. at 77 (a criminal trial is fundamentally unfair if the State proceeds against an indigent defendant without making certain that he has access to the raw materials integral to the building of an effective defense."). These violations would not have occurred but for the deficient course of representation trial counsel was forced to adopt by virtue of the county attorney's involvement in the defense funding process.

Because trial counsel was rendered deficient by the county attorney's involvement in defense funding and these deficiencies were prejudicial to Galindo, trial counsel was ineffective as a result of the county attorney's involvement in defense funding. Therefore, this claim is substantial, and the third *Martinez* requirement has been satisfied.

Galindo respectfully requests this Court permit discovery and hold an evidentiary hearing on the constitutional violations stemming from the county attorney's involvement in defense funding decisions and on whether Galindo was provided effective counsel as required under the Sixth Amendment.

The funding process violated Galindo's rights to due process and protection against cruel and unusual punishment as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. This claim is fully cognizable under *Martinez* because the claim is properly presented as and derivative of trial counsel's ineffective assistance, and the claim fulfills all the *Martinez* requirements. Therefore, this

Court should grant the writ and vacate the convictions and/or death sentences with

directions for the appropriate proceedings.

**Claim 25:** **Mr. Galindo's rights to the effective assistance of counsel at trial and on appeal, as guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution, were violated by the failure of trial and appellate counsel to preserve and present meritorious constitutional errors.**

Galindo raised four separate allegations related to ineffectiveness in this claim. Respondent correctly notes post-conviction counsel failed to raise Habeas Claim 25, Subsections A, C, and D on appeal after raising them at the district court level. Doc. 46 pp. 88, 138. Galindo hereby withdraws those subsections of the claim; yet the failure of post-conviction counsel to raise claims, and/or the facts relating to the merits of those claims, which counsel mentioned in the procedural history of his brief (*see* Doc. 30-23 pp. 37-38), demonstrate post-conviction counsel's ineffectiveness. As to Subpart B, Respondent correctly notes it is properly before the Court on the merits. Doc. 46 p. 88, 139.

Counsel properly objected at trial to the "heinous, atrocious, cruel" prong of the § 29-2523(1)(d) instruction. Doc. 31-11 pp. 46-49. However, defense counsel provided ineffective assistance by failing to raise his objections to the subsection (1)(d) instruction on direct appeal. If he had, the Nebraska Supreme Court would have held the trial court's subsection (1)(d) instruction was erroneous and ordered a new aggravation trial.

Prior to Galindo's trial, the Nebraska Supreme Court held, in *State v. Rust*, 250 N.W.2d 867 (Neb. 1977) and *State v. Hunt*, 371 N.W.2d 708 (Neb. 1985), that for the (1)(d) aggravator to be present, "the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence." *Hunt*, 371 N.W.2d at 725. Rather, the aggravator only applies to "murders involving

278

torture, sadism, sexual abuse, or the imposition of extreme suffering, or where the murder was preceded by acts 'performed for the satisfaction of inflicting either mental or physical pain or that pain existed for any prolonged period of time.'" *State v. Sandoval*, 788 N.W.2d 172 (Neb. 2010) (citing *Rust*, 250 N.W.2d at 874 and *Hunt*, 371 N.W.2d at 721).

Respondent does not contest the factual allegations and instead skips to the conclusion, as did the Nebraska Supreme Court, that there simply can be no prejudice. Doc. 46 pp. 94-96 (citing Doc. 30-4 pp. 49-51). *Strickland*, 466 U.S. 668 represents a two-prong test; thus, this Court should conduct the performance prong *de novo*. *See Porter*, 558 U.S. at 39 ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo*."); *Rompilla*, 545 U.S. at 390 ("Because the state courts found [trial counsel's] representation adequate [under *Strickland*'s first prong], they never reached the issue of prejudice, . . . and so we examine this element of the *Strickland* claim *de novo*."); *Wiggins*, 539 U.S. at 534 (same). This Court reviews the performance prong *de novo* after discovery and hearing from trial counsel.

As to *Strickland's* first prong, it is unquestionable that counsel's failure to raise the (1)(d) issue on appeal, after objecting to it at trial and considering the well-established Supreme Court precedent in *Maynard* and Nebraska precedent in *Rust* and *Hunt*, constituted deficient performance. As in the *Strickland* assessment of trial counsel, appellate counsel is ineffective if the decision not to raise an issue "falls below an objective standard of reasonableness." *Strickland*, 466 U.S. at 692-93. Failing to raise meritorious issues on direct appeal may be considered deficient

279

performance, even when those errors are unpreserved. *Roe v. Delo*, 160 F.3d 416, 419 (8th Cir. 1998) (appellate attorney performed deficiently by failing to raise unpreserved issue on direct appeal for plain error review because the error "was significant and would have been apparent to a reasonably competent appellate attorney."); *see also Smith*, 528 U.S. at 285 (under performance prong of *Strickland*, must show appellate counsel "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them."); *Evitts v. Lucey*, 469 U.S. 387, 397 (1985) ("the promise . . . that a criminal defendant has a right to counsel on appeal . . . would be a futile gesture unless it comprehended the right to the effective assistance of counsel."). If the failure to raise unpreserved issues can constitute deficient performance, failing to raise preserved meritorious issues is clearly deficient. *See Roe*, 160 F.3d at 419; *see also United States v. Phillips*, 210 F.3d 345, 350 (5th Cir. 2000) (failing to raise meritorious appellate issue was deficient performance); *Milton v. Miller*, 744 F.3d 660, 671 (10th Cir. 2014) ("By failing to discover and raise the issue on direct appeal, Milton's appellate counsel clearly performed deficiently.").

In Galindo's case, trial counsel objected to the "heinous, atrocious, cruel" prong of the (1)(d) instruction, preserving the issue for direct appeal. Doc. 31-11 pp. 46-49. There was longstanding United States Supreme Court and Nebraska Supreme Court precedent on point. *See Rust*, 250 N.W.2d at 874; *Hunt*, 371 N.W.2d at 721; *see also State v. Simants*, 250 N.W.2d 881, 891 (Neb. 1977); *State v. Reeves*, 344 N.W.2d 433, 447 (Neb. 1984); *Proffitt v. Florida*, 428 U.S. 242 (1976); *Maynard*, 486 U.S. at 362–363. There could be no strategic basis not to raise the issue on

280

direct appeal, and counsel's failure to do so constituted deficient performance. *See Roe*, 160 F.3d at 419; *Smith*, 528 U.S. at 285.

Respondent distilled the Nebraska Supreme Court's ruling that the three remaining aggravating factors were enough because only one would be needed. Doc. 46 p. 95 (citing Doc. 30-4 p. 49). Galindo does not dispute that this is what unreasonably occurred; an improper numbers game as opposed to an assessment of their relative weight. This simple math equation is contrary to Nebraska law, which prohibits such a perversion of the weighing process. *See Joubert*, 399 N.W.2d at 252 ("The balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors.").

It was premature of the Nebraska Supreme Court to engage in a prejudice analysis without there having been an evidentiary hearing. The Nebraska Supreme Court unreasonably conducted a prejudice inquiry by ignoring the principle that making a prejudice determination requires consideration of the "totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695. The "totality of the evidence" includes consideration of both that adduced at trial and the evidence which could be adduced at a hearing in the post-conviction proceeding; and only then reweighing the evidence. *Williams*, 529 U.S. at 397-98. The court must then assess whether those deficiencies "alter[ed] the entire evidentiary picture" for the jury. *Strickland*, 466 U.S. at 695-96.

A different result means a "reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 538; *see also Williams*,

281

529 U.S. at 398; *Buck*, 580 U.S. at 120; *Andrus,* 590 U.S. at 822. The Eighth Circuit has consistently applied the one-juror standard. *Nelson*, 909 F.3d at 980-81; *Purkey*, 729 F.3d at 868. In Nebraska, this means one member of the sentencing panel may have come to a different conclusion.

Setting that aside, in making the prejudice component outcome determinative, the Nebraska Supreme Court applied a legally incorrect standard. Galindo need only show a reasonable probability, which is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694. **This standard is less than a preponderance standard**. *Id.* (unreliability or unfairness demonstrated "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome"); *Williams*, 529 U.S. at 406 (noting the preponderance standard is higher than the *Strickland* standard); *see also Skaggs*, 235 F.3d 271 ("[A] petitioner need not prove by a preponderance of the evidence that the result would have been different, but merely that there is a reasonable probability that the result would have been different."). In *Paulson*, 703 F.3d at 420-21, the Eighth Circuit remanded for a determination by the district court as to whether the state court acted contrary to *Williams* by requiring a preponderance standard.

The Nebraska Supreme Court acted unreasonably. It is unreasonable under § 2254(d)(2) for a court to incorrectly modify governing precedent. *Williams*, 529 U.S. at 391 (rejecting an outcome-determinative consideration of prejudice and holding that "[t]he Virginia Supreme Court erred in holding that our decision in *Lockhart* [] (1993) modified or in some way supplanted the rule set down in

282

*Strickland*"). Because the Nebraska Supreme Court's analysis failed to comply with AEDPA, this Court's assessment is *de novo*.

Galindo pursued this claim and requested discovery and a hearing. Doc. 30-43 pp. 95, 99-100. Galindo again requested discovery and an evidentiary hearing at the end of his Amended Petition. *Id.* p. 147 ("Granting an evidentiary hearing, leave to amend his motion, and an opportunity to conduct discovery prior thereto.")

On appeal, he reasserted the need for evidentiary development and challenged the process corrupted by the trial court's verbatim acceptance of the State's proposed findings. Doc. 30-23 pp. 40-41. On this allegation, Galindo argued that "The district court erred by denying an evidentiary hearing on Galindo's claim defense counsel provided ineffective assistance on appeal by failing to argue his trial objections regarding the (1)(d) aggravator." *Id.* pp. 96-97. He also generally requested an evidentiary hearing. *Id.* p. 106.

The state courts' rejection of any evidentiary process was heightened when the Attorney General, the party opponent, drafted the findings utilized by the trial court and affirmed by the Nebraska Supreme Court. The Supreme Court in *City of Bessemer*, 470 U.S. at 572, "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of conclusory statements unsupported by statements to the record." In *Jefferson*, 560 U.S. at 293-94, the Court reiterated its criticism of adopting verbatim findings, remanding a capital case where a trial court simply adopted State's findings. Galindo raised this as error on appeal and the Nebraska Supreme Court failed to address it. Doc. 30-23 pp. 40-41.

283

Consequently, Galindo has exercised the requisite diligence and satisfied 28 U.S.C. § 2254(e)(2). As noted by the Supreme Court, Galindo's attempts satisfy the (e)(2) diligence requirement. *Williams*, 529 U.S. at 435, 437. The failure to develop facts in the state court rests with the trial court's verbatim acceptance of the Attorney General's proposed findings without any evidentiary process. This Court should permit an evidentiary process prior to determining the merits.

The Nebraska Supreme Court's treatment of this claim was an unreasonable application of clearly established Supreme Court law and/or an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ and order a new aggravation and/or sentencing proceeding. Alternatively, this Court should permit discovery and/or a hearing to assess the performance and the prejudice prongs *de novo*.

**Claim 26: Mr. Galindo was deprived of his rights to the effective assistance of counsel, due process of law, and to be free from cruel and unusual punishment under the Sixth, Eighth, and Fourteenth Amendments due to counsel's ineffectiveness at all stages of trial.**

Trial counsel provided ineffective representation throughout each stage of Galindo's trial in a manner that prejudiced him, depriving him of the right to effective counsel guaranteed by the Sixth Amendment. Each instance of ineffective assistance of counsel alleged in Galindo's Amended Petition was prejudicial on its own. While Galindo agrees with Respondent that the Eighth Circuit does not recognize cumulative error in addressing prejudice, *Strickland* requires consideration of the "totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695.

The "totality of the evidence" includes consideration of the full picture of the trial and sentencing proceeding, while still requiring each instance of ineffective assistance of counsel to be prejudicial in its own right. As the Court explained in *Strickland*, "Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." *Id.* at 696. Considering the totality of the evidence, each of trial counsel's errors constituted deficient performance that prejudiced Galindo. *Strickland*, 466 U.S. 668; *Cronic*, 466 U.S. at 657; *see also Baer*, 879 F.3d at 782–88.

As Respondent contends, this claim is procedurally defaulted. Doc. 46 p. 139. However, Galindo can show under *Martinez* that the claim is substantial, that post-

285

conviction counsel's ineffectiveness was the cause of the default, and that Galindo was prejudiced by counsel's failure to raise the claim in state court, such that the default should be excused.

### A. Prejudicial opening and closing statements

At each phase of Galindo's trial, defense counsel began his opening and closing statements before the jury and sentencing panel with an apology. He apologized to the jury and the community for "putting everybody through this" and said he did not "do this lightly" and that it was "the hardest thing I've ever had to do." Doc. 31-4 pp. 182-183. In closing, counsel said that they "unfortunately" had to "go through a jury trial" for the process to work, but confessed that "[q]uite frankly I don't want to be here, and I'm quite sure you don't want to be here, and I know for a fact that the families of the victims don't want to be here, and once again I'll apologize for that, that any of us have to go through that, that Madison County has to go through it." Doc. 31-8 pp. 80-81. Throughout the later stages of trial, counsel repeated his apologies and the refrain that no one—including him—wanted to participate in the trial but "unfortunately" the system required it. Doc. 31-10 p. 55; Doc. 31-11 p. 63.

### 1) The claim is substantial

"[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" *Cronic*, 466 U.S. at 656. (quoting *Anders v. California*, 386 U.S. 738, 743 (1967)). Therefore, "the right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic*,

286

466 U.S. at 656. That right, under the Sixth Amendment, is "fundamental and essential to a fair trial." *Gideon v. Wainwright*, 372 U.S. 335, 342 (1963) (internal citations omitted). "[C]ounsel's function . . . is to make the adversarial testing process work." *Gabaree*, 792 F.3d at 997 (quoting *Strickland*, 466 U.S. at 688).

When a defendant's own attorney repeatedly tells the jury and sentencing panel he does not want to be there, apologizes for "putting everybody through" the trial the defendant is constitutionally entitled to, and indicates the reason they are there is only to "make the process work right," counsel is not acting as an advocate for his client. Instead, counsel sends a clear message to the decision-makers that the defendant is harming them and the community for exercising his right to a jury trial and that it is a formality they must endure. Respondent contends Galindo takes counsel's remarks out of context, but the additional remarks Respondent cites do not cure defense counsel's statements. While defense counsel said he was not apologizing for "the jury trial itself" and lauded the US system of jurisprudence, Doc. 46 pp. 140, 142, the overall message he conveyed to the jury was that he believed Galindo was harming the community by exercising his rights under the Constitution.

While counsel may have intended, as Respondent suggests, to curry favor with the jury and the sentencing panel by making these arguments, his actions fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Respondent cites to *Yarborough v. Gentry*, 540 U.S. 1, 9 (2003), but defense counsel's comments in closing in that case vary significantly from what defense counsel repeatedly conveyed to the jury and panel in Galindo's case. In *Yarborough*,

287

counsel commented on the conflicting evidence, arguing that neither he nor the prosecutor could tell the jury who to believe and who was lying. 540 U.S. at 2-3. The theme of counsel's argument was that the jury, like the prosecutor and defense counsel, were not at the scene of the crime and did not know firsthand what actually happened. *Id.* at 4-5. Counsel mentioned some of his client's shortcomings that came out during trial to demonstrate to the jury that they did not matter to the question before them. *Id.* at 9. And while counsel questioned what the truth was, "there is nothing wrong with a rhetorical device that personalizes the doubts anyone but an eyewitness must necessarily have." *Id.* at 11.

Trial counsel's remarks in Galindo's case were of a completely different nature than those at issue in *Yarborough*, and the sentiment far more invidious. Unlike in *Yarborough*, defense counsel in Galindo's case was not commenting on the evidence or pointing out red herrings in the prosecution's case. He was not "personalizing the doubts anyone but an eyewitness" would have about the evidence or the truthfulness of witness testimony. Rather, counsel was commenting on the fact of the jury trial itself and how damaging the experience was for him as well as the victims and the community. While he stated he did not "consider the Constitution a technicality," he conveyed the exact opposite—that he had to "address those issues" at each phase of the case and ultimately get "from point A to point B," even though it caused him and the community pain. Doc. 31-11 pp. 63-64. He was not apologizing for the "system" of jury trials, but he was apologizing that Galindo was forcing him and the community to withstand that system and "put[] everybody through this." Doc. 31-4 p. 182. Putting himself in a position of currying

288

favor with the jury to the detriment of his own client was an objectively unreasonable and damaging strategy, if it was a strategy, because it undermined the adversarial process and the right to counsel Galindo was constitutionally guaranteed. *Cronic*, 466 U.S. at 656; *Anders*, 386 U.S. at 743.

This prejudiced Galindo in the eyes of the jury and the sentencing panel. There was already considerable negative community sentiment surrounding the trial and the defendants, *see* Habeas Claim 1, and defense counsel played directly into that, conveying that even he believed Galindo was compounding the harm caused by the offense by exercising his right to a jury trial—even if the "system" permitted it. The comments also implied that it was Galindo's fault the community was being put through the trauma of a trial, which was both improper and untrue.

For these reasons, Galindo can show that his claim has "some merit"; that it is, at a minimum, "debatable among jurists of reason." *Harris v. Wallace*, 984 F.3d 641, 648-49 (2021). The claim is therefore substantial under *Martinez*.

B. *Failure to cross-examine and impeach State's witnesses*

   1) *The claim is substantial*

The hallmark of the Sixth Amendment right to the effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Cronic*, 466 U.S. at 656. "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Id.* at 657. Indeed, "[w]hile a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." *Id.* (internal quotations

289

omitted). The Supreme Court has emphasized that the right implicates "the ability of the accused to receive a fair trial." *Id.* at 658.

One of the examples the Supreme Court gave of a quintessential violation of this right is when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," including failure to effectively cross-examine witnesses. *Id.* at 659 (citing *Davis v. Alaska*, 415 U.S. 308, 316 (1974)). Indeed, "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis*, 415 U.S. at 316. Cross-examination is so important to the adversarial process that the Court has held a trial court's denial of the right to adequately cross-examine witnesses "would be constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Id.* at 318 (citing *Brookhart v. Janis*, 384 U.S. 1, 3 (1966)); *see also California v. Green,* 399 U.S. 149, 158 (1970) (referring to cross-examination as "the greatest legal engine ever invented for the discovery of the truth") (citations omitted).

Despite the clear importance of subjecting the prosecution's case to adversarial testing at trial, defense counsel only sporadically cross-examined the State's witnesses at every stage of the trial. In total, the State presented testimony from 86 witnesses across the guilt and penalty phases of the trial; defense counsel cross-examined only 20 of them.

Confoundingly, two of the witnesses counsel failed to cross-examine were Scott Strode and Brad Nelson, who claimed in rebuttal to the mitigation presentation that Galindo was a leader in prison and a danger due to his alleged

290

gang membership. Doc. 31-15 pp. 2-16. The testimony by the two witnesses suggested that Galindo—who at the time spoke little English—was in a "leadership role" due to his "attempts to communicate" with other Hispanic inmates, Doc. 31-15 pp. 2-4, and that Galindo escalated an argument between a Black inmate and a Hispanic inmate by standing near another Hispanic inmate. Doc. 31-15 pp. 15-16. Both witnesses admitted they had not been around Galindo for long—Strode had spoken to him once and Nelson had been on his unit a "few" times—yet they were permitted to testify to Galindo's alleged leadership and dangerousness without defense counsel offering any pushback at all against their claims.

Respondent points out that counsel objected to the testimony and moved to strike it. Doc. 46 p. 144. This only supports Galindo's position. Clearly, counsel realized this testimony was damaging and baseless, such that he objected to it. There is no fathomable reason why counsel would not also subject it to even a modicum of adversarial testing through cross-examination, to demonstrate its baselessness to the sentencing panel. *See Gabaree*, 792 F.3d at 998 (counsel's failure to act in accordance with her own purported strategy was unreasonable).

Counsel also inexplicably conducted no cross-examination of the baseless and racially charged testimony by Donnie Thorson about Galindo's alleged participation in the Deets Furniture store theft. Despite the police reports that reveal Thorson believed Adam Lantz was heavily involved in the theft and Lantz never identified Galindo as one of the "Hispanic subjects" who threatened Lantz, Thorson was permitted to testify, with no cross-examination to challenge his testimony, that Lantz was "probably one of the most scared people I've ever dealt with in any of my

291

investigations in the last nine years as an officer." Doc. 31-15 p. 21. *See* Habeas Claim 20. This was especially unreasonable given that the police reports of the furniture theft were provided to counsel with the PSI, *see* Doc. 25-3 pp. 42-65, and because counsel had previously filed an objection to sentencing determinations, including the State's intent to use the Deets Furniture incident to support an aggravating factor. Doc. 30-36 p. 60.

Trial counsel also failed to cross-examine the law enforcement officers who testified that Galindo did not appear to be under the influence of methamphetamine upon his arrest, in contrast with the mitigation evidence counsel presented from Dr. Stalcup that Galindo was under the influence of methamphetamine. This fact was a major feature of the defense mitigation case. *Gabaree*, 792 F.3d at 998 (counsel's performance was deficient when she failed to object to improper testimony, inconsistent with her own purported trial strategy).

These witnesses all presented testimony that was highly questionable—particularly the testimony by Strode, Nelson, and Thorson—and rebutted by other evidence, such as the police records of the Deets theft and testimony by countless witnesses about Galindo being a follower. In addition to being ripe for questioning, the testimony was damaging to the mitigation case. There could have been no strategic reason for counsel not to subject those witnesses and their credibility to adversarial testing through cross-examination, and his failure to do so deprived Galindo of a meaningful adversarial process. *Gabaree*, 792 F.3d at 998.

This was prejudicial. As detailed above, counsel's overall message to the panel and the jury was that he did not want to be there and Galindo was putting

292

everyone through a hardship by exercising his right to a trial; by failing to test witnesses whose sole purpose was to rebut the little mitigation evidence counsel put on, he both solidified that message and also conveyed that everyone, including him, was going through the motions. By treating a guilty verdict and death sentence as a foregone conclusion, it became a foregone conclusion. Failing to test the prosecution's witnesses on key mitigation issues went a long way in creating that result.

This claim has "some merit"; it is, at a minimum, "debatable among jurists of reason." *Harris*, 984 F.3d at 648-49. The claim is therefore substantial under *Martinez*.

C. *Failing to cross-examine and object to improper testimony by Dr. Jones and failing to move for a mistrial*

1) *The claim is substantial*

Like counsel's failure to cross-examine the prosecution's rebuttal witnesses, counsel failed to meaningfully subject the testimony of the prosecution's forensic expert, Dr. Jones, to adversarial testing. Dr. Jones testified multiple times throughout the guilt and aggravation phases; his testimony in the aggravation proceeding went far beyond the scope of what a forensic pathologist can properly attest to, inflaming the jury and urging them to imagine what the victims felt and were thinking as they died. Doc. 31-9 pp. 179-186. *See* Habeas Claim 27. The jury found each of the aggravating factors were proved beyond a reasonable doubt and the sentencing panel found each factor to be "significant and substantial." Doc. 30-36 p. 119. As Respondent notes, the panel stated it had "some concern with historic

293

questions surrounding the constitutionality of aggravating circumstance 1(c) which states that the murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence." *Id.* The panel went on to note that even if it disregarded that aggravating circumstance, the balance of aggravating and mitigating evidence would remain the same. *Id.* at 119-20.

However, disregarding the statutory aggravating circumstance does not equate to disregarding the *evidence* presented to the jury. Indeed, the jury heard Dr. Jones's harmful statements with no pushback from counsel by way of cross-examination or a motion for a mistrial, and the jury considered that testimony in its determination of the aggravating evidence. *See Gabaree*, 792 F.3d at 998. Likewise, that evidence remained available to the sentencing panel regardless of whether it considered the heinous, atrocious, and cruel aggravating factor. The damage of counsel's failure to subject Dr. Jones's exaggerated claims to any adversarial testing whatsoever infected the trial and sentencing notwithstanding the panel's consideration of the specific aggravating factor.

For these reasons, Galindo's claim has "some merit"; it is, at a minimum, "debatable among jurists of reason." *Harris*, 984 F.3d at 648-49. The claim is therefore substantial under *Martinez*.

D. *Failing to object to prosecutorial misconduct and move for a mistrial*

The underlying prosecutorial misconduct claims are addressed in Galindo's reply to Habeas Claim 27. For the reasons set forth there, defense counsel should have objected to the prosecutor's improper statements and misstatements. Like

294

counsel's other failures throughout the trial, his failure to do so amounted to a breakdown in the adversarial process, where the prosecutor's misdeeds were left unchecked before the jury and later the panel. For these reasons, this claim has "some merit"; it is, at a minimum, "debatable among jurists of reason." *Harris*, 984 F.3d at 648-49. The claim is therefore substantial under *Martinez*.

### E. *Incorrectly informing the jury it was counsel's decision whether Galindo would testify*

Respondent does not contest the erroneousness of defense counsel's statement to the jury that it was counsel's decision whether Galindo would testify, and the resulting implication that he did not do so because counsel believed him guilty. Doc. 46 pp. 155-56. Contrary to Respondent's contention that the erroneous statement did not prejudice Galindo because of the trial court's instruction, Galindo need not show a reasonable probability of a different outcome; rather, he must show that the attorney error "rendered the trial fundamentally unfair." *Marcyniuk*, 39 F.4th at 997. The court's instruction did not cure defense counsel's implicit communication to the jury that he believed his client to be guilty and therefore did not allow him to testify. That implication rendered the trial fundamentally unfair, especially considering the totality of the circumstances, including defense counsel's repeated apologies to the jury. This claim is therefore substantial under *Martinez*. *Harris*, 984 F.3d at 648-49.

### F. *Failing to move for a mistrial*

The substance of most of the underlying arguments are addressed in other sections of this Response. *See* Habeas Claims 7, 12, 20, 22, 27, 30. For the reasons

295

set forth in those sections and in Galindo's opening brief, there could have been no strategic reason for counsel not to move for a mistrial in the face of numerous incidents of prosecutorial misconduct, including misstatements of the evidence, presentation of false evidence, and exaggerated witness testimony. The pervasive, unchecked and uncontested instances of prosecutorial misconduct and court error effectuated a breakdown in the adversarial process. This breakdown, in a trial already rife with bias against the defendant and the impression that even defense counsel did not want to be there, rendered Galindo's trial fundamentally unfair. *Marcyniuk*, 39 F.4th at 997. These issues are, at a minimum, "debatable among jurists of reason" and the claim is thus substantial under *Martinez*. *Harris*, 984 F.3d at 648-49.

***

As to each of the issues raised within this claim, post-conviction counsel was ineffective for failing to raise trial counsel's ineffectiveness throughout the stages of trial in state post-conviction proceedings. Post-conviction was Galindo's first and only opportunity to raise ineffective assistance of trial claims, and Galindo had a statutory right to competent and effective post-conviction counsel under Neb. Rev. Stat. § 29-3004. Post-conviction counsel had tunnel vision and unreasonably focused his attention primarily on the aggravation evidence to the exclusion of meritorious claims. The ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (ABA Guidelines) provide useful assistance in determining the duties of counsel in capital cases. *Wiggins*, 539 U.S. at 524; *Williams*, 529 U.S. at 396; *Rompilla v. Beard*, 545 U.S. 384, 387 (2005).

296

Guideline 10.15.1C. provides,

> Post-conviction counsel should seek to litigate all issues, whether or not previously presented, that are arguably meritorious under the standards applicable to high quality capital defense representation, including challenges to any overly restrictive procedural rules. Counsel should make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review.

Guideline 10.15.1E.4. refers to the "ongoing obligation" to "continue an aggressive investigation of all aspects of the case." The Guidelines phrase "arguably meritorious" correlates closely with the substantiality standard of *Martinez*. Under the Guidelines, then, it is inappropriate for post-conviction counsel to fail to raise arguably meritorious claims.

For *Strickland* purposes, post-conviction counsel are most aptly compared to trial counsel. This is because post-conviction counsel—like trial counsel—are obligated to conduct a sweeping, independent investigation into the case. *See, e.g., Trevino v. Davis*, 829 F.3d 328, 347 (5th Cir. 2016); *Sullivan*, 837 F.3d at 1204-07. In performing a *Strickland* analysis, the reviewing court should not create strategic reasons not endorsed by counsel. *Harrington*, 562 U.S. at 108 ("[C]ourts may not indulge 'post hoc rationalization' for counsel's decision making that contradicts the available evidence of counsel's actions."). "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Davis v. Lambert*, 388 F.3d 1052, 1064 (7th Cir. 2004) (quoting *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990)). Any strategy attributed to post-conviction counsel should be

297

determined only after discovery and evidentiary development. *See Sasser*, 735 F.3d at 853-54. (citing *Trevino*, 569 U.S. 413).

For the above reasons, post-conviction counsel's ineffectiveness establishes cause to excuse the procedural default, and Galindo was prejudiced by counsel's failure to raise the claim in state court under *Martinez*. This Court is therefore not precluded from considering Galindo's claim.

Galindo has presented this claim and the evidence of post-conviction counsel's ineffectiveness in state court. As previously noted, Galindo continued to be represented by post-conviction counsel through the appeal to the Nebraska Supreme Court and the petition for writ of certiorari in the United States Supreme Court. Counsel's representation ended upon denial of certiorari and issuance of the mandate by the Nebraska Supreme Court, on December 20, 2024. Within one year of that termination, Galindo, through new post-conviction counsel, filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing. Neb. Rev. Stat. § 25-2001. In the alternative, Galindo asked the state court to construe his motion as a successive motion for post-conviction relief and grant an evidentiary hearing. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004. Galindo also asked the court to exercise its inherent equitable authority to reopen the proceedings. In support of his motion, Galindo moved to introduce into evidence the affidavits and expert reports that have been submitted in these federal habeas proceedings.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Galindo timely filed a notice of appeal to the Nebraska Supreme Court, and the case has been docketed under Case Number S-26-400. Briefing has not yet been initiated but the Bill of Exceptions and Transcripts, including Galindo's motion and exhibits, have been filed.[40]

Galindo could not have filed his state court motion while prior post-conviction counsel continued to represent him, as it is well-settled that counsel cannot raise claims of ineffective assistance of counsel against himself. *Jaeger*, 970 N.W.2d at 764. Galindo diligently filed his motion in state court after procuring new post-conviction counsel, who needed to get up to speed on the complex procedural history and voluminous record. While the district court denied Galindo's request to reopen the proceedings or grant an evidentiary hearing, the correctness of that denial remains to be litigated in the Nebraska Supreme Court.

This procedure distinguishes Galindo's case from the recent decision in *Torres v. Jeffreys*, 17-cv-03078-RFR-MDN (Doc. 133). There, in discussing *Martinez*, the court noted that "none of the potential evidence cited to support the [claim] was part of the state-court record, and because Torres did not seek to develop it in this federal case, . . . this Court cannot consider that potential evidence when determining if the [claim] is substantial." *Id.* p. 35. Unlike in *Torres*, Galindo

---

[40] Galindo will move this Court pursuant to Habeas Rule 5 to expand the record to include the Nebraska Supreme Court filings.

299

presented the wealth of mitigating circumstances evidence and the evidence of trial counsel's ineffectiveness in state court. Thus, § 2254(e)(2) does not preclude this Court from considering the evidence of Galindo's traumatic adversity, exposure to neurotoxins, and other mitigating circumstances, nor is this Court precluded from addressing trial counsel's ineffectiveness for failing to investigate such mitigating circumstances evidence in this capital case.

**Claim 27:    The state committed numerous instances of prosecutorial misconduct throughout Mr. Galindo's trial, depriving him of the rights to due process and a fair trial and to the effective assistance of counsel under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution.**

The Eighth Circuit has established a two-part test for considering prosecutorial misconduct: "(1) the prosecutor's remarks or conduct must have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." *United States v. Conrad*, 320 F.3d 851, 855 (8th Cir. 2003). The question at issue in determining prejudice is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The Eighth Circuit considers three factors to determine prejudice: "(1) the cumulative effect of such misconduct; (2) the strength of the properly admitted evidence of the defendant's guilt; and (3) the curative actions taken by the court." *Conrad*, 320 F.3d at 855.

As part of the inquiry into whether statements are improper, courts must recognize the special character of a prosecutor's statement, which "carried with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005) (citing *United States v. Young*, 470 U.S. 1, 18-19 (1985)). Moreover, "[t]hey are also improper because the role of the prosecutor is not merely to pursue convictions, but to pursue justice." *Berger*, 295 U.S. at 88. "Accordingly, prosecutors may not inject their own testimony nor cast aspersions

301

upon the defendant through offhand comments, suggestions of conspiracy with defense counsel, nor personal attacks upon the integrity of defense counsel." *Holmes*, 413 F.3d at 775.

Here, the prosecutor vouched for the State's witnesses, denigrated the defense, and embellished and exaggerated evidence throughout all phases of the trial. It bears noting that this same prosecutor was being investigated for corruption and committed *Napue* violations at the time of trial. The Court would be remiss not to consider those issues in conjunction with the prosecutor's remarks throughout the case. *See* Habeas Claims 4, 6, 7, 21, 22.[41] Respondent contends most of the prosecutor's comments were not improper, and those that were improper were not prejudicial. Doc. 46 pp. 146-155, 160-161. Relevant precedent dictates otherwise.[42]

Respondent contends the prosecutor's comment about "dead defenseless females" and the emphasis on the victims' gender was truthful and not improper. Doc. 46 p. 148. But the prosecutor's comments were designed to evoke sympathy and an emotional response from the jury based on the particular vulnerability of these victims because they were female. The fact that some of the victims happened to be women was not relevant to the evidence in the case, and the only reason the

---

[41] Galindo is not asking this Court to cumulate these claims but to consider the comments in Habeas Claim 27 in the context of the totality of the case, including the evidence of the prosecutor's corruption and conflicts.

[42] Galindo raises numerous instances of the prosecutor's misconduct in his amended habeas petition. Habeas Claim 27. He responds to Respondent's arguments as to specific instances herein, and rests on his amended petition as to any statements not specifically addressed here.

prosecutor highlighted their gender was to emphasize how vulnerable they were due to that characteristic. This was an improper appeal to the jury's emotions and encouraged a bias-based conviction. *Viereck v. United States,* 318 U.S. 236, 247 (appeals to the jury designed to "arouse passion and prejudice" were "offensive to the dignity and good order with which all proceedings in court should be conducted.").

Respondent also claims the prosecutor's calls equating "fair and balanced justice"[43] with convicting Galindo were not improper because they merely urged a conclusion based on the evidence. Doc. 46 p. 148. Respondent makes similar arguments related to the prosecutor's comments about justice during the guilt phase closing arguments and the aggravation phase opening statements. Doc. 46 pp. 149, 151. But contrary to Respondent's arguments that the prosecutor made general references to the evidence, such references did not negate the overall message that the jury's duty and a fair trial meant a guilty verdict, which was part of the prosecutor's pervasive attempts to inflame the jury. *Conrad*, 320 F.3d at 855 ("the prosecutor's comments were not limited to one phase of the trial."); *cf. United States v. Obi*, 25 F.4th 574, 579 (8th Cir. 2022) (noting the prosecutor's statements came only during the government's rebuttal closing argument and focused on the facts of the case). Unlike in *Obi*, the prosecutor's attempts to inflame the jury were

---

[43] The phrase "fair and balanced justice" is also a callback to the judge's admonition at the beginning of jury selection. Doc. 30-50 p. 96. That admonition influenced the jurors into agreeing they could be fair and impartial despite their original affirmations that they could not, violating Galindo's due process and fair trial rights. *See* Habeas Claim 2. This callback by the prosecutor equating the principle of fair and balanced justice with conviction further exacerbated that harm.

303

pervasive, occurring throughout every phase. Furthermore, these attempts went outside the bounds of the facts of the case. *Holmes*, 413 F.3d at 776 (contrasting with case in which comment was "an isolated remark . . . made early in the trial").

Contrary to Respondent's arguments, the prosecutor's exaggerated and misleading statements about the evidence were improper. Doc. 46 pp. 152-153. The prosecutor speculated that Galindo would have killed three more individuals "but for happenstance." Doc. 31-16 pp. 61-62. While there was evidence that Galindo shot at the door when Micki Koepke started walking into the bank, there was no evidence that he made any attempts or intended to shoot Cahoy or Straehr. It is hard to imagine anything more harmful than a prosecutor's speculation that but for "happenstance" a defendant would have killed more people—and it *was* speculation, not based on the evidence. *Berger*, 295 U.S. at 84 (prosecutorial statements assuming prejudicial facts not in evidence are improper); *Young*, 470 U.S. at 8 n.5 (personal opinions by the prosecutor are "unsworn, unchecked testimony" and "exploit the influence of the prosecutor's office.").

The prosecutor's statement that Galindo's "bragging" in jail led to investigators finding Lundell's body, Doc. 31-16 pp. 90, was also misleading. It is perfectly clear that Galindo led investigators to Lundell's burial site in an attempt to cooperate with law enforcement, not to "brag." Doc 31-8 pp. 189-93. *Cf. Darden*, 477 U.S. at 182 (finding comments not prejudicial because they "did not manipulate or misstate the evidence."). There was no evidence to support the argument that bragging led investigators to Lundell.

304

The prosecutor's claim in opening statements before the aggravation phase that the jury had already decided two or three of the aggravators before any aggravation evidence was presented misled the jury and negated their important role in the aggravation phase. Doc. 31-8 p. 126. If it were simply enough to carry the jury's verdict in the guilt phase over to the aggravation phase, there would be no reason for an aggravation hearing at all. The aggravation phase is essential in a capital case in Nebraska, as it provides the eligibility and narrowing functions necessary under *Ring,* 536 U.S. 584 and *Hurst v. Florida,* 577 U.S. 92 (2016). In a case with multiple victims, for example, a finding of guilt in the culpability trial is not sufficient to fulfill the requirement that aggravating circumstances be found by a jury beyond a reasonable doubt; otherwise, the aggravation hearing would be a mere formality. That is precisely what the prosecutor's comments here communicated to the jury: that the aggravation hearing, and their constitutionally important role in it, was a mere formality because they had already found Galindo guilty of multiple aggravators in the culpability trial. That statement was legally incorrect and unconstitutionally misleading. *See United States v. Marin*, 31 F.4th 1049, 1055 (8th Cir. 2022) (misstating the law in prosecutor's closing argument is improper); *Kellogg v. Skon*, 176 F.3d 447, 451 (8th Cir. 1999); *see also United States v. Holt*, 161 F.4th 1253, 1266 (10th Cir. 2025).

Respondent rests several arguments on the idea that the prosecutor's comments were not improper because they were made in response to defense counsel's arguments. Doc. 46 pp. 150-151. But the Supreme Court has been clear that "the idea of 'invited response' is used not to excuse improper comments, but to

305

determine their effect on the trial as a whole." *Darden*, 477 U.S. at 182 (quoting *Young*, 470 U.S. at 12r). In *Young*, the Court addressed the prosecutor's inappropriate comments, which were a response to misconduct by defense counsel. The Court noted that the idea of an invited response "should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbates the tensions inherent in the adversary process." *Young*, 470 U.S. at 12. When defense counsel committed misconduct in his own statements, the prosecutor "went beyond what was necessary to 'right the scale'." *Id.* at 14.

That is not the situation here. The prosecutor's remark that "Doug's a good lawyer, he's done what he can for his client, he said everything nice he can say about his client," was not a response to misconduct by defense counsel; it was a comment on the fact that defense counsel performed a closing argument at all. Doc. 31-8 p. 85. That was how the prosecutor began his rebuttal closing statement, as soon as defense counsel thanked the jury and sat down. The prosecutor dismissed defense counsel's argument and improperly focused on defense counsel's performance. *See United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005.)(statements "highly improper because they improperly encourage the jury to focus on the conduct and role of Mr. Holmes's attorney rather than on the evidence of Mr. Holmes's guilt."). The idea that defense counsel had said "everything nice he can say" was also irrelevant speculation and opinion testimony by the prosecutor, who had no idea whether counsel might have more to say—particularly at a later mitigation hearing—and was instead offering his own opinion that there could be nothing else positive to say. *Young*, 470 U.S. at 8 n.5 ("Expressions of personal

opinion by the prosecutor are a form of unsworn, unchecked testimony"); *Berger*,

295 U.S. at 88 (assertions by the prosecutor of personal knowledge improper).

The prosecutor's other "invited response" is more egregious. Defense counsel

argued, in accordance with the evidence, that there was no direct evidence tying

Galindo to Lundell's murder. Greatly mischaracterizing defense counsel's argument,

the prosecutor claimed, "Doug has said in argument to you, look, Joe Smith can't

tell you every single detail about how Lundell died. Why? Because he says, why,

because we buried him so successfully, we hid that crime from the police and from

Joe Smith for nine months. And now, you know, we should profit from that." Doc.

31-10 p. 79. This was misconduct in multiple respects. First, it was not a proper

response to defense counsel's evidence-based and entirely appropriate argument

about the holes in the evidence surrounding the Lundell murder. *Young*, 470 U.S. at

12, 14; *Darden*, 477 U.S. at 182. It misconstrued counsel's argument and implied

misconduct on the part of defense counsel that was wholly inappropriate. *Holmes*,

413 F.3d at 775.

Second, the comment improperly focused on the prosecutor's personal role in

the case and his own knowledge instead of the evidence.[44] *Berger*, 295 U.S. at 88

("[I]mproper suggestions, insinuations, and, especially, assertions of personal

knowledge are apt to carry much weight against the accused when they should

properly carry none" due to prosecutor's position in a criminal case.); *Young*, 470

---

[44] This is somewhat ironic considering the evidence that the witnesses who testified about the Lundell murder did have personal connections to the prosecutor through the drug conspiracy for which he was investigated. *See* Habeas Claims 4, 6, 7.

U.S. at 8 n.5 ("Expressions of personal opinion by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment that should separate a lawyer from the cause being argued.").

Third, prosecutorial arguments assuming facts not in evidence or contrary to the evidence are improper—such as the idea that Galindo was attempting to profit from burying Lundell "so successfully" when in reality, it was Galindo who led investigators to Lundell's body, which is the opposite of trying to profit off of the burial. Doc. 31-8 p. 189. *Berger*, 295 U.S. at 84 (explaining that prosecutorial statements assuming prejudicial facts not in evidence are improper).

According to Respondent, the prosecutor's comments about how "good" and "nice" the police officers and other witnesses were and the repeated statements about Galindo and his co-defendants being "cowards" were not prejudicial. Doc. 46 pp. 147-148. Respondent likewise contends there is no impropriety nor prejudice from the prosecutor's tangent equating Lundell's death and burial with the Vietnam War and the millions of dollars spent by the United States to bring back "little pieces of dead bodies." Doc. 31-10 p. 83; Doc. 46 p. 152. Equating a deadly and divisive war with the Lundell aggravator was clearly calculated to inflame and to "arouse passion and prejudice." *Viereck*, 318 U.S. at 247.

Applying the Eighth Circuit's test, the prosecutor in Galindo's case committed prejudicial misconduct, contrary to Respondent's contentions. This Court considers the cumulative effect of the misconduct, and as the court noted in *Conrad*, here too, "the prosecutor's comments were not limited to one phase of the trial." 320

308

F.3d at 855. There, the prosecutor's improper comments took place during the opening statement and closing argument, and the prosecutor sought to elicit improper testimony from a witness. The "pervasiveness of the improper comments substantially impaired the defendant's right to a fair trial." *Id.* at 856; *Berger*, 295 U.S. at 89 ("[W]e have not here a case where the misconduct of the prosecuting attorney was slight or confined to a single instance, but one where such misconduct was pronounced and persistent, with a probable cumulative effect upon the jury which cannot be disregarded as inconsequential."); *see also Holmes*, 413 F.3d at 776 ("[I]mproper comments merit reversal [when] those comments, in the context of the trial as a whole, could reasonably have affected the jury's verdict.")

As in *Conrad* and *Berger*, the prosecutor's misconduct occurred throughout Galindo's trial, infecting and impairing his right to a fair trial. And unlike in *Graves v. Ault*, 614 F.3d 501, 508 (8th Cir. 2010), in which the court noted "there was no improper prosecutorial theme pervading the entire trial," there was such a theme in Galindo's case. It is also imperative to consider that "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19. This means that the prejudicial effect of a prosecutor's improper comments is twofold: (1) the argument encourages the jury to focus on matters not in evidence, and (2) the argument induces the jury—given the prosecutor's stature— to believe the prosecutor's opinion. *See Holmes*, 413 F.3d at 775-76.

The import of the prosecutor's misconduct did not only apply to questions of guilt in this capital case. Rather, the prosecutor's improper comments and

309

statements occurred throughout the multiple phases of the case, and prejudice must therefore be assessed not only with respect to guilt but to the death sentence imposed. While Respondent states that the death sentence would have been imposed without the Lundell aggravator and therefore any prosecutorial misconduct related to it is harmless, it is not possible to merely excise one aggravator and conclude lack of prejudice. *See* Doc. 30-4 pp. 72-73 (Papik, J., dissenting); *see also Joubert*, 399 N.W.2d at 252 ("[t]he balancing of aggravating circumstances against mitigating circumstances is not merely a matter of number counting but, rather, requires a careful weighing and examination of the various factors."). The cumulative effect of the prosecutor's misconduct throughout the trial and penalty phase "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643).

Respondent asserts the prosecutorial misconduct claims discussed herein are procedurally defaulted because he did not raise them on direct appeal. Doc. 46 p. 160. Galindo can demonstrate cause and prejudice for the default.

First, as explained in Habeas Claim 26, *supra*, trial counsel was ineffective for failing to object to the prosecutor's misconduct or move for a mistrial. In failing to preserve objections to these instances of misconduct, trial counsel also precluded himself from being able to raise the claims on direct appeal; he could not argue his own ineffectiveness for failing to preserve objections to the misconduct, and the claim was unexhausted for appellate review. As a result, post-conviction was the first opportunity the claims could have been meaningfully raised, yet post-

310

conviction counsel did not raise them. While *Martinez* does not explicitly apply to prosecutorial misconduct claims, that is of no moment here because Galindo has also asserted the ineffective assistance of trial counsel for failing to object to the misconduct here. *See* Habeas Claim 26. Those allegations can serve as cause and prejudice here.

Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. See *Barnett*, 904 F.3d at 631 (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness," *id*. (citation omitted), such as when "ignored issues are clearly stronger than those presented," *see Smith*, 528 U.S. at 288. Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Titus*, 2025 WL 384709, at *5 (citation omitted).

Post-conviction counsel focused most of his investigation and motion on the prosecutor's corruption and conflict of interest. Given that focus, there could have been no strategic reason to ignore the myriad improprieties by the prosecutor during the trial itself, and raising those issues could have only strengthened counsel's presentation of the prosecutor's widespread misconduct and corruption. It would also have provided evidence of the prejudice to Galindo wrought by the prosecutor's misdeeds.

The Nebraska Supreme Court faulted post-conviction counsel for not demonstrating that the prosecutor's conflict and corruption was not harmless; in

311

other words, that it actually affected the outcome for Galindo. Doc. 30-4 pp. 60-61. But the pervasive improper and prejudicial comments throughout trial, especially those related to the Lundell aggravator, demonstrate that the prosecutor's misconduct impacted the trial itself and prejudiced Galindo. This could only have supported post-conviction counsel's arguments about the prosecutor's corruption, and he thus provided ineffective assistance by failing to raise this claim in post-conviction proceedings.

Under this framework, Galindo can demonstrate cause and prejudice for the procedural default of his prosecutorial misconduct claim and this Court may properly consider the claim. Galindo has raised this claim in state court and thus § 2254(e)(2) does not preclude this Court from considering it here. After previous post-conviction counsel ceased representing him, Galindo filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing, raising this and other claims prior post-conviction counsel had failed to raise. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004.

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. It denied the request for evidentiary processes. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Contrary to Respondent's suggestion (Doc. 46 p. 130), Galindo has satisfied 28 U.S.C. § 2254 (e)(2) and controlling Supreme Court and Eighth Circuit precedent, because he has not "failed

312

to develop" the factual basis of these claims in state court. *Williams*, 529 U.S. 420; *Johnston*, 288 F.3d 1048. Galindo's requests were denied and therefore he is not barred from obtaining a federal evidentiary hearing—he diligently sought it, and any opportunity to present evidence or obtain a hearing in the state court proceedings was denied. *Johnston*, 288 F.3d at 1058. This Court may thus consider the merits of Galindo's claim.

**Claim 28:  Mr. Galindo's Due Process rights were violated when the State of Nebraska failed to comply with the Nebraska death penalty statute and provide notice of aggravators.**

The Nebraska death penalty statute means what it says on its face: the information must contain notice of the aggravation. Yet, the State did not comply with this mandate in Galindo's case. The Nebraska Supreme Court's failure to hew to the language and requirements of Nebraska's death penalty statute violated *Hicks*, 447 U.S. at 346 ("Where, however, a State has provided for the imposition of criminal punishment in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion*, cf. Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State."). Respondent properly concedes the argument is before this Court on the merits. Doc. 46 p. 168.

The Nebraska Supreme Court unreasonably cherry-picks which of the "procedural" rules to enforce. For instance, despite the death penalty not being available at the time of the crime, the court concluded that the legislative changes implemented by L.B. 1 were only "procedural" and could therefore be applied retrospectively to seek death against Galindo in the absence of a Constitutional statute. *See* Habeas Claim 35. However, despite the same retrospective language, other procedural aspects of the newly minted death penalty were not to be applied. Not surprisingly, anything that benefited Galindo—such as the requirement that

314

notice of aggravation be provided in the information—was not to be applied; only the "procedural" change of subjecting him to the death penalty was selected for enforcement.

The Nebraska Supreme Court's ruling cannot square the corners. The following chart notes how "procedural' became a sword to defeat Galindo's argument (that the state comply with the  information requirement), and a shield to protect state action (to subject him to the death penalty).

| Habeas Claim 28 | Habeas Claim 35 |
|---|---|
| "The notice of aggravation is a procedural rule, and while procedural statutes do apply to pending litigation, it is a general proposition that 'new procedural statutes have no retroactive effect upon any steps that may have been taken in an action before such statutes were effective. . . . All things performed and completed under the old law must stand.'"  Doc. 30-1 p. 23 (citation omitted) | "In contrast, the procedural statutes in effect on the date of a hearing or proceeding govern, and not those in effect when the violation took place."  Doc. 30-1 p. 14 (citation omitted) |

The unreasonable result is that Galindo is subject to the death penalty under a procedural statute "before it even existed" but the procedural safeguards enshrined in that statute are simultaneously withheld from him.

The Nebraska Supreme Court's failure to hew to the language and requirements of Nebraska's death penalty statute is contrary to and/or an unreasonable application of clearly established United States Supreme Court law and/or is premised upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The inconsistencies in the treatment of procedural nuances of

315

L.B. 1 demonstrate the unreasonableness of the court's ruling. The Court should grant the writ, vacate the convictions and death sentences, and remand for new proceedings in state court.

**Claim 29:   Mr. Galindo's rights under the Sixth, Eighth, and Fourteenth Amendments were violated when the State of Nebraska weighed non-statutory aggravators against mitigators.**

Galindo challenges the trial court's consideration of non-statutory aggravation not charged in the indictment and found by the jury. Respondent properly concedes the argument is before this Court on the merits. Doc. 46 p. 169.

Nebraska is a weighing state; it carefully specifies the aggravating circumstances that can be used in the death penalty weighing process. As such, Nebraska law prohibits consideration of non-statutory aggravating circumstances. *See Brown v. Sanders*, 546 U.S. 212, 217 (2006) (describing Court's jurisprudence related to weighing states, in which "the only aggravating factors permitted to be considered by the sentencer were the specified eligibility factors."). In its final sentencing order, the sentencing panel stated that it:

> [C]onsiders the non-statutory mitigating circumstance proffered by the defendant that the defendant cooperated with law enforcement personnel following his arrest. The panel determines that this mitigating circumstance does exist. This mitigating circumstance is offset, in part by the fact that the defendant does not demonstrate remorse for his actions. His cooperation has been tempered by his actions and behavior during his post-arrest incarceration. The panel gives this mitigating factor little weight in determining the sentences to be imposed.

Doc. 30-36 p. 119.

The lack of remorse was on the scale—it acted as non-statutory aggravation to refute non-statutory mitigation. This was impermissible under Nebraska's scheme. *See Brown*, 546 U.S. at 217. The Nebraska Supreme Court unreasonably determined the law and/or unreasonably determined the facts. *See* 28 U.S.C. § 2254(d)(1) and (2). The Court should grant the writ, vacate the death sentences,

317

and remand for new sentencing proceedings without the consideration of the non-statutory and prohibited aggravation.

**Claim 30:  Mr. Galindo was penalized for exercising his right to a jury trial in violation of *United States v. Jackson* and *Ring*.**

Galindo raises two arguments here: a *United States v. Jackson*, 390 U.S. 570 (1968) violation and a *Ring* violation. Nebraska's statutory scheme penalized Galindo for exercising his constitutional right to a jury trial. Simultaneously, it robs Galindo of the invocation of that right when it permits the panel of judges determining aggravating circumstances to make separate findings of fact as to which aggravating circumstances have been proven.

Respondent properly concedes that the *Jackson* violation is properly before this Court on the merits. Doc. 46 p. 40. Respondent hedges on the status of the *Ring* violation, stating it was "arguably" presented (*id*. pp. 40, 42) while noting the argument was made to the Nebraska Supreme Court. *Id*. p. 42. The record supports the claim was raised to the Nebraska Supreme Court:

> Beyond this, the process requires the judges to assign weights to the aggravators and the mitigators. The judges are in effect redefining or refinding the aggravators. This amounts to a violation of the constitution as outlined in *Ring*. The Supreme Court determined that because the aggravating factors operated as the functional equivalent of an element of a greater offense, the Sixth Amendment requires that they be found by a jury. Now, the Nebraska statutes provide, in effect, that these findings are to be re-weighed, re-found, or re-defined by the sentencing panel of judges.

Doc. 30-12 p. 68. There can be no legitimate argument that it was not raised – and therefore there can be no procedural default finding.

*A.  Jackson violation.*

Nebraska has a curious statute. The aggravating circumstances provided by statute contain multiple prongs and facts that may exist to support the existence of

319

aggravators. If a defendant waives a jury in the aggravation phase, they are entitled to specific unanimous fact-findings by the sentencing court regarding the facts considered in support of the aggravators being considered. Neb. Rev. Stat. § 29-2521(2). This provides the defendant the clarity of what they are up against (a unanimous determination of each "fact" in support of an aggravating circumstance made in writing)—but at the fundamental cost of a right enshrined in the English common law before the existence of our country: a jury determination in a capital case.

If a defendant asserts their right to a jury in the aggravation phase, however, they can be convicted of aggravating circumstances and face a death sentence by a non-unanimous jury as to the facts that support each aggravating circumstance. In other words, the jury only unanimously needs to find the aggravating circumstance exists, but it need not agree on which fact has been proven as to each aggravator. Nor do they make any written findings as to the facts the jury found to support the existence of a given aggravator. With no information as to which facts the jury found to support each aggravator, the sentencing panel—which was not the fact-finder in the aggravation phase—can then redefine and redetermine the aggravating circumstances on their own when they determine the balance of aggravating and mitigating evidence and the sentence. This runs afoul of both *Jackson* and *Ring* because it chills the exercise of the jury right, and it allow the three-judge panel rather than the jury to be the ultimate arbiter of the aggravating circumstances, which impacts the maximum punishment.

The Nebraska Supreme Court's denial of relief was contrary to or based on an unreasonable application of clearly established Supreme Court precedent or was an unreasonable application of the facts in Galindo's case. As Respondent noted, the Nebraska Supreme Court focused completely on the outcome determinative factors from *Jackson*, that waiving the right to a jury meant no death sentence would be available. Doc. 30-1 p. 21. Specifically, the Nebraska Supreme Court indicated that unlike in *Jackson*, here there was no "direct benefit" of "avoiding the death penalty" from the jury waiver. *See* Doc. 30-1 p. 21. While those were the precise facts in *Jackson*, limiting *Jackson* to its specific facts is an unreasonable circumscription of its holding and violates the underlying principle that a defendant may not be punished for asserting their right to a jury trial in a capital case.

In short, Galindo lost his *Jackson* claim, not because there are no penal aspects of the Nebraska statute as it relates to the exercise of a constitutional right—but because "it is a far cry from the advantage considered unconstitutional in *Jackson*." Doc. 30-1 p. 21.[45] Galindo agrees with the Nebraska Supreme Court's assessment that Nebraska does obtain an "advantage." What the Nebraska Supreme Court unreasonably suggests is that it is constitutionally acceptable to obtain that "advantage" under the Nebraska statutory framework because it is not *as stark* as the "advantage" gained in *Jackson*. That erroneous equivocation demonstrates the very unreasonableness of the Nebraska Supreme Court's ruling: it

---

[45] The Nebraska Supreme Court also relied on *Schad v. Arizona*, 501 U.S. 624 (1991), which has questionable value after *Hurst*, 577 U.S. 92.

321

is premised upon an acknowledgement that the *principle* underlying *Jackson* was violated.

This flouts the Supreme Court's jurisprudence prohibiting the imposition of a penalty "in a manner that needlessly penalizes the assertion of a constitutional right." *Jackson*, 390 U.S. at 583. In so holding, the Court explained that "[a] procedure need not be inherently coercive in order that it be held to impose an impermissible burden upon the assertion of a constitutional right." At minimum, Nebraska's statute "needlessly chill[s]" the exercise of Galindo's right to a jury. *See Jackson*, 390 U.S. at 582; *see Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional.")

The advantage gained by the State (again recognized by the Nebraska Supreme Court) impacts the very procedural safeguards enacted to protect the judicial process. Any advantage gained by Nebraska by the chilling of a defendant's exercise of his constitutional rights abrogates an individual's rights and tinkers with the rules that promote societal trust in our system of justice. It should be beyond doubt that a defendant may exercise their right to a jury trial. What a state cannot do is impose an advantage or punishment for the exercise of that constitutional right.

In conclusion, the Nebraska Supreme Court's ruling was objectively unreasonable. *Jackson's* legal principle was not so narrowly tailored as the court

322

suggests. Indeed, in *Bordenkircher*, 434 U.S. at 363, the Court explicitly stated that a state could not penalize a person's reliance on a constitutional right—indeed, it is "patently unconstitutional." There is no basis for accepting that the operation of Nebraska's death penalty statute can impose penalties against the defendant or "advantages" for the state in seeking death. This Court should thus vacate Galindo's death sentences and remand for new sentencing proceedings free of the taint of these patently unconstitutional procedures.

### B. *Ring violation.*

In Nebraska, the sentencing panel that was not the fact-finder during the aggravation hearing nonetheless acts as the ultimate fact-finder on aggravating circumstances when it reviews all the evidence from the aggravation proceedings, as well as evidence of aggravation contained in the presentence investigation report, and re-weighs, re-finds and redefines that evidence in determining what sentence to impose on a capital defendant. This violates *Ring*, because even when a jury determines the existence of aggravating circumstances initially, the panel of judges acts as the ultimate finder of aggravating circumstances, contrary to the Supreme Court's requirement that a jury be the fact-finder of any fact that could increase the maximum punishment from life to death, including aggravating circumstances. *Ring*, 536 U.S. at 609.

As Respondent agrees, the Nebraska Supreme Court did not address Galindo's *Ring* arguments. Doc. 46 p. 42. The Nebraska Supreme Court's failure to address a presented claim permits this Court to review it *de novo*. *See Wiggins*, 539 U.S. at 534 (reviewing prejudice *de novo* because the state courts never reached the

323

issue of prejudice); *Nooner*, 402 F.3d at 810 ("Because the Arkansas Supreme Court never reached the prejudice issue, we review that issue de novo."). Respondent's citation to the Nebraska Supreme Court's applications of *Ring* in other cases (Doc. 46 p. 43) do not suffice for AEDPA purposes.[46] This Court's review is *de novo*.

*Ring* requires that any facts necessary to increase the range of punishment must be proven beyond a reasonable doubt. Further, in *Apprendi*, the Court held that when the legislature has conditioned an increase in punishment on the assessment of certain facts, those facts must be found by the jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. In *Hurst*, 577 U.S. at 100, the Court recognized that because Florida law included the weighing step as a necessary factual finding, it was properly construed to be a death-eligibility finding. Such a designation implicates the Due Process Clause, which requires proof beyond a reasonable doubt of every fact necessary for a death sentence. *Apprendi*, 530 U.S. at 477 (citing *In re Winship*, 397 U.S. at 364).

Applying *de novo* review, this Court should grant relief on the *Ring* claim, vacate the death sentences, and remand for new aggravation and sentencing proceedings. Galindo's sentences of death were premised upon findings required under Nebraska law to be made by a panel of judges rather than a jury of his peers. *Ring*, 536 U.S. at 588–89. There can be no assurances that the evidence relied upon

---

[46] Although Respondent cites to the Nebraska Supreme Court's decision in *State v. Ellis,* 799 N.W.2d 267, 293-94 (Neb. 2011), it must be noted that Ellis did not raise the *Ring* claim in federal court in the same manner as Galindo, and the Magistrate Judge's Report and Recommendation in *Ellis v. Jeffreys*, Case No. 8:23-cv-00315-BCB-RCC, Doc. 62, does not address the contours of Galindo's *Ring* claim.

324

by the panel of judges is the same as that relied on by the jury, undermining the

role of the jury in determining the existence of aggravating circumstances.

**Claim 31: Mr. Galindo was deprived of his rights under *Caldwell v. Mississippi* when the State of Nebraska minimized the jury's role.**

Respondent rightly concedes that the trial court's *Caldwell* error is properly before this Court on the merits. Doc. 46 p. 74. Because the trial court improperly minimized the impact of the jury's crucial role in determining aggravators, the Nebraska Supreme Court unreasonably applied *Caldwell v. Mississippi*, 472 U.S. 320 (1985) and *Romano v. Oklahoma*, 512 U.S. 1 (1994). Further, the voir dire demonstrates the impact of the minimization; thus, there is also an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

There is no dispute between the parties as to the underlying facts about what the trial court asked. The dispute is the incompleteness of the trial court's questions, which functionally rose to the level of inaccurately informing the jury of their role. The court incorrectly failed to fully inform the jury that the finding of guilt does not automatically trigger the empanelment of a three-judge sentencing body.

Rather, Nebraska law dictates that a finding of guilty to first-degree murder presumptively results in a sentence of life without the possibility of parole. Neb. Rev. Stat. § 29-2520(1). It is only upon a ***further*** jury finding, in an ***additional trial proceeding***, of the existence of one or more aggravating factors that three judges are then empaneled to determine whether to sentence the defendant to death or to life without the possibility of parole. This is the type of misleading by a court (through omission) that the Supreme Court prohibits. *Romano*, 512 U.S. at 9.

326

The Court's statement also omitted the very significant task that the jury would inevitably undertake upon a finding of guilt—determining Galindo's eligibility for a death sentence. After *Ring*, the determination of aggravators is arguably more critical than the sentencing panel's ultimate sentencing determination because the sentencing panel has no discretion to sentence a defendant to death absent a jury determination of at least one aggravator. To underscore the jury's importance in sentencing: the jury is responsible for the only portion of sentencing proceedings requiring alleged facts to be proven beyond a reasonable doubt.

*Romano* clarified that, "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the *jury improperly described the role assigned to the jury by local law.*" 512 U.S. at 9 (emphasis added). The trial court here did exactly that—it improperly described the jury's role under local law in a way that significantly misled the jury to believe that it played no role in Galindo's sentencing determination. The jury did—they opened the door to the death penalty sentencing process.

The Nebraska Supreme Court indicated that there is no "catechism" to employ. Doc. 30-1 p. 36. However, that does not mean a trial court or a voir dire process is permitted to commit sins of omission. Omissions grow to the level of inaccuracies when they neglect to fully and accurately explain to potential jurors what their role will require them to do. *Id.* p. 35. This violated *Caldwell* and *Romano*.

327

Indeed, the court directly misstated Nebraska law when it incorrectly informed the jurors that a sentencing panel would in all cases take on the burden of sentencing Galindo if the jury found that he was guilty of first-degree murder. It omitted the fact that the jury's guilty verdict would automatically trigger an aggravation hearing, at which the **jury** would determine Galindo's eligibility for a death sentence—an essential step in the process to which the jury's role is critical. Only if the jury determined the existence of aggravating circumstances would a three-judge panel be formed. The unreasonableness of the Nebraska Supreme Court's ruling is that it leaves open the option for questions about jurors' ability to serve in a death penalty trial to be posed in the hypothetical so that the "existence or content" of a notice of aggravation is not disclosed, in accordance with the statute, but the jurors are left to answer those questions without knowing what their role will actually entail. What that statute cannot empower – but what nevertheless happened here –is a deliberate distortion of the jury's role in determining the presence of aggravators, which render Galindo death eligible.

It is unreasonable bordering on absurd that the Nebraska Supreme Court held that it was to Galindo's benefit to have no opportunity to voir dire his jurors on the phase that rendered him death eligible. *See* Doc. 30-1 p. 36. It is also severely illogical. The result suggested by the Nebraska Supreme Court's holding is that voir dire can touch upon on the first and third stages of the process, but not the second – the one in which the jury made Galindo death eligible. It is unreasonable to suggest that questions regarding the third phase, which does not involve the jury at all, can be asked (a doubly hypothetical step having occurred to get there) but questions

regarding the second phase, which does involve the jury, cannot. Such an upside-down outcome demonstrates the unreasonableness of the Nebraska Supreme Court's holding relative to *Caldwell* and *Romano*.

Respondent seeks to minimize the statements of a potential juror after receiving the lessening instruction. Doc. 46 p. 77 n.17. The statement of Juror 117 is significant and relevant because it is the only subjective statement by a juror regarding the impact of this instruction to the jurors, and contrary to Respondent's contention, Juror 117's statement proves Galindo's point. Juror 117 described the instruction as lessening his responsibility, precisely what is prohibited by *Caldwell*, when stating: "I was not comfortable on thinking that I would have to make that decision. . .. But knowing at this point in time that that not necessarily will be part of my duties, it's basically just to have a guilty or not guilty, and I guess that burden is left upon someone else if it is a guilty verdict, I am much more comfortable in being able to do my job I guess as a juror." Doc. 30-53 p. 177. Juror 117 specifically agreed that he "changed" his view of whether he could be a fair and impartial juror based on his understanding of the instructions, that he would only be determining guilt and "someone else" would decide the rest. *Id.* p. 178. While it was true he would not be tasked with determining the ultimate sentence, this left out the fact that as a juror he *would* be tasked with deciding whether Galindo was eligible for death in the aggravation phase—an essential step in the sentencing determination.

This error had a substantial and injurious effect. The court's reliance upon potential jurors' responses to this misinformation in jury selection failed to properly

identify for disqualification all those jurors who would impose a death sentence in every case where they found a defendant guilty of first-degree murder. It impeded Galindo's assessment to assure impartiality of the jury because he was deprived of the ability to question them about what their actual role would be in the process of potentially sentencing him to death, and whether they could do that fairly and impartially in light of what they were going to be asked to do. Nebraska's effort to hide from the jury the actual character of their role is unconstitutional, and the Nebraska Supreme Court's determination otherwise was contrary to or an unreasonable application of *Caldwell* and was based on an unreasonable determination of the facts. 28 U.S.C. § 2254(d)(1)-(2). This Court should grant the writ and order a new trial.

**Claim 32:   Mr. Galindo's Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights were violated when the State of Nebraska erroneously prohibited life qualification of the jury in violation of *Morgan v. Illinois.***

Galindo sought to "life qualify" the jury pursuant to *Morgan v. Illinois*, 504 U.S. 719 (1992). Respondent properly concedes the trial court error is properly before this Court on the merits. Doc. 46 p. 78.

To its credit, the Nebraska Supreme Court did not dispute that it was permissible to life qualify a jury. Doc. 30-1 p. 33. Instead, the court unreasonably held that *Morgan* does not apply in Nebraska capital cases because Nebraskan juries do not ultimately weigh the aggravating circumstances against the mitigating circumstances in a capital murder trial. *Id*. However, this distinction is meaningless because, as we know from *Ring*, it is the eligibility phase (i.e. the aggravation phase) that determines whether a death sentence is even on the table, particularly in Nebraska.

Respondent cites Justice Scalia to distinguish eligibility from selection. Doc. 46 p. 80. While this footnote does not control, it nevertheless supports Galindo's position. Justice Scalia relied on the voir dire that occurred in *Morgan* that addressed the eligibility question. *Morgan*, 504 U.S. at 742 n.1. Curiously, Respondent overlooks in their arguments related to Habeas Claim 31 that Galindo is prohibited from conducting the very voir dire Justice Scalia promotes. Galindo agrees that such voir dire could have addressed the concerns he raised in Habeas Claim 31.

Further, the Supreme Court seemingly did not intend for differences in sentencing schemes to dilute the effect of *Morgan*—the Court recognized there is not "any one right way for a State to set up its capital sentencing scheme." *Morgan*, 504 U.S. at 725–26. Instead, the Court's concern is whether a juror can follow a state's law. That is the precise concern here, because as noted, Juror 73 stated, "If he's found guilty of first-degree murder, I'm totally in favor of the death penalty." Doc. 31-2 p. 84. Respondent never addressed this evidence in its Answer.

While Nebraskan juries do not weigh the aggravators and mitigators or pronounce the ultimate sentence, jurors must determine the presence or absence of aggravating circumstances, i.e., the eligibility question. Because a jury's finding of aggravators is necessary for a defendant to face the death penalty, the jury's role should not be diminished. *See Caldwell*, 472 U.S. 320. Here, Galindo was eligible for the death penalty only after the jury determined the presence of aggravators. If a juror predetermined Galindo's eligibility for a death sentence due to vehement support for the death penalty, "the presence or absence of either aggravating *or* mitigating circumstances is entirely irrelevant" to their determination. *Morgan*, 504 U.S. at 729 (emphasis added). A juror inclined toward the death penalty would find the existence of aggravators just as one inclined toward death would find the aggravators outweighed the mitigators, as in *Morgan*.

The Nebraska Supreme Court announces an unreasonable application of *Morgan* and an unreasonable application of the facts. The Supreme Court reiterated that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether

332

the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Morgan*, 504 U.S. at 728 (*citing Wainwright v. Witt*, 469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)).[47]

The Nebraska Supreme Court's discussion of this claim cannot be squared with its citation to *Morgan* for the proposition that trial protections would be rendered "nugatory and meaningless" without a proper voir dire. Doc. 30-1 p. 33 (citing *Morgan*, 504 U.S. at 734). Similarly, Galindo's rights are nugatory and meaningless without the ability to ask a single question on this topic of the jurors that would render him death eligible.

This error had a substantial and injurious effect. Without Galindo's ability to life qualify jurors, when the state is allowed to death qualify, the trial court exposed Galindo to jurors whose personal sentiments were stirred up in favor of death, but prohibited him from exploring whether they would be driven by that belief in reaching their conclusions. The trial court's error impeded Galindo's ability to assure impartiality of the jury because he was deprived of questioning potential jurors accurately about what they were going to be asked to do. Nebraska's effort to hide from the jury the actual character of their role is unconstitutional. Because the Nebraska Supreme Court acted contrary to and unreasonably applied *Morgan*

---

[47] In a recent decision in *Torres v. Jeffreys*, 4:17-cv-03078-RFR-MDN, in response to the petitioner's argument, citing *Morgan*, that he was tried by partial jurors, the district court stated in a footnote that "*Morgan* is inapplicable here because the panel, not the jurors, undertook sentencing in Torres's case." Doc. 133 p. 77. This statement does not foreclose relief in Galindo's case, as Mr. Torres did not squarely raise a claim pursuant to *Morgan* and the district court's footnote is dicta.

and/or an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(1) and

(2). The Court should grant the writ, vacate the convictions and death sentences,

and remand for new proceedings in state court.

**Claim 33: Mr. Galindo's death sentence violated the Eighth Amendment because he was twenty-one years old at the time of the offense.**

Based on scientific evidence regarding brain development in twenty-one-year-olds, which reveals that the human brain does not fully mature until an individual's mid-twenties, Galindo is categorically ineligible for the death penalty under the Eighth Amendment. In 2005, after Galindo was sentenced to death, the Supreme Court held that the lack of maturity of persons under age eighteen prohibits the imposition of the death penalty for crimes committed before age eighteen because immature persons are less morally culpable than adults. *Roper v. Simmons*, 543 U.S. 551 (2005). The Court based its determination on the fact that youths, because of their diminished capacity to control and understand the consequences of their behavior, do not fall into the group of "offenders who commit a 'narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Roper*, 543 U.S. at 568 (quoting *Atkins*, 536 U.S. at 319).

After deciding *Roper*, the Court continued to consider the brain development of young people, recognizing that "youth is more than a chronological fact," and the adolescent brain is not yet fully formed in areas such as impulse control, advance planning, and risk avoidance. *Miller v. Alabama*, 567 U.S. 460, 476 (2012); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) ("developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds"). The premise of Galindo's claim is on a consensus developing after the direct appeal.

335

In *Roper*, the Court also recognized that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper,* 543 U.S. at 574. This is in line with social science research that shows that "brain development continues well beyond the age of 18," into "young adulthood," into an individual's mid-twenties. Doc. 2-4 pp. 1–2. Young adults in their early twenties operate more like those of adolescents than fully developed adults. *See* John H. Blume et al., *Death by Numbers: Why Evolving Standards Compel Extending Roper's Categorical Ban Against Executing Juveniles from Eighteen to Twenty-One*, 98 Tex. L. Rev. 921, 930–31 (2020).

Respondent alleges the claim is procedurally defaulted because it was not raised on direct appeal, which post-conviction counsel stated in briefing to the Nebraska Supreme Court. Doc. 46 p. 161. But counsel was wrong, and the Nebraska Supreme Court wrongly found the claim procedurally defaulted. Direct appeal counsel was one and the same as trial counsel. *See Jaeger* 970 N.W.2d at 764. The Supreme Court's decision in *Roper* was not announced until after Galindo's sentencing; although it was announced before appellate counsel filed their opening brief, counsel could not raise a claim that had no basis in the trial record. Moreover, the argument to extend *Roper*'s categorical exclusion is based not only on *Roper* itself, but the Supreme Court's further recognition of the compelling brain science evidence in subsequent cases, including *Graham* and *Miller*, both of which were announced after the conclusion of Galindo's direct appeal. Thus, post-conviction was the first proceeding in which the claim could have been raised, and counsel was incorrect in arguing to the Nebraska Supreme Court that it could have been raised

336

earlier. The Nebraska Supreme Court was wrong to accept counsel's incorrect assertion.

A valid procedural default requires both an adequate and independent basis for the state procedural default. *Wainwright*, 433 U.S. 72; *Harris*, 489 U.S. at 262. The Nebraska Supreme Court's ruling cannot be adequate in that it violates a principle of Nebraska law. Under *Wainwright*, a state court ruling that a claim is procedurally defaulted can only be considered an "adequate" ground to bar federal habeas review if the state procedural rule in question is firmly established and consistently applied. *See Ford*, 498 U.S. at 423-24. This principle ensures that the procedural rule is not arbitrary or applied in a manner that violates the state's own legal principles. The adequacy of a state procedure presents a question of federal law. *Williams*, 873 F.2d at 1131. Here, the Nebraska Supreme Court ignored its own legal principle of *Jaeger*, and thus the procedural ground is not adequate—it is a departure from Nebraska law. The Nebraska Supreme Court's procedural default finding is therefore not based on an adequate and independent state law ground and does not bar this Court from considering the claim.

Because this claim presents a categorical exclusion from the death penalty under the Eighth and Fourteenth Amendments and it was raised at the first opportunity, by post-conviction counsel, this Court may consider the merits of the claim. Moreover, because the Nebraska Supreme Court merely accepted post-conviction counsel's erroneous concession that the claim was procedurally defaulted and did not otherwise address the claim, this Court reviews the claim *de novo. See* 28 U.S.C. § 2254(d)(1) and (2).

337

Prior to considering the merits, this Court should conduct a hearing and consider the irrefutable science underlying Galindo's claim. A hearing that did not occur in state court in spite of the request and therefore Galindo has satisfied 2254(e)(2). On the merits, the court should grant the writ, vacate the death sentences, and resentence Galindo to life without parole.

**Claim 34: Mr. Galindo was deprived of his rights under Article 1, Section 10, of the United States Constitution because L.B. 1 and the Repeal by Referendum of L.B. 268 are Bills of Attainder.**

    *A. L.B. 1 operates as a Bill of Attainder.*

Galindo raises two arguments here: that L.B. 1 and Referendum 426, repealing L.B. 268, are Bills of Attainder. Respondent correctly concedes that L.B. 1 is properly before this Court on the merits. Doc. 46 pp. 35-36.

The Nebraska Supreme Court failed to reasonably apply the law and/or the law to Galindo's facts. Respondent neglects to address the heft of Galindo's arguments in this regard. Respondent, like the Nebraska Supreme Court, simply does not dispute that the underlying crime created the impetus for L.B. 1, but contends it makes no difference. *See* Doc. 46 p. 38; Doc. 30-1 p. 20.[48]

Respondent ignores the basic precept (as the Nebraska Supreme Court did) that a bill of attainder need not name the specific people it targets and may affect a group of people. Even laws implicating prospective groups still target specific individuals when the bill levies a unique punishment to those individuals. *United States v. Brown*, 381 U.S. 437, 462 (1965); *Crain v. City of Mountain Home*, 611 F.2d 726 (8th Cir. 1979). Inconsistent with this principle, the Nebraska Supreme Court unreasonably rested its analysis on the basis that "it did not focus on any particular persons, but is properly focused on prohibited conduct applicable equally

---

[48] Galindo respectfully suggests that it is unquestionable that the bill's passage specifically targeted him and his co-defendants given that the retrospective application of the L.B. 1 hinged on a particular stage of the criminal process, the sentencing phase. In rushing to pass the bill and based on the language in it, it is clear the legislature wanted Galindo and his co-defendants executed.

339

to everyone" Doc. 30-1 p. 20. Even though the law at issue in *Brown* "inflict[ed] its deprivation upon more than three people," the Court still held it to be a bill of attainder because it specified (without naming) "the people upon whom the sanction it prescribes is to be levied." 381 U.S. at 461.

Respondent seeks the haven of an unreported federal district court opinion from Alaska to counter this principle. Doc.46 p. 38. AEDPA requires the clearly existing law to emanate from the Supreme Court. The State's authority does not trump the above principle from *Brown*, 381 U.S. 437.

Respondent suggests this legislative act only sought to defend Galindo's rights based on *Ring* and did not subject him to any higher penalty. Doc. 46 pp. 38-39. That simply is not true. L.B. 1 literally made the difference between life and death in the wake of *Ring*'s invalidating Nebraska's death penalty statute, and Nebraska marshalled all resources to effectuate that death sentence over Galindo. Galindo could only have been sentenced to life imprisonment under the statute in place at the time of the crime. As noted in Habeas Claim 35, such a punishment clearly falls within the *per se* category of legislation that inflicts punishment and meets the second prong of the bill of attainder analysis.

L.B. 1 is a Bill of Attainder because it was enacted specifically and expressly in response to the September 26, 2002, bank killings, targeted those involved in the crime, increased the punishment to which Galindo was subjected, and deprived Galindo of a defense that he had at the time of the crime. Galindo satisfies the three factors outlined by the Supreme Court in *United States v. Lovett*, 328 U.S. 303 (1946) and, thus, the State of Nebraska acted contrary to and/or unreasonably

340

applied clearly established Supreme Court law and/or unreasonably determined the facts. *See* 28 U.S.C. § 2254(d)(1) and (2).

### B. *Referendum 426 operates as a Bill of Attainder.*

Respondent suggests Galindo's argument regarding Referendum 426 is waived. Doc. 46 p. 36. Respondent omits relevant procedural history demonstrating that post-conviction counsel was ineffective pursuant to *Martinez* in waiving an issue endorsed as available by the Nebraska Supreme Court.

On December 4, 2017, Galindo joined a declaratory action related to the abolition of the death penalty filed in Lancaster County. On January 25, 2019, the state district court denied that action. The Nebraska Supreme Court affirmed the denial on procedural grounds. *Sandoval et al. v. Ricketts et al.*, 922 N.W.2d 222 (Neb. 2019). Critically, the Nebraska Supreme Court made the factual finding that "the other inmates have filed motions seeking postconviction relief. Each has raised the assertion that his death sentence or sentences are unconstitutional and void under L.B. 268." *Id.* at 226. In arguing for a procedural default, Respondent highlights the blatant error by the Nebraska Supreme Court, ***as well as*** a blatant error by post-conviction counsel.

The Nebraska Supreme Court acknowledged the available remedy to raise claims related to L.B. 268. There had to be some efficacy to the claims; otherwise there would be no basis to provide a remedy. The Nebraska Supreme Court noted the viability of these claims and the proper procedure to raise them on January 25, 2019. *Sandoval et al.*, 922 N.W.2d 222. Inexplicably, despite this notice, post-

341

conviction counsel failed to raise this claim only a couple months later in his Amended Motion. *See* Doc. 30-43.

The claim did not exist at the time of trial or on direct appeal, as Respondent acknowledges. It was analogous to a trial ineffectiveness claim because it could only be raised in state post-conviction. *See Jaeger*, 970 N.W. at 764 (2022).[49] Nebraska's rules and procedural requirements are consistent with the federal approach announced by the Supreme Court in *Massaro v. United States*, 538 U.S. 500 (2003). Thus, post-conviction counsel doubly erred—not raising a claim instructed to be raised pursuant to a certain remedy by the Nebraska Supreme Court and failing to abide by a settled principle of Nebraska law to raise a claim at the first available opportunity. The fact that this claim is "newly ripened" and could only be raised in state post-conviction permits it to proceed pursuant to *Martinez.*

Galindo presents a substantial claim. Referendum 426 placed into the hands of the electorate that which is reserved specifically to juries, lacking the constitutional safeguards and "particularized consideration" that accompany the penalty phase of a trial. The Framers sought to prevent this kind of legislation when they instituted bans on bills of attainder. The Court should address this claim pursuant to the *Martinez* gateway due to post-conviction counsel's ineffectiveness and grant the writ and resentence Galindo to life without parole.

---

[49] Respondent may complain that *Jaeger* is a 2022 case; however, the thread of this principle goes at least as far back as *State v. Bazer*, 751 N.W.2d 619 (2008).

**Claim 35: Mr. Galindo's *ex post facto* and due process rights were violated when the State of Nebraska sentenced him to death even though the death penalty statute was declared unconstitutional at the time of the offense.**

Respondent is correct in its recounting of the history behind L.B. 1 and its temporal relationship to the crime – at the time of the crime there was no death penalty in Nebraska; it had been invalidated by *Ring*, 536 U.S. 584. Doc. 46 pp. 18-20. Yet, Respondent and the Nebraska Supreme Court unreasonably concluded L.B. 1 did not constitute a substantive change in the law, merely a procedural one. Because it falls into the third *Calder* category of *ex post facto* laws—it is a law that changed the punishment and inflicted a greater punishment than was attached to the crime of first-degree murder when Galindo entered the bank—it was unreasonably applied retroactively to Galindo.

## A. L.B. 1 is an *Ex Post Facto* Law.

Respondent goes to great pains in its brief to list each of the four *Calder* categories of *ex post facto* laws and to point out that it is this scheme to which the United States Supreme Court subscribes. Doc. 46 pp. 29–30. There is no dispute as to what the law recognizes as *ex post facto* laws that violate the Constitution. Respondent contends that L.B. 1 does not violate the Ex Post Facto Clause, but it relies entirely on the Nebraska Supreme Court's flawed reasoning and presents no independent argument or defense regarding the merits.

L.B. 1 falls under the third *Calder* category of *ex post facto* laws: laws that inflict a greater punishment for a crime than was provided for when the crime was committed. On June 24, 2002, the Supreme Court in *Ring*, 536 U.S. 584, held that

343

the Sixth Amendment entitled capital defendants to a jury determination of any fact on which the Legislature conditions an increase in their maximum punishment. This rendered Nebraska's capital sentencing scheme unconstitutional. *Ring*, 536 U.S. at 620; *see also* Doc. 46 pp. 18–19 (recognizing same). Because the scheme was held unconstitutional, there was no death penalty in effect in Nebraska once *Ring* was decided. Further, there was not even a pending legislative session for any proposed legislation to fix the constitutionally flawed death penalty sentencing scheme.

Over two months later, on September 26, 2002, Galindo, led by Sandoval, tragically entered the bank where multiple lives were lost. On that day, there was *still* no death penalty in effect because the state legislature had not remedied its capital sentencing scheme. It would be nearly another two months before the Nebraska legislature passed L.B. 1, which reinstated the death penalty—or at least was a second attempt to create a constitutionally sound capital sentencing scheme.

Because Galindo committed his crimes at a time when there was no constitutional death penalty in Nebraska, his death sentence pursuant to a law passed after the crimes (L.B. 1) that increased the punishment to death violates the *Ex Post Facto* Clause.

The Supreme Court has acknowledged that "[t]hrough th[e ex post facto] prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (abrogated on other grounds in *California Dep't of Corr. v. Morales*, 514 U.S. 499, 506 n.3 (1995)).

344

"Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Id.* at 30.

Galindo could not have been on notice that the death penalty was a possible punishment for murder in Nebraska since it had been held unconstitutional and therefore was not in effect on September 26, 2002. L.B. 1 was not passed—and therefore the absence of the death penalty had not been "explicitly changed"—until almost two months after that day. By definition, its application to Galindo constitutes an *ex post facto* law because it imposes the death penalty as a punishment for a crime for which it was not a punishment at the time of its commission. Imposition of the death penalty where before there was only the possibility of life imprisonment is "an increase in the possible penalty" and prescribes a punishment "more onerous than [provided for in] the prior law." *Dobbert v. Florida*, 432 U.S. 282, 294, 299 (1977).

This violation could not be more pronounced than in the Galindo retroactivity provision of L.B. 1 cited by the State. *See* Doc. 46 p. 19 n.8 ("shall apply to any…sentencing proceeding commencing on or after November 23, 2002.") Normally, a case commences upon its initiation, when it receives a case number, and the legal process begins. Tying the application of the bill to the commencement of the sentencing date and not the initiation of the case was a clear attempt to include Galindo and his co-defendants under the new law. Thus, the retroactivity

345

provision alone increased the penalty and prescribed a punishment more onerous than that which was applicable at the time of its commission.

"[E]ven if a statute merely alters penal provisions accorded by the grace of the legislature, *it violates the [Ex Post Facto] Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.*" *Weaver*, 450 U.S. at 30–31 (emphasis added). Thus, *Weaver* makes it clear that should a state legislature choose to employ such a process, that process is still capable of violating the *Ex Post Facto* Clause. Such is the case here. The law is being applied retrospectively to Galindo, and as established above, it is more onerous than the law that existed at the time of the crime, which provided only for life imprisonment in first-degree murder cases due to the *Ring* Court's ruling. When an *ex post facto* law is applied to a state prisoner, the "proper relief" is to apply the law in force at the time of the crime. *Id.* at 36 n.22. Therefore, Galindo's sentence should be altered to conform with the law at the time of his crime—his death sentence should be overturned and replaced with a sentence of life in prison.

### B. *Dobbert* is Not Applicable to this Case.

Galindo's case can be distinguished from *Dobbert* for the points on which Respondent and the Nebraska Supreme Court unreasonably rely. At the time Dobbert committed his crimes, the death penalty was provided for by statute. *Dobbert*, 432 U.S. 282. It had not been revoked or held unconstitutional. In contrast, there was no death penalty in effect in Nebraska on September 26, 2002, because it had been held unconstitutional by the United States Supreme Court over three

346

months earlier in *Ring*, and the state legislature had not yet passed a law that provided for the death penalty **and** was constitutional.

### 1) L.B. 1 is Not Comparable to the Statute at Issue in *Dobbert*.

When Dobbert committed murder, the Florida death penalty statute provided a mandatory death sentence for anyone convicted of capital murder unless a majority of the jury recommended mercy. Between the crimes and Dobbert's sentencing, the Florida Supreme Court found that the statute was inconsistent with *Furman*, so Florida passed a new death penalty statute. The new law provided that a capital defendant's sentencing hearing be conducted in front of both a judge and a jury. The jury, after considering any aggravating and/or mitigating circumstances, renders an advisory decision. The judge independently considers aggravating and/or mitigating circumstances before ultimately deciding the penalty. If the judge sentences the defendant to death, then the judge must issue written findings of fact regarding the aggravating or mitigating circumstances. A sentence of death is subject to automatic review by the state supreme court. *Dobbert*, 432 U.S. at 294-95.

On its face, L.B. 1 just reapportioned the responsibility of finding aggravating factors from the judge to the jury—nothing more. L.B. 1, however, *was* much more than that. L.B. 1 was Nebraska bringing its death penalty scheme into compliance with *Ring* and, therefore, back into the arena of constitutional laws. *Ring* entitled capital defendants to a jury determination of any fact on which the Legislature conditions an increase in their maximum punishment. Because Nebraska's law, at that point, instead provided for judicial determination of aggravating circumstances, the *Ring* Court's dissent acknowledged that the majority's holding

347

meant that Nebraska's death penalty scheme was unconstitutional. *Ring*, 536 U.S. at 620 (O'Connor, J., dissenting). It remained unconstitutional for nearly five months (including the time in which this tragedy occurred), until the state enacted L.B. 1.

Although the change in laws in *Dobbert* and in this case may be similar, they are not comparable because the *effects of the change* are different. In *Dobbert*, Florida's death penalty scheme was still considered constitutional when Dobbert murdered his children. *See* 432 U.S. at 293-94. Therefore, the effect of the change in law on Mr. Dobbert was meaningless and merely procedural because he was always subject to the death penalty and had notice of such when he committed his offense. The new law did not change that. *Id.*

In contrast, Galindo committed his crimes during a time when he was ineligible for the death penalty because there was no death scheme in effect in Nebraska. The new law, applied retroactively to Galindo, changed this. The new law increased the available penalty for Galindo's crimes from life in prison to death. The two laws are not comparable. *Dobbert* is inapplicable to the present case and was unreasonably applied by the Nebraska Supreme Court.

### 2) *Dobbert* is Distinguishable in its Order of Events.

*Dobbert* is further inapplicable to this case because its order of events is opposite from those here. In *Dobbert*, the order of events was: (1) the death penalty was in effect, (2) Dobbert committed murder, and *then* (3) the state law imposing the death penalty was held invalid, and finally (4) the new law was passed. In Galindo's case the order was: (1) the death penalty was in effect, *then* (2) the state

348

law imposing the death penalty was held unconstitutional, and then (3) the crimes were committed and (4) the new *ex post facto* law was passed.

Thus, the *Dobbert* Court correctly noted that the death penalty statute in effect at the time Dobbert murdered his children provided him notice "of the penalty which Florida would seek to impose on him if he were convicted of first-degree murder." *Dobbert*, 432 U.S. at 298. That is not the case here. The critical difference is this: Dobbert committed his crimes while a valid death penalty was in effect in his state; Galindo's offense occurred when Nebraska's capital sentencing scheme was not in effect. Because the law had been held unconstitutional, Galindo had no notice that he would be eligible for the death penalty if he were convicted of first-degree murder. The two cases are not the same and it was unreasonable to equate them.

### 3) Unlike the Law in *Dobbert*, Nebraska's L.B. 1 was Not Merely a Procedural Change, but a Substantive One.

The *Ex Post Facto* Clause prohibits only laws that constitute a substantive change—not ones that are merely procedural in nature. *See Dobbert*, 432 U.S. at 293; *Collins v. Youngblood*, 497 U.S. 37, 45 (1990). Substantive changes in the law include any law that falls within the four *Calder* categories of prohibited *ex post facto* laws. *See Collins,* 497 at 45–46, 49.

As discussed above, L.B. 1 belongs in the third *Calder* category of prohibited *ex post facto* laws because it increases the punishment for a particular crime after that crime was committed. When Galindo participated in a bank robbery where people were killed, the highest available punishment for murder was life

349

imprisonment without parole. This is because the *Ring* Court had already invalidated Nebraska's death penalty statutes months before the crimes were committed. The state legislature only attempted to reinstate the death penalty after Galindo's case was initiated and ready to go to trial, months after the crimes were committed. The new law therefore increased the punishment for murder from life imprisonment to death. That was a substantive change under *Calder* that therefore cannot be imposed on Galindo.

However, Respondent maintains that L.B. 1 was merely a procedural change and therefore does not violate the *Ex Post Facto* Clause. Doc. 46 p. 35. A procedural change is one that changes the way "a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." *Collins*, 497 U.S. at 45. A procedural change in the law that disadvantages the defendant does not automatically violate the prohibition on *ex post facto* laws. *Dobbert*, 432 U.S. at 293; *Collins*, 497 U.S. at 45.

Respondent (as did the Nebraska Supreme Court) errs because "by simply labeling a law 'procedural,' a legislature does not thereby immunize it from scrutiny under the *Ex Post Facto* Clause." *Collins*, 497 U.S. at 46 (citing *Gibson v. Mississippi*, 162 U.S. 565, 590 (1896)). "[I]t is the effect, not the form, of the law that determines whether it is *ex post facto*." *Weaver*, 450 U.S. at 31. "The critical question is whether the law changes the legal consequences" of crimes committed before the law was enacted. *Id.* A statute that increases the penalty for a crime and then is retroactively applied is a substantive change in the law that violates the Constitution. *Calder*, 3 U.S. at 390-91; *Weaver*, 450 U.S. at 36; *Miller v. Florida*, 482

350

U.S. 423, 430, 434–36 (1987) (abrogated on other grounds in *California Dep't of Corr.*, 514 U.S. at 506 n. 3).

A law that increases the amount of time a prisoner must serve is a prohibited *ex post facto* law, not a merely procedural change. In *Weaver v. Graham*, Hoyt Weaver was sentenced in Florida to fifteen years for second-degree murder. *Weaver*, 450 U.S. at 25. At the time of his offense and sentencing, Florida law provided a formula to reduce prisoners' sentences in exchange for their good behavior. *Id.* at 26. The reductions for an eligible prisoner were "(a) Five days per month off the first and second years of his sentence; (b) Ten days per month off the third and fourth years of his sentence; and (c) Fifteen days per month off the fifth and all succeeding years of his sentence." *Id.* Two years into Weaver's sentence, the Florida legislature repealed this statute and replaced it with a new formula that decreased, but did not eliminate, good-behavior deductions. *Id.* Florida applied the law retroactively to all prisoners in its system. *Id.* at 27.

The *Weaver* Court found that the new law was retrospective and applied to Weaver's detriment because it lengthened the time he would have to stay in prison. *Id.* at 33. The Court rejected the State's contention that the change was "merely procedural" in nature, finding that "the new provision . . . does not merely alter procedures for [gain time] allocation." *Id.* at 36 n.21. Because the new statute was more onerous than the first, the Court held that the law was void as applied to Weaver. *Id.* at 35–36.

Sentencing a defendant using guidelines imposed after his crimes were committed when those guidelines increase the available punishment violates the *Ex*

351

*Post Facto* Clause—even when those guidelines are merely advisory. *Peugh v. United States*, 569 U.S. 530, 533, 545 (2013). Marvin Peugh was convicted of five counts of bank fraud, which he had committed in 1999 and 2000, but he was not sentenced until May 2010. *Id.* at 533–34. The Federal Sentencing Guidelines at the time the fraud was committed resulted in Peugh's sentencing range being thirty to thirty-seven months; however, the sentencing court applied the guidelines in effect at the time of the sentencing, which provided for a range of seventy to eighty-seven months. *Id.* at 534. *Peugh* held that this was an *ex post facto* violation under the third *Calder* category, even though the change was one of "procedural measures," because it enhanced the punishment for Peugh's crime retroactively. *Id.* at 550. The Court noted that the advisory nature of the guidelines was irrelevant. *Id.* at 545. It remarked that applying the new guidelines to Peugh "offended 'one of the principal interests that the *Ex Post Facto* Clause was designed to serve, fundamental justice.'" *Id.* at 534, 544.

The Court in *Dobbert* found that Florida's new provision was merely a procedural change and therefore did not violate the *Ex Post Facto* Clause. *Dobbert*, 432 U.S. at 292. The Court reasoned that the new law did not change "the quantum of punishment attached to the crime." *Id.* at 293–94. Galindo's case is the opposite; Nebraska's new law, L.B. 1, did exactly that—it changed the "quantum of punishment" by increasing the available punishment from life imprisonment to death. Losing one's life is the ultimate punishment. Life in prison still provides for small "mercies" in the face of losing one's freedom forever. The death penalty causes a prisoner to lose all things forever. It is undoubtedly an increase in punishment.

352

Because L.B. 1 increased the punishment for first-degree murder and was applied retroactively to Galindo, it is not a "merely procedural" change like the law in *Dobbert*. Instead, the law in Galindo's case aligns with those at issue in *Weaver* and *Peugh*.

Weaver and *Peugh* both made clear that the third *Calder* category of prohibited *ex post facto* laws remains in force. They both hold the line: increasing one's punishment by applying a new law to their acts that preceded the law is impermissible. Such action by the State is not "merely procedural" and it is an unreasonable application of the law to hold otherwise.

But, even if L.B. 1 constituted a procedural change, it was a change that substantively affected Galindo to his detriment. It did not just "create a . . . 'significant' risk of increasing the punishment" for Galindo's crime—it increased it. *See Peugh*, 569 U.S. at 541 n.4. Therefore, it is an *ex post facto* violation and cannot be applied to him. The Court has held this to be true even in scenarios where the measure at issue is advisory only.

The present case aligns with *Weaver* and *Peugh*; L.B. 1 increases the available punishment for the crime Galindo committed, and it applies that increased punishment retroactively. The Nebraska Supreme Court unreasonably applied clearly existing federal law holding to the contrary.

### 4) Unlike Florida in *Dobbert*, Nebraska Had No Death Penalty at the Time of the Crimes.

When Galindo entered the bank on September 26, 2002, Nebraska law did not provide for the death penalty. The state's death penalty sentencing scheme had

353

been held unconstitutional over three months earlier on June 24, 2002. *Ring*, 536 U.S. at 620. It was only two months after Galindo's crime occurred, on November 22, 2002, that Nebraska passed a new death penalty scheme. Even though this law was not in effect at the time of Galindo's crimes, and even though the new law increased the punishment available for the crime of murder, Nebraska still unreasonably imposed the death penalty on Galindo.

An unconstitutional law has no authority. *Marbury*, 5 U.S. at 173, 180; *Ex parte Siebold*, 100 U.S. 371, 376 (1879) (abrogated on other grounds by *Jones v. Hendrix*, 599 U.S. 465 (2023)). The Constitution is the "supreme law of the land," and only laws "made in *pursuance* of the [C]onstitution" are elevated to that status. U.S. Const. art. VI cl. 2; *Marbury*, 5 U.S. at 180 (emphasis in original). Laws "repugnant to the [C]onstitution" are void and therefore not law. *Marbury*, 5 U.S. at 177, 180.

Since Nebraska's death penalty scheme was held unconstitutional, it was void and had no authority at the time Galindo committed his crime. Because it was void and had no authority, ***there was no death penalty in Nebraska at the time of the crimes***. There could not be—there was no law so providing, because the only law which purported to provide for the death penalty was unconstitutional, and the state legislature had not yet enacted a constitutional death penalty scheme (and it would not do so for nearly another two months).

This represents another distinction from *Dobbert*. Dobbert also argued, as Galindo does, that there was no death penalty in effect at the time he committed his crimes. *Dobbert*, 432 U.S. at 297. However, the difference between *Dobbert* and

354

Galindo's case is again one of timing. Dobbert committed his crimes while a valid death penalty was "on the books" in Florida, providing him notice that death was a possible consequence for his actions. It was only *after* he murdered his children that the Florida Supreme Court found that the state's death penalty scheme was unconstitutional under *Furman*. A difference with a distinction, Galindo committed his crimes during a period when no death penalty law existed because the state's death penalty scheme had *already* been held unconstitutional.

### 5) *Dobbert* Is Distinguishable in the Timing of Events.

Respondent does little to address the importance of timing in this case, choosing to punt the issue to the Nebraska Supreme Court instead of arguing the point head-on. Doc. 46 pp. 34–35. This sidestep is understandable when the *Calder* categories of *ex post facto* laws are again reviewed:

> 1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a crime, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*.

*Collins*, 497 U.S. at 42 (emphasis in original). The *Calder* categories of *ex post facto* laws are emphatically about timing.

*Timing is literally the point of any* ex post facto *analysis and the nature of the prohibition itself.* Every *Calder* category of laws that violate the Constitution's *Ex Post Facto* Clause hinges on timing. They all deal with what happened before and after a law was enacted. The first category prohibits a law from making conduct

committed before its passing punishable after its passing. The second category forbids a law to make a crime greater after its passing than it was beforehand when the crime was committed. The third category bans a law that imposes a greater punishment for a crime after the law is passed than was imposed before, at the point the crime occurred, which was violated here. Finally, the fourth category prohibits laws that change the legal rules of evidence from what they were at the time a crime was committed to allow for less or different testimony after the crime was committed. *See Collins*, 497 U.S. at 42. *Ex post facto* violations inherently depend on timing. To say otherwise is not only unreasonable but borders on dissonance.

The import of timing is seen in *Dobbert*: because the Florida statute providing for the death penalty had not yet been held unconstitutional *at the time the crimes were committed*, the Court found that Dobbert had notice that the State of Florida had the power to impose the death penalty if he committed first-degree murder. *Dobbert*, 432 U.S. at 298. To the Court, this meant that the new Florida law "was [in] sufficient compliance with the ex post facto provision of the United States Constitution." *Id.*

Galindo, unlike in *Dobbert*, had no such notice because, as the Court itself noted in the *Ring* dissent, *Ring* rendered Nebraska's death penalty scheme unconstitutional. *See Ring*, 536 U.S. at 620 (O'Connor, J., dissenting). As discussed above, an unconstitutional law is void. There was no way for Mr. Galindo to have notice that he might be given the death penalty for his actions because *no death penalty existed at the time he committed his crimes*. This lack of notice leaves L.B. 1

356

squarely within the third category of laws that violate the Constitution's *Ex Post Facto* Clause; it changed the punishment for first-degree murder in Nebraska from life imprisonment to the death penalty—and there is no question that losing one's life is a greater punishment than living the rest of it in prison. Galindo's case cannot reasonably be compared to *Dobbert*.

The Nebraska Supreme Court's decision to ignore the importance of the specific facts in *Dobbert* compared to Galindo's case, instead cherry-picking "procedural" rules to enforce, was contrary to or an unreasonable application of clearly established federal law and/or an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(1) and (2). This Court should grant the writ, vacate the death sentence, and resentence Galindo to life without parole.

**Claim 36: Mr. Galindo's Sixth, Eighth, and Fourteenth Amendment rights were violated by the State of Nebraska when the district court did not receive and review sentencing orders from all Nebraska first degree murder cases for purposes of proportionality review.**

Galindo raises two arguments here: First, the Nebraska Supreme Court's approach to proportionality review is constitutionally flawed; and second, the trial court failed to consider proportional mitigating evidence. Respondent concedes that the arguments are properly before this Court on the merits. Doc. 46 p. 170.

> A. *Proportionality Review.*

Galindo will not revisit the reality that in Nebraska "[t]he obvious fallacy in this reasoning is that a death sentence cannot be 'greater than' or 'disproportionate to' another death sentence." *State v. Lotter*, 586 N.W.2d 591, 638 (Neb. 1998) (Connolly, J., concurring). The Eighth Amendment requires more than a results-driven comparison. Rather, the Due Process Clause entitles the defendant to "procedures that ensure that the right is not arbitrarily denied." *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir. 1994) (citing *Wolff*, 418 U.S. at 557).

The plain language of Nebraska's sentencing statute requires that the sentencing panel consider evidence related to the question of whether a death sentence in a particular case is "excessive or disproportionate to the penalty imposed in similar cases." Neb. Rev. Stat. § 29-2522(3).  The statute demands that the sentencing panel look at similar cases prior to deciding what penalty should be imposed, and then subsequently determine whether imposing the death penalty would be excessive or disproportionate based on a comparative analysis. The statute does not demand that those similar cases *only* be cases in which the death penalty

358

was imposed. As Justice Connolly pointed out, such a reading strains credulity and defeats the purpose of a proportionality review. Therefore, the Nebraska Supreme Court's engagement in rewriting a death penalty statute to deprive Galindo of due process is contrary to or an unreasonable application of clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

There has been a substantial and injurious effect here. Galindo has been deprived of a constitutionally sufficient proportionality review despite Nebraska's statutory requirement. This Court should reverse and remand to allow for this required review to be completed; and if such a review cannot be done, for the imposition of life sentences.

### B. Failure to Consider Proportionality as Mitigation.

The trial court's refusal to consider Galindo's proffered evidence of sentences imposed in similar cases is contrary to *Lockett*, 438 U.S. 586, and its progeny. *Lockett* held that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest capital case, not be precluded from considering, as a *mitigating factor* . . . any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604 (emphasis in original).

The "all but the rarest of cases" language demonstrates the unreasonable nature of the Nebraska Supreme Court's previous findings that the proportionality mitigation evidence could not be presented by Galindo.

In Galindo's circumstance, not only was the required preclusion of proportionality mitigation evidence not done in all but the rarest of cases—*it was*

359

*commonplace*. *See Lotter*, 586 N.W.2d at 638; *State v. Bjorklund*, 604 N.W.2d 169, 213 (Neb. 2000). Moreover, the trial court refused to consider other mitigating evidence, such as Galindo's youth, and refused to permit counsel to admit the Baldus report as mitigating evidence. *See* Habeas Claim 10. Thus, the Nebraska Supreme Court acted contrary to and/or unreasonably applied clearly established Supreme Court law. *See* 28 U.S.C. § 2254(d)(1).

The court went on to bend the rules the other way for the State. In denying relief on a challenge to the PSI's consideration (*see* Habeas Claim 11), the Nebraska Supreme Court noted: "We recognize that under Nebraska's sentencing scheme, the Nebraska Evidence Rules apply to evidence relating to aggravating circumstances. *But the Legislature did not provide that the Nebraska Evidence Rules shall apply to all evidence relevant to sentencing*. We have held that the *traditional rules of evidence may be relaxed following conviction* so that the sentencing authority can receive all information pertinent to the imposition of sentence. We conclude that this rule is still applicable to the sentencing phase of a capital trial except for evidence related to the finding of statutory aggravating circumstances." Doc. 30-1 p. 48 (emphasis added). The rules are relaxed in an unreasonable and inconsistent manner to permit the State to present its rebuttal evidence (it cannot properly be presented as aggravation because Nebraska only allows statutory aggravating circumstances, although it has an aggravating effect), while Galindo's mitigation presentation is unfairly constrained. The Nebraska Supreme Court's opinion thus baldly represents a "heads I win, tails you lose" situation for Galindo.

The Nebraska Legislature has already recognized that the sentences imposed in similar cases are "factors which may call for a less severe penalty." *See* Neb. Rev. Stat. § 29-2522(3). Yet when asked to enforce its own legislature's rule, the Nebraska Supreme Court unreasonably refused to do so. *See* 28. U.S.C. § 2254(d)(1)-(2). This Court should grant the writ, vacate the death sentences, and remand for a new sentencing proceeding.

361

**Claim 37:  The Nebraska Death Penalty Statute is unconstitutional on its face and as applied in Mr. Galindo's case in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution.**

This Claim has multiple sub-parts. Respondent has alleged all subparts are procedurally defaulted. Doc. 46 p. 171. Galindo stands on his briefing from the Amended Habeas with one exception; he respectfully withdraws any arguments related to *Hurst,* 577 U.S. 92, and withdraws Claim 37, Subsection (D). The State is correct that for some inexplicable reason post-conviction counsel raised and then failed to exhaust these constitutional challenges. This is further evidence of that counsel's ineptness.

The Nebraska Supreme Court wrongly found Habeas Claim 37, subparts A and B, to be procedurally defaulted because they were not raised on direct appeal. *See* Doc. 30-4 p. 10. In so doing, the Nebraska Supreme Court ignored both facts and law. Factually, direct appeal counsel had been trial counsel. Doc. 30-12 p. 1. They could not raise a claim they missed because they could not raise their own ineffectiveness. Thus, the claim and trial ineffectiveness related to the claim could only be raised in state post-conviction. *See Jaeger*, 970 N.W.2d at 764.

A valid procedural default requires both an adequate and independent basis for the state procedural default. *Wainwright*, 433 U.S. 72; *Harris*, 489 U.S. at 262. The Nebraska Supreme Court's ruling cannot be adequate in that it violates a principle of Nebraska law. Under *Wainwright*, a state court ruling that a claim is procedurally defaulted can only be considered an "adequate" ground to bar federal habeas review if the state procedural rule in question is firmly established and

362

consistently applied. *See Ford*, 498 U.S. at 423-24. This principle ensures that the procedural rule is not arbitrary or applied in a manner that violates the state's own legal principles. The adequacy of a state procedure presents a question of federal law. *Williams*, 873 F.2d at 1131. Here, the Nebraska Supreme Court ignored its own legal principle, recently reiterated in *Jaeger*, and thus the procedural ground is not adequate—it is a departure from Nebraska law.

Respondent will suggest that the Nebraska Supreme Court relied on Galindo's inept counsel saying this claim could have been raised on direct appeal. Counsel was wrong, just as the Nebraska Supreme Court was wrong to accept the erroneous statement.

Respondent suggests this Court should enforce a procedural default as to Habeas Claim 37, subsection (C). Doc. 46 p. 172. The State incorrectly suggests this should have been raised on direct appeal. This is refuted by the fact that trial counsel were direct appeal counsel. *See Jaeger*, 970 N.W.2d 751. Galindo has sought to exhaust this claim and has presented it to the state courts in a Motion to Vacate.

Trial counsel failed to preserve objections to these errors by the trial court and thus precluded himself from raising such errors on direct appeal, given that he could not raise his own ineffectiveness against himself. *Jaeger*, 970 N.W.2d at 764. As a result, post-conviction was the first opportunity the claims could have been meaningfully raised, yet post-conviction counsel inexplicably and erroneously conceded procedural default. While *Martinez* explicitly dealt with ineffective assistance of trial counsel claims, the reasoning underlying *Martinez* recognizes an equitable basis to excuse procedural default when post-conviction is the first

363

meaningful opportunity to raise a claim and post-conviction counsel, due to ineffectiveness, fails to raise the claim.

Post-conviction counsel is ineffective when "counsel was deficient and . . . counsel's deficient performance prejudiced" the client. See *Barnett,* 904 F.3d at 631 (citation omitted) (cleaned up). Representation is deficient when it falls "below an objective standard of reasonableness," *id.* (citation omitted), such as when "ignored issues are clearly stronger than those presented," *see Smith*, 528 U.S. at 288. Prejudice is shown when there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Titus*, 2025 WL 384709, at *5 (citation omitted).

Here, post-conviction counsel incorrectly conceded procedural default, ignoring the principle that, when trial counsel is also appellate counsel, ineffectiveness cannot be raised on direct appeal. This was ineffective and provides cause for any default under the logic of *Martinez*.

Galindo has raised this claim in state court and thus § 2254(e)(2) does not preclude this Court from considering Galindo's claim. After previous post-conviction counsel ceased representing him, Galindo filed a Motion to Vacate or Modify the District Court Judgment denying post-conviction relief without an evidentiary hearing, raising this and other claims prior post-conviction counsel had failed to raise. The basis for his state court motion was post-conviction counsel's ineffectiveness, which violated Galindo's statutory right to effective and competent counsel in post-conviction proceedings. Neb. Rev. Stat. § 29-3004.

364

The district court denied Galindo's motion to vacate and declined to exercise its inherent equitable authority to vacate or modify its prior judgment. It denied the request for evidentiary processes. The court denied the second or successive motion for post-conviction relief without an evidentiary hearing. Contrary to Respondent's suggestion (Doc. 46 p. 130), Galindo has satisfied 28 U.S.C. § 2254 (e)(2) and controlling Supreme Court and Eighth Circuit precedent, because he has not "failed to develop" the factual basis of these claims in state court. *Williams*, 529 U.S. 420; *Johnston*, 288 F.3d 1048. Galindo's requests were denied and therefore he is not barred from obtaining a federal evidentiary hearing—he diligently sought it, and any opportunity to present evidence or obtain a hearing in the state court proceedings was denied. *Johnston*, 288 F.3d at 1058. This Court may thus consider the merits of Galindo's claim.

**Prayer for Relief**

WHEREFORE, Mr. Galindo prays for the following relief:

1.    That discovery be granted as is necessary for a full and fair resolution of the

      claims contained in this petition;

2.    That an evidentiary hearing be conducted on all disputed issues of fact;

3.    That his convictions be vacated; be resentenced to life without parole; and

4.    That the aggravation findings be vacated;

5.    That his sentences be vacated; and

6.    That all other appropriate relief be granted.

Dated:  June 26, 2026

Respectfully submitted,

/s/ Meredith H. Schlacter
MEREDITH H. SCHLACTER
Assistant Federal Defender
Ny. Bar No. 5321625
/s/ Laurence  E. Komp
LAURENCE E. KOMP
Capital Habeas Unit, Chief
Mo. Bar No.  40446
Federal Public Defender,
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-675-0923
Laurence_Komp@fd.org
Meredith_Schlacter@fd.org

/s/ Tim Burdick
TIM BURDICK
Assistant Federal Defender
Mo. Bar No. 50116
Federal Public Defender,
District of Kansas
201 U.S. Courthouse
500 State Ave.
Kansas City, KS 66101
913-551-6712
Tim_Burdick@fd.org

*Counsel for Petitioner Jorge Galindo*

366

**CERTIFICATE OF SERVICE**

I hereby certify that on June 26, 2026, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by cooperation of the CM/ECF system.

/s/ *Meredith Schlacter*
Meredith Schlacter
Counsel for Petitioner